BOIES, SCHILLER & FLEXNER LLP
RICHARD J. POCKER (NV Bar No. 3568)
300 South Fourth Street, Suite 800
Las Vegas, NV 89101
Telephone: (702) 382-7300
Facsimile: (702) 382-2755
rpocker@bsfllp.com

BOIES, SCHILLER & FLEXNER LLP
STEVEN C. HOLTZMAN (*pro hac vice*)
BEKO O. REBLITZ-RICHARDSON
(*pro hac vice*)
1999 Harrison Street, Suite 900
Oakland, CA 94612
Telephone: (510) 874-1000
Facsimile: (510) 874-1460
sholtzman@bsfllp.com
brichardson@bsfllp.com

MORGAN, LEWIS & BOCKIUS LLP
THOMAS S. HIXSON (*pro hac vice*)
JOHN A. POLITO (*pro hac vice*)
NITIN JINDAL (*pro hac vice*)
One Market, Spear Street Tower
San Francisco, CA  94105
Telephone:  415.442.1000
Facsimile:  415.442.1001
thomas.hixson@morganlewis.com
john.polito@morganlewis.com
nitin.jindal@morganlewis.com

DORIAN DALEY (*pro hac vice*)
DEBORAH K. MILLER (*pro hac vice*)
JAMES C. MAROULIS (*pro hac vice*)
ORACLE CORPORATION
500 Oracle Parkway
M/S 5op7
Redwood City, CA 94070
Telephone:  650.506.4846
Facsimile:  650.506.7114
dorian.daley@oracle.com
deborah.miller@oracle.com
jim.maroulis@oracle.com

*Attorneys for Counterclaimant Oracle
America, Inc. and Defendant and
Counterclaimant Oracle International Corp.*

LEWIS ROCA ROTHGERBER LLP
W. WEST ALLEN (Nevada Bar No. 5566)
3993 Howard Hughes Parkway, Suite 600
Las Vegas, Nevada 89169
Telephone: (702) 949-8200
Facsimile: (702) 949-8398
WAllen@LRRLaw.com

SHOOK, HARDY & BACON LLP
B. TRENT WEBB (*pro hac vice*)
JOHN D. GARRETSON (*pro hac vice*)
RYAN D. DYKAL (*pro hac vice*)
PETER STRAND (*pro hac vice*)
LYNN C. HERNDON (*pro hac vice*)
2555 Grand Boulevard
Kansas City, Missouri 64108-2613
Telephone: (816) 474-6550
Facsimile: (816) 421-5547
bwebb@shb.com
jgarretson@shb.com
rdykal@shb.com
pstrand@shb.com
lherndon@shb.com

SHOOK, HARDY & BACON LLP
ROBERT H. RECKERS (*pro hac vice*)
600 Travis Street, Suite 3400
Houston, Texas   77002
Telephone: (713) 227-8008
Facsimile: (713) 227-9508
rreckers@shb.com

SHOOK, HARDY & BACON LLP
THOMAS DAMMRICH (*pro hac vice*)
111 South Wacker Drive, 51st Floor
Chicago, Illinois 60606
Telephone: (312) 704-7700
Facsimile: (312) 558-1195
tdammrich@shb.com

DEBEVOISE & PLIMPTON LLP
JAMES J. PASTORE (*pro hac vice*)
JOHN S. KIERNAN (*pro hac vice*)
919 Third Avenue
New York, New York  10022
Telephone: (212) 909-6000
Facsimile: (212)  909-6836
jjpastore@debevoise.com
jskiernan@debevoise.com

JOINT STATUS REPORT

DEBEVOISE & PLIMPTON LLP
JEFFREY P. CUNARD (*pro hac vice*)
555 13th Street, N.W.
Washington, DC  20004
Telephone: (202) 383-8000
Facsimile: (202) 383-9237
jpcunard@debevoise.com

RIMINI STREET, INC.
DANIEL B. WINSLOW (*pro hac vice*)
6601 Koll Center Parkway, Suite 300
Pleasanton, California 94566
Telephone: (925-264-7736)
dwinslow@riministreet.com
jreilly@riministreet.com

JOHN P. REILLY (*pro hac vice*)
3993 Howard Hughes Parkway, Suite 500
Las Vegas, NV 89169
Telephone: (336-402-4068)

*Attorneys for Plaintiff and Counter
Defendant Rimini Street, Inc., and Counter
Defendant Seth Ravin*

1    UNITED STATES DISTRICT COURT

2    DISTRICT OF NEVADA

3

| | |
|---|---|
| 4    RIMINI STREET, INC., a Nevada corporation; | Case No  2:14-cv-01699 LRH PAL |
| 5              Plaintiff, | **JOINT STATUS REPORT** |
| 6         v. | |
| 7    ORACLE INTERNATIONAL | [FILED UNDER SEAL] |
| 8    CORPORATION, a California corporation, | |
| 9              Defendant. | |
| 10 | |
| 11 | |
| 12    ORACLE AMERICA, INC., a Delaware corporation, *et al.*, | |
| 13              Counterclaimants, | |
| 14         v. | |
| 15    RIMINI STREET, INC., a Nevada corporation, *et al.*, | |
| 16              Counterdefendants. | |
| 17 | |

18

19

20

21

22

23

24

25

26

27

28

Plaintiff and Counterdefendant Rimini Street, Inc. and Counterdefendant Seth Ravin (together, "Rimini") and Counterclaimant Oracle America, Inc. and Defendant and Counterclaimant Oracle International Corp. (together, "Oracle"; all parties collectively, "Parties," any party, "Party") submit the following joint status report.

## I.   DISCOVERY PROGRESS

Since the last joint status report was filed on December 13, 2015, the Parties have made the following progress in discovery:

### A.   Documents Sought From and Produced By Oracle

#### 1.   Document Requests

On January 29, Rimini sent Oracle correspondence raising concerns regarding Oracle's responses to Rimini's First Set of Requests for Production.  To date, Oracle has produced 3,166 documents, and Oracle has produced only seed-set review documents since October 2015.  The Parties met and conferred regarding Rimini's stated concerns on February 3.

Rimini served its Second Set of Requests for Production on January 29, 2016.

#### 2.   Interrogatories

Rimini has not served any additional interrogatories since the last status conference.  On January 29, Rimini sent Oracle correspondence raising concerns regarding Oracle's responses to Rimini's First Set of Interrogatories.  The Parties met and conferred regarding Rimini's stated concerns on February 3.

Rimini's Additional Statement:

Oracle stated that it would supplement after Rimini restored access to the DevTrack folders and produced Salesforce metadata, both of which Rimini intends to provide in advance of the February 16, 2016 Status Hearing.

### 3.     Document Productions – Centralized Data Sources

Oracle is in the process of identifying and collecting additional contract documents related to the additional customers that Rimini has identified in its updated discovery responses.  Oracle will produce these documents as soon as it reasonably can do so, subject to any necessary privilege review.

Rimini moves to compel identification and collection of relevant documents from additional Oracle centralized data sources below.

Rimini's Additional Statement:

During the parties' February 3 meet-and-confer, Oracle confirmed that—after 14 months of litigation—the only non-custodial source it has examined and produced documents from is its contract repository.  Thus, to date Oracle has produced *fewer than 4,000 documents* (other than the seed set for the TAR process).  Oracle also indicated it will make no further effort to identify or search other non-custodial sources likely to contain relevant information.  This is the subject of a Rimini motion to compel, below.

### 4.     Document Productions – Custodial Productions and Technology-Assisted Review

Oracle has not produced any custodial documents in this litigation because the parties have not yet completed the TAR protocol process.  Pursuant to the parties' TAR protocol process, the parties exchanged seed sets on January 8, 2016.  Oracle's seed set contained 8,140 documents.  Oracle served its seed set privilege log on January 15, 2016.  See Section I(B)(6), below, for information regarding the status of the Parties' seed set reviews and process for exchanging and resolving objections to each other's seed set responsiveness calls.

Rimini has noted that Oracle's seed set includes a large number of "blank" or "junk" documents and requested an explanation.  Oracle responded to Rimini's stated concerns on February 5 and February 11.

1

2         **5.**    **Depositions**

3     Rimini has not noticed or taken any depositions in this litigation.

4     **B.**    **Discovery Sought From and Produced By Rimini**

5         **1.**    **Document Requests**

6     Oracle has not served any additional document requests since the last status

7 conference.

8         **2.**    **Interrogatory Nos. 1, 3, 6, and 8**

9     At the December 15 status conference, the Court ordered Rimini to

10 supplement its responses to Interrogatories Nos. 1, 3, 6, and 8 by December 30,

11 2015.   Rimini served its Second Supplemental Objections and Responses to

12 Interrogatories Nos. 1, 3, 6, and 8 on January 4, 2016.

13     At the January 12 status conference, Rimini agreed to further supplement its

14 responses to Interrogatories Nos. 3, 6, and 8 by January 19, 2016, and the Court

15 ordered Rimini to do so.   (January 12, 2016 Hearing Tr. at 51:22-55:4).   Rimini

16 provided its Third Supplemental Objections and Responses to Interrogatories Nos.

17 3, 6, and 8 on January 19, along with Exhibits D-2, D-3, and D-4.

18     On January 29, Oracle sent Rimini a letter addressing Rimini's supplemental

19 responses to Interrogatories Nos. 3 and 6.   The Parties met and conferred regarding

20 these interrogatories on February 2, 2016.

21     Oracle's motions to compel supplemental responses to Interrogatory Nos. 3

22 and 6 are below.

23     <u>Rimini's Additional Statement:</u>

24     Rimini's Third Supplemental Objections and Responses to Interrogatories

25 Nos. 3, 6, and 8 included detailed exhibits containing thousands of data points that

26 listed the remote environments that Rimini has potentially remotely accessed for

27 purposes of providing support, other than PeopleSoft tax and regulatory

28 development, to its current or former clients since the close of discovery in *Rimini*

3

*I*; the environments that were migrated from Rimini's systems to client-hosted or cloud-hosted systems; the client-hosted environments that were provided by clients to Rimini for the purpose of providing PeopleSoft tax and regulatory development since the close of discovery in *Rimini I*; and the environments that were built on client-hosted systems after February 13, 2014. These environment lists included detailed information regarding the technical specifications of the environments, including DNS name, build source, ERP release name, ERP release version, and patch level.

Rimini further identified produced documents, including directory listings from the FSCM delivered and object folders, which are responsive to Oracle's Interrogatory No. 6.

On January 26, 2016, Rimini provided Oracle with a preliminary written response regarding the status of its investigation into producing KDP data for client archives. Rimini's written response included detailed information and proposed methods of production regarding client archives that were created prior to January 2013 on Rimini's systems, client archives that were created after January 2013, and potential alternatives to the production of every client archive. Rimini's response included a list of clients who have refused outright to cooperate in production absent a subpoena. On January 28, 2016, Rimini further supplemented its list of clients who have refused to cooperate without a subpoena.

On January 29, Oracle sent Rimini a letter that identified omissions and potential inaccuracies in Rimini's Court-ordered supplemental responses to Interrogatory Nos. 3 and 6.

The parties met and conferred on February 2, 2016 and Rimini agreed to investigate the discrepancies in its responses to Interrogatory No. 3 cited by Oracle, but indicated it may not know the answer to some of the information. Oracle requested that Rimini indicate where it does not know the answers in those instances, as opposed to leaving a response blank where it is still trying to obtain

the information.  Rimini states that its responses are complete, and blank spaces currently indicate information it does not know.

With respect to Interrogatory No. 6, Rimini stated that it was also still investigating the issues raised by Oracle, including the existence of further documentation or information in SharePoint.   Oracle also requested supplementation regarding the Siebel, J.D. Edwards, and Oracle Database product lines.  Rimini agreed to supplement with respect to these product lines, and intends to do so prior to the February 16, 2016 Status Hearing.

Oracle's motions to compel supplemental responses to these interrogatories are below.

Oracle's Additional Statement:

After reviewing Rimini's Court-ordered Third Supplemental Interrogatory Responses, Oracle sent Rimini a January 29 letter that identified omissions and inaccuracies that still exist in the supplemental responses to Interrogatory Nos. 3 and 6.

The Parties met and conferred on February 2, and Rimini agreed to investigate the discrepancies in its responses to Interrogatory Nos. 3 and 6.  Oracle also reminded Rimini of Rimini's July 30, 2015 agreement that, in addition to PeopleSoft, Siebel, J.D. Edwards, and Oracle Database are also relevant products with respect to Interrogatory No. 6.   Oracle's motions to compel supplemental responses to these interrogatories are below.

### 3.    Interrogatory No. 5

At the January 12 status conference, Rimini agreed to supplement its response to Interrogatory No. 5, and to provide Oracle with a status report on the technical issues outstanding regarding its supplemental response within two weeks (by January 26).  The Court ordered Rimini to do so.

On January 26, Rimini provided Oracle with a preliminary written response

regarding the status of its investigation into producing the metadata that Interrogatory No. 5 requests for archives of Oracle Software and Support Materials.  Rimini also provided on January 26 (and supplemented on January 28) a list of clients that refused to cooperate with production of the metadata that Interrogatory No. 5 requests absent a subpoena.

Oracle moves to compel a supplemental response to Interrogatory No. 5 below.

Rimini's Additional Statement:

On December 18, 2015, Rimini wrote to 217 current and former PeopleSoft clients in an effort to obtain each such client's authorization to use Karen's Directory Printer ("KDP") to collect metadata from that client's test and/or development environments.  The parties have agreed to the use of KDP to create directory listings from client environments that are responsive to Oracle's Interrogatory No. 5.  The parties agreed to a similar process in *Rimini I*.  Since December 18, 2015, Rimini has obtained authorization to perform the collection from 80 clients, and 25 clients have refused to allow the collection.  As of this filing Rimini has produced KDP printouts from 32 clients.

The following points are provided to inform the Court of Rimini's continued efforts to provide this responsive data.

- Rimini has held conference calls with 46 clients to discuss the details of the process.  These calls have resulted in 23 authorizations, two requests for "friendly" subpoenas, one refusal, four clients that indicated they no longer have access to the environments, and 14 clients that continue to discuss the authorization request internally.  These calls are typically 15 to 30 minutes in duration and include members from the client legal and technical groups, and both in-house and outside counsel for Rimini.

- During the client conference calls and follow up communications, 15

clients have requested "friendly" subpoenas to comply with their internal procedures when responding to legal document requests.

- Of the 80 that have authorized collection, Rimini has completed 49 and 31 are in progress.  Approximately 10 have resulted in technical problems that Rimini is continuing to work with clients to resolve.

- Rimini has produced a total of 49 client KDP printouts.  On January 6, 2016, Rimini produced KDP printouts from 13 clients.  On January 11, 2016, Rimini produced KDP printouts from four clients.  On February 4, 2016, Rimini produced KDP printouts from 15 clients.  On February 12, 2016, Rimini produced KDP printouts from 17 clients.

- On January 20, 2016, Rimini sent 33 clients who had refused the collection a follow-up letter indicating that if they did not allow the collection, their names would be provided to Oracle and it was likely that Oracle would issue a subpoena for the metadata.

- On January 24, 2016, Rimini sent 19 clients that had not responded to repeated requests a letter informing them that Rimini would be providing their names to the Court on a list of clients that have not responded to the collection request.

- On January 24, 2016, Rimini sent 101 clients that were still considering the request a letter informing them that Rimini would be providing their names to the Court on a list of clients that have not yet authorized the collection.

- Despite Rimini's repeated attempts to contact them, 14 clients have not responded.

- On January 28, 2016, Rimini provided Oracle with a list of 25 clients that have refused to cooperate in the production of KDP printouts.

- On February 10, 2016, Rimini served "friendly" subpoenas on 15

7

clients.

Rimini continues to hold conference calls and to correspond with the remaining clients in an effort to obtain authorization to use KDP to collect the metadata requested by Oracle.

Oracle's motion to compel supplemental responses to this interrogatory is addressed separately below.

Oracle's Additional Statement:

Contrary to the Court's Order on the scope of Interrogatory No. 5, Rimini has announced its intent to omit many of the environments within its possession, custody, or control from its response.  Oracle thus addresses the status of the Parties' progress on Interrogatory No. 5 in conjunction with its motion to compel a supplemental response, below.

Oracle has requested a weekly meet and confer limited to discussion of Rimini's progress in producing Interrogatory No. 5 information from, or copies of, environments, archives, and other copies of Oracle Software and Support Materials.  Rimini has not yet responded to the request for a weekly meet and confer on this limited topic.

### 4.    Document Productions – Centralized Data Sources

Since the December status conference, Rimini has made additional SharePoint productions of 22,407 documents consisting of 341,102 pages.  Rimini is now substantially complete with its SharePoint productions.

Rimini has also made three Department Shares productions containing 566,128 documents consisting of 3,664,514 pages.  It has made one production of additional Salesforce material, and made a production of printouts from Rimini's FSCM Delivered Folder and FSCM Objects Folder.

Rimini also produced printouts of KDP metadata for 15 environments on February 4, as well as 334 local preserved environments in productions dated February 4, 5 and 9.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>Rimini's Additional Statement:</u>

In addition to these large-scale document productions since the last conference, Rimini has produced the following documents and data from a variety of sources:



Since October of 2015, Oracle has not produced *any* documents from its non-custodial sources.   In contrast, in addition to the time consuming KDP productions, Rimini has produced millions of pages of non-custodial documents and has produced terabytes of technical data.

Additionally, per the Court's January 12, 2016 Order, Rimini also provided a preliminary written report to Oracle regarding the status of its investigation into the issue of producing KDP data for archives.  In that report, Rimini informed Oracle of approximately how long it would take to produce KDP data for archives (in addition to environments), and stated that it would prioritize the productions in whatever manner Oracle deemed most appropriate.  Oracle did not respond to Rimini's prioritization offer.

<u>Oracle's Additional Statement:</u>

The Parties' discussions regarding deficiencies in Rimini's DevTrack and

9

first Salesforce productions are detailed in Oracle's motion to compel, below. Oracle has requested, below, that the Court enter deadlines for Rimini's productions of the metadata requested by Interrogatory No. 5 (or copies in lieu) for both environments and archives.

