1
                    UNITED STATES DISTRICT COURT
                          DISTRICT OF NEVADA
2        BEFORE THE HONORABLE PEGGY A. LEEN, MAGISTRATE JUDGE

3    RIMINI STREET, INC., a Nevada  :
     corporation,                   :
4                                   :
              Plaintiff,            :   No. 2:14-cv-01699-LRH-PAL
5                                   :
         vs.                        :
6                                   :
     ORACLE INTERNATIONAL           :
7    CORPORATION, a California      :
     corporation,                   :
8                                   :
              Defendant.            :
9    _____:
     ORACLE AMERICA INC., a         :
10   Delaware corporation, et al.,  :
                                    :
11            Counterclaimants,     :
         v.                         :
12                                  :
     RIMINI STREET, INC., a Nevada  :
13   corporation, et al.,           :
                                    :
14            Counterdefendants.    :
     _____:
15

16                  TRANSCRIPT OF STATUS CONFERENCE

17                           April 5, 2016

18                         Las Vegas, Nevada

19
     FTR No. 3B/20160405 @ 9:05 a.m.
20

21

22   Transcribed by:        Donna Davidson, CCR, RDR, CRR
                            (775) 329-0132
23                          dodavidson@att.net

24

25   (Proceedings recorded by electronic sound recording,
     transcript produced by mechanical stenography and computer.)

```
 1                    A P P E A R A N C E S

 2    FOR THE PLAINTIFF:

 3    W. West Allen
      HOWARD & HOWARD ATTORNEYS PLLC
 4    3800 Howard Hughes Parkway
      Suite 1000
 5    Las Vegas, Nevada 89169
      (702) 667-4843
 6    Fax: (702) 567-1568
      ww@h2law.com
 7
      Peter E. Strand
 8    Ryan D. Dykal
      SHOOK, HARDY & BACON LLP
 9    2555 Grand Boulevard
      Kansas City, Missouri 64108
10    (816) 474-6550
      Fax: (816) 421-5547
11    pstrand@shb.com
      rdykal@shb.com
12
      John P. Reilly
13    Rimini Street, Inc.
      3993 Howard Hughes Parkway
14    Suite 500
      Las Vegas Nevada 89169
15    (336) 908-6961
      jreilly@riministreet.com
16
      James J. Pastore
17    DEBEVOISE & PLIMPTON LLP
      919 Third Avenue
18    New York, New York 10022
      (212) 909-6000
19    Fax: (212) 909-6836
      jjpastore@debevoise.com
20
      FOR THE DEFENDANT:
21
      Thomas S. Hixson
22    John A. Polito
      MORGAN, LEWIS & BOCKIUS LLP
23    One Market Street, Spear Street Tower
      San Francisco, California 94105
24    (415) 442-1000
      Fax: (415) 442-1001
25    thomas.hixson@morganlewis.com
      john.polito@morganlewis.com
```

TRANSCRIBED FROM DIGITAL RECORDING

3

1              A P P E A R A N C E S (Continued)

2    FOR THE DEFENDANT:

3    Beko O. Reblitz-Richardson
     BOIES SCHILLER & FLEXNER
4    1999 Harrison Street
     Suite 900
5    Oakland, CA 94612
     (510) 874-1000
6    Fax: (510) 874-1460
     brichardson@bsfllp.com
7
     Richard J. Pocker
8    BOIES SCHILLER & FLEXNER, LLP
     300 South Fourth Street
9    Suite 800
     Las Vegas, Nevada 89101
10   (702) 382-7300
     Fax: (702) 382-2755
11   rpocker@bsfllp.com

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

| | |
|---|---|
| 1 | LAS VEGAS, NEVADA, APRIL 5, 2016, 9:05 A.M. |
| 2 | --oOo-- |
| 3 | P R O C E E D I N G S |
| 4 | |
| 5 | THE COURT:  Good morning.  Please be seated. |
| 6 | COURTROOM ADMINISTRATOR:  Your Honor, we are now |
| 7 | calling the status conference in the matter of Rimini |
| 8 | Street, Inc., versus Oracle International Corporation.  The |
| 9 | case number is 2:14-cv-1699-LRH-PAL. |
| 10 | Beginning with plaintiff's counsel, Counsel, |
| 11 | please state your names for the record. |
| 12 | MR. ALLEN:  Good morning, Your Honor.  West |
| 13 | Allen, from Howard and Howard, on behalf of Rimini Street. |
| 14 | Also with me this morning are Mr. Peter Strand, |
| 15 | from Shook, Hardy & Bacon, and Ryan Dykal, from Shook, |
| 16 | Hardy & Bacon.  And Mr. John Ryan is here, counsel from |
| 17 | Rimini Street. |
| 18 | MR. HIXSON:  Good morning, Your Honor.  Tom |
| 19 | Hixson and John Polito, with Morgan Lewis, for Oracle. |
| 20 | MR. RICHARDSON:  Good morning, Your Honor.  Beko |
| 21 | Richardson, Boies, Schiller & Flexner, on behalf of Oracle. |
| 22 | MR. POCKER:  Richard Pocker on behalf of Oracle, |
| 23 | Your Honor. |
| 24 | THE COURT:  All right, folks.  I have read your |
| 25 | joint status report and supporting exhibits and |

1    declarations and the like.

2              Would Rimini like to bring me up to speed to any

3    ongoing developments on discovery since we last met and

4    since the status report was entered?

5              MR. STRAND:  Sure, Your Honor.  Be happy to do

6    that.

7              How are you this morning?

8              THE COURT:  Very good, thank you, Mr. Strand.

9    And you?

10             MR. STRAND:  I promised fewer documents, but it

11   seems to help if we have a score sheet.  So let me hand

12   that up, if I could real quick.

13             THE COURT:  A score sheet is fine.  But at the

14   end of the day, the game clock is going to run out --

15             MR. STRAND:  Oh, well, Your Honor --

16             THE COURT:  -- so let's talk about when we're

17   going to get there.

18             MR. STRAND:  Yes, ma'am.  And that's -- we're

19   prepared to do that this morning.

20             THE COURT:  Okay.

21             MR. STRAND:  Let me run through the score sheet

22   real quick if you want.

23             Since we last were here, we have produced 29

24   additional KDP data environments.  That's what we talked

25   about back in January and February.  We're now to a total

1    of 80 of those.

2              We produced 77 additional local preserved

3    environments.  We're up to 424 of those.

4              The other things are basically complete.  I

5    won't take a lot of time on that.  The KDP data for archive

6    documents, we are in the process -- I don't know if we did

7    yesterday late or we are today or tomorrow, going to

8    produce 100 plus KDP data for archived documents maintained

9    by Rimini.  So that's moving forward.

10             If you look with me at the second page, Your

11   Honor, this is the client environments.  This is what we've

12   been focusing on for the last 60 days or so, or 90 days.

13             As of today there are 215 total.  There was an

14   adjustment of two.  We have been authorized -- the Oracle

15   subpoena process has spurred some clients to get with the

16   program, I think is the legal term.

17             THE COURT:  Predictably, yes.

18             MR. STRAND:  149 of them have seen the light and

19   have authorized us to produce the documents.

20             As I indicated just a moment ago, we have

21   produced KDP data for 80 of those, and 67 are this process.

22   There are 44 who have refused authorization and 22

23   remaining.

24             As of this morning, I checked -- we are shifting

25   to another phase here, Your Honor.  And this is -- talking

1      about getting it done, the most time-consuming thing right

2      now in the case, as Your Honor I think is aware, is the

3      production of the various KDP data for the archive

4      documents, the environments that we've been working on.

5              At this point we're beginning to shift.  We have

6      basically exhausted all of the work that we can do for the

7      clients who will volunteer.  And as of today, I counted,

8      there are 248 subpoenas that Oracle has issued -- has

9      issued that are outstanding to Rimini clients.

10             As you might well imagine, when those clients

11     are subpoenaed, many of them have called us and said, "Hey,

12     what's going on?  Can you help us?"

13             A few of them, about 25 or so, have been

14     subpoenaed after they provided the KDP data.  So there was

15     a little bit of concern and confusion there.

16             So as we enter this next phase, we've basically

17     done what we can do on the voluntary side of the KDP data

18     project.

19             We are prepared to continue to assist our

20     clients in getting the materials produced that Oracle wants

21     to those subpoenas.  But we'd like a little guidance from

22     Oracle and/or the Court today so that we don't come back

23     here with unnecessary fights.

24             The first thing is, I think it may be a stop.

25     If we get these duplicate subpoenas, if we produce KDP data

1    and the next week they get a subpoena, as they did the 25

2    instances, we get very unhappy clients, and it takes them a

3    while -- it takes us a while to talk them off the ledge.

4           If we get subpoenas going to clients and they --

5    they call us frequently, "What do they want?"  "What are we

6    going to do?"  "How are we going to do it?"

7           Point one.  We are happy to assist in that

8    process.  And we have been.  Oracle has asked us to assist

9    in certain instances, and we have assisted.

10          I believe that the most effective way going

11   forward to get that very large process completed would be

12   the following:

13          One, we work together to make sure we don't get

14   duplication of effort, as we have, so that if something's

15   produced once we don't produce it more than once or we

16   don't get more than one request for it, which I think is

17   reasonable; and, two, if we can get a punch list -- as you

18   might imagine, it's a fairly broad subpoena.  I don't want

19   to argue about the terms of it.  It's fairly broad.

20          We have now begun to develop -- at least we

21   understand some clients, for example, like H&R Block have

22   come up with a list of what they've produced to Oracle that

23   satisfied Oracle.

24          Logically and ideally, what we'd like is a punch

25   list from Oracle, pretty specific, as to, if you get this

1    from your client, we are happy, we're done.  So that we

2    don't come back here every month fighting about little

3    knits and picks.

