1
2
3
4
5
6

UNITED STATES DISTRICT COURT

7

DISTRICT OF NEVADA

8

* * *

9

RIMINI STREET, INC.,

Case No. 2:14-cv-01699-LRH-DJA

10

Plaintiff/ Counterdefendant,

ORDER

11

v.

12

ORACLE INTERNATIONAL CORP., and
ORACLE AMERICA, INC.,

13

Defendants/ Counterclaimants.

14
15
16

    Plaintiff and counterdefendant Rimini Street, Inc. ("Rimini") and defendants and

17

counterclaimants Oracle International Corp. and Oracle America, Inc. (collectively "Oracle") have

18

filed a total of 7 motions for partial summary judgment: Oracle filed five motions for partial

19

summary judgment (ECF Nos. 881 (886-s); 888 (896-s); 898 (904-s); 916 (936-s); & 930 (941-s)),

20

and Rimini filed two motions (ECF Nos. 910 (913-s); & 917 (927-s)).[1] The parties have responded

21

and replied to all motions. For the reasons laid out in this Order, the Court grants in part and denies

22

in part the parties' motions.

23

*///*

24

---

25

[1] The parties filed portions of their motions for summary judgment and attached exhibits under seal. Due
to the nature of the sealed material, the Court granted the parties' request to seal many of these motions.

26

*See* ECF No. 1240. While the Court would prefer to keep all the sealed information confidential, some of
it is necessary to resolve the pending motions. The Court will therefore include the information unredacted

27

in this order where appropriate. The Court recognizes that the parties have privacy interests in the
confidential information, but the public has an even greater interest in the reasoning behind the Court's

28

Order today. The Court will refer to the sealed pleadings with an "-s" designation and, for clarity, will cite
to the sealed document for pinpoint citations unless otherwise noted.

## I.     BACKGROUND

This is a massive lawsuit which follows a prior massive lawsuit. Over sixty attorneys have been admitted to represent the two sides in this case alone, approximately thirty for each side, and for the pending seven motions, the briefings exceed 2,800 pages and the supporting exhibits, declarations, and appendices exceed 43,000 pages.

While this case has been pending since 2014, it is comparable to the parties' initial lawsuit, *Oracle USA, Inc. v. Rimini Street, Inc.*, Case Number 2:10-cv-00106-LRH-VCF.[2] This prior lawsuit likewise involved a voluminous record, plus a month long jury trial, appeals to the Ninth Circuit and the United States Supreme Court, and cost the parties tens of millions of dollars in legal fees and costs. And *Oracle I* continues today by way of permanent injunction.

Oracle develops, manufactures, and licenses computer software, particularly Enterprise Software Programs. Unlike traditional software, entities interested in purchasing Oracle's software do not purchase the software outright, but rather purchase a license to use the software throughout the duration of the license agreement. Also, unlike traditional software that is installed on a single computer, enterprise software is hosted on servers that allow everyone within the organization to access it simultaneously. One of the key features of enterprise software is its customizability; the software can be modified to fit the specific needs of the organization licensing it. Enterprise software is routinely updated with service packs and patches that increase functionality and performance, correct and fix bugs, and improve security. Oracle provides this support service to its licensees for an additional cost on top of the licensing fees, but the licensees can and often do seek third party service providers, such as Rimini, to perform that service instead.

Both this case and the previous litigation (*Oracle I*) concern Rimini's unauthorized copying of Oracle's enterprise software into and from development environments. A development environment allows a software engineer to copy the enterprise software being used by a licensee and update it, patch bugs, and test improvements before implementing the new version into the licensee's computer system. Oracle's licenses generally allow the licensee to copy the software

---

[2] The Court uses "*Oracle I*" to refer to the entirety of case number 2:10-cv-00106-LRH-VCF, and for citations to the record in that case. All other ECF Numbers cited throughout this Order refer to the docket in the above captioned case.

into a development environment and have an in-house IT team service it themselves or otherwise contract with Oracle to perform the same services. Alternatively, the licenses also generally allow for a third-party service provider, like Rimini, to copy the software in place of the licensee and customize it for the licensee. But the licenses do not allow a third-party service provider to use one customer's software to support other customers. This is what Rimini has, in part, been accused of doing here and what a jury, as well as the Court, has previously determined it did in the past.

**A. The Previous (and Ongoing) Litigation**

Oracle first sued Rimini in 2010, alleging that Rimini infringed several of Oracle's copyrights when it, *inter alia*, used work that it completed for one client for the benefit of other clients, which Oracle claimed was a violation of its software copyrights. At issue in *Oracle I* were four of Oracle's business enterprise software products: J.D. Edwards, Siebel, PeopleSoft, and (Oracle) Database. Following the filing of dispositive motions, the Court granted summary judgment to Oracle on some of its copyright infringement claims, the key finding being that Rimini violated the "facilities restriction" within PeopleSoft's standard licensing agreement when it hosted its clients' development environments on its own computer systems, a process called "local hosting." *Oracle USA, Inc. v. Rimini Street, Inc.*, 6 F.Supp.3d 1086, 1096–98 (D. Nev. 2014).[3] Later at trial, a jury found in favor of Oracle on other copyright infringement claims for J.D. Edwards and Siebel. On appeal, the Ninth Circuit affirmed both this Court's grant of summary judgment and most of the jury's verdict, only reversing the jury's determination regarding violations of the California Computer Data Access and Fraud Act ("CDAFA") and Nevada Computer Crimes Law ("NCCL"). *Oracle USA, Inc. v. Rimini Street, Inc.*, 879 F.3d 948, 962 (9th Cir. 2018).[4] The Ninth Circuit also upheld this Court's decision to grant Oracle the "full costs" of the litigation, which included expert witness fees, e-discovery expenses, and jury consultant fees. *Id*. at 965–66. The Supreme Court granted certiorari on the latter issue, reversing the Ninth Circuit and holding that the Copyright Act only allows a district court to authorize awards for litigation

---

[3] The Court refers to its Order in *Oracle USA, Inc. v. Rimini Street, Inc.*, 6 F.Supp.3d 1086, 1096-98 (D. Nev. 2014) as "*Oracle USA*" in citations.

[4] The Court refers to the Ninth Circuit's opinion on *Oracle USA* and other rulings from *Oracle I*, case number 16-16832, *Oracle USA, Inc. v. Rimini Street, Inc.*, 879 F.3d 948 (9th Cir. 2018) as "*Rimini I*".

expenses expressly listed in the costs statute. *Rimini Street, Inc. v. Oracle USA, Inc.*, 139 S. Ct. 873 (2019).

Prior to the Supreme Court's ruling in March 2019, this Court granted Oracle's motion for a permanent injunction, which prevents Rimini from continuing the practices which prompted Oracle's lawsuit. *Oracle I*, ECF No. 1164. On February 27, 2019, Oracle filed a motion to reopen discovery to determine if Rimini had been complying with this court's permanent injunction. *Oracle I*, ECF No. 1199. Oracle claims that it has evidence that demonstrates that Rimini has been circumventing this court's permanent injunction. Magistrate Judge Cam Ferenbach granted Oracle's motion, and subsequently, Oracle filed several motions to compel. *Oracle I*, ECF Nos. 1237, 1290. Following voluminous briefing and oral argument, Judge Ferenbach granted in part and denied in part Oracle's motions to compel on September 3, 2019, and January 22, 2020, respectively. *Oracle I*, ECF Nos. 1250, 1307. Currently pending before the undersigned is Oracle's objections to Judge Ferenbach's January 22 ruling. *Oracle I*, ECF Nos. 1311, 1313-s. While the parties were engaged in this discovery dispute, on August 16, 2019, the Ninth Circuit upheld the majority of the permanent injunction and the grant of attorney's fees to Oracle. *Oracle USA, Inc. v. Rimini Street, Inc.*, 783 Fed. Appx. 707, 2019 WL 3854259 (9th Cir. Aug. 16, 2019) (unpublished).

### B. The Current Litigation

Prior to the October 2015 jury trial in *Oracle I*, Rimini filed a complaint against Oracle (this action) for declaratory judgment on October 15, 2014. ECF No. 1. The complaint stemmed from the Court's granting of summary judgment to Oracle in the first action on the issue of whether Rimini infringed six of Oracle's PeopleSoft and Database copyrights. At the time of filing this second action, Rimini maintained that by July 31, 2014, it had changed its company policies to comply with the Court's February 13, 2014 Order from *Oracle I*, something it dubbed "Process 2.0." *Id.* at 3. Despite Rimini's assertions that it had ceased infringing on Oracle's copyrights, Oracle was skeptical, and suggests that Rimini's new Process 2.0 still infringes upon its software copyrights. *Id.* at 3–4. In response, Rimini preemptively sued Oracle for a declaration that it was no longer engaging in infringing conduct and that its Process 2.0 was lawful. Following Rimini's

new suit, Oracle filed a counterclaim on February 17, 2015, alleging eight causes of action: (1) copyright infringement; (2) violation of the Lanham Act; (3) inducing a breach of contract; (4) intentional interference with prospective economic advantage; (5) breach of contract; (6) unfair competition under California Business & Professional Code § 17200; (7) unjust enrichment, and (8) for an accounting. ECF Nos. 21, 22-s.

Following a round of lengthy and contentious discovery and motion practice, the Court allowed the parties to file third amended complaints. Rimini's third amended complaint alleges eight causes of action: (1) declaratory judgment that it is no longer infringing Oracle's copyrights; (2) declaratory judgment that it is not in violation of any federal, California, or Nevada anti-hacking statutes; (3) declaratory judgment that Oracle's copyrights are unenforceable because of copyright misuse; (4) intentional interference with contractual relations; (5) intentional interference with prospective economic advantage; (6) violations of the Nevada Deceptive Trade Practices Act; (7) violations of the Lanham Act; and (8) unfair competition under California Business & Professional Code § 17200. ECF Nos. 487, 489-s. Oracle's third amended counterclaim alleges twelve causes of action: (1) copyright infringement; (2) violation of the Digital Millennium Copyright Act; (3) violation of the Lanham Act; (4) inducing breach of contract; (5) intentional interference with prospective economic advantage; (6) breach of contract; (7) unfair competition under California Business & Professional Code § 17200; (8) unjust enrichment; (9) an accounting; (10) declaratory judgment on Rimini's fourth cause of action; (11) declaratory judgment on Rimini's fifth cause of action, and (12) declaratory judgment on Rimini's eighth cause of action. ECF No. 397 (ECF No. 584, Corrected).

The Court eventually dismissed Oracle's claims for intentional interference with prospective economic advantage and unjust enrichment. ECF No. 589. The Court also dismissed Rimini's claims for declaratory relief that Oracle engaged in copyright misuse, intentional interference with prospective economic advantage, violations of Nevada's Deceptive Trade Practices Act under the "bait and switch" provision of Nevada Revised Statute ("NRS") § 598.0917, and violations of the Lanham Act. ECF No. 633. The Court denied both parties the opportunity to file fourth amended complaints. *See* ECF Nos. 589, 633.

The crux of Oracle's argument in this action is that Rimini has continued to violate its copyrights, but instead of storing the copyrighted software on its own computer systems like in *Oracle I*, Rimini is storing the software on third-party cloud servers. Oracle asserts that Rimini has continued with its practice of "cross use," by which it uses one customer's software license for the direct benefit of other customers and for the direct economic benefit of Rimini. Oracle has also alleged that Rimini has substantially increased downloading from its servers, downloading "millions" of update files, which Oracle claims is highly unusual and suspicious. Finally, Oracle has contended that Rimini has made numerous false statements to the press and its customers about how its (Rimini's) business practices no longer infringe Oracle's copyrights. As part of its requested relief, Oracle seeks to permanently prohibit Rimini from downloading software updates and patches from its servers. On the other hand, Rimini's case is based on two general premises: (1) its new business practices do not constitute copyright infringement, and (2) Oracle has intentionally interfered with Rimini's business practices by prohibiting Rimini from accessing Oracle's support website. Throughout the summary judgment briefs filed, Rimini has accused Oracle of selectively enforcing the provisions within its licensing agreement with the specific intent of harming Rimini's business.

### C. Rimini's Process 2.0

The central issue in this case is whether Rimini's Process 2.0 infringes upon Oracle's copyrights. While the Court will go into more detail in later sections of this Order, described generally, Rimini's new support model hosts a client's development environments and software on either the client's own computer systems or on a third-party cloud server. In either case, the client grants Rimini remote access to wherever the software is hosted to provide the necessary support services. This is opposed to Rimini's "local hosting" support system in *Oracle I*, whereby Rimini would copy a client's software to its own computer systems and provide support services before copying the software back to the client's computers. Additionally, Rimini claims that Process 2.0 no longer allows for a software engineer to distribute an update or patch made using one client's software to other clients, which was determined in *Oracle I* to constitute copyright infringement. Oracle disputes Rimini's claims concerning Process 2.0.

**D.  The Cease and Desist Letter**

Another central issue in this round of litigation is Oracle's attempt to prohibit Rimini from downloading files from Oracle's support website. On January 17, 2017, Oracle sent a cease and desist letter to Rimini, informing the company that it would no longer be allowed to access Oracle's support website. ECF Nos. 1026, 1039-s at 17. The cease and desist letter stated that access was being revoked because of the amount of data it was downloading, which was "abusive and harmful" to Oracle's systems. *Id.* According to Oracle, Rimini was responsible for more than half the downloads it experienced in 2015 and more than seventy percent of the downloads in 2016. ECF Nos. 881, 886-s at 12. The letter asserted that pursuant to Oracle's support website's terms of use and a then-recent Ninth Circuit decision, *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058 (9th Cir. 2016), Oracle had the right to terminate Rimini's access to its support website and Oracle gave Rimini sixty days to cease access. *Id.* at 13. Rimini complied with Oracle's letter and stopped accessing Oracle's support website as of March 16, 2017. ECF Nos. 1026, 1039-s at 19. Rimini now asserts that Oracle's conduct has caused "significant disruption to [its] business," mostly through having to expend substantially more money and resources to complete client business and giving certain clients discounts stemming from Rimini's inability to access the support website. *Id.*

## II.  LEGAL STANDARD

Summary judgment is appropriate only when the pleadings, depositions, answers to interrogatories, affidavits or declarations, stipulations, admissions, and other materials in the record show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In assessing a motion for summary judgment, the evidence, together with all inferences that can reasonably be drawn therefrom, must be read in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *County of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1154 (9th Cir. 2001).

The moving party bears the initial burden of informing the court of the basis for its motion, along with evidence showing the absence of any genuine issue of material fact. *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 323 (1986). On those issues for which it bears the burden of proof, the moving party must make a showing that is "sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986) (quoting W. Schwarzer, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact*, 99 F.R.D. 465, 487-88 (1984)); *see also Idema v. Dreamworks, Inc.*, 162 F. Supp. 2d 1129, 1141 (C.D. Cal. 2001).

To successfully rebut a motion for summary judgment, the nonmoving party must point to facts supported by the record which demonstrate a genuine issue of material fact. *Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736, 738 (9th Cir. 2000). A "material fact" is a fact "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *See v. Durang*, 711 F.2d 141, 143 (9th Cir. 1983). A dispute regarding a material fact is considered genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248. "The mere existence of a scintilla of evidence in support of the [party's] position [is] insufficient" to establish a genuine dispute; "there must be evidence on which the jury could reasonably find for the [party]." *Id.* at 252.

## III.   ORACLE'S OBJECTIONS TO RIMINI'S EVIDENCE (ECF No. 1181)

Before reaching the merits of the parties' motions for summary judgment, the Court will first address Oracle's objections to evidence Rimini submitted in opposition to two of Oracle's motions for partial summary judgment. ECF No. 1181. In this filing, Oracle seeks to exclude hundreds of pages of Rimini-filed exhibits, but Oracle's motion is mostly devoid of any legal analysis, instead making broad, boilerplate allegations about the legal deficiency of the exhibits. For example, Oracle claims that Rimini presented "numerous Oracle internal emails and presentations without any evidence authenticating the documents" and then cites to a few dozen exhibits in the record. ECF No. 1181 at 4. But Oracle makes no attempt to show how *each* exhibit Rimini filed lacked the proper foundation, which impermissibly places the onus on the Court to examine each email and imagine what specific arguments Oracle could have made to show that the evidence is improper. Courts are not obligated to "methodically scrutinize each objection and

give a full analysis of each argument raised," especially when "many of the objections are boilerplate recitations of evidentiary principles or blanket objections without analysis applied to specific items of evidence." *Shridhar v. Vantage Travel Service, Inc.*, Case No. CV 14-09793-BRO (PJWx), 2016 WL 146076, at *3 (C.D. Cal. Jan. 7, 2016) (quoting *Doe v. Starbucks, Inc.*, Case No. SACV 08-0582 AG (CWx), 2009 WL 5183773, at *1 (C.D. Cal. Dec. 18, 2009)). To the extent Oracle objects to evidence upon which the Court does not rely, the Court will overrule those objections as moot and otherwise overrule the remainder of Oracle's boilerplate objections.

## IV.    DISCUSSION

### A.    Oracle's motion for partial summary judgment on Rimini's second, fourth, and eighth causes of action, as they relate to the cease and desist letter sent by Oracle to Rimini on January 17, 2017, (ECF Nos. 881, 886-s)[5] is granted.

Oracle's first motion seeks partial summary judgment on Rimini's claims premised upon the January 17, 2017 cease and desist letter ("the Letter") sent by Oracle to Rimini. First, Oracle seeks summary judgment on Rimini's second cause of action for declaratory relief that Rimini would not be violating the federal, California, or Nevada computer anti-hacking statutes by accessing Oracle's support websites following the Letter. Second, Oracle seeks partial summary judgment on Rimini's fourth cause of action for intentional interference with contractual relations arguing that Oracle has an absolute right to exclude Rimini from accessing its support websites. And finally, Oracle seeks partial summary judgment on Rimini's eighth cause of action alleging unfair competition under California Business & Professional Code § 17200 *et seq*. ECF Nos. 881, 886-s at 2. Rimini responded to Oracle's motion (ECF Nos. 1026, 1039-s), and Oracle replied (ECF Nos. 1137, 1142-s). The Court will discuss each of Oracle's arguments in turn.

### 1.    The Court grants Oracle's motion on Rimini's second cause of action for a declaration of no violation of federal, California, or Nevada computer statutes.

Rimini's second cause of action requests declaratory judgment under 28 U.S.C. §§ 2201 and 2202, the Declaratory Judgment Act ("DJA"), that if Rimini were to access, use, or download

---

[5] As discussed above, *supra* note 1, the Court shall distinguish between redacted filings and sealed filings with the "-s" designation. While the filings were sealed to protect the confidential information found within, the Court finds that the public's interest in the reasoning behind the Court's order today necessitates citing to the sealed documents. Unless otherwise noted, the Court cites to the sealed document for pinpoint citations.

from Oracle's support websites[6] after the 60-day notice period provided for in the cease and desist letter (March 18, 2017), Rimini would not be in violation of the federal Computer Fraud and Abuse Act (18 U.S.C. § 1030) ("CFAA"), the California Computer Data Access and Fraud Act (CAL. PENAL CODE § 502) ("CDAFA"), and the Nevada Computer Crimes Law (NEV. REV. STAT. ("NRS") § 205.4765) ("NCCL"). ECF Nos. 487, 489-s ¶¶ 114-120.

"The CFAA prohibits acts of computer trespass by those who are not authorized users or who exceed authorized use." *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1065 (9th Cir. 2016) (hereinafter "*Facebook*"). Specifically, the CFAA imposes civil and criminal liability on any person who "intentionally accesses a protected computer without authorization, and as a result of such conduct, causes damage and loss." 18 U.S.C. §1030(a)(5)(C). Similarly, California's CDAFA imposes civil and criminal liability on any person who "[k]nowingly accesses and without authorization takes, copies, or makes use of any data from a computer, computer system, or computer network, or takes or copies any supporting documentation, whether existing or residing internal or external to a computer, computer system, or computer network," or "[k]nowingly and without permission uses or causes to be used computer services." CAL. PENAL CODE § 502(c)(2)-(3). Finally, the NCCL imposes criminal and civil liability on "a person who knowingly, willfully and without authorization . . . [o]btains or attempts to obtain, permit access to or causes to be accessed . . . a program or any supporting documents which exist inside or outside a computer, system or network" or "who knowingly, willfully, and without authorization . . . [o]btains or attempts to obtain access to, permits access to or causes to be accessed . . . a computer, system or network." NRS § 205.4765(3)(k)); § 205.511(1).

Oracle relies on the Ninth Circuit's opinion in *Facebook, Inc. v. Power Ventures, Inc.*, in support of its decision to prohibit Rimini from accessing its support websites. 844 F.3d 1058 (9th Cir. 2016). In *Facebook*, the Ninth Circuit held that a defendant violates the CFAA and CDAFA when it (1) accesses a website after permission to access that website has been explicitly revoked

---

[6] Per the Cease and Desist Letter, Rimini's access and use was revoked for "Oracle's support websites," which included, but was not limited to, My Oracle Support (support.oracle.com), Oracle Software Delivery Cloud (edelivery.oracle.com), and JD Edwards EnterpriseOne and World Update Center (updatecenter.oracle.com). *See* ECF No. 883-7.

by the owner, and (2) the defendant receives notice of the revocation. *Id.* at 1068–69.[7] The Court held that "[o]nce permission has been revoked, technological gamesmanship or the enlisting of a third party to aid in access will not excuse liability." *Id.* at 1067. But the mere fact that a defendant violated the website's terms of use does not alone establish liability under the statutes. *Id.* 1066-67. Although the *Facebook* Court did not address Nevada's NCCL, this Court has previously ruled that *Facebook*'s holding applies to the NCCL. ECF No. 633 at 8 n.4 ("The court finds that the ruling in *Facebook* would be equally applicable to the NCCL which prohibits similar conduct to that prohibited by the [CFAA] and CDAFA."). In that order, this Court denied Oracle's motion to dismiss Rimini's second cause of action because it was unclear whether *Facebook* applied to situations where "the third-party authorization comes from a licensee with a direct contractually vested property interest in accessing the website which arises from the underlying license." *Id.* To properly evaluate Rimini's claim, the Court found that it needed to review the actual language of Oracle's software licenses and the extent of the licensee's authorizations to Rimini. *Id.* at 9.

When support service customers obtain their user ID and password to Oracle's support websites, the user must agree to the website's terms of service. ECF Nos. 881, 886-s at 10; ECF No. 883-7 at 7 ("By using the Oracle Web sites, you agree to these Terms of Use. If you do not agree to these Terms of Use, you may not use the Oracle Web sites."); *Oracle I*, ECF No. 794 at 123-24. The Terms of Use for Oracle.com state that "Oracle reserves the right to terminate the permissions granted" to those accessing the website "at any time." ECF No. 883-7 at 7.  These terms also state that "Oracle may, in its sole discretion, at any time discontinue providing or limit access" to the support site, and that the user agrees that  "Oracle may, in its sole discretion, at any time, terminate or limit [their] access to, or use of," the support site. *Id.* at 8. Oracle also has the authority to terminate access to its support website "for any reason." *Id.* at 14. Rimini's 30(b)(6) designee, Nancy Lyskawa, acknowledged that Rimini was aware of the provisions within the

---

[7] In *Facebook*, the Court recognized that the CFAA and the CDAFA differ: the CDAFA "does not require *unauthorized* access. It merely requires *knowing* access." *Facebook*, 844 F.3d at 1069 (quoting *United States v. Christensen*, 801 F.3d 970, 994 (2015)) (emphasis in original). However, the Court held that despite this difference, the analysis remained the same—"when Facebook sent the cease and desist letter, Power, as it conceded, knew that it no longer had permission to access Facebook's computers at all. Power, therefore, knowingly accessed and without permission took, copied, and made use of Facebook's data," in violation of the CDAFA. *Id.*

support website's terms of use that allowed for Oracle to unilaterally terminate access to the sites. ECF No. 886-6-s at 11 ("[T]o my knowledge, I know that, within my organization, you know, my management team were all aware of the website terms of use, and I believe that we also had, you know specific folks within our legal organization who are aware of the website terms of use."). The designee also testified that Rimini was told, by its clients, "that they had the ability to authorize agents, third parties to access" the support sites and materials on their behalf. *Id.* at 9.

Oracle argues that under *Facebook*, Rimini must have permission from both the licensee and Oracle before it can use the licensee's credentials to access the materials hosted on the support website. ECF Nos. 881, 886-s at 23. Or, at the very least, Rimini (or any other third party acting as an agent of the licensee) must not be explicitly prohibited by Oracle from accessing the support website.  On the other hand, Rimini argues that the only authorization it needs to access the support website is its client's permission. ECF Nos. 1026, 1039-s at 21. Rimini asserts that it is "entirely legal and not a violation of" the computer hacking statutes for "Rimini to access and download support materials from Oracle's support websites as a designated agent of its clients." *Id*. at 26. Essentially, Rimini's argument is that Oracle cannot prohibit a third-party servicer, such as Rimini, from using an Oracle licensee's credentials to access Oracle's support website so long as the licensee has given the third-party permission to act in its stead.

