GIBSON, DUNN & CRUTCHER LLP
JEFFREY T. THOMAS (*pro hac vice*)
BLAINE H. EVANSON (*pro hac vice*)
CASEY J. MCCRACKEN (*pro hac vice*)
JOSEPH A. GORMAN (*pro hac vice*)
3161 Michelson Drive
Irvine, CA  92612-4412
Telephone:   949.451.3800
jtthomas@gibsondunn.com
bevanson@gibsondunn.com
jgorman@gibsondunn.com
cmccracken@gibsondunn.com

GIBSON, DUNN & CRUTCHER LLP
SAMUEL LIVERSIDGE (*pro hac vice*)
ERIC D. VANDEVELDE (*pro hac vice*)
ILISSA S. SAMPLIN (*pro hac vice*)
333 South Grand Avenue
Los Angeles, CA  90071-3197
Telephone:   213.229.7000
sliversidge@gibsondunn.com
evandevelde@gibsondunn.com
isamplin@gibsondunn.com

HOWARD & HOWARD ATTORNEYS PLLC
W. WEST ALLEN (Nevada Bar No. 5566)
3800 Howard Hughes Parkway, Suite 1000
Las Vegas, NV  89169
Telephone:   702.667.4843
wwa@h2law.com

RIMINI STREET, INC.
JOHN P. REILLY (*pro hac vice*)
3993 Howard Hughes Parkway, Suite 500
Las Vegas, NV  89169
Telephone:   336.908.6961
jreilly@riministreet.com

WEIL, GOTSHAL & MANGES LLP
MARK A. PERRY (*pro hac vice*)
2001 M Street, N.W., Suite 600
Washington, D.C.  20036
Telephone:   202.682.7511
mark.perry@weil.com

*Attorneys for Defendants/Counterclaimants*
*Rimini Street, Inc., and Seth Ravin*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| ORACLE INTERNATIONAL CORP., and ORACLE AMERICA, INC.,<br><br>        Plaintiffs/Counterdefendants,<br><br>v.<br><br>RIMINI STREET, INC., and SETH RAVIN,<br><br>        Defendants/Counterclaimants. | CASE NO. 2:14-cv-01699-MMD-DJA<br><br>**RIMINI STREET AND SETH RAVIN'S TRIAL BRIEF**<br><br><br><br>Judge:    Hon. Miranda M. Du |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ....................................................................................................... 1

II.   BACKGROUND ......................................................................................................... 6

    A.   The Parties and Enterprise Software Support ........................................................ 6

    B.   Process 1.0 and the *Rimini I* Litigation ............................................................... 7

    C.   Process 2.0 and the *Rimini II* Litigation .............................................................. 9

III.  ARGUMENT ............................................................................................................ 10

    A.   Rimini Is Entitled to a Declaratory Judgment That Process 2.0 Is Non-
        Infringing .......................................................................................................... 10

        1.   Issues Relevant to Declaratory and Injunctive Relief ............................ 11

        2.   Issues Not Relevant to Prospective Relief .............................................. 16

        3.   Oracle's Indirect Infringement Claims ................................................... 18

    B.   Oracle's DMCA Claims Will Fail ....................................................................... 18

    C.   Oracle Violated the UCL ..................................................................................... 19

    D.   Rimini Is Entitled to an Injunction Against Oracle's Anticompetitive
        Conduct .............................................................................................................. 20

    E.   Oracle's Lanham Act Claims Will Fail ................................................................ 21

    F.   Rimini Did Not Violate the UCL ......................................................................... 22

    G.   Oracle's Claim for Injunctive Relief Fails ........................................................... 22

IV.   CONCLUSION ......................................................................................................... 24

Gibson, Dunn &
Crutcher LLP

# TABLE OF AUTHORITIES

**Page**

CASES

*Bell v. Wilmott Storage Servs., LLC,*
   12 F.4th 1065 (9th Cir. 2021) ...................................................................................10

*Boardman v. Pac. Seafood Grp.,*
   822 F.3d 1011 (9th Cir. 2016) ..................................................................................21

*Caribbean Queen, Inc. v. Lee,*
   2021 WL 3215110 (C.D. Cal. Mar. 24, 2021).........................................................18

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.,*
   973 P.2d 527 (Cal. 1999) .........................................................................................20

*Davis v. Pinterest, Inc.,*
   2021 WL 879798 (N.D. Cal. Mar. 9, 2021).............................................................18

*eBay Inc. v. MercExchange, L.L.C.,*
   547 U.S. 388 (2006)........................................................................................3, 20, 22

*Ellison v. Robertson,*
   357 F.3d 1072 (9th Cir. 2004) ..................................................................................18

*Google LLC v. Oracle Am., Inc.,*
   141 S. Ct. 1183 (2021).............................................................................................17

*Hope Med. Enters. Inc. v. Fagron Compounding Servs., LLC,*
   2021 WL 4963516 (C.D. Cal. Oct. 26, 2021).........................................................21

*Jellybean Ent., Inc. v. Usnile LLC,*
   2013 WL 3283845 (S.D. Cal. June 26, 2013)..........................................................23

*Kirk Kara Corp. v. W. Stone & Metal Corp.,*
   2020 WL 5991503 (C.D. Cal. Aug. 14, 2020).........................................................18

*Knevelbaard Dairies v. Kraft Foods, Inc.,*
   232 F.3d 979 (9th Cir. 2000) ....................................................................................21

*Lewis Galoob Toys, Inc. v. Nintendo of Am., Inc.,*
   964 F.2d 965 (9th Cir. 1992) ....................................................................................14

*Luvdarts, LLC v. AT&T Mobility, LLC,*
   710 F.3d 1068 (9th Cir. 2013) ..................................................................................18

1

## TABLE OF AUTHORITIES
(continued)

2

Page

3

4

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*,
  518 F. Supp. 2d 1197 (C.D. Cal. 2007) ...............................................................22

5

6

*Narell v. Freeman*,
  872 F.2d 907 (9th Cir. 1989) ...............................................................................10

7

*Newton v. Diamond*,
  388 F.3d 1189 (9th Cir. 2004) .............................................................................10

8

9

*Oracle USA, Inc. v. Rimini St., Inc.*,
  783 F. App'x 707 (9th Cir. 2019) ......................................................3, 16, 23, 24

10

11

*Oracle USA, Inc. v. Rimini St., Inc.*,
  879 F.3d 948 (9th Cir. 2018) ...........................................2, 6, 8, 9, 14, 15, 16

12

*Perfect 10, Inc. v. Amazon.com, Inc.*,
  508 F.3d 1146 (9th Cir. 2007) .............................................................................18

13

14

*Perfect 10, Inc. v. Google, Inc.*,
  653 F.3d 976 (9th Cir. 2011) ..........................................................................3, 23

15

16

*Price v. City of Stockton*,
  390 F.3d 1105 (9th Cir. 2004) .............................................................................24

17

*Rimini St., Inc. v. Oracle Int'l Corp.*,
  473 F. Supp. 3d 1158 (D. Nev. 2020) ..........................................................1, 7, 11

18

19

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
  464 U.S. 417 (1984) ...............................................................................................5

20

21

*Southland Sod Farms v. Stover Seed Co.*,
  108 F.3d 1134 (9th Cir. 1997) .............................................................................22

22

*Stevens v. Corelogic, Inc.*,
  899 F.3d 666 (9th Cir. 2018) ...............................................................................19

23

24

*Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*,
  240 F.3d 832 (9th Cir. 2001) ...............................................................................21

25

26

*Theme Promotions, Inc. v. News Am. Mktg. FSI*,
  546 F.3d 991 (9th Cir. 2008) ...............................................................................22

27

*VHT, Inc. v. Zillow Grp., Inc.*,
  918 F.3d 723 (9th Cir. 2019) ...............................................................................10

