GIBSON, DUNN & CRUTCHER LLP
JEFFREY T. THOMAS (*pro hac vice*)
BLAINE H. EVANSON (*pro hac vice*)
CASEY J. MCCRACKEN (*pro hac vice*)
JOSEPH A. GORMAN (*pro hac vice*)
3161 Michelson Drive
Irvine, CA  92612-4412
Telephone:    949.451.3800
jtthomas@gibsondunn.com
bevanson@gibsondunn.com
jgorman@gibsondunn.com
cmccracken@gibsondunn.com

GIBSON, DUNN & CRUTCHER LLP
SAMUEL LIVERSIDGE (*pro hac vice*)
ERIC D. VANDEVELDE (*pro hac vice*)
ILISSA S. SAMPLIN (*pro hac vice*)
333 South Grand Avenue
Los Angeles, CA  90071-3197
Telephone:    213.229.7000
sliversidge@gibsondunn.com
evandevelde@gibsondunn.com
isamplin@gibsondunn.com

HOWARD & HOWARD ATTORNEYS PLLC
W. WEST ALLEN (Nevada Bar No. 5566)
3800 Howard Hughes Parkway, Suite 1000
Las Vegas, NV  89169
Telephone:    702.667.4843
wwa@h2law.com

RIMINI STREET, INC.
JOHN P. REILLY (*pro hac vice*)
3993 Howard Hughes Parkway, Suite 500
Las Vegas, NV  89169
Telephone:    336.908.6961
jreilly@riministreet.com

WEIL, GOTSHAL & MANGES LLP
MARK A. PERRY (*pro hac vice*)
2001 M Street, N.W., Suite 600
Washington, DC  20036
Telephone:    202.682.7511
mark.perry@weil.com

*Attorneys for Defendants/ Counterclaimants
Rimini Street, Inc., and Seth Ravin*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| ORACLE INTERNATIONAL CORP., and ORACLE AMERICA, INC., <br><br> Plaintiffs/ Counterdefendants, <br><br> v. <br><br> RIMINI STREET, INC., and SETH RAVIN, <br><br> Defendants/ Counterclaimants. | CASE NO. 2:14-cv-01699-MMD-DJA <br><br> **RIMINI STREET AND SETH RAVIN'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW** <br><br> Judge:    Hon. Miranda M. Du |

Defendants/Counterclaimants Rimini Street, Inc. and Seth Ravin ("Rimini") submit the following proposed findings of fact and conclusions of law for the bench trial in this case scheduled to begin November 29, 2022.  Consistent with the Court's guidance at the October 14, 2022, status conference (ECF No. 1422-2 at 11:5-19), and the clerk's email guidance to the parties on November 16, 2022, Rimini will submit revised proposed findings of fact and conclusions of law after trial to include citations to specific pages of the official trial transcript, witness testimony, and evidence adduced at trial.

By submitting these proposed findings of fact and conclusions of law, Rimini in no way waives or forfeits any arguments or defenses, nor reliance on any evidence of any kind, whether at trial, on appeal, or otherwise, and reserves all rights.

RIMINI STREET AND SETH RAVIN'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
CASE NO. 2:14-CV-01699-MMD-DJA

Gibson, Dunn &
Crutcher LLP

# TABLE OF CONTENTS

Page(s)

I.  INTRODUCTION ...................................................................................................1

II. FINDINGS OF FACT.............................................................................................2

    A.  BACKGROUND .............................................................................................2

        1. The Parties and Enterprise Software Support ....................................2

        2. The *Rimini I* Litigation......................................................................6

        3. Contempt Proceedings ........................................................................8

        4. Process 2.0 and the *Rimini II* Litigation...........................................9

    B.  RIMINI'S DECLARATORY JUDGMENT CLAIM REGARDING PROCESS 2.0................10

        1. Remote Access and Copying of Code in Client Environments .......11

        2. Siloed, Non-Generic Environments .................................................12

        3. Re-Use of Rimini's Knowledge and Work Product .........................13

        4. Rimini-Created Software Tools ........................................................14

    C.  ORACLE'S CLAIMS FOR DIRECT COPYRIGHT INFRINGEMENT ...............................16

        1. Process 1.0 "Migration" Claims ......................................................16

        2. Product-Line Claims .........................................................................17

    D.  ORACLE'S INDIRECT CLAIMS OF COPYRIGHT INFRINGEMENT AGAINST RAVIN.....26

    E.  RIMINI'S NON-LICENSE DEFENSES TO ORACLE'S CLAIMS OF INFRINGEMENT.......26

        1. Rimini's Statute of Limitations Defense to Oracle's EBS Claims .................26

        2. Rimini's Fair Use Defenses .............................................................28

    F.  RIMINI'S UCL CLAIMS ...............................................................................29

        1. Third-Party Support and the Parties' Offerings...............................29

        2. Oracle's Unfair Business Practices ..................................................31

    G.  ORACLE'S LANHAM ACT CLAIMS AND RIMINI'S DEFENSES .................................34

        1. Rimini's Litigation-Related Statements............................................34

        2. Rimini Support-Related Statements ..................................................35

        3. Rimini's Statements Regarding Support Capabilities......................35

i

Gibson, Dunn &
Crutcher LLP

4. Rimini's Security-Related Statements ................................................. 36

5. Rimini's Laches Defense ................................................................... 38

H. ORACLE'S DMCA CLAIMS AND RIMINI'S DEFENSES ............................... 38

I. ORACLE'S UCL CLAIMS ..................................................................... 40

J. FACTS RELATED TO THE PARTIES' REQUESTED INJUNCTIVE RELIEF .................... 41

1. Rimini's Request for Injunctive Relief ............................................... 41

2. Oracle's Requests for Injunctive Relief .............................................. 42

III. CONCLUSIONS OF LAW ....................................................................... 44

A. RIMINI'S DECLARATORY JUDGMENT CLAIM REGARDING PROCESS 2.0 ................ 44

1. Remote Access and Copying of Code in Client Environments ...................... 45

2. Siloed, Non-Generic Environments ................................................... 46

3. Re-Use of Rimini's Knowledge and Work Product ................................. 46

4. Declaration of Non-Infringement ..................................................... 48

B. ORACLE'S CLAIMS FOR DIRECT COPYRIGHT INFRINGEMENT ................................ 49

1. Process 1.0 "Migration" Claims ....................................................... 49

2. Oracle's Product-Line Claims .......................................................... 50

C. ORACLE'S INDIRECT CLAIMS OF COPYRIGHT INFRINGEMENT AGAINST RAVIN ..... 61

1. Contributory Infringement ............................................................. 61

2. Vicarious Infringement ................................................................. 61

D. RIMINI'S NON-LICENSE DEFENSES TO ORACLE'S CLAIMS OF INFRINGEMENT ....... 62

1. Rimini's Statute of Limitations Defense to Oracle's EBS Claims ................ 62

2. Rimini's Fair Use Defenses .............................................................. 62

E. RIMINI'S UCL CLAIMS ...................................................................... 68

1. Competitor Standing ..................................................................... 69

2. Oracle's Anticompetitive Business Practices ........................................ 69

F. LANHAM ACT CLAIMS AND DEFENSES .................................................. 72

1. Rimini's Litigation-Related Statements ............................................... 73

2. Rimini Support-Related Statements ................................................... 75

RIMINI STREET AND SETH RAVIN'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
CASE NO. 2:14-CV-01699-MMD-DJA

Gibson, Dunn & Crutcher LLP

3. Rimini's Statements Regarding Its Support Capabilities................................76

4. Rimini's Security-Related Statements ................................................................78

5. Rimini's Laches Defense ....................................................................................79

G.   DMCA CLAIMS AND DEFENSES ..........................................................................81

H.   ORACLE'S UCL CLAIMS.......................................................................................83

I.   THE PARTIES' REQUESTED INJUNCTIVE RELIEF .................................................84

1. Rimini's Request for Injunctive Relief.............................................................84

2. Oracle's Requests for Injunctive Relief............................................................87

IV.   CONCLUSION..................................................................................................................91

Gibson, Dunn &
Crutcher LLP

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

## I.    INTRODUCTION

1.      This case arises out of a long-running commercial dispute between Plaintiffs/Counterdefendants Oracle International Corp. and Oracle America, Inc. ("Oracle"), on the one hand, and Defendants/Counterclaimants Rimini Street, Inc., and Rimini's CEO, Seth Ravin, on the other.  The two companies compete with one another in the market for enterprise software support services for Oracle software products, a market in which Oracle has a 95% market share.

2.      Rimini operates "in lawful competition with Oracle's direct maintenance services" for Oracle's enterprise software.  *Oracle USA, Inc. v. Rimini St., Inc.*, 879 F.3d 948, 952 (9th Cir. 2018).  Every Rimini client holds a valid software license from Oracle that allows the client to contract with Rimini (rather than Oracle) for support services.  The Ninth Circuit has also acknowledged that the provision of software support requires Rimini to copy Oracle software files and that the relevant licenses permit such copying.  *Id.* at 952-53, 956.  What Oracle and Rimini have litigated for over a decade is whether the *manner* in which Rimini provides support exceeds the scope of the software licenses and/or infringes Oracle's copyrights.

3.      Following a summary judgment ruling in earlier litigation that certain Rimini processes infringed certain Oracle copyrights, Rimini sought to redesign its support processes so that they would not infringe and would be compliant with the relevant license agreements.  Rimini overhauled its support processes to what is now called "Process 2.0," and filed this lawsuit in 2014 seeking to have Process 2.0 declared non-infringing.  Numerous issues and claims arose as the case developed, including Oracle's claims of over a billion dollars in damages against Rimini for allegations of copyright infringement, violations of the Lanham Act, the Digital Millennium Copyright Act ("DMCA"), and other causes of action.  And Rimini brought claims of unfair business practices against Oracle, contending that Oracle is engaged in anticompetitive conduct to push competitors out of the support market and seeking an injunction.

4.      Following seven years of pretrial litigation and an extensive fact and expert discovery period, including to support these damages claims, Oracle, less than a month before trial,

1

Gibson, Dunn &
Crutcher LLP

abandoned all claims for monetary relief of every kind in exchange for the parties proceeding with a bench trial for non-monetary equitable relief, rather than a jury trial.  ECF Nos. 1409, 1420. Thus, the ultimate question to be decided in the bench trial is what, if any, equitable relief should be ordered in the case based on the parties' presentations of their respective claims against one another.  And the fundamental question underpinning the case concerning the legality of Process 2.0 is the following:  ***Whether, in providing support to multiple Oracle licensees, Rimini is permitted to create, write down, and re-use its own code and other know-how so long as that work product does not substantially incorporate any literal or nonliteral Oracle protected expression***.  Rimini contends that it can; Oracle contends that such conduct violates its licensees' software licenses, and thus the Copyright Act.

5.      The bench trial and these findings of fact and conclusions of law thus concern:

6.      *Rimini's Causes of Action*:  (i) declaratory judgment of non-infringement regarding Process 2.0; (ii) violations of California's Unfair Competition Law ("UCL"); and (iii) the associated equitable relief.

7.      *Oracle's Causes of Action*:  (i) copyright infringement against Rimini and Ravin; (ii) violations of the DMCA; (iii) violations of the Lanham Act; (iv) violations of California's UCL; and (v) the associated equitable relief.

8.      Having considered all relevant evidence adduced at trial and the parties' respective arguments, the Court issues the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

## II.      FINDINGS OF FACT

### A.      Background

#### 1.      The Parties and Enterprise Software Support

9.      Oracle holds intellectual property rights in certain enterprise software programs, including PeopleSoft, JD Edwards ("JDE"), Siebel, E-Business Suite ("EBS"), and Oracle Database ("Database").  Enterprise software programs help companies perform complex tasks such as human resource functions, payroll, taxes, and customer relationship management.  Oracle grants perpetual licenses for its software products to its licensees for a "substantial one-time

payment." *Oracle*, 879 F.3d at 952.

10.     Rimini is an independent third-party support provider for enterprise software.  It is Oracle's most significant competitor in the market to provide support for Oracle-developed programs, yet Oracle has a 95% market share.  Rimini is a publicly traded company with over 1,800 employees and 29 offices in 21 countries that services over 3,000 active clients.  Seth Ravin is the co-founder, CEO, and Chairman of the Board of Rimini.  Rimini provides support for programs developed by Oracle, SAP, Microsoft, IBM, and Salesforce.  Oracle is the only one of the software vendors that has sued Rimini regarding Rimini's support processes.

11.     Oracle enterprise software must be maintained in order to function correctly, which requires copying the software.  *Oracle*, 879 F.3d at 955-56.  Software cannot be accessed, used, updated, modified, compiled, run, tested, moved, or even viewed without creating copies of the software in some form.  Rimini provides support for Oracle's PeopleSoft, JDE, EBS, Siebel, and Database products "in lawful competition with Oracle's direct maintenance services." *Id.* at 952.

12.     Enterprise software is often supported by creating and using several copies of the entire software program: (i) the "production environment," that is, the live-running software on the organization's systems that it uses day in and day out (*Oracle*, 879 F.3d at 955); (ii) a "development environment," that is, a separate version of the program in which engineers develop an update or a fix for a problem with the software (*id.*); and (iii) a "testing environment," that is, an environment that the engineer can use to test the update or fix to make sure that once implemented into the production environment, the update or fix works and will not cause other problems with the software (ECF No. 1253 at 39-40).

13.     It is undisputed that every Rimini client at issue in this case paid for and held an Oracle software license for one or more of the relevant products and that no client received any Oracle software or Oracle protected expression that the client was not entitled to possess and use under the client's license agreement.

14.     In providing its support services, Rimini does not directly license software from Oracle, but rather, relies on the license agreements of Rimini's clients to stand in the licensee's shoes.  Those licenses "generally allow the licensee to copy the software into a development

environment and have an in-house IT team service it themselves," and "also generally allow for a third-party service provider, like Rimini, to copy the software in place of the licensee and customize it for the licensee."  ECF No. 1253 at 2-3.

a.   **Oracle's and Rimini's Support Packages**

15.   Both Oracle and Rimini enter into support contracts with licensees to provide support services.  While Oracle's and Rimini's support offerings share some similarities, they differ in key respects that impact the parties' claims in this case.

16.   When a customer buys an Oracle support contract, the customer typically pays 22% of the amount they paid for their software license, on an annual, upfront basis.  For example, if the customer paid $5 million for their software license, the customer's maintenance fee would be $1.1 million every year.  That customer will have paid more for maintenance in 4 years than it did for the underlying perpetual license.

17.   When Oracle first releases a new version of a software program, that program is eligible for what Oracle calls Premier Support.  Under Premier Support, a customer with an Oracle support contract is entitled to receive newly released versions of the software, as well as software support, including fixes, patches, and updates typically made available for download from Oracle's website.  The customer can also contact Oracle's support organization to receive assistance with problems they are experiencing.

18.   Typically, after a program version has been available for five years, it will no longer be eligible for Premier Support.  At this time, Oracle may offer what it calls "Extended Support" for the program.  Under Extended Support, a customer must pay an additional fee on top of their annual support fee: typically a 10% upcharge for the first year and a 20% upcharge for the next years.  Where Extended Support is offered, Oracle continues to offer the same support package for the program version.  Extended Support typically lasts for three years.

19.   After Extended Support expires, or if Oracle does not offer Extended Support, the program version is placed into "Sustaining Support."  In Sustaining Support, Oracle no longer creates any new updates, fixes, security alerts, data fixes, critical patch updates, or upgrade scripts, nor does it provide any certification with respect to new third-party products/versions or even new

4

Gibson, Dunn & Crutcher LLP

Oracle products.  Sustaining Support costs the same as Premier Support, even though it includes fewer services.

20.     Like Oracle, Rimini provides software updates and fixes, and customers can contact Rimini for help with ongoing issues.  But Rimini's base support package also includes other services that Oracle's does not, including performance tuning, interoperability support, installation and upgrade support, and support for the customer's customized code that has been integrated into the customer's Oracle software.  Further, unlike Oracle, Rimini does not have different support tiers with differing services and costs.  When a client signs up for support from Rimini, Rimini guarantees that it will support the client's software—including providing ongoing software updates and fixes—for at least the next 15 years.  For example, if a client's software is in Sustaining Support—where Oracle is no longer releasing new updates and fixes—the client can terminate support with Oracle and hire Rimini to provide those services.

21.     When a client signs a support contract with Rimini, they also get a "named" support engineer with an average of 20+ years of experience that the customer can contact and guaranteed response times as low as 10 minutes for critical issues.  Rimini engineers will remotely connect to clients' software environments on clients' systems to diagnose and address issues or provide bespoke software updates and fixes that account for the unique aspects and customizations of a particular customer's software.  This is in contrast to support from Oracle, which generally is not customized to individual customers.

22.     For its Oracle clients, Rimini typically charges an annual support fee that is around 50% of whatever the customer was paying to Oracle.  Thus, if a client was paying $1 million a year to Oracle for support, the client will pay around $500,000 to Rimini.

23.     Oracle's share of the revenues in the support market for Oracle software is 95%, with the other 5% shared between much smaller support companies.  For instance, in 2017, Oracle made approximately $20 billion from its software support business, with a profit margin of around 95%.  Rimini by contrast, generated around $150 million in revenue in 2017 for support on the Oracle software products at issue.  Other competitors in the space include Spinnaker Support LLC ("Spinnaker") and Support Revolution, but Rimini is, nevertheless, Oracle's biggest competitor

Gibson, Dunn & Crutcher LLP

for support contracts.

## 2.   The *Rimini I* Litigation

24.    Oracle filed a lawsuit against Rimini and Ravin in 2010 (*Oracle USA, Inc. v. Rimini St., Inc.*, Case No. 2:10-cv-106 (D. Nev.) ("*Rimini I*")), alleging, among other things, copyright infringement, inducing breach of contract, intentional interference with economic relations, and violations of state and federal computer hacking statutes (*see Rimini I*, ECF No. 146).  Rimini and Ravin asserted numerous defenses, including, as relevant here, an express license defense.  *See Rimini I*, ECF No. 474 at 4-15.

25.    As to copyright infringement, Oracle accused the then-in-effect support processes Rimini used to service its clients (ECF No. 1253 at 3), referred to in this litigation as "Process 1.0" (*e.g.*, ECF No. 1253 at 79-80), of violating certain provisions of the Rimini clients' license agreements for PeopleSoft, JDE, Siebel, and Database products (*Rimini I*, ECF No. 146 ¶¶ 58-61, 75-77, 114).

26.    Process 1.0 involved Rimini hosting and using generic Oracle software environments, *i.e.*, located on Rimini's own computer systems and not associated with any particular client, to develop and test software updates that were then delivered to clients to be placed in their production environments running on those clients' systems.  *See Oracle*, 879 F.3d at 959.  Oracle referred to hosting these generic environments on Rimini's systems as "local hosting" and the use of generic environments to develop and test updates for multiple clients containing Oracle code as "cross-use."  *See id.* at 956, 959.

27.    The Court held on summary judgment in 2014 that local hosting violated some PeopleSoft license agreements, which limited use of the PeopleSoft software to the licensee's "facilities."  *Rimini I*, ECF No. 474 at 11-15.  The Court also held that the use of generic environments not associated with a particular client to develop updates and fixes containing Oracle code for multiple clients violated PeopleSoft license provisions limiting use of the software to the licensee's "internal data processing operations."  *Id.*  Moreover, the Court held that certain Siebel and JDE license agreements did not allow for the use of generic environments to develop updates and fixes for multiple clients at once.  *See Rimini I*, ECF No. 474 at 19-24; *see also Oracle*, 879

6

Gibson, Dunn &
Crutcher LLP

F.3d at 955.  And the Court held that Rimini could not use generic environments pursuant to the Oracle License and Service Agreement ("OLSA") because Rimini had downloaded Database files at issue there pursuant to a developer license (not the OLSA) which imposed stricter use limits. *See Rimini I*, ECF No. 476 at 11-16.

28.    In 2012, before the Court's summary judgment rulings and trial in *Rimini I*, Rimini began investing millions of dollars to fundamentally revise its support processes, the result of which is Rimini's "Process 2.0."  Rimini filed this case ("*Rimini II*") in 2014 seeking to have Process 2.0 declared non-infringing.  *See* ECF No. 1 ¶¶ 26-28.

29.    *Rimini I*—which concerned only Process 1.0—went to trial in September 2015. The jury found Rimini (but not Ravin) liable for copyright infringement, but also found that the infringement was "innocent," meaning that Rimini neither knew nor had any reason to believe that its conduct was infringing.  *Rimini I*, ECF No. 896 at 6; *id.*, ECF No. 880 at 43 (jury instruction). The jury also found both Rimini and Ravin liable for violation of state computer hacking statutes. *Rimini I*, ECF No. 896 at 10-12.  The jury awarded a $35.6 million fair market value license as a damages award to Oracle (*id.* at 4), as well as approximately $14 million as a damages award for the state-law claims (*id.* at 10-12).  In post-trial proceedings, the Court granted Oracle's motion for a permanent injunction, prejudgment interest, attorneys' fees, costs, and other litigation expenses.  *Rimini I*, ECF No. 1049 at 22.

30.    On appeal, the Ninth Circuit affirmed the judgment on very specific grounds: (i) that Rimini was liable for locally hosting PeopleSoft environments (*Oracle*, 879 F.3d at 959-60 & n.6) and (ii) engaging in "cross-use" of JDE and Siebel software—that is, "the creation of development environments, under color of a license of one customer, to support other customers" (*id.* at 956 (emphasis omitted)).  The court of appeals also held that the JDE and Siebel license "constructions" by the district court "would not preclude Rimini from creating development environments for a licensee for various purposes after that licensee has become a customer of Rimini."  *Id.* at 958 (emphasis omitted).  As to Database, the Ninth Circuit affirmed liability on the procedural ground that Rimini had waived appellate challenge to the district court's finding that the OLSA did not apply.  *Id.* at 960.  The court of appeals fully reversed the state-law hacking

7

verdict and damages award because Rimini and Ravin "indisputably had ... authorization" to download the relevant materials (*id.* at 962-63), meaning that Ravin was exonerated of any liability in *Rimini I*. Finally, the court of appeals vacated the permanent injunction and remanded after reversing the state law claims. *Id.* at 964-65.

31. On remand, this Court re-entered a permanent injunction (*Rimini I*, ECF No. 1166), and on appeal, the Ninth Circuit struck two provisions as overbroad: the injunction wrongly "restrict[ed] 'local hosting' for the [JDE] and Siebel licenses" because the "licenses do not contain such a limitation"; and the injunction also wrongly prohibited "access[ing] [JDE and Siebel] source code" because "accessing" is not infringement under the Copyright Act. *Oracle USA, Inc. v. Rimini St., Inc.*, 783 F. App'x 707, 710-11 (9th Cir. 2019).

### 3.    Contempt Proceedings

32. Oracle moved for contempt following the second appeal. The Court largely rejected Oracle's allegations, holding that "the injunction does not enjoin conduct that has yet to be adjudicated unlawful" (*Rimini I*, ECF No. 1459 at 10) and that Rimini cannot be held "in contempt for conduct not yet adjudicated in *Rimini II*" (*id.* at 11).

33. Although "Oracle argue[d] that every single update and modification of Oracle's software constitutes a derivative work," "[t]he Court disagree[d]," holding that "whether a particular stand-alone update or modification is a derivative work is a fact specific inquiry," on which the Court would "not make a blanket ruling." *Id.* at 23.

34. The Court also rejected Oracle's new, expansive definition of "cross-use", declining to "make a blanket finding that whenever an update is built quicker for one client than another, that means that Rimini uses one client's environment under color of license for another client," and engages in "cross-use." *Id.* at 16. Rather, it is "common sense that Rimini's engineers would get better and faster at [developing updates] with more experience." *Id.* "It would be inapposite to find that simply because Rimini's developers are able to develop updates faster, with less testing, after they have built the update for another client, Rimini is violating the permanent injunction against cross-use." *Id.*

Gibson, Dunn & Crutcher LLP

35.     The Court was also explicit that Rimini is allowed to re-use its work product with multiple clients (*id.* at 19), and to do less, or even no, testing of updates for subsequent clients as it moves through this process (*id.* at 26).  The Court held it was not "cross-use" for Rimini to test an update in one client's environment as a "test case for multiple customers." *Id.* at 19.  "[S]o long as Rimini is testing the update in its client's individual environments, the testing itself (and necessarily, the copies made in the process of testing the update) is for the benefit of each individual client," whether or not the test will *also* benefit other clients.  *Id.*  Nor was it "cross-use" for Rimini to develop in a text editor a "'one size fits all' [update] file that could be used across multiple customers," and deliver that same file to multiple clients.  *Rimini I*, ECF No. 1548 at 52 n.73.

