BOIES, SCHILLER FLEXNER LLP
RICHARD J. POCKER (NV Bar No. 3568)
300 South Fourth Street, Suite 800
Las Vegas, NV 89101
Telephone:    702.382.7300
Facsimile:    702.382.2755
rpocker@bsfllp.com

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
WILLIAM A. ISAACSON (*pro hac vice*)
KAREN DUNN (*pro hac vice*)
2001 K Street, NW
Washington, DC 20006
Telephone:    202.223.7300
Facsimile:    202.223.7420
wisaacson@paulweiss.com
kdunn@paulweiss.com

MORGAN, LEWIS & BOCKIUS LLP
BENJAMIN P. SMITH (*pro hac vice*)
SHARON R. SMITH (*pro hac vice*)
One Market, Spear Street Tower
San Francisco, CA  94105
Telephone:    415.442.1000
Facsimile:    415.442.1001
benjamin.smith@morganlewis.com
sharon.smith@morganlewis.com

JAMES C. MAROULIS (*pro hac vice*)
ORACLE CORPORATION
500 Oracle Parkway, M/S 5op7
Redwood City, CA 94070
Telephone:    650.506.4846
Facsimile:    650.506.7114
dorian.daley@oracle.com
jim.maroulis@oracle.com

*Attorneys for Plaintiffs and
Counterdefendants Oracle International
Corporation and Oracle America, Inc.*

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| ORACLE INTERNATIONAL CORP., a California corporation, and ORACLE AMERICA, INC., a Delaware corporation,<br><br>　　　　Plaintiffs/Counterdefendants,<br><br>　　v.<br><br>RIMINI STREET, INC., a Nevada corporation, and SETH RAVIN, an individual,<br><br>　　　　Defendants/Counterclaimants. | Case No.  2:14-cv-01699-MMD-DJA<br><br>**ORACLE INTERNATIONAL CORPORATION AND ORACLE AMERICA, INC.'S TRIAL BRIEF**<br><br>***PUBLIC REDACTED VERSION*** |

# TABLE OF CONTENTS

I.    INTRODUCTION.................................................................................................. 1

II.   BACKGROUND ................................................................................................. 3

III.  LIABILITY ....................................................................................................... 11

      A.    COPYRIGHT INFRINGEMENT ...................................................... 11

      B.    VIOLATIONS OF THE DMCA.......................................................... 15

      C.    VIOLATIONS OF THE LANHAM ACT........................................... 16

      D.    RIMINI'S VIOLATIONS OF CALIFORNIA UNFAIR COMPETITION
            LAW ..................................................................................................... 17

      E.    SETH RAVIN'S INDIVIDUAL LIABILITY ................................... 17

IV.   ORACLE WAS IRREPARABLY HARMED BY RIMINI'S CONDUCT.................. 18

V.    RIMINI'S UCL CLAIM AGAINST ORACLE FAILS. .................................... 19

VI.   RELIEF SOUGHT FROM COURT.................................................................... 22

      A.    EQUITABLE RELIEF ......................................................................... 22

      B.    ATTORNEYS' FEES .......................................................................... 23

VII.  CONCLUSION.................................................................................................. 24

APPENDIX A – TIMELINE OF KEY EVENTS................................................... 25

APPENDIX B – GLOSSARY OF TERMS ........................................................... 27

APPENDIX C – INDIVIDUALS............................................................................ 32

APPENDIX D – ISSUES ALREADY DECIDED BY THE COURT ..................... 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Broad. Music, Inc. v. Blueberry Hill Family Rests., Inc.,*
    899 F. Supp. 474 (D. Nev. 1995)......................................................................... 18

*Aardwolf Indus., LLC v. Abaco Machines USA, Inc.,*
    No. CV 16-16-1968-GW (JEMX) 2017 WL 10350547 (C.D. Cal. Nov. 13,
    2017)................................................................................................................... 15

*AK Futures LLC v. Boyd St. Distro, LLC,*
    35 F.4th 682 (9th Cir. 2022)............................................................................... 16

*Am. Prof'l Testing Serv. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns,*
    108 F.3d 1147 (9th Cir. 1997)............................................................................ 21

*Blizzard Entm't Inc. v. Ceiling Fan Software LLC,*
    2013 WL 12143935 (C.D. Cal. Jan. 7, 2013)..................................................... 21

*In re Century 21-RE/MAX Real Est. Advert. Claims Litig.,*
    882 F. Supp. 915 (C.D. Cal. 1994)..................................................................... 18

*Creative Mobile Techs., LLC v. Flywheel Software, Inc.,*
    2017 U.S. Dist. LEXIS 24173 (N.D. Cal. Feb. 21, 2017)................................... 20

*Drum v. San Fernando Valley Bar Assn.,*
    182 Cal. App. 4th 247 (2010)............................................................................. 20

*Ellison v. Robertson,*
    357 F.3d 1072 (9th Cir. 2004)............................................................................ 17

*Energy Four, Inc. v. Dornier Medical Systems, Inc.,*
    765 F. Supp. 724 (N.D. Ga. 1991)...................................................................... 16

*Enter. Tech. Holdings, Inc. v. Noveon Sys., Inc.,*
    No. 5-CV-2236 W (CAB), 2008 WL 11338356.................................................. 15

*Facebook, Inc. v. BrandTotal Ltd.,*
    2021 U.S. Dist. LEXIS 165209 (N.D. Cal. Aug. 31, 2021)................................. 20

*Friedman v. Live Nation Merch., Inc.,*
    833 F.3d 1180 (9th Cir. 2016)............................................................................ 15

*Gen. Bus. Sys. v. N. Am. Philips Corp.,*
    699 F.2d 965 (9th Cir. 1982).............................................................................. 21

*John Doe 1 v. Abbott Labs.,*
    571 F.3d 930 (9th Cir. 2009) ................................................................................. 21

*Newcal Indus. v. Ikon Office Sol.,*
    513 F.3d 1038 (9th Cir. 2008) ............................................................................... 21

*Payment Logistics Limited v. Lighthouse Network LLC,*
    2018 WL 5311907 (S.D. Cal. Oct. 24, 2018) ....................................................... 21

*Perfect 10, Inc. v. Amazon.com, Inc.,*
    508 F.3d 1146 (9th Cir. 2007) ............................................................................... 17

*POM Wonderful LLC v. Purely Juice, Inc.,*
    2008 U.S. Dist. LEXIS 55426 (C.D. Cal. July 17, 2008) .................................... 16

*Reno-Tahoe Specialty, Inc., v. Mungchi, Inc.,*
    No. 2:12-CV-01051-GMN-VC, 2014 WL 7336082 (D. Nev. Dec. 19, 2014) ..................... 15

*Skydive Az., Inc. v. Quattrocchi,*
    673 F.3d 1105 (9th Cir. 2012) ............................................................................... 16

*Sony Corp. of Am. v. Universal City Studios, Inc.,*
    464 U.S. 417 (1984) ............................................................................................... 23

*S.O.S., Inc. v. Payday,*
    886 F.2d 1081, 1088 (9th Cir. 1989) .................................................................... 11

*Symantec Corp. v. CD Micro, Inc.,*
    286 F. Supp. 2d 1265 (D. Or. 2003) ..................................................................... 17

*Tanaka v. Univ. of S. California,*
    252 F.3d 1059 (9th Cir. 2001) ............................................................................... 21

*Transgo, Inc. v. Ajac Transmission Parts Corp.,*
    768 F.2d 1001 (9th Cir. 1985) ............................................................................... 18

*United States v. E.I. du Pont De Nemours & Co.,*
    351 U.S. 377 (1956) ............................................................................................... 21

*Videotronics, Inc. v. Bend Elec.,*
    586 F. Supp. 478 (D. Nev. 1984) .......................................................................... 23

*Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.,*
    382 U.S. 172 (1965) ............................................................................................... 21

*Yellowcake, Inc. v. Morena Music, Inc.,*
    522 F. Supp. 3d 747 (E.D. Cal. 2021) .................................................................. 17

**Statutes**

15 U.S.C. § 1116(a)..............................................................................................16

17 U.S.C. § 117....................................................................................................25

17 U.S.C. § 502(a)...............................................................................................22

17 U.S.C. § 505....................................................................................................23

17 U.S.C. § 1202(b)(3).........................................................................................15

Pursuant to the Court's Order Regarding Bench Trial (ECF No. 1426), Plaintiffs and Counterdefendants Oracle International Corporation and Oracle America, Inc., ("Oracle") submit this Trial Brief.

## I.    INTRODUCTION[1]

Notwithstanding 12 years of party and judicial resources directed at curtailing Defendants Rimini Street, Inc.'s and Seth Ravin's (together, "Rimini") copyright infringement, in the forthcoming trial, this Court must again address Rimini's infringement of Oracle's copyrights, compounded by Rimini's false and misleading statements to its customers about that ongoing infringement and Rimini's related support processes. As Oracle will prove at trial, Rimini violated: (1) the Copyright Act (again); (2) the Digital Millennium Copyright Act ("DMCA"), (3) the Lanham Act; and (4) the California Unfair Competition Law ("UCL"). Oracle respectfully seeks equitable relief and attorneys' fees and costs in this case.

In *Rimini I*, after the Court ruled on summary judgment in 2014 that Rimini's business practices violated Oracle's copyrights, a jury in 2015 awarded Oracle $36.5 million in copyright damages, with over $28.5 million in attorneys' fees added in the judgment. This Court entered a permanent injunction, which the Ninth Circuit unanimously affirmed with only minor modifications. Rimini violated that injunction, and Judge Hicks held Rimini in contempt. *Rimini I*, ECF 1548 at 53. Rimini was sanctioned $630,000 and ordered to pay Oracle's attorneys' fees. *Id.* at 54-55.

Rimini initiated this follow-on lawsuit in October 2014, falsely alleging that it had reformed its practices to stop infringing Oracle's copyrights in "Process 2.0." Thus far in *Rimini II*:

- The Court held that Rimini continued in "Process 2.0" to infringe Oracle's PeopleSoft copyrights when developing and testing certain software updates in one client's environment that it then provided to a different client. *Rimini II*, ECF No. 1253 at 46

---

[1] Oracle has attached three appendices for the Court's reference:
- Appendix A contains a timeline of the key events.
- Appendix B contains a glossary of technical terms.
- Appendix C contains a list of key individuals, along with a brief summary of each individual's role.