### 5. Stipulated Production of Cloud Environments

Rimini has produced four additional ███████████████████████████████████████████████████████████████████████

Rimini's Additional Statement:

Of the remaining 14, two ██████████████████████████████████████████ continue to discuss the production request internally; three ████████████████████████████████████████████████ have refused to produce the environments, citing privacy concerns; and two █████████ ████████████████████████████ have not responded to Rimini's repeated requests.  Rimini notes that Oracle has previously served a Notice of Intent to serve Genesis Healthcare with a subpoena that requests the same or similar data and information.

With regard to the other seven outstanding clients, ██████████████████ ██████████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████████ █████████  Rimini notes that Oracle has served Notices of Intent to serve subpoenas on ████████████████████████████████████████████████████████████s that request the same or similar data and information.

On January 28, 2016, Oracle requested a weekly meet and confer every Wednesday limited to discussion of Rimini's progress in producing Interrogatory No. 5 information from, or copies of, environments, archives, and other copies of

10

Oracle Software and Support Materials, including cloud-hosted environments.  On January 29, 2016, Rimini responded by proposing the following process, which would also be applicable to Oracle's discovery obligations:

- Each Monday by 3:00 PST, the parties exchange lists of any pending concerns by e-mail.
- By Wednesday at 3:00 PST, the parties respond to those concerns by e-mail.
- If there are issues requiring further discussion a meet and confer can be scheduled.

On January 29, 2016, Oracle declined Rimini's proposal, stating that the weekly meet-and-confer process should be limited to only Rimini's production obligations and not to Oracle's.

Oracle's Additional Statement:

As stated above, Oracle has requested a weekly meet and confer limited to discussion of Rimini's progress in complying with the Court's orders regarding production of metadata requested by Interrogatory No. 5 (or copies in lieu of such metadata), including cloud-hosted environments.  Rimini has not yet responded to the request for a weekly meet and confer on this limited topic.

### 6. Document Productions – Custodial Productions and Technology-Assisted Review

Rimini has not produced any custodial documents in this litigation because the parties have not yet completed the TAR protocol process.  Pursuant to the Parties' TAR protocol process, the Parties exchanged seed sets on January 8, 2016.  Rimini's seed set contained 5,000 documents, 4,795 of which were provided to Oracle.  Rimini withheld and logged 118 responsive privileged documents.  Rimini exchanged its seed set privilege log on January 15, 2016.

The Parties agreed to the following process for exchanging and resolving objections to each other's seed set responsiveness calls:  On February 8, each Party

provided a list of documents from the other Party's seed set that it believes have been improperly coded as Not Responsive.  For each objected-to document, the objecting Party identified the specific Request(s) for Production to which it believes that document is responsive.  The Parties have agreed to meet and confer regarding their stated objections on or before February 19.  To the extent that the Parties are unable to resolve any of their disputes regarding responsiveness, they will brief those disputes using the standard process for raising discovery disputes with the Court.

### 7.    Depositions

Oracle has not noticed or taken any depositions of Rimini in this litigation.

## C.    Third Party Discovery

### 1.    Customers – Private Entities

As previously stated, Oracle intends to serve third-party document subpoenas on Rimini customers at issue in this litigation.  To date, Oracle has served subpoenas on approximately 72 of Rimini's customers, and has given Rule 45 notice of its intent to serve subpoenas on approximately 5 additional customers.  Oracle has received approximately 7 objections and 9 productions in responses to these subpoenas thus far.

Rimini's Additional Statement:

Oracle has served Notices of Intent to Serve Subpoenas on Rimini for approximately 51 of Rimini's clients—including some for whom Rimini already has been working to collect KDP data.  Additionally, in the cover letter, Oracle does not make clear from whom the subpoena originates, and at least one of Rimini's clients have inquired why they had received a subpoena from Rimini when they had agreed to cooperate in producing KDP data in an effort to avoid the subpoena process.  *See* Exhibit 2.

Oracle's Additional Statement:

All of Oracle's subpoenas clearly identify the subpoenaing parties as

"Oracle International Corporation and Oracle America, Inc." on the first page of the subpoena, and likewise identify the subpoenaing firm as counsel for Oracle. Oracle includes a cover letter with the subpoena from a law firm identified on the first page of the subpoena as Oracle's counsel.  The letter states that if the customer cooperates with Rimini in producing the requested file-level metadata, then the customer may not need to produce the software environments and archives in response to the subpoena:

> The accompanying subpoena requires you to produce copies of the Oracle software environments that Rimini uses or has used to provide software support to Educate Inc.  Rimini has declined at this time to produce either copies of these environments or certain metadata related to these environments for certain customers, citing its inability to obtain the customers' "permission" as the reason. *If Educate, Inc. has cooperated and continues to cooperate with Rimini in producing these environments and their associated metadata, Oracle may no longer require that Educate, Inc. produce the underlying environments.*

Subpoena cover letter to Educate Inc., p. 2 (emphasis added).  Oracle included this language to incent the subpoena recipients to cooperate with Rimini by "authorizing" Rimini to produce the requested discovery.

### 2.     Customers – Public Entities

As it did in *Rimini I*, Oracle intends to make state "sunshine act" requests of public entities that are Rimini customers at issue in this litigation.  To date, Oracle has served sunshine act requests on approximately 6 of Rimini's customers. Oracle has received no productions or formal objections in responses to these requests thus far.

### 3.     Other Third Parties

Since the last status conference, Oracle has met and conferred with third-party Korn/Ferry International regarding the sufficiency of its December 9, 2015 document production in response to Oracle's subpoena served November 13, 2015. Oracle anticipates the production of additional documents from Korn/Ferry in the weeks following the February 16 status conference.

1
2
3
4
5

Oracle has also served subpoenas for production of documents and deposition testimony on Khurram Aijaz, a former Rimini employee, with a production date of February 8, 2016.  Rimini provided notice of its intent to also serve Mr. Aijaz with subpoenas for production of documents and deposition testimony.

6

**II.     CASE SCHEDULE**

7
8

The Parties jointly request that the Court enter a revised case schedule. Below are their respective proposals.

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

14

| Event | Current Deadline | Rimini's proposal | Oracle's proposal |
|---|---|---|---|
| Deadline for Rimini to complete productions in response to Interrogatory No. 5 as to environments | | Rimini is diligently working to produce KDP data as quickly as possible. The Court has already denied Oracle's request for "definite timetables" for this Interrogatory, instead opting to exercise judicial oversight through Status Hearings to be held every 30 days. *See* January 12, 2016 Hearing Tr., at 43. | April 22, 2016 |
| Deadline for Rimini to complete productions in response to Interrogatory No. 5 as to archives and other non-environment copies | | The Court has already denied Oracle's request for "definite timetables" for this Interrogatory, instead opting to exercise judicial oversight through Status Hearings to be held every 30 days. *See* January 12, 2016 Hearing Tr., at 43. | May 27, 2016 |
| Last date to amend pleadings and add parties | May 16, 2016 | Rimini does not oppose Oracle's request. | December 5, 2016 |
| Last date to file interim status report | May 30, 2016 | Rimini does not oppose Oracle's | December 19, 2016 |

15

| | | | |
|---|---|---|---|
| | | request. | |
| Close of fact discovery | July 25, 2016 | Rimini does not oppose Oracle's request. | February 13, 2017 |
| Last date to file motions to compel related to fact discovery | August 22, 2016 | Rimini does not oppose Oracle's request. | March 13, 2017 |
| Last date for affirmative expert disclosures | September 9, 2016 | Rimini does not oppose Oracle's request. | March 31, 2017 |
| Last date to disclose rebuttal experts | October 28, 2016 | Rimini does not oppose Oracle's request. | May 19, 2017 |
| Close of expert discovery | December 5, 2016 | Rimini does not oppose Oracle's request. | June 26, 2017 |
| Last date to file dispositive motions | January 16, 2017 | Rimini does not oppose Oracle's request. | August 7, 2017 |
| Last date to file joint pretrial order | February 13, 2017 | Rimini does not oppose Oracle's request. | September 11, 2017 |

## A.   Rimini's additional statement

Rimini has expended tremendous effort to meet Oracle's discovery demands, producing millions of pages of documents and terabytes of technical discovery. In contrast, Oracle has produced only a handful of license agreements and has refused to give Rimini relevant discovery from non-custodial sources. Oracle's complaints of delay are unfounded, and its failures of proof in *Rimini I* were due to its flawed theories, not lack of third-party discovery.

**Rimini has not delayed.** Oracle's claims of delay are unfounded and are based on unrealistic and constantly changing demands. The Court has chosen to exercise close judicial oversight of this case, ensuring that the parties stay on top of their discovery obligations. *See* January 12, 2016 Hearing Tr., at 43 ("I'm going to continue to hold status conferences every 30 days. Every 30 days I'm going to be

asking Rimini why hasn't it finished producing what it knows I'm compelling them to produce.  So I guarantee you, I will be on top of them.").

Regarding its own non-custodial sources, Rimini has produced documents from DevTrack, SharePoint, Salesforce, and Avata.   Meanwhile, Oracle has produced essentially no documents from *its* non-custodial sources and refuses to even identify—let alone search—the non-custodial sources clearly relevant to Rimini's Requests for Production.

Oracle's complaints regarding Interrogatory No. 5 also retread the same ground it has raised repeatedly—clearly attempting to obtain "discovery on discovery," rather than focus on the merits.  January 12, 2016 Hearing Tr., at 47 (Ex. 1).  Rimini's efforts regarding the KDP collections speak for themselves.[1]

While Oracle dismisses Rimini's efforts to date, gathering data from client systems is an extraordinary undertaking for which Rimini has continued to make good progress.  Since the last Status Hearing, Rimini has sent hundreds of follow-up letters to clients, held dozens of conference calls between involving technical and legal teams from Rimini and its clients, and produced millions of pages of information to Oracle.  Meanwhile, Rimini has not received a single document from Oracle since October 2015.

**Oracle's failures of proof at trial were not due to lack of third-party discovery.**  In *Rimini I*, Oracle sent subpoenas to *275 Rimini* clients.  From this massive undertaking—which caused Rimini and its clients untold burden and

---

[1]     Oracle has mischaracterized the relevant timeline.  Oracle asserts that it served Interrogatory No. 5 in July, but Rimini only recently started producing client-hosted environments.  Importantly, Interrogatory No. 5 requests environments on "Identified Rimini Computer Systems."  Rimini understood (it believes reasonably) "Identified Rimini Computer Systems" to mean *Rimini's computer systems*.  It was not until November that Oracle indicated it would move to compel on the basis that Rimini's *client's computers* constituted "Identified Rimini Computer Systems."  Dkt. 117, at 13-14.   Believing "Rimini Computer Systems" did not include client computer systems, Rimini opposed Oracle's motion in December, lost, and promptly began gathering and producing information from its clients' systems to Oracle, and continues to do so.

expense—Oracle introduced a total of *seven documents* at trial.

Oracle's attempts to blame its failures of proof on Rimini also fall short. Oracle's problem at the *Rimini I* trial was not that it failed to conduct *enough* third-party discovery (as it now seems to claim to justify yet another round of scorched-earth discovery). Oracle's problem was that its discovery simply yielded nothing to support its claims. Thus, the jury did not award Oracle lost profits and intentional interference damages for the 17 Rimini clients Oracle deposed and nothing for the remainder. Oracle got nothing *across the board* for those claims. Oracle's 17 depositions made no difference to its ultimate success on the merits at trial.

Even so, Rimini does not seek to preclude Oracle from conducting reasonable and proportionate third-party discovery. It simply wants clear and consistent direction on the scope of those requests, and the Court's supervision to ensure that Oracle gets appropriate discovery but does not "kill" Rimini in the process. *See* January 12, 2016 Hearing Tr., at 45 (Ex. 1).

Put simply, Rimini requests that the Court exercise judicial supervision over the process to prevent waste and abuse. Oracle has already served Notices of Intent to subpoena 51 Rimini clients. Some of these clients include those who are already subject to the KDP collection, and multiple requests from both Oracle and Rimini are generating (as expected) confusion among Rimini's clients—some of whom are not sure who served them with a subpoena, since Oracle did not make that clear. *See* Exhibit 2.

Rimini thus proposes:

- Oracle conduct depositions of 10 of these 51 already-subpoenaed customers (at Oracle's choosing) to see what evidence it gathers.
- Afterward, if Oracle believes it must serve more subpoenas on Rimini's clients and conduct more depositions, it should justify its request.

- If Rimini opposes, the Court can resolve whether additional third-party discovery is necessary and appropriate.

This will not deprive Oracle of any relevant discovery, while preventing abuse and unnecessary burden on 300+ additional third-party Rimini clients. *See* Fed. R. Civ. P. 26(b)(1) (imposing relevance and proportionality limits on discovery).

## B.  Oracle's additional statement

Oracle proposes its schedule in light of (1) Rimini's extended delay and non-compliance with its discovery obligations, (2) the expected scope of third-party discovery, and (3) Oracle's expected Amended Counterclaims, which Oracle anticipates filing this month.

**Rimini's extended delay.**  As Oracle has explained previously, discovery concerning Rimini's copying, including Interrogatory No. 5, is foundational discovery as to Rimini's claim for declaratory relief and Oracle's copyright infringement counterclaim.  Oracle prioritized this discovery by serving the majority of its technical discovery requests early in the fact discovery period – between April 2015 and July 2015 – knowing that after it receives responsive information, it will need sufficient time to analyze these materials and to propound additional written discovery and to take depositions, which is what Oracle did in *Rimini I*.  Based upon the size and scope of materials requested, Oracle expected that Rimini would be substantially complete with its production just before the 2015 holiday season.

As the Court knows, that did not happen.  As one example, Oracle's July 2015 Interrogatory No. 5 sought the identification of information regarding Oracle Software and Support Materials residing on any computer system under Rimini's possession, custody or control – core information that goes to the heart of Oracle's infringement claim.  Rimini no longer disputes that it has control over customer-hosted environments and archives, January 12, 2016 Hearing Tr. at 6:13-19, 16:9-

15, and asserts that it can provide the requested information if the customer agrees. But Rimini waited **five months** after Oracle served Interrogatory No. 5 before asking any customers for that permission. *See* Dkt. 131 at 10 & n. 42 (noting Rimini contacted clients on December 18, 2015, *after* the December status conference). As of this writing – now **seven months** after Oracle served this interrogatory – Rimini has produced the requested information for approximately 32 environments, out of what Rimini represents are hundreds of ███████████ ████████████████████████████████████████████████████████████ provide this information *once Rimini finally got around to asking*. Further, Rimini has produced none of the requested information with respect to archives.

Similarly, although this Court has issued two orders compelling Rimini to provide complete answers to Interrogatory Nos. 3 and 6 (December 15, 2015 Hearing Tr. at 41:25-42:5; January 12, 2016 Hearing Tr. at 52:13-17, 53:2-10) – also served in July 2015 – as explained below in Oracle's third motion to compel on these interrogatories, Rimini has still not answered them. Problems pervade Rimini's responses to Oracle's initial set of technical discovery requests.

Rimini's previous representations to Oracle and the Court strongly suggest that Rimini will not provide complete responses to these requests until May 2016 at the earliest. *See, e.g.*, January 12, 2016 Hearing Tr. at 9:24-25 (stating that "three to four months" would be required to comply with even a portion of Rimini's technical discovery obligations). However, even those prior estimates now appear unrealistic. Alarmingly, Rimini has produced an average of 25 KDP environment metadata per month, starting in December 2015, out of more than two hundred customers. At this rate, it will take Rimini **six to nine more months** to answer a foundational interrogatory that goes to the core of this case and that Oracle propounded at the beginning of fact discovery.

Oracle requests that the Court extend the case schedule by 29 weeks, corresponding almost exactly to the delay between when Rimini should have

completed its responses to initial technical discovery and when Rimini will complete its responses. A shorter case schedule than that could allow Rimini to run out the clock on Oracle's ability to prove its case simply by engaging in extraordinary delay.[2] Below, Oracle moves to compel a deadline for Rimini to respond to Interrogatory No. 5 so that even this proposed schedule can be workable.

**Scope of third-party discovery.** At trial in *Rimini I*, Rimini repeatedly argued that Oracle had failed to carry its burden on causation because Oracle did not present individualized evidence as to each and every single customer. Oracle deposed 17 customers in *Rimini I*, and Rimini argued vehemently that this was inadequate, contending that "Oracle must prove wrongful conduct, with the specific intent to cause a breach or to interfere, and actual causation *as to each individual third party*." Dkt. 741 (Rimini trial brief) at 20 (emphasis added and removed); *see also, e.g.*, Dkt. 838 (Rimini Rule 50(a) motion) at 3-5 ("Oracle's attempt to prove its claims by applying pieces of evidence from 17 customers to 211 others would violate tort law and Rimini's due process rights to present individual defenses as to each claim"). Rimini argued that extrapolating from a representative sample of customers to the broader customer base was also improper: "Rimini further intends to object at trial to the extent Oracle seeks to have its witnesses extrapolate any alleged causation, reliance, or harm from an individual situation to a broader group." *Id.* at 21.

At trial, Rimini attacked even those Oracle experts that had reviewed customer materials on grounds that Oracle's evidence was not sufficiently granular as to every single customer. For example:

> Q.   [MR. STRAND] 228 customers; right?
> A.   [MS. DEAN] Right.

---

[2]   Rimini repeats substantial portions of its motions to compel in its separate statement. Rather than argue the same motions twice, Oracle incorporates by reference its responses, below, to Rimini's motions.

Q.   And you didn't talk to any of them?
A.   That's right.
Q.   Okay.  So you don't know whether that customer ever spoke to Rimini Street, correct, any of those 364 customers?
A.   I assume they had spoken to Rimini Street.
Q.   But you don't know as you sit here that those folks ever spoke to anybody at Rimini Street, do you?
A.   I think it would be a reasonable conclusion given that they were licensed customers and Rimini Street was supporting them.
* * *
Q.   You don't know what the customer said to Rimini in the course of any conversation that they have -- had, do you?
A.   That's right, I haven't seen any evidence about that in this case.
* * *
Q.   You also don't know the factors that each of those 228 customers considered in making their decision to leave Oracle and go to Rimini, do you?
A.   That's correct.

Tr. 1858:4-1861:16 (Dean).