4           So our view is, Your Honor, that we're

5    essentially done with the voluntary portion of the KDP

6    product that -- the voluntary portion; i.e., the clients

7    that will volunteer, we're now into the subpoena phase,

8    we'll help with it.  That's the KDP world.

9           In addition to that, Your Honor, we're working

10   forward on the technology-assisted research, TAR, process.

11   We're working that through.  I think there's going to be

12   some initial productions here in the very near future by

13   both sides.

14          Obviously we know where you are if we need -- if

15   we have problems with that.  But thus far that's worked out

16   fairly well.  I don't know where we're going to go with

17   that.

18          We've produced most everything else that we

19   think Oracle wants or needs.  I'm sure there'll be

20   additional things that they'll want.  We'll supplement as

21   we move forward.

22          They've requested 30(b)(6) depositions.  We

23   are -- they are -- again, without characterizing, I don't

24   want to get into a fight.  They're very broad.  They're

25   very comprehensive.  They're very detailed.

1          We have begun the process of interviewing people

2     to find the folks that know the information that we need

3     and folks that can testify to that information so that we

4     don't waste a lot of time with those.

5          So in the nutshell, Your Honor, I believe that's

6     everything.  We can -- and Mr. Dykal is here if you want to

7     do a deep dive on anything.  But that's the 10,000-foot

8     level.

9          Do you have any questions that I can answer?

10          THE COURT:  No.  Let me hear from opposing

11    counsel on the same type of overview from your perspective,

12    please.

13          MR. HIXSON:  Sure.  Thank you, Your Honor.

14          THE COURT:  Mr. Hixson for the record.

15          MR. HIXSON:  Again, this is -- as has now become

16    the practice, we get a status update at the status

17    conference with new information not contained in the

18    statement, which is frustrating for us.

19          But in any event, we are pleased to hear that

20    our subpoenas are spurring Rimini's customers to cooperate

21    with the KDP data collection process.  That seems to result

22    in efficiency.

23          Rimini has said that they are just about done

24    with the voluntary KDP portion of their production.  But if

25    you look at the handouts, that appears not to be the case.

1          On the second page Mr. Strand indicated that as

2     of April 5 there were a total of 215 environments at issue.

3     Authorization was refused as to 44.  They've produced 80.

4          My math isn't perfect, but it looks like they're

5     halfway there with respect to the environment production

6     for KDP data, which is not close to done.

7          Turning to the first page, where they refer to

8     KDP data for archived documents, there's a download

9     archives, none of those have been produced.  In the

10     quantity column there are zero, and that's consistent with

11     our understanding, none have been produced to us.

12          So there still is a long way to go.  And I don't

13     think we're -- we're halfway through the environments part

14     and the downloads --

15          THE COURT:  And I just heard Mr. Strand say that

16     they expect to produce approximately a hundred of those to

17     you this week.

18          MR. HIXSON:  I did hear that he said that they

19     expected to do that.  We will take a look when we get them.

20          Those, if I understood him correctly, were going

21     to be archives from Rimini's own systems rather than from

22     the customer systems or the cloud systems which have -- and

23     those, of course, have been the more time-consuming ones

24     for Rimini to produce.

25          So we will welcome the KDP archives from their

1    systems.  But I understood the other ones may take more

2    time from them.  In the event that's now beginning.  So --

3              THE COURT:  So let's move to how we can be as

4    efficient as possible in obtaining the client data that you

5    want without duplicating effort.  Because they're willing

6    to keep working with you.  And your subpoenas are having

7    the therapeutic effect that it was expected.

8              But I understand their frustration and the

9    client's frustration in not wanting to be in the position

10   of being in the process of voluntarily producing only to

11   get a subpoena.

12             MR. HIXSON:  Oh, of course.  And we certainly

13   don't intend for our subpoenas to duplicate that.  There's

14   only one item on the subpoena where there's potential

15   duplication where we ask the customer for copies of their

16   environment and the download archives.

17             And that's why we include the cover letter that

18   Your Honor saw at the last status conference, where we tell

19   them that if they cooperate with Rimini in producing the

20   KDP data for the environments and the archives, then they

21   may not need to produce the environment to us.

22             And I think that's the sentence in the cover

23   letter that spurs the customers to reach out to Rimini and

24   cooperate with them.

25             We've actually had a couple of customers that

1    says, "What is this KDP process you're talking about?  We

2    haven't heard about it."

3              And so then we emailed Rimini and we said, "When

4    customers ask us, we want to put them in touch with you."

5              And so they gave us the names to put them in

6    contact with.

7              And so I think that will help address any

8    potential duplication.

9              Other than that one item, our subpoenas ask for

10   other documents from the customer.  They're not limited to

11   the environments, the archives.  Those are the customers'

12   own documents.  We're subpoenaing a third party --

13             THE COURT:  Correct.

14             MR. HIXSON:  -- for their documents.

15             THE COURT:  But I --

16             MR. HIXSON:  They're not Rimini's.

17             THE COURT:  -- also understand Mr. Strand's

18   point about if you're satisfied with a category of

19   productions from a client like H&R Block, are you going to

20   be satisfied with the same productions from the other

21   clients?

22             MR. HIXSON:  From -- oh, from Rimini Street?

23             THE COURT:  Of Rimini Street's clients.  In

24   other words, can they go back to their clients and say, "If

25   you do what you did -- if you do what H&R Block did, Oracle

1    is going to regard you in compliance"?  Yes or no?

2              MR. HIXSON:  That depends.  A lot of times we

3    say we're satisfied that their clients say, "We have A, B,

4    and C, and we don't have D, E, and F.  We'll give you what

5    we have."

6              And when a customer says that to us, we have to

7    say, "That's all you can do."

8              But that doesn't mean if another client has D,

9    E, and F -- we do work with each of these customers when we

10   subpoena them and in very much their description of what

11   they have and are able to give us without going through

12   extraordinary efforts.

13             THE COURT:  Drives the process.

14             MR. HIXSON:  Absolutely drives the process.

15             And so -- and so I think that the efficient way

16   to proceed is for Rimini to continue working with customers

17   to collect the KDP data and for us to continue to make

18   clear to customers that if they cooperate in that process

19   then they may not need to produce those environments or

20   archives to us.

21             And then with respect to other documents that

22   are not part of what Rimini is gathering, we meet and

23   confer with the customers and obtain what they're

24   reasonably able to provide to us.  But we'd like to keep

25   that moving forward.  And we think that is efficient.

```
 1                  MR. STRAND:  Your Honor, one follow-up thought.

 2                  THE COURT:  Yes, Mr. Strand.

 3                  MR. STRAND:  The H -- there is an H and R

 4       process.  And Mr. Dykal is familiar with it.  He can give

 5       it to you.

 6                  Here's where we reach the inefficiency.  Oracle

 7       wants something, and they know what they want.  And that's

 8       fine.

 9                  The client comes to us and say, "We want to get

10       what Oracle wants."  We don't know and are hesitant to

11       predict what Oracle wants because we don't want to be in

12       the position of being accused of having --

13                  THE COURT:  That's correct.

14                  MR. STRAND:  -- construed.

15                  THE COURT:  And so the process that Mr. Hixson

16       describes is perfectly appropriate, to have the client talk

17       directly with Oracle so that you're not put in the middle

18       of --

19                  MR. STRAND:  No.

20                  THE COURT:  -- mistranslating and putting your

21       wrench in the process.

22                  MR. STRAND:  Right.  For us, though, it's also

23       moving target for us because we have daily -- multiple

24       daily calls with clients.

25                  If we could get a better idea -- we understand
```

1    if they want A, B, C, D, and F, we just don't know what A,

2    B, D, E, and F are in every situation.  And you can't get

3    blood from a turnip.  We understand that too.

4            But if we could get a little more clarity,

5    distilling down from Oracle what it is they want, it will

6    assist us in talking to the client so that we're not

7    talking past each other with Oracle.

8            MR. DYKAL:  It might help if I put a little more

9    concrete --

10           THE COURT:  Mr. Dykal --

11           MR. DYKAL:  -- on it.

12           THE COURT:  -- for the record.

13           MR. DYKAL:  So Oracle's subpoenas request

14   communications with Rimini, all sorts of things like this.

15           My understanding is Oracle agreed with H&R Block

16   to pick two custodians from H&R Block and run a certain set

17   of keywords.  And H&R Block said, "That's fine.  We just

18   don't know -- do you want us to search our whole company?

19   What do you want?"

20           So they said, "Give us your primary technical

21   contact with Rimini and your primary business contact with

22   Rimini."

23           And then they negotiated a limited set of search

24   words to run against their email.  And they said that that

25   should satisfy them.

1          At least that's my understanding from speaking

2     to H&R Block counsel.

3          So that seems like a reasonable process to us.

4     And then they also produced the environments or the KDP and

5     the contract documents.

6          THE COURT:  My observation is there's no reason

7     for you to be in the middle of that for strict -- for data

8     that only the client has because the discussion between

9     Oracle and the client should flesh out what is most

10    reasonable in each individual case as opposed to -- and I

11    understand Mr. Hixson's point, that if the client says

12    they -- "This is what we have, this is what we don't have,

13    these are the people that are involved in this, and these

14    are the" -- you know, "Is this good enough?"

15         That seems to me to be the most efficacious way

16    of doing it without interjecting you into the process,

17    which --

18         MR. DYKAL:  Sure.  No.

19         THE COURT:  -- then creates the potential for

20    confusion.

21         MR. DYKAL:  I agree.  We're not trying to

22    interject ourselves in the process.  We're just -- clients

23    ask us what is going on.

24         We say, "Talk to Oracle."

25         And they're, like, "Is a starting point what has

TRANSCRIBED FROM DIGITAL RECORDING

18

1    Oracle been satisfied with in the past?"

2             And we tell them, "Maybe this is an idea, and

3    then you'd have to talk to Oracle, would that be

4    acceptable?"