While Rimini is correct in stating that an Oracle licensee may designate a third party to act as an agent and download the files on its behalf, pursuant to the support website's terms of service, Oracle still retains the right to terminate access. ECF No. 883-7 at 7-8, 14.  The Ninth Circuit was clear in *Facebook* that following Facebook's issuance of a cease and desist letter, the defendant "needed authorization both from individual Facebook users (who controlled their data and personal pages) and from Facebook (which stored this data on its physical servers)" to have lawful access. *Facebook*, 844 F.3d at 1068. Similarly, following Oracle's cease and desist letter, Rimini would need authorization both from Oracle licensees (who control their user accounts and Oracle credentials) and from Oracle (which stores the patches, updates, and service packs on its physical servers) to lawfully access Oracle's support website. Rimini has not identified any provision within the terms of service that allows for unfettered access to the downloadable files on the support

website. Nor has Rimini identified any provision that allows for a licensee to appoint an agent to download materials on its behalf over Oracle's objection or disapproval. On the contrary, the terms of service plainly provide that Oracle may terminate the access of anyone using the support website to download files for any reason at any time. This broad provision encompasses the situation here.

The fact that Rimini was acting as an agent of a software licensee is not material to the analysis because pursuant to the terms of service, Oracle retained the authority to terminate anyone's access to the support website. The terms of service do not provide different termination rules for software licensees and their agents. If Oracle can ban its own licensees from accessing the support website for violating the terms of service (or for any other reason), then it can ban a third-party agent it has alleged to have used the website to engage in copyright infringement. This conclusion is consistent with the deposition testimony of Edward Screven, a high ranking Oracle executive, who testified that while licensees have the ability to appoint agents to download support materials on their behalf, the third party cannot do so if Oracle "has made clear to a particular third party that they are not authorized to access" the support website. ECF No. 1039-2-s at 45. Screven testified that he did not know of any contract Oracle has ever signed that included a provision allowing guaranteed access to the support website. *Id*. Rimini has not produced any evidence or case law demonstrating that it is allowed to access Oracle's support website when Oracle has expressly forbidden it from doing so. The Court will accordingly grant Oracle summary judgment on Rimini's second cause of action.

2. The Court grants Oracle's motion on Rimini's fourth cause of action for intentional interference with contractual relations.

Next, Oracle requests summary judgment on Rimini's fourth cause of action, intentional interference in contractual relations. In its third amended complaint, Rimini set forth three different theories of liability by which Oracle interfered with Rimini's client support contracts. First, Rimini alleges that Oracle made several misrepresentations to Rimini's clients regarding the legality of Rimini's services with the intent to induce those clients to break their contracts with Rimini. ECF Nos. 487, 489-s ¶¶ 124-131. Second, Rimini alleges that Oracle engaged in selective audits of Rimini clients to harass them and drive them away from Rimini's services. *Id*. And third, Rimini

alleges that the cease and desist letter impermissibly revoked its access to Oracle's support websites, thereby causing severe contractual issues between Rimini and its clients. *Id*. In this motion, Oracle is only requesting summary judgment on the third theory of liability concerning the cease and desist letter; therefore, the Court only rules on this theory here.[8]

To prove a claim for intentional interference with contractual relations under Nevada law, a plaintiff must demonstrate: "(1) a valid and existing contract; (2) the defendant's knowledge of the contract; (3) intentional acts intended or designed to disrupt the contractual relationship; (4) actual disruption of the contract; and (5) resulting damage." *J.J. Indus., LLC v. Bennett*, 71 P.3d 1264, 1267 (Nev. 2003) (citing *Sutherland v. Gross*, 772 P.2d 1287, 1290 (Nev. 1989)). To demonstrate the "intentional act" requirement, a plaintiff must show that the defendant had a specific purpose or motive to injure the plaintiff through the tortious interference. *Nat. Right to Life Political Action Comm. v. Friends of Bryan*, 741 F.Supp. 807, 814 (D. Nev. 1990). The mere knowledge that a plaintiff had a contract with a third party is "insufficient to establish that the defendant intended or designed to disrupt the plaintiff's contractual relationship." *J.J. Indus., LLC*, 71 P.3d at 1268. The "actual breach or disruption" element requires that a plaintiff show either an actual breach of a contract or a significant disruption of a contract rather than a simple impairment of contractual duties. *Treasury Sols. Holding Inc. v. Upromise, Inc.*, Case No. 3:10-CV-00031-ECR-RAM, 2010 WL 5390134, at *5 (D. Nev. Dec. 22, 2010).

Oracle argues that the cease and desist letter cannot constitute intentional interference because "Oracle has an absolute right to exclude Rimini from its support websites." ECF Nos. 881, 886-s at 25. Oracle asserts that this right is "absolute" because it "grow[s] out of contractual relations" in that licensees and their agents who wish to access the support website must agree to follow the terms of service, which is a form of a contract. *Id*. Oracle also contends that the right is absolute because it stems from a property interest, namely Oracle's right to control access to its computer systems. *Id*. at 25–26. Finally, Oracle contends that the right is absolute because it is asserting the protections provided by the anti-hacking statutes. *Id.* at 26.

The Court has previously made clear that:

---

[8] The Court addresses the additional theories of liability later in this Order. *See* Part IV.D.1.

1
2
3
4

> Generally, there is no liability for causing a breach of contract where the breach is caused by the exercise of an absolute right, that is, an act which a person or entity has a definite legal right to engage in without any qualification. *See* 44B AM. JUR.2d *Interference* § [21]. An absolute right includes rights incident to ownership of property, rights growing out of contractual relations, and the right to enter or refuse to enter into contractual relations. *Id.*

5   ECF No. 633 at 14. Nevada law provides that a privilege or justification exists to defeat an

6   intentional interference with prospective economic advantage claim when a defendant acts to

7   protect its own interests. *Leavitt v. Leisure Sports Inc.*, 734 P.2d 1221, 1226 (Nev. 1987). This

8   privilege applies when a defendant acts "to protect the interests they had acquired via a valid

9   contract." *Id.* But upon further review of the relevant case law, it does not appear that the Nevada

10  Supreme Court has extended the absolute privilege doctrine to encompass the tort of intentional

11  interference with existing contractual relations despite the elements of that tort being nearly

12  identical to the elements of interference with prospective economic advantage. *See Treasury*

13  *Solutions Holdings, Inc. v. Upromise, Inc.*, Case No. 3:10-CV-00031-LRH, 2015 WL 3902400, at

14  *3 (D. Nev. June 25, 2015) (finding that the Nevada Supreme Court has not expressly extended

15  the privilege to existing contractual relations, but only prospective economic advantage) (citing

16  *Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1055 n.2 (9th Cir. 2008)). There

17  have been no cases from the Nevada Supreme Court addressing this issue since this court's opinion

18  in *Treasury Solutions Holding*,[9] and there is still an open question of whether the absolute right

19  doctrine applies to claims for intentional interference with contractual relations.

20      When state law is unclear and the highest court of the state has not ruled on the issue,

21  federal courts are tasked with predicting how that court might decide the issue. *Soltani v. Western*

22  *& Southern Life Ins. Co.*, 258 F.3d 1038, 1045–46 (9th Cir. 2001). Federal courts can look to

23  intermediate appellate court decisions, statutes, and "well-reasoned decisions" from other

24  jurisdictions for guidance. *Takahashi v. Looms Armored Car Service*, 625 F.2d 314, 316 (9th Cir.

25  1980); *Gravquick A/S v. Trimble Navigation Int'l Ltd.*, 323 F.3d 1219, 1222 (9th Cir. 2003).

26      Here, it is likely that given the opportunity, the Nevada Supreme Court would extend the

27  absolute privilege doctrine to encompass the tort of intentional interference with contractual

28

---

[9] Case No. 3:10-CV-00031-LRH, 2015 WL 3902400 (D. Nev. June 25, 2015).

relations. Absolute privilege is included in the Restatement approach to intentional contractual interference, and "Nevada state courts often follow the Restatement approach to the interference torts." *Nationwide Transp. Fin.*, 523 F.3d at 1055 n.2. Moreover, as previously mentioned, the elements of interference with contractual relations are nearly identical to interference with prospective economic advantage. *See In re Amerco Derivative Litigation*, 252 P.3d 681, 702 (Nev. 2011) (providing the elements for interference with prospective economic advantage). The only relevant difference between the elements of the two torts is that a prospective economic advantage plaintiff must prove "the absence of privilege or justification by the defendant." *Id.* In *Leavitt v. Leisure Sports Incorporation*, the Nevada Supreme Court applied the doctrine of absolute privilege to a case where the plaintiffs, *inter alia*, asserted a claim of intentional interference with prospective economic advantage. 734 P.2d at 1225-26. The *Leavitt* Court ruled in favor of the defendants, applying the absolute right doctrine and noting that they had "acted to protect the interests they had acquired via a valid contract." *Id.* at 1226. In doing so, the Court cited to out of jurisdiction cases where courts had applied the absolute privilege doctrine to the tort of intentional interference with contractual relations, noting that "these cases dealt with wrongful interference of contract which is a species of the broader tort of interference with prospective economic advantage." *Id.* It is evident that the Nevada Supreme Court views the two torts as exceedingly similar.

In this case, Oracle's actions are protected by the absolute right doctrine. There is no question that Oracle has a vested property interest in the copyrighted files it hosts on its support website, and Rimini has not presented any evidence to the contrary. *See* 44B AM. JUR. 2d *Interference* §21. Rimini cannot plausibly argue that Oracle must give access to its own support website to anyone who requests it, especially in light of the Ninth Circuit's decision in *Facebook* requiring an entity to receive access permission from the website host after being informed that access would no longer be granted. In addition to having a vested property right in its own software, pursuant to its support website's terms of service, Oracle had the ability to terminate anyone's access at any time for any reason. ECF No. 883-7 at 7-8, 14. Oracle cannot be liable for interfering with Rimini's contracts by exercising its rights under the contracts it entered into with

those who have agreed to the terms of service in exchange for access to the website. *See Leavitt*, 734 P.2d at 1226 (defendants acted appropriately to protect their interests they had acquired via a valid contract, and thus, were privileged). The Court accordingly grants Oracle partial summary judgment on Rimini's fourth claim for intentional interference with contractual relations arising from the cease and desist letter.[10]

> 3. <u>The Court grants Oracle summary judgment on Rimini's eighth cause of action for unfair competition under California Business and Professional Code § 17200 *et seq.*, as it pertains to the cease and desist letter, under both the "unfairness" and "unlawfulness" prongs.</u>

Oracle lastly seeks summary judgment on Rimini's eighth cause of action, unfair competition under California Business & Professional Code §§ 17200 *et seq.* ("UCL"), as it relates to the cease and desist letter. California's unfair competition statute prohibits conduct that can be defined as "any unlawful, unfair, or fraudulent business act or practice." CAL. BUS. & PROF. CODE § 17200. The statute provides three varieties of unfair competition: acts or practices that are (1) unlawful, (2) unfair, or (3) fraudulent. *Hodsdon v. Mars, Inc.*, 891 F.3d 857, 865 (9th Cir. 2018) ("Because Business & Professions Code § 17200 is written in the disjunctive, it establishes three varieties of unfair competition—acts or practices which are unlawful, or unfair, or fraudulent. *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 973 P.2d 527, 540 (Cal. 1999)."); *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1168 (9th Cir. 2012) ("Because the statute is written in the disjunctive, it is violated where a defendant's act or practice violates any of the foregoing prongs."). Rimini has alleged that Oracle prohibiting Rimini from accessing the support website via the cease and desist letter meets the requirements of two prongs – unfairness and unlawfulness. ECF Nos. 487, 489-s ¶¶ 157-164.

Oracle argues that its conduct in banning Rimini from it support website and sending the cease and desist letter cannot support a violation of the UCL for two reasons. First, it argues that the letter cannot be considered "unfair" because Oracle's issuance of the letter entitles the company

---

[10] Oracle further argues that Rimini's fourth cause of action fails because there is no "evidence that there has been any actual disruption of any contractual obligation—or any other cognizable harm." ECF Nos. 881, 886-s at 27. The Court declines to address Oracle's additional argument because it grants Oracle summary judgment based on the absolute right doctrine.

to safe harbor from the UCL. ECF Nos. 881, 886-s at 23. This is so because conduct cannot be deemed "unfair" under the UCL if it is independently legal and a "means to protect Oracle's rights under federal and state computer access statues." *Id*. Oracle argues that it protects its rights because it sent the cease and desist letter following the procedure approved by the Ninth Circuit in *Facebook. Id.* Second, Oracle argues that separate from the safe harbor doctrine, Rimini has failed to produce any evidence indicating that it was harmed or lost money or property because Oracle prohibited it from accessing its support website. *Id*. at 31. In turn, Rimini argues that "Oracle's conduct was independently *illegal* because it constitutes tortious interference." ECF Nos. 1026, 1039-s at 36 (emphasis in original). Moreover, Rimini argues that even if the conduct was not illegal, Oracle's conduct was a violation of the unfairness prong because "Oracle revoked Rimini's access to Oracle's support websites to suppress competition in the market for Oracle software support." *Id.* at 37. Rimini further contends that Oracle is not entitled to safe harbor protection because only legislation from a state or federal legislative body – and not a court – can declare certain types of conduct lawful. *Id.* at 38. Finally, Rimini asserts that it did suffer losses because it was forced to give clients discounts and hire additional contractors to complete their contractual obligations, and it suffered harm to its "brand and goodwill." *Id*. at 39-40.

The Court first considers whether the state or federal legislature has provided safe harbor for Oracle's conduct. *See Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 973 P.2d 527, 544 (Cal. 1999). For conduct to be immunized by the safe harbor doctrine, "the challenged conduct must be affirmatively permitted by statute—the doctrine does not immunize from liability conduct that is merely not unlawful." *Ebner v. Fresh, Inc.*, 838 F.3d 958, 963 (9th Cir. 2016). Stated another way, "to forestall an action under the unfair competition law, another provision must actually 'bar' the action or clearly permit the conduct." *Davis*, 691 F.3d at 1164 (quoting *Cel-Tech*, 973 P.2d at 541).

The California legislature has not passed a statute that explicitly allows for a company to prohibit another company from accessing its website by sending a cease and desist letter. Oracle cites to *Davis v. HSBC Bank of Nevada, N.A.*, for the proposition that judicial opinions can create safe harbors. ECF Nos. 1137, 1142-s at 16. This is a misreading of that case. *Davis* only discussed

that in addition to California state statutes, regulations and federal statutes can also create safe harbors; the opinion contains no discussion about whether a judicial opinion can create a safe harbor for certain conduct (much less explicitly states that it can do so). *Davis*, 691 F.3d at 1166. Absent a Ninth Circuit case explicitly holding that judicial opinions can create safe harbor under the UCL, the Court cannot conclude that the Ninth Circuit's holding in *Facebook* extends the safe harbor doctrine to encompass the conduct at issue in that case.

Because the Court can find no statute or regulation that explicitly provides safe harbor, the Court must then consider whether Oracle's conduct is "unfair," within the meaning set forth by the California Supreme Court: "conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition."[11] *Cel-Tech*, 973 P.2d at 544. "[A]ny finding of unfairness to competitors under section 17200 [must] be tethered to some legislatively declared policy or proof of some actual or threatened impact on competition." *Id.* In other words, to defeat Oracle's motion for partial summary judgment, Rimini needed to provide at least some evidence that Oracle's conduct was motivated by an anti-competitive purpose. It has not done so. Rimini states that Oracle revoked its access to the support websites "to suppress competition," but then fails to cite to any evidence supporting that assertion. ECF Nos. 1026, 1039-s at 37. The evidence it does cite to merely shows that "targeting," an act by an entity with market power directed toward the customers of one particular competitor, "can be" anti-competitive. *Id*. But it does not provide any evidence that what Oracle did in this case constituted "targeting," nor does it provide any evidence that the specific targeting was anti-competitive. While Rimini points to the fact that Oracle has not sought to prohibit any of Rimini's competitors from archiving software, this tends to show that Oracle's conduct is not based on an anti-competitive motive. *Id*. Instead, it supports Oracle's position that it has prohibited Rimini from accessing its support site because it believes that Rimini is engaging in large-scale copyright infringement, not because it is a major competitor in the business software support market.

---

[11] The Court notes that the term "unfair" is not defined by the UCL, and as recently as June 2018, the Ninth Circuit commented that the definition of the term was in "flux" in California state courts. *Hodsdon*, 891 F.3d at 866 (quoting *Davis*, 691 F.3d at 1169).

The Court also notes that the *Facebook* decision flows from the copyright holder's absolute right to protect itself from copyright infringement by a licensee's agent who may have considered its conduct to be authorized. Although *Facebook* does not grant Oracle safe harbor from Rimini's cause of action under the UCL, as the copyright holder, Oracle had no obligation to grant Rimini access to its property. As such, it is axiomatic that Oracle's issuance of the cease and desist letter cannot be considered "unfair" under the UCL. Based on the above, the Court does not reach the issue of whether Rimini has produced sufficient evidence that it suffered harm as a result of Oracle's actions.

Additionally, Rimini's eighth cause of action fails under the unlawfulness prong. Rimini's eighth claim of "unlawful" business practices, is premised on Oracle's alleged "(i) intentional interference with Rimini's contractual relations, (ii) intentional interference with Rimini's prospective economic advantage, (iii) violations of the Nevada Deceptive Trade Practices Act, (iv) violations of the Lanham Act, (v) copyright misuse, and (vi) breach of contractual agreements with its customers." ECF Nos. 487, 489-s ¶ 158. Per the Court's prior order, Rimini's third cause of action, copyright misuse; fifth cause of action, intentional interference with prospective economic advantage; sixth cause of action, violation of Nevada's Deceptive Trade Practices Act, NRS § 598.0903 *et seq.*, as it pertains to the "bait and switch" provision (NRS § 598.0917); and seventh cause of action, violations of the Lanham Act; were dismissed. ECF No. 633. As discussed below, the Court grants Oracle's fourth motion for partial summary judgment on Rimini's eighth cause of action, violation of Nevada's Deceptive Trade Practices Act, under NRS § 598.0915(8). *See* Part IV.D.2. "To be 'unlawful' under the UCL, the [defendant's conduct] must violate another 'borrowed' law," *Davis*, 691 F.3d at 1168 (internal citation omitted), and common law violations such as a breach of contract are insufficient, *Shroyer v. New Cingular Wireless Services, Inc.*, 622 F.3d 1035, 1044 (9th Cir. 2010). Therefore, because no statutory law claim on which Rimini may "borrow" remains, Rimini's unlawfulness theory necessarily fails.

Based on the aforementioned, the Court grants Oracle's motion for partial summary judgment on Rimini's eighth claim under the unfairness and unlawfulness prongs, as it relates to the cease and desist letter.

**B. Oracle's motion for partial summary judgment on its first cause of action, copyright infringement, and Rimini's express license defense as it relates to the 47 at-issue copyrights, and 7 other affirmative defenses asserted by Rimini (ECF Nos. 888, 896-s) is granted in part and denied in part.**

Oracle's second motion seeks partial summary judgment on its first claim, copyright infringement, and Rimini's express license defense, as both relate to the 47 PeopleSoft environments listed in Oracle's corrected third amended counterclaims (ECF No. 584). ECF Nos. 888, 896-s at 6, 8 n.1. Oracle also seeks summary judgment on six affirmative defenses Rimini has lodged against Oracle's first claim for copyright infringement. *Id.* Rimini responded to Oracle's motion (ECF Nos. 967, 974-s), and Oracle replied (ECF Nos. 1146, 1149-s). The Court will discuss each argument in turn.

1. The Court grants Oracle summary judgment on its first cause of action, copyright infringement, and Rimini's express license defense, as both relate to the 47 at-issue PeopleSoft copyrights.

As previously stated, in *Oracle I*, the Court granted Oracle summary judgment on its claim that Rimini committed copyright infringement when it copied its clients' PeopleSoft software from their computer systems over to Rimini's computer systems. *Oracle USA, Inc. v. Rimini Street, Inc.*, 6 F.Supp.3d 1086, 1096–98 (D. Nev. 2014).[12] Though factual discovery in *Oracle I* closed in December 2011 (*Oracle I*, ECF No. 161 at 9), following the Court's February 2014 summary judgment order (*Oracle USA*), Rimini made two supplemental disclosures providing updated client lists, including "clients Rimini had obtained since the close of fact discovery," in December 2011 and "clients that had received updates generated on Rimini-hosted environments after close of fact discovery through," August 2014.  ECF No. 913 at 12; ECF Nos. 910-3, 910-6, 910-7, 910-8. From this supplemental discovery, Oracle identifies "47 PeopleSoft environments that were either (1) associated with customers not at issue" in *Oracle I*, or (2) were built after the Court's February 2014 Order. ECF Nos. 888, 896-s at 7. Rimini admitted that its "conduct prior to December 2011 for servicing PeopleSoft Software would be consistent with its processes for servicing PeopleSoft

---

[12] As noted above, the Court uses "*Oracle I*" to refer to the entirety of case number 2:10-cv-00106-LRH-VCF and for citations to the record in that case. In *Oracle I*, the Court issued *Oracle USA, Inc. v. Rimini Street, Inc.*, 6 F.Supp.3d 1086, 1096-98 (D. Nev. 2014), which the Court refers to as "*Oracle USA*". The Ninth Circuit's opinion on *Oracle USA* and the *Oracle I* case as a whole, *Oracle USA, Inc. v. Rimini Street, Inc.*, 879 F.3d 948 (9th Cir. 2018), is referred to as "*Rimini I*".

Software between December 2011 and July 30, 2014." ECF No. 896-16-s at 4. Given these undisputed facts, Oracle now seeks to recover damages related to Rimini's alleged unlawful infringement of these 47 PeopleSoft copyrights which occurred between September 2011 and July 2014, and which were not adjudicated in *Oracle I*. ECF Nos. 888, 896-s at 6.

### i. Claim Preclusion

Rimini asserts that the doctrine of claim preclusion (also known as res judicata) prohibits Oracle from recovering any damages from September 28, 2011, through July 31, 2014, for any copyright infringement stemming from the 47 PeopleSoft environments. ECF Nos. 967, 974-s at 16-17. Rimini argues that Oracle purposefully chose not to pursue its copyright infringement claims for that period in *Oracle I* even though it could have, instead deciding to file a separate lawsuit to recover those damages. *Id*. As such, it should be estopped from seeking those damages in this case.

"Claim preclusion prevents the relitigation of claims previously tried and decided." *Littlejohn v. U.S.*, 321 F.3d 915, 919–20 (9th Cir. 2003) (citing *Clark v. Bear Stearns & Co.*, 966 F.2d 1318, 1320 (9th Cir. 1992)). "Claim preclusion is a broad doctrine that bars bringing claims that were previously litigated as well as some claims that were never before adjudicated." *Holcombe v. Hosmer*, 477 F.3d 1094, 1097 (9th Cir. 2007) (quoting *Clements v. Airport Auth. Of Washoe County*, 69 F.3d 321, 327 (9th Cir. 1995)). The doctrine "bars all grounds for recovery which could have been asserted, whether they were or not, in a prior suit between the same parties on the same cause of action." *Clark*, 966 F.2d at 1320. The three elements of a successful claim preclusion defense are: (1) "identity of claims, (2) a final judgment on the merits, and (3) privity between parties." *Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 322 F.3d 1064, 1077 (9th Cir. 2003) (internal quotation marks and citation omitted).

What Rimini is requesting is not necessarily claim preclusion, but rather partial judgment on Oracle's copyright infringement claim pursuant to the doctrine of claim-splitting.[13] It is "well-established that a party may not split a cause of action into separate grounds of recovery and raise

---

[13] The doctrine of claim-splitting is a "subspecies" of claim preclusion. *See Finjan, Inc. v. Blue Coat Systems, LLC*, 230 F.Supp.3d 1097, 1102 (N.D. Cal. 2017).

the separate grounds in successive lawsuits; instead, a party must raise . . . all the grounds of recovery arising from a single transaction or series of them that can be brought together." *Ferring B.V. v. Actavis, Inc.*, Case No. 3:13-cv-00477-RCJ-WGC, 2014 WL 3697260, at *5 (D. Nev. July 23, 2014) (quoting *Mars Inc. v. Nippon Conlux Kabushiki–Kaisha*, 58 F.3d 616, 619 (Fed. Cir. 1995)). "Claim-splitting is different from claim preclusion in that it does not require a final judgment on the merits in the first suit." *Finjan*, 230 F.Supp.3d at 1102. Instead, a successful claim-splitting defense must meet the first and third elements of claim preclusion.

A recent Ninth Circuit case, *Howard v. City of Coos Bay*, 871 F.3d 1032, 1040 (9th Cir. 2017), established that there is a bright line rule prohibiting the application of the doctrine of claim preclusion (and, by extension, claim-splitting) to "claims that accrue after the filing of the operative complaint." In *Howard*, the plaintiff accused the defendant of a retaliatory firing stemming from a whistleblower complaint she had filed. *Id*. at 1037. She eventually found a new job, but while her case was pending, the defendant repeatedly posted a job listing for her old position. *Id*. Plaintiff applied for that position when the listing was initially posted, but she was turned down. *Id*. She prevailed at trial in her first case and then filed a second case against the defendant for retaliating against her (by rejecting her job application) because of her success at trial. *Id*. at 1038. The Ninth Circuit held that the district court erred by applying the doctrine of claim preclusion because her second case only accrued around the time her first case went to trial. *Id*. at 1040. The main concern of the Ninth Circuit, like other circuit courts that have considered the issue, was that absent such a rule, a plaintiff would be barred from asserting a claim that arose during a lawsuit unless the district court allowed the plaintiff to amend her complaint. *Id*. This can often be an issue because a plaintiff is only allowed one amended complaint early in a case, and like in *Howard*, a new claim might not accrue until late in a lawsuit.