28

iii

Gibson, Dunn &
Crutcher LLP

**TABLE OF AUTHORITIES**
(continued)

**Page**

STATUTES

17 U.S.C. § 107 ................................................................................................................17

17 U.S.C. § 1202 ........................................................................................................18, 19

Gibson, Dunn &
Crutcher LLP

## I.      INTRODUCTION

Rimini Street, Inc. ("Rimini") is Oracle International Corp. and Oracle America, Inc.'s ("Oracle") primary competitor in the market for enterprise software support services for Oracle software products, a market in which Oracle has a 95% market share.  The two companies have been engaged in a decade-long dispute regarding the manner in which Rimini can provide support to businesses, organizations, and governments that license Oracle software.  On the eve of trial, Oracle dropped all of its claims for damages and monetary relief.  The only issue remaining for the Court to decide is whether declaratory and/or injunctive relief should be ordered.  Rimini seeks a declaration that the core support processes it implemented by July 31, 2014 ("Process 2.0"), including developing updates individually for each of its clients in the clients' own separate software environments and re-using Rimini's own knowledge and work product, comply with Oracle's license agreements with its clients (in whose shoes Rimini stands).

Oracle develops enterprise software programs that it licenses to businesses, organizations, and government entities.  The software helps companies perform complex, mission-critical tasks like human resource functions, payroll, tax calculation and reporting, and customer relationship management.  Both Rimini and Oracle offer support for the software that customers have licensed from Oracle, but the two companies have different models.  Oracle focuses on periodically replacing the software with new versions, while Rimini provides support for the software without the need to replace it.  The vast majority of companies decide to purchase support from Oracle; others choose Rimini's offerings, for various reasons apart from price.  For example, when a version of Oracle software reaches a certain age, Oracle (unlike Rimini) stops providing meaningful support for it.  As a result, Rimini has many clients who, wanting to avoid the disruption and expense of changing to a new version of Oracle software, choose Rimini to provide support for their older versions that Oracle simply does not offer.

Every Rimini client has a license from Oracle to use the software, and clients are fully within their license rights to use third-party service providers for their support work.  Their license agreements "allow for a third-party service provider, like Rimini, to copy the software in place of the licensee and customize it for the licensee." *Rimini St., Inc. v. Oracle Int'l Corp.*, 473 F. Supp.

3d 1158, 1176 (D. Nev. 2020).  That is, licensees have the contractual right to use Rimini for support services.  As the Ninth Circuit has recognized, Rimini engages "in lawful competition with Oracle's direct maintenance services."  *Oracle USA, Inc. v. Rimini St., Inc.*, 879 F.3d 948, 952 (9th Cir. 2018).  But Oracle does not want competition in this lucrative market.  It has been suing Rimini since 2010 to prevent Rimini from eating into its 95% market share and 95% profit margin, and it continues to engage in unlawful anticompetitive conduct—by, for example, making false statements in the market to prevent customers from leaving Oracle and going to Rimini.

Oracle first sued Rimini in 2010 over Rimini's prior support model, "Process 1.0."  Under Process 1.0, Rimini hosted its clients' PeopleSoft software environments on Rimini's systems.  It also, in some cases, treated Client A's Oracle software and Client B's Oracle software interchangeably if both clients had the same license to the same version and release.  For example, it sometimes copied Client A's Oracle software and code and delivered it to Client B, believing this was acceptable because Client B was also licensed to the software.  These practices were found to infringe Oracle's copyrights, although the jury found unanimously that Rimini's infringement was innocent (*Oracle USA, Inc. v. Rimini St., Inc.*, No. 2:10-cv-00106-LRH-VCF (D. Nev.) ("*Rimini I*"), ECF No. 896 at 6)—*i.e.*, that Rimini "was not aware" and "had no reason to believe that" Process 1.0 infringed—and not willful.  *Rimini I*, ECF No. 880 at 43.  In response to rulings in the *Rimini I* litigation, Rimini completed the revision of its support model to ensure full authorization by the software licenses.  Under Process 2.0, every client has its own, separate environments on its own systems, and Rimini's policies prohibit the copying of any of Client A's Oracle software to Client B, even if both are licensed to it.  Rimini then brought this action to have its new processes declared non-infringing.  The evidence will show that Process 2.0 complies with the licenses because each copy of Oracle software that Rimini makes "occur[s] in each client's separate, siloed environments" on the client's, not Rimini's, systems, "while Rimini [is] developing the update for that specific client."  *Rimini I*, ECF No. 1548 at 51-52.

The trial evidence will show that Rimini's current support model (Process 2.0) is lawful, and indeed Oracle lacks substantive grounds to challenge it.  As a result, Oracle will likely focus its trial presentation on *past*—in many cases, *long past*—incidents from years ago that have

2

Gibson, Dunn & Crutcher LLP

nothing to do with Rimini's current processes.  For example, Oracle is likely to focus on claims that Rimini violated certain legacy PeopleSoft license agreements when Rimini (to comply with a ruling in the prior litigation) moved PeopleSoft software off its systems and back to its clients' systems *in 2014*.  Oracle is also likely to rely on what the Court called two "limited" incidents of infringement involving clients Campbell Soup and City of Eugene *in 2014-2015* (ECF No. 1253 at 87).  And Oracle will point to statements Rimini made to its clients in *2014*, and the alleged removal of Oracle copyright notices from files as far back as *2010*.  But Rimini's conduct from a decade ago has nothing to do with the one issue that is now before the Court—what declaratory and injunctive relief, if any, should be entered.  Isolated instances of alleged infringement might have been relevant to Oracle's abandoned damages claims, but the Supreme Court has long rejected the notion that "an injunction automatically follows a determination that a copyright has been infringed."  *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 392-93 (2006).  Oracle is entitled to an injunction only if it can show that it is suffering irreparable harm *now* and that current circumstances are such that an injunction is needed to prevent such ongoing irreparable harm.  It cannot meet that burden based on old incidents that are inconsistent with Rimini's current policies and processes.  This is the first basic flaw in Oracle's injunction request.

The second basic flaw is the lack of any evidence of a "causal connection" between the alleged incidents of infringement and irreparable harm to Oracle—a necessary predicate for any injunctive relief.  *Perfect 10, Inc. v. Google, Inc.*, 653 F.3d 976, 982 (9th Cir. 2011); *see also Oracle USA, Inc. v. Rimini St., Inc.*, 783 F. App'x 707, 710 (9th Cir. 2019).  Oracle claims it was harmed because it lost customers to Rimini.  Its *only* argument for some link between the alleged copyright infringement and Oracle's loss of customers is the unsupported assertion that Rimini gets clients only because it charges 50% less than Oracle, and but for the alleged infringement it would have charged more.  That theory is detached from reality.  Clients come to Rimini for a host of reasons besides price—including that many of Rimini's clients want services that *Oracle will not even offer them*.  It is also incorrect that the incidents Oracle relies on to establish Rimini's liability are connected to Rimini's pricing in the first place, or that the clients otherwise come to Rimini *because of* the at-issue conduct.  There is no link between the processes alleged to be

3

1   infringing and Rimini's prices.  Indeed, Rimini's pricing model was set before it even designed its

2   processes and has stayed the same as it changed its processes.

3       There is a third fundamental problem with Oracle's request for an injunction.  Oracle seeks

4   to prohibit Rimini from using Rimini's own work product, which in no way involves copying any

5   software covered by an Oracle copyright.  Oracle apparently wants an injunction that prohibits

6   Rimini from documenting its own knowledge and work—including Rimini's own code containing

7   no Oracle expression—and using it to serve Rimini's undisputedly licensed clients.  This is based

8   on the extreme position that it constitutes "cross-use" (a term that Oracle made up for purposes of

9   this litigation) for Rimini to document its own know-how and then use that documentation to do

10  additional work.