36.     The Court further emphasized that it was "neither the intention nor the purpose of the permanent injunction" to effect "a complete ban on Rimini support services," and held that the injunction could not be read to prohibit Rimini from distributing updates to clients.  *Rimini I*, ECF No. 1459 at 26.

37.     The Court held an evidentiary hearing on ten discrete issues, discharged the order as to five, found Rimini in contempt on five, and ordered Rimini to pay Oracle $630,000.  *See Rimini I*, ECF No. 1548 at 53-55.  Rimini's appeal of the contempt order and sanctions is pending before the Ninth Circuit.  *See Oracle USA, Inc. v. Rimini Street, Inc.*, Case No. 22-15188 (9th Cir.).

**4.     Process 2.0 and the *Rimini II* Litigation**

38.     After transitioning to Process 2.0, and before the *Rimini I* trial commenced, Rimini filed this lawsuit (*Rimini II*) seeking a declaratory judgment that Process 2.0 does not infringe Oracle's copyrights.

39.     Unlike Process 1.0, under Process 2.0, Rimini no longer hosts Oracle software environments, let alone generic ones, on its computer systems.  ECF No. 1253 at 3-6.  Rather, under Process 2.0, each client's development and testing environments are hosted on the client's own systems that the client controls.  *Id.* at 6.  Thus, as part of "Rimini's support Process 2.0" "Rimini remotely accesses the client's environments" using remote access.  *Rimini I*, ECF No. 1548 at 46; ECF No. 1253 at 6.  Each client's environments are therefore completely "siloed"

9

Gibson, Dunn &
Crutcher LLP

from other clients' environments (*Rimini I*, ECF No. 1548 at 41), unlike with Process 1.0.

40.     Under Process 2.0, Rimini engineers gain knowledge and experience developing solutions for a client in that client's siloed environment, then leverage their know-how and Rimini-created work product to implement similar solutions for other clients in those clients' siloed environments.  It is these and other aspects of Process 2.0 that Rimini seeks to have declared non-infringing in its declaratory judgment action.  Oracle, in turn, filed counterclaims alleging numerous causes of action against Rimini; Rimini amended and added additional claims against Oracle.

41.     Following a lengthy discovery period that lasted from April 2015 to March 2018 (ECF Nos. 353, 364, 372), Oracle filed five motions for partial summary judgment, and Rimini filed two motions (ECF No. 1253 at 1).

42.     On September 14, 2020, the Court granted in part and denied in part Oracle's motions for summary judgment, setting the case for trial due to material issues of fact on a number of claims, including Rimini's declaratory judgment regarding Process 2.0, Rimini's UCL claim against Oracle, and certain of Oracle's specific copyright infringement claims, as well as Oracle's claims under the DMCA, the Lanham Act, and the UCL.  *See* ECF No. 1253.

**B.     Rimini's Declaratory Judgment Claim Regarding Process 2.0**

43.     Process 2.0 was implemented, at least in part, in response to the Court's 2014 summary judgment order construing certain license agreements at issue in *Rimini I*.  Initial work on certain aspects of Process 2.0 began in 2012.

44.     Under Process 2.0, Rimini develops, tests, and delivers tens of thousands of updates and fixes to its clients every year.

45.     Importantly, each Rimini client at issue in this case has a license agreement with Oracle for the respective enterprise software program(s) it uses.  There are over 1,000 client license agreements at issue in this case.  The terms of these licenses differ widely across product lines and even within product lines.  That said, all of them provide clients the basic right to copy, modify, and use the software as necessary to support their own use, and to hire third parties to perform that work for them.

RIMINI STREET AND SETH RAVIN'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
CASE NO. 2:14-CV-01699-MMD-DJA

Gibson, Dunn &
Crutcher LLP

46.     The legality of Process 2.0 is the central question of Rimini's declaratory judgment claim, and, in addition to the above, Rimini has established the following facts about Process 2.0 and established that they hold as generally true across the vast majority of updates and fixes that Rimini develops, tests, and delivers to its clients annually:

### 1.     Remote Access and Copying of Code in Client Environments

47.     Whereas under Process 1.0, Rimini hosted PeopleSoft development and test environments on its own computer systems for its PeopleSoft clients (*Oracle*, 879 F.3d at 959-60), under Process 2.0, all client environments are stored on the clients' own systems, and not Rimini's systems (ECF No. 1253 at 6).

48.     There are no software environments for PeopleSoft, JDE, Siebel, EBS, or Database hosted on Rimini's systems.  *See id.*  All such software environments were migrated off of Rimini's systems as part of the transition to Process 2.0, which was complete by July 31, 2014.

49.     Each client's software environment is now located on client systems chosen by those clients.  With respect to Rimini's PeopleSoft clients, a small number—21 in total—originally chose to host their environments in the clients' cloud accounts at a cloud provider called Windstream.  These clients' cloud accounts constituted those clients' own "facilities" within the meaning of their PeopleSoft license agreements, where applicable.  The clients maintain all relevant control over their environments in those cloud accounts.  Rimini's access to these environments is always contingent on the client's authorization.  Only the client can authorize third parties to access those environments, whether on the cloud or otherwise, and the client must give a third party, including Rimini, permission to make changes to the environments.  ECF No. 606 at 1 (holding that "Rimini does not have control over (nor possession or custody of) its clients' software environments and archives").  Only one active Rimini client currently uses Windstream.

50.     Most PeopleSoft licenses at issue in this case do not contain a "facilities" restriction at all.  Indeed, the Court already found on summary judgment that "[t]he 'facilities' limitation is restricted to just these legacy PeopleSoft licenses, as both newer PeopleSoft licenses and licenses for other software do not contain the restrictive 'facilities' language."  ECF No. 1253 at 89.

---

11

Gibson, Dunn &
Crutcher LLP

51.     Rimini prohibits the presence of Oracle software on Rimini's systems pursuant to its Acceptable Use Policy, or "AUP" (even for software not implicated by a facilities restriction). Under this policy, Rimini prohibits its employees from storing "Oracle's software, files, code, or any other intellectual property on its systems." *Rimini I*, ECF No. 1548 at 9 n.6.  Employees and contractors are trained and tested on the AUP every six to twelve months, and they must certify that they have done so.

52.     Rimini provides repeated instructions and reminders to its clients not to send any Oracle software or other intellectual property to Rimini, even screenshots of code.  Rimini has also introduced technical measures that prevent such material from reaching Rimini's computers, as well as auditing methods that seek to find any potential Oracle software files on Rimini's computers so that they can be quarantined.[1]

### 2.     Siloed, Non-Generic Environments

53.     Whereas, under Process 1.0, some testing and development environments on Rimini's computer systems were "generic"—that is, they were not associated with any particular client and were used to develop and test updates for multiple clients (*Oracle*, 879 F.3d at 959)— under Process 2.0, Rimini engineers remotely access each client's siloed environments (*Rimini I*, ECF No. 1548 at 41).

54.     Whenever one of Oracle's programs is *run*, a copy of at least some portions of the program is made in the Random Access Memory of the computer on which the program is running. This is called a RAM copy.  As noted earlier, software cannot be accessed, used, updated, modified, compiled, run, tested, moved, or even viewed without creating copies of the software in some form.

55.     RAM copies are ephemeral, generally existing for only a very brief period of time, sometimes only fractions of a second.  RAM copies are an inherent feature of all software programs running in conjunction with a computer.  That is, they are necessarily created in conjunction with running the computer and are an essential step to running the software program with the hardware or machine the software is running on.

---

[1] Because litigation with Oracle remains pending, files are quarantined rather than deleted.

56.     Under Process 2.0, all copies created in a particular client's environment are for the internal business use of that particular client.

### 3.     Re-Use of Rimini's Knowledge and Work Product

57.     In supporting its clients, Rimini uses its own know-how, code, documentation, and other work product.

58.     Rimini has many clients.  Sometimes, a group of these clients will need the same update—for example, if the minimum wage rate increases in Nevada, clients who use their PeopleSoft software to run payroll in Nevada will all need an update that implements that same change.  And because many clients will have the same core software, the same or similar update can be implemented for each of them.  In such situations, a Rimini engineer may develop and test the update for an initial client—Client A—in Client A's environment, and then use the knowledge and/or Rimini-written code that engineer developed while working on Client A's software to implement the update for Client B in Client B's environment.  Rimini's re-use of its know-how and/or code can take numerous forms.

59.     First, in its simplest form, an engineer may simply memorize or recall some particular fix, update, or method that the engineer used for Client A, and apply that knowledge when working for Client B.  Relatedly, one Rimini engineer may share the knowledge gained working for Client A with another Rimini engineer, who can then use that knowledge to address the issue for Client B.  This is common sense.

60.     Second, when implementing some updates for clients, Rimini may create documents that memorialize what steps are required to create the update.  These documents are called "technical specifications."  Typically, where Rimini needs to deliver a similar update to multiple clients—for example, a tax rate change for all of its clients—Rimini will create a technical specification that documents the steps required to effectuate the update within each client's environment.  Rimini engineers can then use the technical specification to guide their work on the update for multiple clients.  These documents may also contain code written by Rimini as part of the update.  Per Rimini's policies, these documents *must not* contain any Oracle code.  Under Rimini's policies, these documents contain Rimini's own creative expression regarding how to

Gibson, Dunn &
Crutcher LLP

solve technical software-related problems and updates, and contain no Oracle protected expression, whether literal or non-literal.

61.    Third, under Process 2.0, Rimini engineers often draft Rimini-written code files, which contain no Oracle written expression, whether literal or non-literal. This Rimini-written code can be shared with multiple clients as necessary to support those clients.

62.    Oracle has expressly permitted other third-party providers to re-use their know-how and written work product with multiple clients. In providing support, Spinnaker creates "white papers" or "know-how" papers that contain detailed information, including "pseudo-code," for developers to use in fixing common issues across clients. The white papers are shared across the entire development team for a product line to benefit multiple clients. Oracle audited and approved of Spinnaker's JDE processes and confirmed that they do not infringe Oracle's copyrights.

63.    CedarCrestone, another third-party services provider, was sued by and settled with Oracle on terms that Oracle said were consistent with its licensees and that expressly permit re-use of know-how and written work product. Under the terms of the agreement, Oracle expressly allows CedarCrestone to document and re-use its PeopleSoft "know-how," including code written by CedarCrestone, for multiple customers, including the experience, expertise, and information that its personnel acquired through working with the software.

64.    Despite requests, Oracle has never informed Rimini what activities would comply with the license agreements, instead choosing to litigate against Rimini.

**4.    Rimini-Created Software Tools**

65.    Under Process 2.0, Rimini has also used, at times, proprietary software tools that Rimini developed and that do not contain any Oracle protected expression, whether literal or non-literal.

66.    One such tool is Rimini's Automation Framework, or "AFW," which is just that—a framework that has a number of software tools associated with it that automate certain functions of Rimini's services. For instance, one tool associated with AFW automatically creates certain folders in a client's environment so that an engineer does not have to do it manually. Other tools associated with AFW have at times been used in connection with servicing PeopleSoft, but Rimini

14

Gibson, Dunn & Crutcher LLP

has not used them since late 2018.  At a high level of generality, AFW consists, in part, of a program that runs on a client's computer systems that listens for, processes, and handles requests sent to it from Rimini.  The handling of all requests is performed *on* that client's systems.  Rimini obtained a United States patent on aspects of its tools.

67.     The critical facts relevant to AFW tools are that under Process 2.0 and Rimini's policies:  (i) in no case do they contain Oracle protected expression, whether literal or non-literal; (ii) at no time when they are run do they result in any copies of Oracle protected expression being on Rimini's systems; and (iii) each time they run, to the extent that they *do* result in a copy of Oracle protected expression being made, that copy is in the client's siloed licensed environments, on the client's systems, and for that particular client's internal business operations.

68.     Prior to being disabled in 2018, one of the AFW components Rimini used was a patented tool called CodeAnalyzer.  This program was written without using Oracle tools and does not run on Oracle software.

69.     CodeAnalyzer, and specifically its GenDiff function, created what was essentially a set of instructions for replicating Rimini-created modifications to multiple clients' copy of the same file in each of those client's separate environments.  The instructions did not contain, and could not be used to reconstruct, any Oracle code or other expression.  The use of the tool increased consistency and reduced the likelihood of coding errors.  Rimini ceased using this function in late 2018 out of an abundance of caution because Oracle's interpretation of the *Rimini I* permanent injunction would preclude the use of CodeAnalyzer.

70.     Another tool Rimini developed and uses in support of EBS clients is called "ePack." ePack is a Rimini-written program that contains *no* Oracle protected expression, whether literal or non-literal.  It was written without Oracle tools.  Without ePack, once Rimini finishes developing a bundle of updates in a client's development environment on the client's systems, the client's IT staff typically has to then install the update or fix into the client's production environment or quality assurance (testing) environment.  That is, the updates or fixes have to be moved from one location on the client's systems to another location on the client's systems.  This process does not involve Oracle-protected expression being placed on Rimini's systems, or shared between clients

15

Gibson, Dunn &
Crutcher LLP

1    in any way.

2          71.    That process can be complicated, so Rimini developed ePack as an automated tool

3    that its clients can use for certain updates.  ePack is a shell script designed to be run via a command

4    line, was written by Rimini, and does not include *any* Oracle code or expression, whether literal

5    or non-literal.  A client can use the ePack tool to carry out the oftentimes complex process of

6    installing updates to an environment.

7    **C.    Oracle's Claims for Direct Copyright Infringement**

8          72.    Oracle makes a number of specific direct copyright infringement claims against

9    Rimini, which fall into two broad categories:  (i) migration claims related to Process 1.0; and

10   (ii) specific remaining product-line claims.

11         **1.    Process 1.0 "Migration" Claims**

12         73.    Under Process 1.0, Rimini hosted PeopleSoft environments on Rimini's own

13   computer systems, a practice found to infringe by virtue of violating a "facilities" restriction in

14   certain PeopleSoft licenses.  *Rimini I*, ECF No. 474 at 10-13.

15         74.    As part of the transition to Process 2.0, and particularly after the Court's February

16   2014 summary judgment order, Rimini worked to quickly "migrate" these PeopleSoft

17   environments to its clients' respective computer systems so that they were no longer on Rimini's

18   systems.

19         75.    The migration was done with each client's authorization.  Clients chose where they

20   would host their migrated software environments, whether on their own systems or, if they wanted,

21   in their cloud accounts.

22         76.    Software is not "movable" in the ordinary sense.  To "move" or "migrate" software

23   one necessarily has to make a copy of it.  That is how software works.  Accordingly, the process

24   of migrating Rimini's clients' environments back to those clients' systems necessarily involved

25   making copies of their environments.

26         77.    Notably, following the Court's holding in *Rimini I* that Rimini's local hosting of

27   PeopleSoft environments was outside the scope of certain PeopleSoft license agreements, Oracle

28   requested as a remedy that all software environments on Rimini's systems be impounded or

16

RIMINI STREET AND SETH RAVIN'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
CASE NO. 2:14-CV-01699-MMD-DJA

1    destroyed. The Court denied that relief, and Oracle did not appeal the ruling. *Rimini I*, ECF

2    No. 1049 at 9-10.

3        78.    Rimini completed the migration of its clients' Oracle software environments off of

4    Rimini's systems by July 31, 2014.

5        79.    For clients that chose to migrate their environments to their cloud accounts, those

6    clients had control over the cloud systems to which the environments were migrated.

7            **2.    Product-Line Claims**

8        80.    Oracle also makes a number of specific infringement claims related to each of the

9    Oracle product lines. The Court makes the following additional related factual findings as to those

10   claims.

11       81.    Each Rimini client at issue in this case has a license agreement with Oracle for the

12   respective enterprise software program it uses. There are over 1,000 license agreements at issue

13   in this case. Over 700 of these licenses were authored by Oracle. The remaining licenses are

14   generally known as "legacy" licenses, meaning they were drafted by PeopleSoft, JDE, or Siebel

15   prior to Oracle's acquisition of those companies (*see, e.g.*, ECF No. 1253 at 89 (discussing legacy

16   PeopleSoft licenses)). All of these licenses allow licensees to copy the software and permit the

17   licensee to hire third parties to stand in their shoes and do it for them.

18       82.    However, many of Oracle's infringement arguments depend on restrictions that are

19   not uniform in the license agreements. As the Court recognized when denying summary judgment

20   on certain claims in this case, after having "reviewed a number of the license agreements," "not

21   all [of them] are the same," "some of [the] provisions are more restrictive than others," and it was

22   effectively impossible to "make a blanket ruling" on summary judgment. *Id.* at 90-91. For Oracle

23   to show that Rimini has acted outside the scope of a license agreement required "the Court … to

24   review each license and interpret the provision accordingly." *Id.*

25           ***a.    PeopleSoft***

26       83.    ***Data Changes.*** As part of its tax, legal, and regulatory update services, Rimini

27   engineers sometimes merely change certain data fields in a database used by the PeopleSoft

28   software (*e.g.*, a tax withholding rate). This is typically done through the creation of a script

17

Gibson, Dunn &
Crutcher LLP

consisting of instructions to modify certain values in the database.  These scripts are written by Rimini and do not contain any Oracle protected expression, whether literal or non-literal.  Any modification of client environments, and thus any copies created, when the scripts are run occur on the client environment and not on Rimini's systems, and the copies are for the particular client's internal business operations.

84.     ***Code Changes.***  As part of its tax, legal, and regulatory update services, Rimini engineers sometimes make changes to code in PeopleSoft environments on the client's systems. This often occurs manually, that is, a Rimini engineer will remotely access Client A's environment and modify code to implement the update; that developer, or a different developer, will then remotely access Client B's environment and manually code an implementation for the update, and so on for Client C.  The coding implementation may not be the same for each client, depending on each client's unique environment, configuration, and customizations.  Prior to late 2018, Rimini sometimes used the CodeAnalyzer tool, as described above, to automatically implement certain updates for multiple clients with identical relevant software files.  But each copy of any Oracle protected expression made in this process occurred on the client's environment and not on Rimini's systems, and the copies made were for the particular client's internal business operations.

85.     ***Object Changes.***  PeopleSoft online objects can be user interface elements that allow users to input information or interact with the program, *e.g.*, drop-down menus, check boxes, etc.  Sometimes Rimini creates new online objects or creates modifications to existing ones, either manually or in conjunction with Rimini's proprietary DevReview tool.

86.     One feature of the DevReview Tool is called its "load functionality," which is a way for Rimini to extract data associated with Rimini-created online objects or Rimini's modifications to objects.  To create or modify online objects, a Rimini engineer uses the "AppDesigner" utility in a client's development environment.  This creates data in a PeopleTools database, which the DevReview tool can then export into a text file.  The text data represents Rimini's new objects or modifications to objects and does not contain any protected Oracle code or expression.  The DevReview tool can then be used on a separate client's siloed environments to convert that text into a script that will insert the data representing Rimini's created objects or

18

modifications to objects into the PeopleTools database of that client's environments.

87.     Per Rimini's policies, the DevReview tool is used only for Rimini-created objects and modifications to objects.  The process does not involve the transfer of any literal or nonliteral protected Oracle expression between clients or between Rimini and any client.  Moreover, any copy of any Oracle protected expression made in this process occurred on the client's environment and not on Rimini's systems, and the copies made were for the particular client's internal business operations.  DevReview was discontinued in November 2018.

88.     ***Rimini's Quality Assurance Testing.***  As a part of its Quality Assurance testing ("QA"), Rimini sometimes creates QA groups based on which clients have the same code and thus will receive the same or similar implementation of an update, meaning that only a subset of each group will need more extensive testing.  Testing occurs in each client's separate environment, and to the extent any copies of the client's Oracle software are made during testing, those copies support that client.

89.     ***"rsi" Files.***  In the process of supporting PeopleSoft, Rimini has at times created files with the prefix "rsi."  Oracle's expert, Barbara Frederiksen-Cross, asserts that certain .sqr and .sqc files among these "rsi" files contain protected Oracle expression.  All of the Oracle files from which Ms. Frederiksen-Cross claims Rimini copied to create the accused "rsi" files relate to the calculation and reporting of tax, wage, and similar information to federal, state, and local tax authorities.

90.     Although Rimini's and Oracle's experts disagree on what components of these files must be filtered out in order to do a proper comparison of them under relevant Ninth Circuit caselaw, as the Court did in the contempt proceedings (*Rimini I*, ECF No. 1548 at 34-35), the Court finds Professor Owen Astrachan's opinion on this issue more credible and thus adopts it.  As in the contempt proceeding, "[t]he Court is not convinced that the elements identified by [Ms.] Frederiksen-Cross that appear in both files are indicative of copying, or that at least some of them should not be filtered out as constrained or unprotectable." *Id.* at 34.

91.     The Court finds the following to be non-protected elements of the relevant files, because they are dictated by constraints and conventions:

19

Gibson, Dunn &
Crutcher LLP

i.      Names of tables or fields that are dictated by another program;

ii.      Call procedures, functions, or variables defined in another Oracle file;

iii.      "#include" statements referencing another Oracle file;

iv.      Code dictated by tax filing requirements set by governing bodies or other external restraints;

v.      Sequencing code based on development conventions;

vi.      Defining variable names based on standard development conventions; and

vii.      Standard programming language terms.

92.      Upon filtering out non-protected expression from the relevant files that Oracle's expert has pointed out and presented at trial, it is apparent that the files are not substantially similar.

93.      Moreover, the amount of similar code in the Rimini files represents a small fraction of Oracle's copyrighted work, and because any similarities are tightly constrained by external requirements and involve (at most) minimal creativity and expressivity, the Court finds that any similarities are *de minimis* in quantity and quality.

### b.     JDE

94.      ***JDE Registrations.***   Oracle has asserted copyright ownership and registration in this case of only four JDE updates and one database of documentation, *i.e.*, registration numbers TX 8-116-321, TX 8-116-317, TX 8-116-314, TX 8-130-597, and TXu1-607-455. None of those registrations cover the actual JDE releases themselves. Oracle did not offer any evidence of allegedly infringing conduct related to these five registered copyrights.

95.      ***JDE Source Code.***   A threshold claim Oracle makes regarding JDE is that Rimini acts outside the scope of certain license agreements any time it copies JDE source code. Oracle raised this issue in the contempt proceedings related to the *Rimini I* injunction, arguing that Rimini could never make any copies of JDE source code for any reason. The Court rejected this argument, holding that:

> the Permanent Injunction only applies to conduct previously held unlawful. In this case, whether Rimini is ever permitted to *lawfully* copy source code under a specific provision of the J.D. Edwards license has never been interpreted or decided by this Court. Having considered the provisions of the J.D. Edwards Legacy license agreement, the Court is not convinced at this time that Rimini may never copy

source code when doing so is solely to support the needs of the client. And the Court has not before considered what "screen access" means and whether Rimini's support Process 2.0, in which Rimini remotely accesses the client's environments, is permitted given this provision. These issues are squarely before the Court in *Rimini II* and therefore, the Court declines to reach them at this time.

*Rimini I*, ECF No. 1548 at 46.

96.     This is an example of how the license agreements vary widely within a particular product line.  Oracle claims that various versions of the legacy JDE license agreements at issue in the case contain provisions that prevent a third-party support provider like Rimini from accessing (and thus copying or modifying) JDE source code.  Oracle-written license agreements do not contain an equivalent prohibition.  Of the clients that are relevant to this case and have one of these source code-related restrictions in their license agreement, only four still receive JDE support from Rimini today.  As explained below, the Court disagrees with Oracle's interpretation of the source code provisions in the legacy license agreements.

97.     The Court also finds that it is not possible to make a modification to JDE software without accessing and modifying its source code.  And third-party support provider Spinnaker provides "custom code" solutions for its JDE clients, including "source code changes" to JDE programs, a practice that Oracle itself explicitly approved as non-infringing after conducting an audit of Spinnaker's practices, a position contrary to Oracle's claims in this case.

98.     If the provision means what Oracle contends, the Court finds that it would entirely prohibit meaningful third-party support of JDE software products.

99.     ***JDE Technical Specifications.***  As a part of its memorialization and re-use of know-how, Rimini often creates technical specifications, and it does so with respect to updates implemented for its JDE clients.