1    ("Given these undisputed facts, the Court finds that Rimini used Campbell Soup's

2    development environment, under color of Campbell Soup's license, to develop the

3    update for Toll Brothers."; "[T]he evidence shows that the update was only developed

4    in Campbell Soup's environment and was then given to Toll Brothers outright"); ECF

5    No. 1427 (ruling on motions *in limine*) at 11:3-9 ("Rimini engaged in impermissible

6    'cross use,' violated the applicable license, and committed copyright infringement when

7    Rimini developers developed an update in the Campbell Soup development

8    environment and then gave that update to Toll Brothers (another Rimini client)

9    outright").

10   • The Court denied Rimini summary judgment on its arguments that its processes for

11      supporting Oracle's JD Edwards ("JDE") and E-Business Suite ("EBS") software did

12      not rely on cross-use and thus were not infringing. ECF No. 1253 at 84–89.

13   • The Court granted Oracle's motion as to Rimini's express license defense regarding

14      Rimini's migration of infringing PeopleSoft environments from Rimini to clients or the

15      cloud, holding that "Rimini can point to no express provision in the license that

16      permitted it to make more copies of the software after it was held to have infringed when

17      it migrated the client's software from its servers back to the client." *Id.* at 92.

18   • The Court either dismissed or granted summary judgment to Oracle on six of Rimini's

19      claims against Oracle, leaving only a portion of Rimini's copyright declaratory

20      judgment claim and a portion of Rimini's UCL claim.[2]

21   At trial, Oracle will show additional reasons that Rimini's "Process 2.0" infringes Oracle's

22   copyrights. Rather than cease infringing, Rimini has automated its illegal conduct, using in-house

23   technical tools like its Automation Framework ("AFW") and Dev Review that are designed to

24   cross-use Oracle's software and derivative works of that software. Oracle also will demonstrate

25   that Rimini's "migration" of infringing Oracle software "environments" (computing systems

26   containing Oracle's software and associated applications) from Rimini's own computers to its

27   _____

28   [2] A more detailed summary of the issues the Court has already decided is contained in Appendix
     D.

1    customers' computers and/or to Windstream, a third-party cloud hosting service, constituted a

2    massive—and unlicensed—reproduction and distribution of Oracle software and derivative work

3    updates, which Rimini developed using processes found to be infringing in the *Rimini I* case.

4         Additionally, Oracle will show that Rimini violated the DMCA and the Lanham Act.

5    Rimini violated the DMCA thousands of times by removing and altering copyright management

6    information from Oracle source code files and documentation and by distributing the altered files.

7    Rimini violated the Lanham Act and California's UCL by disseminating false and misleading

8    statements about Rimini's support practices (including security offerings that Oracle provides and

9    Rimini cannot provide).

10        Finally, Oracle will show that Rimini's remaining claim against Oracle under the "unfair"

11   prong of the UCL is baseless.  Oracle has not violated any antitrust law, and Rimini will fail to

12   demonstrate otherwise.  In more than a dozen years of litigation, Rimini has never attempted to

13   assert an antitrust claim against Oracle, and Rimini cannot show any part of an antitrust claim,

14   including harm to competition, as a result of any alleged Oracle conduct.

15        Oracle seeks further equitable and injunctive relief beyond the current permanent injunction

16   to finally bring an end to Rimini's infringement, as well as an award of attorneys' fees and costs.

17   **II.      BACKGROUND**

18        ***Oracle.***   Founded in 1977, one key focus of Oracle's business is creating, licensing, and

19   supporting Enterprise Resource Planning ("ERP") software, including the PeopleSoft, JDE, and

20   EBS product lines at issue in this litigation.  Licensees can modify and customize Oracle software

21   for their own business purposes—provided that the modification and customization is consistent

22   with the software license. Oracle also creates, licenses, and supports Oracle Database, which is

23   database software often used (and, in the case of EBS, always used) in conjunction with ERP

24   software.

25        Oracle's ERP software is complex, configurable software that interacts with numerous other

26   software and hardware components.  ERP software is used to run large enterprises, including

27   companies, governmental entities, hospitals, and numerous other organizations.  This software

28   performs complex tasks, such as human resource functions, payroll, taxes, financial management,

supply chain management, and customer-relationship management.   These are key business functions that must be maintained with up-to-date software.

Given the critical nature of ERP software, its need for updates, and constant security and hacking threats, ERP software requires support.   As the company that wrote the software and holds the copyrights, Oracle offers comprehensive support for its products, including: (a) upgrades to new releases of the software; (b) security patches; (c) copyrighted knowledge documentation; (d) break-fix support; (e) tax and regulatory updates; (f) telephone support to answer customer questions; and (g) access to Oracle's technical support sites and services.

Oracle enters into separate support contracts with its customers for software support. Ordinarily, customers first purchase Oracle support together with a license for the ERP software. Because ERP software is both expensive and crucial to an organization's success, organizations license ERP software only after significant vetting and negotiation.   Typically, customers negotiate substantial discounts to the list price for the software licenses, which can cost millions of dollars, depending on the size of the organization and its software needs.   Oracle, consistent with ERP industry pricing, ordinarily charges customers 22% of the discounted license fee for annual support, subject only to uplifts that account for inflation.   This pricing structure allows the customer to project the total cost of ownership of its ERP licenses and support.

***Third-Party Support.***   Third parties, including Rimini, offer more limited support than Oracle.  Third-party support cannot provide software upgrades.  Nor can it provide security updates because to do so requires access to the underlying source code.  Rimini support largely consists of break-fix support and tax and regulatory updates.  If a customer experiences a problem with their software that they cannot fix on their own, they log a support ticket with the support vendor, and the vendor helps them solve the issue.  Break-fix support could be as easy as walking the customer through a simple process, or as complex as going through major development work over days or weeks to fix a significant bug in the customer's software.

Certain components of some Oracle software, such as PeopleSoft human resources, JDE payroll, and EBS payroll, require updates multiple times each year to account for changes to local, state, and federal tax laws and regulations.  Subject to Oracle's licenses, Oracle customers and

4

1   third-party support vendors can access the limited source code needed to make these updates.

2   Because of the importance of keeping the software running properly, organizations are

3   extremely careful in making any changes to the software. To that end, organizations set up multiple

4   ERP software "environments." The main environment, known as the "production" environment,

5   is the "live" environment that is actually running the organization's functions. Organizations also

6   set up one or more "development" and "test" environments. Those environments are copies of the

7   production environment, but they are used by an organization and its support vendor to make

8   changes in the software and to test those changes before promulgating any changes to the

9   production environment. As a support vendor, Rimini does not perform its test and development

10   work in a customer's production environment; Rimini performs this work in test and development

11   environments.

12   ***Rimini's Unlawful Business.*** Ravin developed what is now Rimini's business model at

13   TomorrowNow, an earlier third-party support provider. TomorrowNow pled guilty to criminal

14   infringement of Oracle's copyrights, admitted civil liability, and shuttered its doors in 2008.

15   Founded in 2005, Rimini, like TomorrowNow, offers to replace Oracle support at a discount

16   of 50% (or more) off Oracle's price. While the 50% discount that Rimini provides on support for

17   Oracle software is enticing to customers, Rimini's ability to provide support is limited in several

18   respects. Rimini does not have a license for any Oracle software or support materials. Therefore,

19   Rimini must operate under the restrictions of each customer's Oracle license. With limited

20   exceptions (discussed above), Rimini also does not have access to the source code underlying the

21   Oracle software, which means that Rimini cannot provide new versions of the software (upgrades)

22   or security patches and bug fixes that implement fundamental source code changes.

23   Rimini is able to offer a 50% discount on support costs because it provides support illegally.

24   As this Court found in *Rimini I*, "Rimini's business model was built entirely on its infringement of

25   Oracle's copyrighted software and its improper access and downloading of data from Oracle's

26   website and computer systems, and Rimini would not have achieved its current market share and

27   business growth without these infringing and illegal actions." *Rimini I*, ECF No. 1049 at 6:3-6. As

28   Oracle will show at trial, Rimini's business model continues to depend on extensive infringement

1  of Oracle's copyrights and other unlawful conduct.

2  **_Rimini I._**  In the _Rimini I_ action, this Court granted partial summary judgment to Oracle in

3  February 2014, holding that Rimini infringed Oracle's PeopleSoft software copyrights through,

4  _inter alia_, (1) using one customer's software (licensed by Oracle) to support other customers

5  ("cross-use")" (ECF No. 1253 at 86 (discussing cross-use)),[3] and (2) creating copies of Oracle

6  copyrighted materials on Rimini's computer systems in violation of the Oracle license provision

7  restricting the software to the customer's facilities ("facilities restriction") (_Rimini I_, ECF Nos. 474,

8  476).  In August 2014, this Court found Rimini infringed Oracle's Database copyrights.  In the

9  2015 trial, a jury also found Rimini liable for infringement of Oracle's PeopleSoft documentation,

10  JDE, and Siebel copyrights, and awarded Oracle $36.5 million in copyright damages and over $28.5

11  million in attorneys' fees.  This Court entered a permanent copyright injunction.  The Ninth Circuit

12  affirmed nearly all of these remedies.  In January 2022, Judge Hicks held Rimini in contempt of

13  court for violating the injunction and for continuing to infringe Oracle's copyrights.

14  **_Rimini II._**  Rimini filed this action for declaratory judgment on October 15, 2014, following

15  the summary judgment rulings against it in _Rimini I_.  ECF No. 1.  Rimini contends that its "Process

16  2.0," deployed after July 31, 2014, was not infringing and no longer cross-used one customer's

17  environment to develop updates for other customers, and that all Oracle copyrighted material and

18  source code had been removed from Rimini's systems.  Oracle counterclaimed on February 17,

19  2015, including the present claims of copyright infringement,[4] violations of the DMCA, violations

20  of the Lanham Act, and violations of the California UCL.  ECF Nos. 21, 22-s.  Rimini subsequently

21  amended its complaint to allege numerous business torts and statutory violations, all of which were

22  subsequently dismissed, except for Rimini's remaining UCL claim.