In closing, Rimini argued to the jury that 17 customer depositions Oracle took was far too few and argued Oracle had cherry picked them to support its experts' opinions:  "At the time we had about 450 customers, Rimini Street customers.  Oracle's lawyers picked 17 of those for deposition. . . . So Oracle's lawyers picked presumably the 17 best customers for their case, took their deposition, and then handed them -- cherry picked them and handed them to their expert . . ." Tr. 3528:21-25, 3529:16-19.

In light of the arguments advanced by Rimini at trial, Oracle intends to subpoena all or virtually all of the relevant Rimini customers, and to depose a substantial number of Rimini's customers and other relevant third parties.  This large amount of third-party discovery should be factored into the case schedule. Unfortunately, the customer depositions in particular may be delayed by Rimini's failure to timely produce technical materials, as the scope of Rimini's copying may be an important topic of exploration in those depositions.

Oracle does not agree to Rimini's proposal that third-party discovery be

22

limited to the customers from which Oracle has already requested documents, for the reasons outlined above.  As well, a substantial number of the customers from which Oracle has requested documents are either cloud customers (some of which Oracle will have to re-subpoena due to Rimini's failure to abide by the Parties' stipulation) or customers who, at Rimini's express invitation, declined to give "authorization" for production of their environments, archives, or associated metadata.  These customers may not be representative of the customer population as a whole.

Rimini's conduct at the *Rimini I* trial elevates the importance of the customer-specific proof that Oracle is attempting to obtain through subpoenas. Because Rimini took the position that Oracle must have evidence specific to every individual customer, Oracle's subpoenas to nearly all of Rimini's customers are exactly proportional to their relevance.

**Amended Counterclaims.**   On February 11, Oracle asked Rimini to stipulate to the filing of Oracle's Amended Counterclaims.  If Rimini will not stipulate, then Oracle will move for leave to amend.   Oracle recently obtained certain registrations from the Copyright Office for its E-Business Suite software and has applied for additional PeopleSoft and E-Business Suite registrations based in part upon Rimini's recent productions and discovery responses.  Oracle seeks to add these registrations to this case as promptly as possible.   The Amended Counterclaims also add copyright claims relating to JD Edwards, Siebel, and Oracle Database and claims under the Digital Millennium Copyright Act.  These Amended Counterclaims will require additional foundational technical discovery, which will likely occur after Rimini completes its current foundational technical discovery obligations.

Rimini's Additional Statement:

Counsel for Oracle sent Rimini its proposed Amended Counterclaims only yesterday.  Rimini has not yet had a chance to assess the proprietary of these

23

proposed amendments, but expects to be in a position to respond at the February 16, 2016 Status Hearing.

## III.   DISPUTES REQUIRING JUDICIAL RESOLUTION

### A.   Rimini's Motions to Compel Discovery from Oracle

After nearly sixteen months of litigation, Oracle continues to stonewall document discovery that is essential to Rimini's request for declaratory judgment and vital to Rimini's defense of Oracle's eight counterclaims.   Oracle asserts Rimini's conduct deceived Oracle's current customers and that, as a result, Oracle has suffered a substantial amount of damages, both in the form of lost profits from Rimini's current customers and financial and reputational harm among Oracle's current customers.

In an attempt to obtain discovery on the issues and allegations Oracle raised in its pleadings, Rimini served its First Set of Requests for Production and Interrogatories on June 15, 2015.  Nearly eight months later, Oracle has still failed to provide any meaningful discovery, asserting a host of boilerplate objections, taking wildly inconsistent positions, and conflating this Court's prior rulings. Despite Rimini's good-faith effort to resolve the dispute during a meet-and-confer telephone conference on February 3, 2016, the parties reached an impasse.  Rimini therefore respectfully requests the Court enter an Order compelling Oracle to adequately respond to Rimini's written discovery.

### 1.   Oracle's Deficiencies Regarding Rimini's Request for Production of    Documents No. 15.

Rimini's Request for Production No. 15 requests:

> All documents relating to communications to or from any former, current, or prospective customer of either Oracle or Rimini Street that refers or relates to Rimini Street, and/or its products or services.

(*See* Oracle's Third Amended Objections and Responses to Rimini's First Set of Requests for Production, at 16.) (Ex. 6)  Oracle refuses to produce discovery with

1   respect to any Oracle customer that did not become a Rimini client, arguing
2   communications with non-Rimini customers are irrelevant in this case.   That is
3   incorrect.   Such evidence is highly relevant to Rimini's alleged liability and
4   Oracle's claimed damages.

5   　　　First, the evidence Rimini seeks is relevant because Oracle's
6   communications with its former, current, and prospective customers (including
7   non-Rimini customers) are directly relevant to defeat Oracle's counterclaims for
8   violations of the Lanham Act, Inducing Breach of Contract, Intentional
9   Interference, Breach of Contract and Unfair Competition as well as Rimini's
10  defenses to each.   For each of these counterclaims, Oracle alleges that ***Oracle***
11  ***customers***—in addition to Rimini customers—were deceived by Rimini's
12  purported wrongful conduct, stating:

13  　　　Rimini's wrongful conduct has a tendency to deceive – and in fact has
14  　　　deceived – a substantial segment of Rimini ***and Oracle customers*** into
     　　　believing that (1) Rimini has discontinued its infringing processes or
15  　　　its use of infringing Oracle software and (2) Oracle is terminating its
16  　　　support for its customers when it is not.

17  Dkt. No. 22 ¶ 92; *see also* ¶ 93 (stating that Rimini's alleged conduct has
18  influenced the purchasing decisions of "Rimini and Oracle customers and potential
19  customers"); ¶ 95 (incorporating by reference paragraph 92-93); ¶ 112 (same); ¶
20  117 (same); ¶ 126 (same).   It cannot be disputed that communications between
21  Oracle and its customers regarding Rimini Street will shed light on (1) whether the
22  customer was "in fact" deceived by Rimini Street's alleged wrongful conduct, (2)
23  whether the customer believed Rimini discontinued its infringing processes, and
24  (3) whether the customer believed Oracle was terminating its support for
25  customers.   In addition, these communications may demonstrate that neither
26  Rimini clients nor Oracle customers reasonably relied on Rimini's alleged
27  wrongful conduct, when, for example, the customer elected not to renew Oracle
28  support after Oracle advised the customer of its belief that Rimini's (or any other

third party's) maintenance and support processes infringe Oracle's copyrights.[3]

Second, Oracle asserts that Rimini's alleged wrongful actions harmed Oracle's relationships with **Oracle's** customers (in addition to Rimini's clients), resulting in reputational harm, loss of cross-selling opportunities, and diminution of revenue through price negotiations (e.g., waiver of automatic annual price increases), among other things.   Oracle's Rule 26(a) disclosures expressly recognize that Oracle's communications with its ██████████████████████ ███████████ regardless whether each is a Rimini client—are at issue in this case, stating:



These topics require discovery from

---

[3]   Oracle now suggests its references to "Oracle customers" is the product of poor drafting. *Infra* pp. 43-44.  But Oracle's Opposition does not, because it cannot, reconcile the "real" reason for referencing "Oracle customers" with its own pleadings and disclosures, including, for example, Oracle's representation that 219 employees would "likely have discoverable information" based on their knowledge of "communications and/or information about Oracle customers who considered [but did not become] Rimini customers."   (Oracle's Rule 26(a) Disclosures, at 35-74) (Ex. 7). Tellingly, Oracle has itself not amended its counterclaims to remove allegations regarding "Oracle customers," (replacing it with "former Rimini clients," for example) and it has not disclaimed damages based on, among other things, "damaged relationships with "current . . . Oracle customers," including the "loss or diminution or delay of reasonable revenue expectations from current customers," (Dkt. No. 22, at ¶¶ 92, 93, 95, 112, 117, 126; Oracle's Rule 26(a) Disclosures, at 35-74) (Ex. 7).  Until such a time, Oracle cannot have it both ways by precluding discovery on the issues that Oracle itself asserts.

Oracle beyond just Rimini's clients because they speak to Oracle's alleged losses and damages comprehensively.   For instance, if, as Oracle alleges, Rimini has damaged relationships with current and/or past Oracle customers—not limited to just Rimini's clients—Rimini is entitled to discovery exploring that, and Request for Production No. 15 is designed, in part, to capture those documents.  Likewise, if, as Oracle asserts, Rimini caused loss of goodwill and/or reputational harm addressing Rimini's statements and conduct, limiting discovery to only those documents identifying Rimini clients is also under-inclusive.   Oracle acknowledges this, identifying 219 Oracle employees who are ███████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████

It is not speculation whether Oracle's communications with its customers are relevant for purposes of damages: Oracle raised nearly identical issues during trial in *Rimini I*.  For example, Safra Catz testified that there are ***Oracle customers*** who believe they are paying too much money, "especially after they've [Oracle customers] been told that they could get everything and more at half the price." (*Rimini I* Trial Tr. (Catz) 993:9-14) (Ex. 4).  She also stated that "when [third-party support providers] come to ***our customers***, ***our customers*** wonder all the sudden whether we are overcharging them.  It really breaks the bonds and the trust that we have with ***our customers***.  We've negotiated a price with them.  All of the sudden, they're wondering whether we've treated them fairly." (*Rimini I* Trial Tr. (Catz) 935:12-17) (Ex. 4).

Oracle's Opposition invokes "proportionality" but offers no more than conclusory, blanket assertions that the discovery Rimini seeks is disproportionate.[4]

---

[4]     *Infra* pp. 44-45.

*See* Comments to 2015 Amendments to Fed. R. Civ. P. 26(b)(1) ("Nor is the change intended to permit the opposing party to refuse discovery simply by making a boilerplate objection that it is not proportional.").  Oracle, as the party from whom the discovery is sought, is "in a better position to specify and support the burdens and expense of responding,"[5] yet Oracle does not articulate—to Rimini or the Court—the actual burden imposed by responding to Request for Production No. 15,[6] particularly in light of the high monetary stakes (Factor 2), Rimini's inability to access the requested information (Factor 3), and Oracle's significant resources (Factor 4).  Oracle's Opposition ignores the proportionality factors, and simply alludes to "vast discovery" and its "hundreds of thousands of customers" without explanation or elaboration.

Further, Oracle's parade of horribles regarding the TAR process is equally without support.  The TAR protocol is a tool to facilitate discovery of responsive documents; it is not a device to inhibit the production of relevant information.  The TAR protocol expressly contemplates adjustments to predictive modeling when "the scope of responsiveness changes significantly at any time during fact discovery," such as when a party serves additional requests for production of documents or (as relevant here) the Court grants a Motion to Compel.[7]  As the parties are in the early stages of the TAR process, it will not be burdensome on Oracle to teach the TAR predictive coding software to identify and produce documents responsive to Request for Production No. 15.[8]

Request for Production No. 15, therefore, is tailored to require Oracle to

---

[5]   *Guidelines and Practices for Implementing the 2015 Discovery Amendments to Achieve Proportionality* Judicature 47, 53 (Winter 2015).

[6]   Oracle has given no indication, for example, of how many such responsive documents might be in Oracle's custodial collections.  Are there 100 additional documents?  Or 100,000?

[7]   Joint Proposal for Technology-Assisted Review (TAR) of Custodial Documents in *Rimini II*, at 5 (Ex. 10).

[8]   Notably, the TAR protocol facilitates the production of responsive documents from *custodial* collections.

28

produce documents that are necessary to enable Rimini to defend against Oracle's counterclaims and to impeach the damages theories Oracle has expressly asserted in this case and in *Rimini I*.

In refusing to provide a complete document production to Request No. 15, Oracle improperly construes the Court's prior ruling in a manner that would render any relevant discovery on Oracle's allegations impossible. Specifically, Oracle has responded that it will only produce non-privileged communications "to or from any customer that Rimini identifies in discovery as being a ***relevant Rimini customer*** . . . ." (*See* Oracle's First Amended Responses to Rimini's First Set of Requests for Production., at 10 (emphasis added).)  Oracle attempts to justify its overly narrow response by misconstruing the Court's prior ruling from the October 16, 2015 Case Management Conference as a bar on any and all discovery concerning non-Rimini clients.  Indeed, during the parties' recent meet-and-confer, Oracle attempted to rely on the Court's previous ruling denying Rimini's Motion to Compel, because Request No. 15 seeks discovery into Oracle's non-Rimini clients.  (*See* Dkt. No. 109 (minute entry denying Rimini's motion to compel); Tr. of Status Conference, at 34:20-24 (Oct. 26, 2015).) (Ex. 5)  This is simply not true.  The October hearing concerned different Requests for Production (Requests Nos. 6, 8, 18, 13, 19, 34) involving different issues and claims in this case—principally, the relevance of licenses between Oracle and non-Rimini clients.  (Tr. of Status Conference Held on October 26, 2016, at 11-24)  Oracle now wishes to expand the Court's ruling to preclude the critical discovery necessary to explore allegations *Oracle* injected into the case, as well as Rimini's ability to mount meaningful defenses to Oracle's counterclaims.

Rimini, therefore, respectfully requests the Court enter an Order compelling Oracle to provide discovery responsive to Request for Production No. 15.

### 2.    Oracle's Deficient Document Production from Non-

29

**Custodial Sources Relevant to RFP Nos. 4, 6-17, 29-30, 32, and 34 ("Non-Custodial Production")**

As the Court is aware, the parties have divided document production into custodial and non-custodial sources. *See, e.g.,* Dkt. No. 106 at 4, 6 (Parties respectively updating the Court on production from "Centralized Data Sources"). With respect to the latter, Oracle has taken unreasonably narrow positions regarding its discovery obligations, flatly refusing to search non-custodial sources except for contract and license documents. Despite agreeing to produce documents responsive to many of Rimini's Requests for Production, Oracle has produced less than 4,000 documents to date. In stark contrast, Rimini has produced to Oracle roughly 4,187,000 pages of documents. Much of Rimini's efforts to date have involved collecting and producing documents from Rimini's non-custodial DevTrack and Salesforce systems, client developments, and other non-custodial sources. Rimini recently asked Oracle to explain this discrepancy between Rimini's non-custodial production and Oracle's failure to produce any non-custodial documents, and Oracle's counsel admitted that they had not been working to collect from non-custodial sources (other than the handful of license agreements Rimini did not already have from *Rimini I*). Rimini asked whether Oracle uses a Customer Relationship Management system ("CRM"), such as Salesforce, which Rimini uses and has produced to Oracle. Oracle counsel stated they did not know and would provide Rimini with an answer. Rimini heard nothing back.

Rimini has many Requests for Production relating to Oracle's interactions with Rimini's clients. (*See, e.g.*, Requests for Production Nos. 4, 6-17, 29-30, 32, 34) (Ex. 8). Oracle has agreed to produce such documents, but has yet to identify the CRM system Oracle presumably uses to track interactions with Rimini clients—let alone to agree to collect and produce responsive documents residing on such a system. Instead, Oracle says that responsive documents may be among its

30

custodial productions.   But this ignores that Oracle's CRM system contains relevant data and is *the most likely* place to find such information.   CRM systems are used to track customer interactions, including negotiations, customer concerns, and other communications.   CRM systems thus are likely to contain documents and information not available from a custodial document collection, such as negotiations, competitive bidding, customer concerns, customer reliance on statements by Rimini, and customer attitudes regarding options for third-party support services.

Such evidence is indisputably relevant.   Was the client determined to leave Oracle no matter what?  Or did Rimini truly lure Oracle's customers away with "lies" and "misrepresentations," as Oracle alleges?  This information bears directly on causation, reliance, and damages with respect to Oracle's copyright, Lanham Act, intentional interference, inducing breach, and unfair competition counterclaims.   Responsive documents from Oracle's CRM database(s) are unlikely to exist elsewhere in Oracle's custodial production because of the unique compiling and analytical functionalities that CRM databases provide.

In its response, Oracle carefully avoids saying whether it actually uses a CRM system or not, instead asserting that "Oracle's support sales organization" does not use a CRM system "to track customer interactions or communications in the way that Rimini describes, or at all."   This non-denial denial is loaded with caveats.  Does the support sales organization use a CRM system at all?  Do other units within Oracle use a CRM to log customer interactions?   Frankly, it is implausible that a company such as Oracle—which touts it has "thousands" of customers in opposing Rimini's discovery requests and publicly states it offers "one of the world's most complete CRM solutions"—does not use a CRM or other system to track interactions with customers.[9]  Oracle should answer these simple,

---

[9]    http://www.oracle.com/us/products/applications/siebel/overview/index.html

straightforward questions: (1) Does Oracle use a CRM system (or something similar, such as spreadsheets or logs)? (2) Will it produce documents from these sources?

Finally, Oracle argues that Rimini acquiesced to Oracle's limited discovery efforts.  This is meritless. Oracle agreed to search non-custodial sources "where necessary to comply with Oracle's document production obligations."  Rimini took Oracle at its word.  It was not until February 3, 2016—when Rimini asked what specific sources Oracle had actually been searching—that Oracle finally admitted it had searched nothing, because its position is that the only relevant, non-custodial documents in its possession are its contracts with Rimini clients.

### 3.      Oracle's Deficient Production of Documents Concerning Maintenance and Support Alternatives Available to Rimini's Clients.

In its response to Requests for Production Nos. 22, 23, and 24, Oracle improperly seeks to block discovery into Oracle's own statements and communications discussing the maintenance and support alternatives available to Rimini customers since December 2011.  As detailed below, this information is relevant to rebutting Oracle's damages claims and to refuting Oracle's allegations that Rimini made false and damaging statements about whether Rimini's current service model infringes Oracle's copyrights.  The Court should compel production of this relevant and meaningful discovery.

Requests 22, 23, and 24, request the following documents:

**REQUEST NO. 22:** All documents relating to or containing statements by Oracle that only Oracle can provide support for Software and Support Materials to Oracle's licensees.

**REQUEST NO. 23:** All documents reflecting communications between Oracle and third-party support providers, independent consultants, or customers who self-support (collectively, "alternative support") regarding the provision of such alternative support for Software and Support materials, including documents and communications regarding the permissibility of such alternative

support.