5             MR. STRAND:  Here's what I suggest, Your Honor.

6    We'll work it out with counsel, and we'll follow their lead

7    to stay out of it.

8             THE COURT:  You know I really can't give you an

9    advisory opinion on discussions that I haven't heard.

10            MR. STRAND:  Correct.

11            THE COURT:  And I'm not going to.

12            MR. STRAND:  Yeah.  We'll try to work over the

13   course of the next month to make that more efficient.

14            I think we've aired the concern.  We can talk

15   with them and try to figure out something that will work

16   and not get down into the extreme minutia with you.

17            THE COURT:  You're both the pros from Dover.

18   You can work it out.

19            MR. STRAND:  Yes, Your Honor.  Although I don't

20   think I've ever been in Dover.  But thank you.

21            THE COURT:  All right.  Let's move now to the

22   areas that are in dispute which require the Court's

23   intervention.

24            You have some issues.  Oracle's seeking a

25   protective order.  Rimini is seeking a motion to compel,

1    which is somewhat the flip side of the equation.

2            So let me hear first from Rimini concerning its

3    discovery requests that are directed towards Spinnaker

4    and -- the name just went out of my head, CedarCrestone,

5    now Sierra --

6            MR. STRAND:  Yes.  And, Your Honor, with your

7    leave I'll refer to them as CedarCrestone.  It's just a

8    force of habit.

9            THE COURT:  Okay.

10           MR. STRAND:  As the Court properly notes, the

11   motions overlap.  And so what I want to do is deal with

12   them kind of together because I don't think there's any

13   reason to take them completely separately.

14           I'm going to speak first to the motion for

15   protective order just generally and then follow up with our

16   motion to compel.

17           Your Honor, in looking at the joint submission

18   and thinking about this a little bit, I think Your Honor --

19   and you probably already figured out, but I think there are

20   four questions that are before us today.  And I want to

21   take each of those in order.

22           The first question is, on what grounds does

23   Oracle oppose production of the requested information and

24   on what grounds does Rimini seek production of that

25   information?

1                    And that sounds simplistic, but it's actually

2       not.  I think it goes to the core of what the dispute is.

3                    Oracle, if you look at the joint submission on,

4       for example, pages 12, 18, and 19, refers to the issues

5       before the Court primarily as ones of liability for

6       infringement, the liability side of the case.

7                    The requests and the subpoenas are in fact

8       focused on causation and damages.  That's where they go.

9       That's where they're relevant.  That's why we believe we're

10      entitled to that information.

11                   So if we look at the -- if we look at those

12      requests from the position of damages and causation in this

13      case, it frames the issues properly, and I think it will be

14      easier for the Court to resolve them so that regardless of

15      whether they relate to liability -- we think they do, but

16      it's just not worth arguing that because they so clearly

17      relate to issues of causation and damages.

18                   With that framing of the issue, Your Honor,

19      let's look at the second question I think the Court has to

20      face.

21                   Recognizing that under Rule 26(b)(1) information

22      within the scope of discovery need not be admissible in

23      evidence to be discoverable.  And that's a quote from the

24      rule.

25                   Is the information that Rimini seeks relevant to

1    Rimini's defenses and claims in the case?  And primarily

2    it's Rimini's defenses and therefore properly the subject

3    of discovery under Rule 26(b)(1).

4              Again, Your Honor, I think there are two

5    foundational questions.  And I don't want to overreach on

6    the Court by any way -- any means.  But let's just get

7    Rule 26 in front of us because that's what this whole

8    discussion is about.

9              So let's first look at Rule 26 that we are --

10   they're in the second or the -- after the colon on the

11   third line down.  Parties may obtain discovery regarding

12   any non-privileged matter that is relevant to any party's

13             I want to talk about relevant to any claim or

14   defense.

15             Your Honor, in the -- in the submission

16   materials we quoted from the *Krause* case, which is an

17   opinion by Magistrate Judge Hoffman in 2014.  And in that

18   opinion he states, As the Supreme Court reiterated in

19   *Oppenheimer Fund versus Sanders*, relevancy is, quote,

20   construed broadly to encompass any matter that bears on or

21   that reasonably could lead to other matter that could bear

22   on any issue that is or may be in the case.

23             So that's a statement by the United States

24   Supreme Court under the breadth of relevance.

25             The rules and the proportionality have changed

TRANSCRIBED FROM DIGITAL RECORDING

1    nothing about what's relevant in discovery.  So I think we

2    need to focus on what's relevant to discovery.  Not what's

3    admissible but what's relevant due to discovery.

4              The second --

5              THE COURT:  The question here is whether you're

6    going to get it, not whether it's relevant.

7              MR. STRAND:  Well, but I --

8              THE COURT:  I --

9              MR. STRAND:  -- think in order to get it, it has

10   to be relevant.  Because obviously if it's not relevant, I

11   wouldn't be asking for it.

12             Okay.  The second question then is must it be

13   admissible in evidence.  And I think we look at the last

14   line of Rule 26(b)(1), information within this scope of

15   discovery need not be admissible in evidence to be

16   discoverable.

17             And I think part of the problem with the parties

18   right now is Rimini is talking about relevance for purposes

19   of discovery, and Oracle is talking about relevance for

20   purposes of admissibility.

21             And I'm not here arguing about relevance for

22   purposes of admissibility.  I just want to get it.  And why

23   don't I proceed to tell you why we should get it.

24             The relevant -- I want to deal with the two

25   separate subpoenas and the RFP to Crestone as separately

1    with Spinnaker.  Because there are slightly different

2    issues afield -- at play in both of those.

3          If we look at CedarCrestone, that's our RFP 37,

4    and the opposition to the motion for protection which

5    Oracle seeks.  Then I'll look at Spinnaker as I said.

6          So let's place the issue in context first, just

7    so we understand what we're talking about when we talk

8    about CedarCrestone.  Because it's had a long history in

9    this litigation.

10          As you'll recall, Oracle issued a subpoena to --

11    both parties issued subpoenas to CedarCrestone in case 1.

12    And as the pleadings show -- or as the submission shows,

13    the subpoena that was issued in case 1 is quite a bit

14    broader than the subpoena that Rimini has issued in this

15    case.

16          Importantly, CedarCrestone did not resist that

17    broader subpoena in case 1.

18          In case 1, in December of 2011, CedarCrestone

19    was deposed.

20          September the following year Oracle sued

21    CedarCrestone.

22          As we point out, Oracle sued CedarCrestone in

23    that case on 19 copyrights.  13 of those same copyrights

24    are asserted against Rimini in this case.  So there's big

25    overlap in the two cases.

1          In August of 2013, CedarCrestone and Oracle

2     settled.  On that same day, August 13th, 2013, Mr. Fees

3     signed the declaration that in the joint submission --

4          THE COURT:  That said their 30(b)(6) designee we

5     disagree with, was what he said?

6          MR. STRAND:  Yes.  Basically calling their

7     30(b)(6) witness out as somebody who misrepresented the

8     facts under oath.

9          THE COURT:  No --

10         MR. STRAND:  I'm not going to --

11         THE COURT:  -- what the declaration says is that

12    legal took a look at it and disagreed with --

13         MR. STRAND:  Disagreed with --

14         THE COURT:  -- the business --

15         MR. STRAND:  All right.

16         THE COURT:  The business guy's view of the

17    thing.

18         MR. STRAND:  Right.  An unhappy moment, to be

19    sure, within CedarCrestone.

20         But I think what's salient there is that

21    declaration of how much they rely is dated the exact same

22    day as the settlement agreement.

23         One could reasonably assume that they were part

24    and parcel of the same overall deal.  And I'll get back to

25    that in a moment.  But I think that's important.  Fair is

1    fair.

2            Now, based on that history, Rimini wants to see

3    that settlement agreement.  And I won't reiterate the

4    rule -- the request for production or the subpoena.  You've

5    seen those in the joint submission.

6            Your Honor, yesterday I came across for the

7    first time the case that was issued just a week ago or --

8    yeah, a week ago tomorrow, the *Sanofi-Aventis* opinion.

9            I don't know if you got a chance to look at our

10   supplemental authorities filing yesterday.

11           THE COURT:  I did.

12           MR. STRAND:  If it would be helpful, I'd be

13   happy to hand up the case.  If it's not, I won't.

14           THE COURT:  I'm happy to take your case.

15           MR. STRAND:  Thank you, ma'am.

16           What's interesting about this case, Your Honor,

17   while it is in the patent context, but we have cited cases

18   that say that the rules and the procedures for calculating

19   damages in the patent context are applicable in copyright

20   cases, this opinion by Magistrate Judge Rosenberg in the

21   *Sanofi-Aventis* case out of the Central District is

22   enormously informative.

23           If you just look with me for a moment, I've

24   highlighted a couple of portions in there on the second

25   page.

1          You remember the big fight in this case -- and I

2    think this case -- the reason I bring this case to your

3    attention first is I believe this is completely dispositive

4    of the issue, presents all the right arguments for all the

5    right reasons in all the right order as to why Rimini is

6    entitled to receive a settlement agreement from

7    CedarCrestone.

8          So if we look -- if you look with me first, Your

9    Honor, it says, The Federal Circuit has rejected the

10   argument that licenses in settlement agreements are

11   categorically irrelevant to a reasonable royalty.

12         Which is essentially the position that Oracle's

13   maintaining in this case, that they're categorically

14   irrelevant.  They're not.  Then it cites the same case that

15   we cite in our joint submission, the *Astrazeneca* case.

16         Then it goes on, talks about previously -- they

17   said, No, you can't look to settlement agreements.  Then it

18   said, Nevertheless, *LaserDynamics* acknowledged that

19   reliance on settlement agreements is permitted under

20   certain limited circumstances.  One such circumstance was

21   presented in *ResQNet*.

22         And there's been enormous amount of briefing

23   about *ResQNet*.  I won't repeat it.  But they said that's

24   the case that said, No, maybe settlement agreements are the

25   most comparable, are the most related license agreement.