The Ninth Circuit has since interpreted the term "accrue" from *Howard*, determining that it means to "come into existence" or "arise." *Media Rights Technologies, Inc. v. Microsoft Corp.*, 922 F.3d 1014, 1021 (9th Cir. 2019) ("*Microsoft*"). In other words, "claim preclusion does not apply to claims that were not in existence and could not have been sued upon—i.e., were not legally cognizable—when the allegedly preclusive action was initiated." *Id.* In addition to these

rules made clear in *Howard* and *Microsoft*, to determine if a copyright infringement claim is precluded by res judicata, the Court considers the "discovery rule," (that "a copyright infringement claim accrues when a party discovers, or reasonably should have discovered, the alleged infringement"), and the "separate-accrual rule" (that "when a defendant commits successive violations of the Copyright Act, the statute of limitations runs separately from each violation"). *Id.* at 1022-23 (internal quotation marks, alterations and citations omitted). Therefore, in *Microsoft*, the Court held that claims that the plaintiff "could reasonably have discovered" prior to filing suit accrued prior to filing and were thus, precluded, if the other claim preclusion elements were met. *Id.* at 1023-24. "By contrast, under the separate-accrual rule, any sale of the allegedly infringing Microsoft products after [the date plaintiff filed its complaint] gave rise to a cause of action . . . as of the date of the sale" and were thus, not precluded. *Id.* at 1024.

Here, there is no doubt Oracle and Rimini were both parties in the previous action. *See Oracle USA*, 879 F.3d 948 (9th Cir. 2018). But in *Oracle I*, Oracle filed its second amended complaint, the operative complaint, on June 1, 2011 (*see Oracle I*, ECF No. 146), and the claims it seeks to recover from in this action accrued from September 28, 2011 through July 31, 2014. Under *Howard* and the "separate-accrual rule," that means any damages or claims that accrued after June 1, 2011, are not subject to the doctrine of claim preclusion (or claim-splitting). *See Microsoft Corp.*, 922 F.3d at 1024 ("Because those claims arose after [the plaintiff] filed the operative complaint in *MRT I* and [the plaintiff] could not have sued on them when it filed *MRT I*, they are not precluded here."). Therefore, Oracle is not precluded from seeking damages in this suit stemming from any infringement of the 47 PeopleSoft development environments that arose after the filing of Oracle's second amended complaint in *Oracle I*.

### ii. Collateral Estoppel

On the other hand, Oracle asserts that Rimini is collaterally estopped from contesting liability on the 47 PeopleSoft environments because Rimini has committed the same acts with the same software, the only difference being that those acts occurred during a different time period. ECF Nos. 888, 896-s at 9. Oracle argues that following the filing of *Oracle I* in 2010, from September 28, 2011 through July 31, 2014, Rimini continued to infringe its PeopleSoft copyrights

24

through a process known as "local hosting." *Id.* As previously described, local hosting is a system by which Rimini copies a client's version of PeopleSoft from the client's computer system over to its own computer system to create and test updates. *Supra* Part I.A. Oracle concludes by arguing that because the Ninth Circuit affirmed this Court's ruling that Rimini's conduct constituted copyright infringement and Rimini continued the same activities through July 2014, the Court should hold that Rimini cannot challenge liability for the 47 PeopleSoft environments.

Instead of an argument for claim preclusion, Oracle makes an argument for issue preclusion, also known as collateral estoppel. This doctrine "bars successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment, even if the issue recurs in the context of a different claim." *Howard*, 871 F.3d at 1040-41 (internal quotation marks and citations omitted). The elements for issue preclusion are similar to claim preclusion (though not identical), and require the party asserting collateral estoppel demonstrate: "(1) the issue at stake was identical in both proceedings; (2) the issue was actually litigated and decided in the prior proceedings; (3) there was a full and fair opportunity to litigate the issue; and (4) the issue was necessary to decide the merits." *Oyeniran v. Holder*, 672 F.3d 800, 806 (9th Cir. 2012). Though not applied "mechanistically," the Court applies four factors to determine if the issues are "identical": (1) whether "there is a substantial overlap between the evidence or argument to be advanced in the second proceeding" as was in the first; (2) whether the "new evidence or argument involve[s] the application of the same rule of law" as in the first proceeding; (3) if pretrial preparation and discovery in the first action could be "reasonably expected to have embraced" the issue in the second action; and (4) whether the claims in the two proceedings are closely related. *Howard*, 871 F.3d at 1041 (citing *Resolution Trust Corp. v. Keating*, 186 F.3d 1110, 1116 (9th Cir. 1999)).

As with claim preclusion, there is no dispute that Oracle and Rimini were both parties in the first lawsuit, and that in *Oracle I*, the Court granted Oracle summary judgment on the issue of whether Rimini engaged in copyright infringement when it copied its clients' PeopleSoft environments from their computer systems over to its own, after a full and fair opportunity to

litigate. *See Oracle USA*, 6 F.Supp.3d 1086.[14] The only true dispute here is whether the issues are identical. Rimini argues that its express license defense for the 47 PeopleSoft environments is different from its express license argument that both this Court and the Ninth Circuit rejected in *Oracle I*. Specifically, Rimini stated that following the Court's grant of summary judgment to Oracle in *Oracle I*, the parties entered into a "limited stipulation" regarding the scope of the software license provisions for PeopleSoft; the parties agreed that "for the purposes of this action," the remaining PeopleSoft licenses were the same as or very similar to the two licenses at issue in the motion for summary judgment. ECF Nos. 967, 974-s at 13; *Oracle I*, ECF No. 599 ¶ 1. The Court had found those two licenses to both contain provisions that prohibited Rimini from copying its customers' PeopleSoft environments over to its own computer system. Oracle now argues that because the 47 PeopleSoft environments at issue here are the same as the two licenses at issue in the Court's summary judgment ruling in *Oracle I*, Rimini is collaterally estopped from contesting liability for the 47 licenses. ECF Nos. 1146, 1149-s at 10–11.

Having reviewed the relevant licenses, the Court agrees with Oracle that the issues in the two lawsuits are identical. First, there is a substantial overlap between the evidence because Oracle would be presenting the same facts surrounding the local hosting process that was one of the central issues in the first case to a jury in this case. Oracle would also be presenting the same argument that it did in the first case, namely that Rimini committed copyright infringement by hosting its clients' PeopleSoft software on its own computer systems. This evidence also invokes the same rule of law as in the first proceeding, as the Court would be applying the same standard contract interpretation principles to interpret the licensing provisions, and Rimini would presumably present the same affirmative defenses. Additionally, the pretrial preparation and discovery in *Oracle I* embraced this issue as substantial discovery was conducted regarding Rimini's local hosting process, and the parties briefed the issue extensively at the dispositive motion phase.

Turning to the factor of whether the claims are "closely related," the major point of contention between the parties is whether the licensing agreements for the PeopleSoft products in *Oracle I* are the same as the licensing agreements for the 47 PeopleSoft products Oracle seeks

---

[14] As the Court has noted, this decision was affirmed by the Ninth Circuit in *Rimini I*, 879 F.3d at 959–60.

judgment on here. In the previous action, one of the two licenses stated that Oracle "grants Licensee a . . . license to use the licensed Software, solely for Licensee's internal data processing operations at its facilities." *Rimini I*, 879 F.3d at 959. On appeal, neither Oracle nor Rimini differentiated between the language in the two licenses despite minor language variations. *Id*. at 959, n.5. The "facilities restriction" provision, regardless of any minor language variation, prohibited Rimini from hosting its clients' PeopleSoft software on its own computer systems.

While not all the PeopleSoft licensing agreements are the same as the ones in *Oracle I*, the evidence presented by Oracle here demonstrates that they all contain facilities restriction provisions that are either identical or substantially similar to the restrictions from the previous action. ECF Nos. 1146, 1149-s at 10–11. Some of the language is identical to the two licenses ruled on in *Oracle I*, such as the license belonging to the City of Ontario, Canada, which granted it the ability to use the software "on one or more servers at Licensee's facilities." ECF No. 896-24-s at 11. Some of the language is substantially similar to the language from *Oracle I*, such as the language from Adventist Healthcare, Inc.'s license, which limited it to only making copies of the software on "one or more servers and/or workstations located at facilities utilized by the licensee," and Brandeis University's license, which limited copying of and use of the software to "servers and/or workstations located at facilities owned or leased by" Brandeis University. *Id*. at 4, 7-8.[15] Rimini's argument to the contrary is unpersuasive because it does not provide any alternative meaning to any of these facilities provisions within the PeopleSoft licenses at issue here. To defeat a motion for summary judgment, especially one such as this where there are no disputed facts, Rimini must do more than make a naked legal conclusion without providing a plausible alternative

---

[15] Rimini points to 4 additional licenses that it argues either do not have facilities provisions or the provisions are not substantially similar to those ruled on in *Oracle I*. *See* ECF No. 974-s at 22. While the provisions identified are not identical, the Court finds that each license contains a provision that prohibits local hosting. *See* ECF No. 896-11 at 6 (under the PNMR Services Company's license, a "Computer license allows you to use the licensed program on a *single* specified computer." (emphasis added)); ECF No. 896-24-s at 2-3 (under the A.H. Belo Corporation license, copying is limited to "each Server at the Site up to the licensed number of workstations specified in the applicable Schedule," and defines "Site" as "a specific, physical location of Licensee's Server as set forth in the applicable Schedule."); ECF No. 896-5-s at 13 (under the Bemis Company, Inc. license, the licensee can "use an unlimited number of copies of Software, solely for the internal data processing operations of Licensee" on specified servers); and ECF No. 896-24-s at 10-11 (under the Choice Hotels International Services Corporation's license, the licensees use is limited to "a single machine.").

explanation. To the contrary, each license contains a provision that makes it clear that Rimini was not allowed to copy the PeopleSoft software or environments to its system. Accordingly, the Court finds that the facilities restrictions language within the PeopleSoft licenses here have the same meaning as their counterparts in *Oracle I*.

Rimini further argues that Oracle has "failed to produce the specific customer licenses for at least 4 of the 47 PeopleSoft environments." ECF Nos. 967, 974-s at 23. The Declaration of Casey McCracken provides that after Rimini notified Oracle that some of the licensee agreements for certain clients were missing, Oracle provided that "Oracle was unable to identify a license agreement for certain clients" and instead provided "a representative agreement." ECF No. 976-s ¶¶ 4-5. The Court agrees with Rimini that the Court cannot rule that these 4 license agreements contain a provision that would prohibit local hosting without seeing the agreement. However, Rimini has not provided the Court with the names of the clients without license agreements, or anything else that would provide a useful guide for determining those left at issue. With nothing more than a bare assertion that some 4 of these 47 PeopleSoft environments do not contain a facilities restriction that would prohibit local hosting, when every other PeopleSoft license the Court has reviewed did, the Court finds Rimini has failed to meet its burden for an express license defense.

Rimini finally argues that the issue was not "actually litigated" in the previous action because Oracle must specifically argue and demonstrate that each particular license did not allow for Rimini's conduct. ECF Nos. 967, 974-s at 23. While this is factually correct, what both the Court and the Ninth Circuit analyzed in *Oracle I*, with respect to the PeopleSoft licenses, was whether Rimini's conduct violated the facilities restriction within those licenses. As stated above, Rimini has also failed to demonstrate how the facilities restrictions that apply to each of the 47 PeopleSoft environments here are different from the facilities restriction from *Oracle I*. If Rimini's argument were correct, then every time a court was presented with a routine insurance contract case, courts would be unable to rely on district and circuit precedent interpreting the same language found in contracts from the past. This, of course, is not the law, and it is well-established that courts may look to previous cases for guidance when interpreting identical contract language. *See,*

*e.g., Kimble v. Marvel Entertainment, LLC*, 576 U.S. 446, 457, 135 S.Ct. 2401, 2410 (2015) (recognizing that in "cases involving property and contract rights, considerations favoring *stare decisis* are at their acme." (internal quotation marks omitted)).

The Court accordingly grants Oracle partial summary judgment on its first claim for copyright infringement for the 47 PeopleSoft environments listed in its third corrected amended counterclaims.

2. <u>The Court grants in part and denies in part Oracle's motion for summary judgment on the six affirmative defenses at-issue in this motion, as each relates to Oracle's copyright infringement counterclaim.</u>

Oracle also seeks summary judgment on six of Rimini's affirmative defenses: (1) implied license and consent; (2) statute of limitations; (3) laches; (4) equitable estoppel; (5) abandonment; and (6) unclean hands. ECF Nos. 888, 896-s at 15-24. Importantly, Oracle only seeks summary judgment on these claims as they apply to its first counterclaim for copyright infringement (not just the 47 PeopleSoft environments at issue above), but not as each would apply to any other counterclaim Oracle has asserted.

### i. *Implied License and Consent Defense*

Oracle seeks summary judgment on Rimini's third affirmative defense, the combined defenses of implied license and consent of use. Implied license and consent of use are legally duplicative affirmative defenses and shall be addressed together. *See e.g.*, *Peter Letterese & Assocs., Inc. v. World Inst. Of Scientology Enters.*, 533 F.3d 1287, 1308-09 (11th Cir. 2008) (equating a consent defense to that of implied license and applying the same standard); *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 775-76 (7th Cir. 1996) (holding that consent is equivalent to nonexclusive license defense).

"An implied license can be found where the copyright holder engages in conduct 'from which [the] other [party] may properly infer that the owner consents to his use.'" *Field v. Google, Inc.*, 412 F.Supp.2d 1106, 1116 (D. Nev. 2006)). "Consent to use the copyrighted work need not be manifested verbally and may be inferred based on silence where the copyright holder knows of the use and encourages it." *Id.*

///

Oracle offers two separate arguments in support of summary judgment. First, it argues that Rimini is collaterally estopped from asserting this defense because Rimini utilizes similar arguments and evidence here as it did in *Oracle I*, and there, the Court granted Oracle summary judgment on the defense. ECF Nos. 888, 896-s at 16. Second, Oracle argues that Rimini has not provided any evidence that Oracle did in fact consent to Rimini's conduct. *Id.* In its response, Rimini highlights the fact that Oracle has often encouraged its clients to use cloud servers to host its business software, and points to the fact that Oracle approved the processes used by two of Rimini's competitors, Spinnaker and CedarCrestone, but inexplicably objected to the same processes when used by Rimini. ECF Nos. 967, 974-s at 28–31.

After reviewing the record, the Court finds partial summary judgment is appropriate for Oracle. As an initial matter, collateral estoppel does not apply here because Rimini is premising this defense on different conduct than before, namely that Rimini's clients had copied their PeopleSoft environments to a cloud server rather than hosting the software on Rimini's computer systems. This support process was not "actually litigated" in *Oracle I*. As to Rimini's contentions about the use of a cloud server, it is undisputed that Oracle executives have consented to and approved of licensees hosting their Oracle software on their licensee's cloud servers. Rimini asserts that the cloud server falls outside the "facilities restriction" provision in the legacy PeopleSoft licensing agreements and that somehow this supports an affirmative defense of implied license and consent. Rimini's argument misses the broader point. The use of a cloud server by an Oracle licensee does not insulate Rimini from Oracle's claims of copyright infringement, such as illegal copying or cross-use. The terms of the licensing agreement do not suddenly expand or allow greater conduct by Rimini simply based upon the physical location of the licensee's software. Access to a licensee's cloud server may be subject to the exclusive control of the licensee, just as is software physically located within the licensee's "facilities."[16]

Rimini argues that Oracle consented to the processes used by Spinnaker and CedarCrestone, but it is unclear from Rimini's brief whether that consent was ever communicated

---

[16] As discussed below, there is an issue of material fact whether the client has control of its cloud server. *See* Part IV.G.3.

by Oracle to Rimini, and if so, when. Rimini states that Oracle approved Spinnaker's support processes, but as evidence, Rimini cites to a confidential letter from Oracle to Spinnaker sent in November 2011. ECF No. 975-10 at 2. Rimini has provided no evidence that it knew about this approval prior to this litigation. Similarly, Rimini cites to a settlement agreement between Oracle and CedarCrestone, whereby Oracle permitted CedarCrestone's use of "know-how" in servicing a licensee's software. ECF No. 975-21. But it is unclear how Rimini would have known the details of this confidential settlement agreement at the time it was agreed to in mid-2013. Rimini cannot claim that it had an implied license to operate in the manner Oracle accuses it of because of private communications between Oracle and a third party. *Field*, 412 F.Supp.2d at 1116; *Alaska Stock, LLC v. Pearson Edu., Inc.*, 975 F.Supp.2d 1027, 1041 (D. Alaska 2013) ("Often, the parties' course of dealings will determine whether an implied license was given."). While this evidence might arguably be used by Rimini at trial to cast doubt on Oracle's motivation for raising the causes of action it has against Rimini, it cannot be used as a basis for an implied license or consent defense.

### ii.   Statute of Limitations Defense

As it did in *Oracle I*, Rimini again asserts a statute of limitations defense (its sixth affirmative defense) to defeat Oracle's copyright infringement claim. Rimini argues that because Oracle filed its first set of counterclaims on February 17, 2015, it can only recover for the infringing actions that took place after February 17, 2012. ECF Nos. 967, 974-s at 33–34. Generally, copyright infringement actions must be filed "within three years after the claim accrued." *Roley v. New World Pictures, Ltd.*, 19 F.3d 479, 481 (9th Cir. 1994) (quoting 17 U.S.C. § 507(b)); *see also Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 671 (2014). A copyright infringement claim "accrues when one has knowledge of a violation or is chargeable with such knowledge." *Roley*, 19 F.3d at 481. One is chargeable with knowledge of a copyright violation if it could have been reasonably discovered. *Polar Bear Prods. v. Timex Corp.*, 384 F.3d 700, 706 (9th Cir. 2004). Thus, "[a] claim for copyright infringement accrues on the date that a reasonable investigation would have put the rights holder on notice that potentially infringing conduct has occurred." *In re Napster, Inc. Copyright Litig.*, Case No. C MDL-00-1369-MHP, C 04-3004 MHP, 2005 WL 289977, at *4 (N.D. Cal. Feb. 3, 2005).

This defense is only applicable to some of Oracle's claims, specifically infringement of Oracle's E-Business Suite software ("EBS") dating back to 2010 (which was not at issue in *Oracle I*) and Oracle's other copyright infringement claims that purportedly accrued prior to February 17, 2012. ECF Nos. 888, 896-s at 17–18. Oracle argues that these copyright infringement claims did not accrue until April 2014 when Rimini provided Oracle with an updated customer list which, for the first time, placed Oracle on notice that Rimini's infringing conduct had continued through the litigation. ECF Nos. 1146, 1149-s at 21.

To prevail on its statute of limitations defense, Rimini must provide at least some evidence showing that Oracle knew or should have known of Rimini's underlying conduct prior to February 17, 2012. As the Ninth Circuit made clear in its recent decision *Oracle America, Inc. v. Hewlett Packard Enterprise Company*, constructive knowledge is enough to trigger the statute of limitations. --- F.3d ---, 2020 WL 4876833, at *3 (9th Cir. Aug. 20, 2020) ("*Hewlett Packard*"). Regarding the EBS claims, Rimini states that in October and November 2011, it released several press statements stating that it was now offering support services for Oracle's EBS. ECF Nos. 967, 974-s at 34 (citing ECF No. 969-1). Importantly, the press statements indicated that Rimini's support services for EBS followed "the same successful model used in the design for each of its other products lines." ECF No. 969-1 at 2-3. Given that Oracle had accused Rimini of using a business model that infringed on its copyrights, Rimini argues that Oracle had a duty to investigate Rimini's conduct at that time. ECF No. 974-s at 34. As to the other copyright claims, Rimini argues that because of what was revealed during discovery in *Oracle I*, Oracle was on notice that Rimini might be continuing to infringe Oracle's copyrights. *Id.*

The Court agrees with Rimini regarding EBS. A "plaintiff is deemed to have had constructive knowledge if it had enough information to warrant an investigation which, if reasonably diligent, would have led to discovery of the" claim. *Pincay v. Andrews*, 238 F.3d 1106, 1109–10 (9th Cir. 2001) (internal quotation marks and citation omitted). The Ninth Circuit has "previously explained that 'suspicion' of copyright infringement 'places upon the plaintiff a duty to investigate further into possible infringements of its copyrights.'" *Hewlett Packard*, --- F.3 ---, 2020 WL 4876833, at *3 (quoting *Wood v. Santa Barbara Chamber of Commerce, Inc.*, 705 F.2d

1515, 1521 (9th Cir. 1983)).  At the time Rimini argues that Oracle was given constructive notice of potential infringement (October/November 2011), Oracle suspected that Rimini had engaged in widespread copyright infringement (which a jury later determined that it did) in the course of providing support services for several of Oracle's software products, such as J.D. Edwards, Siebel, and PeopleSoft. There is an issue of material fact as to whether it would have been reasonable for Oracle, upon hearing that Rimini had begun offering support services for EBS, to investigate whether Rimini was utilizing the same infringing practices with that software as Oracle suspected Rimini was with others.

A case from the Central District of California, *Fahmy v. Jay-Z*, is instructive. 835 F.Supp.2d 783 (C.D. Cal. 2011). There, the plaintiff sued a musician and several other defendants, arguing that in creating the song "Big Pimpin'," the defendants had infringed upon the plaintiff's copyrighted interest in an original song. *Id.* at 786. The plaintiff argued that because he only knew about the "Big Pimpin'" single, which he claims infringed his copyrighted work, the statute of limitations did not bar his recovery for subsequent remixes and acoustic versions of "Big Pimpin'" that he did not know existed. *Id.* at 789. The Court rejected the plaintiff's argument because, *inter alia*, the plaintiff had an obligation to investigate whether the defendants created other songs based on the plaintiff's original song in addition to the single he already knew about. *Id.* at 790. This is the same situation here. There is a plausible argument to be made that Oracle, having suspected that Rimini infringed on its PeopleSoft, Siebel, and J.D. Edwards copyrights, should have investigated whether Rimini also infringed on its EBS copyright after Rimini announced it would be using the same support model for EBS as it did for the other software. *See Kepner–Tregoe, Inc. v. Exec. Dev., Inc.*, 79 F.Supp.2d 474, 488 (D.N.J. 1999) (upon discovering one infringing work, plaintiff had a duty to monitor the defendant's additional published works because "a reasonable [copyright holder], motivated by his interest in recovering for and preventing infringement, keeps abreast of the activities of those in his field of endeavor." (internal quotation marks omitted)). Whether Oracle should have investigated Rimini's support services for EBS is a disputed question of fact that the jury must decide.

///

The Court further finds that there are disputed questions of fact concerning when Oracle acquired knowledge of or is chargeable with knowledge of a prospective Rimini infringement beyond the three-year statute of limitations. Fact discovery closed in *Oracle I* on December 5, 2011, and following motion practice and over the objections of Rimini, the Court ruled that Oracle could supplement its expert damages report to include damages it suffered through the course of litigation regarding pre-suit Rimini clients. *Oracle I*, ECF No. 669 at 4. Oracle represented to the Court that it did not intend to seek damages for so-called "gap customers" (customers Rimini acquired after Oracle had filed its lawsuit) in *Oracle I*, but rather seek damages for them in this litigation. There is an issue of material fact as to what claims Oracle knew or should have known about prior to February 17, 2012, that must be resolved at trial. Accordingly, the Court denies Oracle's motion for summary judgment as to Rimini's statute of limitations defense.

### iii.    Latches Defense

Next, Oracle requests summary judgment on Rimini's fourteenth affirmative defense, laches. To establish a laches defense in a copyright infringement action, a defendant must show that (1) the plaintiff delayed in initiating the lawsuit; (2) the delay was unreasonable, and (3) the delay resulted in prejudice. *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 951 (9th Cir. 2001). Delay is measured from when "the plaintiff knew (or should have known) of the allegedly infringing conduct, until the initiation of the lawsuit." *Id.* at 952. In determining the reasonableness of the delay, "courts look to the cause of the delay." *Id.* at 954. Delays have been held permissible when (1) "it is necessitated by the exhaustion of remedies through the administration process;" (2) "it is used to evaluate and prepare a complicated claim;" and (3) "its purpose is to determine whether the scope of the proposed infringement will justify the cost of litigation." *Id.* (internal quotation marks and citations omitted). As to the prejudice element, courts generally require that a defendant demonstrate greater harm when the delay is short, but less when the delay is lengthy. *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 1000 (9th Cir. 2006) (appendix). The two primary forms of prejudice in the laches context are expectations-based prejudice, which exists where a defendant "took actions or suffered consequences that it would not have, had the plaintiff brought suit promptly," and evidentiary prejudice, which exists where there are "such things as lost, stale, or

34

degraded evidence, or witnesses whose memories have faded or who have died." *Danjaq*, 263 F.3d at 955. Importantly, the Supreme Court recently held that the defense of laches cannot be used to defeat copyright infringement claims that have been brought within the Copyright Act's three-year limitations period absent "extraordinary circumstances." *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 677, 686 (2014).

Pursuant to *Petrella*, Rimini cannot assert a laches defense to any copyright infringement claim brought within the statute of limitations absent an "extraordinary circumstance." At this point, this means that it cannot assert a laches defense to any claim brought after February 17, 2012, unless it can demonstrate this situation is an "extraordinary circumstance." In its response to Oracle's motion, Rimini does not explain how this case qualifies as an "extraordinary circumstance." In fact, Rimini never addresses the issue. Therefore, the Court will grant Oracle summary judgment on this defense because, having failed its burden of persuasion, the only claims to which Rimini can lawfully assert a laches defense would already be barred by the statute of limitations, making this defense unnecessary and redundant.