11      The ***fundamental question*** at the heart of this case is whether, in providing support to

12  multiple Oracle licensees, Rimini is permitted to create, write down, and re-use *its own code* and

13  other work product embodying only Rimini's knowledge and not containing any literal or

14  nonliteral Oracle protected expression.  That question is squarely presented in Rimini's declaratory

15  relief claim, which asserts that Rimini is entitled to document its *own* know-how and work product

16  and use that information as part of its operations.

17      Oracle claims the opposite, seeking an injunction based on an extreme theory of copyright

18  infringement that it is "cross-use" for Rimini to re-use its own knowledge, know-how, code, and

19  work product *in any form* obtained from working with one client when it services a subsequent

20  client with similar or even identical needs.  That was not Oracle's theory in *Rimini I*.  Oracle has

21  taken the narrow concept of "cross-use" adjudicated in *Rimini I* and expanded it into an all-

22  encompassing theory that sweeps in everything Rimini does, including documenting and re-using

23  Rimini's own knowledge.  That theory has no basis in the Copyright Act, the governing case law,

24  or this Court's prior orders, and it cannot form the basis of an injunction.  To the contrary, this

25  Court has already rejected Oracle's theory:  "[I]t would be impossible to direct an engineer, who

26  developed an update in Client A's environment, to not use the knowledge he or she gained when

27  developing the same or similar update for Client B."  ECF No. 1253 at 87.  When Rimini's code

28  and other work product does not include Oracle expression, it is perfectly legal for Rimini to create

4

Gibson, Dunn &
Crutcher LLP

1  it and re-use it.  As the Court held, it is not infringing "for a Rimini engineer to 'memorize and

2  replicate the work'" (*id.*), and neither Oracle's licenses nor the Copyright Act prohibit Rimini from

3  writing down its own creative expression that does not substantially incorporate (literally or

4  nonliterally) Oracle's protected expression.  Endorsing Oracle's conception would undermine the

5  very purpose of Article I, Section 8, Clause 8, of the Constitution, which is to encourage the

6  creation of *new* expression like Rimini's.  *See Sony Corp. of Am. v. Universal City Studios, Inc.*,

7  464 U.S. 417, 429 (1984).

8        The evidence will show that Oracle's conduct at issue in this case is anticompetitive, unfair,

9  and a violation of California's unfair competition law, Business and Professional Code Section

10  17200 ("UCL").  One such violation is Oracle's Matching Service Level ("MSL") policy, which

11  illegally "locks in" licensees by requiring them to purchase Oracle support for *all* of their versions

12  of the same Oracle software program, even when the customer would rather use Oracle to support

13  some of its software and Rimini to support other software.  For example, a customer may want to

14  use Rimini only for software that Oracle has stopped supporting, but Oracle's MSL policy

15  prohibits the customer from doing so.  Another Oracle policy that violates the UCL is its

16  "Reinstatement Fee and Back Support Policy," which penalizes a customer for trying one of

17  Oracle's competitors and then returning to Oracle.  This policy requires a customer who wants to

18  return to Oracle to pay Oracle the technical support fee it *would* have paid Oracle had it remained

19  on support, *in addition to* a 50% penalty.  So if a customer pays Oracle $1 million a year for support

20  and leaves to try a competitor for two years, the customer must pay a *$3 million* fee to return to

21  Oracle—on top of whatever Oracle charges for the support itself and whatever the customer paid

22  the competitor.  This is, of course, designed to dissuade customers from giving Oracle's

23  competitors a try.  Rimini's UCL claim is further supported by a concerted Oracle propaganda

24  campaign it internally called "Project Rimini," in which Oracle makes false statements about

25  Rimini's services, including false statements that third-party support is itself illegal or that moving

26  to Rimini support would cause customers to violate federal securities and healthcare laws.

27        As set forth below, the evidence at trial will show that:  Rimini's current processes are non-

28  infringing because they are within the licenses and otherwise are lawful, and Rimini is entitled to

5

a declaratory judgment so stating; Rimini is entitled to an injunction prohibiting Oracle from future UCL violations; and because Oracle cannot show that is has been harmed or that there is a likelihood of future harm from future illegal conduct, its request for an injunction should be denied.

## II.   BACKGROUND

### A.   The Parties and Enterprise Software Support

It is undisputed that every Rimini client at issue in this case paid for and held a valid Oracle software license for one or more of these products, and that no client received any Oracle software that it was not entitled to possess and use.

Unlike off-the-shelf consumer software used by individuals, Oracle software is used by sophisticated organizations from Fortune 500 companies to universities, hospitals, and governments, and must be modified and customized by the organizations for their own business purposes. *See Oracle*, 879 F.3d at 955. This requires the creation of "development environments," which are copies of the software program that are then modified to develop and test software updates before those updates are applied to the "'live' version of the software," also known as the "production environment." *Id.*

Oracle grants licenses for its software products to its licensees, and Oracle separately enters into support contracts with its customers. When it first releases a new version of a software program, the customers can purchase what Oracle calls "Premier Support," which entitles the customer to receive software upgrades, fixes, patches, and updates, typically made available for download from Oracle's website. But after a program has been available for five years, Oracle moves it to "Extended Support," which requires the customer to pay additional upcharge fees for the same services, and the support typically lasts for three years. After that, the program is placed into "Sustaining Support," in which Oracle no longer creates new updates, fixes, security alerts, data fixes, or critical patches updates. Although Sustaining Support provides the customer with next to nothing, it actually costs the same as Premier Support.

Rimini is a third-party support provider for enterprise software. It provides support to SAP, Salesforce, Microsoft, and other software, and additionally supports Oracle's PeopleSoft, JD Edwards ("JDE"), Siebel, EBS, and Database programs at issue in this case. In that capacity,

1    Rimini engages "in lawful competition with Oracle's direct maintenance services." *Oracle*, 879

2    F.3d at 952.  Rimini is not an Oracle licensee or a party to Oracle's software licenses.  Rimini

3    relies on the license agreements of its clients and stands in the licensee's shoes when providing

4    software support.  All of the licenses, across all product lines, "allow the licensee to copy the

5    software into a development environment and have an in-house IT team service it themselves,"

6    and "allow for a third-party service provider, like Rimini, to copy the software in place of the

7    licensee and customize it for the licensee." *Rimini*, 473 F. Supp. 3d at 1176.  Oracle's theories of

8    infringement have long centered around certain restrictions within the license agreements.  For

9    instance, certain PeopleSoft license agreements have a provision limiting copies of the software to

10   the licensee's "facilities." *Id.* at 1177, 1194.  Another provision requires that copies be made for

11   the licensee's "internal data processing operations." *Id.* at 1193, 1205-07.  It is these and other

12   provisions that form the basis of Oracle's infringement claims.

13          Rimini provides software updates and fixes, but also provides services Oracle does not,

14   including support for the client's customized code that has been integrated into the customer's

15   Oracle software.  Rimini also provides support for older versions of software that Oracle does not.

16   When a client signs up, Rimini guarantees support for at least 15 years.  Thus, if an Oracle

17   customer's software is in Sustaining Support, the customer can terminate its support with Oracle

18   and hire Rimini to provide support that Oracle will no longer provide, and at half the Oracle price.

19   **B.      Process 1.0 and the *Rimini I* Litigation**

20          Oracle sued Rimini and its CEO Seth Ravin in 2010 (*Oracle USA, Inc. v. Rimini St., Inc.*,

21   No. 2:10-cv-00106-LRH-VCF (D. Nev.)), accusing Rimini's then-in-effect support processes

22   (Process 1.0) of violating its licenses.  ECF No. 1253 at 3-5.[1]

23          When laws change—for example if the minimum wage changes in Nevada—affected

24   licensees need to update their software to account for those changes.  Multiple clients will often

25   be affected by the same change in law (*e.g.*, all clients doing business in Nevada).  Rimini must

26   provide an update—called a tax, legal, and regulatory ("TLR") update—to each affected client.