100.    Rimini's change from Process 1.0 to Process 2.0 affected the way in which technical specifications for JDE updates were made. Before 2014, Rimini's JDE development process included the creation of an individual technical specification for each client that received a tax and regulatory update, which sometimes involved taking screenshots of a client's environment and saving them to the client-specific technical specifications.  Those screenshots served only to support the licensee of whose software they were taken because the technical

21

Gibson, Dunn & Crutcher LLP

specifications were not used with other clients.  Following the transition to Process 2.0, Rimini changed the way it makes technical specifications so that they are no longer client-specific, but rather, update-specific.

101.    None of the technical specifications that Oracle's expert, Ms. Frederiksen-Cross, identified as allegedly containing screenshots of Oracle protected expression do so after February 2014.

102.    For one update that Oracle focused on at trial, after the Rimini developer manually implemented an update in the client's environment, the developer printed the Rimini Street code he wrote to a .txt file and saved it to Rimini's system.  The process of printing the object was performed only for Rimini's solution, which contained 100 percent Rimini code.

103.    Apart from doing tax, legal, and regulatory updates, Rimini also provides some custom break/fix solutions for clients as the support need arises.  The team that does break/fix is separate from the team that does tax and regulatory updates.  Rimini generates technical specifications for some break/fix solutions, which (prior to switching to a system called Jira) were recorded in DevTrack under the prefix of JDEC.  Oracle identifies two JDEC technical specifications that it claims show that JDE "updates" reproduce Oracle's copyrighted works, including screenshots of Oracle code.  But the JDEC entries are not updates, they are bug fixes and part of break/fix support.  Oracle's own evidence demonstrates that no two clients received the same JDEC fix.  The screenshots of each client's environment are used to support only that client.

104.    Rimini is not the only support provider that uses documented know-how for multiple clients.  Third-party provider Spinnaker also supports JDE (as well as PeopleSoft, Siebel, EBS, and Database).  Oracle audited Spinnaker's support practices in 2011, which included an on-site visit, and agreed that Spinnaker's JDE processes "do not infringe upon Oracle's intellectual property rights" and "do not violate Oracle's license agreements with its clients."

105.    There are numerous similarities between Spinnaker's processes and Rimini's. Spinnaker designs its updates "at Spinnaker."  It creates a "general design framework"—the same as Rimini's technical specifications—that explains how to make the needed modifications.  Those

design documents are shared across customers at Spinnaker.  Then, each team goes into each customer's environment that needs the change and creates a custom update for that client based on its system and its custom code and all the integrations and differences that the customer might have.

106.    Spinnaker's developers work on several accounts at once.  They gain know-how both from having performed updates on a first account and from shared design documents.  And, that know-how and the documented solutions that result from development (including white papers) benefit multiple customers.  Spinnaker, like Rimini, also treats pseudo-code as its own proprietary information.  In these respects and others, Rimini's JDE support processes are similar to Spinnaker's.  Oracle has similarly approved CedarCrestone's re-use of written "know-how" and other work product for multiple customers.

### c.    Siebel

107.    Rimini provides break/fix support services to its Siebel clients, but does not provide tax, legal, and regulatory updates for Siebel software.

108.    As a part of Process 2.0, Rimini's provision of services to clients using Siebel is done remotely on the client's systems.

109.    During discovery in this case, Oracle asked Rimini to provide the number of Siebel client environments that were either on Rimini's systems or that Rimini had remotely accessed.

110.    There were two Siebel environments on Rimini's systems prior to 2014.  One of the client's systems was created in 2011 and decommissioned in March 2013.  The other was created in 2012 and, prior to Process 2.0, the client amended its contract with Rimini so Rimini would provide remote services rather than locally-hosted ones.

111.    None of the Siebel licenses at issue in this case contain a "facilities" restriction. Indeed, in the second *Rimini I* appeal, the Ninth Circuit explicitly held that the legacy Siebel license agreements "do not contain" a "facilities" restriction like the PeopleSoft licenses in that case. *Oracle*, 783 F. App'x at 710.

112.    Oracle's expert speculated that to the extent Rimini provided "over-the-shoulder" instruction to the client (*i.e.*, Rimini using a remote connection to the client system to be able to

23

Gibson, Dunn &
Crutcher LLP

see what the client was doing) on how to address an issue the client was experiencing, this practice *may* be unlicensed if the applicable Siebel licenses do not permit the licensee to make the Siebel software visible or otherwise available to a "direct competitor" of Oracle in this fashion.  That interpretation of the license is unsupported, but in any event, there is no evidence that Rimini provided support contrary to any license agreement with this limitation.

113.    There are only a couple dozen Siebel licenses in this case that contain the following provision under the definition of "Use":  "Users may include the employee of Customer or third parties; *provided* that such third party is limited to use of the Programs (i) only as configured and deployed by the Customers, and (ii) solely in connection with Customer's business operations as conducted by or through such third party, including but not limited to the installation, administration or implementation of the Programs for Customer…. Users shall exclude any individuals employed by, or acting on behalf or under the direction nor control of, a direct competitor of [Oracle]."  The remaining Siebel licenses do not contain any "direct competitor" provision.  Today, only one of Rimini's Siebel clients identified as relevant in this case that has a "direct competitor" restriction in their license agreement is still receiving support from Rimini.

114.    If the provision means what Oracle contends, the Court finds that it would entirely prohibit third-party support of Siebel software products.  A provider who cannot even have the client make the software visible or otherwise accessible cannot provide support for the product, despite the fact that all Siebel licenses authorize third-party support.  To provide support and use the software for its intended purpose, a third-party, who stands in the shoes of the licensee, has to have it accessible in the ways that Oracle contends third parties cannot.

### d.      EBS

115.    ***Prototyping.***  Oracle's main claim as it relates to EBS is that Rimini's process for developing so-called "prototype" updates is an impermissible form of "cross-use."  This is yet another way in which Oracle is contending that Rimini cannot re-use its own know-how and written work product, even if it contains no literal or nonliteral protected Oracle expression.  At heart, the claim is that Rimini violates the license agreements when Rimini creates and tests an EBS update with one client in that client's environments and then "rolls out" that update to other

Gibson, Dunn &
Crutcher LLP

EBS clients.

116.     Rimini's processes for developing updates for its clients proceed as follows.  First, a tax, legal, or regulatory change is identified, and Rimini determines which clients may need an update pertaining to that change (scoping).   Rimini then creates a functional specification describing in functional terms (*i.e.*, in terms of what the software is designed to accomplish) what the update should entail. Rimini then typically creates a technical specification describing specifically and in more detail how the update should be implemented.  By Rimini's policies, the technical specification may contain Rimini's knowledge or Rimini-written code useful for implementing the update, but the technical specification cannot include Oracle code.  Using the technical specification, developers manually implement the update, separately, in each client's environment.  The implementation of the update for each client may be different because different clients have different software versions, patch histories, and customizations.

117.     ***ePack Tool.***  The Court relies on its previous findings related to the ePack tool, as it relates to Oracle's specific contentions that the ePack tool constitutes a form of prohibited "cross-use."

### e.     *Database*

118.     Oracle accuses Rimini of "cross-using" Database on the ground that each time Rimini "cross-uses" another software program that runs in conjunction with Database, Rimini necessarily "cross-uses" Database as well.  This theory applies only to clients for whom Rimini provides support for both Database and another Oracle application.  However, the process of opening, for example, another Oracle *application*'s source code file and making modifications to that file on the client's systems does not copy or use any Database files or otherwise implicate Database.

119.     Rimini has many clients who receive support from Rimini solely for Database— Oracle has no infringement theory with respect to those clients.

120.     Rimini provides break/fix support for Database, but does not provide tax, legal, and regulatory updates or other updates for Database software.  In providing this support, Rimini receives and responds to support inquiries generated by the client.

1

### f.   Miscellaneous Files on Rimini's Systems

2      121.   Oracle also asserts that there are various files from different product-lines on

3  Rimini's systems, including several folders containing EBS files that Oracle characterizes as a

4  "library."  The evidence shows that the files were from between 2013 and 2015 and have not been

5  used since at least that time.  Many files Oracle identifies were in quarantined status.  Nor is there

6  evidence that any such files were "cross-used."

7  **D.    Oracle's Indirect Claims of Copyright Infringement Against Ravin**

8      122.   Oracle brings claims of indirect copyright infringement against Ravin on theories

9  of contributory and vicarious infringement liability.  ECF No. 399 ¶ 172.

10      123.   Ravin is the co-founder, CEO, and Chairman of the Board of Rimini.  His role

11  involves high-level supervision of Rimini's more than 1,800 employees, located in 29 offices in

12  21 countries, and strategic direction of the company.  Ravin is not a software engineer, and is not

13  familiar with granular specifics of Rimini's support processes for Oracle software or any other

14  support processes offered by Rimini to its over 3,000 active clients.

15      124.   Under Ravin's leadership and direction, Rimini adopted its formal AUP, discussed

16  earlier, in or around 2012.

17      125.   Ravin has consistently instructed Rimini employees to comply with all court orders.

18      126.   Rimini took numerous steps to ensure that clients did not send Oracle intellectual

19  property to Rimini's systems under Ravin's leadership and direction.  Clients are repeatedly

20  instructed not to upload or send to Rimini any third-party software, intellectual property, or

21  confidential data.

22  **E.    Rimini's Non-License Defenses to Oracle's Claims of Infringement**

23  **1.    Rimini's Statute of Limitations Defense to Oracle's EBS Claims**

24      127.   In this case, Oracle asserted counterclaims of copyright infringement going back to

25  2010 arising out of Rimini's support of EBS.  ECF No. 888 at 12.  Rimini and Ravin assert a statute

26  of limitations affirmative defense as to all conduct involving EBS prior to February 17, 2012.  *See*

27  ECF No. 1253 at 31; *see also* ECF Nos. 967, 974-s at 33-34.

28      128.   In January 2010 when Oracle filed suit against Rimini in *Rimini I*, Oracle alleged

26

Gibson, Dunn &
Crutcher LLP

1    that Rimini's entire "business model … relied on extensive infringement of Oracle's copyrights."

2    *Rimini I*, ECF No. 747 at 4.  Rimini introduced its support for EBS products in 2010.  ECF No.

3    969-1 at 1.  In October 2011, Rimini issued public press releases announcing its EBS services,

4    noting it had signed EBS clients, and that it used the same support processes as to EBS as it did

5    for the other Oracle product lines Rimini supported.

6         129.    Oracle deposed Rimini's CEO Seth Ravin on November 17, 2011, introduced

7    exhibits reflecting that the Oracle product lines Rimini serviced as of November 17, 2011 included

8    EBS, and repeatedly asked Ravin about Rimini's EBS support services, alongside questions about

9    PeopleSoft, JDE, and Siebel.

10        130.    Oracle suspected Rimini's Process 1.0 infringed Oracle's copyrights as to

11   PeopleSoft, JDE, Siebel, and Database not later than January 2010 when Oracle filed suit as to

12   those product lines.  It is also clear that Oracle had actual knowledge that Rimini provided services

13   for EBS licensees no later than November 17, 2011.

14        131.    On summary judgment in this case, "[t]he Court agree[d] with Rimini regarding

15   EBS," that in October/November 2011, "Oracle suspected that Rimini had engaged in widespread

16   copyright infringement … in the course of providing support services for several of Oracle's

17   software products, such as [JDE], Siebel, and PeopleSoft."  ECF No. 1253 at 32-33.  The Court

18   found that there were two material issues of fact for trial:  (i) "[w]hether it would have been

19   reasonable for Oracle, upon hearing that Rimini had begun offering support services for EBS, to

20   investigate whether Rimini was utilizing the same infringing practices with that software as Oracle

21   suspected Rimini was with others"; and (ii) "when Oracle acquired knowledge of or is chargeable

22   with knowledge" of any suspected EBS infringement by Rimini.  *Id.* at 33-34.

23        132.    Based on the above, the Court further finds that Oracle had a suspicion of EBS

24   infringement by Rimini not later than November 17, 2011, when Oracle deposed Mr. Ravin about

25   EBS products (which were not at issue in *Rimini I*).  The Court also finds that it would have been

26   reasonable for Oracle to conduct an investigation once it was aware that Rimini was servicing EBS

27   products, beginning no later than November 17, 2011.

28

1

### 2. Rimini's Fair Use Defenses

2    133.    Rimini asserts fair use defenses in this case with respect to Oracle's migration-

3    related claims, Oracle's claims that RAM copies made in Rimini's previous use of CodeAnalyzer

4    are infringing, and Oracle's claims that Rimini's development of its own AFW or other tools is

5    copyright infringement.

6    134.    ***Migration.***  In addition to the facts already found related to Rimini's migration of

7    client environments, the Court further finds that the deletion of client environments from Rimini's

8    systems and the subsequent wholesale rebuilding of those environments on the client systems

9    would have been technically impossible or extremely burdensome and disruptive to the clients'

10   operations.

11   135.    The Court ordered that Rimini could no longer locally host PeopleSoft

12   environments in 2014.  The Court also denied Oracle's requests to order impoundment or

13   destruction of those environments, holding that an injunction prohibiting local hosting of

14   PeopleSoft environments was a sufficient remedy for Oracle along with the damages Oracle

15   received at trial for that conduct.  *Rimini I*, ECF No. 1049 at 9-10.

16   136.    The purpose of the copies made in the migration was simply to move the client

17   environments to the clients' chosen systems in order to comply with the Court's order holding that

18   Rimini could not host PeopleSoft environments on its systems.  The migration was not part of

19   Rimini's normal business model, and *Rimini* (not its clients) spent $4 million to accomplish it.

20   137.    Moreover, there is no evidence that the migration diminished demand for Oracle's

21   PeopleSoft software or otherwise affected the market in any way.  The clients had already paid

22   Oracle for a license at the time Rimini migrated their environments.

23   138.    ***RAM Copies.***  In addition to the facts already found related to the creation of RAM

24   copies made when Rimini previously used the GenDiff function of its CodeAnalyzer tool, the

25   Court further finds:

26   139.    The purpose of the temporary RAM copies differs from the purpose of the original

27   file.  The purpose of the latter is to carry out specific computer instructions relating to the client's

28   use of its PeopleSoft software, while the purpose of the RAM copies made in the CodeAnalyzer

process is to compare files to extract Rimini's written work product.

140. The nature of the RAM copies is functional. Additionally, because the purpose of the RAM copy is simply to read portions of two files and compare them, the temporary RAM copy is not being used to take advantage of the expressive portions of the files. The code in those files is never executed.

141. The amount of Oracle code temporarily copied in a RAM copy is minimal compared to the overall copyrighted work of PeopleSoft. Moreover, the "copying" at issue here is the copying of two files into temporary memory, for a brief instant.

142. The RAM copies do not replace the market for Oracle software.

143. ***AFW Tools.*** In addition to the facts already found related to Rimini's use of AFW tools, the Court further finds that AFW tools are used by Rimini to automate functionality that Rimini could perform manually. Rather, the tools increase the accuracy and efficiency of developing and testing updates and help reduce bugs and other potential issues. AFW tools were entirely written by Rimini and do not contain Oracle code.

## F.   Rimini's UCL Claims

144. Rimini accuses Oracle of violating California's UCL by engaging in a number of unfair business practices with harmful anticompetitive effects, as described below. In response, Oracle asserts several defenses.

### 1.   Third-Party Support and the Parties' Offerings

145. In addition to the findings of fact related to the enterprise software support market, Rimini's and Oracle's respective offerings, as well as the offerings of other third-party competitors such as Spinnaker, the Court makes the following additional findings:

146. Enterprise customers use Oracle's software products to perform critical business functions that require data to remain available, reliable, and confidential. For this reason, customers running enterprise software require support services—including software updates and maintenance services.

147. Customers who purchase licenses for the use of Oracle's software products can also purchase support from Oracle in a separate transaction. Oracle's support offering includes, among

29

other things, the ability to access new releases of the licensed software.

148.    Alternatively, licensees can purchase support from third parties, such as Rimini. These third parties operate in "lawful competition" with Oracle.  *Oracle*, 879 F.3d at 952.

149.    Another option is self-support, whereby licensees use internal resources to update, maintain, and troubleshoot their Oracle software.  This option can be resource-intensive and is often unavailable as a practical matter to companies without the financial resources or technical expertise to manage the software themselves.

150.    Oracle support executives have acknowledged internally that Oracle's relevant support offerings and product upgrades are perceived as having no value.

151.    The evidence also shows high levels of dissatisfaction with Oracle's support offerings among Oracle customers.

152.    As part of its basic support package, Rimini provides support for software for at least 15 years from the time a customer signs up.  This differentiates Rimini's offering from Oracle's, because, as found herein, Oracle discontinues the full complement of support offerings for software after it reaches a certain age.

153.    Rimini also provides several services not included in Oracle's support package, including support for clients' customized code, performance tuning, installation and upgrade support, interoperability support, and archiving support.

154.    Rimini offers its support package at 50% off the annual price customers pay to Oracle for support.

155.    Rimini's ability to charge 50% is not related to the conduct in this case that Oracle accuses as infringing Oracle's copyrights.  Oracle has not proven a causal relationship between the price Rimini charges and any conduct accused as infringing, and Rimini has demonstrated that the two are not causally related.

156.    The evidence shows high levels of satisfaction among Rimini's support customers.

157.    Internal Oracle documents acknowledge that Rimini's support offering is compelling—even superior—to Oracle's support.

158.    By policy, Oracle does not compete with Rimini on price.  By policy, Oracle does

Gibson, Dunn &
Crutcher LLP

1    not compete with Rimini by offering waivers to contractual provisions that require customers to

2    pay for additional products and services and pay additional fees.

3        159.    Oracle maintains a more than 95% share of the annual revenue generated from

4    support contracts for Oracle software, with third-party support providers like Rimini and Spinnaker

5    sharing the other 5%. Further, Oracle's profit margins on support contracts are approximately

6    95%.

7        160.    For years, Oracle has maintained a campaign to attempt to thwart Oracle customer

8    efforts to switch to Rimini for support.

9        161.    Among other things, this campaign involved a consumer-facing website dedicated

10    to disparaging Rimini's support offerings, including telling consumers that they would "get less

11    with Rimini Street"; an internal repository of information and talking points for use by Oracle

12    salespeople that included statements about Oracle's litigation against Rimini to be used in

13    conversations with customers; letters from Oracle's legal department to customers' in-house legal

14    departments explaining that Oracle reserves all rights to seek injunctions against customers related

15    to their use of Rimini for third-party support; letters to customers that warned customers of the

16    "grave risk" of hacking they faced if they switched to Rimini for support; a program to track

17    winbacks of clients that left Oracle support for Rimini support; and at times offering incentives for

18    employees for winning back customers specifically from Rimini.

19        **2.**      **Oracle's Unfair Business Practices**

20           ***a.***      ***Oracle's Matching Service Level Policy***

21        162.    Oracle has a "Matching Service Level" policy that requires that "all licenses in any

22    given license set must be supported under the same technical support service level." A license set

23    is defined as "all of your licenses of a program, including any … program that share[s] the same

24    source code."

25        163.    Oracle's policy further states that "[y]ou may not support a subset of licenses within

26    a license set; the license set must be reduced by terminating any unsupported licenses." In other

27    words, if a customer attempts to drop Oracle support on a subset of licenses within a license set,

28    Oracle will not allow the customer to do so unless the customer cancels the remaining licenses,

Gibson, Dunn &
Crutcher LLP

thereby forfeiting the customer's right to use the licensed software.

164.     Oracle often successfully invokes the MSL Policy to discourage its licensees from dropping Oracle support in favor of Rimini or other third-party support providers, and Oracle recognizes that the MSL policy contributes to Oracle's high renewal rates and thus its market share.

165.     The MSL policy restricts customers' ability to purchase support services they want on a product-by-product basis.  For example, a customer may have several licenses for a product under support from Oracle, some of which are on Sustaining Support and some of which are on Premier Support.  Oracle's MSL policy requires the customer to continue buying Sustaining Support from Oracle even when the customer would prefer to purchase a support contract from a third party like Rimini, which can provide updates and other services not available from Oracle.

166.     Oracle has enforced this policy to try to stop California-based companies from using Rimini services, and Oracle employees based in California have also enforced this policy to stop non-California based companies from using Rimini services.

### b.     Oracle's Reinstatement Fee and Back Support Policy

167.     Oracle's policies regarding "Reinstatement of Oracle Technical Support" require new or returning Oracle support customers to pay retroactive fees and a penalty for prior lapses in Oracle support.

168.     Oracle's policy states:  "In the event support lapses or was never acquired, a reinstatement fee is assessed.  The reinstatement fee covers the value of the technical support for the lapsed period plus a 50% penalty (*i.e.*, 150% of the last annual support fee paid).  In addition, the technical support fee must be paid for the new support term at the time of reinstatement."

169.     Under this policy, an Oracle customer who discontinues Oracle support and then returns to Oracle will end up paying Oracle more than if that customer had maintained an active Oracle support contract.  The fees paid to Oracle are in addition to the fees paid to a third-party competitor such as Rimini or Spinnaker.

170.     The evidence shows that Oracle uses the reinstatement fee and back support requirement to thwart Oracle customer decisions to choose support from third parties, such as

Gibson, Dunn &
Crutcher LLP

1    Rimini.

2        171.    Oracle has enforced this policy to try to stop California-based companies from

3    using Rimini services, and Oracle employees based in California have also enforced this policy to

4    stop non-California based companies from using Rimini services.

5                   *c.*      ***False and Misleading Statements***

6        172.    In public, Oracle gives the appearance of acknowledging that customers have the

7    option to hire third-party support providers, and that such providers can legally offer support.

8        173.    In private communications, however, Oracle repeatedly tells customers—including

9    customers with operations in California—that third-party support is illegal and that no company

10   but Oracle can provide support for Oracle software without infringing Oracle's copyrights.

11       174.    These statements are factually false and are contrary to the rulings of this Court and

12   the Ninth Circuit, which recognize that Rimini and other third-party support providers can lawfully

13   offer support for Oracle software.  These statements are also contradicted by Oracle's own public

14   remarks acknowledging that third-party support is legal.

15       175.    Oracle also made statements to customers to the effect that if those customers hired

16   Rimini to provide support, the customers would not be able to comply with regulatory audits

17   related to software security under the Health Insurance Portability and Accountability Act

18   ("HIPAA") and the Sarbanes-Oxley Act.  The evidence shows that Rimini clients are subject to

19   these audits and pass them.  Accordingly, Oracle's statements are false.

20       176.    Oracle's marketing statements in this regard are unusual and exceed ordinary

21   industry standards for competitive sales activity.

22       177.    Customers in the relevant market heard Oracle's statements, considered them

23   material, and relied on them when deciding which provider to hire for software support.

24       178.    The Court finds that not only were Oracle's various policies and statements noted

25   above harmful to Rimini and its business, they were also harmful to competition.

26       179.    Oracle's behavior is classically anticompetitive behavior with classically

27   anticompetitive effects, and amounts to conditioning contracts on not doing business with Rimini,

28   depriving consumers of valuable competing services, restricting the supply of Rimini's rival

services, baseless denigration of a rival's services as part of an overall pattern of anticompetitive conduct, raising prices to consumers, wrongfully representing to third parties legal risks that do not exist, and bad faith conduct aimed at driving Oracle's largest competitor out of a market space in which Oracle already enjoys a 95% market share.

## G.    Oracle's Lanham Act Claims and Rimini's Defenses

180.    Oracle also accuses Rimini of violating the Lanham Act by allegedly making a number of false or misleading statements years ago to clients about:  (i) the *Rimini I* litigation; (ii) Rimini's support processes; (iii) Rimini's capability of providing what Oracle calls "vendor-level" support; and (iv) Rimini's security capabilities and the efficacy of Oracle's security processes. Rimini has a number of responses and defenses, most importantly, that the statements were unequivocally true.

### 1.    Rimini's Litigation-Related Statements

181.    Oracle argues that various statements that Rimini made updating its clients back in 2014 on the *Rimini I* litigation and describing the implications of that litigation violated the Lanham Act.  These statements explained to Rimini clients that certain Court rulings related to processes that Rimini no longer used given its transition to Process 2.0.

182.    The Court finds that Rimini's litigation-related statements are objectively true and not misleading.  The Court's rulings *did* pertain to a particular set of adjudicated conduct, Process 1.0.  Moreover, even if the Court were to find (and it does not) that Rimini's Process 2.0 were infringing or that certain instances since the implementation of Process 2.0 were infringing (as it found in two instances on summary judgment in this case), it would not alter the fact that Rimini's statements concerning the litigation were true.