23  Because Judge Hicks ruled in February 2014 that Rimini hosting PeopleSoft software on its

24  ---
[3] _Accord Rimini I_, ECF No. 880 at 28 (the JDE License "does not mean that a third party like
25  Rimini Street is authorized to make copies of the J.D. Edwards software application and
documentation to, among other things, access the software's source code to carry out
26  development and testing of software updates, to make modifications to the software, or to use the
customer's software or support materials to support other customers").
27  [4] Oracle's infringement claim in this case includes infringement of Oracle's PeopleSoft, JDE, and
Database copyrights, which were all at issue in _Rimini I_.  Oracle's infringement claim also
28  includes Oracle's EBS copyrights, which were not at issue in _Rimini I_.

own systems violated the relevant licenses and constituted copyright infringement, Rimini was required to remove the infringing copies of software from its systems. As Oracle will demonstrate at trial, rather than deleting or stopping use of the infringing "local" PeopleSoft environments and updates that this Court found to be infringing and unlicensed in *Rimini I*, Rimini made even more copies of these infringing materials and moved them to new locations. (Anticipating their loss at summary judgment, Rimini commenced this process before February 2014, but most of the improper copying occurred after the summary judgment decision issued.) Rimini could have created non-infringing environments by installing software environments from scratch on non-Rimini systems, and Rimini could have then created non-infringing fixes and updates on these environments. Doing so, however, would have taken additional time and resources. As Rimini had agreed to provide support at a cut-rate price, Rimini decided not to proceed in a lawful manner. Instead, Rimini purported to fix the problem of having unlawful copies of software on its systems by making further copies of the unlawful copies, which it then shipped to customers.

The other "change" that Rimini asserts was made as part of "Process 2.0" is that it now keeps customer data in separate "silos." Rimini recycled this fictional story from its Answer to Oracle's original *Rimini I* complaint, where Rimini asserted that it did not use generic test and development environments, but rather strictly kept customer data in separate "silos" and developed each fix or update individually for each customer. In *Rimini I*, Rimini was compelled to confess that this "silo" story was a lie and that it did use generic environments to provide support. Rimini is lying again, this time about "Process 2.0." Rimini recycled the "silo" story, falsely asserting in its standard messaging to customers that it had stopped using the *Rimini I* support processes, and that *this time*, they really would stop using generic test and development environments, and this time, they really would keep customer software siloed. These statements are false, and, along with Rimini's false statements to customers about Rimini's and Oracle's security offerings, violated the Lanham Act.

Oracle will show that "Process 2.0" involves Rimini engineers entering a customer's remote environment or a Windstream cloud environment to copy Oracle software, and then to prototype and test updates in the first environment for use in many other customers' environments. Rimini

moved its "generic" environments outside of its facilities to customer or cloud sites, but that did not cure the problem; the evidence will show that Rimini cross-used the environments of ███████ ████████████████████████████

Far beyond using the knowledge and experience gained from developing the fix once for one customer to develop it again for other customers, Rimini uses several software tools to automate cross-use of Rimini fixes and updates to Oracle software such that the development of an update in one client's environment can be automatically and instantaneously shared with dozens of other customers.  Sometimes, Rimini automatically shares an infringing update with over a hundred customers.

- ████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████
- ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████
- Rimini used another tool, Dev Review, ███████████████████████████████ ████████████████████████████████████████.
- Rimini cross-used EBS software to develop "ePack," an automated packaging tool that Rimini uses for this product line.

This conduct constitutes copyright infringement, fancied up for the digital world.

This Court's rulings on summary judgment and in the contempt proceedings in *Rimini I* have proven false Rimini's public representations that it ceased its "1.0" support processes and that "Process 2.0" was completely different and non-infringing.  The evidence presented at this trial will further show that Rimini continued to use the same underlying, infringing support processes and made only superficial changes to feign compliance with the Court's orders.

***Rimini Willfully Violated the Permanent Injunction.*** After Rimini refused to provide any information about whether it was complying with the injunction—which its counsel described as

1   incomprehensible—Oracle moved to reopen discovery, a motion that the Court granted on April

2   4, 2019. *Rimini I*, ECF Nos. 1199, 1215, 1218. After discovery showed that Rimini had engaged

3   in several violations of the injunction, Oracle filed a motion asking this Court to order Rimini to

4   explain why it should not be held in contempt. The Court issued an order to show cause on ten

5   issues and held a seven-day bench trial on those issues in September 2021.

6          The Court held Rimini in contempt for multiple violations of the injunction, including

7   "willful" violations. *Rimini I*, ECF No. 1548 at 53. The Court ruled that Rimini's conduct went

8   "beyond simple 'reuse of knowledge or know-how'," *id.* at 29:23-24, and violated the permanent

9   injunction and the PeopleSoft license facilities restriction by storing multiple PeopleSoft files on

10  Rimini's systems, *id.* at 17. The Court also found that Rimini repeatedly cross-used the City of

11  Eugene's PeopleSoft environments to support other customers, showing "a return to the use of

12  generic environments" found to be infringing in *Rimini I*. *Id.* at 23-26, 28-30. The Court also

13  found that Rimini improperly created copies of Oracle Database files on its systems, in violation

14  of Oracle's license and the *Rimini I* injunction. *Id.* at 48:27-49:8.

15         During the contempt hearing, Oracle learned that, after entry of the *Rimini I* permanent

16  injunction, Rimini made a conscious decision in supporting JDE software to continue to copy

17  JDE source code that it calls "open code," and to interpret the Court's injunction as only applying

18  to "closed code" (compiled object code). Rimini made this distinction because it has always

19  needed to copy "open code" to support JDE customers, and does not need to—and, as a practical

20  matter, cannot—access closed code for support. Through this sophistry, Rimini interpreted the

21  injunction as only prohibiting Rimini from copying code it could not access and copy, because

22  Rimini was "incredulous" that an express provision barring copying of "source code" precluded

23  the copying of "source code." *Rimini I*, ECF No. 1542 at 1139:21-1140:12. The Court rejected

24  Rimini's attempt to define away the license restrictions by classifying code as open or closed. "It

25  is clear to the Court that Rimini's reading of the Permanent Injunction does not follow the case

26  history." *Rimini I*, ECF No. 1548 at 45."[5]

27  _____

28  [5] The jury in *Rimini I* found that Rimini was liable for copyright infringement of JDE after being
    instructed that "It is also clear that Rimini is not authorized to make copies of J.D. Edwards

9

1    For these violations, the Court imposed a $630,000 sanction to compensate Oracle and

2    granted Oracle's request for attorneys' fees. *Id.* at 54-55.

3    ***The Court's Summary Judgment Order in Rimini II.***

4        **Cross-Use:** On September 14, 2020, the Court ruled on the parties' cross-motions for partial

5    summary judgment.   The Court granted partial summary judgment on Oracle's PeopleSoft

6    copyright infringement claim, ruling—much like in the contempt proceedings—that Rimini cross-

7    used PeopleSoft environments associated with City of Eugene and Campbell Soup Company to

8    prototype two PeopleSoft updates for these customers and many others. ECF No. 1253.  The Court

9    further ruled that Rimini has no fair use defense to this infringing development process. *Id.*  The

10   Court granted partial summary judgment on Oracle's claim that Rimini further infringed Oracle's

11   PeopleSoft copyrights by creating 47 more local PeopleSoft environments—just like those held

12   infringing in *Rimini I*.  *Id*. at 21–29 (citing ECF Nos. 888, 896-s at 6, 8 n.1).  Finally, the Court

13   granted Oracle's motion as to Rimini's express license defense regarding the "migration" of

14   infringing PeopleSoft environments Rimini copied off of its systems onto Windstream and

15   customers' systems. *Id.* at 92.

16       **RAM Copying:** On the issue of copying, the Court considered RAM (Random Access

17   Memory) copies made of Oracle software during Rimini's development of fixes and updates.  The

18   Court noted that "Rimini further concedes that RAM copies were created in the course of

19   developing updates for Campbell Soup's PeopleSoft software" and that "Rimini engineers use these

20   RAM copies – to create and develop updates and fixes for the PeopleSoft software." ECF No. 1253

21

22   software application and related documentation to *access* the software's source code to carry out

23   development and testing of software updates, to make modifications to the software, or to use the
     customer's software or support materials, to support other customers." *Rimini I*, ECF No. 880

24   (Jury Instructions at 28); *Rimini I*, ECF No. 1548 at 45-46.  On appeal, the Ninth Circuit held that
     copyright infringement did not include "access" to and was limited to copying of the software.

25   783 Fed. Appx. 707, 711 (9th Cir. 2019).  The Court's jury instruction was based on Section 3 of
     the Giant Cement JDE License, *Rimini I*, ECF No. 248-16, which the Court has relied on

26   throughout both cases in connection with its JDE rulings and provides for limited use by a Third
     Party such as Rimini of JDE source code, and the permitted uses do not include testing and

27   development or <u>copying</u> of Oracle code.

28

at 41.  The Court held that such RAM copies of PeopleSoft software loaded into the customer environments are "copies" within the meaning of the Copyright Act.  *Id.*

**Derivative Works:**  The Court held that Rimini illegally copied and cross-used a derivative work (a Patient Protection and Affordable Care Act ("PPACA") update) developed in the City of Eugene environment. ECF No. 1253 at 38-44.  The Court held that the PPACA update was a derivative work, even if it did not contain Oracle copyrighted material and "even if the individual update contained only Rimini written expression" because: (1) "this update was designed to interact with PeopleSoft," (2) "Rimini's customers would access the new update by signing into their existing PeopleSoft software," (3) the update could not be used with other software programs other than PeopleSoft, and (4) "Rimini used PeopleTools Application Designer utility to create object changes, like the PPACA updates."  *Id.* at 52-53.  This update, a derivative work, "was only developed in City of Eugene's environment and was then given outright to three of Rimini's other clients."  *Id.* at 53.  As Oracle will show at trial, these criteria also establish that Rimini's other updates at issue in this case are derivative works.

## III.  LIABILITY

Oracle will prove at trial that Rimini is liable for violating (1) the Copyright Act, (2) the Digital Millennium Copyright Act, (3) the Lanham Act, and (4) the California UCL. Correspondingly, Oracle will prove that Rimini's UCL claim against Oracle fails.