**REQUEST NO. 24:** All documents relating to or containing statements by Oracle that third-party support providers can provide support for Software and Support Materials to Oracle licensees. (Ex. 8)

These requests are focused on obtaining discovery concerning a fundamental inconsistency at the core of Oracle's case. In *Rimini I*, Safra Catz, Oracle's Co-CEO, and Richard Allison, Oracle's Vice President of Global Practices, both testified on direct examination that third parties can legally provide maintenance and support services to PeopleSoft licensees. (*See, e.g. Rimini I* Trial Tr. (Catz) 997:22-998:10 (Ex. 4); *Rimini I* Trial Tr. (Allison) 839:10-16) (Ex. 4). Yet, Oracle also asserts that Rimini's clients had *only one* non-infringing option for maintenance and support services: Oracle. The two statements are incompatible and demonstrate that Oracle is misleading its clients about Rimini's ability to compete with Oracle. Evidence of these inconsistent positions by Oracle is relevant to show that Rimini, or any other third-party provider, can compete with Oracle to provide vendor-level support to clients.

After asserting a variety of boilerplate objections,[10] Oracle responded identically to RFP Nos. 22, 23, and 24 as follows:

> Subject to and without waiving its objections, Oracle will conduct a reasonable search and produce non-privileged communications between Oracle and Rimini regarding the legality of Rimini's support model.

(Oracle's Responses to Request for Production Nos. 22-24) (Ex. 9). Oracle, therefore, has elected to limit its production in two important ways by improperly narrowing its search to communications (1) between Oracle and ***Rimini*** and (2) regarding the legality of ***Rimini's*** support model.

Requests for Production Nos. 22 and 24 are related but fundamentally

---

[10] The recent amendments to the Federal Rules of Civil Procedure are not intended to permit a party to make boilerplate objections regarding the proportionality of discovery. *See* Advisory Committee Notes to 2015 Amendments to Fed. R. Civ. P. 26(b)(1).

distinct, one seeking Oracle's statements that *only Oracle* can legally provide maintenance and support services to PeopleSoft licensees (No. 22), while the other seeks statements that *parties other than Oracle* can legally provide maintenance and support services to PeopleSoft licensees (No. 24).[11]   Request No. 23 is related to, but independent of, Requests No. 22 and 24: Request No. 23 requests communications regarding alternatives to Oracle's maintenance and support services (such as self-support, third-party vendor-level maintenance and support, or a hybrid between self-support and vendor-level support) that are and have historically been available to Rimini clients.

Oracle has no proper grounds on which to foreclose discovery on the alternatives to Oracle's maintenance and support services.   In this action, as in *Rimini I*, Oracle seeks lost profits damages.[12]   In *Rimini I*, Oracle asserted Rimini's infringement caused Oracle to suffer lost profits because Rimini and Oracle were the only two providers in the maintenance and support market.[13]   In other words, Oracle attempted to create "an inference that it probably would have made all the sales but for the occurrence of the infringing sales."[14]   *See IGT v. Alliance Gaming*

---

[11]   An example of documents responsive to RFP No. 22 and 24 would be documents reflecting Mr. Allison's and Ms. Catz's testimony from *Rimini I* that third-party support is permitted.  (*See, e.g. Rimini I* Trial Tr. (Catz) 997:22-998:10 (Ex. 4); *Rimini I* Trial Tr. (Allison) 839:10-16) (Ex. 4).

[12]   *See, e.g.* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮   *See Rimini I* Trial Tr. (Dean – Oracle's Damages Expert), at 1796-1797(Ex. 4) (testifying Rimini and Oracle "are the only two credible, viable players in the space today").   Oracle's lost profits theory was similar to the "two-supplier test" in the patent context.  *See IGT v. Alliance Gaming Corp.*, 2008 WL 7084605, at *5 (D. Nev. 2008) ("Under the two-supplier test, a patentee must show 1) the relevant market contains only two suppliers; 2) its own manufacturing and marketing capability to make the sales that were diverted to the infringer; and 3) the amount of profit it would have made from these diverted sales.").

[14]   *See, e.g.*, *Rimini I* Trial Tr. (Yourdon – Oracle's Causation Expert), at 1701:4-22 (Ex. 4) ("Q. So, in your opinion, and based on your experience, what would Oracle's customers have generally done if Rimini Street had not existed?  A.  In my opinion, what they generally would have done is renewed their support at the same kind of historical renewal levels that

34

1  *Corp.*, 2008 WL 7084605, at *5 (D. Nev. 2008).  The following slide—shown

2  during the testimony of Oracle's damages expert—illustrates Oracle's argument

3  that Rimini's clients had no acceptable and ***non-infringing*** alternatives available:

## Other Third-Party Entities

| Company | Product Line(s) | Description / Rimini Statements | Acceptable & Non-Infringing? |
|---|---|---|---|
| TomorrowNow | PSFT, JDE, SBL | • Shutdown in October 2008 | NO |
| netCustomer | PSFT, JDE, SBL | • Stopped offering third-party support in early 2010; Less than 5 customers from 2006- 2009 (PTX 778)<br>• Business model "dead-wrong" (PTX 1331) | NO |
| Conexus Partners | JDE | • Not a "vendor replacement" support service (PTX 1331) | NO |
| LegacyMode | JDE | • "Not likely a stable or significant enough infrastructure investment" (PTX 1331)<br>• Out of business by July 2007 (PTX 1336) | NO |
| ContinuServe | PSFT | • Couldn't handle tax updates (PTX 1335)<br>• "Not credible as a standalone system" (PTX 1335) | NO |
| CedarCrestone | PSFT | • Minor part of its business | NO |
| Spinnaker | JDE | • No experience providing vendor-replacement service; "NO track record at all in this space" (PTX 802)<br>• No downloading or archives (PTX 800, Maddock Dep. at 146:9-147:25) | NO |

17      Rimini, on the other hand, argued that other maintenance and support

18  options—besides Oracle and Rimini—were available and Rimini's clients would

19  have elected alternative support[15] (and would not have renewed support with

20  Oracle) even if Rimini did not engage in the alleged wrongful acts.  (*See, e.g.*,

21  *Rimini I* Trial Tr. (Hampton) 2748:8-19) (Ex. 4).  Oracle cross-examined Rimini's

22  witnesses at length about alternatives to Oracle support.  (*See, e.g.*, *Rimini I* Trial

23  Tr. (Hampton) 3090:6-3099:18 (Ex. 4); *Rimini I* Trial Tr. (Rowe) 2491:13-18 (Ex.

Oracle had already been enjoying. . . . You know, it's fine to say that I might be attracted for this reason or that reason, but without a viable alternative, you might stop the support if you're going bankrupt or if you're being acquired by somebody else or other external factors.  But in the absence of those external forces, you're going to stay with the same enterprise support provider.").

[15] Such alternative support includes self-support, a hybrid between self-support and vendor-level support, and a variety of smaller maintenance and support providers, including NetCustomer, LegacyMode, Abtech, and Spinnaker.

35

1  4). And Oracle presented the following slide during its closing arguments:



Discussing the slide, Oracle's counsel asserted, "When we talked about the other third-party support providers, *this became comical*. NetCustomer, LegacyMode, and Abtech only took two customers collectively. These companies *were like unicorns that nobody ever heard of before this case*."[16]  Requests for Production Nos. 22, 23, and 24 seek documents that challenge Oracle's "unicorn" competitor theory and are tailored to prevent Oracle from distorting the market for maintenance and support services for purposes of its lost profits analysis.

Curiously, Oracle now argues that there are "*countless* unspecified third-party providers" and a "*boundless* group of 'third-party support providers, independent consultants, or customers who self-support'" that fall within the scope of Requests for Production Nos. 22-24.[17]  Importantly, these requests are limited to documents concerning third-party providers of "Software and Support Materials," which is a phrase Rimini defined as "software applications and environments, program updates, software updates, bug fixes, patches, custom solutions, and

---

[16]  *Rimini I* Trial Tr. (Oracle Closing), at 3510:8-16 (Ex. 4).
[17]  *See infra* pp. 50-51; *Rimini I* Trial Tr. (Oracle Closing), at 3510:8-16 (Ex. 4).

instructional documents *for the PeopleSoft* *family of software products*."
(Rimini's First Set of Requests for Production, at 3 (emphasis added)).   Oracle
makes no attempt to reconcile its argument in *Rimini I* that "other third-party
support providers . . . were like unicorns that nobody ever heard of before this
case" and that self-supporting customers were "a very, very small group," with its
argument in *Rimini II* that there are now "countless" third-party support providers
of PeopleSoft software and a "boundless" number of companies that self-support
PeopleSoft software.[18]

Even if, as Oracle suggests, there are "countless" third party support
providers of PeopleSoft software, an obvious place to start would be the companies
listed on Oracle's own slides, including netCustomer, ContinuServe, LegacyMode,
Abtech, and CedarCrestone. Further, Ms. Catz specifically testified that Oracle has
"third-party supporters" that provide "frontline support" or "other parties of
support" and "have licenses to actually provide the support."   (*Rimini I* Trial Tr.
(Catz) 997:22-998:10) (Ex. 4).   The relevance and proportionality of Rimini's
Request for Production Nos. 22-24 is illustrated by Oracle's own Rule 45
subpoenas to Rimini's clients, which seek, for example, "All Documents—
including all . . . Communications with any third party—regardless of date
Concerning . . . Your consideration of third-party support providers for software
support related to PeopleSoft, JD Edwards, Siebel, or Oracle E-Business Suite
software."[19]

Further, Oracle's responses to Requests for Production Nos. 4, 6, 8, 13, 15,
17, 32, and 34 leave out an important category of documents, namely, documents

---

[18]   *See infra* pp. 50-51; *Rimini I* Trial Tr. (Oracle Closing), at 3510:8-16, (Catz), at 983:19-20 (Ex. 4), (Yourdon – Oracle's Causation Expert), at 1700:5-9 (Ex. 4)("Q.  Okay.  Could customers in this case have supported themselves, what's called self-support?  A.  In my experience, the realistic answer is no. It is sometimes considered, but it's - - I've never recommended it, and it's almost never a viable option.").
[19]   *See* Schedule A, Oracle's Notice of Intent to Serve Third-Party Subpoenas, at 2-3 (Feb. 4, 2016) (Ex. 20).

1    in which Oracle itself made representations about the legality (or illegality) of

2    third-party support and Oracle's communications regarding alternative support

3    options, including third-party support and self-support.[20]   This would be

4    compelling evidence at trial for both substantive and impeachment purposes,

5    particularly with respect to acceptable and non-infringing third-party support

6    providers and the viability of self-support as an option for PeopleSoft licensees.

7    Notably, Oracle does not articulate what, if any, incremental burdens it will suffer

8    from searching and producing documents responsive to Request for Production

9    Nos. 22-24, its contemporaneous efforts to produce documents responsive to

10   Requests for Production Nos. 4, 6, 8, 13, 15, 17, 32, and 34.   Oracle also does not

11   disclose whether it is withholding any documents responsive to RFP Nos. 22-24,

12   taking into account Oracle's production of documents responsive to RFP Nos.  4,

13   6, 8, 13, 15, 17, 32, and 34.  *See* Fed. R. Civ. P. 34(b)(2)(C) ("An objection *must*

14   state whether any responsive materials are being withheld on the basis of that

15   objection.").[21]

16        In addition, whether Oracle's PeopleSoft licenses preclude (No. 22) or

17   permit (No. 24) third parties to provide maintenance and support services bears

18   directly on whether a non-infringing alternative exists, the cost of which Judge

19   Hicks held in *Rimini I* to be relevant in the hypothetical negotiation in determining

20   the "value of use."   (Dkt. 724, Order Denying Oracle's Motion in Limine to

21   Exclude Expert Testimony, at 5 (stating, "Thus, the value of a hypothetical license

22   to Rimini is the amount that it would have cost Rimini to implement a non-

23   infringing alternative.").   For example, third-party provider Spinnaker publicly

24   advertises that its service model does not infringe Oracle's copyrights.   Does

25   Oracle agree?  If so, are Rimini's processes materially identical?  If not, how much

26   ─────────────────

27   [20]   *See infra* pp. 51-52.
     [21]   Oracle's argument related to the TAR protocol fails for the same reasons the
28   argument fails with respect to Oracle's response to Request for Production
     No. 15.

1    would it cost Rimini to implement a similar process?  The answers to these

2    questions, and others, are vital both to whether Rimini is liable for infringement

3    and what the value would be of any hypothetical license.  Rimini's requests are

4    designed to elicit that information.

5        The Court's October 2015 Order denying Rimini's Motion to Compel on

6    wholly different Requests for Production and Interrogatories does not preclude

7    discovery on Requests for Production Nos. 22, 23, 24.  Each request is directly

8    relevant to the so-called "relevant" Rimini clients because the requests concern the

9    maintenance and support alternatives that were available to Rimini's clients at all

10   relevant times.  And unlike Rimini's Interrogatory No. 1, Oracle cannot reasonably

11   argue it has insufficient information to respond: Each request seeks documents

12   Oracle currently has in its possession, custody, or control.  Further, the Court's

13   Order stated that "applying the proportionality objectives of the Federal Rules of

14   Civil Procedure, I am not going to compel Oracle to produce the additional

15   materials in the manner in which Rimini has requested in **this** request to compel."

16   Dkt. 109 at 34 (emphasis added).  The Court went on to say that "I'm not

17   foreclosing any potential future discovery on the issue a hundred percent, but based

18   on your arguments today and the need for the materials that you've articulated,

19   I've given you my ruling.  But if something changes, your discovery requests may

20   change as well."  Dkt. 109 at 37.  The discovery requests have changed.  Nothing

21   in the Court's October ruling entitles Oracle to refuse Requests for Production Nos.

22   22, 23, and 24.

23        At bottom, Requests for Production Nos. 22-24 are specifically directed to

24   alternative support for the PeopleSoft family of software products.  Responsive

25   documents are germane to the existence of an acceptable and non-infringing

26   alternative, the existence of alternative third-party support providers, and whether

27   self-maintenance is a viable option for PeopleSoft licensees—all issues that were

28   disputed in *Rimini I*.  Therefore, Rimini respectfully requests an Order compelling

1    Oracle to produce documents responsive to Requests for Production Nos. 22-24.

2        **B.    Oracle's Opposition to Rimini's Motions to Compel**

3        Rimini's belated motions to compel attempt to impose additional discovery

4    burdens on Oracle who, unlike Rimini – and contrary to Rimini's

5    misrepresentation above – has *not* "stonewall[ed]" discovery in this case.  Rimini's

6    motions concern its First Set of Requests for Production, which Oracle timely

7    responded to on July 20, 2015.  Rimini raised several questions that it had about

8    the scope of Oracle's responses to these document requests in a letter dated August

9    3, 2015.  The Parties promptly engaged in good faith meet and confer, and Oracle

10   amended a number of its RFP responses on October 1, 2015 to address Rimini's

11   stated concerns.    The Parties then queued up their unresolved disputes for

12   resolution at the October 26, 2015 joint status conference.  Further meet and confer

13   efforts before that hearing yielded additional compromises, which are reflected in

14   additional amended RFP responses that Oracle served on November 3, 2015.  This

15   months-long meet-and-confer process left Rimini with two categories of

16   documents that it moved to compel Oracle to produce in the October 22, 2015 Joint

17   Status Report:  **(i) "documents that involve current or former Oracle customers**

18   **that are not Rimini clients"** and **(ii) "information about any provider of third-**

19   **party support for Oracle's PeopleSoft software products other than Rimini."**

20   After full briefing and oral argument from the Parties, the Court <u>denied</u> Rimini's

21   motions to compel.  D.I. 109; Oct. 25, 2016 Hrg. Tr. at 34:11-25.  When the Parties

22   submitted their next joint submission in advance of the December 15, 2015 status

23   conference, Rimini raised no further concerns about Oracle's RFP responses, it

24   sought no clarification regarding the scope of the Court's discovery order, and it

25   filed no motions to compel.

26        It was not until January 29, 2016 that Rimini sent Oracle a letter raising the

27   concerns that are the subject of its present motions to compel.  If Rimini truly

28   believes that Oracle has been "stonewalling" discovery for sixteen months, as it

1  claims, then it waited more than fifteen months to make that accusation.[22]  And if
2  Rimini truly believes that the Court's order denying its prior, duplicative motions
3  to compel has the narrow application that it advocates here, then it waited more
4  than three months – *after* Oracle spent weeks reviewing its custodial seed set
5  documents based on the requests that are the subject of Rimini's motions – to take
6  that position.

7      Because Rimini insists on re-litigating its prior, unsuccessful motions to
8  compel, Oracle's response may sound familiar to the Court from past briefing.
9  Notably, Oracle has not outright refused to produce documents in response to *any*
10  of the document requests at issue.[23]  Rather, Rimini asserts that Oracle's responses
11  to RFPs 15, 22-24 are not broad enough because, just like the RFP responses at
12  issue in Rimini's unsuccessful October 2015 motion to compel, Oracle has not
13  agreed to take on the undue burden of identifying and producing communications
14  with or documents regarding non-relevant customers or third-party support
15  providers other than Rimini.  Rimini's motions to compel documents beyond what
16  Oracle has already agreed to produce should be denied.

17          **1.      Rimini's Requests for Production of Documents**

18      Rimini's motion to compel regarding RFP No. 15 and RFP Nos. 22-24 is
19  duplicative of its unsuccessful October motions, and should be denied for the same
20  reasons:

21      • In October, Rimini argued that "Oracle has refused to produce any
22          documents that involve current or former Oracle customers that are
23          not Rimini clients."  D.I. 106 at 9:25-26.  Here, Rimini argues that
24          "Oracle refuses to produce discovery with respect to any Oracle

---

[22]  This contrasts with Oracle's months-long effort to get Rimini to fully comply with its discovery obligations, which has required recurring motion practice and multiple Court orders.

[23]  Nor, as discussed below, has Oracle refused to search for and produce responsive documents from non-custodial sources, where necessary to comply with its discovery obligations.

1

2

customer that did not become a Rimini client."

3   • In October, Rimini argued that "[t]hese documents are obviously
4   relevant to testing any causation theory and damages asserted by
5   Oracle regarding its counterclaims in *Rimini II*." D.I. 106 at 10:21-22.
6   Here, Rimini argues that this "evidence is highly relevant to Rimini's
7   alleged liability and Oracle's claimed damages" and "directly relevant
8   to defeat Oracle's counterclaims . . . . as well as Rimini's defenses to
9   each."