TRANSCRIBED FROM DIGITAL RECORDING

27

1          And then it goes on, The courts in *Astrazeneca*,

2  *LaserDynamics*, and *ResQNet*, as well as other cases cited by

3  counsel -- and we've cited other cases too -- had the

4  benefit of expert analysis in determining whether

5  settlement agreements were admissible in establishing a

6  reasonable royalty rate under the circumstances in those

7  cases.

8          Then it goes on, Defendants in this case, same

9  position as Oracle, seek to avoid producing the settlement

10  agreements altogether.

11          Same exact factual situation we have here.  It

12  goes on for a little bit and it says, Under these

13  circumstances the court concludes that production of the

14  executed settlement agreements is appropriate so that

15  plaintiff's expert can evaluate them.

16          That's all we want to do, get the settlement

17  agreement so our expert can evaluate that settlement

18  agreement in the context of this case and determine whether

19  that settlement agreement provides the data point for

20  calculating hypothetical fair market value of use damages

21  in this case.

22          And I'll pause right there, Your Honor, because

23  we can make it really easy.

24          If we can get the settlement agreement, and we

25  believe that under every authority we can get discovery of

1    the settlement agreement, I would encourage Your Honor to

2    ask Mr. Hixson if there is a single case post-*ResQNet*

3    denying discovery of a settlement agreement.  We have not

4    been able to find one.

5            If the Court will order the production of the

6    settlement agreement within a very reasonable time, this

7    week, a week, 10 days, we will look at that.  If the

8    settlement agreement does not support any type of analysis

9    that will give rise to our damages opinion, we don't need

10   the rest of the negotiation -- settlement negotiation

11   material set forth in either the subpoena to CedarCrestone

12   or in the request to Oracle.

13           So we'll make it easy.  If we don't want it --

14   if we don't want that stuff, we won't press it.  But right

15   now we have to press it because we don't know what's in the

16   settlement agreement.

17           So in the first instance, Your Honor, all we

18   seek is a settlement agreement.  There's -- there's amazing

19   amount of authority saying that we get it, starting with

20   that *Sanofi-Aventis* case.

21           The other case that we rely on principally to

22   get that settlement agreement is the *Oracle vs. SAP* case.

23   And you recall, Your Honor, that's also cited in the joint

24   statement.  If I could -- this is the only other case I'm

25   going to hand up.  I promise.

1           And that was a case, *Oracle vs. SAP*, the famous

2    TomorrowNow case.  It's very similar allegations of

3    infringement and stuff like that in that case.  There the

4    Ninth Circuit, in reversing a damages award, made certain

5    important findings that are relevant to us today.

6           If you'll look with me, Your Honor, at the first

7    red tabby on page 8 of the slip opinion, down toward the

8    bottom it says -- let's see, it's the second little yellow

9    highlighted part.

10          It says, Although actual damages can be awarded

11   in the form of lost profits, hypothetical damages also

12   constitute an acceptable form of actual damages recover

13   under Section 504B.

14          So you can get these hypothetical damages.

15          And then importantly, for our purposes today, go

16   over with me if you would, please, Your Honor, to the

17   bottom of page 12.  It's the third tabby.

18          It says, Although a copyright plaintiff need not

19   demonstrate that it would have reached a license agreement

20   with the infringer or present evidence of benchmark

21   agreements in order to recover hypothetical license

22   damages, it may be difficult for a plaintiff to establish

23   the amount of such damages without undue speculation.

24          Then it goes on, on the next page, Here because

25   Oracle has no history of granting similar licenses and has

1    not presented evidence of benchmark licenses in the

2    industry approximating the hypothetical license in question

3    here, Oracle faced an uphill battle.

4            Clearly the Ninth Circuit anticipates reliance

5    on benchmark license.

6            All we want to do in discovery is see the

7    settlement agreement, see what it says, see if there's a

8    license implicit.  There has to be.  There were allegations

9    of infringement.  They sought millions of dollars I --

10   presumably.  There had to be some type of settlement on

11   that.

12           We want to see that document and determine what

13   it says, how's it -- how might it be relevant to a damages

14   case, how might we get it admitted into evidence in the

15   damages case.

16           Now, once we see the settlement agreement -- and

17   if the Court's so inclined, we believe that we're entitled

18   to see the settlement negotiation documents.  And we've

19   asked for those both in the RFP and the subpoena.

20           The negotiations were between CedarCrestone and

21   Oracle are relevant and discoverable.  We've cited the *MSTG*

22   case from the Federal Circuit and the *Barnes & Noble* case

23   from California, I believe.

24           In addition, and I think this is what is

25   critically important here, as I mentioned, Oracle relies on

1    the Fees' -- Mr. Fees' affidavit.  You mentioned it, Your

2    Honor.

3            That affidavit was part and parcel of the

4    settlement agreement.  In fact, it refers to agreeing with

5    Oracle in paragraph 16.

6            It is simply not appropriate for Oracle to say

7    that that Fees' declaration, which is a part of the

8    settlement, is sufficiently relevant to this motion to try

9    to use that to defeat the motion while at the same time

10   using that motion -- that Fees' declaration as a sword and

11   a shield to preclude us from getting the very settlement

12   agreement that that declaration was a part of.  It's a

13   sword-and-shield problem.

14           We believe we are entitled, if for no other

15   reason, that reason, to see the settlement agreement.  And

16   in fact if you look with me at *MSTG*, Your Honor, there's

17   a -- we've cited that in our brief as well.

18           It says right there, As for the matter of

19   fairness -- as a matter of fairness, MSTG, which is anomaly

20   in Oracle's position here, cannot at one time have its

21   expert rely on information about the settlement

22   negotiations and deny discovery as to those same

23   negotiations.

24           So what we want is the agreement and the

25   negotiations.  The *MSTG* case is a 2012 Federal Circuit

1    case.

2            So, Your Honor, our view is we're entitled to

3    the settlement agreement and we're entitled to the

4    negotiation materials.

5            And, again, if Your Honor doesn't want to go all

6    that way today, if Oracle's willing, we'll look at the

7    settlement agreement and in good faith we'll tell them

8    whether we want to proceed or not.

9            Now, Oracle's arguments that that shouldn't be

10   produced are simply misplaced.  First of all, they argue

11   that -- they try to argue that settlement licenses are not

12   discoverable.  That is simply wrong.

13           We cite *ResQNet*, we cite the *Caluori* case, we

14   cite the *MSTG* case.  I've just given you the *Sanofi-Aventis*

15   case.  All of them recognize the basic concept that since

16   *ResQNet*, settlement licenses have been admissible in trial

17   for damages purposes.  Obviously if they're admissible in

18   trial, they can certainly be discoverable.  As I've

19   indicated, there is no case that we can find that says a

20   settlement agreement is not discoverable.

21           Where are we then?  Oracle has inappropriately

22   conflated relevance and admissibility in this case, the

23   Rule 26(b)(1) standard we started out with, information

24   within the scope of discovery need not be admissible

25   evidence to be discoverable.

1          So we seek discovery.  We're not talking about

2     admissibility right now.  That's for Judge Hicks on down

3     the road.

4          Should we choose to use that settlement

5     agreement and the information in there as a data point,

6     there's no case, as I indicated, that says they can't be

7     used.  We've cited those.

8          Now, timing.  Let's talk a little bit about

9     timing.  They cite the Fees' affidavit or declaration to

10    say that settlement licenses that predate the infringement

11    are irrelevant -- that postdate the infringement, are

12    irrelevant.

13         Well, that simply makes no sense.  Virtually

14    every settlement agreement is going to postdate

15    infringement.  So that isn't a valid reason not to produce

16    it.

17         So we are entitled to the document both from

18    CedarCrestone and from Oracle.  And we'd like to get it --

19    the documents, both the settlement agreement and the

20    negotiation materials, from both of them.  We don't want it

21    from both of them.  We'll take it from either one or the

22    other in the easiest possible way.

23         Now, before I get on to the proportionality, I

24    want to spend a few minutes on the Spinnaker subpoena.

25         But I'll pause there, Your Honor.  Do you have

1    any questions that I can answer about the CedarCrestone

2    situation?

3                THE COURT:  No, sir.  We're talking about

4    Request for Production No. 37 --

5                MR. STRAND:  Yes, ma'am.

6                THE COURT:  -- and your subpoena to them.

7                MR. STRAND:  And my subpoena to them.  Yes,

8    ma'am.

9                Okay.  Spinnaker next?  All right.  Here we go.

10               So Spinnaker, we don't have a request

11   specifically out to Oracle on Spinnaker.  Now, let's think

12   about Spinnaker a little bit.

13               Spinnaker is an organization that was also

14   mentioned in case 1.  As of today on their website

15   Spinnaker provides -- claims to provide services for JDE,

16   Siebel, and E-Business, all but one of the services that

17   are accused in this case.

18               So let's look at what the factual context is

19   regarding Spinnaker.  In case 1 in response to an

20   interrogatory, Oracle admitted or stated that it was its

21   conclusion that Spinnaker was not infringing the JDE

22   copyrights.  And that's important.  Because that makes

23   Spinnaker a noninfringing alternative.

24               Apparently that's correct because Oracle hasn't

25   sued Spinnaker.  So as we sit here today, Spinnaker appears

1    to be a noninfringing alternative.

2           Now, why is that important?  Why does that make

3    Spinnaker's business practices relevant to this case?

4           Well, let's look at *Oracle vs. SAP*, if you will,

5    please, Your Honor, the first tab.  Clear Ninth Circuit law

6    is that a plaintiff in a Section 504 action must establish

7    a causal connection between the infringement and the

8    monetary remedy sought.  They have to show causation.

9           In its portion of the joint submission, Oracle

10   cited to a case called *Panduit*.  And *Panduit's* an old

11   patent case that basically says in order to get lost

12   profits you have to prove four things.