### iv.    Equitable Estoppel Defense

Oracle next moves for summary judgment on Rimini's fifteenth affirmative defense, equitable estoppel. The purpose of equitable estoppel is to "prevent the assertion of legal rights that in equity and good conscience should not be available due to a party's conduct." *In re Estate of Prestie*, 138 P.3d 520, 525 (Nev. 2006) (internal quotation marks and citation omitted). "Equitable estoppel requires that '(1) the party to be estopped must be apprised of the true facts; (2) [it] must intend that [its] conduct shall be acted upon, or must so act that the party asserting estoppel has the right to believe it was so intended; (3) the party asserting the estoppel must be ignorant of the true state of facts; (4) [the party asserting estoppel] must have relied to its detriment on the conduct of the party to be estopped.'" *Leeward Capital, L.P. v. Archon Corp.*, 759 F.Supp.2d 1249, 1254 (D. Nev. 2010) (quoting *In re Harrison Living Trust*, 112 P.3d 1058, 1062 (Nev. 2005)).

Rimini is unable to proffer sufficient evidence on each element of equitable estoppel to create a triable issue of fact. Here, Rimini's basic theory of the defense is that it relied on Oracle's

repeated statements that "third-party support can be performed under its licenses," but that when it changed its support processes, Oracle changed its theories of liability. ECF Nos. 967, 974-s at 36. But whether third-party support is allowed under the licensing agreements is not at issue in this lawsuit, nor was it at issue in *Oracle I*. What was (and is) at issue is the manner in which Rimini performed that third-party support. Rimini has not provided any evidence that Oracle intended for Rimini to rely on its statements or other conduct when Rimini altered the manner in which it provided services to its clients. In any event, the statements to which Rimini cites were made by Oracle employees during depositions taken well-after the date that Rimini states it changed its support practices. For instance, Rimini cites to early 2018 depositions of Oracle founder Lawrence Ellison and co-CEO Safra Catz for the proposition that "the provision of third-party support…is permitted by its software licenses." ECF Nos. 967, 974-s at 36. But Rimini cannot make a plausible argument that it relied on statements that did not yet exist when it changed its support service model in 2014 and 2015. Similarly, Rimini cites to a portion of Oracle's appellate brief, but that brief was not filed until February 2017, roughly two and a half years after Rimini claims to have altered course. *Id.* Rimini does not cite to any Oracle acts or statements that occurred prior to Rimini changing its business model, and therefore, there was nothing upon which it could rely to its detriment.

Accordingly, the Court grants Oracle summary judgment on this defense.

### v.   Abandonment/ Waiver Defense

Next, Oracle requests summary judgment on Rimini's seventeenth affirmative defense, abandonment and waiver, which is focused entirely on Oracle's PeopleSoft copyrights. "In copyright, waiver or abandonment of copyright 'occurs only if there is an intent by the copyright proprietor to surrender rights in its work.'" *A & M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1026 (9th Cir. 2001) (quoting 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* ¶ 13.06 (2000)). "Under Ninth Circuit caselaw, abandonment 'must be manifested by some overt act indicative of a purpose to surrender the rights and allow the public to copy.'" *Marya v. Warner/Chappell Music, Inc.*, 131 F.Supp.3d 975, 991 (C.D. Cal. 2015) (quoting *Hampton v. Paramount Pictures Corp.*, 279 F.2d 100, 104 (9th Cir. 1960)). It is possible for a copyright holder

36

to abandon some rights but not others. *See Micro Star v. FormGen Inc.*, 154 F.3d 1107, 1114 (9th Cir. 1998) ("Given that [FormGen] overtly encouraged players to make and freely distribute new levels, FormGen may indeed have abandoned its exclusive right to do the same. But abandoning some rights is not the same as abandoning all rights, and FormGen never overtly abandoned its rights to profit commercially from new levels."). The *Marya* Court noted that "what does or does not constitute abandonment appears to be a highly fact-specific inquiry" because there is no clear rule as to what constitutes abandonment. 131 F.Supp.3d at 992. What is clear, however, is that the copyright holder does not abandon its rights to its copyright by mere inaction. *Id.*

Here, Rimini is unable to point to any overt acts by Oracle that would signal to the public that it was abandoning its rights to the facilities restrictions in the PeopleSoft licenses. Rimini asserts that "Oracle has *never* claimed that PeopleSoft licenses may not use the cloud" as evidence of overt acts. ECF Nos. 967, 974-s at 38 (emphasis in original). But not stating something cannot constitute an overt act for purposes of abandonment, as the Ninth Circuit made clear in *Hampton*. 279 F.2d at 104 (finding no evidence of an overt act where copyright holder did not consent to public use and did not give anyone permission to sell the copyrighted works). Rimini also asserts that Oracle has "encouraged" its licensees to use the cloud, but the evidence to which Rimini cites only reveals that Oracle stated that its customers had the option of hosting their software on cloud servers if they so desired. *Cf. Melchizedek v. Holt*, 792 F.Supp.2d 1042, 1051-52 (D. Ariz. 2011) (finding issue of material fact where copyright holder stated that he let his material "go out to the world unrestrained. No control on the copyrighted material."). In any event, Rimini does not explain how Oracle informing its customers that it could make use of cloud hosting constitutes its intent to abandon the entire facilities restriction in the PeopleSoft licenses.

Accordingly, the Court grants Oracle summary judgment on this defense.

### vi.    Unclean Hands Defense

Finally, Oracle seeks summary judgment on Rimini's eighth affirmative defense, unclean hands. Under the doctrine of unclean hands, a plaintiff "seeking equitable relief must have acted fairly and without fraud or deceit as to the controversy in issue." *Bangkok Broadcasting & T.V. Co., Ltd. v. IPTV Corp.*, 742 F.Supp.2d 1101, 1117 (C.D. Cal. 2010) (internal quotation marks and

citation omitted). "To establish unclean hands, a defendant must demonstrate (1) inequitable conduct by the plaintiff; (2) the plaintiff's conduct directly relates to the claim which it has asserted against the defendant; and (3) plaintiff's conduct injured the defendant." *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 518 F.Supp.2d 1197, 1223 (C.D. Cal. 2007) (internal quotation marks and citation omitted). This usually presents a question of fact. *Los Angeles News Service v. Tullo*, 973 F.2d 791, 799 (9th Cir. 1992).

Rimini argues that Oracle should be barred from asserting any copyright infringement claims by the doctrine of unclean hands because Oracle "misrepresented the scope of its copyrights to" the Court, Rimini, and the general public to "foreclose lawful competition in the software support market." ECF Nos. 967, 974-s at 40. To support this allegation, Rimini states that Oracle has "privately told customers" that Rimini is an "illegal maintenance provider," and that a customer would be "stupid" and "foolish" to purchase services from Rimini. *Id.* But the documents that Rimini takes these quotes from are internal emails between Oracle employees, not direct statements to customers. *See* ECF Nos. 975-30-s, 975-31-s. These internal emails do not show that Oracle ever communicated such language to Rimini customers, and Rimini has not provided any evidence that Oracle ever did. Rimini also asserts that Oracle's copyright infringement allegations in this lawsuit (namely that Rimini impermissibly engaged in cross use) constitutes unclean hands. ECF Nos. 967, 974-s at 40. But as Oracle states, the mere filing of a lawsuit and the allegations within cannot "form the basis of an unclean hands defense." *Taylor Holland LLC v. MVMT Watches, Inc.*, Case No. 2:15-cv-03578-SVW-JC, 2016 WL 6892097, at *12 (C.D. Cal. Aug. 11, 2016).

Accordingly, the Court grants Oracle summary judgment on this affirmative defense.

### C. Oracle's motion for partial summary judgment regarding cross-use and derivative works (ECF Nos. 898, 904-s) is granted in part and denied in part.

Oracle's next motion seeks partial summary judgment on its first cause of action, copyright infringement, on Rimini's second affirmative defense (express license) and seventh affirmative defense (fair use), and on Rimini's first cause of action for declaratory relief. First, Oracle requests judgment on its claim that Rimini illegally copied and cross used the software environments of its

client, Campbell Soup Company ("Campbell Soup"), in violation of Campbell Soup's PeopleSoft software license agreement. Second, Oracle requests judgment on its claim that Rimini engaged in unlicensed copying, cross use, and the creation of derivative works of Oracle's PeopleSoft license belonging to Rimini's client, City of Eugene. Third, Oracle argues that Rimini's use of its Automation Framework ("AFW") Tools software to distribute updates to its clients constitutes impermissible cross use by design. Fourth and finally, if the court grants any of Oracle's motions for summary judgment, Oracle requests summary judgment on Rimini's claim for declaratory relief that it did not violate any of Oracle's copyrights. The Court will discuss each of Oracle's arguments in turn.

### 1. Campbell Soup.

#### i. *Oracle's Prima Facie Case of Copyright Infringement*

"To prevail on a claim of copyright infringement, a plaintiff must prove ownership of a copyright and a copying of protectable expression beyond the scope of the license." *MAI Systems Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 517 (9th Cir. 1993) (internal quotation marks and citation omitted). It is undisputed that Oracle owns the two at issue copyrights pertaining to Campbell Soup: PeopleSoft Human Resource Management System ("HRMS") 8.9 (TX 7-065-381) and PeopleTools 8.46.17 (TX 7-092-772). *See* ECF No. 1084-s (Rimini does not dispute Oracle's ownership of these copyrights in its Response); ECF No. 1240 at 4 (finding that issue preclusion prevents Rimini from relitigating whether Oracle is the valid copyright holder of PeopleSoft HRMS 8.9 (TX 7-065-318)); ECF No. 899-2; ECF No. 889 ¶ 3 & ECF No. 892-13 (providing that PeopleTools 8.46 (TX 7-092-772) was registered within five years of first publication, and therefore, pursuant to 17 U.S.C. § 410(c), it is presumed valid. No evidence to the contrary has been provided.); ECF No. 899-3.

It is further undisputed that the at issue PeopleSoft software was installed in the Campbell Soup environments WSM-H890CAMX and WSM-H890CAMO. *See* ECF No. 1084-s (Rimini does not dispute this fact in its Response); ECF No. 905-4-s at 11 & ECF No. 905-5-s at 2 (Ex. D-3.5) (listing these environments as "PeopleSoft environments that were migrated from Rimini's computer systems to remote systems"). As this Court discussed in *Oracle USA*, given the critical

nature of enterprise software programs, like Peoplesoft, updates to the software must be fully tested and verified in a development or testing environment before they are provided to a customer. *Oracle USA, Inc. v. Rimini Street, Inc.*, 6 F.Supp.3d 1086, 1092 n.4 (D. Nev. 2014) ("*Oracle USA*"). These testing environments, while stored on the licensed client's computer systems, necessarily require copying Rimini's client's PeopleSoft software to be created. ECF No. 905-3-s at 6-7, 9 ("In order to create the Development and the Test Environment, a *copy* of that Rimini Client's PeopleSoft Software is loaded to a particular location on such Rimini Client's Computer Systems." (emphasis added)). Oracle argues that when "Rimini loaded these environments to use them for development, Rimini copied the environments into" the random access memory ("RAM"), which constitutes the second element of its *prima facie* case of copyright infringement. ECF No. 904-s at 21.

Pursuant to the Copyright Act, "copies" are "material objects, other than phonorecords, in which a work is fixed by any method now known or later developed, and from which the work can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." 17 U.S.C. § 101. "A work is 'fixed' in a tangible medium of expression when its embodiment in a copy or phonorecord, by or under the authority of the author, is sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration." *Id.* The Ninth Circuit addressed whether RAM copies constitute "copies" under the Copyright Act in *MAI Systems Corporation v. Peak Computer Corporation, Inc.*, 991 F.2d 511 (9th Cir. 1993). In *MAI*, it was undisputed that when the computer was on, the copyrighted operating system was loaded into the computer's RAM. *Id.* at 518. When the software was loaded into the RAM, the technician was "able to view the system error log and diagnose the problem with the computer." *Id.* Therefore, because the plaintiff had "adequately shown that the representation created in the RAM [was] 'sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration,'" the Court held that "the loading of software into the RAM creates a copy under the Copyright Act." *Id.* at 518-19 (quoting 17 U.S.C. § 101).

///

Here, it is undisputed that the RAM copies of the at issue PeopleSoft software loaded into the Campbell Soup environments are "copies" within the meaning of the Copyright Act. First, like in *MIA*, when Rimini is accessing and using Campbell Soup's PeopleSoft environments, the copyrighted operating system is copied into the computer's RAM. Oracle's computer software expert, Barbara Frederiksen-Cross, explains:

> Each time Rimini used a PeopleSoft environment, this use resulted in the creation of ephemeral copies of Oracle software in the computer's RAM. Such copies are necessarily created when software is used, because a computer-readable version of the software is loaded into the computer's memory so that its instructions can be interpreted and acted upon by the computer.
> . . . Development, testing, and distribution all result in RAM copies of the individual updates. When a program runs, the copy of the program that is stored on disk is loaded into the computer's memory, so that its instructions can be executed. Without this step, the program cannot perform any useful function, so every use of the software necessarily results in creation of additional in-memory copies. In the case of a complex system such as PeopleSoft, which requires interaction between the application software and infrastructure components, copies of applications, PeopleTools components, and the underlying architectural components such as PIA and the Oracle database may all be active at the same time, running on separate threads supported by the hardware's processing architecture.

ECF No. 904-2-s ¶¶ 7-8.[17] Rimini further concedes that RAM copies were created in the course of developing updates for Campbell Soup's PeopleSoft software. *See* ECF No. 1084-s at 27-28. Given how Rimini engineers use these RAM copies—to create and develop updates and fixes for the PeopleSoft software—it cannot be disputed that the RAM copies are "sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration." Accordingly, like in *MIA*, the Court also finds that these RAM copies are "copies" within the Copyright Act.

Because the Court finds that the copyrighted material is owned by Oracle and that it was copied, Oracle has proved its *prima facie* case of copyright infringement.

### ii.    Rimini's Express License Defense: RAM Copies

Rimini asserts the affirmative defense, express license, which Rimini argues authorized it to make the above-mentioned RAM copies of Oracle's copyrighted software. *See* ECF No. 410 at 22-27. Because Rimini does not hold a "license to copy or to modify from Oracle, the success of

---

[17] This opinion was articulated in Barbara Ann Frederiksen-Cross's May 4, 2018 expert report and reiterated in her supplemental expert report of June 19, 2018. *See* ECF No. 904-2-s ¶¶ 6-8. For clarity, the court cites to her declaration filed with the at issue motion.

Rimini's affirmative defense turns on whether Rimini's accused acts came within the scope of licenses held by its customers." *Oracle USA, Inc. v. Rimini Street, Inc.*, 879 F.3d 948, 954 (9th Cir. 2018) ("*Rimini I*"). Rimini has the initial burden to identify any license provision(s) that it believes excuses its infringement. *Oracle USA*, 6 F.Supp.3d at 1093. If Rimini identifies any relevant license provision, Oracle may overcome the defense of express license by showing that Rimini's conduct exceeded the scope of that provision. *Id.*

Construing the scope of a license is principally a matter of contract interpretation.[18] *S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1088 (9th Cir. 1989). The starting point for the interpretation of any contract is the plain language of the contract. *Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1210 (9th Cir. 1999) ("Whenever possible, the plain language of the contract should be considered first."). When a contract contains clear and unequivocal provisions, these provisions shall be construed according to their usual and ordinary meaning. *Id.* Then, using the plain language of the contract, the Court shall effectuate the intent of the parties. *Id.* ("Contract terms are to be given their ordinary meaning, and when the terms of a contract are clear, the intent of the parties must be ascertained from the contract itself.").

While "[a]nyone who violates any of the exclusive rights of the copyright owner, . . . is an infringer of the copyright," "anyone who is authorized by the copyright owner to use the copyrighted work in a way specified in the statute . . . is not an infringer of the copyright with respect to such use." *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 433 (1984) (quoting 17 U.S.C. § 501(a)).  "The existence of a license creates an affirmative defense to a claim of copyright infringement." *Worldwide Church of God v. Phila. Church of God, Inc.*, 227 F.3d 1110, 1114 (9th Cir. 2000). However, "[w]hen a licensee exceeds the scope of the license granted by the copyright holder, the licensee is liable for infringement." *LGS Architects, Inc. v. Concordia Homes of Nev.*, 434 F.3d 1150, 1156 (9th Cir. 2006).

---

[18] By the express terms, the Campbell Soup and City of Eugene (discussed below) PeopleSoft branded software licenses at issue in this motion are to be construed in accordance with the laws of the State of California. *See* ECF Nos. 905-1-s at 3, 7; & 905-2-s at 10. *See also MDY Indus., LLC v. Blizzard Entm't, Inc.*, 629 F.3d 928, 939 (9th Cir. 2010) (finding that the license was to be interpreted according to Delaware law pursuant to the game's Terms of Use and the End User License Agreement).

It is clear that Rimini's initial copying to create the development and/or testing environment, which it uses to create and test modifications to Campbell Soup's PeopleSoft software, is permitted by the license agreement. *See* ECF No. 905-1-s at 2 (Licensee may: . . . modify or merge the Software with other software, with the understanding that any modifications, however extensive, shall not diminish PeopleSoft's title or interest in the Software."). Additionally, the licensee is permitted to use a third-party servicer, like Rimini, to make these modifications. *See id.* at 10 ("Licensee may, at its option, enter into an outsourcing arrangement with a third party solely for the purpose of outsourcing the processing of Licensee's internal data under this Agreement."). Like in *MAI*, the software license allowed "MAI customers to use the software for their own *internal information processing*," which necessarily allowed "loading of the software into the computer's [RAM] by a MAI customer." *MAI*, 991 F.2d at 517 (emphasis added). Therefore, because the Campbell Soup license permits Rimini to make these updates, fixes, and modifications for Campbell Soup's internal data processing operations, the making of RAM copies while doing so is generally permitted by the license. However, these copies will potentially infringe unless the licensee's use is within the scope of the license. *See MDY Indus., LLC v. Blizzard Entm't, Inc.*, 629 F.3d 928, 938 (9th Cir. 2010) ("The parties agree that when playing WoW, a player's computer creates a copy of the game's software in the computer's random access memory ("RAM"), a form of temporary memory used by computers to run software programs. This copy potentially infringes unless the player (1) is a licensee whose use of the software is within the scope of the license or (2) owns the copy of the software.").

Here, it is undisputed that Rimini "prototyped" or developed its Patient Protection and Affordable Care Act ("PPACA") Phase 1 update HCM104286 in Campbell Soup's environment, and only that environment. ECF No. 906-12-s at 24-25 ("And Ms.  Smith responds to you and says, 'CAMX is only the place where the development is taking place. . . . Based on this email thread, it does look like Campbell's environment was used for prototyping the ACA project. It does appear like we continued in there because we started in there before we knew that they didn't even want to get this update."); ECF No. 906-14-s; ECF No. 1084-1-s ¶ 3 ("Campbell Soup was the 'prototype' client for Rimini's Phase 1 PPACA update, meaning that Rimini developed the

update for Campbell Soup first."). It is undisputed that by October 2014, Rimini was aware that Campbell Soup did not want this update: Susan Tahtaras, senior director for PeopleSoft development at Rimini, testified in her deposition that in October 2014, Rimini learned that Campbell Soup was not scheduled to receive and did not want PPACA Phase 1 update HCM104286. ECF No. 906-12-s at 25; ECF No. 906-14-s at 3 ("CAMX is only the place where the development is taking place. They are not actually receiving the update." (Email dated October 9, 2014)). It is undisputed that until June 2015, Rimini continued to use Campbell Soup's environment to develop the update even though Director Tahtaras testified that it was not their "normal process." ECF No. 906-12-s at 25 ("It is not our practice to be developing a prototype in an environment of a client that is not actually going to receive that update. That is not a normal process."). Finally, it is undisputed that RAM copies of Oracle's protected software were created by Rimini while it was working on this update. ECF No. 904-2-s ¶¶ 7-8. Based on these undisputed facts, the Court finds that these RAM copies, made during the development and testing of the PPACA Phase 1 update HCM104286, could not be for Campbell Soup's sole "internal data processing operations" when it is clear that Campbell Soup did not want or need the update. Accordingly, Rimini's use was outside the scope of the license.

Rimini argues that it did not violate the "internal data processing operations" provision because even though Campbell Soup had articulated that it did not want or need the update, Rimini was still under contract to deliver the update to Campbell Soup. And consequently, it was obligated to develop and test that update for potential use by Campbell Soup because if Campbell Soup changed its mind at the last minute, Rimini would be unable to perform its contractual obligation. ECF No. 1084-s at 27. The undisputed facts show: (1) Campbell Soup engaged Rimini in September 2012 to provide support for its PeopleSoft software (ECF No. 1104-7; ECF No. 1104-8); (2) Rimini began developing the PPACA Phase 1 update as early as August 2014 (ECF No. 1084-1-s ¶ 3 ("In or around August or September 2014, [Timothy Conley's] team of developers began developing Phase 1 of Rimini's PPACA update for its client, Campbell Soup.")); (3) in October 2014, Campbell Soup informed Rimini that it would not need the PPACA update (ECF No. 906-12-s at 25; ECF No. 906-14-s at 3); and (4) at the time Rimini was developing the update,

Rimini's statement of work provided that Campbell Soup was to receive "Enterprise Payroll North America updates," which would have included PPACA updates (ECF No. 1084-1-s ¶ 10).

The Court again draws guidance from the Ninth Circuit's opinion in *MAI Systems Corporation v. Peak Computer, Inc.*, 991 F.2d 511. There, the MAI software license allowed "customers to use the software for their own internal information processing." *Id.* at 517. However, it specifically prohibited "the use or copying of MAI software by third parties." *Id.* Therefore, the Court found that any copying by the defendant (a third-party servicer), which included RAM copies, was outside the scope of the license. *Id.* Similarly here, Campbell Soup's license allows the licensee to use the software solely for its own "internal data processing operations." While third-party servicers are permitted to perform the tasks that the licensee would, they must only act within the scope of the license. Because Campbell Soup specifically told Rimini that it did not want the PPACA Phase 1 update, Rimini's creation of RAM copies while developing and testing the update were not solely for Campbell Soup's internal use. Even though Campbell Soup and Rimini had a contract for third-party service, that does not mean that Rimini may act outside the scope of the license agreement and make copies of the PeopleSoft software that are not solely for the licensee's internal data processing operations.

### iii.   Rimini's Express License Defense: Cross-Use

Oracle further alleges that the PPACA Phase 1 update HCM104286 was then improperly delivered to another Rimini client, Toll Brothers, in December 2014, which constituted further copyright infringement by cross use. ECF No. 904-s at 21-22. Cross use is "the creation of development environments, under color of license of one customer, to support *other* customers. . . . In its narrowest form, 'cross use' is the making of development environments, under color of license held by one identifiable customer of Rimini, for another identifiable customer of Rimini that also holds a license." *Rimini I*, 879 F.3d at 956.

The undisputed facts before the Court are: (1) this update was prototyped under color of Campbell Soup's license (ECF No. 1084-1-s ¶ 3); (2) Rimini was not authorized by Campbell Soup to develop and test the update in its environment—Rimini was expressly aware that Campbell Soup did not want the update; (ECF No. 906-12-s at 25); (3) the Campbell Soup

45

development environment, "CAMX," was "the only place" where development of this update took place (ECF No. 906-14-s at 3); (4) Toll Brothers is a licensee of PeopleSoft permitted to "make and run copies of the Software for Licensee's and Affiliates' internal data processing operations" (ECF No. 942-10-s at 2); and (5) Rimini delivered the PPACA Phase 1 update HCM104286 to Toll Brothers on December 31, 2014 (ECF No. 907-5-s at 6; ECF No. 907-6-s).

Given these undisputed facts, the Court finds that Rimini used Campbell Soup's development environment, under color of Campbell Soup's license, to develop the update for Toll Brothers. As Campbell Soup's license limits copying and use to supporting the licensee, here, Campbell Soup, developing the update in Campbell Soup's environment to support Toll Brothers is a violation of the "internal data processing operations" provision of the license. *See Rimini I*, 879 F.3d at 957 ("Any work that Rimini performs under color of a license held by a customer for other existing customers cannot be considered work in support of that particular customer."). Toll Brothers is authorized under its own license to make copies and create modifications, just as Campbell Soup is. However, that is not what the undisputed evidence shows; rather the evidence shows that the update was only developed in Campbell Soup's environment and was then given to Toll Brothers outright. This is directly prohibited by Campbell Soup's license agreement regardless of the fact that Toll Brothers would have been authorized to create and test its own update. Therefore, Rimini's delivery of the PPACA Phase 1 update HCM104286 to Toll Brothers violates the "internal data processing operations" provision of Campbell Soup's license.

> iv.  Breach of the "Internal Data Processing Operations" provision is a Copyright Violation

Finally, Rimini asserts that even if it breached the "internal data processing" provision in Campbell Soup's license, it is not a copyright violation, but is instead a contract violation. ECF No. 1084-s at 28-29. "Generally, a copyright owner who grants a nonexclusive license to use his copyrighted material waives his right to sue the licensee for copyright infringement and can sue only for breach of contract." *Sun Microsystems, Inc. v. Microsoft Corp.*, 188 F.3d 1115, 1121 (9th Cir. 1999) (internal quotation marks omitted). However, if "a license is limited in scope and the licensee acts outside the scope, the licensor can bring an action for copyright infringement." *Id.*

Therefore, before Oracle "can gain the benefits of copyright enforcement, it must definitively establish that the rights it claims were violated are copyright, not contractual, rights." *Id.* at 1122.