27   *Rimini I* concerned the manner in which Rimini provided TLR updates under Process 1.0.

28   _____

[1] Oracle brought 11 other claims, all of which Oracle dropped or Rimini won.

Gibson, Dunn &
Crutcher LLP

Under Process 1.0, Rimini hosted its clients' PeopleSoft development environments on its own systems. Rimini also sometimes copied Oracle software of one client, Client A, and delivered it to another, Client B, as long as Client A and Client B both had a license to that software. For example, rather than create an Oracle software environment for Client B from Client B's installation disks, Rimini would sometimes "clone" Client A's environment and give it to Client B to achieve the same result. Rimini also sometimes used a generic environment, associated with a version of PeopleSoft (*e.g.*, version 8.8) but not with any particular client, to develop updates containing Oracle code and then copied and delivered them to multiple clients who were licensed to version 8.8. *See Rimini I*, ECF No. 790, Trial Tr. 472:13-17; *id.*, ECF No. 785, Trial Tr. 192:22-193:10, 202:18-203:3.

This Court held on summary judgment in 2014 that Rimini's hosting of client environments on its own systems (called "local hosting") violated the "facilities" restriction in certain PeopleSoft licenses and that the use of Client A's environment, or a generic environment, to develop updates containing Client A's (or generic) Oracle code that was then copied to other clients violated the "internal data processing operations" provision of the licenses. *Rimini I*, ECF No. 474 at 12-14.

*Rimini I* went to trial in September 2015. *Rimini I*, ECF No. 774. The jury held Rimini (but not Ravin) liable for infringement.[2] It further found that Rimini's infringement was "innocent" (*Rimini I*, ECF No. 896 at 6), meaning that Rimini "was not aware" and "had no reason to believe that its acts constituted an infringement of [Oracle's] copyright[s]" (*Rimini I*, ECF No. 880 at 43), and that Oracle lost no profits and Rimini did not gain any profits as a result of the infringement (*Rimini I*, ECF No. 896 at 3-4).

On appeal, the Ninth Circuit affirmed the judgment that Rimini was liable for locally hosting PeopleSoft environments (*Oracle*, 879 F.3d at 959-60 & n.6) and engaging in "cross-use" of JDE and Siebel software—that is, "the creation of development environments, under color of a license of one customer, to support other customers" in violation of the internal data processing

---

[2] The jury originally found Rimini and Ravin liable for violating state computer hacking statutes and imposed a $14 million damages award, but that was reversed on appeal. *Oracle*, 879 F.3d at 962-63 (reversing verdict because Rimini and Ravin "indisputably had … authorization" to download the relevant materials). Thus, Ravin was exonerated of all liability in *Rimini I*.

1    operations provision (*id.* at 956 (emphasis omitted)).  The court of appeals also held that the JDE

2    and Siebel licenses did "not preclude Rimini from creating development environments for a

3    licensee for various purposes after that licensee has become a customer of Rimini."  *Id.* at 958

4    (emphasis omitted).

5        On remand, this Court re-entered a permanent injunction (*Rimini I*, ECF No. 1166), and on

6    a second appeal, the Ninth Circuit struck two provisions as overbroad: the injunction wrongly

7    "restrict[ed] 'local hosting' for the [JDE] and Siebel licenses" because the "licenses do not contain

8    such a limitation"; and the injunction also wrongly prohibited "access[ing] [JDE and Siebel] source

9    code" because "accessing" is not infringement under the Copyright Act.  *Oracle*, 783 F. App'x at

10   710-11.

11       Oracle later moved to hold Rimini in contempt of the injunction, and, following extensive

12   discovery that involved Oracle's 24/7 access to Rimini's systems, the Court held a seven-day

13   evidentiary hearing focused on 10 *discrete* issues related to compliance.  *Rimini I*, ECF No. 1548.

14   The Court made clear that "issues related to Process 2.0" could only be "litigated in *Rimini II*," as

15   the injunction in *Rimini I* only enjoined conduct that had been actually "adjudicated unlawful" in

16   that case.  *Rimini I*, ECF No. 1459 at 10.  The Court "recognize[d] that Rimini has taken steps in

17   an attempt to comply with the Court's Order" (*Rimini I*, ECF No. 1548 at 18) and discharged the

18   order to show cause as to five of those issues; however, the Court held Rimini in contempt on five

19   other issues in a ruling that Rimini has appealed.  *See Oracle USA, Inc. v. Rimini St., Inc.*, Case

20   No. 22-15188 (9th Cir.).

21   **C.    Process 2.0 and the *Rimini II* Litigation**

22       The evidence will show that more than a year before the *Rimini I* trial, Rimini invested

23   millions of dollars to revise its processes to conform to this Court's summary judgment rulings

24   construing the license terms, completing the transition to Process 2.0 by the end of July 2014.

25   Under Process 2.0, every Rimini client **has its own development environment** located **on the**

26   **client's own systems**, not Rimini's, thus eliminating the legacy practice of "local hosting."  To

27   develop TLR updates, Rimini logs into Client A's environment using a remote connection and

28   develops the update for Client A in Client A's environment.  If Client B requires the same TLR

update and thus the same or similar modification to its software, Rimini logs into Client B's environment and modifies Client B's files in Client B's environment on Client B's systems. Changes in tax laws often affect multiple clients, so Rimini repeats this process for Clients C, D, E, and so on.  Under Process 2.0, Client A's Oracle software or code is never copied to Client B, even if Clients A and B have the same license and software.

After transitioning to Process 2.0, and before the *Rimini I* trial commenced, Rimini filed this lawsuit seeking, among other things, a declaratory judgment that Process 2.0 does not infringe Oracle's copyrights.  Oracle, in turn, filed counterclaims.  The following claims remain for trial: *Rimini's Causes of Action*: declaratory judgment of non-infringement regarding Process 2.0; unfair competition under the UCL; and associated equitable relief; *Oracle's Causes of Action*: copyright infringement; Lanham Act; Digital Millennium Copyright Act ("DMCA"); unfair competition under the UCL; and associated equitable relief.

## III.    ARGUMENT

The evidence at trial will show that: **(A)** Process 2.0 is non-infringing and Rimini is entitled to a declaratory judgment to that effect; **(B)** Oracle fails to meet its burden to prove that Rimini violated the DMCA; **(C)** Oracle violated the UCL; **(D)** Rimini is entitled to an injunction prohibiting Oracle from future UCL violations; **(E)** Oracle fails to meet its burden to prove that Rimini violated the Lanham Act; **(F)** Oracle fails to meet its burden that Rimini violated the UCL; and **(G)** Oracle's claim for injunctive relief fails.  The Court should enter judgment for Rimini.