183.    The Court also finds, for purposes of the *Noerr-Pennington* doctrine, that the statements are sufficiently related to Rimini's petitioning activity.  They are statements about pending litigation.

184.    The Court also finds that these statements did not cause any injury to Oracle.  There is no evidence that these statements diverted sales from Oracle or caused a loss of Oracle's business reputation.  Moreover, the Court finds that these statements are not currently hurting Oracle in any

34

Gibson, Dunn & Crutcher LLP

way.  They are nearly a decade old at the time of trial.

185.    At minimum, Rimini's litigation-related statements also constitute opinions regarding the ultimate outcome of a legal proceeding and the interpretation of court rulings.

### 2.    Rimini Support-Related Statements

186.    Oracle claims that various representations Rimini made in 2012 and 2013 regarding its support practices and processes are false and misleading under the Lanham Act.  These statements were made in onboarding materials to new clients and generally describe how Rimini develops updates for clients.

187.    The Court finds that Rimini's support-related statements were true and not misleading.  In the statements in question, Rimini accurately described its process for developing updates.

188.    In addition, the Court finds that Rimini's support-related statements did not cause any injury to Oracle.  Oracle failed to present evidence of injury to a commercial interest in sales or business reputation caused by these statements.  Without exception, these statements were sent to clients that had already contracted with Rimini.

189.    Moreover, the Court finds that these statements are not currently hurting Oracle in any way.  They are nearly a decade old at the time of trial.

190.    Finally, the Court finds that many of Rimini's support-related statements are not commercial advertising because they were not sufficiently disseminated to the market and did not otherwise have a promotional purpose.  Rather, these statements were internal to Rimini or sent to already-existing clients for informational purposes.

### 3.    Rimini's Statements Regarding Support Capabilities

191.    Oracle claims that Rimini's various statements made in 2013 and 2014 in which Rimini claims that prospective clients can replace Oracle support with Rimini support were false and misleading.  In these statements, Rimini represented to prospective clients that it was a viable substitute for support from the clients' vendor, that is, Oracle.

192.    The Court finds that these statements were objectively true and not misleading.  The statements accurately indicate that clients can contract with Rimini to replace support from Oracle,

1    or in some cases, receive support that Oracle does not provide.  There is nothing false or misleading

2    about these representations.

3          193.    The Court also finds that there is no evidence that any of these statements caused

4    Oracle injury.  These statements did not result in any diverted sales or loss of business reputation

5    to Oracle.  Moreover, the Court finds that these statements are not currently hurting Oracle in any

6    way.  They are nearly a decade old at the time of trial.

7          194.    The Court also finds that these statements are, at minimum, mere "puffery"—

8    general statements of opinion regarding the capabilities of Rimini's support offering of the kind

9    that are typical in business practice between competitors.

10         195.    The Court finds that Rimini's statements regarding replacing vendor support were

11    not sufficiently disseminated to constitute commercial advertising.

12        **4.**      **Rimini's Security-Related Statements**

13         196.    Oracle offers security-related fixes to customers in conjunction with their purchase

14    of Oracle's software support.

15         197.    The majority of Oracle's security-related fixes come in the form of critical patch

16    updates (CPUs), which are sets of patches containing fixes for security flaws in Oracle products

17    released to Oracle support customers generally four times per year.

18         198.    Oracle's CPUs purport to fix vulnerabilities in the source code of the Oracle

19    software product for which they are designed.  CPUs require extensive testing to ensure that they

20    can address the vulnerability in question.  And because CPUs modify source code, extensive

21    testing is also required to ensure that the updates do not create other vulnerabilities or otherwise

22    affect software performance.

23         199.    As a result, CPUs are generally not released until at least the second CPU release

24    date after the vulnerability is discovered—that is, it generally takes at least six months for Oracle

25    to release CPUs after the related vulnerabilities are discovered.  During this time, the unpatched

26    vulnerability may be exploited.

27         200.    Oracle does not create CPUs for all of its paying support customers.  For customers

28    with products in Sustaining Support, Oracle does not create new CPUs or other security fixes, even

Gibson, Dunn &
Crutcher LLP

1   if Oracle has created fixes for later versions of the software (which inherently share the same

2   source code vulnerabilities that CPU source code is intended to remedy).  To obtain security fixes

3   from Oracle to address any known vulnerabilities for products in Sustaining Support, Oracle users

4   must upgrade to new versions of their software.

5       201.   Oracle does not create security patches (or any other types of patches and updates)

6   that take into account clients' customizations to their Oracle software environment.

7       202.   Upgrading large enterprise systems can sometimes take a company multiple years

8   and cost millions of dollars.  For Oracle customers that do not want to incur these costs to upgrade,

9   Oracle provides no CPUs.  Thus, to obtain security fixes, Oracle users who do not upgrade must

10  find a different support provider to secure its software.  These users may elect to pursue security

11  solutions that do not involve CPUs or systematic patching, but nonetheless provide adequate

12  security protection given the user's particular needs and risk tolerance.

13      203.   One alternative security solution to CPUs is "virtual patching," sometimes referred

14  to as an "application aware firewall" or a "web application firewall."  Generally speaking, virtual

15  patching tools mitigate security risks by (i) looking for, and blocking, malicious traffic based on

16  rules or "policies" that instruct the tools to recognize certain patterns of behavior, and (ii) allowing

17  only known, benign traffic and behavior and rejecting all other transactions.

18      204.   Virtual patching tools can provide several benefits over traditional patches.  For

19  example, virtual patching software can fix problems in applications without having to touch the

20  applications themselves, which can lead to faster and less costly mitigation of vulnerabilities.

21      205.   Relatedly, because virtual patches do not modify the source code of the protected

22  software, virtual patching policies do not require prolonged development and testing cycles—

23  virtual patches can be developed in a matter of hours or days, as opposed to the many months (or

24  even years) it may take vendors to produce traditional patches.  Furthermore, virtual patching

25  policies do not require time-consuming testing or taking software offline for extended periods of

26  time.

27      206.   In the absence of CPUs, Oracle software users can employ a variety of alternative

28  security controls to reduce the risk of successful exploits, including virtual patching technology,

Gibson, Dunn &
Crutcher LLP

as recommended by Rimini.  Rimini recommends a "holistic security" approach and "virtual patching" solutions as a better overall security strategy than that offered by Oracle— representations that Oracle claims violate the Lanham Act.

207.     In addition to Rimini's statements regarding holistic security and virtual patching, Oracle also challenges various Rimini statements calling into question the efficacy of Oracle's security approach and downplaying the necessity of certain Oracle security offerings.

208.     The Court finds that Rimini's security-related statements were true and not misleading.  Each of the statements accurately describes the security measures at issue, or Rimini's security approach vis-à-vis Oracle's, particularly when the statements are read in their full context.  In addition, the statements are puffery, so are not actionable under the Lanham Act.

209.     The Court also finds that these statements did not cause any injury to Oracle.  Although the statements were aimed at prospective clients, and in some cases compared Rimini's capabilities vis-à-vis Oracle, there is no evidence that the statements diverted any sales from Oracle to Rimini or caused any loss to Oracle's business reputation.

210.     The Court also finds that many of these statements are old, going back as early as 2012.  They are not currently injuring Oracle.

### 5.     Rimini's Laches Defense

211.     As early as April 19, 2010, the date it filed its First Amended Complaint in the *Rimini I* litigation, Oracle knew that "Rimini Street advertises that it can cut customer maintenance and support bills in half and give customers a reprieve from software upgrade cycles by allowing customers to remain on older, often outdated, versions of PeopleSoft, JDE, or Siebel software rather than moving to later versions, and by eliminating fees for fixes and upgrades that customers would otherwise have to pay to remain on the older versions." *Rimini I*, ECF No. 36 at 11.  Oracle first asserted its Lanham Act claims on February 17, 2015.  ECF No. 21.

### H.     Oracle's DMCA Claims and Rimini's Defenses

212.     Oracle also accuses Rimini and Ravin of violating the DMCA.  Oracle's expert Ms. Frederiksen-Cross identified two categories of Rimini-written PeopleSoft files relevant to this claim.  Category 1 consists of Rimini files where she identified at least one version of the file that

38

1  included an Oracle copyright notice, and another version of the file with the same file name that

2  does not have an Oracle copyright notice.  Category 2 consists of Rimini files into which

3  Ms. Frederiksen-Cross claims Rimini "copied over" "more than a de minimis amount of Oracle

4  code" without also copying over an Oracle copyright notice.

5      213.   As to Category 1, Ms. Frederiksen-Cross testified that she found copies of these

6  files on clients' development or test environments.

7      214.   Ms. Frederiksen-Cross identified files in Category 1 based on the following

8  process:  She (i) developed a list of Rimini-created files by searching for them in productions by

9  Rimini's clients ("Rimini candidate files"); (ii) created a list of Rimini candidate files that had the

10  word "copyright" anywhere in the file; and (iii) created a list of any Rimini candidate files that did

11  not have the word "copyright" anywhere in the file and had the same name as a Rimini candidate

12  file with the word "copyright" in it.

13      215.   Using that list, Ms. Frederiksen-Cross identified individual files produced by

14  clients that fall into Category 1.

15      216.   There is no evidence that the files in Category 1 are exact copies of Oracle files.

16  Indeed, for many of the files, Ms. Frederiksen-Cross did not do any comparison of their contents

17  to an Oracle file to determine what percentage (if any) of the files' code matched an Oracle file.

18  The files in Category 1 were created by Rimini as part of a project to rewrite certain Oracle files

19  within the PeopleSoft HR module in 2010.  Oracle was aware of these files as a result of discovery

20  in *Rimini I*.

21      217.   Ms. Frederiksen-Cross identified files in Category 2 based on the following

22  process:  She (i) developed a list of Rimini candidate files; (ii) developed a list of copyrighted

23  Oracle files ("Oracle Master files"); (iii) compared the two lists to pair Rimini candidate files with

24  Oracle Master files that share the most "lines in common"; (iv) created a list of any Rimini

25  candidate files that did not have the word "copyright" anywhere in the file and had the same name

26  as a Rimini candidate file with the word "copyright" in it; (v) filtered Rimini candidate files to

27  create a list of files that did not have the word "copyright" and had at least 20% matching lines to

28  Oracle Master files; and (vi) searched client environments for any of the above identified files and

counted once per client.

218. Ms. Frederiksen-Cross identified 13 unique files in her Category 2 set. Ms. Frederiksen-Cross did not find that any of the "rsi" files in Category 1 were exact copies of Oracle files (less Oracle copyright notices). Moreover, unlike the files in Category 1, Ms. Frederiksen-Cross does not contend that Rimini engineers deleted any Oracle copyright notices from the files in Category 2. Rather, Ms. Frederiksen-Cross has opined that Rimini engineers copied individual lines of code from an Oracle file into a new, Rimini-written file, without also copying over Oracle copyright notices into the new, Rimini-written file.

219. Rimini's policy on copyright treatment was openly written in its Developer Guidelines. And Rimini's delivery documentation that accompanied its rewrite files also informed clients what Rimini had done with the files. There is no evidence that any Rimini clients were confused about the contents of these files. To the contrary, Rimini clients hire Rimini specifically to make updates to Oracle software, and thus expect Rimini to update their licensed Oracle files. The Court finds that to the extent any Oracle copyright notices were deleted, Rimini had no intention to induce, enable, facilitate, or conceal infringement.

220. Rimini produced files in Categories 1 and 2 to Oracle in discovery in *Rimini I*, and thus Oracle was aware of Rimini's conduct before February 28, 2013.

221. Oracle first asserted its DMCA claim on February 28, 2016, in its amended counterclaims. ECF No. 173 ¶¶ 137-48.

## I.    Oracle's UCL Claims

222. Oracle accuses Rimini of violating the UCL through (i) unlawful and (ii) unfair conduct, based on Oracle's accusations of Rimini allegedly violating the Copyright Act (via infringement), the Lanham Act, and the DMCA. In addition to all other findings the Court has made relevant to the above claims, the Court further finds:

223. Oracle has failed to establish that it suffered an injury, economic or otherwise, caused by the conduct Oracle accuses of violating the UCL.

224. In particular, Oracle has failed to show how any of Rimini's conduct that is accused as infringing, violating the Lanham Act, or violating the DMCA—even if the Court were to

40

Gibson, Dunn & Crutcher LLP

conclude that Oracle prevailed on the merits of those claims—*caused* Oracle any injury, economic or otherwise, to Oracle.  As found above, Rimini's pricing is not a function of any accused conduct. Moreover, Oracle has failed to establish that any of the accused statements under the Lanham Act caused any injury to Oracle at all and has similarly failed to show how the alleged removal of copyright notices caused any injury to Oracle.

225.   The Court further finds that, despite all of Rimini's accused conduct, Oracle continues to maintain a consistent 95% market share of the market for Oracle support contracts.

226.   Oracle has also failed to prove how any of the actions of Rimini—a much smaller competitor when compared to Oracle's size and market share—inflicted any injury to competition. Oracle has not proven any classically anticompetitive behavior in the sense relevant under the UCL.

**J.     Facts Related to the Parties' Requested Injunctive Relief**

227.   The Court makes the following additional findings relevant to the parties' respective requests for injunctive relief.

**1.     Rimini's Request for Injunctive Relief**

228.   Rimini seeks a permanent injunction under California's UCL to remedy irreparable harms caused by Oracle's at-issue unfair business practices.  Oracle raises various equitable and speech-related defenses and opposes issuance of a permanent injunction on the merits.

229.   In addition to the findings of fact relevant to the merits of Rimini's UCL claim, the Court further finds:

230.   Rimini has proven that it has suffered an irreparable injury.  Oracle and Rimini compete with one another in the market for software support of Oracle software products.  Rimini has proven injuries to itself in the form of harms both to itself and to competition.  Oracle's classically anticompetitive behavior (its MSL Policy, reinstatement penalty policy, and false statements to customers as a part of "Project Rimini") amounts to: conditioning contracts on not doing business with Rimini, depriving consumers of valuable competing services, restricting the supply of Rimini's rival services, baseless denigration of a rival's services as part of an overall pattern of anticompetitive conduct, raising prices to consumers, wrongfully representing to third

41

Gibson, Dunn & Crutcher LLP

parties legal risks that do not exist, and bad faith conduct aimed at driving Oracle's largest competitor out of a market space in which Oracle already enjoys a 95% market share and a 95% profit margin.

231.    Rimini has also clearly established harms directly to itself in the form of reputational harm and loss of customer goodwill.  Oracle's campaign wrongly impugned Rimini and caused a loss of prospective customers and a loss of goodwill.

232.    Without injunctive relief, harm to Rimini and to competition will continue, and there is no undue harm to Oracle as a result of being enjoined from this conduct.  Oracle has no legitimate interest in acting anticompetitively and equally has no legitimate business reason for making false statements regarding Rimini.

233.    The public interest favors robust competition and truthful statements in the marketplace.

### 2.    Oracle's Requests for Injunctive Relief

234.    Oracle also seeks permanent injunctive relief pursuant to the Copyright Act and DMCA (17 U.S.C. § 502(a)), the Lanham Act (15 U.S.C. § 1116), and California's UCL (Cal. Bus. & Prof. Code § 17203).

235.    Oracle has failed to establish any form of irreparable injury that it claims, including reduced market share, reputational damages, or loss of customer goodwill.  Importantly, all or nearly all of the acts Oracle accuses of being illegal under any theory occurred *years* ago, in some cases as much as a *decade* ago, such as the true statements Rimini has made that Oracle claims violated the Lanham Act, or Rimini's alleged removal of copyright notices.  The two instances of infringement this Court already found on summary judgment related to Campbell Soup and City of Eugene occurred in 2014 and 2015 and were, as the Court found, "limited" instances.  ECF No. 1253 at 87.  And as to other aspects of Rimini's Process 2.0 that Oracle accuses, like CodeAnalyzer, even if infringing (which they are not), Rimini ceased using them in 2018.  Oracle presents no evidence that Rimini's *current* practices threaten Oracle with irreparable injury on a prospective basis that could not be remedied with monetary relief, such as statutory damages, which Oracle abandoned going into this trial.

Gibson, Dunn & Crutcher LLP

236.     The Court further finds that even if Oracle had established *some* irreparable injury, Oracle has failed to prove the required causal nexus between Rimini's accused conduct and Oracle's asserted irreparable injury.  Oracle sought to show causation through a chain of causation linking loss of customers to Rimini's alleged infringement.  Oracle contends that Rimini's infringement generated significant cost savings, which in turn allowed Rimini to offer a 50% lower price, which in turn was the but-for cause of customers leaving Oracle.  But Oracle's evidence fails.

237.     Oracle maintains a 95% share of the market for support of its enterprise software and a profit margin of 95% on that support.  Neither Oracle nor its expert witnesses were able to explain why a 50% discount on that rate could not be achievable absent infringement.  Particularly probative in this regard is the fact that another third-party provider, Spinnaker, offers similar support processes for Oracle's software at a similar 50% discount, if not more.  That discount cannot be attributed to infringement because Oracle itself took the position, after reviewing the company's processes in depth, that Spinnaker's processes *did not infringe* on Oracle's copyrights.

238.     The evidence shows that Oracle loses 6% to 7% of its support customers every year, a far larger number of customers than Rimini gains over the same time period.  As Rimini pointed out at trial, Oracle's own expert admitted in the *Rimini I* litigation that the customers Rimini gained were customers that Oracle would have lost anyway for many of the reasons expressed above.  Importantly, one of the main reasons for Oracle's customer attrition is *Oracle's conduct*, rather than Rimini's, related to decisions to stop supporting certain licensed software products still in use by many support customers.  The vast majority of Rimini's clients at issue in this case use versions of Oracle software that would only be eligible for Sustaining Support today.

239.     The Court rejects the testimony of Oracle's expert, Paul Pinto, on the question of causation.  Mr. Pinto did not analyze whether Rimini could have offered the same price discount even without the cost savings Mr. Pinto attributed to Rimini's alleged infringement.  Nor did Mr. Pinto analyze whether Rimini could have offered a different discount (*e.g.*, a 30% discount) without using the accused conduct, nor whether customers would still have been attracted to Rimini by such a discount.

240.     With respect to Campbell Soup and City of Eugene, Oracle was unable to present any customer statements suggesting that the two infringing updates caused them to leave Oracle in favor of Rimini.  In fact, the direct evidence of customer motivation presented at trial suggests customers left Oracle for a variety of reasons, including dissatisfaction with Oracle's services, Oracle dropping support for the customer's software, and superior quality or service types offered by Rimini or another competitor.

## III.     CONCLUSIONS OF LAW

### A.     Rimini's Declaratory Judgment Claim Regarding Process 2.0

241.     In the Ninth Circuit, Oracle bears the initial burden to demonstrate that Rimini has copied protected expression from one of Oracle's copyrighted works.  *VHT, Inc. v. Zillow Grp., Inc.*, 918 F.3d 723, 731 (9th Cir. 2019).  This requires showing that there is substantial similarity between the two particular works, as well as showing that any such copy is more than *de minimis*.  *Newton v. Diamond*, 388 F.3d 1189, 1193 (9th Cir. 2004).  Moreover, Oracle must show that whatever Rimini has copied is itself protected expression, which requires filtering out non-protected elements of the software in question.  *Narell v. Freeman*, 872 F.2d 907, 910-11 (9th Cir. 1989).  If Oracle meets that burden, Rimini bears the burden of identifying a license that permits Rimini to make copies.  ECF No. 1253 at 42.  Once Rimini does that, the burden then shifts back to Oracle to prove that Rimini made copies in violation of the terms of the license agreement at issue (*id.*), and that the violated term was a "condition" of the license grant, rather than a mere "covenant" under the license (*MDY Indus., LLC v. Blizzard Ent., Inc.*, 629 F.3d 928, 939 (9th Cir. 2010)).

242.     Rimini's claim for a declaratory judgment of non-infringement as to Process 2.0 involves application of this burden-shifting framework under Ninth Circuit precedent.  There is no dispute between the parties that, as a general matter, Process 2.0 routinely involves the copying of Oracle protected expression when Rimini engineers remotely access a client's software environment on the client's systems and run the program.  The Court holds that Rimini has met its burden of proving that the copies it makes in the course of providing its Process 2.0 support are authorized by the license agreements at issue in this case.  The Court also holds that Oracle has

Gibson, Dunn & Crutcher LLP

1  failed to meet its subsequent burden of demonstrating that either Process 2.0 as a whole, or the

2  individual instances Oracle accuses, are infringing.  And in all events, even if some of the instances

3  Oracle points to were infringing (and even accounting for the instances of infringement found on

4  summary judgment), that does not change the Court's declaration that Process 2.0 as designed and

5  generally implemented in the vast majority of cases in Rimini's business operations is licensed

6  and non-infringing.

7       **1.**     **Remote Access and Copying of Code in Client Environments**

8      243.   Construing a license agreement is principally a matter of contract interpretation.

9  *S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1088 (9th Cir. 1989).

10      244.   While there is wide variation among the terms in Oracle's license agreements, the

11  Court has repeatedly held that the license agreements "allow the licensee to copy the software into

12  a development environment and have an in-house IT team service it themselves," and also "allow

13  for a third-party service provider, like Rimini, to copy the software in place of the licensee and

14  customize it for the licensee."  *E.g.*, ECF No. 1253 at 2-3.  In the first *Rimini I* appeal, in which

15  the Ninth Circuit construed certain PeopleSoft, JDE, and Siebel legacy licenses, the Ninth Circuit

16  similarly noted "that the licenses generally permit Oracle's licensees to maintain the software and

17  make development environments for themselves," or, "lacking either the capability or the interest,

18  … to outsource the work of maintenance to others."  *Oracle*, 879 F.3d at 956.  That point is

19  confirmed by the well-established rule of license interpretation that, absent express language to

20  the contrary, a licensee may "fix, update, debug, customize, test, and modify his copy of [licensed

21  software]" and has "unbridled authority to 'authorize' others to effectuate those activities for him."

22  2 *Nimmer on Copyright* § 8.08[D][2]; *see, e.g.*, *Great Minds v. Fedex Office & Print Servs., Inc.*,

23  886 F.3d 91, 96 (2d Cir. 2018) (absent "clear statement," license "provides no basis" for

24  distinguishing between licensee's employees and third party commercial services); *Automation by*

25  *Design, Inc. v. Raybestos Prods. Co.*, 463 F.3d 749, 757-58 (7th Cir. 2006) (license impliedly

26  authorized licensee to hire third party to build machine on licensee's behalf).

27      245.   Thus, when Rimini remotely accesses a siloed client environment on the client's

28  systems and creates copies in order to provide support to the client, such copies are all generally

authorized under the relevant license agreements and are therefore non-infringing.

## 2.    Siloed, Non-Generic Environments

246.    Based on the Court's relevant findings herein, the Court further holds that the use of siloed, non-generic environments on a client's systems is also licensed.  Those environments are themselves copies of Oracle's software (often running with Rimini-written expression in the form of customizations and updates), but are expressly licensed as the "use" and "copying" permitted by the relevant license agreements, across all product lines, the same as third-party copying is licensed.  No evidence supports a conclusion that software environments on a client's systems are anything other than customized software environments that exist for the purpose of running the client's internal data processing operations.

247.    Even if there were instances in which an engineer used a client's environment in a way that, for example, violated the internal data processing operations provisions of a license agreement, as this Court held on summary judgment had occurred on two "limited" occasions with respect to Campbell Soup and City of Eugene (ECF No. 1253 at 48, 53, 87), or as this Court held during the contempt proceedings had occurred on a few other occasions with respect to the environment for City of Eugene (*Rimini I*, ECF No. 1548 at 25, 29), that does not change the fact that each client's production, testing, and development environment exists on the client's systems to support that client, and is thus authorized to that extent.  Such copies are necessary to run and maintain the software for its intended and licensed uses.

## 3.    Re-Use of Rimini's Knowledge and Work Product

248.    The most significant dispute in this case concerns Rimini's various forms of re-using its know-how gained in the process of providing updates and fixes to clients.  As set forth below, the Court holds that, as designed and generally implemented in Process 2.0, Rimini's various forms of re-use of knowledge are licensed.

249.    As the Court previously held on summary judgment, it is not "cross use for a Rimini engineer to 'memorize and replicate the work,' as Oracle claims."  ECF No. 1253 at 87.  "The fact that a Rimini software engineer can create the update for Client B more efficiently because he or she gained experience creating the update for Client A is not relevant in this analysis.  It is obvious

46

that the first time a software engineer creates an update for a client, he or she is slower and less proficient than any subsequent time they create that update. Moreover, it would be impossible to direct an engineer, who developed an update in Client A's environment, to not use the knowledge he or she gained when developing the same or similar update for Client B." *Id.* The Court reiterates this ruling here.