### A.  Copyright Infringement

Oracle will prove at trial that Rimini's unlicensed copying, along with its cross-use and derivative works creation, occurred across four separate Oracle ERP software products— PeopleSoft, EBS, JDE, and Oracle Database.  The extent of Rimini's copying and distribution of Oracle software and modifications to Oracle software, creation of derivative works, and the absence of any license defense for such activities are key issues for trial.  *See S.O.S., Inc. v. Payday*, Inc., 886 F.2d 1081, 1088 (9th Cir. 1989) (license is "assumed to prohibit any use not authorized").

***PeopleSoft Materials.***  At trial, Oracle will prove that Rimini created and maintained even more infringing PeopleSoft environments on its systems after 2011.  Oracle also will prove that Rimini has no "fair use" defense for its "migration."  ECF No. 1253 at 92.

1    Oracle will prove that Rimini continues to engage in cross-use to both develop and test

2    software updates and to develop its own software tools to further automate cross-use. Rimini claims

3    that its various software tools were designed to prevent the copying of Oracle code, but the evidence

4    will show that the tools automate Rimini's copyright infringement. For example:

5        Rimini's AFW tools allow Rimini to create or modify PeopleSoft files in a client

6    environment selected for development and then copy those files or modifications from one client's

7    environment to other clients' environments using the █████████████████████████████

8    ████████████████████████████████████████████████████████████████████████

9    ██████████████████

10       Rimini's "Dev Review" tool ████████████████████████████████████

11   ████████████████████████████████████████████████████████████████████████

12   ████████████████████████████████████████████████████████████████████████

13   ████████████████████████████████████ using a PeopleSoft tool (App Designer), and then

14   runs the Dev Review tool in the ██████████████████████████████████████████

15   ████████████████████████████████████████████████████████████████████████

16   ████████████████████████████████████████████████████████████████████████

17   ████████████████████████████████████████████████████████████████████████

18   ████████████████████████████████████████████████████████████████████████

19   ████████████████████████████████████████████████████████████████████████

20   ██████████████████████████████████████████████████████████████

21       Oracle will prove that, because of its automated tools, Rimini's ongoing copying and cross-

22   use of PeopleSoft software has been massive. Rimini distributed thousands of software update files

23   by directly copying Oracle files for the benefit of multiple customers. Rimini also copied Oracle

24   files and derivative works of Oracle files in whole or in part to Rimini's and customers' systems,

25   deleting Oracle copyright management information in the files, and renaming the files as "RSI"

26   (for "Rimini Street Inc.") files in order to falsely represent that these files were entirely Rimini-

27   authored.

28       Rimini's RSI files, ████████████████████████████████████████████

1 ███████████████████████████████████████████████████

2 ███████████████████████████████████████████████████

3 ███████████████████████████████████████████████████

4 ███████████████████████████████████████████████████

5 ███████████████████████████████████████████████████

6 ███████████████████████████████████████████████████

7 ███████████████████████████████████████████████████

8 ███████████████████████████████████████████████████

9  Similarly, Dev Review enabled Rimini to copy online objects created and modified in one customer

10 environment to other customers' environments.

11  Rimini incorrectly argues that if no Oracle source code is sent between customers, its

12 practices are not cross-use.  As an initial matter, consistent with the Ninth Circuit's decision in

13 *Microstar*, Judge Hicks previously found that Rimini *does* engage in improper cross-use of

14 derivative works when it distributes a PeopleSoft fix or update to multiple customers, even if that

15 fix or update contains no Oracle source code.  Further, Rimini's act of developing or testing a fix

16 or update in one customer's environment for the purpose of benefiting multiple customers violates

17 the relevant license agreement and copyright law because Rimini is not developing or testing that

18 fix or update for or solely for the customer's internal business processing operations.

19  ***EBS.***  Through Rimini's documents and witness admissions, Oracle will show that Rimini

20 copied and cross-used Oracle's EBS software in disregard of Oracle's copyrights.  EBS licenses,

21 like all PeopleSoft licenses, only allow use of the software for the "internal business operations" of

22 the licensee.  Ignoring these restrictions, Rimini still "prototypes" updates in one customer's

23 environment and then distributes those updates to other EBS customers.

24  To assist in its cross-use, Rimini developed—again through cross-use—a software tool

25 known as "ePack," which automates Rimini's cross-use.  ████████████████████

26 ███████████████████████████████████████████████████

27 ████████████████████████████████████

28  Because *Rimini I* did not address E-Business Suite, this trial will be the first time the Court

1    addresses this particular software. But the Court will be decidedly familiar with Rimini's

2    associated infringing conduct.

3         **JDE.** Oracle will show that Rimini violates customers' licenses and engages in copyright

4    infringement when it copies and modifies JDE source code to develop software updates. There is

5    no dispute that Rimini necessarily copies JDE software source code when developing software

6    updates for its customers. The overwhelming majority of JDE software licenses preclude anyone

7    other than the licensee (or the licensee's employees) from copying JDE source code, and many

8    limit *any* access to the software by third parties to screen access. In *Rimini I*, this Court agreed that

9    Rimini is not allowed to copy JDE source code. *Supra* Note 5. After trial, Rimini was also

10   permanently enjoined from copying JDE source code. *Rimini I* ECF No. 1166 ("Rimini Street

11   shall not copy J.D. Edwards software source code to carry out development and testing of software

12   updates").

13        To dodge this restriction, Rimini has fabricated a nonsensical definition of "source code" to

14   allow it to continue its infringing activities, but this Court resolved Rimini's semantic gymnastics

15   during contempt proceedings in *Rimini I*. *Rimini I*, ECF No. 1548 at 41 ("The Court is now utterly

16   convinced that there is no true dispute over the meaning of source code, but the dispute is simply a

17   semantic distinction").

18        In addition to proving that Rimini infringes Oracle's copyrights by copying JDE source

19   code, Oracle will show that Rimini engaged in infringing cross-use of JDE software, using select

20   customer environments as prototype environments and then distributing those updates to other

21   customers. Moreover, Rimini's ▮▮▮▮ JDE updates constitute derivative works and thus are

22   prohibited by nearly all JDE software licenses and infringe Oracle's copyrights.

23        ***Oracle Database.*** Oracle will show that Rimini is liable for copying Oracle Database

24   software. When Rimini copies PeopleSoft environments that have Oracle Database as the database

25   component, Rimini necessarily makes an exact copy of the Oracle Database software. As this Court

26   held in *Rimini I,* no Oracle Database license (neither the Developer License nor the Oracle License

27   and Service Agreement, "OLSA") permitted Rimini to make copies of Oracle Database software

28   on its own systems. *Rimini I*, ECF No. 476 at 7–12; *id.* at 12–15 (the "plain, unambiguous

language" of Sections C and D of the OLSAs does not authorize "Rimini to make copies of the licensed [Oracle Database] software"). And when Rimini cross-uses PeopleSoft, EBS, or JDE in a customer environment that uses Oracle Database as the database component, Rimini is also cross-using Oracle Database software.

### B. Violations of the DMCA

The DMCA prohibits Rimini from removing or altering any copyright management information ("CMI") (such as a copyright notice) and from distributing files from which CMI has been removed if Rimini had reasonable grounds to believe that the removal of CMI would conceal or otherwise enable copyright infringement. 17 U.S.C. § 1202(b)(3); *see Friedman v. Live Nation Merch., Inc.*, 833 F.3d 1180, 1187 (9th Cir. 2016). Oracle will prove that Rimini committed thousands of DMCA violations.

Oracle's software expert, Ms. Frederiksen-Cross, identified at least ▮▮▮▮ instances in which she found a Rimini-modified file containing substantial portions of Oracle's protected expression that once had a copyright notice that later was removed. She also uncovered ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Eliminating duplicates, Ms. Frederiksen-Cross will identify over ▮▮ DMCA violations by Rimini. *Enter. Tech. Holdings, Inc. v. Noveon Sys., Inc.*, No. 5-CV-2236 W (CAB), 2008 WL 11338356, at *14–16 (S.D. Cal. July 29, 2008).

Ms. Frederiksen-Cross identified these violative files from ▮▮▮▮▮▮▮▮▮▮▮, proving that Rimini distributed them to customers. Each act of knowing distribution of a file with CMI removed constitutes a separate violation. 17 U.S.C. § 1202(b)(3); *Friedman*, 833 F.3d at 1187; *Aardwolf Indus., LLC v. Abaco Machines USA, Inc.*, No. CV 16-16-1968-GW (JEMX), 2017 WL 10350547, at *11 (C.D. Cal. Nov. 13, 2017) ("Defendants may still be held liable if they distributed Plaintiff's Logo with knowledge that the CMI had been removed, even if [they] did not remove it"); *Reno-Tahoe Specialty, Inc., v. Mungchi, Inc.*, No. 2:12-CV-01051-GMN-VC, 2014 WL 7336082, at *11 (D. Nev. Dec. 19, 2014) (defendant knew, or had reasonable grounds to know, CMI was removed as an image was cropped to remove the CMI).

### C.      Violations of the Lanham Act

Oracle will prove at trial that Rimini is liable for violating Section 43(a) of the Lanham Act: (1) Rimini's commercial advertisements included false statements about its products and services; (2) those statements had the tendency to deceive, and in fact did deceive, a substantial segment of its audience; (3) the deception was material, in that it was likely to influence prospective customers' purchasing decisions; (4) Rimini caused these false statements to enter interstate commerce; and (5) Oracle has been, and will continue to be, injured as a result of these false statements, by the direct diversion of sales from Oracle to Rimini and the lessening of goodwill toward Oracle's services. *Skydive Az., Inc. v. Quattrocchi*, 673 F.3d 1105, 1110 (9th Cir. 2012).[6]

Rimini's false statements to customers in its standard messaging fall under three categories: (1) statements that the support processes this Court found to be infringing in *Rimini I* were no longer in use as of July 2014 and its processes did not violate Oracle copyrights or licenses; (2) statements that Rimini's support processes were "much different" than TomorrowNow's support processes; and (3) statements about the supposed superiority of Rimini's security offerings.  Each of these claims is false on its face.