10

11   • In October, Rimini argued that "information relating to third parties
12   that Oracle knows supply third-party support for its products is
13   relevant to Rimini's claims, the interpretation of its licenses, and
14   damages, among other issues." D.I. 106 at 12:4-6. Here, Rimini
15   argues that "Oracle improperly seeks to block discovery into Oracle's
16   own statements and communications discussing the maintenance and
17   support alternatives available to Rimini customers since December
18   2011."

19   Even though Rimini has picked a new subset of its document requests (from the
20   same set of RFPs) to focus on, the categories of additional documents that Oracle
21   has declined to produce and the scope of the relief that Rimini seeks is identical to
22   what the Court already ruled on more than three months ago.

23   **a)      Rimini's Document Request No. 15**

24   Rimini's RFP No. 15 asks for:

25   All documents relating to communications to or from any former,
current, or prospective customer of either Oracle or Rimini Street that
26   refers or relates to Rimini Street, and/or its products or services.

27

28   As an initial matter, RFP 15 asks for irrelevant information. Rimini propounded

42

1  the request to obtain information concerning its former tenth affirmative defense of

2  copyright misuse.   In that defense, Rimini alleged that "senior managers in

3  Oracle's support sales organization have told Oracle licensees, including

4  prospective clients of Rimini, that 'no company out there, including Rimini Street,

5  can offer you the support of the vendor without committing copyright

6  infringement.'"   D.I. 46 at 13.   RFP 15 was seeking to obtain those supposed

7  communications with customers who then did not contract with Rimini for support

8  as evidence for that defense.   However, after Rimini propounded RFP 15, the

9  Court struck Rimini's copyright misuse defense as legally deficient. D.I. 90 at 5-7.

10  There is no claim or defense left in this case to which RFP 15 is relevant.   Oracle's

11  claims under the Lanham Act and for inducing breach of contract, intentional

12  interference, breach of contract and unfair competition concern communications *by*

13  *Rimini* to Oracle customers *that went to Rimini*, not communications by Oracle

14  with customers that stayed with Oracle for support.   D.I. 22 ¶¶ 92, 93, 95.   As to

15  the existing claims in the case, RFP 15 is simply backwards.

16      Nonetheless, in an attempt to avoid disputes, Oracle's response to RFP No.

17  15 is consistent with its response to Rimini's other requests asking for documents

18  related to Oracle's communications with customers.   In response to RFP No. 15,

19  Oracle has agreed to produce communications between it and any of the hundreds

20  of relevant customers that Rimini has identified – *plus* any non-privileged

21  documents that describe the contents of such communications – that refer to

22  Rimini, Rimini's products or services, or any potential breach of that customer's

23  relevant contracts.   In other words, if any of Oracle's 38 custodians have

24  documents that reflect any communications with a relevant customer about Rimini,

25  Oracle will produce them.   In addition, Oracle has agreed to search for and produce

26  from its custodial collections any contractual negotiations with relevant customers

27  regarding relevant products (RFP No. 16), as well as speeches, interviews, press

28  releases, or publications by Oracle that refer to Rimini (RFP No. 14).   Rimini

43

1    theorizes in its motion to compel that communications between Oracle and relevant

2    customers might reveal misrepresentations or other misconduct by Rimini – if so,

3    Oracle is producing those.  Rimini's motion to compel further production beyond

4    that in response to RFP No. 15 is unduly burdensome and should be denied.[24]

5           As the Court knows from prior briefing, Oracle has hundreds of thousands of

6    customers, only several hundred of which are relevant to this litigation, and many

7    of which do not receive support from Oracle for any of the product lines related to

8    this case.    Rimini's assertion that it is entitled to vast discovery into

9    communications with the hundreds of thousands of customers that never went to

10   Rimini because they are supposedly relevant to damages is wrong.  Oracle used

11   phrases such as "Rimini and Oracle customers," "current and/or past Oracle

12   customers," and "prospective customers" in its initial disclosures because all of the

13   relevant customers at issue – past or present Rimini customers for relevant product

14   lines and prospective customers that Rimini will acquire during the pendency of

15   this case – have received support services from Oracle and may do so again in the

16   future.  Rimini's related assertion that Oracle sought damages in the *Rimini I* trial

17   for customers that did not go to Rimini for support is untrue.

18          Rimini's motion also makes no practical sense.  As previously briefed, the

19   parties are working to implement a technology-assisted review to facilitate a

20   focused, efficient document production in this case.  The TAR process requires the

21   parties to identify a limited set of custodians and come up with clear, limited

22   categories of documents that – based on human review of a small "training" seed

23   set – will merit a "responsive" designation by the predictive coding software.  If, as

24

---

25   [24]   The timing of Rimini's motion to compel on RFP No. 15 is difficult to
     reconcile with the parties' meet and confer history.  Rimini raised concerns
26   about the scope of Oracle's RFP No. 15 response in its August 3, 2015 letter.
     The parties met and conferred about that request, among others, and Oracle
27   amended its response to RFP No. 15 on July 20, 2015.  In advance of the
     October 2015 status conference, Rimini did not identify RFP No. 15 as one
28   of the document requests about which "[t]he parties could not reach an
     agreement" that required a motion to compel.

---

44

Rimini insists, Oracle must teach the predictive coding software to identify and produce communications with or about customers that have nothing to do with this case – and the overwhelming majority of Oracle's customers are in that category – then any benefit derived from the use of a TAR process will be offset by the overly broad scope of documents that will have to be collected and produced.

For these reasons, Oracle respectfully requests that – consistent with its October 2015 ruling – the Court deny Rimini's motion to compel with respect to RFP No. 15. *See* Oct. 26, 2015 Hrg. Tr. at 34:11-25 ("Since the 1980s the Supreme Court and the drafters of the Federal Rules of Civil Procedure have been urging trial courts to be more proactive and to manage and narrow discovery with a view towards accomplishing the objectives of Rule 1. And the lower courts have been loathe to do that. And the rules are about to be changed again effective December 1st unless Congress acts. We're in Las Vegas. You can make book on that one. And applying the proportionality objectives of the Federal Rules of Civil Procedure, I am not going to compel Oracle to produce the additional materials in the manner in which Rimini has requested in this motion to compel. So your request is denied.").

> b) **Oracle's Document Production from Non-Custodial Sources Relevant to RFP Nos. 4, 6-17, 29-30, 32, and 34 ("Non-Custodial Production")**

Rimini's second motion to compel is inconsistent with the parties' representations and documented understanding regarding the scope of Oracle's agreed document productions. By emphasizing the large scope of its own non-custodial productions and failing to specify what relief it seeks, Rimini quickly reveals this "motion" to be a sounding board for Rimini to air its frustration with the discovery obligations that it has been forced to comply with over the past couple months.

Both Oracle *and* Rimini have been clear about Oracle's obligation to

produce non-custodial documents in this case.[25]  In the Parties' October 2015 joint status report, Oracle stated its understanding that it would produce from non-custodial sources "where necessary to comply with Oracle's document production obligations" and that it would not be necessary for "most" of the "document categories":

> Rimini's document requests [] request the production of documents *only* from the 38 document custodians that Oracle has agreed to produce documents from, as well as limited, non-custodial sources *where necessary to comply* with Oracle's document production obligations.  For example, to the extent that Oracle has agreed to produce customer licenses . . . , Oracle has produced them from the non-custodial source where they are maintained by Oracle in the ordinary course of business.  By contrast, Oracle has agreed to produce documents regarding license analysis in response to RFP No. 6 – *as well as most other document categories requested by Rimini* – by conducting a reasonable search for such documents across its 38 custodians' documents using the Parties' agreed TAR process.  ***During the course of drafting this joint submission, Rimini has now confirmed above that Oracle's understanding is correct with respect to <u>all</u> of its document requests***.

D.I. 106 at 13, n.2 (emphasis added).  Far from disagreeing, Rimini confirmed:

> Rimini also states that, unless Oracle has a specific location where it knows there are likely to be responsive documents, such as a folder containing pertinent communications, Oracle would only need to search its 38 custodians for the relevant documents.

*Id.* at 12.  These representations contradict Rimini's allegation that Oracle has taken an "unreasonably narrow" position regarding its obligation to search non-custodial sources for responsive documents.  The only category of documents responsive to Rimini's First Set of Requests for Production that Oracle knew (and knows) are likely to be stored in a non-custodial location are the contract and license documents that it has produced for relevant customers.  Oracle's efforts to collect contract and license documents for the relevant customers that Rimini identified in its recently updated response to Oracle's Interrogatory No. 1 is

---

[25]   Rimini's statements in other Sections of this Joint Status Report about Oracle's purported refusal to search for and produce responsive documents from non-custodial sources are mischaracterizations for the reasons stated in this section.

1   ongoing, but Oracle is not withholding documents from production to the extent it
2   can locate them as the result of a diligent search.

3        Rimini's assertion that Oracle "admitted [it] ha[s] not been working to
4   collect" responsive documents from non-custodial sources is untrue.  When Rimini
5   inquired about the scope of Oracle's collection and production of non-custodial
6   documents – which it had never done before its January 29 letter – Oracle simply
7   confirmed what it had stated (with Rimini's agreed understanding) in October
8   2015:  that its collection of non-custodial documents in this case to date has been
9   limited to the contract and license documents that it knows exist in centralized
10  sources.

11       If Rimini's argument is meant to be construed as a motion to compel Oracle
12  to produce non-custodial documents in response to Request for Production Nos. 4,
13  6-17, 29-30, 32, or 34, then it must be denied for multiple reasons.  First, as
14  summarized above, the parties have agreed that – with very limited exceptions –
15  Oracle is searching for and producing responsive documents from its *custodial*
16  collections in this case.

17       Second, the document requests identified by Rimini do not call for the
18  production of documents that Oracle maintains in non-custodial sources.  For
19  example, as quoted above, Oracle stated months ago (and Rimini agreed) that
20  Oracle would search for and produce "documents regarding license analysis in
21  response to RFP No. 6" through its *custodial* productions.  RFP No. 15, the subject
22  of Rimini's motion to compel discussed above, similarly calls for the production of
23  communications between Oracle's support sales representatives and relevant
24  customers.  That is why Oracle has identified and included such individuals as
25  document custodians.  RFP Nos. 29 and 30 – which call for the production of
26  various categories of documents sent "to, from or concerning Vicky Jones" are
27  clearly custodial in nature:  Oracle named Vicky Jones as one of its document
28  custodians and stated in its response to these requests that "Oracle will conduct a

1  reasonable search for and produce non-privileged documents to or from Victoria
2  Jones to the same extent that Oracle has agreed to produce specified categories of
3  documents in response to Rimini's other requests for production from Oracle's
4  identified document custodians.   Oracle will not produce any broader set of
5  documents from Ms. Jones' custodial collection."  In short, many of the specified
6  document requests are, on their face, requests for custodial documents.  Indeed,
7  although Rimini moves to compel from non-custodial sources for RFP Nos. 4, 6-
8  17, 29-30, 32 and 34, Rimini does not tell the Court what most of those RFPs ask
9  for or why responsive documents would likely be found in a non-custodial source.

10      Third, Oracle's ongoing production of non-custodial documents is consistent
11  with its *Rimini I* productions.  If Rimini had genuine concerns about whether
12  Oracle has identified the proper non-custodial sources of relevant information, then
13  it defies explanation that Rimini waited until almost a year after the Rule 26(f)
14  conference to raise this issue with Oracle.  On the Parties' February 3rd meet and
15  confer call, Rimini asked Oracle's counsel to confirm whether Oracle uses a
16  Customer Relationship Management system ("CRM") that tracks or contains
17  customer interactions, including negotiations, customer concerns, and other
18  communications.  Oracle has confirmed that Oracle's support sales organization,
19  which is the relevant organization within Oracle, does not use a CRM system to
20  track customer interactions or communications in the way that Rimini describes, or
21  at all.  Rather, the most comprehensive source of customer-specific information
22  related to Oracle customer's support agreements – including the renewal or
23  cancellation thereof – is the Oracle Contracts System.  When the Parties exchanged
24  information as part of the Rule 26(f) conference, Oracle disclosed both the Oracle
25  Contracts Systems ("OKS") and Oracle Data Store ("ODS") as "centralized
26  systems likely to contain information potentially relevant to the Parties' claims and
27  defenses concerning Oracle's customers and contracts."  Polito Apr. 24, 2015 Ltr.
28  to Niegowski at 2.   OKS contains customer-specific information related to

48

customer contracts, which can be accessed using a standardized Oracle reporting tool called "ODS reports." Oracle produced ODS reports in the *Rimini I* litigation to support its damages expert's lost profits analysis, and Oracle intends to produce them again in *Rimini II*. The OKS system does *not* include copies of customer communications per se, but Oracle has confirmed that it is possible to run a version of an ODS report that includes a field where Oracle support sales representatives can manually enter comments regarding a customer's renewal or cancellation of a support agreement. Oracle plans to produce such reports for the relevant customers at issue in this case.

Running ODS reports is labor intensive. If Rimini wants Oracle to produce these reports in advance of expert discovery, then Oracle needs the ability to provide Oracle personnel outside of Legal with the list of customer names for which it needs to run these reports. Rimini's designation of its customer list as "Highly Confidential Information – Attorneys' Eyes Only" prohibits Oracle from doing so. Oracle therefore requests that Rimini reduce the designation of Rimini's customer list to "Confidential Information."

For these reasons, Rimini's speculative motion to compel Oracle to produce additional non-custodial documents should be denied.

### c)    Rimini's Document Requests Nos. 22-24

Rimini's RFP No. 22 asks for:

> All documents relating to or containing statements by Oracle that only Oracle can provide support for Software and Support Materials to Oracle's licensees.

Rimini's RFP No. 23 asks for:

> All documents reflecting communications between Oracle and third-party support providers, independent consultants, or customers who self-support (collectively, "alternative support") regarding the provision of such alternative support for Software and Support materials, including documents and communications regarding the permissibility of such alternative support.

Rimini's RFP No. 24 asks for:

49

All documents relating to or containing statements by Oracle that third-party support providers can provide support for Software and Support Materials to Oracle licensees.

Rimini's motion is a repeat of the October 2015 motion to compel briefing. In that motion, Rimini argued that "Oracle refuses to provide responses and documents regarding third-party support." D.I. 106 at 11 (subheading 2). Rimini argued then, as it does now, that "[t]he existence of alternatives to Oracle's support services was a central issue in the *Rimini I* trial," and that this information is relevant to "the interpretation of Oracle licenses, and damages, among other issues." *Id*. at 12. Oracle explained at length that Rimini was misrepresenting the scope of what Oracle had agreed to produce and why Oracle objected to Rimini's document requests to the extent that they called for documents related to undefined "third-party support" or unspecified "third-party support providers" other than Rimini. *See* D.I. 106 at 17-22. Notwithstanding Rimini's arguments that it was "entitled to plenary responses about Oracle's awareness of third parties that provide support for Oracle's software, regardless of whether Oracle considers those services to be infringing or non-infringing and whether those services involve Rimini clients," *id.* at 12, the Court denied Rimini's motion to compel Oracle to produce documents regarding third-party support unrelated to Rimini.[26] As noted above, the Court's holding was chiefly based on proportionality concerns.

Like the RFPs at issue in Rimini's October motion, RFP Nos. 22-24 are overbroad and unduly burdensome to the extent they seek the production of documents regarding (and communications with) countless unspecified third-party providers. Furthermore, these requests are not limited to statements made in public

---

[26] The duplicative nature of Rimini's motion is further evidenced by the fact that Rimini raised concerns about Oracle's purported "refus[al] to produce any documents for any provider other than Rimini in response to requests . . . 21-35 . . . regarding third-party support providers for Oracle's PeopleSoft products" in its August 3, 2015 meet and confer letter referenced above. Months of meet and confers and amended discovery responses culminated in Rimini's unsuccessful motion to compel regarding this category of documents in October 2015.

or in communications with Rimini or relevant customers.  Rather, RFP No. 23 calls for communications with an undefined, boundless group of "third-party support providers, independent consultants, or customers who self-support."  RFP Nos. 22 and 24 are even broader; they request the production of *all* statements that Oracle has made related to the permissibility of third-party support without any limitation on the recipients or audience of those statements.  Together, these broad requests seek the production of every document in Oracle's custodial files that relate to whether, how, and from whom Oracle licensees can get support (lawful or otherwise) for their Oracle software.

Due to Rimini's failure to reasonably limit the scope of these requests, Oracle has agreed to search for and produce custodial communications between Oracle and Rimini regarding the legality (or illegality) of Rimini's support model in response to RFP Nos. 22-24.  Rimini's motion to compel emphasizes the apparently narrow scope of this response.  What Rimini ignores, however, is how Oracle's stated response to these specific requests fits within the framework of its agreement to produce similar categories of documents in response to other requests in Rimini's First Set of RFPs.

Rimini asserts that Oracle's responses are an attempt to "block discovery into . . . communications discussing the maintenance and support alternatives available to Rimini customers since December 2011," but that is incorrect.  To the contrary, Oracle has agreed to produce documents regarding permissible third-party support for relevant Oracle products in response to multiple requests.  For example, Oracle has agreed to produce:  (i) documents discussing or analyzing the use of Oracle's Software and Support Materials in development and testing environments by third-party support providers (RFP No. 4); (ii) documents regarding the permissible scope of third-party support under the terms of the relevant license agreements (RFP No. 6); (iii) documents evidencing how any Oracle license agreement provisions form the basis for Oracle's claims against

Rimini (RFP No. 6); (iv) communications discussing or analyzing third-party support providers' use of one relevant customer's software to provide services for another customer with that same type of software, or vice-versa (RFP No. 8); (v) documents discussing or analyzing relevant customers' use of cloud computing or offsite servers not owned or operated by those customers (RFP No. 13); (vi) communications with relevant customers that discuss or analyze the scope of protection provided by Oracle's copyrights (RFP No. 34); and (vii) documents containing or discussing points for use in discussion with customers regarding third-party support for any of the product lines at issue (RFP No. 32). This is in addition to other broad categories of documents that Oracle has agreed to produce, including communications with relevant customers that mention Rimini, its products, or its services (RFP Nos. 15, 17). Analyzing Oracle's responses to RFP Nos. 22-24 in their proper context reveals that they were intended to – and do – fill a potential gap in the universe of custodial documents that Oracle reasonably agreed to search for and produce: communications between Oracle and Rimini *itself* that relate to the legality of Rimini's support model. In short, between its various RFP responses, Oracle has agreed to a reasonable scope of production concerning third party support, including alternatives to Rimini and the extent to which third-party support for the relevant products is permissible under the applicable licenses.