13          The one thing that's relevant here today is

14   this:  In order to get lost profits in this case, in order

15   to prove but-for causation, Oracle's going to have to prove

16   the absence of noninfringing alternatives.  So Oracle's

17   going to have to prove at trial that Spinnaker is not a

18   noninfringing alternative.

19          We went through a ton of that at case 1, but I'm

20   sure you don't want to hear about that.  So in order to

21   make their proof, they have got to prove that Spinnaker is

22   a noninfringing alternative.

23          So the existence of Spinnaker as a noninfringing

24   alternative defeats Oracle's ability to get lost profits

25   under the *Panduit* case.  So it's pretty important, pretty

1      relevant.  We want to make sure it's a noninfringing

2      alternative.

3              Secondly, the presence of a noninfringing

4      alternative also affects the hypothetical license

5      negotiation.  If you'll look with me again, please, Your

6      Honor, at page 9 of the Oracle opinion, the second tabby

7      there, it says, down and toward the bottom of the

8      right-hand column, The touchstone for hypothetical license

9      damages is the range of the license's reasonable market

10     value.  The question, therefore, is not what the owner

11     would have charged but rather what is the fair market

12     value.

13              The next little portion, That is fair market

14     value is based on an objective, not a subjective analysis.

15              Our damages expert wants to look at the

16     Spinnaker situation.  We want to look at the Spinnaker

17     situation for causation and damages for reasons -- for the

18     following reason, insofar as they relate to fair market

19     value damages.

20              Obviously if Oracle is a monopolous in the area

21     of providing these services, then it will be able to

22     command a higher reasonable royalty.  If it is not a

23     monopolous, because there is a noninfringing alternative,

24     then the amount of the reasonable royalty we'll be able to

25     charge will be less.

1          And Oracle faces a conundrum here.  In its

2     licenses it says that its clients can use third-party

3     service providers after the first year.  But at trial --

4     which seems to suggest that they can -- they can have a

5     noninfringing alternative.  And at trial even Ms. Catz and

6     Mr. Allison admitted that that was allowed.

7          But at trial they'll also want to say, as they

8     did in case 1, that, no, there are no noninfringing

9     alternatives.

10          So we seek discovery from Spinnaker to establish

11     what they do to establish that it's a noninfringing

12     alternative, to show both that there were alternatives for

13     the customers that left Oracle to come to Rimini and that

14     they -- it would depress fair market value damages and

15     defeat the ability of Oracle to recover lost profit

16     damages.

17          Now, we've had a lot of discussion, and I want

18     to go into it, about relevant/nonrelevant customers.  At

19     least five customers have left Rimini to go to Spinnaker.

20     So the two are in competition.  Relevant customers for whom

21     we believe Oracle will seek damages are at play here.

22          And finally, Your Honor -- and I think perhaps

23     this is the most telling point -- is sauce for the goose,

24     sauce for the gander.  We just spent quite a bit of time

25     talking about the subpoena that Oracle has served on now

1    248 Rimini customers.

2              And let me read you paragraph 8D of the subpoena

3    that they've sent to any single -- every single one of our

4    customers essentially.

5              It asks for your consideration of third-party

6    support providers for software support related to

7    PeopleSoft, J.D. Edwards, Siebel, or Oracle E-Business

8    Suite software.

9              Today, right now, as we sit here, Spinnaker

10   claims it is a third-party support provider for three of

11   those four lines of business.

12             How, Your Honor, can it be relevant in the

13   subpoena that Oracle served our clients and not be relevant

14   for us to seek that information vis-á-vis causation and

15   damages?

16             Discovery is proportional.  It's also a two-way

17   street.  And we want that street to go -- to go both ways.

18             Now, in our brief we said if Oracle will

19   stipulate right now that Spinnaker is a noninfringing

20   alternative, then we don't need that discovery.  But if

21   Oracle's not prepared to stipulate to that, then we need to

22   proceed with that discovery.

23             Your Honor, based on that, I think it's

24   abundantly clear that also the information that is sought

25   in the Oracle -- I mean in the Spinnaker subpoena, is

1    relevant.

2                Now, let's go to the next question then, the

3    Court -- the third question I think you've got to answer,

4    Your Honor, is is the information that Rimini seeks

5    protected -- excuse me, proportional to the needs of the

6    case in light of 26(b)(1)?  And I -- we've got that in

7    front of us now.  And I want to run through that quickly.

8                The one thing I do want to recall for the Court,

9    though, is this.  In the advisory committee's notes to the

10   2015 amendments to Section 26(b)(1), they said, and I

11   quote, "Nor is the change in the rule intended to permit

12   the opposing party to refuse discovery simply by making a

13   boilerplate objection that it is not proportional."

14               We've gotten the boilerplate objection.  There

15   is no showing here by Oracle that it's not proportional.

16   Set that aside.  I'll show you why it is proportional.

17   Let's go through some of those factors and our analysis of

18   those factors.

19               First of all, as I've just shown at great

20   length, the materials that Rimini seeks are important and

21   critical to its defenses and claims regarding causation and

22   damages in this case.  We need them.  We want them.  We

23   want to see them.

24               They could be case dispositive, depending on

25   what the -- or not dispositive, but dispositive of the

1      damages issue, depending on what that settlement agreement

2      says.  But we haven't been able to look at it.

3            The second thing is Rimini has no access to the

4      requested material.  They can't get it.  We can't get that

5      stuff anyplace else.  I think that's obvious.

6            Third, I think we can all agree that the amount

7      in controversy here is going to be substantial.  As the

8      Court will remember, in closing argument they sought over

9      $200 million against Rimini in case 1.  And we assume that

10     will be something akin to that in this case.

11           So it's critical information.  We can't get it

12     anyplace else.  The amount in controversy is substantial.

13           As we mentioned in the joint submission that we

14     submitted, the subpoenas have been narrow in scope.  We try

15     to scope them so that they're not overbroad.

16           Now, we haven't had an opportunity to talk with

17     either Spinnaker or CedarCrestone about their objections.

18     They objected last -- a week ago Friday.  Good Friday.

19           We would like, Your Honor, to go back and see if

20     we can work out something with them to get a lesser amount

21     of data that we can be happy with.

22           So I -- in some respects we view that the

23     current motion is premature.  And if the Court wants to

24     say, Listen, I'll give you a month, go out and talk with

25     them and see if you need to darken my door with this again

1      next month, we'd be happy to do that, Your Honor.

2              But precipitously this has been filed, and so

3      we're here today dealing with it.

4              Finally, the burden to produce the requested

5      materials is certainly no greater than the burden that's

6      been placed on Rimini's clients, all 248 of them who have

7      been served.  And we're talking about two subpoenas here.

8              So because the material is relevant, because

9      it's their burden, Oracle's burden to prove on -- that

10     there's an absence of noninfringing alternatives, we're

11     entitled to that document.  That's why this side-show

12     comment is simply incorrect.  It's their burden.  This

13     isn't a side show.  This is a critical element of their

14     proof that we want to discover on and challenge.

15             Now, last question.  I'm getting close to the

16     end.  And you've been very patient.  Thank you.

17             Do you have any questions up to that point?

18             THE COURT:  No, sir.  I'm not hesitant to ask

19     questions if I have them.

20             MR. STRAND:  I know.  But I want to give you a

21     chance to breathe.  And me too.

22             Fourth question is this.  Are there any

23     privileges or prior rulings of the Court, this Court, that

24     bar discovery of the information that we're seeking?  And I

25     think the answer to that question is no.

1          First of all, the October 15th ruling did not

2     prohibit this discovery.  This is discovery of third-party

3     service providers that dealt with broader discovery on

4     other issues.

5          And you also specifically said, Your Honor, and

6     you quoted it in the brief, that you were not foreclosing

7     discovery -- other discovery.  So we're here on that.  We

8     don't believe that was cut off.

9          In the February 15th order, we were -- in the

10    February 15th conference, excuse me, February 2016, we were

11    talking about nonRimini customers versus Oracle's

12    characterization of relevant customers.

13         This has nothing to do with that.  This is

14    third-party service providers, not liability side, this is

15    damages and causation as I've said at length.

16         The 2014, they make a sideboard comment on that.

17    You will recall the first time we met was back in October

18    of 2014.  We were seeking to reopen discovery to get the

19    CedarCrestone subpoena.  And Your Honor said, No, I'm not

20    going to reopen discovery.  Discovery's closed.  Go to

21    trial on case 1.

22         That had nothing to do with whether we could get

23    the subpoena or not, it was just whether you were going to

24    reopen discovery on case 1.  That's water way under the

25    dam -- way over the dam, long since gone.  So that has

1    nothing to do with the ruling here today.

2           The second point I make, Your Honor, is Rule 408

3    is a rule of evidence, not a rule of discovery.  And it

4    does not in any way preclude discovery of the CedarCrestone

5    agreement.  We cite to the *Hooks* case out of the District

6    of Nevada in 2014, which rejects that very argument.

7           And think about this.  How would all of those

8    settlement agreements be in evidence in patent cases if

9    Rule 408 prohibited even their discovery?  It doesn't.

10          Third, they make reference to the fact that the

11   settlement agreement's confidential.

12          As Your Honor is well aware, we have a very

13   comprehensive protective order in place in this case.  It

14   provides for attorneys' eyes only.  And the parties have

15   even agreed to a heightened level of protection if we need

16   to do that.  We're certainly willing to work with them on

17   that if we need to.

18          All we want is to see it.  The lawyers need to

19   see it so that legally we know what it's about.  And we

20   want our damages expert to see it, that material.

21          Finally, we believe Oracle lacks standing to

22   even pursue the protective order this time.  So it's

23   premature.  But they also lack standing.

24          They -- as they say in Texas, where I practiced

25   for a while, Oracle really doesn't have a dog in this

1      fight.  This is between us and Spinnaker and us and

2      CedarCrestone.  Oracle doesn't need to get in the middle of

3      it, just like we don't need to get in the middle of their

4      subpoenas to our clients.