As discussed above, the Court finds that Rimini's copying of Oracle's at issue PeopleSoft software violated the "internal data processing operations" provision of Campbell Soup's license. If this term is a "condition" that limits the scope of the license, a violation constitutes copyright infringement. *MDY*, 629 F.3d at 939. Conversely, if it is an independent contractual "covenant," it is only actionable under breach of contract. *Id.* To determine if the "internal data processing operations" provision is a "condition" or a "covenant" the Court looks to California state contract law,[19] to the extent such construction is "consistent with federal copyright law and policy." *Id.*

A covenant is a "'contractual promise,'" which "for contract purposes 'is a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made.'" *Netbula, LLC v. Storage Tech. Corp.*, Case No. C06-07391 MJJ, 2008 WL 228036, at *3 (N.D. Cal. Jan. 18, 2008) (quoting George W. Kuney & Donna C. Looper, California Law of Contracts § 6.32 (1st ed. 2007); Restatement (Second) of Contracts § 2 (1981)) (evaluating whether the license provision at issue was a condition or contractual covenant under California law). In contrast, a condition "'is an event, not certain to occur, which must occur, unless its non-occurrence is excused, before performance under a contract becomes due.'" *Id.* (quoting Restatement (Second) of Contracts § 224 (1981)). "Conditions precedent are disfavored and will not be read into a contract unless required by plain, unambiguous language." *Effects Assoc., Inc. v. Cohen*, 908 F.2d 555, 559 n.7 (9th Cir. 1990); *see also MDY*, 629 F.3d at 939 ("Conditions precedent are disfavored because they tend to work forfeitures.").

Further, as the Ninth Circuit made clear in *MDY*, for the provision to be a condition, it "must be grounded in an exclusive right of copyright (e.g., unlawful reproduction or distribution)." *MDY*, 629 F.3d at 940. This means that for "a licensee's violation of a contract to constitute copyright infringement, there must be a nexus between the condition and the licensor's exclusive rights of copyright." *Id.* at 941. For example, in *MDY*, the Court distinguished between prohibitions

---

[19] *Supra* note 18.

in a software Terms of Use agreement: a prohibition against creating derivative works and prohibitions against the use of botting software. *Id.* at 940-41. While a violation of either would be a breach of the Terms of Use agreement, only creating derivative works would "violate one of the [copyright holder's] exclusive rights under the Copyright Act." *Id.* at 941.  The Court therefore held that the use of botting software was only a violation of a contractual covenant with the copyright holder and was not actionable under copyright law. *Id.*

Applying these principals to the provision of Campbell Soup's license at issue, the Court finds that the limit to using the software for the Licensee's "internal data processing operations" is a copyright-enforceable condition rather than a contractual covenant. The at issue provision in Campbell Soup's license provides:

> **1.1**    PeopleSoft grants Licensee [Campbell Soup] a perpetual, non-exclusive non-transferable license to use the licensed number of copies of Software, solely for Licensee's *internal data processing operations* on the corresponding number of Servers located at the Site(s) specified in the Schedule. . . .
> **1.2**    Licensee may:
>          . . .
> c.      modify or merge the Software with other software, with the understanding that any modifications, however extensive, shall not diminish PeopleSoft's title or interest in the Software.

ECF No. 905-1-s at 2 (emphasis added). This provision is part of the overall section of the license designed to limit the ways in which a licensee can utilize and copy the copyrighted software, which as discussed above, includes the creation of RAM copies. As a bedrock principal of copyright law is prohibiting the reproduction or copying of protected work without the owner's permission, 17 U.S.C. §101 *et seq.*, a provision of the license working to prohibit such unlawful copying clearly provides the required nexus between the condition and the licensor's exclusive rights of copyright.

Because a violation of the "internal data processing operations" provision is a copyright-enforceable condition, not a contract violation, both the RAM copies created when developing and testing the PPACA Phase 1 update HCM104286 and the delivery of that update to Toll Brothers, in violation of the provision, were outside the scope of Campbell Soup's license. And because Rimini's use was outside the scope of the license, Rimini is not entitled to an express license defense. Accordingly, the Court grants Oracle's motion for summary judgment.

///

1

2. <u>City of Eugene</u>

2

Separate from the Campbell Soup license, Oracle alleges that Rimini engaged in unlicensed

3

copying, cross use, and the creation of derivative works of Oracle's PeopleSoft license belonging

4

to another of Rimini's clients, City of Eugene, when it created and distributed the PPACA Phase

5

3 update HCM104288. ECF No. 904-s at 24. Like with Campbell Soup, it is undisputed that Oracle

6

owns the at issue copyrighted software: PeopleSoft HRMS 8.3 (TX 5-469-032) and PeopleTools

7

8.48.10 (TX 7-092-819). *See* ECF No. 1084-s (Rimini does not dispute Oracle's ownership of

8

these copyrights in its Response); ECF No. 889 ¶ 3; ECF No. 892-13 & ECF No. 892-15

9

(providing that PeopleSoft HRMS 8.3 (TX 5-469-032) and PeopleTools 8.48.10 (TX 7-092-819)

10

were registered within five years of first publication, and therefore, pursuant to 17 U.S.C. § 410(c),

11

it is presumed valid. No evidence to the contrary has been provided.); ECF Nos 899-1 & 899-4. It

12

is further undisputed that the at issue PeopleSoft software was installed in the City of Eugene

13

environments WSM-H900COEX and WSM-H900COEM. *See* ECF No. 1084-s (Rimini does not

14

dispute this); ECF No. 905-4-s at 11; ECF No. 905-5-s at 2 (listing these environments as

15

"PeopleSoft environments that were migrated from Rimini's computer systems to remote

16

systems."). As discussed above, whenever Rimini creates development environments and accesses

17

and uses those environments, RAM copies are made, which satisfies the second element of

18

Oracle's *prima facie* case—the copyrighted software is "copied." *See supra* part C.1.i. Therefore,

19

the Court finds that Oracle has also proved its *prima facie* case of copyright infringement as it

20

relates to City of Eugene.

21

i.      *Rimini's Express License Defense: Derivative Works*

22

23

Oracle argues that Rimini infringed on its exclusive right to create derivative works when

24

Rimini developed the PPACA Phase 3 update HCM104288. *See* ECF No. 904-s at 24. Oracle

25

argues that not only was the individual update a derivative work, but the update as applied to City

26

of Eugene's environment was also a derivative work. *Id.* at 24-29. Rimini argues that while the

27

update combined with the development environment may have been a derivative work, the update

28

itself was not. ECF No. 1084-s at 29-33. It further argues that both the development and testing of the update were expressly licensed. *Id.*

Under the Copyright Act, the owner of a copyright has the exclusive right "to prepare derivative works based upon the copyrighted work." 17 U.S.C. § 106(2). A "derivative work," is a work "based upon one or more preexisting works that recasts, transforms, or adapts a preexisting work and consists of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship." *ABS Entertainment, Inc. v. CBS Corp.*, 908 F.3d 405, 414 (9th Cir. 2018) (internal quotation marks and alterations omitted). Because this statutory language is overly broad, the Court uses narrower criteria to make its determination: to qualify as a derivative work, a work must "exist in a 'concrete or permanent form'" and must "substantially incorporate protected material from the preexisting work." *Micro Star v. FormGen Inc.*, 154 F.3d 1107, 1110 (9th Cir. 1998) (quoting *Lewis Galoob Toys, Inc. v. Nintendo of America, Inc.*, 964 F.2d 965, 967 (9th Cir. 1992) and citing *Litchfield v. Spielberg*, 736 F.2d 1352, 1357 (9th Cir. 1984)). Additionally, "a work will be considered a derivative work only" if it took material from a preexisting work "without the consent of the copyright proprietor." *Micro Star*, 154 F.3d at 1112 (internal quotation marks omitted).

The parties dispute the meaning of an important Ninth Circuit copyright infringement case dealing with computer software and derivative works, *Micro Star v. FormGen Inc.*, 154 F.3d 1107 (9th Cir. 1998). FormGen was a computer software company that held the rights to *Duke Nukem 3D* ("*Duke 3D*"), a popular first-person shooter video game. *Id.* at 1109. When a consumer purchased *Duke 3D*, in addition to receiving the game, the consumer also received separate software called the Build Editor, a utility that allowed the player to create new levels to play in the game. *Id.* The player could share his or her created levels with other players online. *Id.* Micro Star downloaded several hundred user-created levels from the Internet and began selling them commercially on CD-ROMs. *Id.* FormGen sued, arguing that the level files (designated with the file extension "MAP") contained on the CD-ROMs constituted unlicensed derivative works of *Duke 3D*. *Id.*

///

The Ninth Circuit agreed. The Court first found that the "MAP files themselves exist in a concrete or permanent form; they are burned onto a CD-ROM." *Id.* at 1111. Further, the audiovisual displays generated when a player runs the Micro Star MAP files ("the actual game level as displayed on the screen") also satisfied the concrete or permanent form requirement because those displays were in the MAP files themselves. *Id.* at 1111-12. Second, the Court considered whether the MAP files were substantially incorporated from the "preexisting work." *Id.* at 1112. In part, Micro Star argued that while the MAP files "reference the source art library," they "do not contain any art files themselves," and therefore, did not include any of the original work. *Id.* The Court disagreed, finding instead that the "protected work" included the Duke Nukum story itself, and like with any story, the "copyright owner holds the right to create sequels." *Id.* The Ninth Circuit also noted that the MAP files could only be used with *Duke 3D*; had they been compatible with another game, then "the MAP files would not incorporate the protected expression" of *Duke 3D*. *Id.* at 1112, n.5.

Starting with the entire City of Eugene environment with the incorporated PPACA Phase 3 update HCM104288, Rimini concedes that this is a derivative work because it contains substantial copyrighted expression; but contends it is a licensed one. *See* ECF No. 1084-s at 30-31. The Court agrees. City of Eugene's license provides, in pertinent part:

> **1.1.** PeopleSoft grants Licensee a perpetual, non-exclusive, non-transferable license to use the licensed Software, *solely for Licensee's internal data processing operations* at its facilities in the Territory for the size of the entity specified in the Schedule(s). . . .
>
> **1.2** Licensee may:
> . . .
>
> c. modify or merge the Software with other software, with the understanding that any modifications, however extensive, shall not diminish PeopleSoft's title or interest in the Software.
> . . .
>
> **4.1** PeopleSoft retains title to all modifications created by Licensee as a derivative work, but Licensee shall have a perpetual, royalty free license to use such modifications in conjunction with the Software in accordance with this Agreement. . . . PeopleSoft shall have no obligation to support Licensee created modifications or *third party modification*.
> . . .

51

> **14.2**   . . . Licensee may provide access to and use of the Software only to those third parties that: (i) provide services to Licensee concerning Licensee's use of the Software; (ii) have a need to use and access the Software; and (iii) have agreed to substantially similar non-disclosure obligations imposed by Licensee as those contained herein.

ECF No. 905-2-s at 7-9 (emphasis added).  As part of this PeopleSoft licensing agreement, City of Eugene is clearly allowed to develop and test updates for the software. *See Rimini I*, 879 F.3d at 956 (noting that maintaining business enterprise software requires copying and creating development environments, and that licensees may "opt to outsource the work of maintenance to others, such as Rimini or even Oracle itself."). In addition, like with the Campbell Soup license, City of Eugene is permitted to hire a third-party servicer, such as Rimini, to create these updates instead. *See id.* Unlike other license agreements the Court has analyzed in the past, the City of Eugene agreement includes Section 4.1, which also clearly permits City of Eugene to create derivative works, and permits a third party servicer, like Rimini, to create those derivative works on its behalf. Additionally, the Court agrees with Rimini that the evidence does not show that this entire environment was ever marketed or distributed to any other Rimini client. Therefore, while this entire environment is a derivative work, the creation and testing of it was permitted under the City of Eugene license.

Now, turning to the individual PPACA Phase 3 update HCM104288, the Court finds that it is also a derivative work. Following the *Micro Star* analysis, the Court first finds that the update exists in a concrete and permanent form. Neither party disputes this. *See* ECF No. 904-s at 28-29; ECF No. 1084-s at 31-32. Second, the Court finds that the update substantially incorporated protected material from the preexisting work. It is undisputed that Rimini used PeopleTools Application Designer utility to create object changes, like the PPACA updates. *See* ECF No. 1100-3-s at 38; ECF No. 906-12-s at 26 ("Well in order to complete the development for the online objects, the developer would have had to use the Application Designer. . . . Application Designer is part of PeopleTools."). It is also undisputed that this update was designed to interact with PeopleSoft, and Rimini's customers would access the new update by signing into their existing PeopleSoft software. ECF No. 906-12-s at 26. Nothing in the record supports a finding that the update could be used with other software programs other than PeopleSoft. These undisputed facts

show, similarly to *Micro Star*, that even if the individual update contained only Rimini written expression, because it only interacts and is useable with PeopleSoft and it was designed using Oracle's utility tools software, it substantially incorporated protected material.

Like above, creation of this individual update is also expressly licensed. However, under the license, these derivative works and modifications are also only permitted for the Licensee's *internal data processing operations*. It is undisputed that this update was created and tested in City of Eugene's environment as a "prototype" for the PPACA Phase 3 update HCM104288. ECF No. 906-1-s at 11; ECF No. 906-12-s at 27. Nothing in the record supports that this update was developed or tested in any other client's environment. If Rimini was "prototyping" the individual update in City of Eugene's environment, that necessarily means that Rimini was planning on sending that update to other Rimini clients. If the update was being created and tested in the City of Eugene's environment, for other customers, the court must find that it was not being developed and created solely for City of Eugene's "internal data processing operations." Because Rimini is only permitted under the license to develop and test these derivative works and modifications for the "internal data processing operations' of City of Eugene, prototyping the update was outside the scope of the license. Moreover, Rimini's "know-how" argument is irrelevant to the Court's analysis: Rimini has presented no evidence that it took the "know-how" it received by developing this update in City of Eugene's environment and used it to develop a separate update for other clients. Rather, the evidence shows that the update was only developed in City of Eugene's environment and was then given outright to three of Rimini's other clients—Easter Seals New Hampshire, Inc. ("Easter Seals"), Shawnee Mission Schools, and the City of Glendale. *See* ECF No. 906-17-s at 38 (Easter Seals); ECF No. 907-4 at 30 (Shawnee Mission Schools); ECF No. 907-2-s at 26 (City of Glendale) (showing that update number "HCM104288" was "ready for download" by these customers).  As the Court found above, a violation of the "internal data processing operations" provision is a copyright violation, not a contract violation; therefore, Rimini's express license defense fails as a matter of law. Accordingly, the Court grants Oracle summary judgment.

///

*ii.*      *Rimini's Express License Defense: Cross Use*

Second, Oracle argues that Rimini engaged in impermissible cross use when it distributed the PPACA Phase 3 update HMC104288, which was developed and tested in City of Eugene's development environment, to other Rimini customers. ECF No. 904-s at 29-31. Even if the Court were to find that the prototyping of the update for distribution to other clients was not a violation of the license, or if the individual update was not a derivative work, it was clearly a violation of the license agreement to distribute and market the update to other Rimini clients.

Section 4.1 of City of Eugene's license provides: "Licensee may share modifications with other customers *only* through PeopleSoft Forum, subject to PeopleSoft's right to modify and monitor modifications distributed through PeopleSoft Forum. Except as stated above, Licensee *shall have no rights to market or distribute modifications*." ECF No. 905-2-s at 8 (emphasis added). Even if the individual update was not a derivative work, it was clearly a modification that was created for and tested in City of Eugene's environment. The license agreement expressly prohibits distribution and/or marketing of those modifications, created and tested for City of Eugene, to anyone else. It is undisputed that Rimini distributed the PPACA Phase 3 update HCM104288 to Rimini customers other than City of Eugene: specifically, Easter Seals, Shawnee Mission Schools, and the City of Glendale. Emails from Rimini to these three clients indicate that the update designated as "HCM104288" was available for them to download. *See* ECF No. 906-17-s at 38 (Easter Seals); ECF No. 907-4 at 30 (Shawnee Mission Schools); ECF No. 907-2-s at 26 (City of Glendale). Nothing in the record supports finding that this update "HCM104288" delivered to Easter Seals, Shawnee Mission Schools and City of Glendale was different than the update "HCM104288" developed for City of Eugene. Therefore, Rimini violated Section 4.1 of the license agreement.

The Court must now, like above, determine whether a violation of Section 4.1 of the license is a contract or copyright violation. Applying the Ninth Circuit's reasoning in *MDY* to the Section 4.1 provision, the Court finds that the limit on marketing and distribution of derivative works and modifications is a copyright-enforceable condition rather than a contractual covenant. Section 4.1. is part of the overall section of the license designed to limit the ways in which a licensee can utilize

and copy derivative works and modifications it created of the copyrighted software.  Prohibitions on copying, as well as limitations on the right to create derivative works, are bedrock principles of copyright law. *See* 17 U.S.C. §101 *et seq*. Therefore, a provision of the license working to prohibit copying and the creation of derivative works clearly provides the required nexus between the condition and the licensor's exclusive rights of copyright.

Because a violation of Section 4.1 is a copyright-enforceable condition, not a contract violation, Rimini's distribution of the PPACA Phase 3 update HCM104288 to clients other than City of Eugene, was outside the scope of the license. And because Rimini's use was outside the scope of the license, Rimini's express license defense fails as a matter of law. Accordingly, the Court grants Oracle summary judgment.

### 3.   Rimini's Seventh Affirmative Defense: Fair Use

Oracle argues that Rimini has failed to meet its burden of showing that the Section 107, 17 U.S.C. § 107, fair use factors weigh in its favor, and thus, Rimini's fair use defense fails as a matter of law. *See* ECF No. 904-s at 31-34. The fair use doctrine "permits unauthorized use of copyrighted works 'for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research." *Micro Star*, 154 F.3d at 1112 (quoting 17 U.S.C. § 107). "This listing was not intended to be exhaustive, or to single out any particular use as presumptively a 'fair' use." *Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 561 (1985) (internal citation omitted). The Court must consider and weigh the determinative factors: "(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use on the potential market for or value of the copyrighted work." 17 U.S.C. § 107. But the "statutory factors are not exclusive. Rather, the doctrine of fair use is in essence 'an equitable rule of reason.'" *Sega Enterprises Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1522 (9th Cir. 1992) ("*Sega*") (quoting *Harper & Row,* 471 U.S. at 560).

Additionally, "[a]lthough defendants bear the burden of proving that their use was fair, they need not establish that each of the factors set forth in § 107 weighs in their favor. Instead, all

factors must be explored, and the results weighed together in light of the purposes of copyright and the fair use defense." *NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 476-77 (2d Cir. 2004) (internal citations omitted); *see also Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577-78 (1994) ("*Acuff-Rose*") ("The text employs the terms 'including' and 'such as' in the preamble paragraph to indicate the 'illustrative and not limitative' function of the examples given, which thus provide only general guidance about the sorts of copying that courts and Congress most commonly had found to be fair uses." (internal citations omitted)).  "Fair use is a mixed question of law and fact. If there is no genuine issues of material fact, or if, even after resolving all issues in favor of the opposing party, a reasonable trier of fact can reach only one conclusion, a court may conclude as a matter of law whether the challenged use qualifies as a fair use of the copyrighted work." *Worldwide Church of God v. Phila. Church of God, Inc.*, 227 F.3d 1110, 1115 (9th Cir. 2000); *see Harper & Row*, 471 U.S. at 560 ("Where the district court has found facts sufficient to evaluate each of the statutory factors, an appellate court . . . may conclude as a matter of law that [the challenged use] do[es] not qualify as a fair use of the copyrighted work." (internal quotation marks omitted, alterations in original)). Because the fair use inquiry requires a case-by-case analysis, the court shall address each of the four statutory factors in turn. *Harper & Row*, 471 U.S. at 560.

### i.    *Purpose and Character*

Under this factor, the Court first looks at whether the use is commercial in nature, rather than educational or for public interest purposes. *See Acuff-Rose*, 510 U.S. at 584-85 (reiterating that the "'fact that a publication was commercial as opposed to nonprofit is a separate factor that tends to weigh against a finding of fair use.'" (quoting *Harper & Row*, 471 U.S. at 561)). "[A]lthough the statute requires [the Court] to consider the 'commercial nature' of the work, 'the degree to which the new user exploits the copyright for commercial gain—as opposed to incidental use as part of a commercial enterprise—affects the weight we afford commercial nature as a factor.'" *Oracle America, Inc. v. Google, Inc.*, 886 F.3d 1179, 1197 (Fed. Cir. 2018) ("*Google*") (quoting *Elvis Presley Enters., Inc. v. Passport Video*, 349 F.3d 622, 627 (9th Cir. 2003)). "The crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain

but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price." *Harper & Row*, 471 U.S. at 562.

Rimini's purpose in using PeopleSoft is clearly commercial and for Rimini's own financial gain—it uses the software, making RAM copies in the process, to provide its clients with updates and fixes. *See* ECF No. 906-10-s ("Our clients run Oracle systems, and we deliver tax, legal and regulatory updates to those clients); ECF No. 906-8 at 5 ("We work on providing updates and fixes."). While Rimini's commercial use is not dispositive, the Court finds that it does weigh against a finding of fair use. *See Acuff-Rose*, 510 U.S. at 584 ("If, indeed, commerciality carried presumptive force against a finding of fairness, the presumption would swallow nearly all of the illustrative uses listed in the preamble paragraph of § 107, including news reporting, comment, criticism, teaching, scholarship, and research, since these activities 'are generally conducted for profit in this country.'" (quoting *Harper & Row*, 471 U.S. at 592)). It is also not disputed that Rimini profited from its work creating and testing updates for its clients. *See* ECF No. 1084-s at 34 (Rimini only argues about the transformative nature of the conduct, not whether its conduct was commercial in nature); *See Worldwide Church of God*, 227 F.3d at 1118 ("It is beyond dispute that PCG 'profited' from copying *MOA*—it gained an 'advantage' or 'benefit' from its distribution and use of *MOA* without having to account to the copyright holder.").

Second, the Court considers "whether the new work is transformative or simply supplants the original." *Wall Data Inc. v. Los Angeles County Sheriff's Dept.*, 447 F.3d 769, 778 (9th Cir. 2006) (citing *Acuff-Rose*, 510 U.S. at 579). The new use is transformative if it "adds something new, with a further purpose or different character, altering the first with new expression, meaning or message." *Acuff-Rose*, 510 U.S. at 579. If "the 'use is for the same intrinsic purpose as [the copyright holder's] . . . such use seriously weakens a claimed fair use.'" *Worldwide Church of God*, 227 F.3d at 1117 (quoting *Weissmann v. Freeman*, 868 F.2d 1313, 1324 (2d Cir. 1989)). "[W]hether a work is transformative is a question of law." *Google*, 886 F.3d at 1199 (citing *Mattel, Inc. v. Walking Mountain Prod.*, 353 F.3d 792, 801 (9th Cir. 2003)).

Here, the Court cannot find that Rimini's new work was transformative. While Rimini created new code to create the PPACA updates, they were ultimately implemented in the same

PeopleSoft software as the original. This software, with Rimini's updates, works just as the original copyrighted software does. The client accesses the software in the same way it did with the original work, it sees the software in the same way (albeit with the updates from Rimini), and it uses the software for the same purpose as the original software. *See Google*, 886 F.3d at 1199 (finding that Google's use was not transformative as a matter of law, in part, because "the purpose of the API packages in Android [was] the same as the purpose of the packages in the Java platform, . . . [and because] Google made no alteration to the expressive content or message of the copyrighted material[.]"). *C.f. Sony Comput. Entm't, Inc. v. Connectix Corp.*, 203 F.3d 596, 603 (9th Cir. 2000) ("*Sony*") (finding that the new product was "modestly transformative" when it created a new platform, on which users could play Sony PlayStation games, and a "wholly new product, notwithstanding the similarity of the uses and functions between" the old and new products. The Court noted this was in contrast to *Micro Star*, 154 F.3d at 1113 & n.6, "which involved a use that was non-transformative.").

Rimini argues that its copying, making of RAM copies to create and test its PPACA updates, was only "intermediate," and resulted in "the creation of entirely new software, containing no Oracle copyrighted expression." ECF No. 1084-s at 34 (citing *Sega*, 977 F.3d at 1527-28). In *Sega Enterprises Ltd. v. Accolade, Inc.*, game developer Accolade copied the Sega software "to discover the functional requirements of compatibility" so that it could make its own games compatible with the Sega game console, Genesis. 977 F.3d at 1522. "Although Accolade's ultimate purpose was the release of Genesis-compatible games for sale, its direct purpose in copying Sega's code, and thus its direct use of the copyrighted material, was simply to study the functional requirements for Genesis compatibility so that it could modify existing games and make them usable with the Genesis console." *Id.* The *Sega* Court further found that Accolade's copying "led to an increase in the number of independently designed video game programs offered for use with the Genesis console," which was "precisely [the] growth in creative expression, based on the dissemination of other creative works and the unprotected ideas contained in those works, that the Copyright Act was intended to promote." *Id.* at 1523. This is not the case here—Rimini's direct purpose in copying Oracle's software was not for research of the software but to create and test

updates, that work within and can only be used with the existing PeopleSoft software, that Rimini then marketed to its clients for profit. Accordingly, this factor weighs against fair use.

Lastly, the Court considers "whether the historical facts support the conclusion that the infringer acted in bad faith." *Google*, 886 F.3d at 1196; *see also Harper & Row*, 471 U.S. at 562 ("Fair use presupposes 'good faith' and 'fair dealing.'" (internal citation and quotation marks omitted)). "'[T]he innocent intent of the defendant constitutes no defense to liability.'" *Monge v. Maya Magazines, Inc.*, 688 F.3d 1164, 1170 (9th Cir. 2012) (quoting 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyrights* § 13.08[B][1] (Matthew Bender rev. ed. 2011) (footnote omitted)). Oracle argues that Rimini acted in bad faith because "Rimini engaged in the same infringing conduct long after this Court's February 2014 [*Oracle USA*] summary judgment order." ECF No. 904-s at 32. While similar issues of copyright infringement appear both before the Court now, and in *Oracle I*, the alleged infringing practices before the Court today are different from those alleged in case 1. Simply because Rimini's new practices have been found to be infringing also, albeit for similar reasons to those found in *Oracle USA*, the Court cannot find that Rimini acted in bad faith on this assertion alone. Therefore, this factor does not weigh in Oracle's favor, and is at most neutral to its analysis.