## A.    Rimini Is Entitled to a Declaratory Judgment That Process 2.0 Is Non-Infringing

Oracle bears the initial burden to demonstrate that Rimini has copied protected expression from one of Oracle's copyrighted works.  *See VHT, Inc. v. Zillow Grp., Inc.*, 918 F.3d 723, 731 (9th Cir. 2019).  This requires showing that there is substantial similarity between the two particular works, as well as showing that any such copying is more than *de minimis*.  *Newton v. Diamond*, 388 F.3d 1189, 1193 (9th Cir. 2004).  Moreover, Oracle must show that whatever Rimini has copied is itself protected expression, which requires filtering out non-protected elements of the

software in question.  *See Narell v. Freeman*, 872 F.2d 907, 910-11 (9th Cir. 1989).[3]  If Oracle meets that burden, Rimini bears the burden of identifying a license that permits Rimini to make copies.  *Rimini*, 473 F. Supp. 3d at 1204.  Once Rimini does that, the burden shifts back to Oracle, which must prove that Rimini made copies in violation of the terms of the license agreement at issue.  *Id.*

Rimini brought this case to obtain a declaration that its core processes under Process 2.0 are non-infringing.  The lawfulness of those core processes is the central question relevant to declaratory or injunctive relief.  Separately, Rimini expects Oracle to bring a number of allegations regarding Process 1.0 (for customers who, for one reason or another, were not adjudicated in *Rimini I*), or other incidents that occurred in the past, including instances where Rimini employees violated Rimini's policies.  While these past incidents would have been relevant to damages (if Oracle could show it was harmed), they are not relevant to the injunctive relief that this Court needs to decide.

### 1.    Issues Relevant to Declaratory and Injunctive Relief

**a.   Rimini's Process 2.0 and Re-Use of Know-How.**   The central issue that affects Oracle's claims as to PeopleSoft, EBS, and JDE is whether Rimini is permitted to (i) develop an update for Client A in Client A's separate development environment, (ii) document Rimini's solution and its know-how in solving the problem for Client A, such as in a technical specification—not containing any Oracle expression (literal or non-literal), and (iii) log in to Client B's environment to perform the same or similar changes to Client B, relying on Rimini's know-how gained from solving the problem for Client A.  This is Rimini's general process for developing TLR updates for multiple clients for EBS and JDE.  And it is Rimini's process for developing some updates for PeopleSoft; other updates used patented Rimini tools to automate this process,

---

[3] The Ninth Circuit's decision in *Bell v. Wilmott Storage Services, LLC*, 12 F.4th 1065, 1074 (9th Cir. 2021), which Oracle relies on for the proposition that it need not conduct analytic dissection if there is "verbatim" copying, is inapposite—the case concerns the *de minimis* exception, not analytic dissection of computer code.  As this Court recognized in the contempt proceedings, analytic dissection is *required* when assessing whether substantial similarity exists as to software code, because not all components of software are "protectable" under the Copyright Act, and thus must be filtered out.  *Rimini I*, ECF No. 1548 at 34.

11

Gibson, Dunn & Crutcher LLP

as discussed later.

Rimini's re-use of know-how can take various forms, but includes notes about what the Rimini engineer did, code the Rimini engineer wrote, and Technical Design Specifications which document Rimini's work and can serve as instructions for how to implement a particular update for other clients. All these forms of written know-how contain only *Rimini-written* expression, including *Rimini-written* code embodying *Rimini* engineers' knowledge. This Rimini work product does not incorporate any Oracle protected expression, literal or non-literal. And the evidence will show that under Process 2.0, every time Rimini engineers use these and similar documents to implement updates to clients, any copy of Oracle protected expression is made: (i) pursuant to the client's valid software license with Oracle and the client's contract with Rimini authorizing Rimini to work on the client's behalf; (ii) *in* that client's licensed software environment; (iii) *on* that client's computer systems (not Rimini's systems); and (iv) *for* that client's internal business operations.

Oracle takes the position that the practice of developing an update for a first client and then re-using Rimini's work product (whether it be knowledge, notes documenting knowledge, or Rimini code not containing any Oracle expression), is "prototyping" and that it violates Oracle's licenses. Oracle claims that if Rimini gains "specific knowledge" of how to solve a problem by working in Client A's software, then if Rimini re-uses that knowledge to solve the same problem for Client B, Rimini has "cross-used" Client A's software by using it to support both Clients A and B. That is because, according to Oracle, Client B "benefited" from Rimini's use of Client A's software when Rimini solved the problem for Client A. Oracle claims that Rimini benefits from this "prototyping" by being able to develop updates for Clients B, C, D, etc., faster than it developed the update for Client A. For Oracle to call this "cross-use," it is not necessary that any Oracle code be copied from Client A to Client B, or even that any or all of the clients receive identical solutions.

The Court has already recognized, however, that it is not infringing conduct "for a Rimini engineer to 'memorize and replicate the work,' as Oracle claims," nor is it infringing for Rimini engineers to become "more efficient[]" in providing services to subsequent clients based on

12

Gibson, Dunn &
Crutcher LLP

1    previous "gained experience"; indeed, "it would be impossible to direct an engineer, who

2    developed an update in Client A's environment, to not use the knowledge he or she gained when

3    developing the same or similar update for Client B." ECF No. 1253 at 87.  Nor is it infringing in

4    and of itself for Rimini to "wr[i]te a file and then sen[d] that file to several [clients]" because, as

5    Rimini will establish, "any copies of Oracle software occurred in each client's separate, siloed

6    environments while Rimini was developing the update for that specific client." *Rimini I*, ECF

7    No. 1548 at 51-52.  It follows from the fact that Rimini can "memorize and replicate" its own work

8    that Rimini can also write down and replicate its own work.

9         **b.  Rimini's Patented AFW Tools (for PeopleSoft).**  Rimini created software tools,

10   known collectively as AFW tools, to automate aspects of its TLR development process for

11   PeopleSoft.  Rimini received a United States patent on its AFW tools.  One tool in particular, called

12   CodeAnalyzer, is at the heart of Oracle's infringement claims.  Rimini stopped using the tool in

13   November 2018 in an abundance of caution, but believes it is non-infringing and seeks a

14   declaration to that effect.

15        One (patented) aspect of CodeAnalyzer is called the "GenDiff" utility.  After Rimini logs

16   into Client A's environment and makes changes to Client A's code, Rimini can use the GenDiff

17   utility to extract instructions for re-creating Rimini's changes.  The instructions are extracted in

18   such a way that no Oracle code or other expression is extracted.  The instructions can then be sent

19   to Client B, and as long as Client B has exactly the same file that needs changing as Client A, the

20   program will automatically replicate the changes for Client B.  Thus, instead of having an engineer

21   manually log in to Clients B, C, and D and manually code Rimini's changes, the tool does the

22   same thing automatically.  Use of this tool is not "cross-use" because Client A's software is used

23   to develop the changes to Client A's software in Client A's environment, and changes to Client

24   B's software are made using Client B's software in Client B's environment.  No aspect of Client

25   A's Oracle software is copied to another client (or to Rimini) in the process; Rimini's work product

26   is simply replicated across clients.

27        A second aspect of CodeAnalyzer called CopyRSIFileFromClientToClient allows Rimini

28   to copy a *Rimini-written* file—not containing any Oracle code or copyrighted expression (literal

13

Gibson, Dunn &
Crutcher LLP

or non-literal) from one client to another.  Rimini's own code is not subject to Oracle's copyrights, so Rimini is free to copy it wherever it wants.

**c.   Rimini's EBS "ePack" Tool.**  Oracle accuses another Rimini-created tool called "ePack" that Rimini uses for EBS updates as a derivative work of Oracle software.  This claim will fail.  The evidence will establish that ePack contains no Oracle protected expression whatsoever, whether literal or non-literal, and that it was neither derived from Oracle tools nor is a program that runs exclusively on Oracle software.[4]  Moreover, even *if* it were a derivative work, Oracle cannot show that it violates any relevant provision of the EBS license agreements.  In particular, any copy of EBS made in the process of using ePack is in the client's licensed, siloed environment and for that particular client.[5]

**d.   Client Cloud Hosting of Environments.**  Some Rimini clients choose to host their development and test environments on a cloud-based system rather than, say, at a physical location. They do so pursuant to their own contract with a cloud provider, and have control over their cloud account, including the power to control what is stored there and who can access it.  Whether a client chooses to use physical systems or enter into a contract with a cloud provider, Rimini accesses the software in the exact same way.  Nevertheless, Oracle contends that these cloud environments are not the clients' "facilities" and thus if a PeopleSoft client has a "facilities restriction" in their license agreement, then Rimini (and the customer) infringes when Rimini accesses the environment.