250. As the Court's prior holdings make clear, Rimini is permitted to re-use the knowledge it gains when it supports Client A in order to support Client B and other subsequent clients.

251. Rimini is also permitted to write down or otherwise memorialize its own know-how and knowledge in technical specifications or other similar documents. There is no discernible distinction—in either the copyright laws or the relevant license agreements—between Rimini engineers *remembering* the work they did and Rimini engineers *writing down* in a document the work that they did. And on a practical level, no software support company can operate without creating documentation showing the work it has done. Nor is there any cognizable harm to Oracle's intellectual property rights if an engineer puts down on paper what is in the engineer's mind, as opposed to memorizing it.

252. Finally, Rimini is permitted to re-use its own Rimini-written code (not containing Oracle protected expression, either literal or non-literal) with multiple clients so long as the code does not contain Oracle code or protected expression. As the Court has already held, "it is generally not cross use for a Rimini engineer to create an update file for Client A exclusively using Client A's software and then create the same update file for Client B exclusively using Client B's software." ECF 1253 at 87. Similarly, the Court has held that Rimini is permitted to "memorize and replicate" its updates. *Id.* Such updates routinely involve Rimini-written code, and thus it is clear based on the Court's prior rulings that Rimini is allowed to create and then replicate the same code for multiple clients. Nor does it matter whether Rimini *memorizes* the code or *writes it down* before sharing it with a second client—again, neither the copyright laws nor the license agreements recognize any relevant distinction between these forms of copying of *Rimini's own expression*.

253. The operative phrase "internal business operations" (or its equivalent) in all of

47

Gibson, Dunn &
Crutcher LLP

Oracle's license agreements does not sweep to the extent Oracle suggests.  Oracle's interpretation would effectively prohibit third-party support providers from ever having multiple clients or effectively re-using their *own* protected expression to provide support for multiple clients.

254.    The Court also notes that Oracle has specifically *approved* of this same kind of re-use of knowledge and written code and other know-how as to Spinnaker and CedarCrestone.  This evidence supports the Court's construction of the licenses as not preventing Rimini's re-use of know-how, its work product, and its own code.

255.    Thus, although specific accusations of infringement are addressed further below, the Court concludes that Rimini's re-use of Rimini-created know-how and Rimini-written code typical to Process 2.0 is licensed.

**4.     Declaration of Non-Infringement**

256.    District courts have discretion to entertain actions for declaratory judgment with respect to copyright infringement pursuant to the Copyright Act (17 U.S.C. §§ 101 *et seq.*) and the Declaratory Judgment Act (28 U.S.C. § 2201(a)).  Based on the relevant findings of fact, the Court holds that a justiciable controversy exists between the parties and exercises its discretion to enter a declaratory judgment.  *See Shloss v. Sweeney*, 515 F. Supp. 2d 1068, 1075 (N.D. Cal. 2007).

257.    Based on the foregoing findings of fact, the Court holds that Rimini may do all of the following without violating Oracle's license agreements or the Copyright Act:

(i) Rimini engineers can, in the process of providing support to a licensed client, memorialize and document the know-how gained in that process, including in Rimini-authored documents such as technical design specifications, development instructions, and other similar documents, and re-use that knowledge and documentation for multiple licensed clients.

(ii) Rimini engineers can, in the process of providing support to a licensed client, memorialize and document Rimini's own written software code that does not contain Oracle protected expression, literal or non-literal, and re-use that code for multiple licensed clients.

(iii) Rimini engineers can use Rimini-written software tools, including Rimini's AFW

48

tools, that contain no Oracle protected expression, literal or non-literal, to automatically perform functions associated with Rimini's re-use of its code and know-how, as held above, including Rimini's CodeAnalyzer and ePack tools.

(iv) Rimini can access and create copies in client environments when those clients host their environments on cloud systems such as Windstream, so long as the clients maintain relevant control over those systems, which Rimini has demonstrated exists in this case.

258.    The Court orders Rimini to file a proposed declaratory judgment consistent with these findings of fact and conclusions of law.

259.    The Court's judgment renders Rimini a "prevailing" party for purposes of the Copyright Act's attorneys' fees provision.  17 U.S.C. § 505; *Shloss v. Sweeny*, 515 F. Supp. 2d 1083, 1085 (N.D. Cal. 2007).

**B.      Oracle's Claims for Direct Copyright Infringement**

**1.      Process 1.0 "Migration" Claims**

260.    Oracle asserts in this case that Rimini's process of "migrating" PeopleSoft environments from Rimini's systems to Rimini's clients' systems, done in part to comply with the Court's 2014 summary judgment orders, infringed Oracle's copyrights by creating unauthorized copies on Rimini's systems as a part of that process.

261.    Rimini "migrated" environments and software for a total of 195 of its PeopleSoft clients.  Based on the relevant factual findings entered by the Court, the Court holds that Oracle fails to shoulder its burden of showing that the creation of these copies violated the relevant license agreements as to a substantial number of those environments.  Rimini certainly made copies during this process, but those copies were licensed.  It is Oracle's burden to demonstrate that such copying was done outside the scope of the relevant PeopleSoft license agreements.  *S.O.S.*, 886 F.2d at 1085.  But there can be no doubt that the copying of environments in order to relocate them to a place of the client's choosing was done as a part of supporting the client's "internal business operations."

262.    Furthermore, in *Rimini I*, Rimini was held liable, and that liability was affirmed on appeal as to PeopleSoft software and documentation because the license agreement at issue

49

Gibson, Dunn &
Crutcher LLP

contained a provision limiting the use of the software to the licensee's "facilities." *Oracle*, 879 F.3d at 959-60. But there simply *is no facilities restriction* in a number of the PeopleSoft licenses for migrated environments. The Ninth Circuit has been clear that a license agreement lacking such a restriction does not dictate *where* the licensee uses or copies the software, thus, even copies on Rimini's systems are non-infringing (*Oracle*, 783 F. App'x at 710-11), and the copies were made within the scope of the relevant license agreements.

263.    Furthermore, even assuming *arguendo* that the copies Rimini made during the migration for the remaining clients whose license agreements *did* have a "facilities" restriction were *prima facie* infringing, as set forth below, Rimini has met its burden of showing that such copies were permitted as a matter of fair use to comply with a court order.

264.    Oracle's argument that Rimini should have deleted or sequestered the software on its systems and built new environments for each PeopleSoft client from scratch is unavailing. At worst, rebuilding environments from scratch would be impossible, such as in the case of attempting to recreate client archives; returning the client's software to the clients was Rimini's only option. At best, the end result would be exactly the same: Rimini's clients would still have the same software environments with the same licensed Oracle code. Oracle would not have earned any more money, as it is undisputed that every client involved in the migration already paid Oracle for a license. The only impact would be to make Rimini's clients suffer through delays and disruption (thereby damaging their relationship with Rimini), and to force Rimini to spend unnecessary time and resources recreating and reapplying updates it had already provided to these clients.

**2.      Oracle's Product-Line Claims**

        *a*.      ***PeopleSoft***

265.    ***Rimini Clients That Used Windstream Cloud Accounts.*** Oracle contends that Rimini made copies of PeopleSoft software outside of clients' "facilities," and thus violated those clients' PeopleSoft license agreements, when it provided support to clients that stored their PeopleSoft software environments in their cloud account provided by Windstream, a cloud-hosting company. The Court rejects this argument.

266.    As this Court held at summary judgment, "agree[ing] with Rimini," "[t]he Ninth

Circuit" held that whether a computer system is a licensee's "facilities" in the PeopleSoft license depends on whether the client has "control" over it; indeed, "the concept of control is vital to a determination of what constitutes the licensee'[s] facilities."  ECF No. 1253 at 90-91 (citing *Oracle*, 879 F.3d at 959-60).  But that dispute has now been resolved, because as found herein, for those few clients that choose to store their environments on the cloud, those clients retain total relevant control over those environments, and thus such cloud systems qualify as "facilities" under the license agreements.

267.  ***Data, Code, and Object Changes.***  Oracle accuses a number of procedures Rimini uses with respect to data, code, and object changes in PeopleSoft of infringing by violating the "internal business operations" provision common to PeopleSoft licenses.  Based on the relevant findings of fact, the Court holds that Oracle has failed to meet its burden of showing that Rimini acted outside the license agreements.

268.  Oracle's theory with respect to all of these matters is that Rimini engages in "cross-use" because, in essence, it makes copies in the client's environment that inure to the benefit of subsequent clients that receive the same tax, legal, and regulatory update.  The Court rejects Oracle's theory for substantially the same reasons as stated in discussing Rimini's declaratory judgment claim.

269.  The Court further holds that the Rimini-written scripts and other materials at issue that the Court has found contain no protected expression of Oracle, whether literal or non-literal, are not derivative works under the Ninth Circuit's test.  *Micro Star v. Formgen Inc.*, 154 F.3d 1107, 1110 (9th Cir 1998); *Lewis Galoob Toys, Inc. v. Nintendo of Am., Inc.*, 964 F.2d 965, 967 (9th Cir. 1992).  Even under the test this Court articulated on summary judgment, which treats purely Rimini-written work product or code containing no protected Oracle expression as a derivative work if it (1) was written using an Oracle tool and (2) can only run with Oracle software (*see* ECF No. 1253 at 52-53), these materials do not amount to derivative works.  Even if they did, they were licensed, as PeopleSoft licenses permit the licensee, and third parties on their behalf, to create derivative works (*see id.* at 52 (noting PeopleSoft license agreement "clearly permits … a

Gibson, Dunn & Crutcher LLP

third party servicer, like Rimini, to create … derivative works on [the licensee's] behalf")).[2]

270.   ***Rimini's Quality Assurance Testing.***   Based on the relevant findings of fact, the Court rejects Oracle's theory that shortened testing time in Rimini's QA testing amounts to illegal "cross-use."

271.   As the Court already held on summary judgment, it is "not cross use" for a Rimini engineer to become "more efficient[]" in providing updates.  ECF No. 1253 at 87.  And the Court has already held that "Rimini is not required to test updates" at all.  ECF No. 1459 at 26.  It necessarily follows that Rimini can batch its testing in such a way that earlier tests require more time, and subsequent tests require less.  Nothing in the license agreements prohibits that.

272.   ***"rsi" Prefixed Files.***   Based on the relevant findings of fact, the Court holds that Oracle has failed to meet its burden of demonstrating that the Rimini rewrite files constitute copying, that is, that they are "substantially similar" to the Oracle files that Oracle accuses Rimini of copying.

273.   As this Court has previously held in rejecting similar accusations from Oracle with respect to files accused of copying Oracle expression, "[i]t is well settled that not all copying violates the Copyright Act, but rather, a plaintiff must prove 'copying of protectable expression beyond the scope of the license.'"  *Rimini I*, ECF No. 1548 at 33 (quoting *MAI Sys. Corp. v. Peak Comput., Inc.*, 991 F.2d 511, 517 (9th Cir. 1993)).  "Copying may be shown by circumstantial evidence of access and substantial similarity of both the general ideas and expression between the copyrighted work and the allegedly infringing work."  *Apple Comput., Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1442 (9th Cir. 1994).  "[W]orks cannot be substantially similar where analytic dissection demonstrates that similarities in expression are either authorized, or arise from the use of common ideas or their logical extensions."  *Id.* at 1439.  Analytic dissection refers to the process of determining whether the allegedly similar features are "elements of a work that are protectable

---

[2] Rimini disagrees with the definition of derivative works the Court adopted on summary judgment, contending that under *Lewis Galoob Toys*, if a stand-alone program or update contains no Oracle expression, literal or non-literal, then it cannot be a derivative work, and has presented that test as a means of preservation, contending that the *Lewis Galoob Toys* definition should apply to all claims of derivative works in this case.

Gibson, Dunn & Crutcher LLP

and used without the author's permission[.]" *Id.* at 1443.

274.   Applying the same "extrinsic test" that the Court applied in the contempt proceedings, "[t]he Court is not convinced that the elements identified by [Ms.] Frederiksen-Cross that appear in both files are indicative of copying, or that at least some of them should not be filtered out as constrained or unprotectable." *Rimini I*, ECF No. 1548 at 34.   The Court agrees with Rimini's expert that analytic dissection requires filtering out from the accused Rimini files things such as:   (i) names of tables or fields that are dictated by another   program; (ii) call procedures, functions, or variables defined in another Oracle file; (iii) "#include" statements referencing another Oracle file; (iv) code dictated by tax filing requirements set by governing bodies or other external restraints; (v) sequencing code based on development conventions; (vi) defining variable names based on standard development conventions; and (vii) standard programming language terms.   These do not qualify as protected expression.

275.   And, when applying the proper filter, the Court finds that the files Oracle accuses Rimini of copying are not substantially similar to the Oracle files.[3]

276.   Furthermore, based on the Court's relevant findings as to the quantity and quality of any "copied" material, the Court holds, as it did during the contempt proceedings, that these "copies" are *de minimis* and that "*de minimis* copying is not prohibited by the Copyright Act." ECF No. 1548 at 47 (citing *Newton*, 388 F.3d at 1193).

              ***b.***     ***JDE***

277.   **JDE Registrations.**   Because Oracle has asserted copyright ownership and registration in this case of only four JDE updates and one documentation database, none of which cover the actual JDE releases themselves, and because Oracle also did not offer any evidence of allegedly infringing conduct related to these five registered copyrights, Oracle's claims as to JDE

---

[3] The Ninth Circuit's decision in *Bell v. Wilmott Storage Services, LLC*, 12 F.4th 1065, 1074 (9th Cir. 2021), which Oracle relies on for the proposition that it need not conduct analytic dissection if there is "verbatim" copying, is not on-point—that case concerns the *de minimis* exception, not analytic dissection of computer code.   As this Court recognized in the contempt proceedings, analytic dissection is required when assessing whether substantial similarity exits as to software code, because not all components of software are "protectable" under the Copyright Act, and thus must be filtered out.   *Rimini I*, ECF No. 1548 at 34.

Gibson, Dunn &
Crutcher LLP

fail as matter of law for failing to prove the *prima facie* element of ownership. *Kruska v. Perverted Justice Found. Incorporated.org*, 2010 WL 3210847, at *3 (D. Ariz. Aug. 9, 2010). In any event, Oracle's JDE claims also fail for the following reasons:

278. **JDE Source Code.** As the Court held generally with respect to Process 2.0 above, the license agreements in this case, across all product lines, permit Rimini to make copies on behalf of the licensee for the purposes of software support and maintenance.

279. With regard to JDE, however, Oracle argues that Rimini acts outside the scope of the license agreements any time it makes a copy of JDE source code. Oracle raised this issue in the contempt proceedings related to the *Rimini I* injunction, arguing that Rimini could never make any copies of JDE source code for any reason. The Court rejected this argument in the contempt context, holding that:

> the Permanent Injunction only applies to conduct previously held unlawful. In this case, whether Rimini is ever permitted to *lawfully* copy source code under a specific provision of the J.D. Edwards license has never been interpreted or decided by this Court. Having considered the provisions of the J.D. Edwards Legacy license agreement, the Court is not convinced at this time that Rimini may never copy source code when doing so is solely to support the needs of the client. And the Court has not before considered what "screen access" means and whether Rimini's support Process 2.0, in which Rimini remotely accesses the client's environments, is permitted given this provision. These issues are squarely before the Court in *Rimini II* and therefore, the Court declines to reach them at this time.

*Rimini I*, ECF No. 1548 at 46.

280. The JDE license agreements vary significantly. However, based on the relevant findings of fact, the Court concludes that the licenses authorize third-party support, including the copying of source code, so long as it is done consistent with the other terms of the license agreements, such as the common limitation to use copies for the internal data processing operations of the licensee.

281. In one version of the JDE license typified by the Liz Claiborne license (held by around 40 Rimini clients), the license says that the "Customer" (licensee) "may allow its customers, vendors or other entities in a similar relationship to Customer to access [JDE] and use the same for the purpose of conducting inquiries and other limited activities so long as Customer can demonstrate" seven elements, including that "none of the aforementioned entities, at any time,

Gibson, Dunn & Crutcher LLP

1  has access to J.D. Edwards' source code."  In another version, typified by the Giant Cement

2  license, it says that "[f]or any access to the Software other than by an employee of Customer,

3  Customer shall not provide access to source code and all provided access shall be restricted to

4  screen access for the functions required."  Oracle established only that five Rimini clients have

5  this license.

6  282.  Oracle's argument fails under both versions of this language.  First, Oracle's

7  argument, for either version of the license, is inconsistent with the Ninth Circuit's earlier ruling

8  construing the Giant Cement JDE license.  The Ninth Circuit held that the Giant Cement license's

9  language—providing that the licensee can authorize third parties to "copy the Documentation or

10  Software … to the extent necessary for the Customer's archival needs *and to support the Users*"—

11  "would not preclude Rimini *from creating development environments for a licensee for various*

12  *purposes* after that licensee has become a customer of Rimini."  *Oracle*, 879 F.3d at 955, 958

13  (emphases added).  As found herein, the creation of a "development environment" necessarily

14  requires the copying of source code.  Oracle's argument falls flat in the face of this binding

15  construction by the Ninth Circuit.

16  283.  Second, the Liz Claiborne licenses' own terms preclude Oracle's theory.  Those

17  licenses expressly acknowledge that any "Derived Software," a term defined as "[s]oftware

18  programs or modifications to [JDE] created through the use of a development tool licensed

19  hereunder and developed *by Customer, its employees or third party agents (not [Oracle])*,"

20  (emphasis added), belongs to the "Customer," that is, the "Customer shall own all right, title, and

21  interest [in] any Derived Software except [that] [Oracle] shall retain sole ownership of such

22  portions of the Derived Software that contain part or all of [JDE] Software."  It is not possible to

23  make a "modification" to JDE software using the tools delivered with JDE without accessing and

24  modifying JDE "source code."  And the plain language of the license agreement states not only

25  that the Customer—*not Oracle*—*owns title* to those modifications (meaning Oracle cannot base a

26  copyright infringement claim on them), but it specifically provides in the very definition of

27  "Derived Software" that such Derived Software consists of "[s]oftware programs or

28  modifications" to JDE "developed by *Customer, its employees or third party agents (not*

1    *[Oracle])*.*"  (Emphasis added).

2        284.    These provisions would be rendered incoherent were the "Third-Party Access"

3    provision read to prohibit "third party agents" from accessing "source code."  These particular

4    licenses are governed by Colorado law, which, like most jurisdictions, holds to the basic

5    contractual interpretive principle that the Court must view an agreement "in its entirety with the

6    end in view of seeking to harmonize and to give effect to all provisions so that none will be

7    rendered meaningless."  *Fed. Deposit Ins. Corp. v. Fisher*, 292 P.3d 934, 937 (Colo. 2013)

8    (quoting *Copper Mountain, Inc. v. Indus. Sys., Inc.*, 208 P.3d 692, 697 (Colo. 2009)); *see also*

9    *Peterson v. Minidoka Cnty. Sch. Dist. No. 331*, 118 F.3d 1351, 1359 (9th Cir. 1997) ("The usual

10   rule of interpretation of contracts is to read provisions so that they harmonize with each other, not

11   contradict each other.").    Oracle's reading would contradict that bedrock principle of

12   interpretation—as well as Oracle's earlier approval of Spinnaker accessing source code.  As noted

13   above, it is standard industry practice for consultants, integrators, and third-party support providers

14   to modify source code, including JDE source code, without being considered in preach of software

15   license agreements.  The Court therefore rejects Oracle's contrary no-access argument.

16       285.    Third, the Court's interpretation of the Liz Claiborne licenses is further supported

17   by the fact that there is simply no *need* to read the license agreement as Oracle proposes—the

18   third-party access limitations Oracle points to, when read in context of the entire agreement,

19   including the rights related to Derived Software as noted above, clearly pertain to third parties *of*

20   *a particular kind* and do not include Rimini.  As the plain language of the agreement states, "screen

21   access" is a limitation to the licensee's "customers, vendors or other entities in a similar

22   relationship to Customer" who are actually running and using JDE for its primary functions, *not*

23   individuals or entities hired to maintain the software for the licensee.  That is why the license says

24   that third parties may access JDE's *interface* (*i.e.*, screen access) to "conduct[] inquiries" using the

25   software.

26       286.    Fourth, the Giant Cement license reaches the same outcome with different

27   language.  Article IV of that license contemplates the provision of "consulting services" for

28   software support, which can be provided *either* "by [Oracle]" *or* "from *third parties*," with Oracle

56

Gibson, Dunn &
Crutcher LLP

disclaiming any responsibility "for problems caused by *alterations or modifications made by Customer or a third party to the Software*." (Emphases added). Indeed, the license explicitly contemplates either Oracle or third parties providing "Developed Software" to the licensee under Article IV of the license. None of this would make any sense if the third party were not able to access "source code," both because accessing and copying "source code" is undisputedly necessary to make "alterations" or "modifications" "to the Software" (indeed, to *any* software), and because making such alterations and modifications is clearly the nature of the "consulting services" discussed in the license to be provided by either Oracle or a "third party."

287. Fifth, Oracle's reading, including reliance in the Liz Claiborne license provisions that limit access to source code to third parties that do not "compet[e] with [Oracle]," would be an unequivocal instance of copyright misuse. Oracle's "license[s] must be construed in accordance with the purposes underlying federal copyright law" (*S.O.S.*, 886 F.2d at 1088), including avoiding instances of copyright misuse, which are "violative of the public policy embodied in the grant of a copyright" (*Lasercomb Am., Inc. v. Reynolds*, 911 F.2d 970, 978 (4th Cir. 1990)). "The copyright misuse doctrine prevents holders of copyrights 'from leveraging their limited monopoly to allow them control of areas outside the monopoly'" by "'using … conditions to stifle competition'" and "'prevent[ing] … licensee[s] from using *any other competing product*.'" *Oracle*, 879 F.3d at 957-58 (quoting *Apple Inc. v. Psystar Corp.*, 658 F.3d 1150, 1157, 1159 (9th Cir. 2011)). The Court would thus construe the licenses in this fashion to avoid copyright misuse in all events because Oracle cannot use license provisions to monopolize the aftermarket for software support services.

288. ***JDE Technical Specifications.*** Based on the relevant findings of fact, the Court holds that Oracle has failed to meet its burden to demonstrate that Rimini's re-use of know-how in the form of JDE technical specifications violates the relevant licenses and is therefore infringing. Oracle's theory is that Rimini's use of JDE technical specifications to record know-how constitutes "cross-use" of JDE software in violation of the license provisions limiting copies to the internal business operations of the licensee. The Court rejects this theory.

289. Under Rimini's policies, technical specifications can include Rimini know-how and Rimini written code, but cannot include any Oracle protected expression. Any copies of Oracle

57

expression created while working on an update for a client, or technical specification created for an update, remain in that client's siloed environment.

290.    The Court has already rejected Oracle's overly broad "cross-use" theories, and does the same here.  Each time a copy, for instance a RAM copy, is made when a Rimini engineer is creating an update that is documented in a technical specification, the initial copy is made to service that client's licensed business operations.  The licenses do not prohibit Rimini from having multiple clients.

291.    Indeed, that the licenses permit this conduct is readily apparent from Oracle's explicit approval of Spinnaker's JDE support processes, which are materially identical to Rimini's in numerous respects.  Oracle inspected Spinnaker's support processes—processes which involve a "general design framework" and re-use know-how in the same manner as Rimini's technical specifications—and concluded that the processes did not infringe Oracle's intellectual property rights or violate Oracle's license agreements with Spinnaker's clients.  Rimini's conduct, like Spinnaker's, does not violate the license agreements.

### c.    Siebel

292.    Based on the relevant findings of fact, the Court holds that Oracle has failed to meet its burden to demonstrate copyright infringement as to its Siebel claims.

293.    As to the two Siebel environments Oracle found on Rimini's systems from before July 2014, Oracle has failed to demonstrate that such copies were outside the scope of the license agreements.  None of the Siebel licenses have a "facilities" restriction, as the Court has found here and as the Ninth Circuit also held in the second appeal in *Rimini I*.  *See Oracle*, 783 F. App'x at 710-11.

294.    The Court also rejects Oracle's claim that Rimini's over-the-shoulder remote support may violate some small subset of Siebel license agreements that prohibit "direct competitors" of Oracle from being a permitted "User."