As discussed above, the Court already has determined through its contempt and summary judgment rulings that Rimini continued to use the processes that this Court found were unlawful. Rimini's "Process 2.0" continued to employ cross-use and copying of Oracle software in violation of the facilities restriction.  The evidence at trial will show that Rimini's continued use of its infringing support processes was widespread, and Rimini's statements that it had ceased using its

---

[6] The evidence at trial will show that Rimini's false statements deceived and misled support customers, that the statements were material to customer's support purchasing decisions, and that Oracle actually lost customers as a result of Rimini's statements. However, because Rimini's statements are literally false, Oracle need not prove the elements of deceit or reliance. *POM Wonderful LLC v. Purely Juice, Inc.*, 2008 U.S. Dist. LEXIS 55426, at *28-29 (C.D. Cal. July 17, 2008) ("A plaintiff is entitled to relief under the Lanham Act on proof of literal falsity alone, as the court will assume that the false statements actually mislead . . . ."); *Energy Four, Inc. v. Dornier Medical Systems, Inc.*, 765 F. Supp. 724, 731 (N.D. Ga. 1991) ("When representations are actually false, a court does not have to determine whether the representations are likely to create confusion" and actually false claims are presumed material.). Oracle also is entitled to a rebuttable presumption of irreparable harm on a Lanham Act violation. 15 U.S.C. § 1116(a); *AK Futures LLC v. Boyd St. Distro, LLC*, 35 F.4th 682, 694 (9th Cir. 2022).

1   unlawful practices are false.   Further, Rimini's own public statements show that Rimini's

2   statements that its support processes were different from TomorrowNow's were false.   Finally,

3   Oracle's security expert, Dr. Patrick McDaniel, will explain in detail how Rimini's statements about

4   its and Oracle's security offerings were false.

5   **D.   Rimini's Violations of California Unfair Competition Law**

6   Oracle will prove that Rimini violated the "unlawful" prong of California's Unfair

7   Competition Law.   The "'unlawful' prong 'borrows violations of other laws . . . and makes those

8   unlawful practices actionable under the UCL,' and 'virtually any law or regulation—federal or

9   state, statutory or common law—can serve as a predicate.'"   *Yellowcake, Inc. v. Morena Music,*

10   *Inc.*, 522 F. Supp. 3d 747, 772 (E.D. Cal. 2021) (alterations in original) (citation omitted).

11   Accordingly, by proving that Rimini's business practices violated the Copyright Act, the DMCA,

12   and/or the Lanham Act, Oracle also will establish that Rimini violated the UCL.

13   **E.   Seth Ravin's Individual Liability**

14   ***Contributory Infringement.***   Oracle will prove that Ravin is liable for contributory

15   infringement because he (i) knew of or had reason to know of Rimini's infringing activity and

16   (ii) intentionally induced or materially contributed to the infringing activity.   *Perfect 10, Inc. v.*

17   *Amazon.com, Inc.*, 508 F.3d 1146, 1170–73 (9th Cir. 2007).   Oracle will demonstrate Ravin's

18   knowledge with evidence that Ravin directly supervised and controlled development efforts related

19   to Rimini tools that infringe Oracle software.

20   ***Vicarious Liability for Infringement.***   Oracle will prove that Ravin is vicariously liable for

21   Rimini's copyright infringement because he (i) received a direct financial benefit from Rimini's

22   infringing activity, and (ii) had the right and ability to supervise or control the infringing activity.

23   *Perfect 10*, 508 F.3d at 1173–74; *Ellison v. Robertson*, 357 F.3d 1072, 1076 (9th Cir. 2004) ("A

24   defendant is vicariously liable for copyright infringement if he enjoys a direct financial benefit from

25   *another's* infringing activity and 'has the right and ability to supervise' the infringing activity."

26   (citation omitted)).   Ravin, as Rimini's CEO and largest individual shareholder, both benefited from

27   and had the right and ability to stop the infringement.   *Symantec Corp. v. CD Micro, Inc.*, 286 F.

28   Supp. 2d 1265, 1275 (D. Or. 2003) (CEO held vicariously liable on summary judgment for

17

1   company's copyright infringement where "[i]n addition to his salary, [the CEO] is also the majority

2   shareholder and would thus have a direct financial benefit if the infringing sales raise the value of

3   the company's stock"); *Broad. Music, Inc. v. Blueberry Hill Family Rests., Inc.*, 899 F. Supp. 474,

4   480 (D. Nev. 1995) (director and shareholder of corporation "jointly [and severally] liable with his

5   corporation for the copyright infringement" where he "had the power to control the conduct of the

6   'primary' copyright infringers"); *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001,

7   1021 (9th Cir. 1985) ("A corporate officer or director is, in general, personally liable for all torts

8   which he authorizes or directs or in which he participates, notwithstanding that he acted as an agent

9   of the corporation and not on his own behalf." (citation and internal quotation marks omitted)).

10      ***Vicarious Liability for Lanham Act Violations.***   Mr. Ravin is vicariously liable for

11   Lanham Act violations because he "knowingly participated in the creation, development and

12   propagation of" Rimini's false statements to customers in its advertising.  *In re Century 21-*

13   *RE/MAX Real Est. Advert. Claims Litig.*, 882 F. Supp. 915, 925 (C.D. Cal. 1994) (quoting *Gillette*

14   *Co. v. Wilkinson Sword, Inc.,* 795 F.Supp. 662, 664 (S.D.N.Y.1992)).  The evidence will show

15   that Ravin was integrally involved in developing Rimini's standard marketing messaging, and

16   many of the false and misleading statements Rimini made in violation of the Lanham Act came

17   directly from Ravin himself.

18   **IV.    ORACLE WAS IRREPARABLY HARMED BY RIMINI'S CONDUCT.**

19      The Court in *Rimini I* found that "Rimini Street's conscious disregard for Oracle's

20   software copyrights enabled Rimini Street to rapidly build its business from a new and unknown

21   company in the after-license software support market to a major competitor of Oracle.  By

22   offering cut-rate prices on its own services, generally at a discount of 50% of Oracle's prices for

23   similar service contracts, Rimini Street gained increasing market share and growth, including

24   through the length of this litigation."  *Rimini I*, ECF No. 1164 at 6:15-20.  In the years since the

25   Court made that finding, not only has Rimini continued its unlawful practices, but it has expanded

26   its business both domestically and internationally, and in 2018, Rimini became a publicly traded

27   company.

28      Through Rimini's infringing conduct and false statements in violation of the Lanham Act,

1   as described above, Rimini continued to build its business based on infringement of Oracle's

2   copyrights by saving time and labor costs through infringement, which enabled Rimini to offer

3   support to Oracle customers at a highly discounted rate.  Oracle will prove that Rimini saved

4   hundreds of millions of dollars in time and labor through its infringement, which allowed Rimini

5   to offer support at 50% off, which was extremely attractive to Oracle's support customers—and

6   extremely unfair to Oracle.  Rimini further enticed those customers with its false advertising

7   about Rimini's support practices and security offerings.  During the period of Rimini's

8   infringement and Lanham Act violations, between 2011 and 2017, ███████  Oracle's

9   PeopleSoft, JDE, Database, and/or EBS customers terminated Oracle support and contracted with

10   Rimini for support.  Absent Rimini's discounted support offering, the vast majority of those

11   customers would have remained with Oracle.

12        Along with the revenues associated with those customers' support contracts, Oracle also

13   lost the goodwill associated with those customer relationships.  The value of those customer

14   relationships is difficult, if not impossible, to quantify, because Oracle support relationships are

15   generally long-term relationships, often lasting more than 20 years and resulting in opportunities

16   to expand the Oracle footprint with the customer into new products and services well into the

17   future.  Rimini's copyright infringement and Lanham Act violations have irreparably harmed

18   Oracle.

19   **V.    RIMINI'S UCL CLAIM AGAINST ORACLE FAILS.**

20        The Court previously struck Rimini's affirmative defense of copyright misuse, rejecting

21   Rimini's allegation that Oracle attempted to "to unlawfully leverage a monopoly in the support

22   services market."  ECF No. 634 at 4:24-25.  The Court either dismissed or granted Oracle summary

23   judgment on Rimini's claims against Oracle for prospective interference, interference with contract,

24   Lanham Act violations, and deceptive trade practices, leaving only Rimini's UCL "unfair" prong

25   claim to be tried (the Court also granted summary judgment to Oracle on Rimini's UCL "unfair"

26   prong claim based on Oracle's January 2017 cease and desist letter to Rimini regarding Rimini's

27   access to Oracle's support websites).  The remaining conduct at issue in Rimini's UCL claim has

28   always overlapped with Rimini's other claims.  Now that those other claims have all been

1   dismissed, the conduct remaining at issue in Rimini's UCL claim is narrow.  Oracle suspects that

2   Rimini will attempt, wherever possible, to shoehorn all of the alleged conduct underlying its

3   dismissed claims into the remaining UCL claim.[7]  The alleged conduct would include statements

4   by Oracle to customers regarding the litigation and Rimini's support practices; Oracle's use of its

5   contractual audit right with licensees; Oracle's contractually agreed technical support policies; and

6   Oracle's policies regarding customers to which Oracle will provide consulting services.

7        To prove its UCL "unfair" prong claim, Rimini must prove that Oracle's conduct "threatens

8   an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because

9   its effects are comparable to or the same as a violation of the law, or otherwise significantly

10  threatens or harms competition." *Drum v. San Fernando Valley Bar Assn.*, 182 Cal. App. 4th 247,

11  254 (2010).  Rimini cannot meet its burden.  Through more than 12 years of litigation, Rimini has

12  never attempted to allege an antitrust claim against Oracle.  Further, Rimini has no antitrust expert

13  to support what is essentially an antitrust claim, and it therefore has not presented a market analysis

14  and cannot show monopolization or harm to competition.  This Court already has considered and

15  rejected many of Rimini's allegations regarding purported harm.  The evidence will make clear that

16  Rimini has no support for its UCL claim.

17       ***No Monopolization Proof.***  Rimini cannot satisfy even the basic elements of a UCL "unfair"

18  claim because Rimini will not even attempt to demonstrate an actual or threatened violation of the

19  antitrust laws.  *Facebook, Inc. v. BrandTotal Ltd.*, 2021 U.S. Dist. LEXIS 165209, at *16-17 (N.D.

20  Cal. Aug. 31, 2021) ("Courts have dismissed competitors' claims under this ['unfair'] prong of the

21  statute where plaintiffs fail to identify 'any "unusual" aspect of the alleged conduct that would

22  make that conduct something that violates the "policy and spirit" of the antitrust laws without

23  violating the actual laws themselves ….'"); *Creative Mobile Techs., LLC v. Flywheel Software,*

24  *Inc.*, 2017 U.S. Dist. LEXIS 24173, at *15-16 (N.D. Cal. Feb. 21, 2017) (except in unusual

25  situations such as the government-licensed duopoly, challenged conduct either violates "both the

26  antitrust laws and their 'policy and spirit' or it violates neither").  To demonstrate an actual or

27

28  [7] Rimini has declined Oracle's meet and confer request to explain any details of the UCL claim it
    intends to try.