The further documents Rimini seeks to compel in response to RFP Nos. 22-24 are disproportionate to any relevance they might have. Rimini's motion never really argues otherwise. Instead, Rimini pretends that Oracle agreed to produce nothing concerning other third party support providers – ignoring all of the RFP responses in which Oracle did agree to a reasonable scope of production – and then Rimini argues that documents concerning other third parties could potentially be relevant. But the whole issue before the Court in October, and now again in this repeat motion, was how much discovery is proportional to that amount of

relevance.[27]   Oracle's agreements to produce are generally tied to documents concerning third parties engaged in specific practices relevant to this case (such as the use of development and testing environments) or relevant customers or licenses.   RFP Nos. 22-24, by contrast, are completely boundless.   The Court should reaffirm the line it drew last October and deny Rimini's motion compel. Further, despite Rimini's odd assertion that the Court's order is inapplicable because "[t]he discovery requests have changed," in fact RFP Nos. 22-24 were in the same set as RFP Nos. 8 and 18 that the Court ruled on previously.

Finally, Rimini's motion to compel, if granted, would undermine the usefulness of the parties' agreed TAR protocol.  If Oracle must teach the predictive coding software to search for and produce broad categories of minimally relevant documents, then any benefit derived from the use of a TAR process will be offset by the overbroad scope of documents that will be collected and produced.

For these reasons, Oracle respectfully requests that the Court deny Rimini's motion to compel with respect to Request for Production Nos. 22, 23, and 24.

### C.   Oracle's Motions to Compel Discovery from Rimini

Rimini has failed to comply with this Court's Orders granting Oracle's motions to compel responses to Interrogatory Nos. 3 and 6, and has announced its intent to limit its response to Interrogatory No. 5, again in defiance of the Court's Order.  Oracle moves, once again, for supplemental responses, and asks the Court to enter a written Order to which Rimini can be bound.  Oracle also moves that Rimini be ordered to update its productions of Salesforce and DevTrack, in light of obvious omissions in its productions to date.

---

[27] As even Rimini observes, the recent updates to Federal Rule of Civil Procedure 26 emphasize that the scope of discovery is limited to information "relevant to any party's claim or defense *and proportional to the needs of the case*, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1) (emphasis added).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 1.    Oracle's motion to compel Rimini's compliance with the Court's order re Interrogatory No. 5

As Oracle made clear in the last Joint Status Report, Interrogatory No. 5 seeks, and Rimini previously agreed to provide, file-level metadata for *all* copies of Oracle files.  December 13, 2015 Joint Status Report at 20-21, 23.[28]  The Court already found that Rimini has possession, custody, and control over the environments and archives for which Oracle seeks this information.  December 15, 2015 Hearing Tr. at 34:17-21; *see also* January 12, 2016 Hearing Tr. at 43:17-20 ("Every 30 days I'm going to be asking Rimini why hasn't it finished producing what it knows I'm compelling them to produce."); *id.* at 47:18-24 ("…I found they have control of this material.").  At the last status conference, the Court stated that it expected Rimini to "produce as many [environments] as you reasonably can in the next 30 days.  And we'll take up your progress and whether it's reasonable or it's not reasonable when we meet again in 30 days."  January 12, 2016 Hearing Tr. at 57:1-4.  In the subsequent three weeks, Rimini produced approximately half of the purported 400 preserved local environments, but it produced little additional environment metadata for customer- or cloud-hosted environments, did not produce any archives or archive metadata, and did not provide a timeline for doing so.[29]  (As in the past, Rimini made a small production of environment metadata in the days immediately leading up to the February 16 status conference, so it could say it did something, rather than nothing.)  Nor has Rimini completed its process for identifying the customers who will require a subpoena from Oracle.

In addition, Rimini has informed Oracle that it will *not* comply with the

---

[28] "…including files contained within environments, files contained within archives, and any other such files in Rimini's possession, custody, or control, whether those files are still on Rimini's computer systems and virtual machines or whether Rimini has attempted to hide those files (and virtual machines containing those files) on other computer systems."  *Id.* at 20.

[29] As noted above, Rimini has produced an average of 25 KDP environment metadata per month.  At this rate, it will take six to nine more months for Rimini to complete this production.

Court's Order on Interrogatory No. 5 as to a newly invented category of customer environments: "support only" or "access only" environments.[30]   Neither Rimini's prior briefing, nor Rimini's discovery responses, nor Rimini's statements in Court have ever referred to any such categories of environments. [31]   To the contrary, Rimini promised the Court that it would no longer argue about control, and would instead turn to satisfying its production obligations.  January 12, 2016 Hearing Tr. at 6:13-22; *see also id.* at 13:18-19 ("[W]e're not going to fight.  We'll produce it.").  Rimini's promise has been short-lived.

Oracle once again asks the Court to compel Rimini to provide the information requested by Interrogatory No. 5.  Oracle asks the Court to adopt Oracle's proposed case schedule, which sets the deadlines for Rimini to complete its responses to Interrogatory No. 5 as to environments and archives as April 22, 2016 and May 27, 2016, respectively.  Oracle further requests that the Court enter Oracle's Proposed Order, to prevent any further efforts by Rimini to disregard its discovery obligations with respect to Interrogatory No. 5.  Declaration of John A. Polito, Ex. A, Proposed Order (filed concurrently by Oracle).

### a)   Rimini's claimed ignorance of the scope of its discovery obligations require clarification from the Court

Oracle has already shown, through Rimini's own interrogatory responses, support contracts, and technical documents, that Rimini has control of its customers' environments and archives for the purposes of Rule 34.  *See, e.g.*, December 13, 2015 Joint Status Report at 25-34; *see also* December 15, 2015

---

[30] While Rimini used the term "support only" in meet and confer correspondence, Oracle presumes that Rimini refers to the same set of environments when it uses the term "access only" environments in this Joint Status Report.

[31] Indeed, its December 30, 2015 Supplemental Report on Technical Issues Rimini identified "[t]hree distinct types of client environments," defined "Client Hosted Environments" as "Development and test environments Rimini clients maintain on their own systems," and averred that Rimini contacted "all of the clients who have Client-Hosted Environments…." *See* December 30, 2015 Supplemental Report on Technical Issues at 1, 10.

1   Hearing Tr. at 36:6-8 ("your client was the one who made the election to do what
2   they did to make them more difficult to produce"); January 12, 2016 Hearing Tr. at
3   47:18-24.  Having lost this motion, Rimini is now attempting to carve out certain
4   environments from its Court-ordered discovery obligations with new theories, and
5   claims that Rimini misunderstood the scope of Oracle's motion to compel.
6   Rimini's efforts are both disingenuous and untimely, given the scope of meet and
7   confer, briefing, and oral argument on this issue.

8       First, Rimini now contends that there are "support only" client-hosted
9   PeopleSoft environments that are not within the scope of Interrogatory No. 5.  *See*
10  January 19, 2016 email from D. Niegowski to Oracle.  Rimini states that these
11  environments "are typically accessed only intermittently and not used for the
12  development of tax and regulatory updates."  January 26, 2016 email from D.
13  Niegowski to Oracle.  In addition, Rimini claims that it "did not previously
14  understand that Oracle was requesting KDP productions for every environment
15  Rimini has ever accessed."  January 29, 2016 email from R. Dykal to J. Polito.  In
16  the Parties' February 2, 2016 meet and confer, Rimini identified Exhibit D-2 to its
17  Third Supplemental Responses to Oracle's Interrogatories as a list of "support
18  only" environments.

19      Rimini cannot credibly claim that it did not understand the breadth of
20  Oracle's discovery request and subsequent motion to compel.  In response to
21  Rimini's first supplemental response to this interrogatory, Oracle informed Rimini
22  that "Oracle seeks, and is entitled to, the KDP information for ***all* of the**
23  **environments**…."  November 10, 2015 Letter from L. Shinn to D. Niegowski at 3
24  (emphasis added).  Oracle repeated this in subsequent meet and confer
25  correspondence.  November 25, 2015 Letter from L. Shinn to D. Niegowski at 3
26  ("Oracle also reiterated that **this interrogatory seeks KDP data for all**
27  **environments**, not just those listed in replacement Exhibit E.  Oracle understands
28  that you will confer with your client regarding Oracle's request that you provide

(1) .ovf files for all environments—'cold storage' or otherwise—created, accessed, copied, or used on or after December 2011 (i.e., prior to the start date you represented for Exhibit E), and (2) either .ovf files or **KDP data for all environments stored on third party/cloud servers or on Rimini clients' servers**") (emphasis partially added).  Oracle's motion to compel was in accord.  *See, e.g.*, December 13, 2015 Joint Status Report at 20, 34.[32]  In light of these repeated statements by Oracle, it is disingenuous for Rimini to claim that it did not understand the scope of Oracle's motion.

Second, Rimini's assertion that there are customer-hosted and cloud-hosted environments over which it does not have possession, custody, and control is untimely, incorrect, and unsupported by any specific evidence.  The Court has already ruled that Rimini has control over all customer-hosted and cloud-hosted environments.  December 15, 2015 Hearing Tr. at 34:17-21; *see also* January 12, 2016 Hearing Tr. at 47:18-24 ("And that's water under the bridge because I found they have control of this material.").  Moreover, the Court ruled that, far from "litigation by ambush," Rimini had a "full opportunity to flush out what the issues are and what [its] positions are."  December 15, 2015 Hearing Tr. at 4:8-5:2.  Indeed, Rimini had an opportunity to put evidence before the Court, Rimini failed to do so, and the Court determined that Rimini's "own answers to interrogatories and the documents [it] produced from the customer contracts" support a finding of unfettered access and administrative rights to client-hosted and cloud-hosted environments "24/7, 365."  *Id.* at 6:6-11.[33]  Rimini's opposition to the instant

---

[32]   Oracle's early meet and confer correspondence explained Interrogatory No. 5 by analogy to similar requests made in *Rimini I*.  *See* September 30, 2015 Letter from L. Shinn to D. Hinkle at 5.  Rimini never raised the concept of "support only" environments in *Rimini I*, either.  Thus, the timeline in Rimini's opposition asserting that Oracle should have mentioned them as far back as 2010 is highly misleading.

[33]   Nor is Rimini likely to be able to adduce any persuasive evidence if given the opportunity, since Oracle already addressed some of the alleged "support only" customers in Oracle's prior motion to compel.  For example, as already briefed by Oracle, the support contracts for these allegedly "support

---

57

1 | motion again fails to put forth evidence substantiating this hypothetical category of
2 | environment.

3 |       Rimini tries to rely on a supposed distinction between Oracle's Interrogatory
4 | No. 5 (concerning software copies in Rimini's "possession, custody or control")
5 | and Interrogatory No. 3 (concerning environments that Rimini "accessed"),
6 | claiming it understood those interrogatories to be asking about different categories
7 | of environments.  That argument fails because Rimini argued in the December
8 | motion to compel briefing that it did *not* have possession, custody or control over
9 | any of the cloud- or customer-hosted environments and that it instead merely
10 | accessed them.  Dkt. 117 at 48.  Rimini stated:  "The purported basis for Oracle's
11 | argument is that Rimini's ability to *access* its clients' systems as defined and
12 | limited by contract to provide consulting services amounts to *control* under the
13 | Federal Rules."  *Id.*  In other words, Rimini did *not* think Interrogatories 5 and 3
14 | referred to *different* sets of environments.  It thought they referred to the same set –
15 | all the ones Rimini accessed – and Rimini argued it did not have control over them.
16 | The Court then rejected that argument based on specific evidence that Rimini did
17 | have control.  The very issue before the Court in December was *whether* Rimini
18 | had control or just access.  Rimini's view, which the Court rejected, was that none
19 | of the cloud- or customer-hosted environments fell within the scope of
20 | Interrogatory No. 5 – not the newly concocted position that some of them do.

21 |       Rimini also failed to raise this issue during the Parties' previous rounds of
22 | meet and confers and motion practice, waiting instead until Oracle won its motion
23 | to compel.  Rimini's request for "dialogue" is nothing more than an attempt to

24 |

25 |
_____

26 | only" customers are the same as any other client-hosted customer.
*Compare, e.g.*, December 13, 2015 Joint Status Report at 26, n. 7 (citing
Statement of Work from Future Electronics, Inc.) *with* Exhibit D-2 (listing
27 | Future Electronics, Inc.), *and* December 13, 2015 Joint Status Report at 25,
n. 6 (citing Self-Hosting Amendment from ███████████████████████)
28 | *with* Exhibit D-2 (listing ███████████████████████).

1  manufacture a new round of disputes and further delay.[34]  And once again, Rimini

2  has failed to offer *any evidence* to support its new theory.[35]  Rimini's untimely

3  attempt to avoid its discovery obligations should not be rewarded.  Oracle

4  respectfully requests the Court enter the attached Proposed Order, discussed above,

5  consistent with its previous rulings.

6          **b)     Rimini's preliminary response regarding its efforts to
            produce client archives or KDP metadata of same
7          further reveal its lack of diligence**

8          With respect to archives of Oracle Software and Support Materials

9  responsive to Interrogatory No. 5, the Court ordered Rimini to provide a

10  preliminary written response on January 26, 2016.  January 12, 2016 Hearing Tr. at

11  55:25-56:6.  Rimini's response indicates ███████████████████████████

12  ████████████████████████████████████████████████████████████

13  ████████████████████████████████████████████████████████████

14  ████████████████████████████████████████████████████████████

15  ████████████████████████████████████████████████████████████

16  ████████████████████████████████████████████████████████████

17  ██████████████████████████████████████████████  *See* January 26,

18  2016 email from R. Dykal to Oracle.  This timeframe is excessive, just as Rimini's

19  estimate for the time it takes to produce environments was excessive.  *See* Dkt.

20  140-1, Hicks Decl. at ¶¶ 12-13.  And Rimini's extended timeframe is due in part,

21  again, to Rimini's delayed (and unwarranted) request for "authorization."

22          Oracle respectfully requests that, to avoid further disputes, the Court enter

23  Oracle's Proposed Order that will require Rimini to contact immediately any

24  customers from which Rimini claims to need authorization prior to production of

---

26  [34]   Rimini's claim that Oracle demanded new discovery and ignored Rimini's
        questions includes quotations attributed to "Oracle" without citation.

27  [35]   Rimini's discussion of "production" and "migrated" environments, below,
        are further attempts to treat environment discovery piecemeal, contrary to
        the Court's order, by inventing distinctions without evidence.  Whereas
28      Oracle presented evidence that Rimini in fact has control.

1    archives or archive metadata.   Oracle further requests entry of its proposed

2    calendar order, discussed above, lest Rimini's delays continue to compound.

3              **2.      Oracle's motion to compel a supplemental response to**

4                       **Interrogatory No. 3**

5              In response to the Court's January 12, 2016 order granting Oracle's motion

6    to compel, Rimini served its Third Supplemental Response to Interrogatory No. 3

7    on January 19, 2016.   In addition to being incomplete, Rimini's latest response

8    contains information that is almost certainly incorrect.

9              Oracle's Interrogatory No. 3 seeks an identification of "each Environment

10   that has ever existed on any Identified Rimini Computer System or that Rimini has

11   ever accessed in support of its current or past customers," including the following

12   information about each environment:

13          [1] the date created, [2] the date deleted (if applicable), [3] the name of the
            server and of any virtual machine where the Environment is or was installed,
14          [4] the Source of the Environment, and [5] the name, version, and patch
            level of any and all associated Software and Support Materials.
15

16   Dkt. 119 at 36-37 (quoting Interrogatory No. 3).   Interrogatory No. 3 seeks key

17   evidence: In *Rimini I*, Rimini's responses to similar interrogatories were used as

18   deposition exhibits, as the basis for further discovery and stipulations that

19   substantially limited the scope of disputed issues at trial, as exhibits to expert

20   reports, and ultimately as trial exhibits.

21             Oracle previously moved to compel Rimini to provide this information,

22   along with other information that Rimini previously agreed to produce.   *Id.*   The

23   Court granted Oracle's motion to compel further response to Interrogatory No. 3.

24   January 12, 2016 Hearing Tr. at 53:13-17 ("MR. DYKAL: Your Honor, after we

25   supplemented, we saw in Oracle's January 7th report [Dkt. 140] their complaints.

26   We are currently working on it.   We should be able to do that in seven days.   THE

27   COURT: Seven days it is.   Compelled.").   Rimini has failed to comply.

28             **Missing data.**   Rimini has failed to provide all of the information that the

60

Court compelled.    For the Court's convenience, Oracle summarizes Rimini's omissions in the Exhibits to Rimini's Second Supplemental Response and in its Third Supplemental Response (which Rimini has confirmed supplement rather than supersede Rimini's Second Amended Response) below:

| Data Requested |
| --- |
| [1] the date created: |
| [2] the date deleted (if applicable): |
| [3] the name of the server and of any virtual machine where the Environment is or was installed: |
| [4] the Source of the Environment: |
| [5] the name, version, and patch level of any and all associated Software and Support Materials. |

---

[36]     In addition, Oracle's investigation is continuing as to 19 JD Edwards, 3 PeopleSoft, and 6 Siebel environments for which Rimini provides only private network IP addresses that may not identify particular server or virtual machine names with sufficient specificity.

61

Rimini cannot reasonably claim not to know ███████████████ ██████ or to know nothing about the product and version installed for 128 of them. To date, Rimini has not provided a creation date or deletion date for any environment on any exhibit to its Responses to Interrogatory No. 3.[37] Nor has Rimini indicated whether environments identified in its Second and Third Supplemental Responses are client-hosted or cloud-hosted, as Oracle specifically requested in Dkt. 140, ████████████████████ This is information that Rimini would obviously know, as it needs to know the location of the environment to access it. And Rimini has not stated how more than ███ of its environments were built. These omissions are inexcusable. Rimini has repeatedly proclaimed to the public at large that Rimini respects Oracle's IP rights, and has sought a declaration from the Court that it does not infringe. If Rimini does not maintain basic business records for hundreds of environments created after the *Rimini I* lawsuit began, these proclamations ring hollow.