5              So if we could get a month to work with those

6      folks, see what we can get, and not have a precipitous

7      protective order cutting off all discovery, maybe we could

8      get someplace and maybe we could get something done.

9              So, Your Honor, in summary, what do we want?  We

10     want the Court's order compelling Oracle to produce the

11     CedarCrestone settlement agreement.  We believe we're

12     entitled to that under every authority.

13             We want an order from the Court compelling

14     Oracle to produce materials related to the negotiation of

15     the CedarCrestone settlement agreement.  And if Oracle

16     will give us --

17             THE COURT:  Even though your Request for

18     Production No. 37 doesn't ask for that?

19             MR. STRAND:  I believe it does, Your Honor, in

20     the definition of documents.  If you disagree, I'm not

21     going to argue with the Court.  Never a good plan.

22             If -- we'll file another request for production.

23     If we -- if you don't believe it's coming --

24             THE COURT:  Well, you just told me that if you

25     review the settlement agreement, depending on what it says,

1    you may not need it.

2              MR. STRAND:  Exactly.  That was going to be my

3    separate offer.  If we -- if we can -- if you don't want to

4    compel it, we're happy to take a ruling today that will

5    review the settlement agreement, be back here in a month if

6    you think we want to go to any further.  I'm happy with

7    that, Your Honor.  I just want to see the settlement

8    agreement.

9              And I really, really don't believe about

10   fighting about stuff I don't know about.  And I don't know

11   what's in the settlement agreement.  If there's nothing

12   there, there's nothing there.

13             So first we'd like an order -- if you feel so

14   inclined, which I'm not picking up that you are, to compel

15   them, but if you don't feel like that, if the Court -- if

16   you so desire, we'll look at the settlement agreement and

17   get back -- get back to Oracle, and if necessary back to

18   you.

19             The third thing we want is to deny their motion

20   for a protective order as to the Spinnaker subpoena so that

21   we can have time to go to Spinnaker and see what we can

22   work out with them to get.  That's what we'd like.  We

23   think it's reasonable, we think it's proportionate, and we

24   don't think there's any reason not to get that.

25             Again, if you've got any questions, I'm happy to

1    answer.

2              THE COURT:  Thank you, Mr. Strand.

3              MR. STRAND:  Thank you.

4              THE COURT:  Let me hear from -- who will be

5    arguing Oracle's position?

6              MR. HIXSON:  I will, Your Honor.

7              THE COURT:  Mr. Hixson.

8              MR. HIXSON:  Good morning, Your Honor.  I'd like

9    to start with Oracle's motion for a protective order.

10             Obviously the Spinnaker subpoena has nothing to

11   do with settlements.  And seven of the nine requests for

12   production and deposition topics in the CedarCrestone

13   subpoena don't have anything to do with settlements.

14             So we can cabin out a large area where we're

15   moving for a protective order.  And then after that I will

16   get to the discussion about RFP 37 and Rimini's request for

17   the CedarCrestone settlement, which I think presents

18   distinct issues from those.

19             First let's start with why you should do

20   something now and why Oracle has standing to seek this

21   protective order.

22             Our protective order motion was pretty

23   straightforward.  We relied on the Court's rulings in

24   October and in February limiting the scope of discovery

25   into the third-party support providers.

1          October dealt generally with third-party

2     support.  It dealt with liability.  It dealt with

3     causation --

4          THE COURT:  It also dealt with --

5          MR. HIXSON:  -- it dealt with --

6          THE COURT:  -- extraordinarily overbroad

7     discovery requests that Rimini had served.

8          MR. HIXSON:  That's right.  And we think that

9     the lines that the Court drew in October and February

10    provide the appropriate guidance for what should be

11    followed now.

12         In particular the Court cabined discovery into

13    discovery about relevant customers and their connection to

14    these other third-party support providers; relevant meaning

15    Rimini's customers, the customers that Oracle's subpoenaing

16    in its subpoenas and the issues regarding communications

17    about, you know, third parties or what third parties have

18    done for those relevant customers.

19         And when you look at the subpoenas to

20    CedarCrestone, the 9 requests and the 11 to Spinnaker, none

21    of them are in any way limited by that at all.

22         This morning counsel for Rimini said that there

23    are, to their understanding, five customers that left

24    Rimini to go to Spinnaker.

25         But if you compare the very broad requests that

1    went to Spinnaker, there's no limitation at all --

2              THE COURT:  They're a --

3              MR. HIXSON:  -- to those five.

4              THE COURT:  -- lot narrower than the ones you

5    served them with last time around.

6              MR. HIXSON:  That's true.  But we have never

7    been shy about saying that certain issues were decided in

8    the first case and that they don't need to be relitigated

9    here.

10             And a lot of the issues that we -- that were the

11   subject of Oracle's subpoena in the first case dealt with

12   the licensing issues, dealt with liability issues, and

13   dealt with infringement issues that have since been

14   resolved, a large part by Judge Hicks' orders on summary

15   judgment and by the liability findings of -- about

16   Rimini's, at least their old process at trial.

17             And that's why we don't think we need to replow

18   that ground which a lot --

19             THE COURT:  But noninfringing --

20             MR. HIXSON:  -- of their requests go to.

21             THE COURT:  -- alternatives is still an issue in

22   this case.

23             MR. HIXSON:  That -- that's true.  And that's

24   why the line that the Court drew last October and this

25   February is the appropriate one here, which is the

| | |
|---|---|
| 1 | particular relevant customers at Rimini Street, what other |
| 2 | options did they consider?  Whereas Rimini's request to |
| 3 | CedarCrestone and Spinnaker are -- |
| 4 | THE COURT:  But they're talking about their need |
| 5 | for damages analysis and causation.  Because what are your |
| 6 | damages in a copyright infringement case? |
| 7 | Now, hypothetical a license; correct?  Fair |
| 8 | market value of a hypothetical license or lost profits. |
| 9 | MR. HIXSON:  Right.  There's -- and then |
| 10 | infringers' profits as well. |
| 11 | THE COURT:  And in your *Oracle/SAP* case, the |
| 12 | Ninth Circuit agreed with you that you don't have to prove |
| 13 | that you were given a license, and your executives indeed |
| 14 | said, We never give people licenses. |
| 15 | But still the Court has to engage in the |
| 16 | hypothetical damages analysis. |
| 17 | MR. HIXSON:  Well, that's all true.  And that |
| 18 | I'll address when I talk about the CedarCrestone |
| 19 | settlement.  But for obviously Spinnaker, none of that is |
| 20 | at issue about hypothetical licenses or because there -- |
| 21 | there's no contention there was any such license. |
| 22 | And in terms of noninfringing alternatives, if |
| 23 | you look at particular Rimini customers and what are the |
| 24 | options they considered, which is what we asked for in our |
| 25 | subpoena, and which is the line that we think the Court |

1      drew in October and February, that would be the appropriate

2      cabining of the discovery to those third-party support

3      providers.

4                   And Rimini's requests go way beyond that.  They

5      ask for every facet of their business operations, all

6      document about how they provide support going back to 2008,

7      which is the time period covered in the first lawsuit as

8      well.

9                   These subpoenas go way beyond what the Court has

10     already ordered.  And that --

11                  THE COURT:  Well, if I understand correctly,

12     what you told me about CedarCrestone in your settlement

13     with CedarCrestone and the affidavit that Mr. Fees provided

14     to you contemporaneously with your settlement agreement,

15     they stopped infringing in 2012, and they don't do what

16     they did that caused them to be sued for infringement after

17     they settled with you -- or after actually the end of 2012,

18     before the settlement was --

19                  MR. HIXSON:  Before the settlement, about eight

20     months before the settlement.

21                  Well, Your Honor, I can see that you're

22     interested in argument about the settlement.  So why don't

23     I turn to that issue now.

24                  THE COURT:  Well, they're kind of all connected.

25                  MR. HIXSON:  They're a little bit connected.

1    Obviously the Spinnaker one is distinct.

2              But turning to the settlement --

3              THE COURT:  It's distinct in that you don't have

4    a settlement agreement with it.  It's --

5              MR. HIXSON:  Right.

6              THE COURT:  But you still regard them as a

7    noninfringing alternative; correct?

8              MR. HIXSON:  We're not prepared to make that

9    stipulation now, Your Honor.

10             The issue here is whether -- turning to the

11   CedarCrestone settlement, they have -- Rimini has satisfied

12   both the requirement under Rule 26 to show that that

13   discovery is relevant for producing in the litigation.

14             And it's funny that both of us have this -- the

15   same view that the *Genentech* case that Rimini provided

16   actually does provide a useful framework for how to assess

17   the relevance of a potential settlement.

18             This case that they provided to you concerned

19   the Cabilly patents and whether there could be discovery

20   into settlements that *Genentech* had entered into for some

21   other patents in some of that litigation.

22             And initially the court's first ruling -- and

23   this is you can see on the second page of the opinion that

24   Mr. Strand handed to you -- was that in September 2011, the

25   Northern District of California said no, that court would

1    not order the production even in discovery of the

2    settlement concerning the Cabilly patents.

3              It was Judge Feltzer in that case said that

4    these documents were at best marginally relevant to their

5    commercial success and damages issues in the case.  That's

6    on the second page of that opinion.

7              And then three years later, in August 2014,

8    Judge Feltzer again denied a motion to compel another one

9    of those settlements, again saying that they were

10   marginally relevant and that if there were a change of

11   circumstances or unexpected developments in the case, that

12   could render them more than marginally relevant.

13             And then what happened leading to the 2016

14   opinion is that there was a change in circumstances.  And

15   the Court identifies that on the next page, page 3 of 4 of

16   the decision, that in 2015 there were additional

17   settlements.