### ii.     *Nature of the Copyrighted Work*

The nature of the copyrighted work factor "turns on whether the work is informational or creative." *Worldwide Church of God*, 227 F.3d at 1118. "Although 'software products are not purely creative works,' it is well established that copyright law protects computer software." *Google*, 886 F.3d at 1204 (quoting *Wall Data*, 447 F.3d at 780). Here, the nature of the copyrighted work is unique business enterprise software, which is clearly protected by copyright law. *See Oracle USA*, 6 F.Supp.3d at 1093 (finding Rimini liable for copyright infringement pursuant to the Copyright Act). While it is true that some functional aspects of the PeopleSoft software may be unprotected by copyright law, unlike in *Sega*, where the only means of determining the unprotected functional aspects of the software was disassembly, and necessarily copying, that is not the case here. *See* 977 F.2d at 1526. Rimini, and the licensees it services, are permitted to make copies of PeopleSoft, including RAM copies, to make updates and fixes to the software. What the

Court determined above was that Rimini (and the licensee) could only do so within the scope of the license. *Sega* has no bearing on this conclusion.  Accordingly, this factor weighs in Oracle's favor.

### iii.   Amount and Substantiality

Third, the Court "looks to the quantitative amount and qualitative value of the original work used in relation to the justification for its use." *Google*, 886 F.3d at 1205 (citing *Seltzer v. Green Day, Inc.*, 725 F.3d 1170, 1178 (9th Cir. 2013)). Rimini's use was quantitatively significant: Rimini created RAM copies every time it worked in Campbell Soup's and City of Eugene's environments creating and testing its PPACA updates. *See* ECF No. 904-2-s ¶¶ 7-8. And these RAM copies contained a substantial portion of the protected expression of the at issue copyrighted software. *See* ECF No. 899-12 at 4 (Rimini's admission that the at issue environments embody "a substantial portion of the protected expression of each of the registered copyrights"); ECF No. 905-7-s at 10. "While 'wholesale copying does not preclude fair use per se,' copying an entire work 'militates against a finding of fair use.'" *Worldwide Church of God*, 227 F.3d at 1118 (quoting *Hustler Magazine Inc. v. Moral Majority Inc.*, 796 F.2d 1148, 1155 (9th Cir. 1986)).

Rimini's copying was also qualitatively significant. First, "the fact that a substantial portion of the infringing work was copied verbatim is evidence of the qualitative value of the copied material, both to the originator and to the plagiarist who seeks to profit from marketing someone else's copyrighted expression." *Harper & Row*, 471 U.S. at 565. Second, Rimini copied the software to create updates for Oracle's software so that it could continue to be used for its original purpose and in the same manner for which it was designed to be used. *See Triad Systems Corp. v. Southeastern Exp. Co.*, 64 F.3d 1330, 1337 (9th Cir. 1995) ("Southeastern is simply commandeering its customers' software and using it for the very purpose for which, and in precisely the manner in which, it was designed to be used."). Rimini argues that because the RAM copies are intermediate, that exist for a "brief, sometimes fleeting" moment and are "inherent in all software use," such copying is not significant. ECF No. 1084-s at 34. It is undisputed that it is impossible to use the software or create and test Rimini's updates without making RAM copies of Oracle's software. *See* ECF No. 1100-7-s ¶ 184 ("If a tool needs to be tested to confirm that it

60

works within a PeopleSoft environment and needs to run PeopleSoft to do so, temporary copies of the software will be loaded in RAM—there would be no other way to perform such testing without making those RAM copies."). It is also undisputed that the PPACA updates depend on the core functionality of PeopleSoft to allow the client to utilize the new functionality provided by Rimini's updates. ECF No. 906-12-s at 26 (Describing that Rimini's client "would have to access the existing PeopleSoft software to get" to the updated pages, and that the new functionality is added "within the framework of being able to access it through . . . the PeopleSoft software."). Therefore, like the Court found in *Google*, "no reasonable juror could conclude that what was copied was qualitatively insignificant, particularly when the material copied was" essential to the creation and functionality of the updates. *Google*, 886 F.3d at 1207. Accordingly, this factor weighs in Oracle's favor.

### iv.    Effect on the Market

Finally, the Court looks at "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). Courts are to "consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also whether unrestricted and widespread conduct of the sort engaged in by the defendant would result in a substantially adverse impact on the potential market for the original." *Acuff-Rose*, 510 U.S. at 590 (internal quotation marks and alterations omitted). While the Supreme Court initially directed that this factor was "undoubtedly the single most important element of fair use," *Harper & Row*, 471 U.S. at 566, it has since clarified that all of the factors should be weighed together, *Acuff-Rose*, 501 U.S. at 578. "Market harm is a matter of degree, and the importance of this factor will vary, not only with the amount of harm, but also with the relative strength of the showing on the other factors." *Acuff-Rose*, 510 U.S. at 590 n.21. Additionally, "[i]n evaluating the fourth factor, courts consider not only harm to the actual or potential market for the copyrighted work, but also harm to the 'market for potential derivative uses,' including 'those that creators of original works would in general develop or license others to develop.'" *Google*, 886 F.3d at 1208 (quoting *Acuff-Rose*, 510 U.S. at 592). "A court can therefore consider the challenged use's 'impact on potential licensing revenues for traditional, reasonable, or likely to be developed markets.'" *Google*, 886 F.3d at 1208 (quoting

*Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg, L.P.*, 756 F.3d 73, 91 (2d Cir. 2014) (citation omitted)). "Since fair use is an affirmative defense, its proponent would have difficulty carrying the burden of demonstrating fair use without favorable evidence about relevant markets." *Acuff-Rose*, 510 U.S. at 590.

Rimini argues that the infringing "RAM copies have no conceivable effect on the market for copyrighted PeopleSoft software." ECF No. 1084-s at 35. The Court disagrees: as discussed above, without the RAM copies, Rimini would be unable to create and test its updates, and those updates clearly have an effect on the market. As Rimini itself provides, "Rimini and Oracle are competitors in the aftermarket (or aftermarkets) for software support," and that "Rimini's offering of independent aftermarket support for Oracle software products, and the decision of Oracle licensees to purchase Rimini's services, pose a direct competitive threat to Oracle." ECF No. 582-3 ¶¶ 8, 80. And it is undisputed that Oracle "released new PeopleSoft functionality designed to support the PPACA's reporting requirements for IRS Forms 1094-C and 1095-C." ECF No. 898-6 at 2. Like in *Google*, the fact that Rimini competes directly with Oracle in the market for software support, is sufficient to undercut Rimini's arguments that its conduct does not affect the market. *Google*, 886 F.3d at 1209 ("That Android competed directly with Java SE in the market for mobile devices is sufficient to undercut Google's market harm arguments.").

Moreover, while licensees can create their own updates, under the City of Eugene license, Oracle owns title to any derivative works that a licensee creates, which shows that Oracle intends to occupy the market for derivative works. *See Acuff-Rose*, 510 U.S. at 592 ("The market for potential derivative uses includes only those that creators of original works would in general develop or license others to develop."). Rimini's creation, testing, and distribution of these derivative works will undoubtedly impact Oracle's ability to function in that market—a PeopleSoft licensee that needs a PPACA update, will purchase that update from either Rimini or Oracle, but not both. *C.f. Sega*, 977 F.2d at 1523 (reasoning that unlike the case in *Harper & Row*, where it was unlikely a consumer would purchase more than one version of President Ford's memoirs, video game users are likely to purchase multiple games); *Sony*, 203 F.3d at 607 (reasoning that while Sony is likely to lose console sales and profits to Connectix's Virtual Game Station, "because

the Virtual Game Station is transformative, and does not merely supplant the PlayStation console, the Virtual Game Station is a legitimate competitor in the market for platforms on which Sony and Sony-licensed games can be played."). Accordingly, this factor too weighs in favor of Oracle.

        *v.*    *Conclusions*

"The four statutory fair use factors must be 'weighed together, in light of the purposes of copyright.'" *Sony*, 203 F.3d at 608 (quoting *Acuff-Rose*, 501 U.S. at 578). "Courts balance these factors to determine whether the public interest in the free flow of information outweighs the copyright holder's interest in exclusive control over the work." *Hustler*, 796 F.2d at 1151-52. The Court has analyzed the four statutory factors and finds that each is either neutral or weighs in favor of Oracle. While these factors are not exclusive, *Harper & Row*, 471 U.S. at 560, nothing else in the record before the Court changes its analysis. Therefore, the Court finds that Rimini's making of RAM copies of Oracle's copyrights associated with Campbell Soup and City of Eugene, was not a fair use under 17 U.S.C. § 107, as a matter of law. Accordingly, the Court grants Oracle summary judgment on Rimini's seventh affirmative defense.

Because the Court finds that Rimini infringed on Oracle's copyrights—PeopleSoft HRMS 8.9 (TX 7-065-381); PeopleTools 8.46.17 (TX 7-092-772); PeopleSoft HRMS 8.3 (TX 5-469-032); and PeopleTools 8.48.10 (TX 7-092-819)—and neither Rimini's second affirmative defense (express license) nor its seventh affirmative defense (fair use) are applicable, the Court grants Oracle summary judgment on its first counterclaim for copyright infringement, as it relates to these four specific copyrights.

    4.  <u>Automated Framework ("AFW") Tools</u>

Oracle also seeks summary judgment on its claim that Rimini's Automated Framework ("AFW") Tools software impermissibly cross uses Oracle's copyrighted software "by design." ECF No. 904-s at 34-36. Oracle asserts that the AFW Tools software essentially continues Rimini's practices of cross use that the Court ruled infringed Oracle's copyrights in *Oracle USA*. *Id*. Oracle argues that the only difference this time is that instead of Rimini employees manually transferring files from one licensee's copy of PeopleSoft to another licensee's copy, Rimini's automated software does it for them. *Id*. Rimini, however, argues that the AFW Tools software

does not transfer any Oracle code or other copyrighted expression between clients. ECF No. 1084-s at 35-36.

Rimini provides the following definition for AFW Tools:

[A] proprietary suite of Rimini designed and developed software tools for which a patent is pending – also known collectively as the Automation Frameworks Tools – that are, among other things, used to develop and deliver TLR Updates to Rimini Clients, to develop and deliver the Rimini Change Set to certain Rimini Clients that have identical files that require updating (as described in further detail in this Interrogatory No. 2 response), and to promulgate Rimini Customer Content to Rimini Clients.

ECF No. 905-3-s at 5. Rimini provides that AFW operates in the following way:

Rimini uses the AFW Tools to automate certain development and record keeping functions for Rimini Clients, including (1) to generate and to deliver the Rimini Change Set to certain Rimini Clients that have identical Code or Text Files that require updating, and (2) to promulgate Rimini Custom Content to Rimini Clients. Using the AFW Tools, Rimini can automatically provide TLR Updates to Rimini Clients that have identical Code or Text Files without copying any of Oracle's protectable copyrightable expression from one such Rimini Client to another.
The AFW Tools are installed on each Rimini Client's Computer Systems when Rimini commences its relationship with such Rimini Client. The AFW Tools rely on the Automation Framework Manager ("AFM"), which also is installed on each Rimini Client's Computer Systems when Rimini commences its relationship with such Rimini Client. The AFM is a Rimini-developed service that periodically checks the Rimini Client's dedicated account on the Rimini FTP Server for files written in the XML programming language that contain machine-readable instructions for that Rimini Client.
When the AFM installed on a Rimini Client's Computer Systems finds an XML file in that particular Rimini Client's dedicated account on the Rimini FTP Server, the AFM reads that XML file to determine what task needs to be performed by the AFM. When the task has been executed in that Rimini Client's Development Environment or Test Environment, the AFM generates an XML file that reports on whether or not the task has been completed successfully. This XML file is sent back to the Rimini Client's dedicated account on the Rimini FTP Server. In this way, Rimini can track whether tasks have been successfully executed for each Rimini Client.

*Id.* at 14.  Owen Astrachan, one of Rimini's technical experts, provided the following analogy as to how the AFW Tools software works:

In effect, this process is akin to an engineer remotely logging in to each client development environment and performing the modification. By automating Rimini's modifications, Rimini increases consistency and reduces the chance of coding errors.

ECF No. 907-9-s at 4; ECF No. 1100-3-s ¶ 104. Astrachan further testified that the "DIFF files do not contain Oracle IP, either in and of themselves, nor in a numerical representation of Oracle IP.

Oracle IP, in any form, is not part of a DIFF file." ECF No. 907-9-s at 4. Rickard Frank, a software developer at Rimini, explained that the AFW toolset will locate the Rimini written update or modification located in the client's PeopleSoft development environment. ECF No. 906-4-s at 18. The AFW Tools then copies only the Rimini code file, designated "RSI," and sends it to the AFW monitor on a Rimini server. *Id.* The AFW monitor picks up the XML file and sends it to the target machine (the other Rimini client that is getting that update). *Id.*

After reviewing the relevant evidence, the Court finds that there is an issue of material fact as to whether Rimini's AFW Tools software per se constitutes copyright infringement, and whether through the use of a "Diff" file, which is, at its core, an "XML" file, Rimini copies Oracle's protected expression. There is no evidence that the AFW Tools software copies Oracle's source code or its copyrighted expression; the evidence shows that Rimini copies its own code only. Nor is there evidence that the AFW Tools software distributes files containing copyrighted Oracle expression to multiple clients. Oracle argues that copying an update, developed in one of Rimini's client's environments to another client, even if it is Rimini's code, is impermissible cross use. The Court disagrees. The Court found above that when Rimini accessed its client's development environment and created and tested the updates, it made RAM copies in the process, which constituted "copying" under the Copyright Act. Here, Oracle has not shown that when Rimini's AFW Tools software operates, RAM copies of Oracle's copyrighted software are made. If no "copies" of Oracle's protected expression are made, then Oracle has not proven its prima facie case of copyright infringement. As such, the Court finds that there is an issue of material fact and denies Oracle summary judgment on this claim.

### 5. Declaratory Relief

Finally, Oracle seeks summary judgment on Rimini's first cause of action, declaratory judgment that its new processes are not violating Oracle's copyrights. ECF No. 904-s at 36. Because, as discussed above, Rimini has infringed on four of Oracle's copyrights on which Rimini sought declaratory judgment—PeopleSoft HRMS 8.9 (TX 7-065-381); PeopleTools 8.46.17 (TX 7-092-772); PeopleSoft HRMS 8.3 (TX 5-469-032); and PeopleTools 8.48.10 (TX 7-092-819)— while following its new Procedure 2.0, the Court grants Oracle summary judgment on this claim

65

as it pertains to these specific copyrights. *See TD Bank, N.A. v. Hill*, Civil No. 12-7188 (RBK/JS), 2015 WL 4523570, at *20 (D.N.J. July 27, 2015) ("[T]hough neither party addressed Defendant's declaratory judgment counterclaim of non-infringement, it necessarily follows that the Court must enter judgment against Defendant on this counterclaim."). As Rimini's Third Amended Complaint specifies that it seeks declaratory rulings on each of Oracle's software copyrights as identified, dated, and numbered, the Court's summary judgment ruling for Oracle is limited to the four at issue copyrights. *See* ECF No. 582-3 ¶ 113.

> **D. The Court grants in part and denies in part Oracle's motion for partial summary judgment regarding Rimini's fourth, sixth, and eighth causes of action, and Rimini's damages claims (ECF Nos. 916, 936-s).**

Oracle's fourth motion seeks partial summary judgment relating to three of Rimini's causes of action: intentional interference with contractual relations (fourth cause of action), violations of the Nevada Deceptive Trade Practices Act (sixth cause of action), and violations of the California Business and Professional Code § 17200 *et seq.* (eighth cause of action), and what Oracle argues are improperly aggregated damages claims. ECF Nos. 916, 936-s. The Court will address Oracle's arguments as to each cause of action in turn.

> 1. The Court grants Oracle's motion on Rimini's fourth cause of action for intentional interference with contractual relations.

In Part IV.A.2 above, the Court granted Oracle summary judgment on Rimini's fourth cause of action as it pertained to Rimini's third theory of liability: that the cease and desist letter impermissibly revoked Rimini's access to Oracle's support websites, thereby causing severe contractual issues between Rimini and its clients. Therefore, the court's ruling on this motion addresses Rimini's remaining two theories of liability—(1) that Oracle made several misrepresentations to Rimini's clients regarding the legality of Rimini's services with the intent to induce those clients to break their contracts with Rimini; and (2) that Oracle engaged in selective audits of Rimini clients to harass them and drive them away from Rimini's services—and Oracle's arguments that Rimini lacks evidence that proves the elements of intentional interference with contractual relations. *See* ECF Nos. 916, 936-s.

///

As articulated above, to prove a claim for intentional interference with contractual relations under Nevada law, a plaintiff must demonstrate: "(1) a valid and existing contract; (2) the defendant's knowledge of the contract; (3) intentional acts intended or designed to disrupt the contractual relationship; (4) actual disruption of the contract; and (5) resulting damage." *J.J. Indus., LLC v. Bennett*, 71 P.3d 1264, 1267 (Nev. 2003). To demonstrate the "intentional act" requirement, a plaintiff must show that the defendant had a specific purpose or motive to injure the plaintiff through the tortious interference. *Nat. Right to Life Political Action Comm. v. Friends of Bryan*, 741 F.Supp. 807, 814 (D. Nev. 1990) ("*Friends of Bryan*"). The mere knowledge that a plaintiff had a contract with a third party is "insufficient to establish that the defendant intended or designed to disrupt the plaintiff's contractual relationship." *J.J. Indus., LLC*, 71 P.3d at 1268. The "actual disruption" element requires that a plaintiff show either an actual breach of a contract or a significant disruption of a contract rather than a simple impairment of contractual duties. *Treasury Sols. Holding Inc. v. Upromise, Inc.*, Case No. 3:10-CV-00031-ECR-RAM, 2010 WL 5390134, at *5 (D. Nev. Dec. 22, 2010).

According to Oracle, at issue in this cause of action are Rimini's relationships with approximately 355 clients and licensees of Oracle business software. Oracle derives this number from Rimini's various expert reports and discovery responses. ECF Nos. 916, 936-s at 20. Out of these 355 customers, Rimini has provided contracts for only 177 of them. ECF Nos. 995, 1004-s at 19. Therefore, the Court will proceed and determine whether Oracle is entitled to judgment as a matter of law as to those 177 contracts. Obviously, Rimini cannot proceed on any intentional interference claim for any client for which it has not provided the Court with evidence of a valid and existing contract. *See Strack v. Morris*, Case No. 3:15-CV-00123-LRH-VPC, 2015 WL 7428555, at *4 (D. Nev. Nov. 20, 2015).

Oracle argues that Rimini has failed to provide any evidence that Oracle actually interfered with any of the 177 identified contracts. ECF Nos. 916, 936-s at 21. Specifically, Oracle points to the fact that Rimini's causation expert, Paul Loftus, offered a specific opinion on causation as to only 16 Rimini clients. *Id.* at 21–22; ECF Nos. 1170, 1179-s at 9. Oracle also argues that Rimini does not have a cause of action for any client that failed to renew a contract, as opposed to a client

breaching a contract it had with Rimini. ECF Nos. 916, 936-s at 22. Oracle makes numerous other but related arguments; each essentially asserting that Rimini, in one form or another, has not provided any evidence that any action Oracle took regarding Rimini's clients was designed to induce those clients to breach their existing Rimini contracts (or that such a breach occurred in the first place). *Id.* at 20–29. Rimini counters by arguing that opinions offered by its causation expert, Paul Loftus, while helpful, are not required to establish causation and that Oracle's general conduct could lead a reasonable finder of fact to conclude that Oracle interfered with the 177 contracts at issue here. ECF Nos. 995, 1004-s at 20. Rimini also points to a report authored by another one of its experts, Dr. Russell Winer, who opined that "Oracle's false statements about Rimini influenced customer purchasing decisions" and drove them away from Rimini and to Oracle. *Id.*

Rimini argues that Oracle's general conduct throughout its decade-long dispute with Rimini is evidence sufficient to establish the intentional act element, but this assertion falls well-short of the standard needed to survive summary judgment. If Rimini seeks to recover damages stemming from tortious interference with 177 separate contracts, it must demonstrate how Oracle caused damage to Rimini in relation to each of those contracts on a contract by contract basis. The only specific evidence of Oracle conduct Rimini presents is contained within the Loftus report, wherein Loftus analyzes and offers an opinion about how Oracle's conduct involving sixteen different Rimini clients caused business harm to Rimini. In his report, Loftus cites to numerous business documents, depositions, and public statements produced or generated by the parties in discovery, but Rimini has not provided all those documents to the Court in the over seven hundred exhibits it filed alongside its response. Although Oracle has not contested the accuracy of the documents on which Loftus bases his opinions, Rimini's failure to provide them to the Court prevents the Court from delving deeper into their contents beyond the portions Loftus discusses in his report.

Out of the sixteen companies Loftus discusses in his report, Rimini has provided contracts for five of those. These five customers/contracts are: (1) Telenor ASA, (2) AZZ, Inc. ("AZZ"), (3) Yanmar Co., Ltd. ("Yanmar"), (4) Saint Francis Hospital and Medical Center ("St. Francis"), and (5) Philips. Rimini's cause of action falls apart, however, because it has not presented any evidence

that Oracle's conduct induced Telenor ASA, AZZ, Yanmar, St. Francis, Philips, or any other client to breach the contracts they had with Rimini. Instead, the evidence presented in the Loftus report for each of these clients (and all the others) indicates that they declined to either enter or renew contracts with Rimini and either continued with or returned to Oracle for support services upon the expiration of their contracts with Rimini. *See* ECF No. 1076-1-s at 54, 66-67, 68, 73, 80. A Rimini client declining to renew its service contract with Rimini because of statements Oracle made to that client is not the same as a client breaching the service contract because of those statements. The absence of any demonstrable breach or disruption of the existing contract defeats any cause of action for intentional interference with contractual relations. *See Treasury Solutions Holdings, Inc. v. Upromise, Inc.*, Case No. 3:10-CV-00031-ECR-RAM, 2010 WL 5390134, at *5 (D. Nev. Dec. 22, 2010) ("Unless there is a breach of contract, Plaintiffs cannot prevail on a claim of tortious interference with contractual relations.").

Not only must Rimini present evidence of a contractual breach, it must also present evidence that Oracle's actions were committed with the intent to cause a breach. *J.J. Indus.*, 71 P.3d at 1267; *Lake at Las Vegas Investors Grp., Inc. v. Pacific Malibu Development Corp.*, 867 F.Supp. 920, 924–25 (D. Nev. 1994) ("[A]t the heart of [an intentional interference] action is whether Plaintiff has proved *intentional acts by Defendant* intended or designed to disrupt Plaintiff's contractual relations." (emphasis in original) (quoting *Friends of Bryan*, 741 F.Supp. 807, 814 (D. Nev. 1990)). Rimini points to interactions that Oracle employees had with Rimini clients as evidence of Oracle's intent to disrupt Rimini's contracts. Generally speaking, the Oracle employees would tout the alleged superiority of Oracle's support services, direct the client to recently issued decisions adverse to Rimini by this Court and the Ninth Circuit, claim that Rimini's support offerings were too high risk, and/or threaten the client with legal action or audits. ECF Nos. 995, 1004-s at 12–14. For instance, the Loftus report states that Oracle representatives made "false and misleading" statements to Philips executives that caused Philips to "reconsider its contractual and business relationship with Rimini." ECF No. 1076-1-s at 77. However, and most significantly, Philips continued in its contract with Rimini and the contract was never breached. *Id.* at 80. And with regard to the St. Francis contract, St. Francis switched from Oracle to Rimini

for a defined project from September 2015 to March 2016. ECF No. 1076-1-s at 70-73. After the project was completed, St. Francis lawfully ended the contract and returned to Oracle. Although Rimini's contract was not renewed, the existing Rimini contract was never breached. *Id.*

These interactions support an inference that Oracle intended to cause its licensees to not go to Rimini or to leave Rimini when trial periods and other contract periods were over and return to Oracle. Internal Oracle documents support this view, as Rimini has presented several self-described "saves" and "winbacks," wherein Oracle employees recount to their fellow employees how they successfully persuaded Rimini clients to return to or stay with Oracle for software support. ECF Nos. 995, 1004-s at 18, 20. But Rimini has not presented any evidence that Oracle intended for Rimini's clients to breach their existing contracts with Rimini as a result of Oracle's actions. Oracle's alleged actions were always directed toward the retention or creation of future contracts as opposed to a disruption of an existing Rimini contract. Without at least some evidence that Oracle's intentional acts were specifically designed (at least in part) to induce a contractual breach, Rimini cannot survive summary judgment on this claim. *J.J. Indus., LLC*, 71 P.3d at 1268; *Friends of Bryan*, 741 F.Supp. at 814-15; *Gonzales v. Shotgun Nev. Invs., LLC*, Case No. 2:13-cv-00931-RCJ-VPC, 2013 WL 3944140, at *2-3 (D. Nev. July 30, 2013).