The Court, "agree[ing] with Rimini," held that the Ninth Circuit had already resolved whether a computer system counts as a licensee's "facilities" under the PeopleSoft license depends

---

[4] Rimini continues to maintain that the definition of derivative works adopted by the Court on summary judgment was erroneous and preserves its rights to appeal that issue, among the other issues Rimini has preserved and continues to preserve for appeal.  *See*, *e.g.*, ECF No. 1309 (Pretrial Order) at 81-115.  For a work to be derivative, it must actually incorporate (not just depend on) protected expression, either literal or non-literal, from the copyrighted work.  *Lewis Galoob Toys, Inc. v. Nintendo of Am., Inc.*, 964 F.2d 965, 967 (9th Cir. 1992).

[5] Oracle also has a claim based on a supposed EBS "library" on Rimini's computer systems.  The evidence will show that there is no such library, nor is there any evidence such a library was "cross-used" as Oracle claims.

on whether the client has "control" over it; indeed, "the concept of control is vital to a determination of what constitutes the licensee's facilities." ECF No. 1253 at 90; *Oracle*, 879 F.3d at 959-60.  The evidence will show that in each case, *the client* has control over the cloud systems, meaning that they are the client's "facilities," and the clients' decisions to host their environments on cloud systems does not render Rimini accessing them infringing.  *See* ECF No. 606 at 1-2.  Indeed, Magistrate Judge Hoffman agreed during discovery that "Rimini does not have control over (nor possession or custody of) its clients' software environments and archives." *Id.* at 1.

In addition, Oracle's litigation position that certain licensees cannot use the cloud is directly contrary to Oracle's out-of-litigation public statements and statements by its executives that *encourage* licensees to use the cloud.  Indeed, Oracle has a Bring Your Own License ("BYOL") policy that allows licensees to bring their license to either Oracle's cloud or to a competitor's cloud, like Amazon, Microsoft, or others.

**e. JDE "Source Code."**  Oracle claims that certain legacy license agreements written by JDE before it was acquired by Oracle forbid Rimini (or any third party for that matter) from accessing or modifying JDE "source code."  If true, this would eliminate third-party software consulting for all JDE users with these license agreements, as it would prevent any third party from accessing, copying, or modifying the JDE source code, including to perform installations, updates, or customizations.  It also would make no sense, as the software comes with tools explicitly for the purpose of modifying source code, and that is one of the selling points of the software.  Indeed, the Ninth Circuit has already held that the very license Oracle is relying on for this argument permits Rimini to "creat[e] development environments for a licensee" (*Oracle*, 879 F.3d at 958)— a process which necessarily requires copying *source code*.  Moreover, numerous JDE licenses explicitly provide that "third party agents" that are "not [Oracle]" are entitled to create modifications to the source code, and that such modifications *do not even belong* to Oracle, but to the licensee.[6]

---

[6] Oracle also has claims regarding Oracle's Database and Siebel programs.  Oracle's entire theory of infringement as to Database is derivative, claiming that each time, say, PeopleSoft is "cross-used," Database is also "cross-used" because PeopleSoft, as a program, sometimes draws upon

### 2. Issues Not Relevant to Prospective Relief

The remainder of Oracle's case focuses on specific instances of past alleged infringement that are not representative of Rimini's current processes, such as one-time events or violations of policy. Although Rimini disputes these issues, they are irrelevant now that damages are not in the case. Oracle's focus on such issues only demonstrates that it has no viable challenge to Process 2.0.

**a. "Gap" Customers.** Process 1.0 was adjudicated in *Rimini I*. However, discovery in that case ended in September 2011, and thus there are some customers who joined Rimini between September 2011 and the transition to Process 2.0 that were supported under Rimini's old support model; the parties call these "gap" customers because they fall in the gap between *Rimini I* and *Rimini II*. With no damages at issue, however, the "gap" customers are irrelevant. Process 1.0 ended eight years ago, and there is already an injunction in place enjoining Process 1.0 conduct.

**b. PeopleSoft "Migration."** The first set of specific claims Oracle brings concern the "migration" of PeopleSoft environments from Rimini's systems, where they were stored under Process 1.0, to the clients' systems, where they are stored under Process 2.0. In a 2014 summary judgment order, Rimini was held liable in *Rimini I* for having PeopleSoft environments on its systems contrary to the restriction contained in some license agreements, limiting copies to the licensee's "facilities." *Oracle*, 879 F.3d at 959-60. Rimini took that order very seriously, and as a result, quickly completed the removal of the clients' environments from Rimini's systems and returned them to the clients' systems.

Rimini attempted in good faith to comply with the Court's order. But software cannot be "moved" without making a copy. Yet Oracle claims that Rimini should not have made copies of the environments for the purpose of delivering them to the clients. It takes the extreme position that Rimini was required to *delete* the clients' environments and rebuild them all from scratch.

---

Database for information. Rimini's processes are non-infringing, so this claim will fail, but the evidence will also show that Database itself is never used contrary to any relevant license limitation. Oracle's Siebel-based claims are similarly minimal and meritless. Oracle found two Siebel environments on Rimini's systems from before July 2014, but Oracle raises no theory under which this would even be infringing. None of the Siebel licenses in this case contain a "facilities" restriction, as the Ninth Circuit has already held. *See Oracle*, 783 F. App'x at 710-11.

RIMINI STREET AND SETH RAVIN'S TRIAL BRIEF
CASE NO. 2:14-CV-01699-MMD-DJA

Gibson, Dunn & Crutcher LLP

This position makes no sense given that every client was entitled to its environments under the license agreement, and deleting the environments would have interrupted the clients' service and caused severe hardship for them.  Indeed, if Rimini had completed the transfer Oracle's way, all of the customized features of the software would have been lost, and while the environments were being rebuilt, the clients would have had no access to the software.  It is critical that enterprise software remain up and running.  Moreover, Oracle's position is not in substance different than a request Oracle already made *and lost* with respect to copies made in *Rimini I*—that this Court order "impoundment" of "all infringing copies" so that they could be "destroy[ed] … outright, thereby preventing [Rimini] from continuing to" use them.  *Rimini I*, ECF No. 1049 at 9-10 (denying Oracle's request).

At the end of the day, the "migration" simply involved Rimini moving the software off its own systems and onto the clients' systems as quickly as possible to comply with the Court's summary judgment order, and in a way that avoided serious harm to the clients.  This was entirely lawful, and, as Rimini will demonstrate at trial along with other issues Oracle accuses, all four of the "fair use" factors weigh in Rimini's favor, meaning the migration was entirely lawful.  *Google LLC v. Oracle Am., Inc.*, 141 S. Ct. 1183, 1196 (2021) (citing 17 U.S.C. § 107).

**c. Alleged Isolated Incidents and Violations of Policy.**  Rimini expects Oracle will also put forth evidence of incidents where Rimini employees violated policy.  For example, Oracle's expert identified certain Oracle files—not environments—on Rimini's systems that were missed when Rimini transitioned to Process 2.0 and attempted to remove all Oracle files from its systems.  Oracle will not be able to show that those files were used, and they have since been quarantined.[7]  Oracle was not harmed by unused files on Rimini's systems (and has dropped any claim to damages).  Years-old mistakes that have already been rectified are irrelevant to injunctive relief.

**d. "RSI" Files Allegedly Containing Oracle Code.**  Rimini developed some files that it labeled with an "RSI" prefix, denoting that they were Rimini-written files.  Certain of these files contain portions of code that match code from Oracle files.  Although the parties' experts dispute

---

[7] Due to the litigation hold for this case, Rimini does not delete any Oracle files, but instead quarantines and archives them for litigation preservation in a way that they cannot be accessed.