295.    As an initial matter, Oracle failed to present any evidence of any specific instance where Rimini delivered such support to a Siebel client.

296.    Moreover, even assuming that this language would prohibit the conduct Oracle

58

Gibson, Dunn & Crutcher LLP

1    claims for these licenses—that is, prohibit Rimini from accessing, directly or indirectly, Siebel

2    source code—the Court would find such a construction to render the license illegal under the

3    doctrine of copyright misuse, as explained above with regard to JDE.  Oracle cannot lawfully

4    prohibit licensees from hiring competing software support providers to do the very things the

5    licensee itself can do.

6                    *d.      EBS*

7        297.    The Court addresses Oracle's various EBS-related claims of infringement dealing

8    with prototyping, EBS scripts, and the ePack tool.

9        298.    ***Prototyping.***  Based on the relevant findings of fact, the Court holds that Oracle has

10   failed to demonstrate that Rimini's supposed "prototyping" of EBS updates is an illegal form of

11   "cross-use" that violates the internal data processing limitation in the EBS license agreements.

12       299.    Rimini has established that during the "prototype" process, Rimini creates an

13   update for a first client in that client's environment, and then manually re-implements the update

14   in each subsequent client's environments.  In that process, Rimini may re-use its own knowledge

15   or Rimini-written code created while developing the update for the first client to implement the

16   same or similar update for subsequent clients.  But there is no evidence that Rimini uses Oracle-

17   written code from the first client for the next clients.  That means that every copy of Oracle

18   expression made during this process, whether disk or RAM, is made in the siloed client

19   environment and *for* that client.

20       300.    Further, that Rimini may gain more efficiency and be able to test less for subsequent

21   clients does not render this practice "cross-use."  As the Court already held on summary judgment,

22   it is "not cross use" for a Rimini engineer to become "more efficient[]" in providing updates.  ECF

23   No. 1253 at 87.  And the Court has already held that "Rimini is not required to test updates" at all.

24   *Rimini I*, ECF No. 1459 at 26.

25       301.    ***ePack Tool.***  The same holds true for Rimini's EBS ePack tool.  It is undisputed

26   that this tool contains no Oracle protected expression at all, whether literal or non-literal.  ePack

27   is not a derivative work.  Rimini's development of ePack is not "cross-use," for the same reasons

28   that Rimini is permitted to engage in the conduct that Oracle accuses with respect to prototyping.

1   Further, in cases where the running of ePack causes Oracle software to run, the use of Oracle

2   software occurs in a client's environment to support only that client and is therefore licensed.

3   302.   In any event, even under the test the Court adopted on summary judgment, which

4   would treat purely Rimini-written work product or code containing no protected Oracle expression

5   as a derivative work if it (1) was written using an Oracle tool, and (2) can only run with Oracle

6   software (*see* ECF No. 1253 at 52), Rimini's EBS ePack tool is not a derivative work because it is

7   not made using Oracle tools.

8   *e.   Database*

9   303.   Based on the relevant findings of fact, the Court holds that Oracle has failed to

10  prove that Rimini has infringed Oracle's copyrights in Database.

11  304.   First, Oracle's entire theory of infringement as to Database proceeds on the

12  assumption that Rimini has engaged in "cross-use" of programs that rely on Database when they

13  run.  But Rimini has not, so even on Oracle's theory, no "cross-use" of Database occurred.

14  305.   Second, even if Oracle had prevailed on some claims of infringement as to other

15  programs that rely on Database, Oracle has still failed to prove that Rimini engaged in "cross-use"

16  of Database itself.  If Rimini modifies a specific PeopleSoft file, for instance, that simply does not

17  implicate Database at all, even if that PeopleSoft file were "cross-used" in violation of a license

18  agreement.  Oracle presents no specific incidence in which Rimini "cross-used" a break/fix as to

19  Database.

20  *f.   Miscellaneous Files on Rimini's Systems*

21  306.   Based on the relevant findings of fact, the Court holds that Oracle has failed to

22  prove that Rimini infringed on account of files found on Rimini's systems, including the so-called

23  "EBS library."  There is no "library," but only six folders for which there is no evidence of access

24  or use since 2015.  Nor is there any evidence the files were ever "cross-used."  Nor does Oracle

25  point to any relevant prohibition that would prohibit such files on Rimini's systems.  None of the

26  EBS licenses, for instance, contain a "facilities" restriction.  *Cf. Oracle*, 783 F. App'x at 711

27  (reversing injunction prohibiting local hosting as to JDE and Siebel licenses because they "do not

28  contain [a facilities] limitation").

1

## C.    Oracle's Indirect Claims of Copyright Infringement Against Ravin

2      307.    In order to prevail on a claim of secondary copyright infringement liability, Oracle

3  must prove predicate instances of *direct* copyright infringement on which the secondary liability

4  claims rely.  *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1169 (9th Cir. 2007).

5      308.    For contributory infringement liability, Oracle must prove that Ravin: (i) had

6  "actual knowledge of specific acts of infringement" by Rimini; and that he (ii) intentionally

7  induced or materially contributed to Rimini's infringing acts.  *Luvdarts, LLC v. AT&T Mobility,*

8  *LLC*, 710 F.3d 1068, 1072 (9th Cir. 2013) (citation and quotation marks omitted).  "Stated

9  differently, liability exists if the defendant engages in personal conduct that encourages or assists

10 the infringement."  *Cobbler Nev., LLC v. Gonzales*, 901 F.3d 1142, 1147 (9th Cir. 2018) (citation

11 and quotation marks omitted).  For vicarious infringement liability, Oracle must prove that Ravin:

12 (i) directly benefited financially from Rimini's direct infringement; and (ii) had the right and the

13 ability to supervise or control the infringing activity.  *Ellison v. Robertson*, 357 F.3d 1072, 1076

14 (9th Cir. 2004).  Oracle fails on each set of claims.

15          **1.    Contributory Infringement**

16      309.    Based on the relevant findings of fact, the Court holds that Oracle has failed to carry

17 its burden of proving the elements of contributory infringement liability as to Ravin.

18      310.    Ravin: (1) did not have actual knowledge that Rimini engineers accessed or used

19 Oracle copyrighted materials in specific ways that are alleged to be copyright infringement, and

20 (2) did not actively encourage or induce those engineers to infringe in the ways alleged.  Rather,

21 Ravin established a framework to investigate potentially infringing activity under the Acceptable

22 Use Policy and imposed consequences, up to and including termination, for employees or

23 contractors in violation.

24          **2.    Vicarious Infringement**

25      311.    Based on the relevant findings of fact, the Court holds that Oracle has failed to carry

26 its burden of proving the elements of vicarious infringement liability as to Ravin.

27      312.    Ravin: (1) did not receive a direct financial benefit from the particular alleged

28 instances of infringement, as Oracle has not shown that he received payments directly related to

Gibson, Dunn &
Crutcher LLP

the infringement or any other facts amounting to a direct benefit, and (2) did not have the practical ability to stop the allegedly directly infringing conduct as CEO overseeing thousands of employees and clients.

**D.    Rimini's Non-License Defenses to Oracle's Claims of Infringement**

313.    Although the Court finds that Oracle has failed to meet its burden of proof on its direct infringement claims, the Court nonetheless addresses Rimini's non-license affirmative defenses in an abundance of caution, as follows:  (i) Rimini's statute of limitations defense as to Oracle's Process 1.0 EBS claims; and (ii) Rimini's fair use defenses.

**1.    Rimini's Statute of Limitations Defense to Oracle's EBS Claims**

314.    In this case, Oracle asserted counterclaims of copyright infringement "going back to 2010" arising out of Rimini's support of EBS.  ECF No. 888 at 12.  Rimini and Ravin assert a statute of limitations affirmative defense as to all conduct involving EBS prior to February 17, 2012.  *See* ECF No. 1253 at 31; ECF Nos. 967, 974-s at 33-34.  Oracle's claims are subject to a three-year statute of limitations (17 U.S.C. § 507(b)), and runs at the time Oracle "discover[ed], or reasonably should have discovered, the alleged infringement."  *Media Rts. Techs., Inc. v. Microsoft Corp.*, 922 F.3d 1014, 1022 (9th Cir. 2019).  Based on the relevant findings of fact, the Court finds that Oracle "had constructive knowledge" sufficient "to warrant an investigation" (*id.* at 1024 (citation and quotation marks omitted)) no later than November 17, 2011, during the deposition of Mr. Ravin.  At that point Oracle had a clear "suspicion" of infringement as to EBS, it was under a "duty to investigate" its claims, and it is "imput[ed]" with all knowledge it would have gained in that investigation—an investigation it did not do.  *Oracle Am., Inc. v. Hewlett Packard Enter. Co.*, 971 F.3d 1042, 1048 & n.5 (9th Cir. 2020).  Oracle's EBS infringement claims against Rimini are therefore time-barred as to any conduct before February 17, 2012.

**2.    Rimini's Fair Use Defenses**

315.    Rimini raises a fair use defense to several of the accusations of infringement that Oracle has raised.  The Court need not reach these defenses, as Oracle has failed to prove infringement in the first instance, but in an abundance of caution, the Court now holds that were it to apply the fair use doctrine, it would conclude that Rimini has carried its burden.

Gibson, Dunn &
Crutcher LLP

### a.     Standard for Fair Use

316.    "[A] copyright holder cannot prevent another person from making a 'fair use' of copyrighted material."  *Google LLC v. Oracle Am., Inc.*, 141 S. Ct. 1183, 1196 (2021) (citing 17 U.S.C. § 107).  The "fair use" doctrine is an "equitable rule of reason" that "permits courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster."  *Stewart v. Abend*, 495 U.S. 207, 236 (1990) (citation and quotation marks omitted).

317.    The statute sets out four factors that "indicate[], rather than dictate[], how courts should apply" the doctrine (*Google*, 141 S. Ct. at 1196):  (i) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (ii) the nature of the copyrighted work; (iii) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (iv) the effect of the use upon the potential market for or value of the copyrighted work.  17 U.S.C. § 107.

318.    Rimini bears the burden of proving fair use (*Dr. Seuss Enters., L.P. v. ComicMix LLC*, 983 F.3d 443, 459 (9th Cir. 2020)), but need not prove that each of these factors weighs in its favor (*Google*, 141 S. Ct. at 1197).  Fair use requires a "case-by-case analysis" that is "not to be simplified with bright-line rules."  *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577 (1994).  All four factors must be explored, weighed together, and considered alongside the goals of copyright law (*id.*): "[t]o promote the Progress of Science and useful Arts" (U.S. Const. art. I, § 8, cl. 8) and to serve "the welfare of the public" (*Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 429 n.10 (1984) (citation and quotation marks omitted)).

319.    The first factor requires courts to consider the "purpose and character" of the accused use in order to determine whether and to what extent the new work is "transformative."  *Perfect 10*, 508 F.3d at 1164 (quoting *Campbell*, 510 U.S. at 579).  A commercial character generally weighs against fair use, while a nonprofit educational purpose weighs in favor of fair use.  *See id.* at 1164, 1166.  But "the commercial or nonprofit education purpose is only one element of the first factor" and does not carry "presumptive force."  *Campbell*, 510 U.S. at 584.  If the accused use "adds something new and important" and furthers the purpose of copyright law

Gibson, Dunn &
Crutcher LLP

1    (*Google*, 141 S. Ct. at 1203), it is transformative and may be fair use even if used for commercial

2    purposes (*Campbell*, 510 U.S. at 584-85).

3         320.   The second factor concerns the nature of the copyrighted work and the degree of

4    protection afforded as a result.   Creative works "are closer to the core of intended copyright

5    protection" than "more fact-based works," so it is generally more difficult to establish fair use for

6    copying traditional literary works than for copying informational works.   *Kelly v. Arriba Soft*

7    *Corp.*, 336 F.3d 811, 820 (9th Cir. 2003) (citation and quotation marks omitted).   "[C]omputer

8    programs are subjects of copyright" and may involve creative expression, but may also include

9    uncopyrightable computing tasks and/or code.   *Google*, 141 S. Ct. at 1201.

10        321.   The third factor asks whether the "amount and substantiality of the portion used" is

11   "reasonable in relation to the purpose of the copying."   *Campbell*, 510 U.S. at 586 (citation and

12   quotation marks omitted).   In assessing this factor, courts consider both quantity and quality: a

13   small amount of copying may go to the heart of a work's creative expression, while a large amount

14   of material copied may be largely divorced from the original work's creative expression or be

15   central to the copier's valid purpose.   *Google*, 141 S. Ct. at 1205.   Wholesale copying therefore

16   does not weigh against a finding of fair use if the secondary user copies only as much as is

17   necessary for the transformative use.   *Kelly*, 336 F.3d at 821.

18        322.   The fourth and final factor focuses on the effect of the copying on the potential

19   market for or value of the copyrighted work.   Potential lost revenue and whether the copied work

20   has created a market substitute for the original may have a detrimental effect on the market of the

21   copyrighted work and weigh against a finding of fair use.   *Google*, 141 S. Ct. at 1206.   However,

22   courts must consider "not just the amount but also the source of the loss."   *Id.*   For example,

23   criticism of a copyrighted work may reduce demand for the original, but that is not cognizable

24   harm because there is a benefit to the public.   *Id.*; *see also MCA, Inc. v. Wilson*, 677 F.2d 180, 183

25   (2d Cir. 1981) ("[W]here a claim of fair use is made, a balance must sometimes be struck between

26   the benefit the public will derive if the use is permitted and the personal gain the copyright owner

27   will receive if the use is denied.").   "This last factor is undoubtedly the single most important

28   element of fair use."   *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 566 (1985).

64

1

### b.   *Application of Fair Use to Particular Claims of Infringement*

2  323.    Rimini asserts its fair use defense as to two distinct areas of accused conduct: the

3 migration of copies off of its systems and the creation of certain incidental RAM copies Oracle

4 accuses.  Each is addressed in turn.

5  324.    ***Migration.***  Based on the relevant findings of fact, the Court holds that, having

6 holistically considered the fair use factors, Rimini has met its burden of demonstrating that even

7 if the migration of client environments off of Rimini's systems to Rimini's clients' systems

8 resulted in unauthorized copies being made, such copies were a fair use.

9  325.    First, and most importantly, the Court will consider the effect on the marketplace

10 of the copies made during the migration.  The Court has found that Rimini's clients do not leave

11 Oracle *because* of any supposed infringement.  The copies Rimini made of client environments

12 during the migrations, so that their software could simply be *moved* in order to comply with a court

13 order, had no impact on the market for Oracle's products and services.  Furthermore, each client

14 was entitled to its environments under the license agreements and depends on those environments

15 for its internal business operations.  The deletion of those environments followed by full-scale

16 reconstruction, rather than copying them and moving them, would have been unduly injurious to

17 those clients.

18  326.    Second, the amount and substantiality copied here was significant, including entire

19 environments, but it was nonetheless reasonable in relation to the purpose of the copying.  The

20 clients needed their entire environments, so Rimini's copying of them to return the environments

21 to the clients was justifiable under this factor.  It is impossible to "move" environments without

22 creating the copies at issue here, and thus the copying was no more than necessary to comply with

23 court orders.

24  327.    Third, the purpose of the accused use here was to move client environments in order

25 to comply with a court order.  While the copies here were minimally transformative (in that these

26 were disk copies of the entire environments or entire files), the overall purpose and character of

27 this use weighs in favor of a finding of fair use.

28  328.    Finally, the nature of the copyrighted work here is a neutral factor.  The programs

Gibson, Dunn &
Crutcher LLP

1   copied contain mixed elements of both functional unprotected expression, as well as copyrighted

2   protected expression.  However, as noted above, there is no dispute that each client held a valid

3   license entitling them to their environments—the only question was one of how to remove them

4   from Rimini's systems and get them onto the clients' systems.

5        329.   Considered together, the Court holds that Rimini has met its burden of

6   demonstrating that the copies made in the process of migration were a fair use.  The Court will

7   thus enter judgment for Rimini on this issue.

8        330.   ***RAM Copies Created by CodeAnalyzer.***  Based on the relevant findings of fact, the

9   Court holds that, having holistically considered the fair use factors, Rimini has met its burden of

10  demonstrating that even if the incidental creation of RAM copies of text of an Oracle software file

11  made during the previous use of its CodeAnalyzer tool were outside the scope of the license

12  agreements, it would nonetheless constitute fair use.

13       331.   First, the purpose and character of the RAM copies here, while commercial, is

14  sufficiently transformative as the purpose of the original files versus the RAM files is completely

15  different.  The purpose of the original files is to carry out specific computer instructions relating

16  to the client's use of its PeopleSoft software, such as printing information on a tax form or creating

17  a report.  But the purpose of the ephemeral RAM copies Oracle accuses is fundamentally different.

18  The temporary RAM copy does not carry out the instructions of the program.  It is made with the

19  purpose of simply finding and identifying the differences that *Rimini* has introduced into a file

20  when it first manually implemented an update.  This is no different than a human reading two

21  paragraphs of text that are slightly different and noting the differences.  These RAM copies are

22  made in order to locate and extract *Rimini*'s own expression and work product—Rimini's

23  modifications of files.  This factor weighs in Rimini's favor.

24       332.   Second, as to the nature of the files, they undisputedly contain numerous purely

25  functional aspects.  Additionally, because the purpose of the RAM copy is simply to read portions

26  of two files and compare them, the temporary RAM copy is not being used to take advantage of

27  the expressive portions of the files. The code in those files is never executed.  This factor also

28  weighs in Rimini's favor.

Gibson, Dunn &
Crutcher LLP

333.    Third, considering the amount of copied code in relation to the work as a whole, the Court also holds that this factor favors Rimini.  No Oracle code or expression is copied in any non-transitory way—we are dealing with RAM copies that exist for likely only fractions of a second.  Moreover, the amount copied temporarily is minimal in the context of the entire copyrighted work, PeopleSoft.  PeopleSoft itself may have tens of thousands of files, but the copying here is dealing with a single file being copied into temporary memory for a brief instant.  In addition, the creation of the RAM copy is inherent in the functioning of computers and is unavoidable.

334.    Fourth, the Court considers the effect of the copy on the potential market, and concludes that these temporary RAM copies do not have any meaningful effect on the market for PeopleSoft software.  Apart from the fact that these temporary copies exist for only a fraction of a second, the Court has also found that Rimini clients do not leave Oracle *because* of any supposed infringement.  Indeed, Rimini shut CodeAnalyzer off in 2018, and it did not have any effect on Rimini's pricing, thus demonstrating that accused infringement was not a significant factor in Rimini's pricing strategy, which is what Oracle's entire causation theory is based on.

335.    ***AFW Tools.***    Based on the relevant findings of fact, the Court holds, having holistically considered the fair use factors, that Rimini has met its burden of demonstrating that even if initial testing of certain of the AFW tools resulted in unauthorized copies being made, such copies were a fair use.

336.    First, the purpose and character of the AFW tools is transformative.  Although Rimini uses the tools for a commercial purpose, Rimini created the tools for a purpose that is entirely different from what the PeopleSoft software does or was designed to do.  PeopleSoft files perform various business functions for an enterprise.  When Rimini was creating and testing the AFW tools, Rimini was using tools that it independently developed to make sure they are interoperable with PeopleSoft.  The AFW tools do not perform any of the same functionality as PeopleSoft itself.  Rather, the tools manage development processes, such as extracting data representing a developer's modifications to a file (CodeAnalyzer GenDiff), automatically generating scripts that will edit tax tables (GenDataChanges), combining individual updates into a

67

Gibson, Dunn &
Crutcher LLP

1  bundle (CreateUpdate), and others.  The overall purpose is to allow a developer to remotely invoke

2  tasks in a client's environment.  This factor weighs in favor of Rimini.

3  337.  Second, regarding the nature of the files, any copies made during the creation of

4  the AFW tools were RAM copies.  As part of the testing process of the AFW tools to confirm they

5  work within a PeopleSoft environment, temporary RAM copies are necessarily created.  There

6  would be no way for Rimini to test the functionality without running PeopleSoft and therefore

7  causing temporary copies of the software to be loaded in RAM.  As explained above, temporary

8  RAM copies have numerous purely functional aspects and do not implicate the expressive portions

9  of the copyrighted material.  As no copies other than RAM copies were made as a result of the

10  creation of the AFW tools, this factor favors Rimini.

11  338.  Third, the amount of copied code in the RAM copies is minimal and transitory, for

12  the same reasons explained above.  This factor favors Rimini.

13  339.  Fourth, neither the temporary RAM copies nor the AFW tools themselves have a

14  meaningful effect on the market for PeopleSoft or the support market for the same.  The AFW

15  tools are used in the environments of clients that have already purchased PeopleSoft software, so

16  it cannot be the case that the AFW tools harm the market for the PeopleSoft software itself.  And

17  PeopleSoft software does not come with any tools that perform the same functionality as the

18  Rimini-developed AFW tools.  This factor weighs in favor of Rimini.

19  **E.    Rimini's UCL Claims**

20  340.  To establish that Oracle's challenged business practices violate the "unfair" prong

21  of California's UCL , Rimini must prove by a preponderance of the evidence that the practice

22  (1) threatens an incipient violation of an antitrust law, (2) violates the policy or spirit of one of

23  those laws because its effects are comparable to or the same as a violation of the law, or

24  (3) otherwise significantly threatens or harms competition.  *Cel-Tech Commc'ns, Inc. v. L.A.*

25  *Cellular Tel. Co.*, 973 P.2d 527, 544 (Cal. 1999).  For the reasons that follow, the Court holds that

26  Rimini has established the necessary elements of its UCL claims against Oracle, both individually

27  and collectively, as to:  (i) Oracle's MSL policy; (ii) Oracle's reinstatement fee and back support

28  policy; and (iii) Oracle's false and misleading statements about Rimini's legal liability and legal

68

risk.   Oracle's actions exhibit "classic anti-competitive behavior" and inflict classic anticompetitive harms comparable to those that antitrust law and policy seek to prevent.  *Mattel, Inc. v. MGA Ent., Inc.*, 782 F. Supp. 2d 911, 1013 (C.D. Cal. 2011).  These harms were felt by California-based companies and were inflicted by Oracle employees in California.  The Court further holds that Oracle has failed to establish any applicable justification or speech-related defense.

### 1.   Competitor Standing

341.   Based on the relevant findings of fact, the Court holds that Rimini has carried its threshold burden of proving competitor standing under the UCL by establishing that it suffered an economic injury caused by Oracle's conduct.

342.   Rimini is Oracle's direct and primary competitor in the support services market for Oracle's software products.  Oracle's policies require Rimini to expend additional resources and employee time to retain its clients and, on occasion, have resulted in Oracle licensees in the process of shifting to Rimini to abandon that plan and renew support with Oracle.

343.   In addition to restricting Rimini's access to customers, Oracle's campaign of false and misleading statements has harmed Rimini's goodwill among consumers and diminished market opportunities Rimini otherwise would have had to compete for support customers.

344.   The direct and vigorous nature of the competition between the parties is enough to show standing in a competitor case.  *E.g.*, *Kwikset Corp. v. Super. Ct.*, 246 P.3d 887, 889 (Cal. 2011).

### 2.   Oracle's Anticompetitive Business Practices

#### a.   *Oracle's Matching Service Level Policy*

345.   Based on the relevant findings of fact, Rimini has established that Oracle's MSL policy is an "unfair" practice both on its own and in conjunction with the other accused Oracle conduct, which is part of an overall pattern of conduct.

346.   Rimini has presented sufficient evidence to prove that Oracle's MSL policy substantially harms competition.  Under this policy, Oracle requires that "all licenses in any given license set must be supported under the same technical support service level," and further, that the

69

Gibson, Dunn & Crutcher LLP

customer cannot "support a subset of licenses within a license set; the license set must be reduced by terminating any unsupported licenses."  One practical effect of the MSL policy is that it forces certain Oracle customers to continue to purchase Oracle's so-called "Sustaining Support" for older versions of Oracle software for which Oracle does not even provide new updates or fixes, when the client would rather support those older products with Rimini, who does provide those updates and fixes.  This has the practical effect of "condition[ing] [Oracle's] contracts" on not doing business with competitors (*Mattel*, 782 F. Supp. 2d at 1013; *cf. Lorain J. Co. v. United States*, 342 U.S. 143, 152 (1951); *Covad Commc'ns Co. v. Bell Atl. Corp.*, 398 F.3d 666, 675 (D.C. Cir. 2005)); "depriv[ing] consumers of valuable products" and "potentially restricting the supply of [a rival's] products to consumers" (*Mattel*, 782 F. Supp. 2d at 1013; *see Cisco Sys., Inc. v. Beccela's Etc., LLC*, 403 F. Supp. 3d 813, 831 (N.D. Cal. 2019)); and "rais[ing] the price to consumers" (*Weco Supply Co. v. Sherwin-Williams Co.*, 2012 WL 1910078, at *5 (E.D. Cal. May 25, 2012)). Moreover, internal Oracle documents link the MSL policy to Oracle's high renewal rates and its ability to avoid competing on price in the support market.