1 | threatened violation of an antitrust law, Rimini would have to prove monopolization or attempted

2 | monopolization. But Rimini has no evidence to establish a relevant market, market power exercised

3 | by Oracle within that market, or any other anticompetitive conduct by Oracle.[8]

4 |         Further, unlawful monopolization cannot result from market power that arises solely from

5 | contractual rights that consumers knowingly and voluntarily agree upon. *Newcal Indus. v. Ikon*

6 | *Office Sol.*, 513 F.3d 1038, 1048–49 (9th Cir. 2008). Here, it is undisputed that Oracle customers

7 | are advised of, and agree to, each of the support policies Rimini claims to be anticompetitive, and

8 | the price of support is established at the time customers enter into the underlying license agreement.

9 | As such, Rimini will not be able to establish the existence of any actionable market power in any

10 | relevant market. Moreover, Rimini will not be able to show that Oracle has the power to control

11 | prices or exclude competition—a primary indicator of monopoly power. *See United States v. E.I.*

12 | *du Pont De Nemours & Co.*, 351 U.S. 377, 391 (1956).

13 |         **No Proof of Harm to Competition.** Rimini will present no evidence of any conduct by

14 | Oracle that had a "significant and enduring impact on competition itself in the relevant markets,"

15 | as required under the antitrust laws, and, by extension, the UCL. *Am. Prof'l Testing Serv. v.*

16 | *Harcourt Brace Jovanovich Legal & Prof'l Publ'ns*, 108 F.3d 1147, 1152 (9th Cir. 1997). Even if

17 | Rimini could prove all of Oracle's alleged conduct and the resulting harm, that harm is limited to

18 | Rimini, and not competition as a whole. Rimini's claim fails on that basis alone.

19 |         **No Proof of Causation for Audits or False Statements.** The Court already has determined

---

[8] To state a claim under Section 2 of the Sherman Act, a plaintiff must plausibly allege the defendant possesses "monopoly power" within a "relevant market." *John Doe 1 v. Abbott Labs.*, 571 F.3d 930, 933 n.3 (9th Cir. 2009). The threshold for establishing monopoly power is defining "the relevant market." *Gen. Bus. Sys. v. N. Am. Philips Corp.*, 699 F.2d 965, 972 (9th Cir. 1982). "Without a definition of that market there is no way to measure [the defendant's] ability to lessen or destroy competition." *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 177 (1965); *see Ohio v. Am. Express*, 138 S. Ct. 2274, 2285 (2018) (same); *see also Payment Logistics Limited v. Lighthouse Network LLC*, 2018 WL 5311907, at *4 (S.D. Cal. Oct. 24, 2018) ("Where, as here, PL fails to sufficiently allege a relevant market definition, the Court deems it is impossible to determine market power"). "Failure to identify a relevant market is a proper ground for dismissing a Sherman Act claim." *Tanaka v. Univ. of S. California*, 252 F.3d 1059, 1063 (9th Cir. 2001); *see Blizzard Entm't Inc. v. Ceiling Fan Software LLC*, 2013 WL 12143935, at *2 (C.D. Cal. Jan. 7, 2013) ("Defendants do not sufficiently allege a relevant market. Therefore, the Court cannot determine whether Blizzard's actions violate the Sherman Act").

1    that Rimini failed to prove causation as to its audit- and misrepresentation-based interference

2    claims. ECF No. 1253 at 67:24-68:24. This precludes Rimini's UCL claim, which also requires

3    proof of causation of harm, based on the same conduct.

4         ***No Actionable False or Misleading Statements.*** While Rimini has identified dozens of

5    statements as a basis for its UCL claim, not a single one is actionable. Each statement is either not

6    made by one of the Oracle counter-defendants; not made to a customer at all; true by Rimini's own

7    admission; a quotation or paraphrase of this Court's orders; a non-actionable statement of opinion,

8    puffery, or a future event; or protected by the litigation privilege or *Noerr-Pennington* doctrine.

9    **VI.    RELIEF SOUGHT FROM COURT**

10        Oracle seeks an injunction and other equitable relief, along with attorneys' fees.

11        **A.    Equitable Relief**

12        Oracle's entitlement to equitable relief and the scope of such relief is a legal issue for the

13   Court. ECF No. 1309 at 61. The Copyright Act provides that courts may grant injunctive relief on

14   "terms as it may deem reasonable to prevent or restrain infringement of a copyright." 17 U.S.C. §

15   502(a). In its contempt proceedings, the Court deferred ruling on whether several Rimini acts—

16   such as the creation of derivative works and whether Rimini could ever copy JDE source code—

17   constitute contempt of the Court's prior permanent injunction until after *Rimini II*. *See Rimini I*,

18   ECF No. 1548 at 46, 52. Now that this action is proceeding as a bench trial and Oracle seeks further

19   injunctive relief, those issues are before the Court. In light of Rimini's continued extensive

20   infringement, Oracle seeks to expand the Court's existing injunction against Rimini's practices.

21        Subsequent to a finding of liability on Oracle's claims, Oracle will seek an injunction

22   including, but not limited to, the following provisions:

23   •   Prohibiting Rimini from using or further reproducing Oracle software environments that

24       have been found to infringe;

25   •   Prohibiting Rimini from using or further reproducing Rimini updates and associated files

26       that have been found to infringe;

27   •   Prohibiting the creation of RAM copies associated with cross-use and the creation of

28       derivative works;

- Prohibiting Rimini's cloud hosting of customer environments;

- Prohibiting infringement of Oracle's EBS software;

- Prohibiting Rimini's use of certain automated tools, including AFW, Dev Review, and ePack;

- Prohibiting Rimini's copying of JDE source code;

- Prohibiting Rimini from removing CMI from files containing Oracle code;

- Prohibiting Rimini from making certain false and misleading statements in its commercial advertising and promotions;

- Requiring Rimini to take remedial measures to correct false and misleading statements it has previously made in its commercial advertising and promotions;

- Other relief tailored to the evidence that develops, including appointment of a monitor for Rimini's support processes to ensure compliance with existing and additional injunctive relief; and

- Impoundment of Rimini's computer systems.[9]

### B.   Attorneys' Fees

The Court has awarded Oracle attorneys' fees and costs before—both in *Rimini I* and after the Court held Rimini in contempt for violating the injunction. *See Rimini I*, ECF No. 1164 at 17; *Rimini I*, ECF No. 1548 at 55. Oracle anticipates that, subsequent to the Court's determinations concerning the full scope of Rimini's copyright infringement, Oracle will seek costs and attorneys' fees under 17 U.S.C. § 505 and any other applicable laws.

---

[9] "The Copyright Act provides the owner of a copyright with [many] remedies against an infringer of his work, including . . . the impoundment and destruction of all reproductions of his work made in violation of his rights[.]" *Sony Corp. of Am. v. Universal City Studios, Inc.,* 464 U.S. 417, 433–34 (1984); *see Videotronics, Inc. v. Bend Elec.*, 586 F. Supp. 478, 487–88 (D. Nev. 1984) (impounding infringing copies). In his ruling finding Rimini in contempt, Judge Hicks found that impoundment was not appropriate "at this time." Between the two *Rimini* cases, Rimini been sanctioned for destroying evidence, lost three summary judgment motions, had a jury verdict entered against it, and has been held in contempt of court. Should Rimini lose a second trial, Oracle respectfully submits it will be time for an impoundment order, which will allow Oracle to finally protect its intellectual property.

1    **VII.    CONCLUSION**

2           Based on the evidence and arguments that Oracle will present at trial, Oracle will seek

3    judgment against Ravin and Rimini, attorneys' fees, costs, and injunctive and equitable relief.

4

5    DATED: November 22, 2022                    MORGAN, LEWIS & BOCKIUS LLP

6
                                         By:  _____
7                                                    */s/ Benjamin P. Smith*
                                                   Benjamin P. Smith
8
                                         Attorneys for Plaintiffs and Counterdefendants
9                                        Oracle International Corporation and Oracle
                                                     America, Inc.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### APPENDIX A – TIMELINE OF KEY EVENTS

| Date | Event |
|---|---|
| 1/2005 | Oracle acquires PeopleSoft, which had previously acquired JD Edwards. |
| 9/2005 | Rimini launches operations, offering support for Siebel. |
| 1/2006 | Oracle acquires Siebel. |
| 4/2006 | Rimini expands support offering to include Oracle's PeopleSoft software. |
| 9/2006 | Rimini expands support offering to include Oracle's JD Edwards software. |
| **1/25/10** | **Oracle initiates *Rimini I* lawsuit.**  Oracle alleges, inter alia, that Rimini's support model infringes Oracle's copyrights in its PeopleSoft, JD Edwards, and Siebel software and documentation. |
| 9/2010 | Rimini expands support offering to include Oracle's E-Business Suite software. |
| 10/2011 | Rimini expands support offering to include standalone support for Oracle Database. |
| 3/29/13 | *Rimini I*: Rimini is sanctioned for spoliation of evidence following its deletion of a software library containing copies of Oracle's copyrighted works. |
| 2/13/14 | *Rimini I:* This Court grants partial summary judgment to Oracle, holding that Rimini infringed Oracle's PeopleSoft copyrights through, inter alia, using one customer's Oracle software environment to develop fixes and updates for that customer and other Rimini customers ("cross-use") and by creating copies of Oracle copyrighted materials on Rimini's computer systems in violation of the Oracle license provision restricting the software to the customer's facilities ("facilities restriction").  *Rimini I*, ECF No. 474. |
| 8/14/14 | *Rimini I*: This Court again grants partial summary judgment to Oracle, holding that Rimini infringed Oracle Database copyrights through, inter alia, hosting unlicensed copies of Oracle Database on its computer systems and cross-using those copies to support multiple customers.  *Rimini I*, ECF No. 476. |
| **10/15/14** | **Rimini initiates *Rimini II* lawsuit.**  Rimini seeks declaratory judgment, contending that its "Process 2.0," deployed after July 31, 2014, does not infringe, it no longer cross-used one customer's environment to develop updates for other customers, and that all Oracle copyrighted material and source code had been removed from Rimini's systems.  Rimini serves its complaint on Oracle over three months later, on January 26, 2015. |
| 2/17/15 | *Rimini II*: Oracle files counterclaims, including the present claims of copyright infringement, violations of the DMCA, violations of the California UCL, and violations of the Lanham Act.  ECF No. 22. |
| 10/13/15 | *Rimini I*: A jury finds that Rimini infringed Oracle's J.D. Edwards and Siebel copyrights, as well as its copyrights related to PeopleSoft documentation.  *Rimini I*, ECF No. 896. |
| 2/28/16 | *Rimini II*: Oracle amends its counterclaims, adding allegations regarding E-Business Suite to its copyright infringement claim.  ECF No. 174. |
| 9/21/16 | *Rimini I*: This Court enters a permanent injunction against Rimini, prohibiting Rimini from continuing to infringe Oracle's copyrighted software, and orders Rimini to pay Oracle's attorneys' fees and costs. |