Rimini's exhibits also suggest the existence of many environments about which no information has yet been disclosed in *Rimini I* or *Rimini II*. This is inappropriate: each of Rimini's JD Edwards, PeopleSoft, and Siebel environments that was not disclosed in *Rimini I* should be affirmatively identified in Rimini's response to Interrogatory No. 3, because it must have been created after December 6, 2011. To give but one example, ███████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████

---

[37] Exhibit D to Rimini's First Supplemental Response contains an "Inactive Date" column, which Oracle does not understand to be a deletion date based on Rimini's responses to date.

JOINT STATUS REPORT

no identifying information (beyond what appear to be environment names) is present in Rimini's response to Interrogatory No. 3.

There is no justification for Rimini's continuing refusal to provide this information, in violation of the Court's prior Order. Rimini should provide Oracle with a complete listing of Rimini's environments; Rimini should either include all of the requested information for each environment or, if Rimini claims not to know this basic information about environments under its control, state in a verified response to Interrogatory No. 3 that it does not know.

**Inaccurate data.**   Rimini's exhibits contain information that appears to be facially inaccurate. Without burdening the Court with an exhaustive list of likely errors, some examples are provided below.

The following four rows from Rimini's Exhibit D-2 to its Third Supplemental Response to Interrogatory No. 3 ███████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████

1

2

3

4

5

6

7

8

9

10

11   Based upon Oracle's experience and Rimini's past naming conventions

12

13

14

15          A similar problem appears in Rimini's Exhibit D-3 to its Third Supplemental

16   Response to Interrogatory No. 3:

17

18

19

20

21

22

23

24

25

26

27

28

64

It is unlikely that environments ███████████████████████████████████

███████████████████████████████████████████ Again, these products are sufficiently different such that this information supplied by Rimini is likely inaccurate.  Rimini's Exhibits contain additional rows with facially implausible data beyond that cited here, rendering suspect the accuracy of all of the rows.

Rimini's opposition makes no attempt to explain or correct these errors. Instead, it accuses Oracle of lodging "new" complaints (without actually identifying them).  Oracle has simply reiterated its request for the information enumerated in its Interrogatory No. 3 each time Rimini has provided another incomplete response.  *See* September 30, 2015 Letter from L. Shinn to D. Hinkle (stating that Rimini "has not provided all of the information that Oracle's Interrogatory No. 3 seeks" and noting missing creation dates); November 10, 2015 Letter from L. Shinn to D. Niegowski at 2-3 (reiterating information sought by Interrogatory No. 3); Dkt. 117, December 13, 2015 Joint Status Report at 36-37 (listing information sought); Dkt. 139, Oracle's January 7, 2016 Response to Rimini's Suppl. Report at 18 (noting, *e.g.*, that Rimini's response "still lacks 'the date created [and] the date deleted (if applicable)' for each environment, both of which are expressly requested in Interrogatory No. 3.").  *See also* October 15, 2015 email from L. Shinn to D. Hinkle, Oracle's Portion of Joint CMC Statement for Exchange at 10-11 ("Interrogatory No. 3 seeks a list of and descriptive information about software environments… Rimini agreed on October 9, 2015 to amend its response to provide the requested lists of environments and related descriptive information….." (emphasis added)).

**Failure to use its own existing data sources**.  Rimini claims that its engineers had to "painstakingly" compile the data in Exhibits D-1 – D-4 and that it simply lacks other data.  Rimini's December 23, 2015 productions in connection with its Automated Framework ("AFW") software suggest otherwise.  *See* RSI2_AFW_000000001.  While Oracle's analysis is ongoing, the December 23,

2015 AFW production appears to include much of the information Oracle has been seeking all along.  For example, a database table called ████████ (excerpted below) ██████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

RSI2_AFW_000000001 (excerpt of "gpdPsClients").    Two other tables, "gpdPsEnvironments" and "gpdPsEnvironmentInfo," appear to contain related information.  In particular, these files contain information that is still missing from Rimini's responses to Interrogatory No. 3.  The existence of these tables strongly suggests that Rimini has failed to perform a diligent investigation, and has misrepresented the burden of compiling the requested information, now twice-ordered by the Court.

Finally, Rimini's description of the environments identified in Exhibits D-1 and D-2 as "potentially accessed" is unacceptable.  Interrogatory No. 3 seeks a list of environments that Rimini has *actually accessed*:  "Identify each Environment

that has ever existed on any Identified Rimini Computer System *or that Rimini has ever accessed* in support of its current or past customers . . . ." Oracle seeks information regarding Rimini's actions during ongoing litigation; Rimini's "potentially" response is improper and insufficient. Essentially, Oracle is asking Rimini what it *did*, and Rimini's response instead lists what Rimini might or might not have done. This response is evasive and inappropriate.

Oracle requests that Rimini be compelled to update its response to Interrogatory No. 3 with complete and accurate information by February 23, and that Rimini be required to submit a detailed declaration detailing the quality control steps it has taken to ensure that its responses are accurate and complete.[38]

### 3.    Oracle's motion to compel a supplemental response to Interrogatory      No. 6

Oracle's Interrogatory No. 6 requires Rimini to identify "all instances" of Rimini's distribution of Oracle's copyrighted materials or portions thereof to customers. This request seeks information about Rimini's distribution of all forms of Oracle's copyrighted software and support materials, including environments, archives, and fixes and updates.

On January 12, the Court ordered Rimini to produce information concerning its distribution of environments by January 19:

MR. POLITO: Just by way of example, the representations that

---

[38]    Oracle requests this declaration in light of Rimini's now consistent misrepresentations and violations of the orders of this Court. Rimini has affirmatively represented to this Court *on two separate occasions* that it could—and would—provide a complete and accurate response to Interrogatory No. 3 within the time allotted. January 12, 2016 Hearing Tr. at 53:7-10 ("THE COURT: Mr. Dykal, any reason that can't occur in seven days? MR. DYKAL: We can do that in seven days. THE COURT: So ordered."); December 15, 2015 Hearing Tr. at 41:25-42:5 ("MR. POLITO: And, Your Honor, for the interrogatory responses that don't require this kind of technical investigation, would we get a date at which they could complete those? THE COURT: They told me by the end of the month, so it's going to be December 30th."). On both occasions, Rimini then violated the Court's order. If *two* court orders are not sufficient to compel Rimini's compliance, a declaration detailing the steps Rimini has taken to ensure the quality and completeness of its response seems an appropriate remedy.

counsel made that their migration included both distribution of existing environments and creation of new environments, that's information that we asked for in discovery. It isn't in their response. So we'd like the --

> THE COURT: All right. Now, they just told you in open court and how many were of each, and now they're going to be supplementing their interrogatory to make that explicit.
>
> MR. POLITO: That would be great.
>
> THE COURT: Mr. Dykal, any reason that can't occur in seven days?
>
> MR. DYKAL: We can do that in seven days.
>
> THE COURT: So ordered.

January 12, 2016 Hearing Tr. at 52:21-53:10.   Rimini's Third Supplemental Response to Interrogatory No. 6 admits that Rimini distributed both archives and environments to customers, either via USB hard drive or via Rimini's FTP site. However, in defiance of the Court's Order granting Oracle's motion to compel, Rimini does not identify any instance of distribution of archives or environments with specificity.

As for fixes and updates, Rimini has produced information relating to its HRMS Delivered Folder, HRMS Objects Folder, FSCM Delivered Folder, and FSCM Objects Folder, and now refers to this information pursuant to Rule 33(d). But this response does not address fixes and updates for products other than PeopleSoft, and does not discuss PeopleSoft product lines other than PeopleSoft HRMS and PeopleSoft FSCM.  *See, e.g.*, Dkt. 140 at 18-19.

Contrary to Rimini's assertions below, this information is not an "additional request" that Oracle made after receiving Rimini's Third Supplemental Response on January 19, 2016.  Oracle has been seeking this information all along.  *See* September 30, 2015 Letter from L. Shinn to D. Hinkle ("this Interrogatory No. 6 is not duplicative because it seeks an explication of the instances in which Rimini has distributed protectable copyrightable expression to its customers…."); October 15, 2015 email from L. Shinn to D. Hinkle, Oracle's Portion of Joint CMC Statement for Exchange at 25-26 ("Oracle is entitled to be told what fixes, *environments*, and

other software and support materials (or portions thereof) Rimini has distributed to its customers, *as well as* any and all *archives* it has distributed as part of any 'conversion' or 'migration' to its current processes." (emphasis added)); Dkt. 117, Dec. 13, 2015 Joint Status Report at 39-40 (same). *See also* Dkt. 139, Oracle's January 7, 2016 Response to Rimini's Suppl. Report at 18-19 (noting response to Interrogatory No. deficient for failing to address product lines other than PeopleSoft HRMS and distribution during migration).

Rimini's own statements confirm its awareness of its obligations. *See, e.g.*, October 21, 2015 email from D. Hinkle to L. Shinn ("[t]here is no dispute that Rimini will provide Oracle 'identification of the fixes, environments, *and other software and support materials* that Rimini has provided to its customers' in response to Oracle's discovery requests." (emphasis added)); Dkt. 117, December 13, 2015 Joint Status Report at 3 ("Rimini stated it has or will produce documents providing identification of the Oracle Software and Support Material that Rimini has provided its clients in response to Interrogatory No. 6."). Moreover, there has been no dispute about providing discovery regarding J.D. Edwards, Siebel, and Oracle Database since July 30, 2015. *See* July 30, 2015 Letter from D. Hinkle to J. Polito. Oracle requests that the Court order Rimini to provide a complete response to Interrogatory No. 6 that complies with the Court's Order and addresses environments, archives, and fixes and updates by February 23.

Rimini has offered to "supplement" its response by February 16 to discuss "archives; environments for the J.D. Edwards and Siebel product lines; and Oracle Database software." Rimini does not appear to offer to identify all instances of distribution for any product line or for any category of copy, and thus does not moot Oracle's motion for a supplemental response. If Rimini does identify all instances of distribution with respect to all relevant product lines before the February 16 hearing, Oracle will withdraw its motion.

### 4.    Oracle's motion to compel supplemental database

**productions**

Oracle requests that the Court enter an Order compelling Rimini to make supplementary productions of certain of its non-custodial databases.  Although Oracle's investigation and review of Rimini's non-custodial database productions is ongoing, Oracle moves to compel specific supplementation of these two productions:  Rimini's productions of DevTrack and Salesforce, made on November 12, 2015 and December 9, 2015, respectively.[39]

First, with respect to the DevTrack database, Oracle has observed that several folders that were provided in a previous production are missing from this updated instance of DevTrack, despite falling within the scope of this case.  In particular, Rimini's September 12, 2014 DevTrack database included the following folders:  ██████████████████████████████████████████████
███████████████████████████████████████ Oracle requests that Rimini be compelled to provide access to these folders by February 23.

Second, with respect to the Salesforce data, no metadata was provided along with this production, except for the "File Name" metadata field.  Additional metadata is necessary to make this production comprehensible and to comply with the Parties' production agreements concerning ESI.  For example, documents in Salesforce are obviously organized by customer, yet Rimini did not provide that metadata.  Rimini's production is the electronic equivalent of dumping the contents of dozens of file cabinets into one big undifferentiated pile, and producing the pile.  No company stores documents that way in real life.

Rimini claims that its obligation to provide metadata was met when it produced Salesforce documents in "native format."  However, the native files that Rimini produced are processed documents whose metadata (such as date created and date last modified) appears to have been altered during processing.  Rimini's

---

[39] To the extent additional deficiencies are identified, Oracle reserves the right to seek further supplementation and clarification.

1    assertion that no additional metadata exists simply defies belief.  Oracle requests
2    that Rimini be compelled to provide a replacement production by February 23,
3    with, at minimum, additional metadata for each document sufficient to identify the
4    customer with whom the document is associated, the date and time the document
5    was created, the date and time the document was last edited, and the author.

6    **D.    Rimini's Opposition to Oracle's Motions to Compel**

7    **1.    Oracle's Interrogatory No. 5**

8    Oracle's motion to compel further responses to Interrogatory No. 5 lacks any
9    factual foundation, conflates two interrogatories, and is ultimately belied by the
10   record in this litigation.  It should be denied.

11   Oracle now attempts to expand the scope of its previous ask from
12   environments under Rimini's "control" (Interrogatory No. 5) to any environment
13   Rimini has "ever accessed" (Interrogatory No. 3).  Oracle then falsely accuses
14   Rimini of seeking to avoid its obligations and deprive Oracle of any discovery to
15   which it is entitled.  Oracle's assertions are factually incorrect and lack any
16   foundation in the record in this litigation.  Oracle ***never*** argued that the "control"
17   Interrogatory (No. 5) and the "ever accessed" Interrogatory (No. 3) were the same
18   thing.  Indeed, to establish control, Oracle previously focused on Rimini's
19   migration of environments from its systems to client systems, along with Rimini's
20   "technical authority" over client-hosted environments, as required of Rimini's new
21   development processes.  Now Oracle retreats from these positions, asserting that
22   mere "access" to an environment—even one time—was always within the scope of
23   Oracle's demand.  Oracle's claim is belied by its interrogatories and previous
24   arguments, however. Oracle's motion should be denied.

25   A simple review of the record demonstrates Oracle's shifting demands:

26

27

28   **"Access Only" Environments – When Did Oracle Mention Them?**

| Date | Event | Did Oracle Mention or Accuse "Access Only" Environments? |
|---|---|---|
| 2010-2012 | *Rimini I* Discovery | No |
| 1/2015 | *Rimini I* Pre-Trial | No |
| 9/2015 | *Rimini I* Trial | No |
| 2/2015 | *Rimini II* – Oracle Counterclaims | No |
| ██████ | ████████████████████████ | ████ |
| 12/2015 | *Rimini II* – Joint Status Report | No |
| 12/15/2015 | *Rimini II* – Status Hearing | No |
| 1/2016 | *Rimini II* – Joint Status Report | No |
| 1/12/16 | *Rimini II* – Status Hearing | No |

Rimini has not stonewalled Oracle. Rather, Oracle has burdened this Court and Rimini with unnecessary motion practice. Indeed, to avoid the present dispute, Rimini proposed a reasonable compromise and asked Oracle several questions regarding the relevance of the evidence sought and the proportionality requirements of Fed. R. Civ. P. 26(b)(1). *See* Fed. R. Civ. P. 26(b)(1) (imposing proportionality and relevance requirements, with the comments recognizing that "a party claiming that a request is important to resolve the issues should be able to explain the ways in which the underlying information bears on the issues as that party understands them."). Oracle refused to respond, instead preferring to lob allegations of misconduct and moving ahead with its scorched-earth approach. Rimini's proposal is reasonable and will avoid disproportionate and burdensome discovery. The Court should adopt it.

### a.    Oracle Seeks to Expand its Previous Motion Regarding Interrogatory No. 5 to Interrogatory No. 3

This dispute originates from a difference in scope between two Oracle Interrogatories: Interrogatory No. 5, which requests KDP data for environments under Rimini's "control," and Interrogatory No. 3, which requests data for environments under Rimini's "control," ***as well as for environments that Rimini***

72

*"has ever accessed."*   Oracle now contends that all "accessed" environments included in Rimini's Response to Interrogatory No. 3 were within the scope of its motion to compel KDP data for Interrogatory No. 5.

Rimini certainly did not understand this to be Oracle's argument. Interrogatory No. 5 specifically requests KDP metadata for environments on "Identified Rimini Computer Systems."   Interrogatory No. 3 is facially broader, requesting information both from any "Identified Rimini Computer System" *as well as* from any environment Rimini "has ever accessed":

> **Interrogatory No. 3:**   Identify each Environment that has ever existed on any Identified Rimini Computer System *or that Rimini has ever accessed* in support of its current or past customers, including for each Environment the date created, the date deleted (if applicable), the name of the server and of any virtual machine where the Environment is or was installed, the Source of the Environment, and the name, version, and patch level of any and all associated Software and Support Materials.

Oracle's current argument that this difference in scope is "a fiction" is belied by the very language Oracle chose to use in the interrogatories themselves.

### b.     Oracle's December Motion to Compel Contrasted Mere "Access" With "Control"

In its previous motion regarding Interrogatory No. 5, Oracle repeatedly relied upon Rimini's new, non-infringing development processes to compel the production of environments on "Identified Rimini Computer Systems"—that is, environments that Oracle argued were within Rimini's "possession, custody, or control."   Specifically, Oracle argued that three factors relating to Rimini's new processes proved Rimini's "control" over these environments:

> (i) Rimini's customers give Rimini authority to control the copies on customer-hosted systems, (ii) Rimini initiated the process of moving customers to self-hosting to avoid having the data on Rimini servers, and (iii) Rimini exercises pervasive control over the copies during the initial migration, during the set-up process, and during subsequent delivery of maintenance and support services.

Dkt. 117, at 25.  None of these factors apply to the "access only" environments

1   now at-issue.

2       To be clear, Oracle now apparently seeks collection and production of
3   environments that Rimini had no role in creating, including clients' production
4   environments (as opposed to the test and development environments used by
5   Rimini that were at-issue in *Rimini I*, and that were the subject of Oracle's
6   December Motion to Compel).  Such environments *have never been at issue or*
7   *produced*, either in this case or in *Rimini I*.

8       Regarding (i), Oracle expressly differentiated mere "access" from "control"
9   in its previous motion, stating that Rimini's new processes "require much more
10  than mere access: they include administrator rights, such as the right to manipulate,
11  copy, actively change, or even delete the materials that Oracle seeks."  Dkt 117, at
12  26.   Now Oracle contends that environments not involved in Rimini's new
13  processes, and which Rimini has merely accessed, were always within the scope of
14  its previous motion.

15      Regarding (ii), Oracle argued that environments "migrated" from Rimini's
16  systems were the focus of its motion, stating that "Rimini shifted the storage and
17  hosting of customer environments and archives, including those that it would have
18  previously maintained on its own servers, to the customers' servers," and "Rimini
19  cannot avoid production of this information simply by moving files that it
20  controls."  Dkt. 117, at 31.  As the Court is aware, Rimini is diligently working to
21  produce all environments that exist or have ever existed on Rimini's own systems
22  (including those migrated to client systems). Thus, this factor is not applicable to
23  the "access only" environments presently at-issue—by definition these are
24  environments that have never existed on Rimini systems and were not part of the
25  migration.