18             And then it's towards the end of the third page,

19   it's the language that Rimini didn't highlight.  It's the

20   language right above that, where they say, Plaintiffs argue

21   that the settlement agreements account for half of the

22   licenses under which defendants receive royalties from

23   products that, like Praluent, have FDA approval and are on

24   the market.

25             In other words, the fact of a settlement

1    concerning a relevant product wasn't enough, and it wasn't

2    enough twice in a row.  It was when on the third time the

3    plaintiff came back and said 50 percent of all of the

4    sales, all of the license sales for this patented product

5    are occurring under litigation settlement agreements.

6            At that point the Court said, Well, okay now,

7    now, you've established relevance.

8            Let's contrast that with the showing that Rimini

9    has made here.  There's no showing that CedarCrestone

10   accounts for any significant fraction of support sales,

11   license sales, or anything, no matter how you would define

12   what would be relevant in terms of what Oracle has.

13           They haven't attempted to argue that.  They've

14   come nowhere near the type of showing that was held here

15   simply to justify discovery because these are discovery

16   orders.

17           We have shown that the infringing contact of the

18   maintained servers was ended in December 2012 and that the

19   settlement was distant by eight months after that.

20           We've also shown that CedarCrestone and Rimini

21   were in different positions, that CedarCrestone had a

22   preexisting business relationship with Oracle, it was part

23   of the Oracle partner network, and indeed breach of those

24   contracts were at issue in that case.

25           So there's no showing like there was in this

1          *Genentech* case that any kind of license or settlement had

2          any -- was a benchmark, that it accounted for a significant

3          amount of sales, or that Rimini is in a similar position to

4          CedarCrestone.

5                    So as a factual matter, we think that they have

6          not shown that the settlement agreement is relevant in any

7          way.

8                    We've also gone beyond just the bare relevant

9          statements to cite for Your Honor two cases, *Big Baboon* and

10         *Brantley v. Boyd*, dealing with the policy applied by courts

11         in the Ninth Circuit adopting heightened scrutiny for

12         discovery requests concerning producing settlement

13         agreements.

14                   And those were discovery cases.  They weren't

15         admissibility cases, they were discovery cases where the

16         courts deny discovery into settlement agreements because

17         there hadn't been a sufficient factual showing to satisfy

18         that heightened scrutiny standard.

19                   And so under that kind of standard, Rimini

20         hasn't met that burden either.

21                   They say there's some PeopleSoft copyrights at

22         issue in this case, there's some PeopleSoft copyrights that

23         were at issue in CedarCrestone, and that's all that they've

24         argued.

25                   That certainly wasn't enough in the *Genentech*

1       trilogy of cases to take access to the settlements, and it

2       doesn't satisfy any kind of heightened scrutiny standard.

3       Because there's no showing that CedarCrestone sales account

4       for any significant percentage of Oracle sales or that

5       there's any kind of factual or otherwise similarities

6       between Rimini Street and CedarCrestone.

7                   So we submit that under these heightened

8       standards that they simply haven't made the showing

9       necessary to justify the production of those.

10                  And, again, ordering a company to produce a

11      settlement agreement without any real showing that it's

12      relevant or that it bears on the issues in the case, that's

13      a big deal.  It wades out into other settlement discussions

14      that companies can have.

15                  And, furthermore, the way they want not just the

16      settlement agreement but, in their subpoena to

17      CedarCrestone, settlement negotiations, that's a pretty

18      hefty thing for a court to order a party to produce and is

19      invasive of the policy of promoting settlements.

20                  And so we would submit they have not made the

21      necessary showing to show that the settlement agreement

22      should be produced at all.

23                  Substantively, in terms of whether a settlement

24      agreement can even be used to support a reasonable royalty

25      rate, we've cited for the Court a number of courses --

1    cases that say, No, never, that's simply not possible.

2           Rimini's response is to cite a couple of cases

3    that say, Well, maybe, in some circumstances that it could

4    be possible to serve as a benchmark.

5           But the important thing is there's unanimity

6    among the courts that as a matter of substantive law it's

7    very dubious to try to use litigation settlement agreements

8    to come in as --

9           THE COURT:  Correct.  But --

10          MR. HIXSON:  -- evidence of a --

11          THE COURT:  -- sometimes that's --

12          MR. HIXSON:  -- (indiscernible) royalty.

13          THE COURT:  -- all there is.

14          MR. HIXSON:  Sometimes that's all there is.

15          But here that's not the case.  Oracle routinely

16   goes out and licenses software to customers and charges

17   support contracts to them.

18          Those practices, I mean, those are routine.

19   Those are the overwhelming majority of the support

20   business.  That -- those are --

21          THE COURT:  That wasn't --

22          MR. HIXSON:  -- out there --

23          THE COURT:  -- the position --

24          MR. HIXSON:  Those are benchmarks.

25          THE COURT:  -- you took in *SAP.*

1            MR. HIXSON:  But in *SAP* -- well, in *SAP* that was

2   relying on the defendant's internal documents about how

3   they valued their prospective use of the Oracle software

4   and, as well, Oracle's executives' testimony about how they

5   would charge SAP to use on it.  Because those were very

6   different from a customer phasing of license like the ones

7   that Oracle typically enters into.

8            And the Ninth Circuit held that that showing

9   wasn't adequate.

10            But that doesn't mean that the CedarCrestone

11   settlement somehow, because it's so factually distinct, it

12   doesn't account for any significant fraction of shares.

13            So at least Rimini hasn't established that would

14   somehow come within relevance or trump the policy that

15   there's heightened scrutiny before producing a settlement

16   agreement as here.

17            And so -- and likewise in SA -- *Oracle v. SAP*,

18   there was no suggestion by the Ninth Circuit that a

19   settlement that resulted from litigation would somehow be

20   substantively relevant.

21            There continues to be that substantive

22   skepticism.

23            So what we have here are really three layers

24   under Rule 26.  We had as a matter of substantive law that

25   many courts outright refuse use settlement agreements as a

1    relevant benchmark.  Some sometimes allow it.  But it's

2    under unusual circumstances.

3              Piled on top of that we have the absence of a

4    factual showing that Rimini Street is in any way similarly

5    situated to CedarCrestone or that there's any significant

6    sales through the settlement agreement.

7              And then on top of that, we have this heightened

8    discovery standard which does apply in discovery cases that

9    courts in the Ninth Circuit apply to resist producing

10   settlement agreements.

11             And when you add these things to each other, I

12   think you get to the conclusion that the settlement

13   agreement with CedarCrestone isn't discoverable at all.

14             With that I'd like to turn back to the

15   protective order issues.  Because seven of the nine

16   requested CedarCrestone just have nothing to do with the

17   settlement agreement and all of them to Spinnaker don't

18   either.

19             The causation and damages issues were certainly

20   in front of this Court last October and this February when

21   you drew the line that discovery, at least directed at

22   Oracle concerning these third parties, should be limited to

23   relevant customers.

24             And in February Rimini Street mentioned

25   CedarCrestone and Spinnaker by name in their motion to

1    compel.  So, again, this issue was keyed up.

2              It was remarkable to me this morning how

3    Rimini's counsel began with handing you a copy of Rule 26

4    and spent more than half an hour arguing as if none of

5    these issues had been before Your Honor before when, in

6    fact, you had heard and decided them last October and again

7    in February on very significant issues here.

8              They largely said nothing to justify the request

9    to CedarCrestone.  They suggested they might not need any

10   of them, actually.  And they said very little about the

11   requests to Spinnaker.

12             Most of these requests really have nothing to do

13   with causation or damages.  Like the Request No. 1 to

14   CedarCrestone deals with licensing regime that

15   CedarCrestone operates under; their Requests 6 or 7 to

16   CedarCrestone and 9 to Spinnaker as wholesale about their

17   entire business operations not limited to causation or

18   damages issues, not relevant -- not limited to relevant

19   customers in any way.

20             We think a lot of these issues were resolved on

21   summary judgment in the first case where Judge Hicks had

22   interpreted the relevant Oracle licenses and where there

23   was already a finding that at least the Rimini 1.0 process

24   was infringing.  And so the discovery into the

25   CedarCrestone business model to see about industry

1      practice, to look at license interpretation simply isn't

2      relevant here and isn't something that needs to be -- isn't

3      something that needs to be retread.

4              In this case as we briefed in October and in

5      February, we heard a talk about whether Rimini Street's 2.0

6      process in lawful and then the damages that Rimini should

7      have to pay for the 1.0 process while it continued to be in

8      effect.

9              On that damages point, we've acknowledged that

10     certain causation of damages evidence may be relevant from

11     third parties like CedarCrestone and Spinnaker, but it

12     would be cabined to discovery about relevant customers,

13     namely Rimini customers, that considered or went to or went

14     from CedarCrestone and Spinnaker.

15             And if you look at these very broad subpoenas

16     and deposition topics that they -- that Rimini has

17     propounded, none of them are in any way limited to those

18     topics.

19             Which gets us to why we have brought this as a

20     protective order motion in front of Your Honor.

21             THE COURT:  And your -- and both CedarCrestone

22     and Spinnaker have served objections that point to those

23     narrowing of the subpoenas --

24             MR. HIXSON:  Yes.

25             THE COURT:  -- and rely upon the two prior

1   status conferences in which I made discovery rulings in

2   this case.

3              Why aren't they perfectly competent to directly

4   work with counsel for Rimini to narrow the requests in

5   accordance with what they understood my rulings were?

6              MR. HIXSON:  They certainly could work with

7   Rimini.  They have also, though, objected across the board

8   to all of the requests and to all of the deposition topics.

9              The dispute between the parties and now the

10  third parties, as well, is over the interpretation of Your

11  Honor's orders.  And you heard Rimini's position that they

12  somehow take the view that those orders have no

13  implications because they claim their subpoenas are within

14  those, where CedarCrestone and Spinnaker have asserted that

15  all of these requests are outside of them.