Rimini broadly points to an expert report from Dr. Russell Winer, a professor of marketing at New York University, as evidence that "Oracle's false statements about Rimini influenced customer purchasing decisions." ECF Nos. 995, 1004-s at 20. But the paragraph in the report to which Rimini cites only relates that "when prospective Rimini customers are exposed to Oracle's alleged mischaracterizations and misstatements," those customers are less likely to switch from Oracle to Rimini for support services. ECF No. 1083-4-s at 28. Not only is this citation irrelevant because there must, at some point, be a valid and existing contract between the plaintiff and a third party for a claim of tortious interference in contractual relations (not merely a possible or speculative one), but it does not identify any specific contractual relationships that were supposedly interfered with. Even assuming that Winer's report is correct in asserting that Oracle's statements did dissuade potential or prospective entities from contracting with Rimini, any such

damages that Rimini has alleged to have incurred are not recoverable through an action for intentional interference with contractual relations.

The fifth essential element to a claim for intentional interference with contractual relations requires resulting damage arising from the actual disruption of the contract. *See Financial American Group, LLC v. CH Montrose, LLC*, 373 P.3d 913, 2011 WL 6916454 (Nev. 2011) (unpublished). Obviously, there can be no compensable damage when there has been no breach of a contract and the contract reached its natural termination. Rimini's action for intentional interference with contractual relations lacks at least two essential elements and cannot be sustained.

The Court will therefore grant Oracle summary judgment on Rimini's fourth claim for intentional interference with contractual relations on Rimini's two remaining theories of liability.

2.   The Court grants Oracle's motion on Rimini's sixth cause of action, Nevada Deceptive Trade Practices Act.

Next, Oracle argues that Rimini's claims under the Nevada Deceptive Trade Practices Act ("NDTPA") should be dismissed for three independent reasons: (1) the act does not apply extraterritorially; (2) none of the alleged misrepresentations are actionable; and (3) Rimini cannot satisfy all the elements of the claim. ECF Nos. 916, 936-s at 30. To prove a private claim under the NDTPA, Rimini must demonstrate that "(1) an act of consumer fraud by [Oracle] (2) caused (3) damage to [Rimini]." *Picus v. Wal-Mart Stores, Inc.*, 256 F.R.D. 651, 658 (D. Nev. 2009). Actionable consumer fraud is defined by statute in N.R.S. §§ 598.0915 to 598.0925. Relevant here is § 598.0915(8), which states that "[a] person engages in a 'deceptive trade practice' if, in the course of his or her business or occupation, he or she disparages the goods, services or business of another person by making false or misleading representations of fact."

Oracle's first argument concerns the scope of the NDPTA. It argues that because it (as a California-based corporation) made all the alleged misrepresentations outside Nevada to entities also located outside Nevada, Rimini cannot use a Nevada law to hold it liable for those alleged misrepresentations. ECF Nos. 916, 936-s at 30–31. It asserts that any misrepresentation must be physically made in Nevada to entities residing in Nevada. *Id.* at 31. Conversely, Rimini argues that

1  because it, a Nevada corporation, was the intended target of the misrepresentations (i.e. Oracle

2  made them to third parties with the intent to harm Rimini), it is not attempting to apply the NDPTA

3  extraterritorially. ECF Nos. 995, 1004-s at 32.

4  　　　　There appears to be no case law from the Nevada Supreme Court about the reach of the

5  NDPTA. There is, however, a general presumption against the extraterritoriality of a state's statute.

6  *Risinger v. SOC LLC*, 936 F.Supp.2d 1235, 1250 (D. Nev. 2013); *see also E.E.O.C. v. Arabian*

7  *Am. Oil Co.*, 499 U.S. 244, 248 (1991) (recognizing the presumption as it relates to federal law

8  applying outside of U.S. jurisdiction). One of the primary principals behind this rule, as Rimini

9  recognizes, is to avoid conflicts of laws with other states. Hannah L. Buxbaum, *Determining the*

10  *Territorial Scope of State Law in Interstate and International Conflicts: Comments on the Draft*

11  *Restatement (Third) and on the Role of Party Autonomy*, 27 DUKE J. COMP. & INT'L L. 381, 391

12  (2017). As the Kentucky Supreme Court once accurately explained, "[i]mposing the policy choice

13  by [Kentucky] on the employment practices of our sister states should be done with great prudence

14  and caution out of respect for the sovereignty of other states, and to avoid running afoul of the

15  Commerce Clause of the United States Constitution." *Union Underwear Co., Inc. v. Barnhart*, 50

16  S.W.3d 188, 193 (Ky. 2001). The concern here is imposing liability on Oracle under a Nevada

17  statute where virtually all of the alleged misconduct occurred in California and other states.

18  　　　　As before, absent guidance from Nevada Supreme Court, it is up to this Court to predict

19  how the state supreme court would rule on an issue. *Soltani v. Western & Southern Life Ins. Co.*,

20  258 F.3d 1038, 1045–46 (9th Cir. 2001). Federal courts can look to intermediate appellate court

21  decisions, statutes, and "well-reasoned decisions" from other jurisdictions for guidance. *Takahashi*

22  *v. Looms Armored Car Service*, 625 F.2d 314, 316 (9th Cir. 1980); *Gravquick A/S v. Trimble*

23  *Navigation Int'l Ltd.*, 323 F.3d 1219, 1222 (9th Cir. 2003). Given the general presumption against

24  applying statutes extraterritorially, it is likely that the Nevada Supreme Court would find that

25  actionable conduct must occur within Nevada's borders. As such, Rimini cannot maintain a cause

26  of action under the NDTPA when the challenged conduct occurred outside of Nevada; it is more

27  appropriate to bring a claim under the applicable statute of the state where the conduct is alleged

28

1    to have occurred. Because the Court grants Oracle summary judgment on this claim based on

2    extraterritoriality, the Court declines to address Oracle's additional arguments.

3           3.   The Court grants in part and denies in part summary judgment on Rimini's eighth
            cause of action for violations of the California Business and Professions Code
4            § 17200 et seq.

5         Oracle lastly seeks summary judgment on Rimini's eighth cause of action, unfair

6    competition under California's Business and Professions Code §17200 et seq. ("UCL"),

7    (equivalent to the NDTPA). ECF Nos. 916, 936-s at 33-34. Like Nevada's unfair competition law,

8    the UCL prohibits any unfair competition, which it defines as "any unlawful, unfair, or fraudulent

9    business act or practice." CAL. BUS. & PROF. CODE § 17200. Plaintiffs who prevail on an UCL

10   claim are generally limited to injunctive relief and restitution, never damages or attorneys' fees.

11   *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*, 973 P.2d 527, 539 (Cal.

12   1999). Section 17203 provides that restitution is an available remedy under the UCL to "restore

13   to any person in interest any money or property, real or personal, which may have been acquired

14   by means of" unfair competition. Oracle argues that Rimini's claim for restitution must fail as a

15   matter of law because Rimini has not presented any evidence that Oracle took and now holds funds

16   from Rimini that Oracle obtained through unfair business practices. ECF Nos. 916, 936-s at 34.

17        Rimini has not presented any evidence showing what money or property Oracle has

18   improperly obtained through a violation of the UCL. Rimini may only recover money in which it

19   held "a vested interest." *Tomlinson v. Indymac Bank, F.S.B.*, 359 F.Supp.2d 891, 893 (C.D. Cal.

20   2005) (quoting *Korea Supply Co. v. Lockheed Martin Corp.*, 63 P.3d 937, 947–48 (Cal. 2003)).

21   To successfully rebut Oracle's motion for summary judgment, Rimini must present some evidence

22   that it had a vested interest in money that Oracle obtained as a result of alleged unlawful business

23   practices. Rimini merely states that it "had a vested interest in the money owed to it by clients that

24   terminated their contracts," but it does not explain how it had a vested interest in the money or

25   which clients terminated their contracts because of Oracle's alleged unlawful UCL conduct. ECF

26   Nos. 995, 1004-s at 36. The reality is that Rimini's claim here is for damages, not restitution, and

27   damages are not available under the UCL. On the other hand, Oracle has not discussed why it

28   should be granted summary judgment on the injunctive relief Rimini has also requested under the

1   UCL. ECF No. 487 at 50. The Court will accordingly grant Oracle summary judgment on Rimini's

2   UCL claim insofar as it seeks restitution and damages, but summary judgment will be denied as to

3   the injunctive relief.

4   **E.  Oracle's motion for partial summary judgement regarding Rimini's migration and
        Windstream hosting (ECF Nos. 930, 941-s) is denied in part and granted in part.**

5

6   Oracle's fifth and final motion for summary judgment requests judgment on its first claim

7   for copyright infringement based on Rimini's migration, Windstream hosting, and its second

8   affirmative defense of express license related to those processes. ECF Nos. 930, 941-s. Oracle

9   argues that the process by which Rimini returned its customers' PeopleSoft environments to them

10  (and later hosted some of those environments on Windstream's servers) constituted unlicensed

11  copying of Oracle's PeopleSoft software. *Id.* at 6–7. In response, Rimini argues that because

12  Oracle failed to address its affirmative defense of fair use, Oracle's motion for partial summary

13  judgment should be denied outright. ECF Nos. 979, 986-s at 24.

14  Where the party moving for summary judgment bears the burden of proof at trial, that party

15  "has the initial burden of establishing the absence of a genuine issue of fact on each issue material

16  to its case." *C.A.R. Transp. Brokerage Co., Inc. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir.

17  2000). But where the moving party does not bear the burden of proof at trial, the party must either

18  produce evidence negating an essential element of the nonmoving party's defense or show that the

19  nonmoving party does not have enough evidence of an essential element to carry its ultimate

20  burden of persuasion at trial. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d

21  1099, 1102 (9th Cir. 2000). Because fair use is an affirmative defense, Rimini bears the burden of

22  proof at trial.

23  Rimini has asserted the affirmative defense of fair use in response to Oracle's numerous

24  allegations of copyright infringement. Although Oracle argues in its reply that Rimini never

25  asserted a fair use defense regarding its migration or Windstream hosting, this argument is belied

26  by a plain reading of Rimini's answer to Oracle's third amended complaint. Under the section

27  setting forth its fair use defense, Rimini states that "any reproduction, display, derivation,

28  publication, or distribution of any valid Oracle copyright by [Rimini] is fair use protected by the

74

provisions of 17 U.S.C. § 107." ECF Nos. 410, 414-s at 31. This clearly encompasses Oracle's allegations that Rimini's migration process and subsequent Windstream hosting constituted impermissible copying of PeopleSoft software. Rimini even specifically addresses its migration process under its fair use defense argument. *See Id.* at 33. Oracle cannot now claim that it was unaware that Rimini would be asserting a fair use defense when its answer clearly indicated that it would.

While Rimini has the burden of proving every element of its fair use defense at trial, in a motion for summary judgement, Oracle has the burden of showing that no evidence supports Rimini's defense or that there is evidence that negates one of the elements of that defense. By not addressing Rimini's fair use defense at all, Oracle has failed to carry its burden. And although Oracle addresses the fair use defense in its reply, raising issues for the first time in a reply brief in support of summary judgment is improper. *See, e.g.*, *Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999) ("an argument raised for the first time in a reply brief, . . . is not an argument that we may consider here."). Therefore, because an outstanding defense exists, the court cannot grant Oracle summary judgment on its copyright infringement claim. Accordingly, the Court denies in part Oracle's fifth motion for partial summary judgment.[20]

### F. The Court denies Rimini's first motion for partial summary judgment for preclusion of Oracle's gap customer claims.[21]

Rimini's first motion for partial summary judgment seeks to preclude Oracle from seeking damages in this action for so-called "gap customers": clients Rimini gained from December 5, 2011 (the close of fact discovery in *Oracle I*) to February 13, 2014 (the end of the *Oracle I* damages period). ECF Nos. 910, 913-s at 8. Rimini argues that claim preclusion and judicial estoppel preclude Oracle from seeking pre-February 2014 damages, or alternatively, that if Oracle is permitted to proceed with its damages claims, issue preclusion bars Oracle from recovering lost

---

[20] The Court's reasoning for granting Oracle's motion regarding Rimini's express license defense is discussed below as it is interrelated with Rimini's second motion for partial summary judgment on undisputed processes. *See* Part IV.G.3.

[21] Rimini's motion is entitled Motion for Partial Summary Judgement Re: Preclusion of Oracle's Already Adjudicated Claims. For clarity, the Court refers to this motion as entitled here.

profits. *See id.* Oracle opposed Rimini's motion arguing that the law of the case precludes Rimini's motion and that claim preclusion, judicial estoppel, and issue preclusion are all inapplicable. ECF Nos. 983, 1038-s. Accordingly, Rimini replied. ECF Nos. 1152, 1155-s.

Fact discovery for *Oracle I* closed in December 2011. In January 2012, Oracle served its expert report on the issue of damages seeking lost profits for customers gained by Rimini as of September 28, 2011, the date of Rimini's last disclosed customer list prior to the close of discovery. Oracle's expert damages report calculated damages for these identified customers 'through the end of trial' which was presumed in the report to be December 2012. On February 13, 2014, the Court issued a summary judgment order in *Oracle I* finding that, *inter alia*, Rimini infringed on a number of Oracle's copyrights through its "local hosting" support process. *See Oracle USA*, 6 F.Supp.3d 1086 (D. Nev. 2014). Following the Court's order, Rimini alleges that by July 31, 2014, it had changed its support practices to no longer infringe Oracle's copyrights (i.e. Process 2.0).

Pursuant to court order, the parties were then ordered to submit a proposed joint pre-trial order. *Oracle I*, ECF No. 476. However, because the parties had a "fundamental disagreement over the scope of the issues to be decided and the evidence to be presented" in the *Oracle I* trial, the parties requested a case management conference. *Oracle I*, ECF No. 488 at 1. Oracle argued that the *Oracle I* trial should be limited to Rimini's "old support model" rather than the new support model Rimini adopted in 2014, and agreed that it would not seek damages for the period after February 13, 2014. *Id.* at 8.[22]   At this hearing held on October 9, 2014, the Court agreed with Oracle and declined to reopen discovery, held Oracle to its offer to stipulate that it would not seek damages for any period after the February 2014 summary judgment order, and found that the case would "remain as it was put in at the close of discovery." *Oracle I*, ECF No. 508 at 25-26; *Oracle I*, ECF No. 515.[23]

///

---

[22] Following the Court's February 2014 Order and in response to Oracle's supplemental discovery requests, Rimini produced discovery and made its "development lead" available for a Rule 30(b)(6) deposition regarding "the technical details of Rimini's remote service model." *Oracle I*, ECF No. 488 at 20.

[23] During the hearing, the parties did not specifically discuss these gap customers as issue in this motion. *See Oracle I.* ECF No. 508.

Rimini provided Oracle with supplemental discovery including "client lists and financials through early 2014." *Oracle I*, ECF No. 554 at 2. Because Oracle failed to supplement its damages report to include post-December 2011 clients, in May of 2015, Rimini moved to preclude Oracle from supplementing its expert report to include either damages for customers Rimini gained after September 28, 2011 (i.e. "gap customers"), and updated damages for customers Rimini gained before September 28, 2011. *Oracle I*, ECF No. 593 at 6. Oracle responded arguing that the *Oracle I* trial should proceed in accordance with Magistrate Judge Lean's Order (*Oracle I*, ECF No. 515), and should allow for updated damages for Rimini customers as of September 28, 2011 through February 2014, while precluding damages arising from conduct after the close of discovery, including customers Oracle lost to Rimini after September 28, 2011. *Oracle I*, ECF No. 593 at 6. While noting that Oracle's request to supplement its report was "technically late," the Court allowed it for those customers that were currently set forth in the prior report, to account for the nearly two and a half years of continued litigation between the parties, as doing so would not prejudice defendants. *Oracle I*, ECF No. 669 at 4.[24] In denying Rimini's motion, the Court's order made no further reference to the "gap customers." *See id.*  Accordingly, Oracle served its updated expert damages report on July 30, 2015, and the parties joint pretrial order listed only Rimini customers with start dates on or before September 28, 2011. ECF Nos. 910, 913-s at 14; ECF No. 983, 1038-s at 15 (citing *Oracle I*, ECF No. 528-s at 9-18).  After a lengthy trial, the jury determined that Rimini had engaged in copyright infringement and found that the best measure of Oracle's actual damages for all acts of copyright infringement was fair market value license. *Oracle I*, ECF No. 896 at 1-3.

Having reviewed this procedural history, the Court finds that it did not rule that Oracle *could not* seek damages from gap customers in the first case. *Oracle I*, ECF No. 669. On the contrary, it was Oracle that decided not to pursue damages arising from the gap customers who arose during the pendency of Oracle's first lawsuit. Fact discovery concerning the gap customers would have required a re-opening of discovery and further delay of a complex case that was already

---

[24] In the alternative, Rimini argued that if the Court did not preclude supplementation, the two actions should be consolidated. The Court disagreed, finding that consolidation would lead to an unreasonable delay of trial. *Oracle I*, ECF No. 669 at 5.

going on over 5 years old. Oracle's position there was that the instant case had now been filed and it would have the opportunity to seek damages arising from gap customers in the new action. Accordingly, the Court finds that Oracle's law of the case argument (*see* ECF Nos. 983, 1038-s at 19–20) lacks merit and that Rimini's arguments of preclusion and estoppel must be addressed.

### 1.   Claim Preclusion

"Claim preclusion prevents the relitigation of claims previously tried and decided." *Littlejohn v. U.S.*, 321 F.3d 915, 919–20 (9th Cir. 2003) (citing *Clark v. Bear Stearns & Co.*, 966 F.2d 1318, 1320 (9th Cir. 1992)). The three elements of a successful claim preclusion defense are: (1) "identity of claims, (2) a final judgment on the merits, and (3) privity between parties." *Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 322 F.3d 1064, 1077 (9th Cir. 2003) (internal quotation marks and citation omitted). As discussed previously, a recent Ninth Circuit case, *Howard v. City of Coos Bay*, 871 F.3d 1032, 1040 (9th Cir. 2017), established a bright line rule prohibiting the application of the doctrine of claim preclusion to "claims that accrue after the filing of the operative complaint." The term "accrue" from *Howard*, has since been determined to mean "come into existence" or "arise." *Media Rights Technologies, Inc. v. Microsoft Corp.*, 922 F.3d 1014, 1021 (9th Cir. 2019) ("*Microsoft*"). In other words, "claim preclusion does not apply to claims that were not in existence and could not have been sued upon—i.e., were not legally cognizable—when the allegedly preclusive action was initiated." *Id.*

Here, like above, the Court's analysis is straightforward: Oracle's claims regarding gap customers are not precluded because they did not arise until after September 28, 2011, which is after the operative complaint was filed in *Oracle I* on June 1, 2011 (*see Oracle I*, ECF No. 146). *See Microsoft Corp.*, 922 F.3d at 1024 ("Because those claims arose after [the plaintiff] filed the operative complaint in *MRT I* and [the plaintiff] could not have sued on them when it filed *MRT I*, they are not precluded here.").

Rimini directs the Court to a recent unpublished decision by the Ninth Circuit, *Yagman v. Garcetti*, 743 Fed. App'x. 837 (9th Cir. Aug. 8, 2018), arguing that *Howard* does not apply to cases where a defendant is alleged to have engaged in a continuous pattern of unlawful conduct. ECF Nos. 1152, 1155-s at 13. In *Yagman*, the Ninth Circuit noted that *Howard* does not always

allow for a plaintiff to assert claims that accrue after the filing of the operative complaint in a successive lawsuit. 743 Fed. App'x. at 839–40. When a plaintiff challenges "the same ongoing procedure or policy and the new factual event is alleged 'only as an example of…[a] long-standing practice of non-compliance with [the law],' " a plaintiff cannot assert that new factual event in a subsequent case. *Id.* at 840 (quoting *Turtle Island Restoration Network v. U.S. Dep't of State*, 673 F.3d 914, 918 (9th Cir. 2012)). In *Yagman*, the plaintiff challenged the constitutionality of the procedure to contest parking tickets in his city. 743 Fed. App'x. at 838. This was his third lawsuit challenging the same procedure; relevant here, the plaintiff based the third lawsuit on a new parking ticket he received while his second case was pending. The Ninth Circuit held that despite the basis of his third lawsuit accruing during the pendency of his second lawsuit, the plaintiff was still barred from reasserting claims based on his new parking ticket. *Id.* at 840.

The difference between *Yagman* and this case is that the *Yagman* plaintiff's successive claims complained of the same conduct involving the same actors. Oracle, on the other hand, seeks damages stemming from Rimini for gap customers that Rimini contracted with from September 28, 2011. While the conduct Oracle complains of (Process 1.0) is the same, the third parties (the gap customers) are different. This distinction is key and takes Oracle's gap customers claims out of the realm of the impermissible successive claims the Ninth Circuit spoke of in *Yagman*. Therefore, the doctrine of claim preclusion does not bar Oracle from asserting claims based on Rimini's gap customers.

2.   Judicial Estoppel

Judicial estoppel is an equitable doctrine that "precludes a party from gaining an advantage by asserting one position, and then later seeking a second advantage by taking" a clearly inconsistent position. *Rissetto v. Plumbers & Steamfitters Local 343*, 94 F.3d 597, 600-601 (9th Cir. 1996); *Russell v. Rolfs*, 893 F.2d 1033, 1037 (9th Cir. 1990). This court invokes judicial estoppel not only to prevent a party from gaining an advantage by taking inconsistent positions, but also because of "general consideration[s] of the orderly administration of justice and regard for the dignity of judicial proceedings," and to "to protect against a litigant playing fast and loose with the courts." *Russell*, 893 F.2d at 1037 (internal quotation marks and citations omitted).

The United States Supreme Court has noted that when a court is considering judicial estoppel, one of the considerations is that a "party's later position must be 'clearly inconsistent' with its earlier position." *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001). Here, Rimini claims that Oracle is judicially estopped because in *Oracle I*, it "successfully persuaded this Court to draw a clear line between the two cases and two processes," and adjudicate all issues related to Process 1.0 in *Oracle I* while leaving issues involving Process 2.0 for this action. But that is not what Oracle previously argued. Rather, as articulated in the procedural history above, Oracle only argued that it wished to keep the legality of Rimini's new process (Process 2.0) the subject of this action rather than litigate everything together in *Oracle I*. It did not take the position that any issue related to the old process should only be litigated in *Oracle I*. Accordingly, Rimini's judicial estoppel argument fails.

### 3.   Issue Preclusion

As an alternative argument, Rimini asserts that the doctrine of issue preclusion prevents Oracle from recovering lost profits damages from any gap customers in this case, meaning that Oracle would only be able to seek fair market value license damages because in *Oracle I* the jury determined that fair market value license damages for infringement under Process 1.0 was the appropriate remedy. ECF Nos. 910, 913-s at 29-30; *Oracle I*, ECF No. 896 at 3.

The doctrine of issue preclusion (or collateral estoppel) "bars successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment, even if the issue recurs in the context of a different claim." *Howard*, 871 F.3d at 1040-41 (internal quotation marks and citations omitted). The elements for issue preclusion are similar to claim preclusion (though not identical), and require the party asserting issue preclusion demonstrate: "(1) the issue at stake was identical in both proceedings; (2) the issue was actually litigated and decided in the prior proceedings; (3) there was a full and fair opportunity to litigate the issue; and (4) the issue was necessary to decide the merits." *Oyeniran v. Holder*, 672 F.3d 800, 806 (9th Cir. 2012). Though not applied "mechanistically," the Court applies four factors to determine if the issues are "identical": (1) whether "there is a substantial overlap between the evidence or argument to be advanced in the second proceeding" as was in the first; (2) whether the

"new evidence or argument involve[s] the application of the same rule of law" as in the first proceeding; (3) if pretrial preparation and discovery in the first action could be "reasonably expected to have embraced" the issue in the second action; and (4) whether the claims in the two proceedings are closely related. *Howard*, 871 F.3d at 1041 (citing *Resolution Trust Corp. v. Keating*, 186 F.3d 1110, 1116 (9th Cir. 1999)).

Rimini argues that the issue in *Oracle I* and before this Court now are identical: whether a fair market value license or lost profits is the best measure of Oracle's damages for Process 1.0 infringement.  The Court disagrees. The evidence that will be presented in this case will be distinct from that presented in *Oracle I* as the customers are different, and the time frame of the alleged infringement is different. As the Court found above, the application of the evidence will involve the same rule of law, namely that Rimini cannot avoid liability or contest liability for local hosting conduct which was found to be infringing in *Oracle I*. However, whether Oracle is entitled to lost profits or fair market value license damages is a distinct question related to the specific at issue gap customers and to be decided by the jury. While a reasonable jury in *Oracle I* concluded that fair market value license damages was proper as it related to the 228 customers at issue there, a reasonable jury could find that as it relates to these distinct gap customers lost profits is proper. As discussed, while Rimini disclosed supplemental discovery following the Court's February 2014 summary judgment Order, the Court ruled that to litigate damages issues for customers not disclosed in the September 28, 2011 expert report or to consolidate the cases would require re-opening of and extensive additional discovery which would cause impermissible delay to the *Oracle I* trial. Accordingly, the Court does not find that the pretrial preparation and discovery in *Oracle I* "embraced" the issue of damages for gap customers. Furthermore, the issue of damages as it relates to gap customers was not litigated and never resulted in a decision on the merits in *Oracle I*. Therefore, the Court denies Rimini's motion for partial summary judgment and will permit Oracle to argue for either lost profits or fair market value license damages related to these gap customers at trial in this case.

///

///

**G. The Court denies Rimini's second motion for summary judgment regarding its undisputed processes (ECF Nos. 917, 927-s).[25]**

Rimini's second motion for summary judgment seeks partial judgment on Oracle's first cause of action for copyright infringement. Specifically, Rimini seeks judgment on four issues: (1) its work product which does not contain any Oracle code are not derivative works; (2) it is not "cross use" when a Rimini employee services more than one client by utilizing the experience he or she gained from working with other clients; (3) Oracle licensees who host their Oracle software on off-site cloud servers do not violate the facilities restriction provision within the PeopleSoft licenses, and (4) Rimini's process of migrating its clients' software off its computer systems does not infringe any of Oracle's copyrights. As before, the Court will examine each of the arguments in turn.