Gibson, Dunn &
Crutcher LLP

1  whether the matching code is protectable or substantial, the fact of the matter is that Rimini, in an

2  abundance of caution, removed them from its systems and stopped sending them to clients by

3  November 2018.

4         **3.**      **Oracle's Indirect Infringement Claims**

5        Oracle brings claims of indirect infringement against Rimini's CEO, Seth Ravin.  Those

6  claims will fail for a host of reasons, including that Oracle cannot prove the underlying direct

7  infringement by Rimini (*Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1169 (9th Cir.

8  2007)), and cannot show, among other things, that Ravin had "actual knowledge of specific acts

9  of infringement" by Rimini (*Luvdarts, LLC v. AT&T Mobility, LLC*, 710 F.3d 1068, 1072 (9th Cir.

10  2013)), that he intentionally "induced or materially contributed" to Rimini's infringing acts (*id.* at

11  1073 n.2), that he directly benefited financially from Rimini's infringement, or that he had the

12  right and the ability to supervise or control the infringing activity (*Ellison v. Robertson*, 357 F.3d

13  1072, 1076 (9th Cir. 2004)).  Ravin had no actual knowledge "of *specific* acts of infringement"

14  (*Davis v. Pinterest, Inc.*, 2021 WL 879798, at *3 (N.D. Cal. Mar. 9, 2021)) as they relate to any

15  individual update or fix.  He is the CEO of a publicly traded company with more than 1,800

16  employees, and "[s]imply holding the position of CEO, particularly in a fairly large company such

17  as [Rimini], is not alone sufficient evidence to support the claim that [Ravin] can personally police

18  the many" development environments, updates, and support services offered to clients. *Caribbean*

19  *Queen, Inc. v. Lee*, 2021 WL 3215110, at *4 (C.D. Cal. Mar. 24, 2021).

20  **B.**     **Oracle's DMCA Claims Will Fail**

21        Oracle's DMCA claims in this case are contrary to the text and purpose of the DMCA.

22  Oracle bases its claims on files written by Rimini long ago that do not contain Oracle copyright

23  notices and were found on clients' servers.  The DMCA relevantly prohibits the removal of

24  copyright management information ("CMI") from "copies of [copyrighted] works," and the

25  distribution of "copies of [copyrighted] works" with CMI removed, yet it is undisputed that none

26  of the files at issue are copies of any Oracle file (*e.g.*, a single PeopleSoft file), let alone entire

27  Oracle copyrighted "*works*" (*e.g.*, an *entire version of PeopleSoft*, comprised of thousands of

28  Oracle PeopleSoft files). *See* 17 U.S.C. § 1202; *Kirk Kara Corp. v. W. Stone & Metal Corp.*, 2020

WL 5991503 at *1, *6 (C.D. Cal. Aug. 14, 2020) (DMCA does not prohibit distribution of derivative works without the underlying work's CMI; rather, it prohibits distributing "identical" "copies" of a copyrighted work with CMI removed).  Indeed, for a majority of the files, Oracle did not even analyze whether they contain *any* Oracle code or protected expression of any kind.  Nor does Oracle have any evidence that Rimini "distributed" these files—Oracle simply notes that they were found on client servers, without considering (for example) whether the files were created on the client's servers.  But even if Oracle could show that Rimini distributed the files, it certainly cannot show that Rimini did so "knowing" or "having reasonable grounds to know" that doing so would "induce, enable, facilitate, or conceal an infringement of any" copyright.  17 U.S.C. § 1202; *Stevens v. Corelogic, Inc.*, 899 F.3d 666, 673 (9th Cir. 2018).  Clients were not misled into thinking they were receiving Rimini files when in fact they were receiving unmarked "copies of" Oracle copyrighted works.  It was never any secret to Oracle licensees who hired Rimini that they would receive files from Rimini that contained Oracle code and Rimini code modifying it.  That was the *point* of clients hiring Rimini in the first place, and Rimini *told* clients when it modified Oracle files.  Moreover, every client was certainly licensed to receive Oracle copyrighted works—Rimini would not be "inducing" copyright infringement by sending works to licensed recipients.  So even if Oracle could establish all the technical elements for a DMCA claim, which it cannot, none of that would demonstrate that the *removal caused* infringement or *concealed* infringement from a client—the clients knew exactly what they were getting, and were authorized to access Oracle copyrighted works.

As with Oracle's other claims, none of this is here nor there when it comes to Oracle's request for an injunction.  Even assuming that Rimini removed copyright notices and distributed those works with the requisite mental state in the early *2010s*, that says nothing about Oracle's entitlement to injunctive relief *today*.  Indeed, the evidence will show that rewritten files have not been distributed since 2018.

## C.    Oracle Violated the UCL

To establish that any of Oracle's challenged business practices violates the California UCL's "unfair" prong, Rimini must prove that the practice:  (1) threatens an incipient violation of

an antitrust law, (2) violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or (3) otherwise significantly threatens or harms competition. *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 973 P.2d 527, 544 (Cal. 1999). The evidence at trial will establish that Oracle has long been engaged in an unfair anticompetitive course of conduct against Rimini.

Oracle maintains an anticompetitive policy known as its Matching Service Level ("MSL") policy. Under it, Oracle requires that "all licenses in any given license set must be supported under the same technical support service level," and that the customer cannot "support a subset of licenses within a license set; the license set must be reduced by terminating any unsupported licenses." Rimini will show that the practical effect of the MSL policy is to force certain Oracle customers to continue to purchase Oracle's so-called "Sustaining Support" for older versions of Oracle software for which Oracle does not even provide new updates or fixes, when the client would rather support those older products with Rimini, who does provide those updates and fixes.

The evidence will also show Oracle admittedly using its "Reinstatement Fee and Back Support Policy" to threaten licensees with substantial penalties and retroactive fees for lapses in Oracle support. This makes it financially infeasible for an Oracle support customer to try an alternative to Oracle (such as Rimini) and then return to Oracle, because if it does so the policy requires the client to pay Oracle a large penalty fee. This policy is used—in Oracle's own words— "as a deterrent to customers terminating their support or going to get support," and the evidence will show Oracle inflicting this anticompetitive deterrent on customers to stop them from choosing more competitive options like Rimini.

The evidence will also show Oracle telling customers that third-party support is itself illegal, or telling them that Rimini's support would jeopardize their HIPAA compliance or render them out of compliance with the Sarbanes-Oxley Act, all of which are false. These and other instances will prove Oracle's liability under the UCL.

**D.   Rimini Is Entitled to an Injunction Against Oracle's Anticompetitive Conduct**

Oracle's violations of the UCL entitle Rimini to an injunction against Oracle. Rimini will establish all four equitable factors for injunctive relief under *eBay*, 547 U.S. at 391.

Oracle's anticompetitive conduct "constitutes an irreparable injury" (*Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1023 (9th Cir. 2016)) and impacts customer decisions in a way that harms competition.  There is no doubt that, for example, Oracle's MSL policy dissuades customers from choosing Rimini, harming competition.  Oracle's MSL policy forces customers to buy services they do not even want and at a higher price when they would otherwise choose Rimini.  Oracle's Reinstatement Fee and Back Support Policy also injures Rimini and injures competition by literally *punishing* customers for not choosing Oracle support.   And Oracle's false and misleading statements harm the competitive process, as well as Rimini's reputation and goodwill—which is exactly what Oracle intends to do with its unlawful campaign against Rimini. *See Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 841 (9th Cir. 2001) ("threatened loss of prospective customers or goodwill certainly supports" irreparable harm).  The balance of harms and the public interest both weigh in favor of enjoining Oracle's blatantly anticompetitive conduct, because "competition" is "vital to the public interest."  *Boardman*, 822 F.3d at 1024 (quoting *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 988 (9th Cir. 2000) (emphasis omitted)).  And these are just the sorts of injuries and circumstances that courts find inadequately remedied by money damages.  *See Hope Med. Enters. Inc. v. Fagron Compounding Servs., LLC*, 2021 WL 4963516, at *20-21 (C.D. Cal. Oct. 26, 2021).  The Court should enjoin Oracle's anticompetitive conduct.