347.    The Court is not persuaded that the MSL policy is necessary to protect Oracle's intellectual property.  No evidence suggests Oracle tailored the MSL policy to that purpose. Rather, Oracle has asserted its extreme MSL policy against Oracle licensee support customers who have sought a competitive alternative to Oracle, threatening them with withdrawing Premier Support from products customers were paying for if they did not choose to keep *all* license sets with Oracle, or terminating those licenses sought to be supported elsewhere.  This anticompetitive motive and effect are all the more clear when the MSL policy is coupled with threats about the "reinstatement" fees and penalties Oracle would charge if the customer left for Rimini and then returned to Oracle.

### b.    Oracle's Reinstatement Fee and Back Support Policy

348.    Based on the relevant findings of fact, the Court also holds that Rimini has established that Oracle's Reinstatement Fee and Back Support Policy is an "unfair" practice within the meaning of California's UCL, both on its own and in conjunction with Oracle's other anticompetitive conduct.

70

Gibson, Dunn &
Crutcher LLP

349.    Rimini's arguments with respect to Oracle's Reinstatement Fee and Back Support Policy are similar to those offered with respect to Oracle's MSL policy, and they succeed for substantially the same reasons:  The policy substantially harms competition by creating lock-in effects above and beyond those stemming from long-term customer investment in Oracle products. Oracle uses the fee policy as a deterrent to keep Oracle support customers from leaving for competitors—in other words, to keep customers locked-in.  Oracle licensees seeking to use an alternative provider are subject to the substantial and unnecessary risk of being forced to pay hundreds of thousands of dollars, if not more, to bring critical enterprise systems back online.  And Oracle emphasizes this penalty to customers it suspects may switch to Rimini's support services. As with the MSL Policy, this has the practical effect of "condition[ing] [Oracle's] contracts" on not doing business with competitors (*Mattel*, 782 F. Supp. 2d at 1013; *cf. Lorain J.*, 342 U.S. at 152; *Covad*, 398 F.3d at 675); "depriv[ing] consumers of valuable products" and "potentially restricting the supply of [a rival's] products to consumers" (*Mattel*, 782 F. Supp. 2d at 1013; *Cisco*, 403 F. Supp. 3d at 831), and "rais[ing] the price to consumers" (*Weco*, 2012 WL 1910078, at *5).

350.    The Court is not persuaded by the argument that Oracle's fee structure for reengaging Oracle support is necessary to protect investments in client-specific software implementations and support.  As with the intellectual property rationale, Oracle's justification is pretextual and far out of proportion with the selected means.  For starters, there is no evidence that Oracle is burdened when a support customer leaves for a competitor but later returns, and any argument for incipient financial risk is belied by Oracle's consistent 95% profit margin on support services.  Even assuming Oracle has a legitimate business interest in the fee structure in a subset of cases, requiring a returning customer to pay the technical support fee it would have paid Oracle had it remained on support, *in addition* to a 50% penalty, smacks of double-counting and has no relation to that justification.

### c.    *False and Misleading Statements*

351.    Based on the relevant findings of fact, the Court holds that Rimini has established that Oracle engaged in "unfair" conduct in violation of the UCL by pressuring customers against switching to Rimini through implied threats of legal liability.

352.    Unfair competition in violation of the UCL may also take the form of false and misleading statements intended to lure customers away from potential competitors and toward the dominant market player.  Testimony from customers subject to these Oracle communications illustrates a coordinated scheme to use legal language and implied threats of liability to keep customers away from Rimini and other third-party providers.

353.    Both by themselves and collectively with Oracle's MSL policy and punitive reinstatement and back support fees, Oracle's concerted false statements form part of an overall pattern of anticompetitive conduct that violates the UCL.  *See Mattel*, 782 F. Supp. 2d at 1013 ("warn[ing]" other companies "not to [use]" a competitor's products can form the basis of a UCL claim); *GSI Tech., Inc. v. United Memories Inc.*, 2015 WL 5655092, at *10 (N.D. Cal. Sept. 25, 2015) ("disparaging remarks" when they are "part of a pattern of conduct" are sufficient to show a UCL unfair practice).

### e.    *Oracle's Speech Defenses*

354.    Finally, based on the relevant findings of fact, the Court holds that Oracle's UCL liability for false and misleading statements is not precluded by any constitutional or statutory protection for speech.  Although the provisions Oracle invokes are varied, the reason none of them apply here is not: false and misleading speech made incidental to a broader scheme of conduct that violates the UCL does not enjoy free speech protection.  "Untruthful speech, commercial or otherwise, has never been protected for its own sake." *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 771 (1976).  As the California Supreme Court has explained, "commercial speech that is false or misleading receives no protection under the First Amendment, and therefore a law that prohibits only such unprotected speech cannot violate constitutional free speech provisions." *Kasky v. Nike, Inc.*, 45 P.3d 243, 261 (Cal. 2002).[4]

### F.    Lanham Act Claims and Defenses

355.    To prove that any of Rimini's statements violated the Lanham Act, Oracle must

---

[4] Oracle requests a declaratory judgment that it has not violated the UCL as alleged by Rimini. Because the Court holds above that Rimini has established that multiple of Oracle's business practices violate the California UCL and that Oracle failed to establish an applicable affirmative defense, Oracle's request for declaratory relief is denied.

Gibson, Dunn &
Crutcher LLP

prove the following by a preponderance of the evidence: (1) Rimini made a false statement of fact in a commercial advertisement about Rimini or Oracle's product; (2) the statement actually deceived or had the tendency to deceive a substantial segment of customers; (3) the deception was material to the purchasing decisions of consumers; (4) Rimini caused the false statement to enter interstate commerce; and (5) Oracle has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to Rimini or by a lessening of the goodwill associated with Oracle's products.  *Wells Fargo & Co. v. ABD Ins. & Fin. Servs., Inc.*, 758 F.3d 1069, 1071 (9th Cir. 2014).

356.   For the reasons set forth below, the Court now holds that Oracle has failed to establish the necessary elements of its Lanham Act claims as to:  (i) Rimini's litigation-related statements; (ii) Rimini's support-related statements; (iii) Rimini's statements regarding its capability to provide what Oracle calls "vendor-level" support; and (iv) Rimini's security-related statements.  The Court further holds that even if Oracle had proven its Lanham Act claims, Rimini has established its laches defense.

### 1.   Rimini's Litigation-Related Statements

357.   Based on the relevant findings of fact, the Court holds that Oracle's Lanham Act claim related to Rimini's litigation-related statements fails.

358.   First, Oracle has not proven that Rimini's litigation-related statements were false or misleading.  *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997).  As explained above, Rimini statements were *true*.

359.   Second, and in any event, Oracle has not satisfied its burden to prove that the litigation-related statements were "material" to customers' decisions to contract with Rimini for support.  *See Verisign, Inc. v. XYZ.COM LLC*, 848 F.3d 292, 298 (4th Cir. 2017).  Oracle's expert Paul Pinto opines that Rimini's standard message in its marketing materials and to individual customers that the processes found infringing in *Rimini I* were no longer used played a significant role in the decision of *Rimini II* customers to contract with Rimini  for support.  But this "opinion" is a legal conclusion on the materiality of Rimini's "no longer used" statements, which the Court affords no weight.  *Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1058 (9th Cir.

73

2008).

360.    Third, Oracle failed to prove that Rimini's litigation-related statements caused Oracle any injury in the form of diverted sales or loss of business reputation.  There is simply no evidence that Rimini's statements caused any client to withhold business from Oracle, or switch from Oracle to Rimini, when that client would not have otherwise done so, or that the statements damaged Oracle's business reputation.  Accordingly, Oracle's Lanham Act claim also fails for lack of causation.  *See Dependable Sales & Serv., Inc. v. TrueCar, Inc.*, 394 F. Supp. 3d 368, 375 (S.D.N.Y. 2019).

361.    Finally, "[u]nder the *Noerr-Pennington* doctrine, those who petition any department of the government for redress are generally immune from statutory liability for their petitioning conduct."  *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 929 (9th Cir. 2006).  "Conduct incidental to a lawsuit … falls within the protection of the *Noerr-Pennington* doctrine."  *Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1007 (9th Cir. 2008).  This includes a company's communications to its customers, so long as those communications "are sufficiently related to petitioning activity."  *AirHawk Int'l, LLC v. TheRealCraigJ, LLC*, 2017 WL 3891214, at *2 (C.D. Cal. Jan. 19, 2017) (quoting *Sosa*, 437 F.3d at 935).

362.    Rimini's statements providing litigation updates to customers and discussing the implications of the *Rimini I* litigation with customers and in the press are statements regarding ongoing litigation or, at minimum, "sufficiently related" to statements and issues regarding Rimini's litigation activity.  The *Noerr-Pennington* doctrine thus bars Oracle's Lanham Act claim as to these statements.  The Court rejects Oracle's argument that Rimini's statements that it was no longer using processes that the Court found infringing go beyond details of the litigation, so are not covered by the *Noerr-Pennington* doctrine.  The doctrine protects even communications that "can be construed to contain advertising or promotion," so long as the communications sufficiently relate to the litigation.  *AirHawk*, 2017 WL 3891214, at *3 (quotation omitted).  Here, while the communications may have incidentally served an advertising or promotional function, they primarily concerned Rimini's litigation with Oracle.  Accordingly, the *Noerr-Pennington* doctrine bars Oracle's Lanham Act claims as to these communications.

74

363.     Even if the *Noerr-Pennington* doctrine did not apply, Rimini's litigation-related statements constitute opinions regarding the ultimate outcome of a legal proceeding and the interpretation of court rulings, which are not actionable under the Lanham Act.  *See Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 731 (9th Cir. 1999).

### 2.     Rimini Support-Related Statements

364.     Based on the relevant findings of fact, the Court holds that Oracle failed to prove that Rimini's onboarding statements violated the Lanham Act.

365.     As an initial matter, Oracle has failed to prove that Rimini's onboarding statements were false or misleading.  Rimini's representations about how it uses clients' software and develops updates for its clients were all true statements—and Oracle has not offered proof that these statements conveyed an "implied message" that "deceived a significant portion of the recipients." *William H. Morris Co. v. Grp. W, Inc.*, 66 F.3d 255, 258 (9th Cir. 1995); *see also Prager Univ. v. Google LLC*, 951 F.3d 991, 1000 (9th Cir. 2020).  Oracle has not satisfied its burden on falsity.  As the Court has found, the statements were true.

366.     Nor has Oracle proven that any of Rimini's onboarding statements caused, or were likely to cause, Oracle any injury.  Under the Lanham Act, Oracle must prove "an injury to a commercial interest in sales or business reputation proximately caused by the defendant's misrepresentations." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 140 (2014).  But Oracle provided no evidence that Rimini's onboarding materials diverted any sales from Oracle, or harmed Oracle's goodwill or reputation.  In fact, the customers at issue were *already Rimini clients* at the time they received the allegedly false statements, so any link between Rimini's statements and Oracle's (unproven) commercial injury would be tenuous at best.  *See Suntree Techs., Inc. v. Ecosense Int'l, Inc.*, 693 F.3d 1338, 1349 (11th Cir. 2012).  Oracle has not presented any evidence linking the onboarding statements to any injury.  *See Dependable Sales*, 377 F. Supp. 3d at 350.

367.     Oracle also failed to prove that Rimini's onboarding statements "constitute 'commercial advertising or promotion,' as the Lanham Act requires." *Prager*, 951 F.3d at 999-1000 (quoting 15 U.S.C. § 1125(a)(1)(B)).  "Not all commercial speech is promotional." *Id.* at

75

Gibson, Dunn &
Crutcher LLP

1000.  Rimini's representations in its onboarding materials were related to instructions that Rimini provided to its new clients *after* they had contracted with Rimini.  Oracle provided no evidence showing that this introductory, instructional material was actually "for a promotional purpose to 'penetrate the relevant market' of the viewing public."  *Id.* (quoting *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 57 (2d Cir. 2002)); *see also Interlink Prods. Int'l, Inc. v. Cathy Trading, LLC*, 2017 WL 931712, at *5 (D.N.J. Mar. 9, 2017).

368.    Even setting aside the instructional nature of the statements, the handful of examples Oracle raises does not prove sufficient "dissemination" to the market to qualify as commercial advertising.  *Burton v. Label, LLC*, 344 F. Supp. 3d 680, 702 (S.D.N.Y. 2018).  Oracle has failed to prove that these "sporadic communications" were part of an organized campaign to penetrate the industry.  *Meredith Lodging LLC v. Vacasa LLC*, 2021 WL 5316986, at *3 (D. Or. Nov. 15, 2021); *see also EarthCam, Inc. v. OxBlue Corp.*, 49 F. Supp. 3d 1210, 1242 (N.D. Ga. Sept. 22, 2014), *aff'd*, 703 F. App'x 803 (11th Cir. 2017).  And other statements were only *internal to Rimini*, so were not disseminated at all.  Even if Oracle had provided sufficient evidence to prove that these internal communications were, in fact, disseminated to the market (it has not), the statements in question are puffery—that is, "generalized boasting" that is not actionable under the Lanham Act.  *Southland Sod*, 108 F.3d at 1145; *Kurin, Inc. v. Magnolia Med. Techs., Inc.*, 473 F. Supp. 3d 1117, 1136-37 (S.D. Cal. 2020).

### 3.    Rimini's Statements Regarding Its Support Capabilities

369.    Based on the relevant findings of fact, the Court holds that Oracle has failed to prove its claims related to statements about alleged promises of "vendor-level" support.

370.    Oracle has failed to prove that Rimini's statements were sufficiently disseminated such that they constituted "commercial advertising" under the Lanham Act.  Proof that Rimini made false statements to "an unspecified number of … clients" does not prove "sufficient market dissemination under the Lanham Act."  *Burton*, 344 F. Supp. 3d at 702.  Indeed, in *Burton*, the counterclaimant failed to show sufficient dissemination in a market of "over 750 clients."  *Id.* Here, the number of active clients is more than 3,000, and Oracle offers no evidence establishing what portion of the market received the communication.  Furthermore, Oracle's evidence that

76

Gibson, Dunn &
Crutcher LLP

1   Rimini's purportedly false statements were part of a broader campaign that included all prospective

2   customers is insufficient where Oracle failed to prove that a sufficient number of prospective

3   customers actually received the email.

4       371.    Rimini's statements were also puffery, which is not actionable under the Lanham

5   Act.  *Kurin*, 473 F. Supp. 3d at 1136; *see Quidel Corp. v. Siemens Med. Sols. USA, Inc.*, 2021 WL

6   4622504, at *2 (9th Cir. Oct. 7, 2021).

7       372.    The opinion of Oracle's expert Paul Pinto does not change the Court's conclusion.

8   Mr. Pinto opined that, based on his review of documents, 207 customers viewed Rimini's supposed

9   promise of "vendor-level" support as one of the main reasons they chose to engage Rimini.  But

10  as Mr. Pinto's report makes clear, he could not meaningfully disaggregate the alleged promise of

11  "vendor-level" support from the (unsubstantiated) reason that he claims customers left Oracle to

12  engage Rimini—cost savings.  Oracle has not proven that Rimini's generalized statements were

13  material.  *See Snac Lite, LLC v. Nuts 'N More, LLC*, 2016 WL 6778268, at *8 (N.D. Ala. Nov. 16,

14  2016).

15      373.    Oracle has also failed to prove that Rimini's other statements that it could save

16  prospective clients money and spare them the need to upgrade their software violated the Lanham

17  Act.  Those statements were true—Rimini did, in fact, offer its support services at a 50 percent

18  discount, and Rimini did not require its clients to upgrade their software as a prerequisite to

19  receiving support.  In addition, Rimini's statements that it would not require forced upgrades is

20  non-actionable puffery—"a general statement of opinion regarding the superiority of [Rimini's]

21  product over all others."  *Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 498 (5th Cir.

22  2000).

23      374.    Finally, Oracle has not proven that any of Rimini's statements regarding its support

24  capabilities caused any injury to Oracle.  That is, even if these statements were false or misleading

25  and sufficiently disseminated, there is no evidence that any of the statements caused Oracle any

26  lost sales or harm to business reputation.  *See Lexmark*, 572 U.S. at 140; *Dependable Sales*, 377

27  F. Supp. 3d at 350.

28

RIMINI STREET AND SETH RAVIN'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
CASE NO. 2:14-CV-01699-MMD-DJA

Gibson, Dunn &
Crutcher LLP

### 4.      Rimini's Security-Related Statements

375.    Based on the relevant findings of fact, the Court holds that Oracle has failed to prove that Rimini's security-related statements violated the Lanham Act.

376.    Oracle has not shown that Rimini's security-related statements were false or misleading.  And, given the context of these statements, no reasonable consumer would have been misled by them.  *See William H. Morris*, 66 F.3d at 258; *Intermountain Stroke Ctr., Inc. v. Intermountain Health Care, Inc.*, 638 F. App'x 778, 795-96 (10th Cir. 2016).

377.    Oracle's evidence of falsity is insufficient.  Oracle's expert Patrick McDaniel opines that Rimini's statements regarding the benefits of holistic security and virtual patching are false and misleading because virtual patching only resolves security issues at the application level rather than the software code level, and because virtual patching can only complement, rather than substitute for, traditional patching.  But as Rimini's expert Avi Rubin explained, given the delays and other challenges associated with reliance on CPUs, holistic security and virtual patching is, in fact, often a more secure, more effective option for many customers, particularly those who would be forced to upgrade to receive security updates from Oracle.

378.    McDaniel also opines that Rimini's claim that it can provide what Oracle calls "vendor-level" support, and Rimini's statements downplaying the necessity of Oracle maintenance and support are false and misleading because Rimini cannot provide Oracle licensees with Oracle CPUs.  But Rimini never said that it provides clients the exact same configuration of support that Oracle provides—it simply said that it can give clients a way to sufficiently replace vendor support.  As Rubin persuasively explains, Rimini offers Oracle licensees an alternative to Oracle security support that nonetheless allows them to maintain an adequate level of software security taking into account all relevant factors, including the system at issue, relevant threat models, the software user's budget, and the user's risk tolerance.  Furthermore, McDaniel's bald assertion that the only way to maintain application security is to patch the application itself is contradicted by the record, including Oracle's own security white paper.

379.    Oracle's Lanham Act claims as to Rimini's security-related statements also fail because the statements are puffery and opinion, so are not actionable under the Lanham Act.

1  *Southland Sod*, 108 F.3d at 1145; *Coastal Abstract*, 173 F.3d at 731.

2      380.    Finally, as the Court concluded with respect to the other categories of Rimini's

3  statements, Oracle again fails to prove that Rimini's security-related statements caused any injury

4  to Oracle.  Although Rimini made at least some of the statements to prospective customers, there

5  is simply no evidence that the security-related statements caused Oracle to lose any client or sales,

6  or that the statements harmed Oracle's business reputation.  Oracle's Lanham Act claim thus fails

7  for this reason as well.  *Williams & Cochrane, LLP v. Rosette*,  --- F. Supp. 3d ----, 2022 WL

8  4544711, at *17, *20 (S.D. Cal. Sept. 27, 2022).

9      **5.    Rimini's Laches Defense**

10      381.    Rimini asserts a laches defense to Oracle's Lanham Act claims.  Although the Court

11  need not reach this defense given Oracle's failure to prove any Lanham Act violation, the Court

12  nevertheless holds that Oracle's Lanham Act claims are barred by the doctrine of laches.

13      382.    "Laches is an equitable time limitation on a party's right to bring suit, resting on

14  the maxim that one who seeks the help of a court of equity must not sleep on his rights."  *Jarrow*

15  *Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 835 (9th Cir. 2002) (citations and quotation

16  marks omitted).  "A party asserting laches must show that it suffered prejudice as a result of the

17  plaintiff's unreasonable delay in filing suit."  *Id.*

18      383.    Although the Lanham Act contains no explicit statute of limitations, the limitations

19  period from the most closely analogous state law cause of action determines the presumptive

20  applicability of laches.  *Id.* at 836-37.  If a Lanham Act claim "is filed within the analogous state

21  limitations period, the strong presumption is that laches is inapplicable; if the claim is filed after

22  the analogous limitations period has expired, the presumption is that laches is a bar to suit."  *Id.* at

23  837.  "[T]he presumption of laches is triggered if *any part* of the claimed wrongful conduct

24  occurred beyond the limitations period."  *Id.* (emphasis added).  In determining the presumption

25  for laches, "the limitations period runs from the time the plaintiff knew or should have known

26  about his [Lanham Act] cause of action."  *Id.* at 838.

27      384.    Here, the analogous limitations period is Nevada's limitations period for fraud,

28  which is three years.  Nev. Rev. Stat. § 11.190(3)(d); *see Jarrow Formulas*, 304 F.3d at 838

(borrowing California's three-year limitations period for fraud for Lanham Act false advertising claim); *Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 191-92 (2d Cir. 1996) (borrowing New York's fraud period for Lanham Act false advertising claim).

385.    Oracle first asserted its Lanham Act claims on February 17, 2015 (ECF No. 21). But Oracle "knew or should have known" about its Lanham Act claims more than three years before that date. *Jarrow Formulas*, 304 F.3d at 838.  As early as April 19, 2010, the date it filed its First Amended Complaint in the *Rimini I* litigation, Oracle knew that "Rimini Street advertises that it can cut customer maintenance and support bills in half and give customers a reprieve from software upgrade cycles by allowing customers to remain on older, often outdated, versions of PeopleSoft, JDE, or Siebel software rather than moving to later versions, and by eliminating fees for fixes and upgrades that customers would otherwise have to pay to remain on the older versions." *Rimini I*, ECF No. 36 at 11.  Rimini's statements that it could save clients 50 percent in support costs and allow clients to avoid upgrades are clearly "part of the claimed wrongful conduct" in this case.  *Jarrow Formulas*, 304 F.3d at 837.  Therefore, laches is presumed to bar Oracle's Lanham Act claims.

386.    Rimini has also demonstrated that Oracle's delay in filing suit was unreasonable. As Rimini pointed out, Oracle waited nearly five years after it knew of its potential cause of action to assert its claims.  What's more, Oracle knew about that potential cause of action *while already engaged in litigation with Rimini*.  Under these circumstances, the Court finds that Oracle's delay was unreasonable.

387.    Rimini also suffered prejudice.    Rimini's statements regarding its support processes, its security-related offerings, and how it provides a cheaper, more effective alternative to Oracle have been a significant part of Rimini's marketing to the public.  *Jarrow Formulas*, 304 F.3d at 839.  "If [Oracle] had [asserted its claims] sooner, [Rimini] could have invested its resources in shaping an alternative identity for [Rimini security offerings] in the minds of the public."  *Id.*  Given Rimini's reliance on the challenged statements in carrying out its business operations, and Oracle's failure to object to them earlier, the Court concludes that Rimini would be prejudiced if Oracle's claims were to proceed.  *Id.* at 839-40; *Conopco*, 95 F.3d at 192-93.

80

Gibson, Dunn &
Crutcher LLP

## G. DMCA Claims and Defenses

388. To prevail on its DMCA claims, Oracle must prove by a preponderance of the evidence that Rimini and/or Ravin intentionally removed or altered copyright management information ("CMI") from Oracle's works, or that Rimini intentionally distributed copies of Oracle works knowing that CMI had been removed or altered. *See* 17 U.S.C. § 1202(b)(1), (b)(3). Oracle must also prove that Rimini and/or Ravin took these actions knowing or having reasonable grounds to know that they would induce, enable, facilitate, or conceal copyright infringement. *Id.*; *see also Kirk Kara Corp. v. W. Stone & Metal Corp.*, 2020 WL 5991503, at *6 (C.D. Cal. Aug. 14, 2020).