| Date | Event |
|---|---|
| 1/8/18 | *Rimini I*: The Ninth Circuit affirms the copyright infringement judgment in full. *Oracle USA, Inc. v. Rimini St., Inc.*, 879 F.3d 948, 964 (9th Cir.), *cert. granted on other grounds*, 139 S. Ct. 52 (2018). |
| 2/28/18 | *Rimini II*: Close of fact discovery.  ECF Nos. 365, 372. |
| 11/6/18 | *Rimini I*: After the Ninth Circuit denies a stay pending appeal, this Court's permanent injunction against Rimini goes into effect, prohibiting Rimini from continuing to infringe Oracle's copyrighted software.  *Rimini I*, ECF No. 1166. The Ninth Circuit later affirms the injunction with two minor modifications. *Oracle USA, Inc. v. Rimini St., Inc.*, 783 F.App'x 707, 710–12 (9th Cir. 2019), *cert. denied*, 140 S. Ct. 850 (2020). |
| 7/18/18 | *Rimini II*: Close of expert discovery.  ECF Nos. 365, 372. |
| 4/4/19 | *Rimini I*: This Court grants Oracle's motion to reopen discovery into Rimini's compliance with the permanent injunction.  This discovery ultimately shows that Rimini had engaged in several violations of the injunction.  *Rimini I*, ECF No. 1459. |
| 9/14/20 | *Rimini II*: This Court grants partial summary judgment to Oracle, finding that (1) Rimini infringed seventeen of Oracle International Corporation's PeopleSoft copyrights when it created 47 PeopleSoft environments on Rimini's computer systems for 29 customers through July 30, 2014, and (2) that Rimini Street infringed four of Oracle International Corporation's PeopleSoft copyrights when it cross-used PeopleSoft software associated with two of its customers to develop two PeopleSoft updates for 92 other customers.  ECF No. 1253 at 21–29. |
| 1/12/22 | *Rimini I*: After a seven-day hearing, this Court finds that Rimini was in contempt of court for multiple and willful violations of the permanent injunction, including Rimini's continued cross-use of Oracle's copyrighted PeopleSoft software and maintenance of Oracle copyrighted source code on Rimini's systems.  *Rimini I*, ECF No. 1548. |
| 1/12/22 | *Rimini I*: This Court finds that Rimini continued to infringe Oracle's copyrights in willful contempt of the Court's 2018 permanent injunction in *Rimini I*, ECF 1548 at 53.  Rimini was sanctioned $630,000 and ordered to pay Oracle's attorneys' fees.  *Id.* |

**APPENDIX B – GLOSSARY OF TERMS**

| Term | Definition |
|---|---|
| AFW | Automation Framework; a suite of tools developed by Rimini to help automate development and distribution of fixes and updates from one customer's PeopleSoft environment to other customers' PeopleSoft environments and thereby cross-use Oracle's software |
| AFW database | ██████████████████████████████████████ |
| App Designer | Core development tool built into PeopleTools; used to build and modify PeopleSoft applications such as Online Objects that define the PeopleSoft user interface. |
| ████████ | ██████████████████████████████████████ |
| AUP | Rimini's Acceptable Use Policy.  The AUP prohibits Rimini employees from receiving, saving, or using third-party intellectual property; under the AUP, if any Rimini employee suspects unauthorized intellectual property is on Rimini's system, they are required to immediately report it to security@riministreet.com |
| ██████ | ██████████████████████████████████████ |
| Client | Aka customer; generally used by Rimini to refer to the entities with which it has contracted to provide support |
| CMI | Copyright Management Information; includes copyright notices, such as "Copyright (c) 1999–2001 PeopleSoft, Inc." |
| ████████ | ██████████████████████████████████████ |
| ████████ | ██████████████████████████████████████ |
| Cross-use | The infringing copying of one Rimini customer's Oracle software to develop software fixes or updates that are then delivered to other Rimini customers.  *Rimini I*, ECF No. 474 at 12–13. |
| Customer | Aka "client"; generally used by Oracle to refer to licensee of Oracle software that may also purchase a support contract with Oracle |
| DAT File | A common file type; █████████████████████ |

| Term | Definition |
|---|---|
|  | ████████████████████████████ |
| **Data Mover Script** | Aka "DMS"; files with .dms file extension; used by the PeopleTools DataMover tool to modify data in a database associated with an installations of PeopleSoft |
| **Database (ODB)** | Oracle Database; Oracle's database software created, licensed, and supported by Oracle and often used in conjunction with ERP software |
| **Derivative work** | A work, such as a Rimini Street update or software tool, that is based on one or more pre-existing works, where the pre-existing work is recast, transformed, or adapted and substantially incorporates Oracle's protected expression. If a Rimini Street update or software tool only interacts and is useable with Oracle's software and it was designed using Oracle's utility tools software, the update or software tool substantially incorporates protected material and is a derivative work even if it contains no Oracle code. ECF No. 1253 at 52–53; *Rimini I*, ECF No. 1548 at 24 n.33, 35, 40, 50 n.69, 52; *Rimini I*, ECF No. 880 at 22 (Instruction No. 21) |
| ████████ | ████████████████████████████ |
| **DevTrack** | A development tracking system used by Rimini that maintains records related to project requirements and progress related to Rimini's creation of fixes and updates. Rimini uses DevTrack to track various aspects of the design, development, and distribution of updates |
| **Development environment** | Software environment that contains an installed copy of the software program which is then modified to develop software updates; sometimes referred to as a "non-production" environment alongside test environments. *Oracle USA, Inc. v. Rimini Street, Inc.*, 879 F.3d 948, 955 (9th Cir. 2018). |
| ██████ | ████████████████████████████ |
| **E-Business Suite (EBS)** | Oracle's integrated suite of ERP business operations applications |
| **ePack** | ████████████████████████████ |
| **ERP** | Enterprise Resource Planning; a type of software that helps enable core operational tasks—like payroll, human resource tasking, and inventory management—across an entire organization. *Rimini I*, MSJ Order, ECF No. 474 at 1-2 n.2. PeopleSoft, JD Edwards, and E-Business Suite are all ERP software. |
| **Facilities restriction** | Provision in many of the PeopleSoft licenses in this case that prohibits licensees from copying PeopleSoft software except to a licensee's "facilities," thereby prohibiting Rimini Street from copying PeopleSoft software to Rimini Street's own computer |

| Term | Definition |
|---|---|
| | systems.  ECF No. 1253 at 27, 90-91; *Rimini I*, ECF No. 474 at 8-20; *Rimini I*, ECF No. 880 (Instruction 24). |
| **Fix** | Software patch to address a bug |
| **Gap Customers** | Customers who because customers of Rimini, or for whom Rimini created development environments on its servers, after the close of fact discovery in *Rimini II* but before the purported implementation of Rimini's "Process 2.0." |
| ███████ | ████████████████████████████████████ |
| ███████ | ████████████████████████████████████ |
| | ████████████████████████ |
| **JD Edwards (JDE)** | Oracle ERP software that provides ERP applications and tools for finance, human resources, distribution, consumer goods, and manufacturing customers. |
| **JD Edwards World Source Editor** | Tool included with JDE and used by Rimini to develop software fixes and updates, as well as to copy and modify JDE source code |
| ████ | ████████████████████████████████████ |
| **Migration** | Rimini's copying of infringing PeopleSoft software environments from Rimini's own computer systems to its clients' computer systems or to Windstream's computer systems, thereby creating additional unlicensed and infringing copies |
| **OIC** | Oracle International Corporation |
| **OMW** | Object Management Workbench; Oracle tool used by Rimini to copy and modify JDE source code and develop software fixes and updates for its JDE EnterpriseOne customers |
| ████████ | ████████████████████████████████████ |
| **PeopleSoft** | Oracle's ERP software that provides ERP applications and tools for human resources, finances, supply chain management, customer relationship management, enterprise performance management, manufacturing, and student administration. |
| **PeopleTools** | Component of PeopleSoft environment; provides the integrated development environment used by PeopleSoft developers and the necessary infrastructure required for operation of PeopleSoft Applications; includes utilities such as App Designer and Data Mover |

| Term | Definition |
|---|---|
| PPACA | Patient Protection and Affordable Care Act. ████████████████████████████████ |
| Process 1.0 | Rimini support practices found to be infringing in *Rimini I*.  Under "Process 1.0," Rimini stored many of its customers' Oracle software environments on Rimini's computer systems ("local hosting") and used certain of those environments as "generic" environments to support multiple customers ("cross use"). |
| Process 2.0 | Under Rimini's "Process 2.0" support model at issue in this litigation, development and test environments are hosted on either the client's computer systems or on a third-party cloud server that the parties refer to as Windstream.  In either case, Rimini remotely accesses these development and test environments to perform support services. |
| Production environment | Live software environment used by end users |
| Prototype environment | Software environment associated with one customer that is used to develop, test, and package updates for distribution to other customers |
| QA | ████████████████████████████████ |
| QA Groups | ████████████████████████████████ |
| RAM | Random access memory; a type of computer memory used to store data as it is used by a computer processor |
| RSI files ████████ | ████████████████████████████████ |
| Siebel | Oracle's ERP software that provides ERP applications and tools for customer relationship management |
| Source code | A set of statements and instructions written by a human being using a particular programming language…. These statements or instructions are comprehensible to a person who is familiar with the relevant programming language, but in most cases a computer or other electronic device cannot execute these statements or instructions unless they have been converted into object code. This conversion is performed by a separate program within the computer, which is known as an interpreter, assembler, or compiler.  *Rimini I*, ECF No. 1548 at 42. |
| ████████ | ████████████████████████████████ |
| Test environment | Software environment that contains a copy of the software program which is then modified to test software updates; sometimes referred to as a "non-production" environment alongside development |

| Term | Definition |
|---|---|
|  | environments. *Oracle USA, Inc. v. Rimini Street, Inc.*, 879 F.3d 948, 955 (9th Cir. 2018). |
| TLR | Tax, Legal, and Regulatory updates developed by Rimini to account for new tax, legal, and regulatory changes for PeopleSoft, JD Edwards, and EBS |
| ▮▮▮▮ | ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ |
| Update | Periodic changes to software; may be minor patch or more substantial feature enhancements |