26      Regarding (iii), Oracle argued that control is demonstrated from the
27  migration, setup, and development requirements of Rimini's new processes.  But
28  again, the "access only" environments were not migrated from Rimini's systems

74

and were never involved in the "set-up process."  Further, Rimini is working to produce all environments subject to Rimini's "development" requirements.

Oracle did not argue, and never indicated, that mere "access" to an environment brought it within the scope of its previous motion to compel.  Rather, its arguments were focused on the factors that could help it establish control—such as migration and technical authority.  These factors are not present with the "access only" environments.

Oracle also misleadingly cites previous correspondence to try to shore up its position that "access only" environments have always been at issue.  For instance, Oracle provides this quote from its November 10, 2015 letter: "Oracle seeks, and is entitled to, the KDP information for all of the environments . . . ."  November 10, 2015 Letter from L. Shinn to D. Niegowski at 3 (Ex. 21).  But the portions omitted via ellipses make clear that Oracle was referring to *environments that Rimini had previously produced* (i.e., environments used as part of Rimini's tax and regulatory development process):

> Oracle seeks, and is entitled to, the KDP information for *all* of the environments, ***even those previously produced, because the KDP information about these environments will have changed since Rimini's last corresponding production approximately four years ago.***

*Id.* (emphasis added).  As discussed, Oracle has *never* previously requested "access only" productions, and Rimini certainly has not previously produced them such that new productions are required to update them.

### c.    Oracle Has Not Even Attempted to Satisfy The Rule 26(b)(1) Factors

After Oracle demanded that Rimini also produce KDP data for the "access only" environments, Rimini asked Oracle several questions relating to the new requirements of Fed. R. Civ. P. 26(b)(1).   Specifically, Rimini asked Oracle how mere access relates to its claims—particularly given Oracle's trial testimony:

> Mr. Hixson: Under that sentence [section 14.2 of the license agreement], what does it mean for a customer to provide access to and use

1
2

of the software to a third party?

Mr. Allison: Well, I think it grants them ability to access and use the software. I think those statements are pretty straightforward.

3

4

*Rimini I* Trial Tr., at 918:4-9 (Ex. 4).  Despite this testimony, Oracle declined to

5 answer Rimini's questions, instead responding that, "Oracle will raise Rimini's

6 attempts to frustrate the Court's order in the upcoming joint status report."  Rimini

7 followed up with Oracle, asking (1) what Oracle intends to prove through KDP

8 data for "access only" environments (which is particularly important given

9 Oracle's admissions at trial that remote access is permissible); (2) whether this

10 proof may be adduced in any other manner; (3) and whether Oracle would consider

11 a sampling methodology to avoid burdensome discovery.  (Ex. 19). Again, Oracle

12 declined to respond.

13     Oracle's refusal to even engage in a dialogue with Rimini on these questions

14 is contrary to the new Federal Rules, which specifically state that the scope of

15 discovery is limited to information "relevant to any party's claim or defense and

16 proportional to the needs of the case, considering the importance of the issues at

17 stake in the action, the amount in controversy, the parties' relative access to

18 relevant information, the parties' resources, the importance of the discovery in

19 resolving the issues, and whether the burden or expense of the proposed discovery

20 outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1); *see also Guidelines and*

21 *Practices for Implementing the 2015 Discovery Amendments to Achieve*

22 *Proportionality*, 99 Judicature 47, 53 (Winter 2015) ("[T]he party seeking

23 proposed discovery ordinarily is in a better position to specify the likely benefits

24 by explaining why it is seeking the discovery it needs," and emphasizing that

25 "[p]arty cooperation is particularly important in understanding the burdens or

26 benefits of proposed discovery and in resolving disputes.").

27     As other Courts have found, fishing expeditions are no longer to be blindly

28 countenanced under the Federal Rules:

76

1
2
3

> No longer is it good enough to hope that the information sought might lead to the discovery of admissible evidence. In fact, the old language to that effect is gone. ***Instead, a party seeking discovery of relevant, non-privileged information must show, before anything else, that the discovery sought is proportional to the needs of the case.***

4
5
6
7
8
9
10
11
12
13

*Gilead Sciences,* Inc. *v. Merck & Co., Inc., et al.*, 2016 WL 146574, at *1 (N.D. Cal., Jan. 13, 2016) (emphasis added). Oracle has not made this showing. Obtaining KDP printouts from third party systems is expensive and time-consuming. Indeed, Rimini has spent hundreds of hours collecting KDP data for environments that satisfy Rimini's technical requirements for development purposes. Given this, Oracle should at a minimum endeavor to explain *how* this information relates to its causes of action when it comes only from customers whose environments Rimini may have "ever accessed." Oracle also should explain why indiscriminately obtaining all of this information is proportional to the case, particularly given its trial admissions that remote access is permissible.

14
15
16

In short, Oracle should not be permitted to compel collections for every client environment that Rimini has ever accessed without providing basic, fundamental answers regarding the requirements of Fed. R. Civ. P. 26(b)(1).

17

#### d.    Rimini's Compromise is Reasonable and Efficient

18
19
20
21
22
23
24
25
26

Rimini's counter-proposal is reasonable and straightforward: Rimini is already providing Oracle with the information in its possession regarding its access to client environments (including millions of pages from Salesforce, DevTrack, SharePoint, and custodial sources). If Oracle identifies an instance of access that may be relevant to its claims, it should identify that instance to Rimini. If Rimini does not dispute the relevance and other Fed. R. Civ. P. 26(b)(1) factors, Rimini will promptly endeavor to collect and produce that environment to Oracle. If Rimini disagrees with Oracle's purported bases, Rimini would have the ability to challenge Oracle's request with the Court.

27
28

Rimini's counter-proposal best ensures that any "access only" environment

77

collections are both relevant and proportional, and will avoid subjecting Rimini (and its clients) to the burden of "having to produce discovery on all sorts of [environments] that bear no indication of any nexus to the disputes in this case." *Gilead*, at *2.

### e. Rimini's Offer to Prioritize Production of KDP Data for Client *Archives* was Ignored by Oracle, and an Order with a Definitive Deadline is Inappropriate

Oracle's request for a definite timetable and Order regarding KDP data for *archives* is unnecessary and counterproductive. Rimini provided Oracle with a description of this information, and an estimated timeline of how long they will take to produce. Rimini explained that its KDP team was already diligently working to collect client *environments*, but would be happy to prioritize these resources in whatever manner Oracle wanted. Oracle declined to even respond to Rimini's offer. Further, the Court has already denied Oracle's request for "definite timetables" to complete the KDP productions for Interrogatory No. 5, instead opting to exercise judicial oversight through Status Hearings to be held every 30 days. *See* January 12, 2016 Hearing Tr., at 43.

### 2. Oracle's Interrogatory No. 3

Rimini has complied with the Court's orders. Contrary to Oracle's arguments, Oracle received Rimini's supplementation, lodged *new* complaints, and now argues that Rimini has "defied" the Court's orders. This tactic is both disingenuous and needlessly inflammatory.

As a starting point, it is important to put the scope of Oracle's Interrogatory No. 3 into perspective: Oracle's request seeks detailed information for every environment on "any Identified Rimini Computer System," as well as any environment Rimini has "ever accessed." At this point, Rimini's response includes ████████████████████████████████████████████ that were painstakingly compiled by Rimini engineers. The spreadsheets themselves demonstrate the effort and care that went into their creation. (*See* Exhibit 17).

Rimini has been as accurate and thorough as possible, and has agreed to promptly investigate any apparent discrepancies noted by Oracle going forward.   Indeed, Rimini has already fixed or explained the six items identified by Oracle in its motion.

Oracle also complains of some missing data points among Rimini's spreadsheets.   As Rimini explained during the parties' recent meet-and-confer, there are some things Rimini just does not know.   For instance, Oracle requests detailed information regarding the source and timing of creation for every environment Rimini "has ever accessed"—including environments that have never been on Rimini's systems and were built by clients without Rimini's involvement and before the client had contracted with Rimini Street.   Rimini was not involved with these activities and simply does not know the "build" information Oracle requests.   Similarly, Oracle complains that for some environments, Rimini has stated that it has "potentially accessed" them, rather than specifically describing each instance of access.   Again, Rimini provided Oracle with the information in its possession.   Rimini offers support to its clients—not unlike any technical "help desk" offered by companies or organizations to their computer users to troubleshoot their problems.   When a client contacts a Rimini engineer, Rimini may access an environment. (It may not, if phone support is adequate).   For some environments, Rimini cannot say definitively whether it has accessed them or not. Rimini cannot provide Oracle information it does not have.

Finally, in any event, Oracle states that Rimini's "December 23, 2015 AFW production appears to include much of the information Oracle has been seeking all along."   Rimini will cite these productions under Rule 33(d), mooting Oracle's complaints and completing Rimini's Responses to Interrogatory No. 3.

### 3.    Oracle's Interrogatory No. 6

Rimini supplemented its response to Oracle's Interrogatory No. 6 in accordance with the Court's order on January 19, 2016. Specifically, Rimini

explicitly described the migration process it discussed during the January Status Conference:

> Shortly after the Court's Order regarding Oracle's First Motion for Partial Summary Judgment in February of 2014, Rimini began migrating locally hosted PeopleSoft client software off of Rimini's systems. The process proceeded in the following manner: (1) For Rimini Clients that had client archives on Rimini's systems, Rimini migrated those archives to a USB hard drive for delivery to the client; (2) for Rimini clients that had Oracle Software or Support Material in their Client Deliverable folder on Rimini's FTP site, Rimini migrated those files to a USB hard drive for delivery to the client; and (3) for Rimini clients that had locally hosted test and development environments, Rimini migrated the database component and the PS Home folder to a USB hard drive for delivery to the client or onto Rimini's FTP site for download by the client.

(Rimini's Third Supplemental Responses to Oracle's Interrogatory No. 6.) (Ex. 11) Rimini also produced and cited documents under Rule 33(d) from which "specific instances" can be discerned:

> Rimini further responds that, pursuant to Rule 33(d), it has produced or will produce the following types of documents from which Oracle may ascertain the answer to this Interrogatory: Documents providing identification of the Oracle Software and Support Material that Rimini has provided its clients, including: Rimini's FSCM Delivered Folder (RSI2_002010038) and FSCM Objects Folder (RSI2_002010039).

To the extent Oracle complains that Rimini has not specifically identified every environment that was migrated or created, Rimini has identified all such environments it knows about in Interrogatory No. 3.  Oracle thus has thousands of data points relating to the environments that were migrated.  As Oracle also knows, Rimini is also working to produce these environments themselves, and Rimini will agree to cite them pursuant to Rule 33(d) once its productions are complete.

Finally, after Rimini served this third round of supplementation, Oracle requested additional supplemental information regarding **archives**; **environments** for the **JD Edwards and Siebel** product lines; and **Oracle Database** software. During the parties' meet-and-confer, Rimini agreed to supplement with respect to these new Oracle requests and intends to do so prior to the February 16 Status

1    Hearing.

2            **4.    Database Productions**

3            During the parties' meet-and-confer, Rimini agreed to investigate the issues

4    raised by Oracle regarding DevTrack and restore access to a tiny minority of

5    DevTrack folders.   These efforts are ongoing.   Rimini expects access to those

6    folders to be restored.

7            Regarding Salesforce, Rimini explained that it has produced all available

8    metadata.   Specifically, the document bearing bates-stamp "RSI2_SF_000072762

9    Highly Confidential.csv" contains metadata for customers (i.e., the field

10   "accountID," which is the client ID of the associated client).   The document

11   "RSI2_SF_000072727 Highly Confidential.csv" contains the table of customers

12   including customer ID, name, and other customer information, which can be

13   matched to the "accounted" in "RSI2_SF_000072762 Highly Confidential.csv."

14           There is nothing more to compel.

15           **E.    Oracle's Challenge to Rimini's Protective Order Designations**

16           Rimini continues to maintain that it may designate copies of Oracle Software

17   and Support Materials and metadata about those materials as Highly Confidential

18   Information-Attorneys Eyes Only ("HCI-AEO") under the Protective Order in this

19   case, as well as *entire copies* of Oracle software.   *See* Response to Rimini Street's

20   Supplemental Report on the Technical Issues Involved in Collecting Data on Client

21   Environments, Dkt. 140, at 20.   Such designations may prevent Oracle from

22   showing copies of and information about Oracle's own software and

23   documentation to Oracle employees, including technical employees able to provide

24   input to counsel on these issues, because they are not permitted to see Rimini's

25   HCI-AEO information.[40]   This unnecessarily complicates Oracle's ability to

26   _____

27   [40]     Oracle reserves and does not waive the right to assert that, because Oracle is
         the author of all or virtually all of these materials, counsel for Oracle could
28       disclose these materials to Oracle employees pursuant to ¶ 10(c) of the
         Stipulated Protective Order, Dkt. 58.   Instead, Oracle brings this

litigate this matter.  The Parties met and conferred on this issue on February 2, pursuant to ¶ 16 of the Stipulated Protective Order.  *See* Declaration of John A. Polito, ¶¶ 3-6 (filed concurrently).  Oracle now moves for an order that Rimini may not designate environments, archives, or metadata about environments and archives as HCI-AEO.[41]

Under the protective order, to designate materials as HCI-AEO, Rimini must have a good faith belief that the materials are:

> extremely sensitive, highly confidential, non-public information, consisting either of trade secrets or other highly confidential documents related to current or future business plans, protocols or strategies, the disclosure of which to the Receiving Parties or non-parties (other than the Designating Party) would be likely to cause competitive or business injury to the Designating Party (other than injury to the Designating Party's position in this Action).

Dkt. 58, ¶ 4.  Now that Oracle has challenged Rimini's designations of these materials, Rimini has the burden to support its designations with specificity the justification for the designation. *Id*. ¶¶ 16(b-c).

Rimini cannot dispute that Oracle or its predecessors-in-interest created the software and support materials at issue in this case—Rimini's business model is based upon providing support of Oracle software to Oracle's customers.  Rimini has admitted that Oracle has valid and enforceable copyrights in these materials. Disclosure of Oracle's software applications, Oracle's product documentation, and Oracle's bug fixes *to Oracle* is not and cannot be likely "to cause competitive or business injury" to Rimini as the Protective Order requires, because Oracle already has all or virtually all of these materials.

But Rimini has designated each of the environments and metadata

---

[41] redesignation motion out of an abundance of caution.
Oracle has designated all copies of Oracle Software and Support Materials that Rimini has produced or will produce as HCI-AEO.  Oracle has designated all copies of file information and metadata derived from Oracle Software and Support Materials, such as KDP data and directory listings, that Rimini has produced or will produce as HCI-AEO as to file names, and as Confidential as to all other portions.

productions that it has made to date as HCI-AEO in their entirety. *See* January 20, 2016 Email from R. Dykal to J. Polito. It has even designated the sample KDP printout used as an exhibit in open court on January 12 as HCI-AEO. By designating these materials as such, Rimini prevents counsel for Oracle from showing copies of, modifications made to, and metadata about Oracle's own intellectual property to Oracle's employees. Dkt. 58, ¶ 10.    Again, as these are *Oracle's* Software and Support Materials or associated metadata, there is no defensible reason for Rimini to do so.

Rimini states that its clients use Oracle software to store sensitive financial information and records. However, that argument is misdirection because the KDP metadata does not reveal such information. To the extent that these environments or metadata reflect any Rimini or Rimini-customer non-public information, such as dates of access or system configurations, they do not satisfy the Protective Order's definition of HCI-AEO. The small portions of these productions that reflect such Rimini or Rimini customer information would at most be "Confidential," a designation that would not bar Oracle's own employees assisting with this litigation from seeing the environments or metadata. If Rimini claims that it has a good faith basis for asserting that the environments and metadata, it must identify such files with specificity, not merely generalized hypotheticals. *Id.* ¶¶ 4, 13, 16. There is simply no justification for Rimini's designation of the entirety of these productions as HCI-AEO.

Oracle respectfully asks the Court to prevent Rimini from designating Oracle's Software and Support Materials as HCI-AEO.

### F.    Rimini's Opposition to Oracle's Challenge to Rimini's Protective Order Designations

Oracle's arguments rely on oversimplifying and mischaracterizing the data in question. While the KDP printouts and environment productions from client systems indeed include Oracle software, they also include *non-Oracle* information.

Rimini's clients use Oracle software to store highly sensitive financial information, record confidential medical records, run human resources systems, process payroll, calculate taxes, track inventory, etc.  The KDP printouts also include information about how Rimini's clients have configured their systems generally and may include information regarding non-Oracle software.  Rimini's clients understandably guard this information closely, and Rimini has a good faith basis for asserting that its clients consider it highly confidential, competitive, sensitive information qualifying for HCI-AEO protection under the protective order.  Since Rimini is gathering this data on the clients' behalf (at Oracle's demand), Rimini has designated this information accordingly as HCI-AEO.

Dated:  February 12, 2015

| SHOOK, HARDY & BACON LLP | MORGAN, LEWIS & BOCKIUS LLP |
|---|---|
| By:           /s/  Peter E. Strand | By:          /s/ Thomas S. Hixson |
| Peter E. Strand<br>Attorneys for Plaintiff and Counterdefendant Rimini Street, Inc. and Counterdefendant Seth Ravin | Thomas S. Hixson<br>Attorneys for Counterclaimant Oracle America, Inc. and Defendant and Counterclaimant Oracle International Corp. |

_____
/s/ Peter E. Strand

**ATTESTATION OF FILER**

The signatories to this document are Thomas Hixson and me, and I have obtained Mr. Hixson's concurrence to file this document on his behalf.

JOINT STATUS REPORT

1

2      Dated:  February 12, 2016                    SHOOK, HARDY & BACON LLP

3

4                                                   By:  /s/ Peter E. Strand
                                                    Peter Strand
5                                                   *Attorney*s for Plaintiff and
                                                    Counterdefendant
6                                                   Rimini Street, Inc. and
                                                    Counterdefendant
7                                                   Seth Ravin

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JOINT STATUS REPORT