16             One path we can go down is for Your Honor to

17  make clear what your orders were, which will provide a lot

18  of guidance for the parties.

19             The path that I think Rimini is contemplating is

20  that there would be these meet-and-confers and negotiations

21  with CedarCrestone and Spinnaker and ultimately there could

22  be motions to quash or to compel filed in the District of

23  Colorado or the Southern District of Georgia.

24             If that were to happen, obviously those would be

25  before different federal judges.  But I expect those judges

1    would also want to know your view on what you've already

2    decided.  Because that's the principal dispute between the

3    parties and the third parties, is your interpretation of

4    your prior orders.

5              And so that's why we're here before you today

6    asking you to give guidance on that and to state your view

7    about whether or not these subpoenas comply with your

8    Court's prior guidance.  Because that would moot a lot of

9    these discussions and disputes.

10             And in fact if there end up being motions to

11   compel and motions to quash filed in Colorado and Georgia,

12   Oracle, or potential third parties, likely would move to

13   transfer those back to Your Honor to have you --

14             THE COURT:  Well, that --

15             MR. HIXSON:  -- assess what --

16             THE COURT:  -- happens all the time.  And that

17   makes perfect sense.

18             MR. HIXSON:  Yes.

19             THE COURT:  And the rule allows it if that

20   happens.  But it hasn't happened yet.

21             MR. HIXSON:  Right.  But under Rule -- and

22   that's why we moved under Rule 26, which provides that a

23   party can bring a motion for protective order in the court

24   where the action is residing, because the issue we're

25   dealing with is your prior orders and what effect do they

1    have --

2              THE COURT:  Is there any --

3              MR. HIXSON:  -- on the subpoena.

4              THE COURT:  -- reason why the parties can't just

5    stipulate to the -- any motion to compel and -- that would

6    have to be with the acquiescence and approval of the -- of

7    CedarCrestone and --

8              MR. HIXSON:  Spinnaker.

9              THE COURT:  -- Spinnaker?  Just present any

10   issue concerning the breadth of the subpoenas that they are

11   unable to work out here.

12             MR. HIXSON:  I see no reason why we could not

13   reach such a stipulation, Your Honor.

14             THE COURT:  Instead of opening a miscellaneous

15   action in their state of incorporation where they do

16   business?

17             MR. HIXSON:  I have no reason to think that

18   stipulation would not be appropriate.

19             THE COURT:  And, Mr. Strand, is there any reason

20   why Rimini wouldn't be willing to stipulate that --

21             MR. STRAND:  No, Your Honor --

22             THE COURT:  So that we don't --

23             MR. STRAND:  -- other than the --

24             THE COURT:  -- waste time having another court

25   take a first look?

1          MR. STRAND:  Other than the notion that misery

2     loves company, I think it would be appropriate to stipulate

3     to bring it back here and let you --

4          THE COURT:  Well, it's up to, of course, the --

5          MR. STRAND:  Sure.  Subject to their approval.

6          THE COURT:  CedarCrestone and Spinnaker

7     certainly have the right to take whatever action they deem

8     appropriate on your subpoenas.

9          MR. STRAND:  Right.

10          THE COURT:  But I can predict that any other

11     court in a case that's been going on as long as this one

12     has and is preceded by prior litigation is going to want

13     this Court to make any determination.

14          MR. STRAND:  Yeah.  And that's why we're

15     suggesting a month where we can try to sort all those

16     things out and not bother you or any other court with this

17     and just work it out in a gentlemanly fashion and get the

18     documents that we think we need and move on.

19          MR. HIXSON:  This is obviously up to Your

20     Honor's discretion.  And because we saw a conflict between

21     the subpoenas and your orders in October and in February,

22     we wanted to bring this to the Court's attention as

23     promptly as possible.

24          And we would like an order clarifying that these

25     are outside the scope of your prior orders.  But if your

1          preference is simply to wait for a dispute to develop and

2          then have it heard before you by stipulation, if possible,

3          then that's acceptable with Oracle as well.

4                    THE COURT:  Mr. Hixson, I wish I could keep in

5          my brain everything that has happened in just one case, let

6          alone -- but I have to tell you, the nuances of the rulings

7          and the hundreds of pages of transcript probably of those

8          two hearings, I do not have laser-like precision and focus

9          on what was before me then and what I told you.

10                   I am going to compel you to produce the

11         CedarCrestone settlement agreement.  I am not inclined at

12         all to compel settlement negotiations absent a much higher

13         threshold showing by Rimini in this case that they haven't

14         made.

15                   I have read the *ResQNet* case and the *Astrazeneca*

16         case.  And I do regard this as a -- this case -- the

17         damages that are allowed in copyright infringement case as

18         the -- I was particularly amused by the description of the

19         judge being more conjurer than judge-like in arriving at a

20         hypothetical, not speculating but still hypothesizing.

21                   This is a very difficult area of the law and an

22         area in which -- as you know in your first Oracle case, the

23         jury awarded zero damages for lost profits.  And the only

24         alternative to a lost profits damages analysis is a

25         hypothetical reasonable royalty.

1           MR. HIXSON:  Your Honor, I just -- Rimini's

2    talking point is that there were zero dollars in lost

3    profits.  There were $14 million.  So every time they say

4    zero, I think, no, it was 14 million.

5           THE COURT:  You got damages --

6           MR. HIXSON:  Yeah.

7           THE COURT:  -- for various categories of things.

8           MR. HIXSON:  Yeah.

9           THE COURT:  And the point is I regard this as

10   discoverable.  And whether or not it's admissible, I think

11   you may have the upper hand on that for all of the reasons

12   you state in your joint status report, that -- the

13   litigation value of it, the fact that CedarCrestone stopped

14   infringing before -- long before and for many other good

15   policy reasons.

16           But since there are -- there's very little

17   information on which to base causation and damages in a

18   unique area like this.  And so I'm going to allow the

19   discovery of the settlement agreement itself subject to the

20   protective order.

21           I'm going to deny your motion for protective

22   order and require Rimini to negotiate with the two

23   recipients of the subpoena duces tecum to narrow the

24   subpoenas and determine whether the recipients of the

25   subpoenas wish to contest.

1          You also have served subpoenas on 248 of their

2     clients asking for broad discovery of information.  And at

3     this discovery stage I'm inclined to allow them more

4     targeted discovery than was before me in the very, very

5     broad discovery request.

6          I agreed with you with respect to the customer

7     issues, but the context of those discovery requests, as I

8     recall, they wanted every agreement that you ever made, any

9     licensing agreement with any customer, whether they were

10    involved in this line of business or not.

11         And those were simply extraordinarily overbroad,

12    and there was no way I was going to compel you to produce

13    that breadth of information.

14         But these two subpoenas duces tecum are much

15    more narrow.  And I do agree they ought to be focused on

16    obtaining customer information pertinent to this case and

17    product lines pertinent to this case.

18         However, as they are exploring from Spinnaker,

19    whether Spinnaker -- what Spinnaker does is noninfringing

20    alternative to the services you provide.  They're entitled

21    to some latitude there.

22              MR. HIXSON:  Understood, Your Honor.

23              THE COURT:  Okay.  Let's set a date for our next

24    status and dispute resolution conference.

25         And at the next conference I expect the parties

1    to submit an updated discovery plan and scheduling order.

2              And I do expect that Rimini will have made

3    substantial progress towards getting the rest of this

4    discovery to Oracle that's been outstanding for months and

5    months and months now.

6              As I said, the time -- the time clock is running

7    on this case.

8              So, Mr. Miller, what do we have in approximately

9    30 days?

10             COURTROOM ADMINISTRATOR:  Well, Your Honor, in

11   approximately 30 days we can reschedule this matter for

12   Tuesday, May the 10th, 2016, at 9:00 a.m. in this

13   courtroom.

14             THE COURT:  Do you want to consult your various

15   devices?

16             And we'll go off record and see if that works

17   for you all.

18         (Discussion held off the record from

19         10:20 a.m. until 10:21 a.m.)

20             THE COURT:  As I said, I do want a proposed

21   schedule to get this ready for trial.

22             MR. HIXSON:  On that --

23             THE COURT:  A meaningful one.

24             MR. HIXSON:  -- Your Honor, I do have a

25   question.

1        My colleague has pointed out that a couple of

2   the dates in the existing schedule expire within a week or

3   two after the May status conference.  The current last day

4   to amend pleadings and add parties is May 16th.  And then

5   the last date to file interim status report is May 30.  We

6   would ask --

7        THE COURT:  Mr. Miller, are we back on the

8   record?

9        COURTROOM ADMINISTRATOR:  We are now back on the

10  record.

11       THE COURT:  Okay.  I just wanted to make sure

12  you're getting this on the record.

13       Go ahead.

14       MR. HIXSON:  Okay.  And so with respect to the

15  May 16th and May 30 deadlines in the current case schedule,

16  I understand that the next one of those are likely to be

17  kicked, we would appreciate it if the Court could at least

18  extend those by 30 days as of today so we don't worry that

19  we have a deadline less than a week --

20       THE COURT:  Correct.  There's no reason to --

21  I'm not going to enforce that deadline.  I've been telling

22  you that I'll enter a schedule once I have a much better

23  handle on how close or far away we are to completing the

24  discovery that you need from Rimini.

25       And so, no, you're not going to be held to those

DONNA DAVIDSON    (775) 329-0132

70

1    deadlines, and they'll be extended a minimum of 30 days.

2             MR. HIXSON:  All right.  Thank you.

3             THE COURT:  Okay.  We'll see you back then,

4    gentlemen.  Thank you.

5             COURTROOM ADMINISTRATOR:  All rise.

6         (The proceedings concluded at 10:22 a.m.)

7                     *    *    *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

71

1                              -o0o-

2          I certify that the foregoing is a correct

3      transcript from the electronic sound recording

4      of the proceedings in the above-entitled matter.

5

6      _____        4/7/16

7          Donna Davidson                        Date

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25