1. <u>The Court denies Rimini's motion regarding work product as derivative works.</u>

Rimini first argues that files it creates from scratch which do not contain any Oracle code or expression cannot infringe Oracle's copyrights because those files are not derivative works. ECF Nos. 917, 927-s at 21. Rimini requests summary judgment generally that any such file does not constitute copyright infringement. It also requests summary judgment that three specific categories of files—ePack scripts, Rimini-created scripts, and its "functional and technical specifications"—are not derivative works. *Id.* In response, Oracle argues that Rimini's motion is "impermissively vague" because it identifies categories of files rather than specific files. ECF Nos. 1053, 1085-s at 16. As to the merits of Rimini's motion, Oracle argues that even if Rimini-created files do not have any Oracle code within them, they still can be derivative works if they are "[e]xpansions to existing software." *Id.* at 18.

Rimini points to three categories of files it claims do not contain any Oracle-protected expression: (1) the "ePack script," (2) Rimini-created scripts, and (3) Rimini's "functional and technical specifications." ECF Nos. 917, 927-s at 21. According to Rimini, the ePack script is essentially a separate executable file that Rimini provides its customers along with an update. *Id.*

---

[25] Rimini's initial unredacted motion (ECF No. 917) contained contents that should have been redacted. To protect the confidential information contained therein, this filing was sealed, and Rimini refiled the redacted motion as ECF No. 965. ECF No. 927-s is the unredacted sealed version of the motion.

at 22. Once a customer receives the update and ePack script, the customer runs the script, which installs the update automatically. *Id.* The ePack script automates the update installation process that the client would otherwise have to perform manually, which, in Rimini's experience, could be cumbersome for some clients. *Id.*

Oracle's expert Barbara Frederiksen-Cross testified in her deposition that as to the text script of ePack "as it might be stored on disc" it was not her opinion that the script contained Oracle expression, but testified that as to the "running software" that would be her opinion. ECF No. 929-1-s at 8-9. Rimini's computer software expert, Owen Astrachan, stated that:

> [ePack] script was written by Rimini and does not include any Oracle code or expression.  When run by a client (in the client's production environment), the script automatically carries out the tasks that the client would have otherwise had to carry out (prior to ePack), including moving files to the appropriate runtime folders, running scripts associated with individual updates, compiling code, and other tasks. ePack merely makes it easier for the client to install the updates and reduces the possibility of errors during the installation process.

ECF No. 931-9-s at 47. In other words, "ePack packages Rimini's individually coded updates for a particular client, which are already on that clients' system, into an easily installable package that is also on the client's system." *Id.* at 48.

As the Court noted above, even if the software does not contain any copyrighted code, it may still substantially incorporate protected material from the preexisting work. *See* Part IV.C.2.i. Frederiksen-Cross has opined that ePack "relies heavily" and "cannot function" without Oracle's EBS tools and other Oracle software, and that ePack "actually incorporates Oracle software and Oracle functionality when they're run." ECF No. 929-1-s at 3. Because of the way ePack interacts with Oracle's software, Frederiksen-Cross testified that ePack is not an "independent work, but rather an extension of the Oracle environment in which it's run." *Id.* at 4. Given the conflicting opinions of the parties' experts, the Court finds that there is an issue of material fact as to whether Rimini's ePack scripts substantially incorporate protected material from the preexisting work. Accordingly, Rimini's motion for summary judgment on this issue is denied.

As to the other two categories of Rimini files, the Court agrees with Oracle that these two categories of files are too broad for the Court to rule on. To support a motion for partial summary judgment, Rimini must sufficiently identify which portion of Oracle's claim for copyright

infringement on which it seeks judgment. *See* FED. R. CIV. P. 56(a). Merely requesting judgment on all "Rimini-created scripts" and "functional and technical specifications" without identifying which scripts and specifications (along with proffering evidence demonstrating how none of them contain any protected Oracle expression) does not allow the Court to determine whether Rimini may qualify for summary judgment in its favor. Therefore, summary judgment is denied as to these other two categories of files.

### 2.   The Court denies Rimini's motion regarding know-how as cross-use.

Rimini next requests partial summary judgment on any claim that an engineer's use of "know-how" constitutes cross use. This essentially entails a Rimini engineer gaining experience performing work for one client and then reusing the knowledge he or she gained to perform the same work for other clients. ECF Nos. 917, 927-s at 25. As discussed below, Rimini asserts several different legal theories as to why it is entitled to partial judgment.

#### i.   *Express License Defense*

Rimini first argues that the licenses of each of its clients allows it to, in effect, create an update for Client A using Client A's development environment and then distribute the exact same update file to Client B under Client B's license. ECF Nos. 917, 927-s at 26. According to Rimini, this is because Clients A and B both have the same license for the same software, so they are both licensed to receive the update file regardless of where it originated. *Id.* As discussed above, it is the burden of the party asserting the express license defense to identify which provisions of the license allow for its conduct. *Oracle USA*, 6 F.Supp.3d at 1093.

Rimini and Oracle dispute the Court's and the Ninth Circuit's previous holdings regarding cross use. Rimini asserts that in *Oracle USA*, this Court held that "once Oracle granted a licensee the right to copy Oracle expression, that license right applied regardless of the source of the copies." ECF Nos. 917, 927-s at 27. But Rimini takes the Court's holding out of context. In that instance, Oracle had argued that it was copyright infringement for Rimini to install its customers' licensed software on Rimini's computer systems with anything other than the physical installation media (i.e. the DVDs or flash media the software was distributed on) that Oracle gave to its licensees. *Oracle USA*, 6 F.Supp.3d at 1095. The Court rejected this argument, instead holding

that Rimini did not violate Oracle's software license because software installation media is not protected under federal copyright law; instead, the Court articulated that the ownership of a copyright is separate and independent from ownership of the material object in which it is embodied. *Id.* This holding has nothing to do with whether Rimini committed copyright infringement by using one client's software to create an update that would then be distributed to other clients.

The flaw in Rimini's argument is that even assuming that an Oracle licensee may receive an update file Rimini created using another licensee's software without violating the licensing agreement, Rimini itself is not insulated from a claim of copyright infringement. As the Court has noted throughout this order and as the Ninth Circuit held, for Oracle to prove copyright infringement based on the cross use theory, it must show that the work Rimini completed for one client was done to support other clients. *Rimini I*, 879 F.3d at 956. Whether Client B is licensed to receive the same update file as Client A is simply not relevant to whether Rimini committed copyright infringement by using one customer's license to create updates for another. Furthermore, Rimini has failed its burden of identifying any provision within the applicable software license that allows for it to engage in the conduct which Oracle has alleged is unlawful. Summary judgment is therefore denied on this basis.

### ii.   *"Benefit"*

Rimini's next theory is that the Court should grant it summary judgment on any Oracle infringement claims premised on J.D. Edwards and EBS clients because Rimini's support for those products are "premised exclusively on Rimini's reuse of know-how." ECF Nos. 917, 927-s at 28. This dispute centers on Oracle's accusation (bolstered by the expert report of Frederiksen-Cross and accepted by Rimini as true for the purpose of the motion) that when Rimini begins development of a new patch or update, it uses the first client's software as a "prototype" to "test" various features of the update. *Id.* at 29. Even if Rimini does not use any protected Oracle code to create new updates or copy one client's files for another client's use, Oracle argues that "the use of an Oracle software environment associated with one customer to prototype and test an update for many customers" violates the licensing agreement. ECF Nos. 1053, 1085-s at 25. Specifically,

Oracle points to the licensing agreement provisions that require the software to be used "solely" for that customer's "internal business use." *Id.* Rimini also points to the "internal business operations" provision, but argues that this provision supports its argument that its engineers can reuse knowledge gained from working on an update from client to client. ECF Nos. 917, 927-s at 29-30. Rimini argues that this provision is only intended to prohibit the licensee from performing "PeopleSoft services for others and thereby prevent Oracle from selling more PeopleSoft software." *Id.* at 30 (quoting ECF No. 925-28 at 10).

After Rimini identifies a provision within the software license that it claims allows for its conduct, Oracle may overcome the defense by showing that Rimini's conduct exceeded the scope of that provision. *Oracle USA*, 6 F.Supp.3d at 1093. As discussed above, the Court again construes the scope of a license by utilizing the rules of contract interpretation. *Supra* Part IV.C.1.ii.

The Court finds the "internal business operations" provision to be unambiguous: the plain language of the contract indicates that the licensee can only use Oracle software to support its own business operations, such as managing payroll or storing personnel information. The licensee (or Rimini acting in its stead) cannot use the software to manage another company's payroll, for instance, even if that other company has a valid license for the same software. Testimony from the *Oracle I* trial to which Rimini cites supports this interpretation—Richard Allison, the senior executive in charge of licensing, testified that it was "generally the intent" of the "internal business operations" provision to stop licensees from using their Oracle software "to perform services for others [non-licensees] and thereby prevent Oracle from selling more copies of its PeopleSoft software." ECF No. 925-28 at 10. As the Court found above, along with a prohibition on performing business services for third parties, the licensee (or Rimini) cannot use Oracle software to develop an update for the software that it then distributes to another Oracle licensee.

The Ninth Circuit defined cross use "generally" as "the creation of development environments, under color of a license of one customer, to support *other* customers." *Rimini I*, 879 F.3d at 956 (emphasis in original). The core of this definition is the phrase "creation of development environments," meaning that cross-use must entail the use of one customer's software to directly support another customer, whether the use of that software entails the creation

of a development environment or an update that is then distributed to other customers. As the Court found above in Part C, there are some limited cases where there can be no explanation other than cross use, such as where a client informs Rimini that it does not want a particular update, but Rimini continues to use that client's license to develop that update anyway. And then, after not developing the update in any other client's environment, Rimini distributes that update to other customers. This limited circumstance aside, it is generally not cross use for a Rimini engineer to create an update file for Client A exclusively using Client A's software and then create the same update file for Client B exclusively using Client B's software. Nor is it cross use for a Rimini engineer to "memorize and replicate the work" as Oracle claims. ECF Nos. 1053, 1085-s at 26. The fact that a Rimini software engineer can create the update for Client B more efficiently because he or she gained experience creating the update for Client A is not relevant in this analysis. It is obvious that the first time a software engineer creates an update for a client, he or she is slower and less proficient than any subsequent time they create that update. Moreover, it would be impossible to direct an engineer, who developed an update in Client A's environment, to not use the knowledge he or she gained when developing the same or similar update for Client B.

Turning now to the evidence presented for EBS, Oracle cites to three forms of evidence to support its claim of EBS cross-use: the 30(b)(6) deposition of Rimini employee Craig Mackereth, several internal Rimini technical specification documents, and a declaration from Frederiksen-Cross. In the portions of Mackereth's deposition provided to the Court, he testified that the phrase "prototype" within the EBS product line "refers to the client with whom development starts first." ECF No. 1090-6-s at 13. But he also testified that the "prototype for that one client is not then used with another client." *Id.* If more than one customer needs the same tax or regulatory update (for example), a second developer "gains access to the second client's environment and starts development on that second client's environment." *Id.* The second developer refers to the "technical specification" to develop the update. *Id.* Mackereth testified that "no Oracle code" is copied from one client to another during this process, but some "pseudo code" created by Rimini may be. *Id.* at 14. Importantly, Mackereth also testified that "[c]ode doesn't need to be copied from one client environment to another client environment" and that it did not ever happen to his

knowledge. *Id.* In fact, it was against company policy to do so. *Id.* There is no indication from Mackereth's testimony that when servicing EBS clients, Rimini copied files created using one client's software over to another client.

Oracle also cites to several technical specifications which show that several clients received the same update, but these documents do not show whether the clients received updates that were created using another client's software license. In Frederiksen-Cross's declaration, however, she opines that Rimini has copied files "containing a substantial amount of Oracle copyrighted EBS code," which Rimini then uses to create updates for clients other than the source of the copied EBS code. ECF No. 1085-3-s at 40. Given the conflicting opinions of the parties' experts, the Court finds that there is an issue of material fact as to whether Rimini improperly copied EBS code.

As for J.D. Edwards, Oracle cites to the 30(b)(6) deposition of Rimini employee Michael Jacob and the same declaration by Frederiksen-Cross for the proposition that "Rimini copies [J.D. Edwards] updates from one environment to another." ECF Nos. 1053, 1085-s at 26. In his deposition, Jacob testified that Rimini developers used the Object Management Workbench ("OMW") to modify a customer's J.D. Edwards environment. ECF No. 1086-12-s at 7. Although recognizing that others may disagree with him, Jacob stated that when using the OMW, developers are modifying J.D. Edwards's source code. *Id.* But when asked about whether Rimini developers "copied and pasted" J.D. Edwards's updates from one client to another, Jacob testified that they did not. *Id.* at 9. Instead, the developers would "sit and type" and manually make the updates into every client's environment. *Id.* Like with Mackereth's testimony concerning EBS, Jacob's deposition does not demonstrate that Rimini developers copied code created in one client's J.D. Edwards environment to another. However, in contrast, Frederiksen-Cross opines in her declaration that Rimini developers "made copies of [J.D. Edwards] source code files and stored those files on Rimini hosted servers as part of its development practices." ECF No. 1085-3-s at 24. She then lists several examples of such files. *Id.* Again, given the conflicting opinions of the parties' experts, the Court finds that there is an issue of material fact as to whether Rimini improperly copied protected Oracle expression and then distributed that expression to multiple Rimini clients.

1

*iii. Contractual Violation*

2

As a final alternative argument, Rimini states that even if it is found to have violated the

3

internal business operations provision within the licensing agreements, such a violation is only a

4

breach of contract issue and not copyright infringement. ECF Nos. 917, 927-s at 34. Rimini first

5

raised this argument in its reply brief on appeal to the Ninth Circuit, but contrary to Oracle's

6

assertion that the Ninth Circuit "rejected" Rimini's argument, the Court declined to address it

7

because Rimini improperly raised it for the first time in its reply brief. *Rimini I*, 879 F.3d at 957.

8

This Court addressed this argument in full above in Part IV.C.1.iv, and finds that a violation

9

of the "internal data processing operations" provision is a copyright violation, not a contract

10

violation. As Rimini presents no evidence or argument in this motion that changes the Court's

11

above analysis, it sees no reason to further discuss the issue here.

12

Given that there are numerous issues of material fact pertaining to Rimini's motion

13

regarding "know-how as cross-use," the Court denies Rimini summary judgment.

14

3.   The Court denies Rimini's motion regarding cloud hosting.

15

Rimini next requests summary judgment on Oracle's argument that Rimini clients hosting

16

their PeopleSoft software on cloud servers violates the "facilities" limitation contained within

17

legacy PeopleSoft license agreements. ECF Nos. 917, 927-s at 35.[26] The "facilities" limitation is

18

restricted to just these legacy PeopleSoft licenses, as both newer PeopleSoft licenses and licenses

19

for other software do not contain the restrictive "facilities" language. Following the Court's ruling

20

that Rimini infringed Oracle's copyrights by hosting its clients' Oracle software on its own

21

computer systems, Rimini gave its clients two options—they could either host the software on

22

their own computer systems or on cloud servers. ECF Nos. 917, 927-s at 36. A number of clients

23

chose the cloud option and began to host their software on either Windstream (now known as

24

Tierpoint) or Amazon Web Services ("AWS"). *Id.* at 36–37. Rimini provided support to these

25

clients by using the client's credentials to remotely access the software. *Id.*

26

///

27
28

---

[26] Oracle's fifth motion for summary judgment requested the opposite relief. *See* ECF No. 930, 941-s. While the Court denies Oracle's motion because Rimini's fair use affirmative defense remains, additional arguments made in Oracle's motion are discussed here.

Rimini argues that this new process of clients hosting their software on cloud servers does not run afoul of the facilities restriction contained within the legacy PeopleSoft licenses. In *Oracle I*, the Court analyzed two PeopleSoft license agreements and found that under both licenses, it was a violation of the "facilities" provision for Rimini to host the client's software on Rimini servers. *Oracle USA*, 6 F.Supp.3d at 1096-1102. On appeal, the Ninth Circuit upheld this court's ruling that a plain reading of the phrase "licensee's facilities" did not encompass Rimini's own servers. *Rimini I*, 879 F.3d at 959–60. In doing so, it was "necessary" for the district court to read a requirement of control into the definition of "facilities." *Id.* at 960. As Rimini failed to make a showing that any customer had actual or even constructive control over Rimini's internal servers, it was in violation of the PeopleSoft facilities restriction. *Id.* ("The record supports the district court's conclusion that the Rimini servers where the copying took place were outside the control" of Rimini's customers.).

Based on this concept of "control," Rimini argues that with the new cloud-based system, its clients contract directly with either Windstream or AWS. ECF Nos. 917, 927-s at 36–37. Only the client can authorize third parties to access the software, and the client must give a third-party permission to make any changes to the software. *Id.* The client can also access the software whenever it wants and make any changes it wants without input from Windstream or AWS. *Id.* Oracle does not contest any of these facts but rather argues that unless a client has physical control or ownership over the facilities, any cloud hosting of Oracle software violates the facilities restriction. ECF Nos. 1053, 1085-s at 32–33.

The Court agrees with Rimini that the concept of control is vital to a determination of what constitutes the licensee' facilities. Additionally, the Court has reviewed a number of license agreements that contain facilities restrictions, but not all are the same. As the Court determined above, while all of the license provisions regarding the 47 gap customers would prohibit Rimini from local hosting, the Court recognizes that some of those provisions are more restrictive than others, some of which would likely prohibit cloud hosting. *See* ECF No. 896-11 at 6 (under the PNMR Services Company's license, a "Computer license allows you to use the licensed program on a *single* specified computer." (emphasis added)). Given how different these facilities

restrictions can be, the Court cannot make a blanket ruling that all cloud hosting is permitted under any license. Rather, the Court would need to review each license and interpret the provision accordingly. If the provision is in line with those facilities restrictions the Court has already analyzed, the Court would then need to determine whether the client had *control* over its own software. While Oracle is correct in arguing that Rimini clients may not have ownership of the buildings in which the cloud hosted servers are housed or control over the physical servers themselves, ownership does not necessarily equate to control. *See Rimini I*, 879 F.3d at 959–60. The Ninth Circuit is well-aware that there is a difference between ownership and control, and if it believed that the facilities restriction required ownership of the building housing the servers or the servers themselves, it would have so stated.

Here, evidence from both Windstream and AWS demonstrates that only Rimini clients have the authority to access the PeopleSoft software on the cloud servers. During his deposition, Windstream's corporate representative, Denny Heaberlin, testified that Windstream clients have the ability to give authorization to third parties (like Rimini) to access their cloud-hosted content. ECF No. 933-18-s at 6. However, of particular note, Heaberlin testified that if Rimini was listed as the "primary point of contact, they would have the same level of access as the end client." *Id.* One of Rimini's clients, Toll Brothers, noted that it "controlled" its account and could have it shut down if it wished. ECF No. 942-1-s at 4–5. As for AWS, another Rimini client, Timex, testified that it had access to the cloud based environments and could discontinue, shut down, and delete the environments and that it would not be "appropriate" for Rimini to access its environments without the client's permission.  ECF No. 942-4-s at 6. While these individual entities may have testified as to their control over the cloud hosted software, that is not to say that every client that uses the cloud hosting programs believes the same. And, regardless of whether the client believed it to be in control, it is not to say that every client's license approves cloud hosting. Accordingly, the Court finds that there is a disputed question of material fact as to whether the license agreements expressly allow for cloud hosting and if they do, whether the client exercised control such that the cloud constituted its "facility." Therefore, both Rimini's and Oracle's motions regarding cloud hosting must be denied on this basis.

1    4.   The Court denies Rimini's motion regarding its migration process.

2          Lastly, Rimini requests summary judgment on another one of Oracle's theories of

3    copyright infringement, namely that Rimini infringed Oracle's copyrights when it "migrated" its

4    clients' software from its own computer systems over to its clients' (or a third-party cloud

5    service).[27] Following the Court's February 2014 summary judgment order, Rimini states that it

6    began the process of transferring its clients' environments over to its clients by copying them to

7    flash drives or hard drives and then shipping them to the clients. ECF Nos. 917, 927-s at 40. Rimini

8    argues that this copying was "unavoidable" and "licensed." *Id.* at 40-41. Oracle counters by plainly

9    stating that this conduct constituted new copyright infringement. ECF Nos. 1053, 1085-s at 34.

10         The Court will deny Rimini summary judgment on this claim. The Court does not reach

11   the merits of this claim because Rimini has failed to identify which portion of the licensing

12   agreement allows for the copying of software between computer systems. As it is the entity

13   invoking the express license defense, it is Rimini's burden to direct the Court to the licensing

14   provision that permits its conduct. It has not done so here.

15         In its response to Oracle's fifth motion for partial summary judgment, Rimini argues that

16   its clients had complete control over the migration process, and therefore had "constructive

17   control," over the migration copying pursuant to the "facilities" restriction. *See* ECF No. 986-s at

18   32. It is clearly a stretch for Rimini to point to the facilities restriction provision to argue that it

19   was expressly licensed to make more copies of the software the Court had already held Rimini was

20   infringing. While the Court denied Oracle's fifth motion above outright because the fair use

21   defense remains, it must grant Oracle's motion as to the express license defense regarding

22   migration: Rimini can point to no express provision in the license that permitted it to make more

23   copies of the software after it was held to have infringed when it migrated the client's software

24   from its servers back to the client.

25   ///

26   ///

27

28   ---
     [27] Oracle also argues the contrary position in its fifth motion for summary judgment. *See* ECF No. 930,
     941-s.

92

1  **V.      CONCLUSIONS**

2         IT IS THEREFORE ORDERED that Oracle's first motion for partial summary judgment

3  on Rimini's second, fourth, and eighth causes of action regarding the cease and desist letter (ECF

4  Nos. 881, 886-s) is **GRANTED**.

5         IT IS FURTHER ORDERED that Oracle's second motion for partial summary judgment

6  on its first cause of action, copyright infringement, and Rimini's affirmative defenses (ECF

7  Nos. 888, 896-s) is **GRANTED in part** and **DENIED in part.** The Court denies Oracle summary

8  judgment on Rimini's statute of limitations defense.

9         IT IS FURTHER ORDERED that Oracle's third motion for partial summary judgment

10  (ECF No. 898, 904-s) is **GRANTED in part** and **DENIED in part.** The Court grants Oracle

11  summary judgment on Oracle's first counterclaim, copyright infringement, as it relates to Oracle's

12  copyrighted software found in the Campbell Soup and City of Eugene environments, at issue in

13  this motion. The Court grants Oracle summary judgment on Rimini's second affirmative defense

14  (express license) and seventh affirmative defense (fair use) as it relates to these copyrights.

15  Accordingly, the Court also grants Oracle summary judgment on Rimini's first cause of action for

16  declaratory judgment on non-infringement as to these copyrights. Because there is a material issue

17  of fact pertaining to whether Rimini is committing copyright infringement per se through its AFW

18  Tools software, the Court denies Oracle summary judgment on this claim.

19         IT IS FURTHER ORDERED that Oracle's fourth motion for partial summary judgment

20  regarding Rimini's fourth, sixth, and eighth causes of action and Rimini's improper damages

21  claims (ECF Nos. 916, 936-s) is **GRANTED in part and DENIED in part**. The Court denies

22  Oracle summary judgment as to Rimini's eighth cause of action for violations of the California

23  Business and Professions Code § 17200 *et seq.* as to Rimini's requested injunctive relief.

24         IT IS FURTHER ORDERED that Oracle's fifth motion for partial summary judgment

25  regarding Rimini's migration and Windstream hosting (ECF No. 930, 941-s) is **DENIED in part**

26  and **GRANTED in part**. The Court grants Oracle summary judgment on Rimini's express license

27  defense regarding its migration process.

28  ///

IT IS FURTHER ORDERED that Rimini's first motion for partial summary judgment regarding preclusion of Oracle's gap customer claims (ECF Nos. 910, 913-s) is **DENIED**.

IT IS FURTHER ORDERED that Rimini's second motion for partial summary judgment regarding its undisputed processes (ECF Nos. 917, 927-s) is **DENIED**.

IT IS FURTHER ORDERED that Oracle's motion on objections to evidence Rimini submitted in opposition to Oracle's motion (ECF No. 1181) is **DENIED**.

IT IS FURTHER ORDERED that the following motions to seal (ECF Nos. 895, 940, 1199), which were inadvertently left out of the Court's prior order (ECF No. 1240), are **GRANTED** *nunc pro tunc*.

IT IS FURTHER ORDERED that the parties shall submit a proposed joint pretrial order in compliance with Local Rules 16-3 and 16-4 within **60 days** of the entry of this order.

The parties are reminded that **ANY and ALL** future pre-trial motions, **including but not limited** to motions in limine, motions pertaining to witnesses or evidence, and motions to reconsider, are limited to **one filing** per party per type of motion, of no more than **30 pages** in length, not including tables of content, tables of authorities, signature pages, or other non-substantive portions of the filing. Exhibits are limited to no more than **100 pages** per filing, not including cover pages, and they must be evidentiary in nature. *See* ECF No. 1240; LR 7-3; LR IA 10-3.

IT IS SO ORDERED


DATED this 14th day of September, 2020.

_____
LARRY R. HICKS
UNITED STATES DISTRICT JUDGE