### E.     Oracle's Lanham Act Claims Will Fail

Oracle accuses Rimini of violating the Lanham Act by making a number of allegedly false or misleading statements to clients about:  the *Rimini I* litigation; Rimini's support processes; Rimini's capability to provide vendor-level support; and Rimini's security capabilities and the efficacy of Oracle's security processes.  As with all of Oracle's claims, most of the alleged conduct is extremely old, and so does not bear on Oracle's request for an injunction.  Further, these claims will fail for the simple reason that the statements were *true*.

Rimini's statements to clients in an accused August 2014 litigation update were absolutely true—Rimini's description of the Court's 2014 summary judgment ruling as applying "to processes and software no longer used by Rimini Street," that would therefore "not cause any

interruptions to service for any client or any product line," was true.  Rimini *had*, in fact, transitioned from its previous Process 1.0 to its Process 2.0.  Similarly, Rimini's 2012 and 2013 statements about its own support processes, such as the fact that it "develop[s] each tax update individually for each client," are all true.  The same goes for Rimini's statements regarding its capability to provide what Oracle calls "vendor-level" support, and the efficacy of Oracle's security processes.  Oracle cannot show that any statement was "literally false, either on its face or by necessary implication, or that the statement was literally true but likely to mislead or confuse consumers."  *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997).

Moreover, even if Oracle *could* demonstrate falsity (it cannot), Oracle's Lanham Act claims will fail for other reasons, including:  (i) certain statements are immune from liability under the *Noerr-Pennington* doctrine because they were made in connection with a lawsuit (*see Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1007 (9th Cir. 2008)); (ii) there is no evidence that Oracle suffered "an injury" "proximately caused" by any of these statements; and (iii) Oracle's obviously stale claims are barred by laches.  And regardless, Oracle cannot get an injunction for statements made nearly a *decade* ago.  Such an injunction serves no rational purpose.

**F.     Rimini Did Not Violate the UCL**

Oracle's UCL claims are derivative and add nothing to this case.  They are based entirely on Oracle's Lanham Act and copyright claims, which fail on the merits, and so Oracle's UCL claims necessarily fail.  Oracle will also fail to establish standing or show any injury at all.

**G.     Oracle's Claim for Injunctive Relief Fails**

The reasons for denying Oracle's breathtaking request for injunctive relief are manifold.  To begin with, Oracle's claims fail on the merits, meaning Oracle is not entitled to any relief at all.  But even if Oracle establishes some incidents of past infringement, it is *not* the case that "an injunction automatically follows." *eBay*, 547 U.S. at 392-93.  Instead, Oracle must prove it likely will suffer *irreparable* harm in the future—even showing a "likelihood of future infringement" will not do given that "future copyright infringement can always be redressed via damages, whether actual or statutory." *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d 1197, 1214-15 (C.D. Cal. 2007).  Oracle cannot satisfy its burden by basing its case—as it

22

1  will—exclusively on long-past purported instances of infringement, removal of copyright notices,

2  and false statements for which Oracle (on the eve of trial) scrapped its claims of damages.  An

3  abandoned effort to show past harm does not establish a likelihood of future harm, let alone

4  *irreparable* future harm justifying prospective relief.  Nor can Oracle show, as it must, that no

5  adequate legal remedies exist for these harms when it voluntarily abandoned and waived those

6  damages claims with prejudice after years of pursuing those claims.

7         Oracle also cannot meet its burden to establish the "causal connection" between any claim

8  on which it prevails and Oracle's purported irreparable harm.  *Perfect 10*, 653 F.3d at 982; *Oracle*,

9  783 F. App'x at 710.  With respect to infringement, Oracle posits that the only way Rimini was

10  able to charge the prices that it does—typically 50% less than Oracle—is because its infringement

11  avoided labor costs.  Then, Oracle contends, customers leave Oracle solely because of Rimini's

12  price.  No evidence supports this theory.  Customers leave Oracle for a *host* of reasons, including

13  the fact that Oracle does not offer meaningful "support" for its older programs that certain

14  customers want to continue using and offers no support at all for custom code.  As for Rimini's

15  price, Oracle's expert never analyzed whether Rimini could have offered the same price, or a

16  higher price that is still significantly lower than Oracle's, without the baseless cost savings he

17  attributed to Rimini's alleged infringement.  Nor could Oracle plausibly show that the isolated

18  incidents of infringement, such as those found on summary judgment, are causally related to

19  Rimini's price or Oracle's customers' decisions to come to Rimini.

20         Oracle's request for *further* injunctive relief makes little sense in light of an *existing*

21  injunction already in place.  If, for instance, Oracle were to prevail on its migration claims, it would

22  not be entitled to any further relief.  Those claims concern copies of PeopleSoft on Rimini's

23  systems from *years* ago, and the *Rimini I* injunction already prohibits the presence of PeopleSoft

24  files on Rimini's systems.  Thus, Oracle's remedy already exists as to those claims, and it is not

25  entitled to a further injunction.  *Jellybean Ent., Inc. v. Usnile LLC*, 2013 WL 3283845, at *3 (S.D.

26  Cal. June 26, 2013) ("[A]n order enjoining Defendants' alleged copyright infringement and unfair

27  business practices already issued, which undermines the risk of future harm.").

28         Oracle has intimated that it may seek an injunction prohibiting Rimini from supporting

Gibson, Dunn &
Crutcher LLP

environments on clients' siloed computer systems that were sent to the client as a result of the migration, because, according to Oracle, Rimini infringed in the process of sending those environments and archives back to the clients *in 2014*. This is beyond extreme, and Oracle cannot conceivably demonstrate an entitlement to such injunctive relief when clients—*that each have a license entitling them to those environments*—have been relying on them for *eight years*. Oracle's apparent request is clearly against the public interest and would gravely injure third parties.

Finally, Oracle's claim for any injunction would not be practicable or sufficiently tailored. Injunctions must be "narrowly tailored … to remedy *only* the specific harms shown by the plaintiffs, rather than to enjoin all possible breaches of the law." *Price v. City of Stockton*, 390 F.3d 1105, 1117 (9th Cir. 2004) (emphasis added) (internal quotation omitted). Indeed, it was settled in this case by the Ninth Circuit that the injunction cannot reach conduct that is not prohibited by the license agreements themselves, which is why the court of appeals struck "local hosting" restrictions on JDE and Siebel from the *Rimini I* injunction on appeal—the "licenses do not contain such a limitation." *Oracle*, 783 F. App'x at 710-11. As this Court has already recognized, moreover, the license agreements are incredibly varied in this case. *See* ECF No. 1253 at 90. While they uniformly permit third-party support, their terms differ in other respects. Oracle thus cannot propose any coherent way to draft an injunction narrowly tailored to the license agreements in this case as the law requires.

## IV.   CONCLUSION

Rimini is entitled to declaratory and injunctive relief, and Oracle is not.

Dated:  November 22, 2022                          Respectfully submitted,

                                                                   GIBSON, DUNN & CRUTCHER LLP


                                                                   By:   ___*/s/ Eric D. Vandevelde*___
                                                                              Eric D. Vandevelde

                                                                   *Attorneys for Defendants/Counterclaimants Rimini Street, Inc., and Seth Ravin*