389. Based on the relevant findings of fact, the Court holds that Oracle failed to prove a removal of CMI from an Oracle "work" as required by the DMCA. The DMCA prohibits the removal of CMI from "copies … of a work" and the distribution of "copies of works" from which CMI has been removed. 17 U.S.C. § 1203(b)(3), (c). Here, Oracle has not shown that any of the Category 1 or Category 2 files from which copyright notices were allegedly removed are "copies" of Oracle "works," as opposed to files that contained a mix of Rimini-written and Oracle-written code. *See Robert L. Stark Enters., Inc. v. Neptune Design Grp., LLC*, 2017 WL 1345195, at *11 (N.D. Ohio Apr. 12, 2017) (no DMCA violation where there was "no evidence that plaintiff … removed CMI *from defendant's original work*" as opposed to a work "strikingly similar" to the original work); *Kirk Kara*, 2020 WL 5991503, at *6 ("[E]ven where the underlying works are similar, courts have found that no DMCA violation exists where the works are not identical."). Because the files at issue are not the copyrighted work, Oracle's DMCA claim fails.

390. Moreover, with respect to the Category 2 files, Oracle has failed to prove by a preponderance of the evidence that Rimini removed any CMI at all. For these files, Ms. Frederiksen-Cross opined only that Rimini "copied over" Oracle code from an Oracle file into a Rimini-written file without "retaining" an Oracle copyright notice. This is not a "removal" under the DMCA. *See Frost-Tsuji Architects v. Highway Inn, Inc.*, 2014 WL 5798282, at *5 (D. Haw. Nov. 7, 2014) (DMCA requires "evidence of removal" and "[t]he physical act of removal is not the same as basing a [work] on someone else's work"), *aff'd*, 700 F. App'x 674 (9th Cir. 2017); *Falkner v. Gen. Motors LLC*, 393 F. Supp. 3d 927, 938-39 (C.D. Cal. 2018) (copying whole parts

81

1  of a work without copying the work's CMI does not constitute removing CMI); *Huffman v.*

2  *Activision Publ'g Inc.*, 2020 WL 8678493, at \*11 (E.D. Tex. Dec. 14, 2020), *adopted* 2021 WL

3  2141352 (E.D. Tex. May 26, 2021) (DMCA "does not cover the mere failure to add truthful CMI

4  to a copy," but "requires actual alteration or removal of CMI already found on [a work]").

5      391.    Finally, Oracle failed to prove that any Rimini employee took any action knowing

6  or having reasonable grounds to know that it would induce, enable, facilitate, or conceal copyright

7  infringement.  The evidence shows that Rimini did not attempt to hide its conduct, that its engineers

8  believed it was proper to remove CMI to avoid suggesting that the files were fully created by

9  Oracle, and that its clients would not have suffered any confusion about the nature of the files

10  given that Rimini's work is to deliver updates to Oracle software.  It is not sufficient for Oracle to

11  generically argue that alleged CMI removal *might* somehow lead to infringement.  *Stevens v.*

12  *Corelogic*, 899 F.3d 666, 673-75 (9th Cir. 2018).  Oracle also ignores that many of the alleged

13  removals indisputably occurred in 2010, during the period of time when the *Rimini I* jury found

14  that any infringement by Rimini was innocent—meaning that Rimini did not know or have reason

15  to know its conduct was infringing.

16      392.    Rimini asserts a statute of limitations defense against Oracle's DMCA claims.

17  Although the Court need not reach this defense given Oracle's failure to prove any DMCA

18  violation, based on the relevant findings of fact, the Court nevertheless holds that Oracle's DMCA

19  claims are barred by the statute of limitations.

20      393.    The statute of limitations for a DMCA claim is three years.  17 U.S.C. § 507(b).

21  Oracle filed its DMCA claims on February 28, 2016.  ECF No. 174 ¶¶ 137-48.  Accordingly,

22  claims that accrued before February 28, 2013, are time-barred.  A claim accrues when Oracle "has

23  knowledge of a violation or is chargeable with such knowledge."  *Polar Bear Prods., Inc. v. Timex*

24  *Corp.*, 384 F.3d 700, 706 (9th Cir. 2004) (citation and quotation marks omitted).  The evidence

25  shows that Oracle was aware of the underlying conduct at issue before February 28, 2013, as the

26  result of discovery in the *Rimini I* case, and thus Oracle's claims are barred by the statute of

27  limitations.

28

Gibson, Dunn &
Crutcher LLP

1

**H.     Oracle's UCL Claims**

2       394.    To establish its claims for "unlawful" conduct under the UCL, Oracle must show

3  by a preponderance of the evidence that Rimini engaged in conduct that (1) "can properly be called

4  a business practice" and (2) "is forbidden by law."  *Korea Supply Co. v. Lockheed Martin Corp.*,

5  63 P.3d 937, 943 (Cal. 2003).  To establish its claims for "unfair" conduct, Oracle must show by

6  a preponderance of the evidence that Rimini's conduct amounts to an incipient violation of the text

7  or spirit of the antitrust laws or threatened substantial harm to competition, as set out above.  *Cel-*

8  *Tech*, 973 P.3d at 544.  Based on the relevant findings of fact and for the reasons that follow, the

9  Court holds that Oracle has failed to establish any of its claims under the UCL.

10      395.    ***Competitor Standing.***   By contrast to Rimini, Oracle failed to establish an

11 economic injury caused by the accused illegal or unfair conduct as required to establish competitor

12 standing.

13      396.    Setting aside its sweeping allegations of infringement and disparaging statements,

14 Oracle ultimately failed to show the ascertainable harm required by many of its claims and did not

15 overcome Rimini's contrary evidence that Oracle maintained, and continues to retain,

16 overwhelming market power and profit margins of over 95% on the support services Rimini was

17 alleged somehow to have damaged.

18      397.    The Court notes that intangible harms to reputation and the like do not confer

19 standing under the UCL.  "California courts have distinguished the UCL standing requirement as

20 more stringent than the federal Article III standing requirement" because the statute limits

21 claimants to those who "lost money or property."  *Pirozzi v. Apple, Inc.*, 966 F. Supp. 2d 909, 919

22 (N.D. Cal. 2013).

23      398.    ***Unlawful Conduct Claims.***  In any event, Oracle's "unlawful" conduct claims fail

24 for the additional reason that Rimini's accused conduct did not "violate another 'borrowed' law."

25 *Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1168 (9th Cir. 2012) (citing *Cel-Tech*, 973 P.2d

26 at 539-40) (affirming dismissal of UCL "unlawful" claim).

27      399.    ***Unfair Conduct Claims.***  Similarly, Oracle's "unfair" conduct claims fail on the

28 merits because the predicate conduct has been adjudicated lawful and because Oracle fell well

Gibson, Dunn &
Crutcher LLP

1   short of proving the incipient antitrust violation or substantial harm to competition required under

2   *Cel-Tech*.

3       400.   The underlying allegations comprising Oracle's unfair competition claims—that

4   Rimini "engaged in a systemic breach of Oracle's software licenses" and "false advertising in

5   violation of the Lanham Act" (ECF No. 589 at 21)—have either dropped out of the case (ECF

6   No. 1420 at 1 (stipulation of dismissal of Oracle's breach of contract and inducing breach of

7   contract claims with prejudice)), or, as set forth herein, been adjudicated as true and otherwise not

8   unlawful (*see*, *e.g.*, *Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 1053 (N.D. Cal. 2021)

9   (clearly lawful conduct not considered unfair)).

10       401.   Finally, Oracle failed to present a plausible theory to explain, let alone present

11   evidence to prove, how a much smaller competitor in a market dominated by Oracle inflicted

12   "injury *to competition*." *Cel-Tech*, 973 P.2d at 544 (emphasis added).  Even had harm to Oracle

13   been proven, both federal and California courts have been crystal clear that, like other antitrust

14   laws, the UCL was "enacted for 'the protection of *competition*, not *competitors*.'" *Id.* (quoting

15   *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 115 (1986)).

16   **I.**    **The Parties' Requested Injunctive Relief**

17       **1.**    **Rimini's Request for Injunctive Relief**

18       402.   Rimini seeks a permanent injunction under California's UCL to remedy the

19   irreparable and ongoing harms caused by Oracle's at-issue unfair business practices.  Oracle raises

20   defenses of unclean hands and a variety of speech defenses arising under certain statutes and

21   constitutional protections, and also opposes issuance of a permanent injunction on the merits.

22           ***i.***    ***Injunctive Relief***

23       403.   Based on the relevant findings of fact and for the reasons that follow, the Court

24   grants Rimini's request for injunctive relief.

25       404.   Under the UCL, successful claimants may seek broad-based injunctive relief in the

26   public interest to remedy and prevent unfair business practices.  *See* Cal. Bus. & Prof. Code

27   § 17203; *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 2020 WL 1812257, at *5 (N.D. Cal.

28   Apr. 9, 2022).  To obtain injunctive relief under the Supreme Court's *eBay* test for equitable

1    jurisdiction, Rimini must prove: "(1) that it has suffered an irreparable injury; (2) that remedies

2    available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that,

3    considering the balance of hardships between the plaintiff and defendant, a remedy in equity is

4    warranted; and (4) that the public interest would not be disserved by a permanent injunction."

5    *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *see Sonner v. Premier Nutrition*

6    *Corp.*, 971 F.3d 834, 837 (9th Cir. 2020).

7        405.   ***Irreparable Injury.***   Rimini has proven that it has suffered an irreparable injury.

8    As a competitor in the same market as Oracle, Rimini is irreparably injured by the reduction in

9    competition caused by Oracle's harmful anticompetitive policies.  *See Boardman v. Pac. Seafood*

10   *Grp.*, 822 F.3d 1011, 1023 (9th Cir. 2016).  Rimini established the factual basis for competitive

11   injury by presenting evidence of Oracle's high market share and profit margins, as well as written

12   exhibits and live testimony reflecting the experiences of Oracle licensees participating in the same

13   market and demonstrating the tangible, and negative, effect of Oracle's anticompetitive practices

14   on the market.

15       406.   Although loss in competition is sufficient to show irreparable injury here, the Court

16   notes that Rimini has established a second irreparable injury in the form of reputational harm and

17   loss of customer goodwill.  *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832,

18   841 (9th Cir. 2001) ("threatened loss of prospective customers or goodwill certainly supports"

19   irreparable harm).  Without injunctive relief, harm to Rimini's reputation stemming from Oracle's

20   misstatements and implied threats will only continue to ripple throughout the market and unfairly

21   enhance Oracle's position.  The Court finds the proposed injunction will forestall further harm and

22   allow Rimini gradually to recover the lost reputation and customer goodwill.

23       407.   ***Inadequate Remedy at Law.***   From the foregoing analysis, the Court easily

24   concludes that Rimini has no adequate remedy at law that could forestall and redress its

25   competitive and reputational injuries.  *See Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*,

26   518 F. Supp. 2d 1197, 1219 (C.D. Cal. 2007) (noting the first and second *eBay* factors generally

27   collapse into the same inquiry when considering whether to issue a permanent injunction).  As

28   California courts have emphasized, the broad substantive coverage of the UCL is contrasted by the

1    fact that "the primary form of relief available … is an injunction." *In re Tobacco II Cases*, 207

2    P.3d 20, 34 (Cal. 2009).

3    408.    Damages cannot be tabulated for market-wide harms to competition because the

4    analysis of what the world would look like but for Oracle's unfair conduct quickly becomes an

5    exercise in speculation.  For the same reason, damages cannot be reliably assessed for reputational

6    harm that spreads unpredictably and exponentially.  And even if damages could be tabulated, that

7    legal remedy would be inadequate to make up for the competitive harm here because a one-time

8    payment from Oracle to Rimini would not necessarily deter Oracle and would do nothing to

9    compensate the other competitors and customers harmed by Oracle's anticompetitive activities.

10   409.    ***Balance of Hardships.***   The Court also concludes that the balance of hardships

11   favors issuing Rimini's requested injunction.  The Court has identified a number of ways in which

12   Rimini is tangibly harmed on an ongoing basis by Oracle's anticompetitive policies, including by

13   enduring increased costs and unfairly losing support customers.  By contrast, Oracle will not be

14   seriously burdened by the requested injunction.  And there is no valid business reason to make

15   false statements.

16   410.    ***Public Interest.***   The Court finds that granting a permanent injunction designed to

17   increase competition is necessarily in the public interest.  *See Boardman*, 822 F.3d at 104.  The

18   market for support of Oracle products will benefit from *more*, rather than *less* competition.

19             *ii.    **Oracle's Defenses***

20   411.    Oracle asserts a defense of unclean hands and a variety of speech defenses arising

21   under applicable statutes and constitutional protections.  For the following reasons, the Court holds

22   that Oracle failed to make the showings required to establish these defenses and defeat otherwise

23   available equitable relief.

24   412.    The doctrine of unclean hands is an equitable defense that precludes awarding relief

25   to a plaintiff who acted in bad faith or with fraud or deceit as to the controversy at issue.  *Northbay*

26   *Wellness Grp., Inc. v. Beyries*, 789 F.3d 956, 959 (9th Cir. 2015).  The doctrine should not be

27   enforced to aid an undeserving defendant or when contrary to the public interest.  *Id.* at 960.

28   413.    The Court concludes that Oracle failed to prove its unclean hands defense.  Oracle

86

has failed to identify bad faith conduct by Rimini that would be severe enough to warrant denial of otherwise available equitable relief. Indeed, as set forth herein, the Court concluded that the very conduct at the center of Oracle's assertion of unclean hands is, in fact, lawful. The Court further concludes that Oracle's speech-related defenses are inapplicable where, as here, the requested injunction bars unlawful anticompetitive conduct rather than protected speech. *Va. State Bd. of Pharmacy*, 425 U.S. at 771; *Kasky*, 45 P.3d at 261.

414. Accordingly, the Court holds that Rimini has demonstrated each of the four *eBay* factors weighs in favor of granting the requested permanent injunction, and that none of Oracle's defenses have merit, for the reasons set forth above. The Court orders Rimini to submit a proposed order and injunction for the Court's consideration and based on these findings of fact and conclusions of law.

## 2. Oracle's Requests for Injunctive Relief

415. Oracle also seeks permanent injunctive relief in connection with its claims under the Copyright Act, Lanham Act, DMCA, and California's UCL. The Court holds that Oracle has failed to show an entitlement to injunctive relief, that Rimini has established defenses precluding most such relief, and that Oracle's requested relief is overbroad and impermissibly vague in any event. Oracle's request for injunctive relief is denied.

416. ***Irreparable Harm and Causal Nexus.*** To succeed under the first *eBay* factor, Oracle must "demonstrate that irreparable injury is *likely* in the absence of an injunction" and cannot succeed by pointing to "a mere 'possibility of some remote future injury.'" *Park Vill. Apt. Tenants Ass'n v. Mortimer Howard Tr.*, 636 F.3d 1150, 1160 (9th Cir. 2011) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)).

417. With respect to its infringement claims, Oracle asserts irreparable harm in the form of reduced market share, reputational damage, and loss of consumer goodwill. Injunctive relief is required to forestall these harms, Oracle argues, because the Court found on summary judgment that Rimini infringed four of Oracle's PeopleSoft copyright registrations in connection with two specific updates developed for clients Campbell Soup and City of Eugene (because the Court found no additional infringement at trial, these are the only instances of prior infringement at issue here).

87

1   ECF No. 1253 at 38-66.  Based on the relevant findings of fact, the Court finds that Oracle failed

2   to show irreparable harm on this basis.

3       418.   Under Ninth Circuit precedent, Oracle must show "a sufficient causal connection"

4   between the infringement found and the likelihood of actually facing irreparable loss of market

5   share, reputational damage, or loss of goodwill.  *Perfect 10, Inc. v. Google, Inc.*, 653 F.3d 976,

6   981 (9th Cir. 2011); *see also Oracle*, 783 F. App'x at 710.  This showing is necessary for injunctive

7   relief because courts can no longer "presum[e] irreparable harm in a copyright infringement case"

8   in light of the Supreme Court's decision in *eBay*.  *Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.*,

9   654 F.3d 989, 998 (9th Cir. 2011).

10      419.   Oracle failed to show the required causal connection.  As an initial matter, the Court

11  notes that Oracle presented no direct evidence that Rimini's alleged infringement reduced its

12  market share by "even a single former [customer]."  *Perfect 10,* 653 F.3d at 982.  With respect to

13  Campbell Soup and City of Eugene, Oracle was unable to present any customer statements

14  suggesting that the two infringing updates caused them to leave Oracle in favor of Rimini.  In fact,

15  the direct evidence of customer motivation presented at trial suggests customers left Oracle for a

16  variety of reasons.  *See Perfect 10*, 653 F.3d at 981-82 (denying injunction where threat of

17  bankruptcy was not caused by alleged infringement).

18      420.   The Court also finds that Oracle's asserted irreparable harm requiring DMCA

19  relief—the prospective removal of CMI—is substantially similar to, and ultimately derivative of,

20  Oracle's argument for an injunction under the Copyright Act.  *See, e.g.*, *TELUS Corp. v. Watson*,

21  2010 WL 11614138, at *2 (N.D. Cal. Dec. 17, 2010) (analyzing requests for injunctive relief under

22  both statutes simultaneously).  Oracle has not shown any past harm of any sort stemming from the

23  failure to include Oracle copyright notices on files that were not Oracle copyrighted works, let

24  alone establish a likelihood of future harm that could not be remedied by money damages.

25      421.   The same holds true for the Lanham Act.  Oracle has failed to demonstrate how

26  statements from Rimini, *even if false and misleading*, from *nearly a decade ago* could conceivably

27  cause Oracle *irreparable harm* justifying prospective injunctive relief.  There is no risk of any

28  future injury here.

RIMINI STREET AND SETH RAVIN'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
CASE NO. 2:14-CV-01699-MMD-DJA

Gibson, Dunn &
Crutcher LLP

422.    With respect to Oracle's UCL claims, Oracle asserts generalized harms of unfair competition that have reduced Oracle's competitive advantages.  As explained above, Oracle's UCL claims under the "unlawful" prong are coterminous with its claims under the Copyright Act and Lanham Act, and Oracle's UCL claims under the "unfair" prong are limited to injuries to competition for which Oracle cannot demonstrate competitor standing by showing harm caused by Rimini's alleged unfair conduct.  Based on the Court's previous analysis of Oracle's competitor standing and of causation in the infringement context, the Court finds that Oracle has failed to establish an irreparable injury capable of being remedied by an injunction under the UCL's "unfair" prong separately from Oracle's remaining claims.

423.    Finally, Oracle's request for further injunctive relief makes little sense in light of an existing injunction that is already in place.  If, for instance, Oracle were to prevail on its migration claims, it would not be entitled to any further relief on them.  The claims concern copies of PeopleSoft on Rimini's systems from years ago, and the *Rimini I* injunction already prohibits the copying or use of PeopleSoft files on Rimini's systems.  Thus, Oracle's remedy already exists as to those claims, and it cannot seek a further injunction.  *Jellybean Ent., Inc. v. Usnile LLC*, 2013 WL 3283845, at *3 (S.D. Cal. June 26, 2013) ("[A]n order enjoining Defendants' alleged copyright infringement and unfair business practices already issued, which undermines the risk of future harm.").

424.    ***Inadequacy of Monetary Relief.***  To succeed under the second *eBay* factor, Oracle must show that money damages would be inadequate to compensate the asserted harm in the absence of an injunction.  The Court notes that the first and second *eBay* factors often overlap in the permanent injunction context.  *See City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1243 (9th Cir. 2018).  But, importantly, Oracle litigated this case until the eleventh hour pursuing claims of *over $1 billion* in actual and statutory damages under the Copyright Act, DMCA, Lanham Act, and other state law statutes and causes of action.  All of these claims involve allegations of infringement that are generally remediable through damages.  *See generally* ECF Nos. 397, 1309.  It is black-letter law that "future copyright infringement can always be redressed via damages, *whether actual or statutory*."  *Metro-Goldwyn-Mayer*, 518 F. Supp. 2d at 1215

Gibson, Dunn &
Crutcher LLP

1   (emphasis added); *see also eBay*, 547 U.S. at 391.  Yet Oracle voluntarily forfeited its claims for

2   actual damages as well as *statutory* damages that could have entitled it to legal relief for the alleged

3   wrongdoing.  In all events, the Court holds that Oracle has failed to demonstrate irreparable harm

4   or an inadequate remedy at law.

5     425. ***Balance of Hardships.***  To succeed under the third *eBay* factor, Oracle must show

6   that the balance of hardships favors granting relief.  In evaluating this factor, the Court recognizes

7   that enjoining a party to stop conduct that has been adjudicated unlawful is not a hardship.  *See*,

8   *e.g.*, *BNI Enters., Inc. v. Referral Leaders Int'l, LLC*, 2015 WL 12644984, at *7 (C.D. Cal. Jan. 9,

9   2015).  On the whole, however, the Court finds this factor weighs in Rimini's favor as well because

10  the nature and scope of the requested relief threatens greater hardship than that faced by Oracle in

11  the absence of an injunction.  And, as noted above, Oracle is basing its claims for injunctive relief

12  on conduct that is, in many cases, a decade old.  Injunction compliance is burdensome, and

13  imposing an injunction based on acts from so long ago would hurt Rimini far more than it would

14  prevent likely future irreparable injuries to Oracle.

15    426. ***Public Interest.***  To succeed under the fourth *eBay* factor, Oracle must show the

16  public interest does not run contrary to the injunctive relief sought.  The Court finds that this factor,

17  too, counsels against issuing injunctive relief.  "[G]eneral public interest" in supporting intellectual

18  property rights is not sufficient to warrant a permanent injunction, because infringement alone

19  does not justify injunctive relief.  *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d

20  1312, 1341 (Fed. Cir. 2012).  Furthermore, granting the injunction requested in this case will not,

21  given the Court's findings above, likely aid competition, and may in fact harm it.  *See eBay*, 547

22  U.S. at 396-97 (Kennedy, J., concurring) (an injunction does "not serve the public interest" where

23  it "is employed simply" to gain "undue leverage").

24    427. The Ninth Circuit has repeatedly emphasized that "[i]njunctive relief … must be

25  tailored to remedy the *specific harm alleged*.  An overb[roa]d injunction is an abuse of discretion."

26  *Park Village*, 636 F.3d at 1160 (alterations in original) (quoting *Lamb-Weston, Inc. v. McCain*

27  *Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991)).  Based on the relevant findings of fact, the Court

28  finds that Oracle's requested relief is overbroad and vague in several respects.

Gibson, Dunn &
Crutcher LLP

428.     With respect to its Copyright Act claims, Oracle requests a sweeping injunction across virtually all of the product lines relevant here.  But as noted above, Oracle only proved infringement as to four specific PeopleSoft registrations with respect to two specific updates developed for Campbell Soup and City of Eugene.  Evidence presented at trial indicates that both cases do not reflect Rimini's overall policy framework for software support and involved conduct that Oracle was not able to generalize across Rimini's support activities.

429.     Moreover, and importantly, Oracle cannot propose any coherent way to meet the requirement that injunctions be "narrowly tailored" when it comes to the *license* restrictions in the 1,000+ licenses in this case.  *Price v. City of Stockton*, 390 F.3d 1105, 1117 (9th Cir. 2004).  The Court cannot enjoin Rimini from conduct permitted by the license agreements; that much is clear from the Ninth Circuit's decisions in *Rimini I*.  *Oracle*, 783 F. App'x at 710-11.  If a particular license agreement does not have a "facilities" restriction, the Court cannot enjoin Rimini from having that program on its systems.  It follows that the Court cannot practically issue a properly tailored injunction that blanketly prohibits conduct across even a *single* product line, because the license agreements are so varied.

430.     Oracle fails to demonstrate that the *eBay* factors are established here and that it is entitled to an injunction *even if* it were to have prevailed on its claims (which it has not).

## IV.    CONCLUSION

431.     For the foregoing reasons, the Court hereby enters judgment for Rimini and Ravin. The Court directs Rimini to prepare a proposed declaratory judgment and permanent injunction, as well as to propose modifications to the existing *Rimini I* injunction, based on these findings of fact and conclusions of law.

Gibson, Dunn & Crutcher LLP

1    Dated:  November 22, 2022                    Respectfully submitted,

2                                                 GIBSON, DUNN & CRUTCHER LLP

3
                                                  By:  _____/s/ Eric D. Vandevelde_____
4                                                            Eric D. Vandevelde

5                                                 *Attorneys for Defendants/ Counterclaimants*
                                                  *Rimini Street, Inc., and Seth Ravin*
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

RIMINI STREET AND SETH RAVIN'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
CASE NO. 2:14-CV-01699-MMD-DJA

Gibson, Dunn &
Crutcher LLP