**APPENDIX C – INDIVIDUALS**

| Name | Affiliation | Description |
|---|---|---|
| Adler, Todd | Oracle | Senior Managing Counsel |
| Allen, Jeff | Rimini | Senior PeopleSoft Support Developer |
| Allison, Richard | Oracle | EVP, Global Practices and Risk Management |
| Astrachan, Owen | Rimini (expert) | Copyright infringement expert |
| Aubrejuan, Paco | Oracle | SVP, Oracle Applications Development for PeopleSoft, JD Edwards, Siebel, and other Oracle software, and former PeopleSoft developer |
| Benge, Jim | Rimini | VP, Global Product Development - PeopleSoft |
| Bonfanti, Michael | Easter Seals NH | 30(b)(6) witness for Easter Seals NH |
| Catz, Safra | Oracle | CEO |
| Cauthen, John | Oracle (expert) | Digital forensics expert |
| Conley, Tim | Rimini | Manager, PeopleSoft Development |
| Corpuz, Jr., Stanley | Rimini (former) | Technical Onboarding Manager (former) |
| Davenport, Brenda | Rimini | GVP, Quality Assurance |
| Dean, Elizabeth | Oracle (expert) | Damages expert |
| Ellis, Daniel | Rimini (expert) | Downloading expert |
| Fanning, Scott | McAfee | 30(b)(6) witness for McAfee; Director of Product Management for Data Center, Server, and Cloud |
| Frank, Rick | Rimini | Principal Software Developer, including development of AFW |
| Frederiksen-Cross, Barbara | Oracle (expert) | Digital forensics expert |
| Goodman, Charlotte | Rimini | Team Lead, Quality Assurance |
| Grady, Sebastian | Rimini | President |
| Heaberlin, Danny | Tierpoint | 30(b)(6) witness for Tierpoint; Product Manager, Development and Marketing at Windstream prior to Tierpoint acquisition |
| Hicks, Christian | Oracle (expert) | Computer science and forensics expert |
| Hosalli, Manjula | Rimini | PeopleSoft environment engineer |
| Hovsepian, Hagop | City of Glendale | 30(b)(6) witness for City of Glendale |
| Hu, Chen | Rimini | Senior E-Business Suite Primary Support Engineer |
| Iftikhar, Naveed | Rimini (former) | Primary support engineer for E-Business Suite (former) |
| Jacob, Michael | Rimini | Business analyst for JD Edwards tax and regulatory department |
| Jameson, Cathy | Brandeis University | 30(b)(6) witness for Brandeis University |

| Name | Affiliation | Description |
|------|-------------|-------------|
| Jamieson, David | Lifeway Christian Resources | 30(b)(6) witness for Lifeway Christian Resources |
| Khasky, Steven | Matheson Trucking | 30(b)(6) witness for Matheson Trucking |
| Lanchak, Stephen | Rimini (expert) | Industry expert |
| Loftus, Paul | Rimini (expert) | Causation expert |
| Lyskawa, Nancy | Rimini | EVP, Global Client Onboarding and Client Care |
| Mackereth, Craig | Rimini | GVP, Global Service Delivery, Support for PeopleSoft, JD Edwards, E-Business Suite, Oracle Database, Siebel, and other Oracle software |
| Maddock, Kevin | Rimini | EVP and Chief Recurring Revenue Officer |
| Mandla, Harika | Rimini | Senior PeopleSoft Developer |
| Martinez, Kim | Rimini | Senior Manager, Global Quality Assurance |
| McDaniel, Patrick | Oracle (expert) | Security expert |
| McMillian, Lynn | Blue Cross-Blue Shield of Kansas City | 30(b)(6) witness for BCBS of Kansas City |
| Metzger, Ken | SafeNet | 30(b)(6) witness for SafeNet |
| Miller, David | Rimini | VP, Onboarding |
| Myers, Nancy | Toll Brothers | 30(b)(6) witness for Toll Brothers |
| Narasimhan, Satish | Rimini | VP, Financial Planning & Analytics |
| Phung, Kien | Rimini | VP, Service Delivery |
| Pinto, Paul | Oracle (expert) | Industry expert |
| Rowe, David | Rimini | Chief Marketing Officer |
| Rubin, Avi | Rimini (expert) | Security expert |
| Sahni, Praveen | Rimini | Senior Director, EBS Tax and Regulatory Development |
| Salaets, Steven | Rimini | Chief Information Officer |
| Screven, Edward | Oracle | EVP and Chief Corporate Architect |
| Seth Ravin | Rimini | Founder, CEO, and largest shareholder |
| Sheffield, Don | Rimini | Senior PeopleSoft Developer |
| Slepko, Brian | Rimini | Senior VP, Global Service Delivery |
| Sutton, Michael | Media General | 30(b)(6) witness for Media General |
| Tahtaras, Susan | Rimini | Senior Director, PeopleSoft Development |
| Teegarden, Ron | Rimini | Regional Manager, Global Applications Support (US East region) for PeopleSoft, JD Edwards, and Siebel |
| Valdez, Raul | Porex | 30(b)(6) witness for Porex |
| Van Horn, Gertrude | NCH Corporation | 30(b)(6) witness for NCH Corporation |
| White, Debra | Matheson Trucking | 30(b)(6) witness for Matheson Trucking |

ORACLE'S TRIAL BRIEF

| Name | Affiliation | Description |
|------|-------------|-------------|
| Wood, Kevin | Rimini | Senior PeopleSoft Developer |

**APPENDIX D – ISSUES ALREADY DECIDED BY THE COURT**

Throughout the extensive history of the two litigations concerning its unlawful business practices, Rimini has often sought to re-litigate issues that the Court has previously decided. This includes several issues in Rimini's "Issues of Law" and "Statement Regarding Appellate Preservation of Issues" sections of the parties' recent joint pre-trial order. *See* ECF 1309 at 81. This Court already has ruled on the issues discussed below (and others), which will not be the subject of the upcoming trial.

The Court has dismissed almost all of Rimini's affirmative defenses. Prior to its summary judgment order, the Court dismissed Rimini's affirmative defenses for limitations on exclusive use of computer programs under 17 U.S.C. § 117, and for copyright misuse, ECF No. 49, as well as Rimini's affirmative defenses based on the First Amendment, preemption, and litigation privilege. *See* ECF No. 589 at 10–15. In its summary judgment order, the Court granted Oracle's motion for summary judgment on Rimini's affirmative defenses of implied license and consent (ECF No. 1253 at 29–30), laches (*id*. at 34–35), equitable estoppel (*id*. at 35–36), abandonment/waiver (*id*. at 36–37), and unclean hands (*id*. at 37–38) with respect to Oracle's first counterclaim for copyright infringement. As discussed above, the Court also granted in part Oracle's motion for summary judgment on Rimini's affirmative defense of express license and fair use as it relates to the copyright software found in the Campbell Soup and City of Eugene environments at issue in his motion. *Id*. at 55–63, 93. Finally, the Court granted Oracle's motion as to Rimini's express license defense regarding the migration and the 47 PeopleSoft environment Rimini copied on its computer systems. *Id*. at 21–29 (citing ECF Nos. 888, 896-s at 6, 8 n.1), 92.

Rimini previously argued that its affirmative defense for privilege and justification remain. But that defense is only asserted against Oracle's claims for intentional interference with prospective economic advantage, which the Court dismissed. ECF No. 414 at 37–38; ECF No. 589. Because this claim is no longer live, neither is the corresponding affirmative defense.

The Court also made several rulings dismissing Rimini's claims. Prior to summary judgment, the Court "dismissed Rimini's claims for declaratory relief that Oracle engaged in copyright misuse [which the Court noted was duplicative of its stricken affirmative defense],

intentional interference with prospective economic advantage, violations of Nevada's Deceptive Trade Practices Act under the 'bait and switch' provision of Nevada Revised Statute ('NRS') § 598.0917, and violations of the Lanham Act." ECF No. 1253 at 5, 20 (citing ECF No. 633). In its partial summary judgment order, the Court granted summary judgment for Oracle on what remained of Rimini's second claim for Declaratory Judgment of No Hacking (Under Federal, California, and Nevada Anti-Hacking Statutes), and its first claim for Declaratory Judgment of Non-Infringement of Copyright as to four of Oracle's copyright registrations. *Id*. at 13, 65–66. The Court also granted summary judgment as to Rimini's fourth claim for Intentional Interference with Contractual Relations. *Id*. at 17 (arising from the case and desist letter), 66–71 (arising from alleged misrepresentations and audits). Finally, the Court granted summary judgment to Oracle as to Rimini's remaining claims on its sixth cause of action for violations of Nevada's Deceptive Trade Practices Act and as to its claims for restitution and damages and relating to the cease-and-desist letter under its eighth cause of action for violations of California's UCL. *Id*. at 20, 72–74.

1

## CERTIFICATE OF SERVICE

I hereby certify that on the 22nd day of November, 2022, I electronically transmitted the foregoing **ORACLE INTERNATIONAL CORPORATION AND ORACLE AMERICA, INC.'S TRIAL BRIEF,** to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to all counsel in this matter; all counsel being registered to receive Electronic Filing.


DATED:  November 22, 2022

MORGAN, LEWIS & BOCKIUS LLP


By: _____ */s/ Benjamin P. Smith* _____
Benjamin P. Smith

Attorneys for Plaintiffs and Counterdefendants
Oracle International Corporation and Oracle
America, Inc.