1   GIBSON, DUNN & CRUTCHER LLP          HOWARD & HOWARD ATTORNEYS PLLC
    JEFFREY T. THOMAS (*pro hac vice*)    W. WEST ALLEN (Nevada Bar No. 5566)
2   BLAINE H. EVANSON (*pro hac vice*)    3800 Howard Hughes Parkway, Suite 1000
    CASEY J. MCCRACKEN (*pro hac vice*)   Las Vegas, NV  89169
3   JOSEPH A. GORMAN (*pro hac vice*)     Telephone:  702.667.4843
    3161 Michelson Drive                  wwa@h2law.com
4   Irvine, CA  92612-4412
    Telephone:  949.451.3800              RIMINI STREET, INC.
5   jtthomas@gibsondunn.com               JOHN P. REILLY (*pro hac vice*)
    bevanson@gibsondunn.com               3993 Howard Hughes Parkway, Suite 500
6   cmccracken@gibsondunn.com             Las Vegas, NV  89169
    jgorman@gibsondunn.com                Telephone:  336.908.6961
7                                         jreilly@riministreet.com
    GIBSON, DUNN & CRUTCHER LLP
8   SAMUEL LIVERSIDGE (*pro hac vice*)    WEIL, GOTSHAL & MANGES LLP
    ERIC D. VANDEVELDE (*pro hac vice*)   MARK A. PERRY (*pro hac vice*)
9   ILISSA S. SAMPLIN (*pro hac vice*)    2001 M Street, N.W., Suite 600
    333 South Grand Avenue                Washington, DC  20036
10  Los Angeles, CA  90071-3197          Telephone:  202.682.7511
    Telephone:  213.229.7000              mark.perry@weil.com
11  sliversidge@gibsondunn.com
    evandevelde@gibsondunn.com
12  isamplin@gibsondunn.com

13  *Attorneys for Defendants/ Counterclaimants*
    *Rimini Street, Inc., and Seth Ravin*
14

15              **IN THE UNITED STATES DISTRICT COURT**

16                  **FOR THE DISTRICT OF NEVADA**

17

18  ORACLE INTERNATIONAL CORP., and       CASE NO. 2:14-cv-01699-MMD-DJA
    ORACLE AMERICA, INC.,
19                                         **RIMINI STREET AND SETH RAVIN'S**
                  Plaintiffs/ Counterdefendants,   **POST-TRIAL PROPOSED FINDINGS OF**
20                                         **FACT AND CONCLUSIONS OF LAW**
    v.
21                                         Judge:    Hon. Miranda M. Du
    RIMINI STREET, INC., and SETH RAVIN,
22
                  Defendants/ Counterclaimants.
23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

1

**TABLE OF CONTENTS**

2

Page(s)

3

I. INTRODUCTION ................................................................................................. 1

4

II. FINDINGS OF FACT ......................................................................................... 3

5

    A.   BACKGROUND ....................................................................................... 3

6

       1. The Parties and Enterprise Software Support ................................... 3

7

          *a. License Agreements* ................................................................. 4

8

          *b. Oracle's and Rimini's Support Services* ................................ 6

9

       2. The *Rimini I* Litigation ................................................................. 10

10

       3. Contempt Proceedings ................................................................... 13

11

       4. Process 2.0 and the *Rimini II* Litigation ...................................... 14

12

    B.   RIMINI'S DECLARATORY JUDGMENT CLAIM REGARDING PROCESS 2.0 ............... 15

13

       1. Third-Party Copy Authorization ................................................... 16

14

       2. Remote Access and Copying of Code in Client Environments ...................... 19

15

       3. Siloed, Client-Specific (Non-Generic) Environments ..................... 24

16

       4. Re-Use of Rimini's Knowledge and Work Product ........................ 28

17

       5. Rimini-Created Software Tools ...................................................... 33

18

       6. JDE-Specific Facts ........................................................................ 36

19

    C.   ORACLE'S CLAIMS FOR DIRECT COPYRIGHT INFRINGEMENT ................................. 43

20

       1. Process 1.0 "Migration" Claims .................................................... 43

21

       2. Product Line Claims ...................................................................... 44

22

          *a. PeopleSoft* ............................................................................. 45

23

          *b. JDE* ....................................................................................... 55

24

          *c. Siebel* ................................................................................... 55

25

          *d. EBS* ...................................................................................... 56

26

          *e. Database* ............................................................................... 58

27

          *f. Miscellaneous Files on Rimini's Systems* ............................ 60

28

i

Gibson, Dunn &
Crutcher LLP

*g. Derivative Works* .................................................................................60

3. Oracle's Claims Regarding Recordkeeping.................................................61

D. ORACLE'S INDIRECT CLAIMS OF COPYRIGHT INFRINGEMENT AGAINST RAVIN.....63

E. RIMINI'S NON-LICENSE DEFENSES TO ORACLE'S CLAIMS OF INFRINGEMENT.......64

1. Rimini's Statute of Limitations Defense to Oracle's EBS Claims .................64

2. Rimini's Fair Use Defenses .......................................................................65

F. RIMINI'S UCL CLAIMS .................................................................................69

1. Support for Oracle Software .....................................................................70

2. Support Pricing ........................................................................................73

3. Oracle Acknowledges the Low Value Proposition of Oracle Support ...........74

4. Oracle Seeks to Lock In Customers Rather Than Compete on
Price or Service ........................................................................................77

a. *The Matching Service Level Policy* ...............................................78

b. *Oracle's Reinstatement Fee and Back Support Policy* .............................83

c. *False and Misleading Statements* ................................................84

G. ORACLE'S LANHAM ACT CLAIMS AND RIMINI'S DEFENSES ...............................88

1. Rimini's Statements Regarding Its Support Complying with Oracle's
Copyrights and Licenses ...........................................................................88

2. Rimini's Security-Related Statements .......................................................91

a. Software Security for Oracle Customers..................................91

b. Software Security for Rimini Clients ......................................93

c. Rimini's Security-Related Statements Are Not False or Misleading..........95

3. Statements Regarding TomorrowNow .........................................................98

4. Ravin's Involvement in Rimini's Statements ................................................101

5. Rimini's Laches Defense ...........................................................................101

H. ORACLE'S DMCA CLAIMS AND RIMINI'S DEFENSES ..........................................101

I. ORACLE'S UCL CLAIMS..................................................................................104

J. FACTS RELATED TO THE PARTIES' REQUESTED INJUNCTIVE RELIEF ..................105

ii

Gibson, Dunn & Crutcher LLP

1. Rimini's Request for Injunctive Relief .........................................................105

2. Oracle's Requests for Injunctive Relief ......................................................108

    *a. Oracle Failed to Present Any Facts Showing Irreparable Injury* .............108

    *b. Oracle's Causation Expert Failed to Show Irreparable Injury* ...............111

III. CONCLUSIONS OF LAW ...............................................................................118

    A.  RIMINI'S DECLARATORY JUDGMENT CLAIM REGARDING PROCESS 2.0 .............118

        1. Third-Party Copy Authorization and "Cross-Use" .......................................119

        2. Remote Access and Copying of Code in Client Environments ....................127

        3. Siloed, Client-Specific Environments ..........................................................128

        4. Re-Use of Rimini's Knowledge and Work Product .......................................128

        5. Rimini-Created Software Tools .....................................................................130

        6. JDE Specific Conclusions .............................................................................130

        7. Declaration of Non-Infringement .................................................................135

    B.  ORACLE'S CLAIMS FOR DIRECT COPYRIGHT INFRINGEMENT .............................137

        1. Process 1.0 "Migration" Claims ...................................................................137

        2. Oracle's Product-Line Claims ......................................................................139

            *a. PeopleSoft* ............................................................................................139

            *b. JDE* .......................................................................................................141

            *c. Siebel* ....................................................................................................142

            *d. EBS* .......................................................................................................142

            *e. Database* ................................................................................................143

            *f. Miscellaneous Files on Rimini's Systems* .............................................144

            *g. Derivative Works* ..................................................................................144

    C.  ORACLE'S INDIRECT CLAIMS OF COPYRIGHT INFRINGEMENT AGAINST RAVIN...145

        1. Contributory Infringement ............................................................................145

        2. Vicarious Infringement .................................................................................146

    D.  RIMINI'S NON-LICENSE DEFENSES TO ORACLE'S CLAIMS OF INFRINGEMENT.....146

iii

Gibson, Dunn &
Crutcher LLP

1. Rimini's Statute of Limitations Defense to Oracle's EBS Claims ............... 146

2. Rimini's Fair Use Defenses .................................................................. 147

    *a. Standard for Fair Use* ...................................................................... 147

    *b. Application of Fair Use to Particular Claims of Infringement* ............... 149

E. RIMINI'S UCL CLAIMS .......................................................................... 154

    1. Competitor Standing ..................................................................... 154

    2. Oracle's Market Definition Argument ........................................... 155

    3. Oracle's Anticompetitive Business Practices ................................ 155

        *a. Oracle's Matching Service Level Policy* ........................................ 155

        *b. Oracle's Reinstatement Fee and Back Support Policy* ........................... 157

        *c. False and Misleading Statements* ..................................................... 158

        *e. Oracle's Speech Defenses* ............................................................. 158

F. LANHAM ACT CLAIMS AND DEFENSES .................................................... 159

    1. Rimini's Statements Regarding Its Support Complying with Oracle's Copyrights and Licenses .............................................................. 159

    2. Rimini's Security-Related Statements ........................................... 161

    3. Statements Regarding TomorrowNow ........................................... 163

    4. Vicarious Liability as to Ravin ..................................................... 163

    5. Rimini's Laches Defense ............................................................. 165

G. DMCA CLAIMS AND DEFENSES ............................................................. 167

H. ORACLE'S UCL CLAIMS ........................................................................ 169

I. THE PARTIES' REQUESTED INJUNCTIVE RELIEF ...................................... 170

    1. Rimini's Request for Injunctive Relief .......................................... 170

    2. Oracle's Requests for Injunctive Relief ........................................ 173

IV. CONCLUSION .......................................................................................... 182

iv

RIMINI STREET AND SETH RAVIN'S POST-TRIAL PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW
CASE NO. 2:14-CV-01699-MMD-DJA

Gibson, Dunn &
Crutcher LLP

Defendants/Counterclaimants Rimini Street, Inc. and its CEO, Seth Ravin (collectively, "Rimini") submit the following post-trial proposed findings of fact and conclusions of law, which incorporate Rimini's pre-trial proposed findings and conclusions (ECF No. 1445), revised to conform to the evidence introduced and arguments and rulings made at trial.  As set forth in detail further below, Rimini established the following key facts:

- Every Rimini client at issue in this case held a valid Oracle license for the Oracle software it possessed and used, and that Rimini supported.

- Every Rimini client maintained its own, separate Oracle software environments on that client's own systems, which the client "controlled," and which Rimini remotely accessed to provide support for that client under Rimini's contract with the client.

- As the Ninth Circuit has held, Oracle's software licenses permit a licensee to make copies to support that software, whether by the licensee itself or by hiring a third-party provider such as Rimini (which "stands in the shoes" of the licensee).

- Rimini redesigned its support processes to what is now called "Process 2.0" in response to rulings in earlier litigation with Oracle.  The transition to Process 2.0 was complete by the end of July 2014.  Under Process 2.0, Rimini no longer locally hosts its client environments on Rimini's systems and does not use any generic testing and development environments.  Instead, Rimini engineers remotely access each client's separate environments on that client's systems.

- Rimini's Process 2.0 as designed and implemented across tens of thousands of updates and fixes delivered to its clients each year is non-infringing in light of the applicable license agreements, the Copyright Act and controlling precedent, and prior rulings in this case.

- Nearly every code file, technical specification, and other Rimini-created work product that Oracle accused of infringement was 100% Rimini-written and *contained no Oracle protected expression whatsoever*, literal or nonliteral.  The specific files that Oracle accused of containing Oracle expression were a limited set of so-called "re-write" files

(15 total) relating only to PeopleSoft that Rimini stopped providing to clients in 2018, and a single E-Business Suite ("EBS") technical specification from 2013, before Process 2.0 was implemented.

- Rimini's software tools, including its Automation Framework ("AFW"), which pertains *only* to PeopleSoft, do not contain any literal or nonliteral Oracle protected expression, and any interoperation with Oracle software—which, by the inherent nature of computing, may create ephemeral Random Access Memory ("RAM") copies—both is non-infringing and constitutes fair use.

- The undisputed testimony of Rimini's industry expert Stephen Lanchak (Oracle did not offer an industry expert) is that the practices underlying Process 2.0—including the re-use of code and other written work product developed by third-party support providers in connection with supporting Oracle software for multiple clients—has been accepted in the enterprise software support industry for decades, and that Oracle has repeatedly approved those practices when carried out by persons or entities other than Rimini as permitted by Oracle's license agreements.

- Oracle's ever-evolving theory of "cross-use," as presented to the Court at trial, is vastly overbroad and encompasses any instance in which a Rimini engineer writes down and re-uses entirely Rimini-created code or know-how that Oracle's expert claimed was too detailed or too long (*e.g.*, could not fit "on the back of [a] napkin"), even when such work product contains no literal or nonliteral Oracle protected expression.  That other clients may *indirectly* benefit from Rimini's *prior* work for earlier clients, which often involves making copies of Oracle software in those earlier clients' environments for development and testing, does not (and as a matter of law could not) transform those earlier copies into prohibited "cross-use."

- Oracle's theory that Rimini infringes Oracle's copyrights in technical specifications is undermined by the fact that, after examining the relevant Rimini witnesses, Oracle failed to show that Rimini's technical specifications under Process 2.0 contained any Oracle

protected expression.   Oracle's theory that Rimini's use of technical specifications without Oracle protected expression is infringing in any event is undermined by uncontroverted testimony from experts, software engineers, client witnesses, and Oracle's own witnesses that the use of technical specifications to document work has been accepted in the industry for decades, is taught in schools, and is done regardless of whether the work will be used to support a subsequent client.

- Oracle proposes a definition of derivative works that would include any Rimini-created code or other expression standing alone, and containing no literal or nonliteral Oracle protected expression whatsoever, if it were designed to work with and cannot operate independently of Oracle software.  That definition is contrary to binding Ninth Circuit case law and undermines both the Copyright Clause and the Copyright Act.  It is also contrary to Oracle's own license agreements.

- Oracle failed to tie any particular accused act of infringement to any specific copyright registration alleged in its complaint, and Oracle's expert admitted that was the case as to all J.D. Edwards ("JDE")-related allegations.  This is fatal to Oracle's affirmative JDE claims.

- The uncontroverted evidence showed that Oracle previously agreed in writing and under oath in a Rule 30(b)(6) deposition that JDE licenses permit third-party support providers to provide support for JDE products and to modify JDE source code in the process.  Oracle provides a tool (as part of JDE) to modify JDE source code, and Oracle conceded at trial that the inability to modify JDE source code would preclude third-party support for JDE products.  Oracle's 30(b)(6) corporate representative also testified that Oracle reviewed and approved of identical support processes for EBS.

- The vast majority of Oracle's case, whether as to infringement or its other claims, focused on conduct and practices that ended years ago, rather than on Rimini's *current* conduct and practices, despite the fact that Oracle abandoned its monetary damages claims on the eve of trial and seeks only *prospective* relief.  At trial, for instance, Oracle focused on

RIMINI STREET AND SETH RAVIN'S POST-TRIAL PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW
CASE NO. 2:14-CV-01699-MMD-DJA

Gibson, Dunn &
Crutcher LLP

stale conduct, including Rimini's "migration" to Process 2.0 (which was complete by the end of July 2014), a single EBS technical specification from 2013 (before Process 2.0 was implemented), "re-write" files that Rimini stopped sending to clients in 2018, and allegedly false statements Rimini made many years ago. Such isolated and non-recurring instances of past conduct cannot support a finding of future irreparable harm.

- Rimini's clients primarily use older, stable versions of Oracle software for which Oracle only offers "Sustaining Support." Oracle no longer develops any tax, legal, and regulatory updates, bug fixes, or security patches for software on Sustaining Support. Oracle wants clients on Sustaining Support to upgrade to the latest version of the software, but many elect not to do so because it would be prohibitively expensive, time-consuming, disruptive to the business, and cause them to lose customizations. These clients retain Rimini (or other third-party providers) because Rimini offers support that Oracle chooses not to offer.

- Oracle failed to prove causation and irreparable harm, which are necessary to obtain injunctive relief on any of its claims. Oracle failed at the outset to show actual injury in the past (indeed, it abandoned all claims for monetary relief). Oracle's CEO admitted she could not name a single customer that had left Oracle for Rimini as a result of any accused Rimini conduct and confirmed that around *95%* of Oracle's support customers renew their support contracts with Oracle each year, a figure that has remained unchanged throughout the pendency of this litigation and Rimini's existence as a competitor. Oracle did not present a scintilla of evidence that a single customer left Oracle support and joined Rimini *because of* Rimini's alleged infringing practices. Instead, Oracle presented a causation expert who attempted to present an attenuated chain of causation that was deeply flawed at each link: (1) his "avoided cost" theory failed to take into account Rimini's *actual* costs at all; (2) he failed to analyze whether Rimini could have absorbed any additional costs without raising its prices (*e.g.*, through reduced profit margins) or what price Rimini would have charged if it had to absorb the additional

Gibson, Dunn &
Crutcher LLP

costs; (3) he illogically assumed that if Rimini could not offer a 50% discount (as opposed to, *e.g.*, a 40% discount), then Rimini would not exist; and (4) he ignored the fact that the vast majority of Rimini's clients run versions of Oracle software on Sustaining Support, for which Oracle no longer provides any new patches, fixes, or updates.  Given these fundamental errors, the record contains no credible evidence that the alleged infringing acts (as opposed to lawful competition from Rimini generally) *caused* Oracle any past harm, let alone that an injunction is necessary to protect Oracle from future harm.  Nor did Oracle's causation expert identify a single customer that left Oracle as a result of any of Rimini's alleged false statements.  In any event, Oracle failed to prove the statements were false.

- In contrast to Oracle's failure to prove its claims against Rimini, Rimini proved that Oracle engaged in anticompetitive conduct in violation of California's Unfair Competition Law ("UCL").  Oracle's internal documents acknowledge that Oracle's support offering has "zero" perceived value to customers, and that the offerings of third parties like Rimini—which cost 50% or less of what Oracle charges—are "compelling." Yet Oracle still maintains around a 95% share of support contracts for its software and a profit margin of around 95% or more.  Remarkably, Oracle does this despite not competing with Rimini or other third parties on price.  Oracle achieved this by making it difficult or impossible for customers to leave Oracle support and hire a third-party support provider, including through its Matching Service Level ("MSL") policy, its other contractual penalty provisions, and its campaign of false and misleading statements about third-party support providers, including Rimini.  Oracle itself estimated that these efforts diverted $300 million in sales from Rimini to Oracle.

Based on the proceedings and record, and as detailed more fully below, the Court should grant Rimini's request for declaratory and injunctive relief and deny Oracle's request for injunctive relief.

The night before the parties' proposed findings of fact and conclusions of law were due,

ix

Gibson, Dunn &
Crutcher LLP

Oracle informed Rimini that it would be filing a proposed permanent injunction, but provided no copy of that injunction to Rimini. Rimini objects to the terms and scope of any relief being briefed before the Court has resolved the merits of the case.[1]

---

[1]    As *both* parties had earlier proposed, Rimini requests that the prevailing party on any request for injunctive relief be given 45 days after entry of the Court's findings of fact and conclusions of law to submit briefing on the appropriate scope of injunctive relief, and that the Court provide 30 days for opposition briefs and 15 days for reply briefs. *See, e.g.*, ECF No. 1451 ¶¶ 140, 143; ECF No. 1445 ¶¶ 258, 414, 431. This proposal makes sense, as neither party can address the appropriate scope of injunctive relief to which it is entitled *before* the Court has resolved the existence and scope of any liability. Should the Court decide to issue injunctive relief, it will be beneficial to consider the parties' input and resolve potential objections and ambiguity before drafting an injunction, rather than in later proceedings to modify ordered relief.

Denying any prevailing party that opportunity would not only contravene ordinary practice requiring that liability findings be entered *before* the scope of injunctive relief is litigated (*United States v. Colonial Pipeline Co.*, 242 F. Supp. 2d 1365, 1372 (N.D. Ga. 2002); *Payan v. L.A. Cmty. College Dist.*, 2019 WL 9047062, at *16 (C.D. Cal. Apr. 23, 2019)), but would also violate due process and Federal Rule of Civil Procedure 65. A party has a due process right to fair notice before being enjoined, and that right would be violated if the Court were to enter an injunction simultaneous with making (presently unknown) liability findings—as the enjoined party would have no opportunity to argue the proper *scope* of injunctive relief in light of such findings. *See Mullane v. Cent. Hoover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950) (due process requires parties be given "an opportunity to present their objections"); *SEC v. Am. Bd. of Trade, Inc.*, 751 F.2d 529, 534, 540 (2d Cir. 1984) (reversing entry of injunction entered "without giving the parties an opportunity to express themselves with regard to the terms of the injunction"); *United States v. Microsoft Corp.*, 253 F.3d 34, 101-03 (D.C. Cir. 2001) (vacating injunction because of district court's failure to distinguish between "[a] hearing on the merits" and the defendant's right to a hearing "as to the appropriate relief"); *cf. Dr. Jose S. Belaval, Inc. v. Perez-Perdomo*, 465 F.3d 33, 36 (1st Cir. 2006) (due process prohibits courts from modifying terms of injunction without providing notice and opportunity to object to injunction's terms).

RIMINI STREET AND SETH RAVIN'S POST-TRIAL PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW
CASE NO. 2:14-CV-01699-MMD-DJA

Gibson, Dunn &
Crutcher LLP

1

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

2

### I.   INTRODUCTION

3       1.      This case arises out of a long-running commercial dispute between

4    Plaintiffs/Counterdefendants Oracle International Corp. and Oracle America, Inc. ("Oracle"), on

5    the one hand, and Defendants/Counterclaimants Rimini Street, Inc., and Rimini's CEO, Seth

6    Ravin, on the other.  The two companies compete with one another in the market for enterprise

7    software support services for Oracle software products, a market in which Oracle has a 95% market

8    share.

9       2.      Rimini operates "in lawful competition with Oracle's direct maintenance services"

10   for Oracle's enterprise software.  *Oracle USA, Inc. v. Rimini St., Inc.*, 879 F.3d 948, 952 (9th Cir.

11   2018).  Every Rimini client holds a valid software license from Oracle that allows the client to

12   contract with Rimini (rather than Oracle) for support services.  D-2370; D-2370A; D-12793.  The

13   Ninth Circuit has also acknowledged that the provision of software support requires Rimini to

14   copy Oracle software files, and that the relevant licenses permit such copying.  *Oracle*, 879 F.3d

15   at 956.  What Oracle and Rimini have litigated for over a decade is whether the *manner* in which

16   Rimini provides support exceeds the scope of the software licenses and/or infringes Oracle's

17   copyrights.

18      3.      On summary judgment in earlier, separate litigation (*Oracle USA, Inc. v. Rimini

19   St., Inc.*, Case No. 2:10-cv-00106-LRH-VCF (D. Nev.) ("*Rimini I*")), the Court construed certain

20   licenses to prohibit certain aspects of Rimini's then-current processes.  A jury subsequently found

21   Rimini to have engaged only in "innocent infringement," meaning that Rimini did not know and

22   had no reason to know that its actions were unlawful.  Ravin was ultimately exonerated entirely of

23   any liability.  Rimini overhauled its support processes to what is now called "Process 2.0" to

24   account for the rulings and the verdict so that those processes would not infringe and would be

25   compliant with the relevant license agreements, and filed this lawsuit in 2014 as a declaratory

26   judgment action seeking to have Process 2.0 declared non-infringing.  Numerous issues and claims

27   arose as the case developed, including Oracle's demand for over a billion dollars in damages

28

Gibson, Dunn &
Crutcher LLP

against Rimini for allegations of copyright infringement, violations of the Lanham Act, the Digital Millennium Copyright Act ("DMCA"), and other causes of action. And Rimini brought claims of unfair business practices against Oracle, contending that Oracle is engaged in anticompetitive conduct to push competitors out of the support market and seeking an injunction.

4.      The parties engaged in eight years of pretrial litigation and discovery, including extensive fact and expert discovery on Oracle's damages claims of more than a billion dollars. Less than a month before trial, Oracle abandoned all claims for monetary relief in exchange for the parties proceeding with a bench trial for non-monetary equitable relief, rather than a jury trial. ECF Nos. 1409, 1421. Thus, the ultimate question for the bench trial was what, if any, equitable relief should be ordered in the case based on the parties' presentations of their respective claims. And the fundamental question concerning the legality of Process 2.0 was the following: ***Whether, in providing support to multiple Oracle licensees, Rimini is permitted to create, write down, and re-use its own code and other know-how so long as that work product does not substantially incorporate any literal or nonliteral Oracle protected expression***. Rimini contends that it is; Oracle contends that such conduct is not authorized by its software licenses, and thus constitutes infringement under the Copyright Act.

5.      The bench trial and these findings of fact and conclusions of law thus concern:

6.      *Rimini's Causes of Action*: (i) declaratory judgment of non-infringement regarding Process 2.0; (ii) violations of California's Unfair Competition Law ("UCL") against Oracle; and (iii) any associated equitable relief.

7.      *Oracle's Causes of Action*: (i) copyright infringement against Rimini and Ravin; (ii) violations of the DMCA against Rimini and Ravin; (iii) violations of the Lanham Act against Rimini and Ravin; (iv) violations of California's UCL against Rimini and Ravin; and (v) any associated equitable relief.

8.      Having considered all relevant evidence adduced at trial and the parties' respective arguments, the Court issues the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a). In brief, the Court rules in favor of Rimini and against

Gibson, Dunn &
Crutcher LLP

1   Oracle on all claims presented and relief requested.

2   **II.   FINDINGS OF FACT**

3   **A.   Background**

4   **1.   The Parties and Enterprise Software Support**

5   9.   Oracle holds intellectual property rights in certain enterprise software programs,

6   including PeopleSoft, J.D. Edwards ("JDE"), Siebel, E-Business Suite ("EBS"), and Oracle

7   Database ("Database").   ECF No. 1460 ("Stipulated Facts") ¶¶ 3-4; Tr. 9:15-10:1 [Screven].[2]

8   Enterprise software programs help companies perform complex tasks such as human resource

9   functions, payroll, taxes, and customer relationship management.   Stipulated Facts ¶ 5.   Oracle

10   grants perpetual licenses for its software products to its licensees for a "substantial one-time

11   payment."   *Oracle*, 879 F.3d at 952; *see, e.g.*, Tr. 1573:6-7 [Jackson] (approximately $5 million

12   fee to license EBS software); Tr. 2271:14-17 [Martin] (between $1 and $2 million fee to license

13   EBS software).   At the time of the events at issue, Oracle had its principal place of business in

14   Redwood City, California.   Stipulated Facts ¶ 1.

15   10.   Rimini is an independent third-party support provider for enterprise software.   *See*

16   Stipulated Facts ¶ 13.   It is Oracle's most significant competitor in the market to provide support

17   for Oracle-developed programs, yet Oracle has in the range of a 95% market share.   *See* Tr. 1736:1-

18   4 [Pinto]; Tr. 24:20-25:4 [Screven]; Tr. 2525:23-2526:1, 2527:9-20 [Campbell].   Rimini is a

19   publicly traded company with over 1,800 employees and 29 offices in 21 countries that has over

20   4,900 signed clients, including Fortune 500 companies and government agencies around the world.

21   *See* Tr. 162:2-163:11, 167:9-15 [Ravin].   Seth Ravin is Rimini's co-founder, CEO, and Chairman

22   of the Board.   Stipulated Facts ¶ 12; Tr. 163:17-18 [Ravin].   Rimini provides support for programs

23   developed by Oracle, SAP, Microsoft, IBM, and Salesforce.   Tr. 164:17-165:2 [Ravin]; Tr. 1461:2-

24   6 [Mackereth].   Oracle is the only software vendor that has sued Rimini regarding Rimini's support

25   processes.   Tr. 165:25-166:4 [Ravin]; Tr. 1461:16-22 [Mackereth].

26

27   [2] All citations to "Tr." are to the final daily trial transcripts (ECF Nos. 1503-1508 and 1512-1516)
    and incorporate the errata identified in Rimini's Notice of Trial Transcript Errata (ECF No. 1523).

28

Gibson, Dunn &
Crutcher LLP

11.     Oracle enterprise software must be maintained in order to function correctly, and that maintenance requires copying the software.  Tr. 2331:22-2332:6 [Astrachan]; Tr. 310:1-311:4 [Frederiksen-Cross]; Tr. 2134:10-2135:7 [Lanchak]; *see Oracle*, 879 F.3d at 955-56; Stipulated Facts ¶¶ 6-8.  Software cannot be accessed, used, updated, modified, compiled, run, tested, moved, or even viewed without creating RAM copies of the software.  Tr. 305:10-311:4, 499:18-500:10 [Frederiksen-Cross]; Tr. 1485:15-23 [Mackereth]; Tr. 2135:8-20 [Lanchak]; Tr. 2317:4-25 [Astrachan]; ECF No. 1253 at 41.  Rimini provides support for Oracle's PeopleSoft, JDE, EBS, Siebel, and Database products "in lawful competition with Oracle's direct maintenance services." *Oracle*, 879 F.3d at 952; *see also* Tr. 1055:8-22 [Catz]; Tr. 2133:6-2134:9 [Lanchak].

12.     Enterprise software typically involves multiple copies of the software program, which are called "environments," namely: (i) the "production environment," that is, the live, running software on the organization's systems that it uses day in and day out; (ii) a "development environment," that is, a separate copy of the program in which engineers develop an update or fix for a problem with the software; and (iii) a "testing environment," that is, an environment that engineers can use to test the update or fix to make sure that once placed in the production environment, the update or fix works and will not cause other problems with the software.  *See* Tr. 12:10-13:10 [Screven]; Tr. 303:22-305:2 [Frederiksen-Cross]; Tr. 781:13-782:5 [Benge]; *see also Oracle*, 879 F.3d at 955.

### a.     *License Agreements*

13.     It is undisputed that every Rimini client at issue in this case paid for and held an Oracle software license for one or more of the relevant products (D-2370; D-2370-A; D-12793; Tr. 200:25-201:11, 202:2-23 [Ravin]; Tr. 502:6-12 [Frederiksen-Cross]; D-237 at 6; Tr. 964:9-13 [Allison]; Tr. 2072:24-2073:13 [Lyskawa]), and Oracle presented no evidence that any client received any Oracle software or Oracle protected expression that the client was not entitled to possess and use under the client's license agreement (*cf.* Tr. 202:2-23, 215:18-216:9 [Ravin]; Tr. 1326:22-1327:8 [Conley]).

14.     In providing its support services, Rimini does not directly license software from Oracle, but rather, relies on the license agreements of Rimini's clients to stand in the licensees' "shoes." Tr. 1061:19-1062:4 [Catz]; *see also* Tr. 99:12-100:2, 202:2-23 [Ravin]; Tr. 2074:7-15 [Lyskawa]; D-237 at 6, ¶ 10.A; D-2370; D-2370-A; D-12793. There are over 1,000 client license agreements at issue in this case. *See* D-2370A. The terms of these licenses differ widely across product lines and even within product lines. D-2370A; Tr. 943:24-950:3 [Allison] (conceding in detail that there are many differing terms across license agreements, even for the same product lines); *see generally* Appendix to Rimini's Proposed Post-Trial Findings of Fact and Conclusions of Law ("License Appendix") at A1-20 (highlighting in detail relevant differences in produced license agreements within product lines). Despite Oracle seeking to enjoin Rimini pursuant to supposed limitations in the license agreements, and despite conceding that all clients have a license, Oracle failed to produce or introduce all of the license agreements actually at issue, instead using *other* clients' licenses as purported stand-ins for the clients with licenses that Oracle failed to produce. *See* D-2370; D-12793; D-2370A; License Appendix at A6-7, A18-20.

15.     The licenses fall into two basic categories: (1) "legacy licenses" for PeopleSoft, JDE, and Siebel, which were drafted by those software vendors before they were acquired by Oracle; and (2) Oracle-drafted license agreements, which themselves have evolved, known as the Software License and Services Agreement ("SLSA"), then the Oracle License and Services Agreement ("OLSA"), then the Oracle Master Agreement ("OMA"). *See* Tr. 943:24-947:18 [Allison]. *All* of the licenses provide clients the basic right to copy, modify, and use the software as necessary to support their own use, and to hire third parties to perform that work for them, with a contested set of certain restrictions. *E.g.*, Tr. 957:2-959:25, 963:13-964:8, 978:15-19 [Allison]; D-117 § 2.1 (example SLSA); D-124, Schedule P § 2.3 (example OMA); D-118 ¶¶ C-D (example OLSA); *see also* License Appendix at A1-20 (setting forth citations to legacy licenses by client). Some license restrictions are disputed in this case, despite the fact that the restrictions are not in all of the licenses. For example, as to PeopleSoft, the parties dispute the meaning of a "facilities" restriction, discussed *infra* Section II.B.2, but less than half of PeopleSoft license agreements at

Gibson, Dunn &
Crutcher LLP

issue in this case have been shown to include a "facilities" restriction. *See* License Appendix at A7-20. As to JDE, the parties dispute the meaning of certain restrictions related to third-party access to source code, but only approximately one-third of the JDE license agreements at issue in this case include a provision on that subject. *See id.* at A1-7.

### b. Oracle's and Rimini's Support Services

16. Both Oracle and Rimini enter into support contracts with licensees to provide support services. Tr. 14:5-15:12, 24:11-23 [Screven]; Tr. 164:21-165:13 [Ravin]; D-237 (example Rimini Master Services Agreement); D-10143 (example Rimini Statement of Work). While Oracle's and Rimini's support offerings share some similarities, they differ in key respects that impact the parties' claims in this case. *See* Tr. 14:5-15:23 [Screven]; Tr. 168:5-170:4, 171:6-172:24 [Ravin].

17. When a customer buys an Oracle support contract, the customer typically pays 22% of the amount they paid for their software license, on an annual, upfront basis. Tr. 23:8-24:5 [Screven]; Tr. 1000:15-24 [Allison], Tr. 1036:23-1037:4 [Catz]; *cf. Oracle*, 879 F.3d at 952. For example, if the customer paid $1 million for its software license, the customer's maintenance fee would be $220,000 every year. Tr. 23:8-24:5 [Screven]. That customer will have paid more for maintenance in 5 years than it did for the underlying perpetual license. *See id.*

18. When Oracle first releases a new version of a software program, that program is eligible for what Oracle calls Premier Support. Tr. 28:12-25 [Screven]; Tr. 1001:20-1002:10 [Allison]; D-278 at 1-2; D-2078 at 6; D-2077 at 6. Under Premier Support, a customer with an Oracle support contract is entitled to receive newly released versions of the software, as well as software support, including fixes, patches, and updates typically made available for download from Oracle's website. D-278 at 1-2. Those updates include tax, legal, and regulatory ("TLR") updates—in which, for example, payroll systems are updated to account for changes in laws and regulations (*e.g.*, changes to a state's withholding rates)—that are essential for customers to be in legal compliance. *See* D-278 at 2; Tr. 14:5-15:12 [Screven]; Tr. 780:4-11 [Benge]. The customer

Gibson, Dunn &
Crutcher LLP

1   can also contact Oracle's support organization to receive assistance with problems they are

2   experiencing.  D-278 at 2.

3       19.     Generally, after a program version has been available for five years, it will no

4   longer be eligible for Premier Support.  *See* Tr. 28:12-29:13 [Screven]; D-278 at 1; D-2077 at 6.

5   At this time, Oracle may offer what it calls "Extended Support" for the program.  Tr. 29:4-13

6   [Screven]; Tr. 1002:21-1003:3 [Allison].  Under Extended Support, a customer must pay an

7   additional fee on top of their annual support fee: typically a 10% upcharge for the first year and a

8   20% upcharge for the following years.  Tr. 29:14-22 [Screven]; Tr. 1003:4-19 [Allison].  Where

9   Extended Support is offered, Oracle continues to offer a nearly identical support package for the

10   program version.  Tr. 32:8-13 [Screven]; D-278 at 1-2; D-2077 at 6-7.  Extended Support typically

11   lasts for three years.  Tr. 29:11-13 [Screven]; Tr. 1001:24-1002:14 [Allison]; D-2078 at 6.

12       20.     After Extended Support expires, or if Oracle does not offer Extended Support, the

13   program moves into "Sustaining Support."  Tr. 29:23-30:12 [Screven]; Tr. 1003:20-1004:6

14   [Allison]; D-278 at 1-2; D-2077 at 7.  In Sustaining Support, Oracle no longer creates any new

15   TLR updates, fixes, security alerts, data fixes, critical patch updates, or upgrade scripts for the

16   program version, nor does it provide any certification with respect to new third-party

17   products/versions or even new Oracle products.  Tr. 34:3-35:5, 82:18-83:3 [Screven]; Tr. 1003:20-

18   1004:22 [Allison]; Tr. 1041:14-1042:1, 1062:12-19 [Catz]; Tr. 1576:15-1577:3, 1578:22-1579:8

19   [Jackson]; Tr. 2169:14-2170:15 [Lanchak]; Tr. 2202:22-2203:5 [Loftus]; D-278 at 1-2; D-2077 at

20   7; D-2078 at 7.  Sustaining Support costs the same as, or more, than Premier Support, even though

21   it includes far fewer services.  Tr. 30:5-7 [Screven] (testifying that customers paying Sustaining

22   and Premier Support pay the same); Tr. 1003:17-19 [Allison] (testifying that Sustaining Support

23   "is more expensive than Premier Support"); *see also* Tr. 2273:16-21 [Martin].

24       21.     Just as Oracle does for customers running software on Oracle's Premier or

25   Extended Support, Rimini provides updates and fixes, and clients can contact Rimini for help with

26   ongoing issues.  Tr. 86:11-14, 168:5-170:4, 171:6-172:24 [Ravin]; Tr. 1458:25-1460:11

27   [Mackereth].  But Rimini's base support package also includes other services that Oracle's does

28

Gibson, Dunn &
Crutcher LLP

not, including support for the client's customized code that has been integrated into the client's Oracle software (Tr. 169:12-20 [Ravin]; Tr. 1459:6-9 [Mackereth]; Tr. 1574:7-15 [Jackson]), performance tuning (Tr. 1459:15-20 [Mackereth]), interoperability support (Tr. 1459:21-1460:1 [Mackereth]), and installation and upgrade support (Tr. 172:6-20 [Ravin]; Tr. 1459:10-14, 1460:2-5 [Mackereth]). Further, unlike Oracle, Rimini does not have different support tiers with differing services and costs. Tr. 168:5-19 [Ravin]. When a client signs up for support from Rimini, Rimini guarantees that it will support the client's software—including providing ongoing updates and fixes—for at least the next 15 years. Tr. 168:5-19 [Ravin]. Thus, if a client's software is in Sustaining Support—where Oracle is no longer releasing any new updates and fixes—the client can terminate support with Oracle and hire Rimini to provide those services. Tr. 168:5-169:25 [Ravin]; Tr. 1064:7-19 [Catz]; Tr. 1513:17-1514:2 [Mackereth] (testifying that 80% of Rimini's Database clients would be in Sustaining Support with Oracle); Tr. 2074:16-2075:5, 2080:1-8 [Lyskawa] (testifying that between 70 and 90% of Rimini clients using Oracle software run versions that would be "on Sustaining Support"); *cf.* D-166 at 5 (Oracle presentation noting "end of life" products have "No new major releases, lack of perceived value for Support," which is "[a]ccelerating cancellation rates and moves to [third party support providers]").

22.     When a client signs a support contract with Rimini, they also get a primary support engineer with an average of 20+ years of experience that the client can contact and guaranteed response times as low as 10 minutes for critical issues. Tr. 168:20-169:3 [Ravin]; Tr. 1464:17-1465:1 [Mackereth]; *see* Tr. 1586:22-1588:11 [Jackson]. The clients' contracts with Rimini specifically authorize "Rimini to use the client's licensed software to provide support." Tr. 2073:14-2074:15; *see, e.g.* D-11904 at 4 ¶ 6(b). Rimini engineers remotely connect to clients' software environments on clients' systems to diagnose and address issues or provide bespoke software updates and fixes that account for the unique aspects and customizations of a particular client's software. Tr. 1462:24-1464:16 [Mackereth]; Tr. 305:3-9 [Frederiksen-Cross]; Tr. 169:12-20 [Ravin]; Tr. 1575:4-10 [Jackson]. This is in contrast to support from Oracle, which is not customized to individual customers, has significantly longer response times, and does not offer

1   primary support engineers as part of its standard service.  Tr. 173:25-174:13, 175:1-12 [Ravin];

2   Tr. 1574:7-23, 1586:22-1587:16 [Jackson]; Tr. 33:13-22 [Screven]; Tr. 2203:15-2204:12 [Loftus].

3       23.    For its clients running Oracle enterprise software, Rimini typically charges an

4   annual support fee that is around 50% of whatever the client was paying to Oracle for support.

5   Stipulated Facts ¶ 15; Tr. 191:8-192:14 [Ravin]; Tr. 1588:19-1589:3 [Jackson].  Thus, if a client

6   was paying $1 million a year to Oracle for support, the client would pay around $500,000 to

7   Rimini. Tr. 191:8-192:14 [Ravin].  Rimini's pricing is standard for a third-party software support

8   provider; reliable market reports show (and Oracle's economics expert agreed) that *all* third-party

9   support providers provide "at least 50 percent savings against current Oracle rates" for support.

10  Tr. 2533:13-2534:5 [Campbell]; *see also* Tr. 199:19-25 [Ravin] (Spinnaker "standard price is 62.5

11  percent off of Oracle … pricing").  Rimini similarly uses the same 50% pricing model when

12  servicing SAP software.  Tr. 190:23-191:7 [Ravin].

13      24.    Oracle's share of the revenues in the Oracle software support market is 95%, with

14  the other 5% spread among much smaller support companies, including Rimini.  *See* Tr. 146:10-

15  16 [Ravin]; Tr. 1736:1-4 [Pinto]; Tr. 2527:9-20 [Campbell].  For instance, in 2017, Oracle made

16  approximately $20 billion from its software support business (Tr. 24:20-23 [Screven]; Tr. 1056:22-

17  25 [Catz]), with a profit margin of around 95% (Tr. 24:24-25:4 [Screven] (over 90%); Tr. 192:15-

18  25 [Ravin] (testifying to 95% margin in Oracle securities filings)).  Rimini by contrast, generated

19  around $150 million in revenue in 2017 for support of the Oracle software products at issue.  *See*

20  P-4922 at 8, 22 (Rimini's SEC Form 10-K stating Rimini's revenue in 2017 was $212.6 million,

21  and that 72% ($153.1 million) was attributable to support of Oracle software).  Other competitors

22  in the space include Spinnaker Support LLC ("Spinnaker") (Tr. 199:15-20 [Ravin]; Tr. 1586:6-11

23  [Jackson]; Tr. 1745:15-1747:24 [Pinto]; Ransom Dep. 35:12-14), and Support Revolution (Tr.

24  1470:7-16 [Mackereth]; Tr. 1745:15-23 [Pinto]); but Rimini is Oracle's biggest competitor for

25  support contracts (*see* Tr. 146:10-16 [Ravin]).

26

27

28

RIMINI STREET AND SETH RAVIN'S POST-TRIAL PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW
CASE NO. 2:14-CV-01699-MMD-DJA

Gibson, Dunn &
Crutcher LLP

## 2.     The *Rimini I* Litigation

25.     Oracle filed a lawsuit against Rimini and Ravin in 2010 (*Rimini I*), alleging, among other things, copyright infringement, inducing breach of contract, intentional interference with economic relations, and violations of state and federal computer hacking statutes (*see Rimini I*, ECF No. 146).  Rimini and Ravin asserted numerous defenses, including, as relevant here, an express license defense.  *See Rimini I*, ECF No. 153 at 25; *Rimini I*, ECF No. 474 at 4-15.

26.     As to copyright infringement, Oracle accused the support processes Rimini used at the time to service its clients, referred to in this litigation as "Process 1.0" (*e.g.*, ECF No. 1253 at 79-80), of violating certain provisions of the Rimini clients' license agreements for PeopleSoft, JDE, Siebel, and Database products (*Rimini I*, ECF No. 146 ¶¶ 58-61, 72-77, 114).  EBS was not at issue in the *Rimini I* litigation.  *See* ECF No. 1452 at 6 n.4 (Oracle's trial brief) ("Oracle's EBS copyrights … were not at issue in *Rimini I*."); ECF No. 1253 at 3.

27.     Process 1.0 involved Rimini hosting and using generic Oracle software environments, *i.e.*, located on Rimini's own computer systems and not associated with any particular client, to develop and test software updates that were then delivered to clients to be placed in their production environments running on those clients' systems.  *Rimini I*, ECF No. 1548 at 25-26 ("At base, the underlying case [*Rimini I*] found that Rimini was using generic development environments to develop and create updates used to support multiple Rimini clients."); *Oracle*, 879 F.3d at 955-56; Tr. 790:1-791:17 [Benge]; *see also* Tr. 224:20-225:3 [Ravin].

28.     Oracle referred to hosting these generic environments on Rimini's systems as "local hosting" and the use of generic environments to develop and test updates for multiple clients containing Oracle code as "cross-use."  *Oracle*, 879 F.3d at 956, 959.

29.     The Court held on summary judgment in 2014 that local hosting violated some PeopleSoft license agreements, which limited use of the PeopleSoft software to the licensee's "facilities."  *Rimini I*, ECF No. 474 at 12-14, 18.  The Court also held that the use of generic environments not associated with a particular client to develop updates and fixes containing Oracle

Gibson, Dunn &
Crutcher LLP

1  code for multiple clients violated PeopleSoft license provisions limiting use of the software to the

2  licensee's "internal data processing operations." *Id.* at 12-13.  Moreover, the Court held that

3  certain Siebel and JDE license agreements did not allow for the use of generic environments to

4  develop updates and fixes for multiple clients at once. *See id.* at 19-24; *see also Oracle*, 879 F.3d

5  at 955.  And the Court held that Rimini could not use generic environments to develop Database

6  updates under the applicable Developer Agreement, and that Rimini could not invoke the OLSA

7  (which is less restrictive) because none of the Database versions were subject to the OLSA.  *See*

8  *Rimini I*, ECF No. 476 at 11-13.

9        30.    In 2012, before the Court's summary judgment rulings and trial in *Rimini I*, Rimini

10  began investing millions of dollars to fundamentally revise its support processes, the result of

11  which is Rimini's "Process 2.0." Tr. 89:20-90:17, 93:2-9, 134:23-135:12, 207:25-214:11, 219:4-

12  8 [Ravin]; *see also* Tr. 797:2-798:10 [Benge]; Tr. 2081:22-2082:7, 2085:1-2086:11 [Lyskawa].

13  Rimini filed this case ("*Rimini II*") in 2014 seeking to have Process 2.0 declared non-infringing.

14  *See* ECF No. 1 ¶¶ 26-28.

15       31.    *Rimini I*—which concerned only Process 1.0—went to trial in September 2015.

16  *Rimini I*, ECF No. 774.  Rimini tried to consolidate the two cases, but Oracle successfully opposed.

17  *Rimini I*, ECF No. 669 at 5.  At Oracle's request, all evidence of Process 2.0 was excluded from

18  the *Rimini I* trial.  *Rimini I*, ECF No. 723 at 3.

19       32.    The jury in *Rimini I* found Rimini liable for copyright infringement, but also found

20  that the infringement was "innocent," meaning that Rimini neither knew nor had any reason to

21  believe that its conduct was infringing.  *Rimini I*, ECF No. 896 at 6; *Rimini I*, ECF No. 880 at 43

22  (jury instruction).  The jury found that Ravin was not liable for copyright infringement under

23  Oracle's secondary liability theories.  *Rimini I*, ECF No. 896 at 2-3.  The jury also found both

24  Rimini and Ravin liable for violation of state computer hacking statutes.  *Id.* at 10-12.  The jury

25  awarded a $35.6 million fair market value license as a damages award to Oracle (*id.* at 4), as well

26  as approximately $14 million as a damages award for the state-law claims (*id.* at 10-12).  In post-

27

28

RIMINI STREET AND SETH RAVIN'S POST-TRIAL PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW
CASE NO. 2:14-CV-01699-MMD-DJA

Gibson, Dunn &
Crutcher LLP

trial proceedings, the Court granted Oracle's motion for a permanent injunction, prejudgment interest, attorney's fees, costs, and other litigation expenses. *Rimini I*, ECF No. 1049 at 22.

33.     On appeal, the Ninth Circuit partially affirmed the judgment on very specific grounds: that Rimini was liable for (i) locally hosting PeopleSoft environments (*Oracle*, 879 F.3d at 959-60 & n.6) and (ii) engaging in particular "cross-use" of JDE and Siebel software (*id.* at 954-57)—that is, "the creation of development environments, under color of a license of one customer, to support other customers" (*id.* at 956 (emphasis omitted)).  The court of appeals also held that the JDE and Siebel license "constructions" by the district court "would not preclude Rimini from creating development environments for a licensee for various purposes after that licensee has become a customer of Rimini." *Id.* at 958 (emphasis omitted).  As to Database, the Ninth Circuit affirmed liability on the procedural ground that Rimini had waived appellate challenge to the district court's finding that the OLSA did not apply to the particular version of Database at issue on summary judgment. *Id.* at 960.  The court of appeals fully reversed the state-law hacking verdict and damages award because Rimini and Ravin "indisputably had … authorization" to download the relevant materials (*id.* at 962-63); with the state-law hacking claims reversed, Ravin was exonerated of any liability in *Rimini I*.  Finally, the court of appeals vacated the permanent injunction and remanded after reversing the state law claims. *Id.* at 964-65.[3]

34.     As modified by the Ninth Circuit's judgment on appeal, the jury's special verdict findings are binding on the Court under the Seventh Amendment's Reexamination Clause, and the Court cannot draw inferences contrary to the jury's findings from the exhibits used in the *Rimini I* jury trial that Oracle has introduced in this case.  *See Gasoline Prods. Co. v. Champlin Refin. Co.*, 283 U.S. 494, 500 (1931); *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 961-62 (9th Cir. 2001); *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 750-51 (5th Cir. 1996) (Reexamination Clause bars not only inconsistent findings, but also putting same evidence before second factfinder that will inevitably reevaluate "the findings of a first jury").

---

[3] The Supreme Court subsequently reversed the Ninth Circuit's award of expert witness fees and other litigation expenses. *Rimini St., Inc. v. Oracle USA, Inc.*, 139 S. Ct. 873, 881 (2019).

12

RIMINI STREET AND SETH RAVIN'S POST-TRIAL PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW
CASE NO. 2:14-CV-01699-MMD-DJA

Gibson, Dunn & Crutcher LLP

35.     On remand, the Court re-entered a permanent injunction (*Rimini I*, ECF No. 1166), and on appeal, the Ninth Circuit struck two provisions as overbroad: the injunction wrongly "restrict[ed] 'local hosting' for the [JDE] and Siebel licenses" because the "licenses do not contain such a limitation"; and the injunction also wrongly prohibited "access[ing] [JDE and Siebel] source code" because "accessing" is not infringement under the Copyright Act (*Oracle USA, Inc. v. Rimini St., Inc.*, 783 F. App'x 707, 710-11 (9th Cir. 2019)).

**3.      Contempt Proceedings**

36.     Oracle moved to initiate contempt proceedings following the second appeal.  The Court rejected the vast majority of Oracle's accusations, holding that "the injunction does not enjoin conduct that has yet to be adjudicated unlawful" (*Rimini I*, ECF No. 1459 at 10), and that Rimini cannot be held "in contempt for conduct not yet adjudicated in *Rimini II*" (*id.* at 11).

37.     Although "Oracle argue[d] that every single update and modification of Oracle's software constitutes a derivative work," "[t]he Court disagree[d]," holding that "whether a particular stand-alone update or modification is a derivative work is a fact specific inquiry," on which the Court would "not make a blanket ruling." *Id.* at 23.

38.     The Court also rejected Oracle's new, expansive definition of "cross-use," declining to "make a blanket finding that whenever an update is built quicker for one client than another, that means that Rimini uses one client's environment under color of license for another client," and engages in "cross-use." *Id.* at 16.  Rather, it is "common sense that Rimini's engineers would get better and faster at [developing updates] with more experience." *Id.*  "It would be inapposite to find that simply because Rimini's developers are able to develop updates faster, with less testing, after they have built the update for another client, Rimini is violating the permanent injunction against cross-use." *Id.*

39.     The Court was also explicit that Rimini is allowed to re-use its work product with multiple clients (*id.* at 19), and to do less, or even no, testing of updates for subsequent clients as it moves through this process (*id.* at 26).  The Court held it was not "cross-use" for Rimini to test an update in one client's environment as a "test case for multiple customers." *Id.* at 19.  "[S]o long

Gibson, Dunn &
Crutcher LLP

as Rimini is testing the update in its client's individual environments, the testing itself (and necessarily, the copies made in the process of testing the update) is for the benefit of each individual client," whether or not the test will *also* benefit other clients. *Id.* Nor was it "cross-use" for Rimini to develop in a text editor a "'one size fits all' [update] file that could be used across multiple customers," and deliver that same file to multiple clients. *Rimini I*, ECF No. 1548 at 52 n.73.

40. The Court further emphasized that it was "neither the intention nor the purpose of the permanent injunction" to effect "a complete ban on Rimini support services," and held that the injunction could not be read to prohibit Rimini from distributing updates to clients. *Rimini I*, ECF No. 1459 at 26.

41. After rejecting the vast majority of Oracle's accusations outright, the Court held an evidentiary hearing on ten discrete issues, discharged the order to show cause as to five of them, found Rimini in contempt on the other five, and ordered Rimini to pay Oracle $630,000 while deferring ruling on an award of attorney's fees and costs. *See Rimini I*, ECF No. 1548 at 54-56; *Rimini I*, ECF No. 1552. Rimini's appeal of the contempt order and sanctions is pending before the Ninth Circuit. *See Oracle USA, Inc. v. Rimini St., Inc.*, Case No. 22-15188 (9th Cir.). The Ninth Circuit heard oral argument on February 6, 2023. *See id.*, ECF No. 57; *see also* https://www.ca9.uscourts.gov/media/video/?20230206/22-15188.

### 4. Process 2.0 and the *Rimini II* Litigation

42. After transitioning to Process 2.0, and before the *Rimini I* trial commenced, Rimini filed this lawsuit (*Rimini II*) seeking a declaratory judgment that Process 2.0 does not infringe Oracle's copyrights. Tr. 244:20-245:10 [Ravin]; *see* ECF No. 1 ¶¶ 26-28.

43. Unlike Process 1.0, under Process 2.0, Rimini no longer hosts Oracle software environments, let alone generic ones, on its computer systems. Tr. 212:9-214:11 [Ravin]; Tr. 795:12-796:7, 796:17-797:1 [Benge]; P-1261. Rather, under Process 2.0, each client's development and testing environments are hosted on the client's own systems that the client controls. Tr. 216:21-217:16 [Ravin]; Tr. 795:12-797:1 [Benge]. Thus, as part of "Rimini's support

Process 2.0" "Rimini remotely accesses the client's environments" using remote access.  *Rimini I*, ECF No. 1548 at 46; *see also* Tr. 305:3-9 [Frederiksen-Cross]; Tr. 795:21-797:1 [Benge].  Each client's environments are therefore completely "siloed" from other clients' environments (Tr. 794:13-795:11 [Benge]; *see also Rimini I*, ECF No. 1548 at 41), unlike with Process 1.0 (Tr. 790:1-791:17 [Benge]).

44.     Under Process 2.0, Rimini engineers gain knowledge and experience developing solutions for a client in that client's siloed environment, then leverage their know-how and Rimini-created work product to implement similar solutions for other clients in those clients' siloed environments.  Tr. 793:23-794:21, 807:1-811:7 [Benge]; Tr. 1471:10-1473:13 [Mackereth].  It is these and other aspects of Process 2.0 that Rimini seeks to have declared non-infringing in its declaratory judgment action.  Oracle, in turn, filed counterclaims alleging numerous causes of action against Rimini; Rimini amended and added additional claims against Oracle.

45.     Following a lengthy discovery period that lasted from April 2015 to March 2018 (*see* ECF Nos. 353, 364, 372), Oracle filed five motions for partial summary judgment, and Rimini filed two motions (ECF No. 1253 at 1).

46.     On September 14, 2020, the Court granted in part and denied in part Oracle's motions for summary judgment, setting the case for trial due to material issues of fact on a number of claims, including Rimini's declaratory judgment regarding Process 2.0 as to PeopleSoft, JDE, Siebel, EBS, and Database; Rimini's UCL claim against Oracle; and certain of Oracle's specific copyright infringement claims, as well as Oracle's claims under the DMCA, the Lanham Act, and the UCL.  *See* ECF No. 1253.

**B.     Rimini's Declaratory Judgment Claim Regarding Process 2.0**

47.     Process 2.0 was implemented, at least in part, in response to the Court's 2014 summary judgment order construing certain license agreements at issue in *Rimini I*.  Tr. 209:21-212:19 [Ravin]; Tr. 794:4-12 [Benge].  Initial work on certain aspects of Process 2.0 began in 2012.  Tr. 207:25-209:15 [Ravin].

48.     Under Process 2.0, Rimini develops, tests, and delivers tens of thousands of updates

1   and fixes to its clients every year.  *See* Tr. 170:12-22 [Ravin]; Tr. 782:22-24 [Benge]; Tr. 1462:18-

2   23 [Mackereth].

3       49.    The legality of Process 2.0 across all product lines is the central question of

4   Rimini's declaratory judgment claim, and, in addition to the above, Rimini has established the

5   following facts about Process 2.0:

6       **1.    Third-Party Copy Authorization**

7       50.    As discussed, each Rimini client at issue in this case has a license agreement with

8   Oracle for the respective enterprise software program(s) it uses, whether PeopleSoft, JDE, EBS,

9   Siebel, or Database.  D-2370A (Oracle interrogatory response identifying a license agreement for

10  all Rimini clients); Tr. 944:2-5, 963:13-964:13 [Allison]; *see* Tr. 502:6-12 [Frederiksen-Cross].

11  The licenses fall into two basic categories: (1) "legacy licenses" for PeopleSoft, JDE, and Siebel,

12  which were drafted by those companies before being acquired by Oracle; and (2) Oracle-drafted

13  license agreements which themselves have evolved, known as the SLSA, then the OLSA, then the

14  OMA.  *See* D-2370A; Tr. 943:24-947:18 [Allison].   All license agreements signed by Oracle

15  customers since 2005 have been the SLSA, the OLSA, or the OMA.  Tr. 947:9-948:8 [Allison].

16      51.    Oracle admits that *all* of the license agreements at issue here provide clients the

17  basic right to copy, modify, and use the software as necessary to support their own use, and to hire

18  third parties to perform that work for them.  Tr. 957:2-959:25 [Allison] (acknowledging that Oracle

19  licenses allow the licensee to use third parties to modify and provide updates to their software);

20  Tr. 963:13-964:8 [Allison] (acknowledging that all Oracle licenses at issue in this case give

21  licensees "the right to modify the software for their own business purposes" and "the right to use

22  third parties for support within the restrictions of the license agreements"); Tr. 1061:25-1062:4

23  [Catz] (Oracle's CEO Safra Catz testifying that under all the licenses Oracle issues, the customer

24  "could hire a consulting firm to stand in their shoes, customer's shoes, and do it instead of self-

25  support").

26      52.    During trial, Richard Allison—an Oracle executive in charge of licensing—

27  testified that certain Oracle-written license agreements only allow third parties to "use" the

28

Gibson, Dunn &
Crutcher LLP

software, which he asserted does not "encompass the right *to copy*." Tr. 933:9-18 [Allison] (emphasis added).

53.    The OMA and OLSA state:

> You [the licensee] have the non-exclusive, non-assignable, royalty free, perpetual (unless otherwise specified in the order), limited right to **use** the Programs and receive any Program-related Service Offerings You ordered solely for Your internal business operations and subject to the terms of the Master Agreement…. **You may allow Your agents and contractors (including, without limitation, outsourcers) to use the Programs** and deliverables for Your internal business operations and You are responsible for their compliance with the General Terms and this Schedule … in such use.

D-124 at 7 (emphases added); *see also* P-5567 at 1; Tr. 932:12-25 [Allison]. Mr. Allison further testified that he was not "aware of any express provision in the OLSA allowing third-party support providers like Rimini to make copies of EBS or Database software." Tr. 933:19-22 [Allison].

54.    On cross-examination, Mr. Allison admitted that the language in Oracle-written license agreements: (i) "does allow a third-party service provider to remotely access the … software on the customer's systems" "[f]or the purpose of … internal business operations" (Tr. 957:12-16 [Allison]; *see* D-124 (OMA)); (ii) "allow[s] the customer to use a third-party support provider to modify the software" (Tr. 958:4-7 [Allison] ("Modification -- you could say modification, yes.")); and (iii) permits the customer to "use a third-party support provider to do tax, legal, and regulatory updates for the customer" "for that customer for their internal business operation[s]" (Tr. 958:8-12 [Allison]). Mr. Allison also admitted that merely running Oracle software to create an update would create a copy of the software, and that "[y]ou wouldn't send [the update] out … until you tested it against the programs," which would "definitely" create a copy of the software. Tr. 959:10-25 [Allison]. Similarly, Oracle's technical expert Barbara Frederiksen-Cross testified repeatedly that when an Oracle software "environment is *used*" a copy of the software is necessarily created. Tr. 310:11-15 [Frederiksen-Cross] (emphasis added). In fact, merely "looking at" a software program "with [a] human eyeball as opposed to some programmatic means" "necessarily" creates at least "a RAM copy" "so that you can actually view [the program] with your eyes." Tr. 499:18-500:10 [Frederiksen-Cross].

Gibson, Dunn & Crutcher LLP

55.     In short, Oracle's witnesses admit that "use" of the software necessarily creates copies, and thus the authorization to "use" granted in the Oracle-written license agreements must encompass the authorization to copy.  Indeed, when Mr. Allison was presented with language in an *Oracle* 1006 summary asserting that "[n]one of the EBS licenses grant third parties rights to copy or modify EBS software or source code," he unequivocally stated that he *disagreed* with it. Tr. 999:11-1000:5 [Allison].   Moreover, the Court also notes that Oracle's argument is not supported by the language in the OMA and OLSA quoted above, or the SLSA, which gives *both* the licensee and its agents the same right to "use" the software, and does not explicitly reference a right to copy *with respect to either party*.  *See* D-124 at 7; D-4733 [Commercial Metal Company's Oracle SLSA] ¶ 2.1(A) ("Oracle grants to Customer a nonexclusive license to use the Programs… solely for Customer's operations … [and] to allow third parties to use the Programs for Customer's operations so long as Customer ensures that use of the Programs is in accordance with the terms of this Agreement.").

56.     There was also extensive evidence that it is necessary—and a widely accepted practice in the industry—for third-party support providers to copy Oracle software in the course of providing support.  *See*, *e.g.*, Tr. 2136:16-2137:25 [Lanchak] (Rimini industry expert Stephen Lanchak: "**Q.** Could Rimini Street provide tax, legal, and regulatory updates without modifying the JDE code?  **A.** Absolutely not.  **Q.** Could anyone in the industry provide tax, legal, and regulatory updates without modifying the JDE code?  **A.** No."); Tr. 2141:5-2144:13 [Lanchak] ("**Q.** And in your 18 years of working with Oracle software, did Oracle ever take the position that it would be unlawful for a third party to modify and copy JDE code using these Oracle provided tools?  **A.** Not a one.  **Q.** And is it the first time, in this litigation, that you've heard Oracle take that position?  **A.** This is the first time I've heard it, yes."); Tr. 1470:7-1471:9 [Mackereth] (other support providers modify code in the process of providing EBS support).  Oracle did not present any evidence to rebut that such copying is common among third-party support providers—to the contrary, Mr. Allison admitted that third-party consultants modify (and thus copy) Oracle software. Tr. 999:11-1000:5 [Allison].  And as discussed *infra* ¶¶ 87-88, Oracle specifically approved of

RIMINI STREET AND SETH RAVIN'S POST-TRIAL PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW
CASE NO. 2:14-CV-01699-MMD-DJA

Gibson, Dunn &
Crutcher LLP

1  Spinnaker and Cedar Crestone's support practices, which involved modifying (and thus copying)

2  Oracle code.

### 2.    Remote Access and Copying of Code in Client Environments

4  57.    Whereas under Process 1.0, Rimini hosted PeopleSoft development and test

5  environments on its own computer systems for its PeopleSoft clients (Tr. 790:1-12 [Benge];

6  *Oracle*, 879 F.3d at 955-56), under Process 2.0, all client environments are stored on the clients'

7  own systems, and not Rimini's systems (Tr. 89:25-90:9, 209:21-210:12 [Ravin]; Tr. 632:23-633:3

8  [Jacob]; Tr. 794:22-795:11 [Benge]).  As discussed in more detail *infra* Section II.C.1, Rimini

9  migrated all environments off of its systems, moving them to a location of the client's choosing.

10  Tr. 2080:17-2082:16, 2085:12-15 [Lyskawa].

11  58.    The presence of Oracle materials on Rimini's system implicates the "facilities"

12  restriction in certain PeopleSoft license agreements, which is not present in the license agreements

13  for other product lines.  Less than half of the PeopleSoft licenses at issue in this case contain a

14  "facilities" restriction.  *See* License Appendix at A7-20.  Indeed, the Court already found on

15  summary judgment that "[t]he 'facilities' limitation is restricted to just these legacy PeopleSoft

16  licenses, as both newer PeopleSoft licenses and licenses for other software do not contain the

17  restrictive 'facilities' language." ECF No. 1253 at 89.  When Oracle began writing its own license

18  agreements in 2005, it chose *not* to incorporate a "facilities" restriction.  *See* Tr. 966:13-15

19  [Allison] (OLSA does not contain "facilities" restriction); D-118; D-124; *e.g.*, Tr. 956:23-957:1

20  [Allison] (discussing D-124, which has no "facilities" restriction).

21  59.    After transitioning to Process 2.0, Rimini prohibited the presence of all Oracle

22  software on Rimini's systems pursuant to its Acceptable Use Policy, or "AUP."  *See*, *e.g.*, D-12 at

23  8-9, 21; Tr. 238:4-240:5 [Ravin]; Tr. 797:7-11 [Benge]; Tr. 1330:19-21 [Conley]; Tr. 1490:8-13,

24  1491:21-1494:7 [Mackereth]; Tr. 2122:21-23 [Davenport].  In addition to migrating environments,

25  Rimini undertook efforts to render inaccessible any individual Oracle files that were on its systems

26  during Process 1.0.  Tr. 797:12-798:20 [Benge].  And Rimini's AUP prohibits its employees from

27  storing Oracle's software, files, code, or any other intellectual property on its systems.  D-12 at

28

Gibson, Dunn &
Crutcher LLP

21; Tr. 238:4-240:5 [Ravin].  Employees and contractors are trained and tested on the AUP annually, and they must certify that they read, understood, and agreed with the AUP.  Tr. 240:6-242:3 [Ravin]; Tr. 1494:17-1496:3 [Mackereth]; D-12758.  The Court notes that Rimini's AUP applies to *all* Oracle software, while the "facilities" restriction issue, as noted, is limited to only certain PeopleSoft licenses.  Rimini's policy is thus broader than required by the Court's summary judgment order on the "facilities" restriction, and instances where the policy was not followed outside of the PeopleSoft context do not relate to any "facilities" restriction violation.

60.   Rimini provides repeated instructions and reminders to its clients not to send any Oracle software or other intellectual property to Rimini, even screenshots of code, although a limited number of clients have sometimes failed to comply.  *See* Tr. 1499:8-1502:9, 1504:8-1505:7 [Mackereth]; D-2280; D-2066 at 28.  There is no dispute that Rimini is allowed to see, access, and use such materials in the course of providing support to the client to which the materials belong, but Rimini does not need these materials on its own servers—as opposed to clients' servers that Rimini remotely connects to—to perform its work.  Tr. 1506:9-21 [Mackereth].  Accordingly, Rimini provides warnings and reminders to clients, and when clients do not follow them, Rimini instructs its engineers to report the material to Rimini's security team so it can be quarantined.  Tr. 1506:22-1507:5 [Mackereth].  Rimini has also introduced technical measures that prevent such material from reaching Rimini's computers, as well as auditing methods that seek to find potential Oracle software files on Rimini's computers so that they can be quarantined.  Tr. 1507:6-1509:9 [Mackereth].[4]

61.   There was no evidence presented by Oracle at trial that, in the limited instances where clients did not heed Rimini's instructions and sent Rimini Oracle files, the policy was not followed.  Although Oracle's technical expert Ms. Frederiksen-Cross testified that she identified 75,000 files on Rimini's systems with Oracle copyright notices, she acknowledged that Rimini had "lots of Oracle files on its systems" *prior* to the transition to Process 2.0, and that Rimini

---

[4] Because litigation with Oracle remains pending, files are quarantined rather than deleted.  *See* Tr. 797:21-799:14 [Benge]; *see also* Tr. 1506:22-1507:5 [Mackereth].

RIMINI STREET AND SETH RAVIN'S POST-TRIAL PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW
CASE NO. 2:14-CV-01699-MMD-DJA

Gibson, Dunn &
Crutcher LLP

"attempted to archive all of that software that was on its systems that it wasn't allowed to delete because of the litigation." Tr. 604:15-605:12 [Frederiksen-Cross]. She also acknowledged that files within the 75,000 were "archived"—meaning stored for purposes of a litigation hold, but inaccessible to ordinary Rimini employees—but she did not analyze how many, and she did not dispute that "many, if not the vast majority of those 75,000 files … were archived." Tr. 605:13-606:16 [Frederiksen-Cross]. Moreover, other than a specific subset of 185 files, Ms. Frederiksen-Cross offered no opinion that any of these files were "ever accessed or used in any way." Tr. 606:17-607:8 [Frederiksen-Cross]. And even with respect to those 185 files, Ms. Frederiksen-Cross did not analyze whether they were archived, and she had no opinion that they were ever accessed or used other than when they were initially placed on Rimini's servers. Tr. 607:9-608:17 [Frederiksen-Cross]. By contrast, Rimini presented testimony that when Oracle files were discovered on Rimini's systems, Rimini developers did not use them. Tr. 798:21-799:14 [Benge]. Further, Oracle presented no evidence that any particular file placed on Rimini's servers was a PeopleSoft file associated with a specific client that had a "facilities" restriction in its PeopleSoft license. Indeed, some of the files Ms. Frederiksen-Cross discussed were EBS files (*see* Tr. 327:7-335:24 [Frederiksen-Cross]), but EBS is subject to Oracle-written license agreements that, as noted, do not contain "facilities" restrictions (Tr. 966:13-15, 956:23-957:1 [Allison]; *see also* ECF No. 1253 at 89).

62.     While Ms. Frederiksen-Cross also testified regarding the creation of PeopleSoft environments on Rimini's systems, she acknowledged that this occurred *before* the transition to Process 2.0, and that these environments were migrated back to clients during the transition. Tr. 601:22-603:15 [Frederiksen-Cross]. Ms. Frederiksen-Cross also did not do any analysis linking any of these environments (or any other environments created on Rimini's servers) to any "facilities" restriction in an Oracle license. Tr. 603:18-604:14 [Frederiksen-Cross]. Oracle's technical expert Christian Hicks further testified that he "saw no evidence that Rimini ever hosted local environments on its systems after July 2014." Tr. 1399:7-23 [Hicks].

Gibson, Dunn &
Crutcher LLP

63.     Oracle also contends that Rimini's provision of support to clients that have hosted their PeopleSoft software in a cloud service provided by Windstream (later known as Tierpoint) violates the "facilities" restriction.  During the migration, a small number of Rimini's clients—around 20 in total (P-9008)—originally chose to host their environments in those clients' cloud accounts at Windstream.  *See* Tr. 216:21-217:16 [Ravin]; Tr. 660:20-23, 731:17-22 [Benge].  Oracle contends that clients' Windstream cloud accounts did not constitute those clients' own "facilities" within the meaning of their PeopleSoft license agreements.  The Court rejects Oracle's argument and finds that these cloud accounts do constitute the clients' facilities.

64.     As the Court has previously held, "the concept of control is vital to a determination of what constitutes the licensee'[s] facilities."  ECF No. 1253 at 90.  Rimini presented evidence that these cloud accounts belonged to, and were controlled by, the clients that contracted for them.  *See* Waide Dep. 37:12-20 (representative for Windstream/Tierpoint testifying that the Windstream cloud account "belongs to the client who purchased it" and TierPoint "consider[s] that cloud account part of the client's computing resources"); Tr. 2377:6-2378:1 [Astrachan]; Tr. 2164:5-2166:2 [Lanchak].  The evidence was substantial that clients (not Rimini) entered into the contracts with Windstream, clients (not Rimini or Windstream) chose who could access their software stored at Windstream and what access rights they would have, and clients (not Rimini) could choose to stop using Windstream:

- Windstream's contracts with clients stated that the client controlled who would access their accounts, and that Windstream "exercises no control whatsoever over" what clients store in their accounts, D-258 at 9, ¶ 3(a), 3(b); Waide Dep. 33:21-35:4;

- Windstream representative Denny Heaberlin testified that the client "ultimately decides who has access to the environments," that Windstream does not make that call, and that clients are the ones that get the invoices, pay them, and can make the decision to terminate services, Heaberlin Dep. 65:23-66:2, 67:22-68:3, 69:7-15;[5]

---

[5] Oracle elicited some testimony indicating that Rimini offered a temporary discount on support fees for clients that used Windstream.  But in reality, Rimini offered temporary reimbursement to clients affected by the 2014 migration (and the unexpected costs it imposed on clients) regardless

22

- Rimini's PeopleSoft development manager Jim Benge testified that clients "control the access" and "remain in control of the environment," Tr. 796:17-797:1 [Benge];

- Rimini's executive in charge of onboarding Nancy Lyskawa testified that clients had "access and direct control with Windstream" and could "choose who else could access their software stored on Windstream," Tr. 2087:9-21 [Lyskawa];

- Rimini's head of support delivery Craig Mackereth testified that clients have control of their cloud accounts "[i]n every meaningful way"; "They have complete control of the administration of the access, the control of the access, they can bring environments up, they can shut them down. They can grant access to third parties such as Rimini Street, and they can turn those off at any time," Tr. 1489:19-1490:7 [Mackereth].

*See also* ECF No. 606 at 1 (holding that "Rimini does not have control over (nor possession or custody of) its clients' software environments and archives").

65.     Oracle did not present any evidence to dispute these facts.  While Oracle elicited testimony that Rimini had "continuous access" to Windstream-hosted environments, it was undisputed that Rimini had this level of access because clients chose to give it to Rimini so that Rimini could support their software.  *See, e.g.*, Tr. 115:2-9, 216:21-217:16 [Ravin]; Tr. 1489:19-1490:7 [Mackereth].

66.     Oracle also elicited testimony that Windstream environments were easier to access for Rimini engineers than non-Windstream hosted environments.  *See, e.g.*, Tr. 727:10-728:17 [Benge]; Tr. 1153:14-1154:15 [Tahtaras].  But this does not establish that a client does not control its Windstream environment.  Further, the evidence showed that Windstream environments could be easier to access than some other environments because the Windstream environments used a connection protocol called Remote Desktop Protocol ("RDP"), which was relatively easy to use. Tr. 1348:8-1349:10 [Conley].  But there are also non-Windstream environments that use RDP.  Tr. 1349:1-10 [Conley].    In short, this issue is not specific to Windstream or cloud-hosted

---

of whether the client elected to store their environments on cloud servers or servers in buildings owned by the client.  Tr. 2085:4-2086:11 [Lyskawa].

Gibson, Dunn &
Crutcher LLP

environments, and does not have any bearing on whether Windstream cloud accounts are a client's facilities.

67.     The Court also notes that Rimini's technical expert Professor Owen Astrachan and industry expert Stephen Lanchak offered testimony about clients' control over cloud accounts (Tr. 2377:6-2378:1 [Astrachan]; *see* Tr. 2164:5-2166:2 [Lanchak]), and Oracle's technical expert Ms. Frederiksen-Cross did not rebut those opinions or otherwise opine that clients do not have control of the accounts.

68.     Finally, the Court notes that there was substantial evidence that Oracle encourages its licensees, including licensees of PeopleSoft, to store their software in the cloud, and has never publicly claimed that cloud usage could violate a "facilities" restriction.   Tr. 973:10-975:18 [Allison]; Tr. 1089:9-1090:14 [Catz]; D-138 at 1 ("Customers may use their existing Oracle licenses on Amazon [Elastic Compute Cloud] at no additional license cost, or they may acquire new licenses from Oracle.").   The evidence also showed that, outside the context of this litigation, Oracle has never found a licensee to be not in compliance with a "facilities" restriction "based solely on the location of where that licensee is hosting its software."   Koop Dep. 19:25-20:2, 103:17-103:21, 104:5-8; *see also* Tr. 976:8-12 [Allison] ("**Q.** Other than in this case against Rimini, has Oracle ever taken the position that these -- that customers with these old PeopleSoft agreements cannot put their PeopleSoft software on the cloud?  **A.** I'm not aware of other cases, no."); Ellison Dep. 92:1-92:4.

### 3.     Siloed, Client-Specific (Non-Generic) Environments

69.     Whereas, under Process 1.0, some testing and development environments on Rimini's computer systems were "generic"—that is, they were not associated with any particular client and were used to develop and test updates for multiple clients (Tr. 224:20-225:3 [Ravin]; Tr. 790:1-791:17 [Benge]; *Oracle*, 879 F.3d at 955-56)—under Process 2.0, each client has its own environments that are "siloed" on that client's system (Tr. 216:21-217:16 [Ravin]; Tr. 689:6-16, 794:22-796:1 [Benge]).   Under Process 2.0, Rimini does not have or use generic environments. *See* Tr. 224:20-225:8 [Ravin]; *see also* Tr. 502:13-17 [Frederiksen-Cross] ("**Q.** And you also don't

RIMINI STREET AND SETH RAVIN'S POST-TRIAL PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW
CASE NO. 2:14-CV-01699-MMD-DJA

Gibson, Dunn &
Crutcher LLP

1    dispute that each client had its own EBS software environments, correct?  **A.** When the software

2    had been installed in a client environment, that would be its own environment. I don't dispute

3    that."). And Rimini's AUP prohibits the use of one client's software to support another. *See* Tr.

4    1490:14-1491:20 [Mackereth]; D-12 at 6-8.

5         70.     Rimini's base support services contract includes a number of different components.

6    Tr. 1458:13-1460:11 [Mackereth].  At trial, the evidence focused on Rimini's break/fix support

7    and its TLR update support. Only the PeopleSoft, EBS, and JDE product lines require TLR

8    updates.  *See*  Tr. 1468:20-1469:1, 1469:19-23 [Mackereth].  Oracle did not present any

9    infringement theories with respect to the other elements of Rimini's offering, such as performance

10   tuning or interoperability support.

11        71.     As the head of Rimini's support delivery team Craig Mackereth explained,

12   break/fix support involves instances where "a client has a problem with their system, they think

13   it's broken, they'll come to us and we will provide a solution or a fix for that issue."  Tr. 1459:3-

14   5 [Mackereth].  By contrast, TLR update support is necessary because "in order for the clients to

15   continue to use their enterprise systems they need to be compliant with changing government

16   regulations, and so Rimini Street proactively provides tax, legal, and regulatory updates, and we

17   provide support if they have any issues with those."  Tr. 1460:6-11 [Mackereth]; *see also* Tr.

18   2170:2-15 [Lanchak].  Mr. Mackereth's support team spends "around five percent" of its time on

19   TLR update related work, and the other 95% on break/fix and other support services.  Tr. 1460:12-

20   22 [Mackereth].  And Rimini handles around 30,000 break/fix cases per year.  Tr. 1462:18-23

21   [Mackereth].  Break/fix work may require, and TLR update work does require, Rimini engineers

22   to remotely connect to clients' siloed software environments.

23        72.     **Break/Fix:**  A break/fix issue begins with Rimini receiving notice from a client of

24   a problem.  Depending on the nature of the issue, a Rimini engineer may be able to solve it over

25   the phone, or it may be necessary for Rimini to connect to the client's environments.  Tr. 1462:24-

26   1464:16 [Mackereth].  Rimini engineers use their knowledge and experience to identify the

27   problem and resolve it.  *Id.*; *see also* Tr. 1465:2-1467:18 [Mackereth] (discussing D-2280 as an

28

Gibson, Dunn &
Crutcher LLP

example of a typical break/fix case).  Rimini presented evidence that while multiple Rimini clients sometimes have the same problem, the fix will necessarily be tailored to each client's specific software.  Tr. 1467:19-1468:11 [Mackereth].  Rimini does not use one client's remote, siloed environment to provide break/fix support to another client.  Tr. 1468:12-19 [Mackereth].

73.     At trial, Oracle largely did not dispute any of this evidence.  Oracle's expert Ms. Frederiksen-Cross testified in her direct examination regarding two instances in which she asserted Rimini had used one client's environment to "troubleshoot" a problem that was affecting a different client, which she labeled as "cross-use."  *See* Tr. 432:5-438:2 [Frederiksen-Cross] (discussing P-2307 and P-2308).  But during cross-examination, Ms. Frederiksen-Cross testified that in a situation where multiple clients have the same issue, Rimini is permitted to "choose whichever environment they start work in."  Tr. 592:16-25 [Frederiksen-Cross].  And she acknowledged that if Client A has reported an issue with a file, and Client B has the same file, it is permissible for Rimini to investigate that issue in Client B's environment.  Tr. 594:1-594:10 [Frederiksen-Cross].  The evidence was undisputed that this is precisely what occurred in the examples of purported "cross-use" troubleshooting Oracle presented at trial: a client reported an issue with a Rimini-delivered file, which multiple clients had, and Rimini proactively investigated whether that issue was occurring in another client's environment because it knew the issue was likely to be replicated across all clients that had the file.  *See* Tr. 1346:17-1348:7 [Conley] (Rimini developer Tim Conley testifying that file discussed in P-2308 was Rimini-written file rsi810st, which was a "binary equal file across all … clients" and thus "if they have a problem with that program … you would expect that all clients would have that same problem"); P-2307 (also discussing rsi810st); *see also* Tr. 1289:2-1292:25 [Conley].

74.     **TLR Updates:**  In their contracts with Rimini, clients sign up for TLR updates by geography—for example, a client may contract for all federal US tax changes.  Tr. 786:2-14 [Benge].  Rimini has a team that proactively monitors tax, legal, and regulatory changes that could impact clients' software and identifies when updates are required.  Tr. 784:9-785:5 [Benge].  Rimini then creates the update for the clients contracted to receive it.  At a high level, Rimini does

Gibson, Dunn &
Crutcher LLP

this by remotely connecting to the clients' environments and performing the development and testing work necessary to implement the changes.  Tr. 1471:13-1472:22 [Mackereth] (explaining process for EBS); Tr. 786:15-788:2 [Benge] (explaining process for PeopleSoft); Tr. 631:2-633:3 [Jacob] (explaining process for JDE).  Where Rimini has multiple clients contracted to receive the same changes, Rimini separately logs into each client's environment to perform the necessary work.  Tr. 2341:12-2342:11 [Astrachan].

75.     Oracle contends that during the process of providing updates to clients, Rimini makes Random Access Memory ("RAM") copies of Oracle copyrighted material.  Oracle further contends that in the course of providing updates, Rimini has "cross-used" these RAM copies.

76.     Whenever one of Oracle's programs is *run*, a copy of at least some portion of the program is made in the RAM of the computer on which the program is running.  Tr. 305:10-306:18 [Frederiksen-Cross]; Tr. 2317:4-2318:6 [Astrachan].  This is called a "RAM" copy.  Tr. 305:10-306:18 [Frederiksen-Cross]; Tr. 2317:4-2318:6 [Astrachan].  As Oracle admits, software cannot be accessed, used, updated, modified, compiled, run, tested, moved, or even viewed without creating RAM copies of the software.  *See* Tr. 305:10-306:18, 310:11-311:4, 499:18-500:10 [Frederiksen-Cross]; *see also* Tr. 2135:8-20 [Lanchak]; Tr. 2317:4-2318:6 [Astrachan].

77.     RAM copies are ephemeral, generally existing for only a very brief period of time, sometimes only seconds.  *See* Tr. 310:1-10 [Frederiksen-Cross]; Tr. 1389:15-1390:4 [Hicks]; Tr. 2317:4-2318:6 [Astrachan].  RAM copies are an inherent feature of all software programs running in conjunction with a computer.  Tr. 499:18-500:10 [Frederiksen-Cross]; Tr. 2317:4-2318:6 [Astrachan]; Tr. 2135:8-20 [Lanchak].  That is, they are necessarily created in conjunction with running the computer and are an essential step to running the software program with the hardware or machine on which the software is running.  Tr. 499:18-500:10 [Frederiksen-Cross]; Tr. 2317:4-2318:6 [Astrachan]; Tr. 2135:8-20 [Lanchak].  Rimini engineers do not do anything with the RAM copies that are unavoidably created in the process of providing support—the RAM copies remain (briefly and temporarily) in the client's environment where they are created and are never shared between clients.  Tr. 2318:7-18 [Astrachan]; Tr. 911:21-912:11 [Benge] ("**Q.** Do you make RAM

27

Gibson, Dunn &
Crutcher LLP

copies of Client A's software while modifying Client A's files?  **A.** Yes.  **Q.** In which environment do those RAM copies exist?  **A.** Client A.  **Q.** For whose support are those RAM copies?  **A.** Client A.  **Q.** Do the RAM copies go anywhere else?  **A.** No.").

78.    The Court rejects Oracle's RAM copy "cross-use" theory.  As discussed more fully below, under Process 2.0, all copies created in a particular client's environment are for the internal business use of that particular client.  *See* Tr. 2310:20-2311:7, 2318:7-18 [Astrachan]; Tr. 911:21-912:11 [Benge].

### 4.    Re-Use of Rimini's Knowledge and Work Product

79.    Like other third-party providers of support for enterprise software, Rimini, in supporting its clients, uses its own know-how, code, documentation, and other work product.  Tr. 807:19-809:15, 844:9-22 [Benge]; Tr. 2148:5-2151:8, 2152:25-2153:16 [Lanchak].

80.    Rimini has many clients.  Tr. 162:9-20 [Ravin].  Sometimes, a group of these clients will need the same update—for example, if the minimum wage increases in Nevada, all clients that use their PeopleSoft software to run payroll in Nevada will need an update that implements that change.  *See* Tr. 785:6-786:14 [Benge]; Tr. 1471:10-25 [Mackereth].  In such situations, a Rimini engineer may develop and test the update for an initial client—Client A—in Client A's environment, and then use the knowledge and/or Rimini-written code that engineer developed while working on Client A's software to implement and test the update for Client B in Client B's environment.    Tr.  807:5-810:9  [Benge];  Tr.  1472:1-1473:7  [Mackereth];  Tr.  2099:2-9 [Davenport].  The actual implementations of the update for Client A and Client B, while they may be similar in some respects, are often different due to software customizations that the clients may have.  Tr. 809:16-810:9 [Benge].  Rimini's re-use of its know-how and/or code can take numerous forms.

81.    First, in its simplest form, an engineer may simply memorize or recall some particular fix, update, or method that the engineer used for Client A, and apply that knowledge when working for Client B.  Tr. 1472:23-1473:7, 1478:11-17 [Mackereth].  As the Court has found, it is "common sense that Rimini's engineers would get better and faster" at performing the

same update for subsequent clients, and it is not "cross-use" for Rimini developers to be "able to develop updates faster, with less testing, after they have built the update for another client." *Rimini I*, ECF No. 1459 at 16; *see also id.* at 26 (Rimini need not test an update at all where "it had previously been tested and worked for other clients before distribution").  Oracle does not dispute that it is permissible for a Rimini engineer to perform work for Client A, memorize that work, and then replicate the same work for Client B.  Tr. 524:16-525:17 [Frederiksen-Cross] ("It could appear here that the Court certainly recognizes that a programmer is able to use the know-how that they have of a solution"); Tr. 562:22-563:5 [Frederiksen-Cross]; Tr. 978:20-979:6 [Allison]; Tr. 1213:2-1214:10 [Cauthen]; Tr. 1410:3-24 [Hicks].  Relatedly, Oracle agrees that a Rimini engineer may share the knowledge gained working for Client A with another Rimini engineer, who can then use that knowledge to address the issue for Client B.  Tr. 979:2-11 [Allison] (internal business processing provision in Oracle licenses does not prohibit one Rimini engineer from sharing know-how gained in one client's environment with another Rimini engineer).

82.     Second, when implementing updates for clients, Rimini creates "technical specifications" that memorialize the steps that are required to create the update.  Tr. 632:5-19 [Jacob]; Tr. 786:15-22 [Benge]; Tr. 1473:18-1474:8 [Mackereth].  Technical specifications are commonly used in software support and taught in college computer science courses.  Tr. 641:17-642:11 [Jacob]; Tr. 2149:16-2150:3 [Lanchak] (technical specifications are a "standard and accepted practice").  Typically, where Rimini needs to implement a similar update for multiple clients (for example, a tax rate change for all of its clients) or needs to memorialize the history of an update for only one client, Rimini will create a technical specification that documents the steps required to effectuate the update within each client's environment.  Tr. 642:12-17 [Jacob]; Tr. 786:15-787:5 [Benge]; Tr. 1473:18-1474:8 [Mackereth].  Rimini engineers can then use the technical specification to guide their work on the update for multiple clients.  Tr. 642:12-17 [Jacob]; Tr. 786:23-787:18 [Benge]; *see* Tr. 844:9-845:21 [Benge] (discussing D-2349).  Rimini also may create technical specifications where a solution is going to only one client.  Tr. 641:2-16 [Jacob].  These documents may contain code written by Rimini as part of the update.  Tr. 800:9-

Gibson, Dunn &
Crutcher LLP

21 [Benge]; Tr. 653:16-654:23 [Jacob]; Tr. 2326:5-12 [Astrachan].

83.     Per Rimini's policies, technical specifications *cannot* contain any Oracle code or expression. Tr. 800:22-801:2 [Benge]; Tr. 1477:25-1478:7 [Mackereth].  Under Rimini's policies, these documents contain Rimini's own creative expression regarding how to solve technical software-related problems and updates, and contain no Oracle protected expression, whether literal or nonliteral.  Tr. 801:3-8 [Benge] (technical specifications "don't contain any Oracle IP" and are "[Rimini's] work product, [Rimini's] knowledge, something that [Rimini] wrote"); Tr. 2326:5-2327:10, 2328:6-2330:1 [Astrachan]; *see also*, *e.g.*, Tr. 653:16-654:23 [Jacob] (testifying there is no Oracle code in P-6349.17327); Tr. 558:21-562:21 [Frederiksen-Cross] (admitting that she had no opinion that the code in P-6349.17327 was Oracle code); Tr. 1474:24-1476:19 [Mackereth] (testifying there is no Oracle code in P-6349.26774 and P-6349.15781).  Oracle did not identify at trial any Rimini technical specification written after the change to Process 2.0 that contained non–*de minimis* Oracle code.  *See infra* Sections II.B.6, II.C.2.d; *cf.* Tr. 1476:20-1478:7 [Mackereth] (testifying that EBS technical specification created in 2013 *before Process 2.0* that allegedly contained Oracle code would not be consistent with Rimini's policies under Process 2.0).  As explained in more detail *infra* Sections III.A.1, III.A.4, the Court rejects Oracle's argument at trial that Oracle's license agreements, or the Court's prior orders, prevent Rimini from documenting its own know-how and code in technical specifications used with multiple clients.

84.     Third, under Process 2.0, Rimini engineers draft Rimini-written code files, which contain no Oracle-written expression, whether literal or nonliteral.  Tr. 1479:4-22 [Mackereth]; *see*, *e.g.*, Tr. 649:21-652:21 [Jacob].  This Rimini-written code can be shared with multiple clients as necessary to support those clients.  Tr. 1479:4-22 [Mackereth].  As discussed in more detail *infra* Sections III.A.1, III.A.4, the Court rejects Oracle's argument that Oracle's license agreements or the Court's prior orders prevent Rimini from creating and re-using its own work product that does not contain protected Oracle expression.

85.     Oracle elicited testimony that some Rimini-written files include instructions known as "#include" lines. Tr. 319:3-321:23 [Frederiksen-Cross].  Such #include lines are not specific to

30

Oracle software, and are ubiquitous in software written in certain languages. Tr. 2366:18-2367:12 [Astrachan]. A #include consists of a single line of code that reads, for example: "#include xyz.sqc." Tr. 496:18-498:6 [Frederiksen-Cross]; Tr. 2364:20-2365:13 [Astrachan]. In this example, "xyz.sqc" is a file that already exists in the client's environment. Tr. 2364:20-2365:13 [Astrachan]. The #include line is an instruction to include the xyz.sqc file *when the Rimini file is run within the client's environment*. Tr. 2365:14-2366:12 [Astrachan]. Before the file is run, it does not include the contents of xyz.sqc—all that is included in the file at that point is the line that reads: "#include xyz.sqc." Tr. 2365:14-2366:12 [Astrachan]. Oracle claims that when a Rimini file references a pre-existing Oracle file via a "#include" line, the Rimini file "substantially incorporate[s] Oracle protected expression" into the Rimini file. Tr. 321:20-23 [Frederiksen-Cross]. But Ms. Frederiksen-Cross admitted that this incorporation happens in the client's environment—she had no opinions that Rimini has ever run a Rimini-written "file with a pound-include that resulted in any incorporation of Oracle code into Rimini's file, … on Rimini's systems" as part of Process 2.0. Tr. 498:7-499:17 [Frederiksen-Cross]. Thus, even where Rimini's work product includes a "#include" line referencing an Oracle file, transferring that work product between clients does not transfer any Oracle expression between the clients—any Oracle expression incorporated into the file by virtue of the #include is incorporated *only* on the client's environment, for that client, when the file is run. Tr. 2365:11-2366:12 [Astrachan].

86.     Even where Rimini's engineers re-use the knowledge or work product they created while supporting Client A to support Client B, the evidence shows that those engineers still perform additional development and testing to reimplement (or "retrofit") that work for Client B. Tr. 836:13-837:15, 908:12-23 [Benge]; Tr. 1340:14-21, 1344:7-1346:1 [Conley]. For example, even where Rimini provides the same or similar Rimini-written file to multiple clients, the Rimini engineer still logs into Client B's siloed environment, implements the updated file, makes any modifications necessary to adapt the file to Client B's particular software environment and customizations, and performs testing. Tr. 1345:3-1346:1, 1340:1-1341:25, 1342:25-1344:1 [Conley] (explaining 22 step process for retrofitting an "online object" update for Client B); Tr.

2318:19-2319:4 [Astrachan].  Moreover, Rimini updates typically consist of multiple deliverables.
Even after a particular Rimini file is implemented and tested for Client B, that file will typically
be bundled together with other deliverables, packaged, and tested again in Client B's environment
before being ultimately delivered to Client B for application to its production environment.  Tr.
908:16-23 [Benge]; Tr. 1345:3-21 [Conley]; Tr. 2102:17-2104:15 [Davenport].  Oracle's
witnesses did not contest this evidence.  Tr. 2579:23-2581:9 [Frederiksen-Cross] ("**Q**. Okay. And
you did acknowledge that retrofitting occurs, correct?  **A.** As I understand that term to have been
used here, yes …."; "**Q.** You don't dispute that additional work might be done, correct?  **A**. Yes
…."); Tr. 1207:24-1209:1, 1210:15-1211:3 [Cauthen].  While the Court previously found on
summary judgment that Rimini engaged in "cross-use" when it used one client's environment to
create an update and then sent that update to other clients "outright" without any further
development and testing (ECF No. 1253 at 46, 53, 87), the evidence presented at trial shows that
this was indeed, as the Court described it, a "limited circumstance" and not part of Rimini's Process
2.0 (*id.* at 87).

87.     Oracle has expressly permitted other third-party support providers to re-use their
know-how and written work product with multiple clients, in contrast to the positions Oracle has
taken with Rimini.  In providing support, Spinnaker creates "white papers" or "know-how" papers
that contain detailed information, including "pseudo-code," for developers to use in fixing
common issues across clients. D-516 at 1; D-513 at 2, 5; D-530 ¶¶ 18-21 [Stava Decl.]; Brua Dep.
46:19-48:10, 50:4-7, 196:3-21; Tr. 2151:19-2153:16, 2158:18-2160:12 [Lanchak]; Tr. 2334:21-
2337:4 [Astrachan].  The white papers are shared across the entire development team for a product
line to benefit multiple clients.  D-516 at 1 ("The 'know how' related to solving a problem is
Spinnaker Support property and can be incorporated into our own knowledge base on
Sharepoint."); D-513 at 5 (same); Brua Dep. 49:13-22 (white papers made available to all of the
development team in a product line and are stored in a "central repository [so] that the teams can
access them"), 196:3-21; Tr. 2151:19-2153:16, 2159:20-23 [Lanchak].  Oracle's 30(b)(6) witness
testified unequivocally in her deposition that Oracle audited and approved of Spinnaker's

processes in 2011 and confirmed that they do not infringe Oracle's copyrights.  Ransom Dep. 50:1-17, 98:5-10, 155:24-157:3; *see* Brua Dep. 119:5-14, 120:19-121:7, 158:2-13; *see also* Tr. 1766:6-10 [Pinto]; Tr. 2160:8-12 [Lanchak].

88.     CedarCrestone, another third-party services provider, was sued by and settled with Oracle on terms that Oracle said were consistent with its licenses, and that expressly permit re-use of know-how and written work product.  Tr. 983:13-988:7 [Allison]; D-131; *see* Tr. 2337:5-22 [Astrachan].  Under the terms of the settlement agreement, Oracle expressly allows CedarCrestone to document and re-use its PeopleSoft "know-how," including code written by CedarCrestone, for multiple customers, as well as the experience, expertise, and information that its personnel acquired through working with the software.  D-131 at 55 ("Nothing in this Settlement Agreement prevents CedarCrestone personnel from documenting and re-using 'know-how' and CedarCrestone code related to solving a PeopleSoft issue, customization, or extension."); Tr. 2340:15-2341:11 [Astrachan].

89.     Further, Oracle was unable to explain at trial how a third-party support company could plausibly operate without re-using its own knowledge and work product.  *See* Tr. 557:1-24 [Frederiksen-Cross].

**5.     Rimini-Created Software Tools**

90.     Under Process 2.0, Rimini has also used, at times, proprietary software tools that Rimini developed, and that do not contain any Oracle protected expression, whether literal or nonliteral.  Tr. 816:3-12 [Benge]; Tr. 536:7-24, 578:9-24, 579:21-580:23 [Frederiksen-Cross].  These tools were created to automate the re-use of Rimini's knowledge and work product described above.  Tr. 818:16-821:23, 826:15-827:3 [Benge]; Tr. 1215:22-25 [Cauthen]; Tr. 1480:20-1481:16 [Mackereth]; Tr. 2099:18-2101:2 [Davenport].

91.     One such tool is Rimini's Automation Framework, or "AFW," which is just that—a framework that has a number of software tools associated with it that automate certain functions of Rimini's services for PeopleSoft.  Tr. 242:6-19 [Ravin]; Tr. 813:24-814:17 [Benge].  For instance, one tool associated with AFW automatically creates certain folders in a client's

Gibson, Dunn &
Crutcher LLP

environment so that an engineer does not have to do it manually. *See* Tr. 590:23-591:13 [Frederiksen-Cross]. This process does not involve any copying whatsoever of any files or data from one Rimini client to another. Tr. 591:6-592:15 [Frederiksen-Cross]. Other tools associated with AFW have at times been used in connection with servicing PeopleSoft, but Rimini has not used them since late 2018. Tr. 739:7-16 [Benge]; Tr. 244:17-19 [Ravin]. At a high level of generality, AFW consists, in part, of a program that runs on a client's computer systems that listens for, processes, and handles requests sent to it from Rimini. Tr. 816:21-817:16 [Benge]. The handling of all requests is performed *on* that client's systems. *Id.* Rimini obtained a United States patent on aspects of its tools. Tr. 815:2-21 [Benge]; D-1.

92.     The critical facts relevant to AFW tools are that under Process 2.0 and Rimini's policies:  (i) in no case do the tools contain Oracle protected expression, whether literal or nonliteral (Tr. 816:3-12, 820:22-821:2, 828:10-829:15, 832:25-833:23 [Benge]; D-15; Tr. 2342:23-2343:17, 2347:5-24, 2353:2-12 [Astrachan]; *see* Tr. 579:21-580:23 [Frederiksen-Cross]; Tr. 1404:16-1405:5 [Hicks]); (ii) at no time when the tools are run do they result in any copies of Oracle protected expression being on Rimini's systems (Tr. 590:23-591:19 [Frederiksen-Cross]; Tr. 840:17-841:3 [Benge]; Tr. 1400:23-1401:4 [Hicks]; Tr. 2358:9-2359:11, 2359:24-2360:15 [Astrachan]); and (iii) each time the tools are run, to the extent that they *do* result in a copy of Oracle protected expression being made, that copy is in the client's siloed licensed environments, on the client's systems, and for that particular client's internal business operations (Tr. 816:21-817:16, 821:3-23, 835:13-836:4 [Benge]; Tr. 1415:7-14 [Hicks]; Tr. 2100:12-16 [Davenport]; Tr. 2344:23-2345:8, 2349:9-18, 2353:14-2354:23 [Astrachan]). Oracle's expert witness did not dispute that the overwhelming majority of files moved with AFW tools—over 99.999% of them—contained no Oracle protected expression, whether literal or nonliteral, and were entirely Rimini-written files. Tr. 1401:17-1405:5 [Hicks] (identifying 6 files from May 2015 allegedly containing Oracle expression out of over 755,000 files); *see also* Tr. 1197:17-1199:14, 1199:15-1200:14 [Cauthen].

93.     The evidence also showed that Rimini did not use Oracle's software tools to

develop its own tools, and that the Rimini tools could be used outside the context of Oracle software. *See*, *e.g.*, Tr. 2321:9-2322:11, 2323:10-15, 2363:15-2364:15 [Astrachan]. Rimini eventually implemented and tested these tools in client environments, but the tools were being used *for* the clients that received them, and thus any copies made in the testing process were for that client. *See* Tr. 2323:3-25, 2363:15-2364:19 [Astrachan].

94.     Prior to being disabled in 2018, one of the AFW components Rimini used was a patented tool called CodeAnalyzer. Tr. 244:17-19 [Ravin]; Tr. 822:2-5 [Benge]. This tool was written without using Oracle software, and users of the tool do not need to be logged into PeopleSoft to use it. Tr. 816:3-12 [Benge].

95.     CodeAnalyzer, and specifically its GenDiff function, created what was essentially a set of instructions for replicating Rimini-created modifications to multiple clients' copies of the same file in each of those client's separate environments. Tr. 243:11-244:11 [Ravin]; Tr. 832:25-833:23 [Benge]; D-15; Tr. 1383:17-1384:10 [Hicks]; Tr. 2348:14-2349:4 [Astrachan]. The instructions did not contain, and could not be used to reconstruct, any Oracle code or other expression. Tr. 825:20-826:12, 828:10-829:15 [Benge]; Tr. 1197:17-1199:14 [Cauthen]; Tr. 1412:11-22, 1415:3-6 [Hicks]; Tr. 2350:5-2353:12 [Astrachan]; D-469 at 5. As Oracle's expert Mr. Cauthen admitted, when Rimini uses the CodeAnalyzer tool, it achieves "exactly the same result that would be achieved if an engineer memorized the work for Client A and then replicated it for Client B"—conduct that Oracle admits is permitted. Tr. 1215:22-1216:23 [Cauthen]. The use of the tool increased consistency and reduced the likelihood of coding errors. *See* Tr. 243:11-244:11 [Ravin]; Tr. 2345:21-2346:9 [Astrachan]. Rimini ceased using this function in late 2018. Tr. 244:17-19 [Ravin].

96.     Another tool Rimini developed and uses in support of EBS clients is called "ePack." Tr. 1480:20-1481:18 [Mackereth]. ePack is a Rimini-written program that contains *no* Oracle protected expression, whether literal or nonliteral. *Id.*; Tr. 536:12-537:5 [Frederiksen-Cross]; P-7579. Without ePack, once Rimini finishes developing a bundle of updates in a client's development environment on the client's systems, the client's IT staff typically has to install the

1   update or fix into the client's production environment or quality assurance (testing) environment.

2   *See* Tr. 1453:2-10, Tr. 1480:20-1481:13 [Mackereth]. That is, the updates or fixes must be moved

3   from one location on the client's systems to another location on the client's systems.

4       97.     That process can be complicated, so Rimini developed ePack as an automated tool

5   that its clients can use for certain updates. Tr. 1480:20-1481:16 [Mackereth]. ePack, a shell script

6   designed to be run via a command line, was written by Rimini, and does not include *any* Oracle

7   code or expression, whether literal or nonliteral. Tr. 2319:18-2322:16, 2323:10-15 [Astrachan];

8   P-7644; *see* Tr. 1453:19-1454:11, 1481:14-18 [Mackereth]. The shell script is not executed using

9   Oracle software, and it can be run in any most operating systems, such as Windows or Unix. Tr.

10  2322:4-11 [Astrachan]. A client can use the ePack tool to carry out the oftentimes complex process

11  of installing updates to an environment. Tr. 1453:2-1454:11, 1480:20-1481:16 [Mackereth]. All

12  of this activity occurs on the client's system. Tr. 537:6-538:11 [Frederiksen-Cross]; Tr. 2320:16-

13  2321:5 [Astrachan]. And ePack does not cause any material to be transferred between clients or

14  back to Rimini's system. Tr. 2321:2-5 [Astrachan]; Tr. 538:15-539:6 [Frederiksen-Cross].

15      **6.      JDE-Specific Facts**

16      98.     Rimini seeks a declaratory judgment that its support practices do not infringe 24

17  specific JDE copyrights. *See* ECF No. 487 at 37-38 (listing the 24 JDE copyright registrations).

18  Oracle only seeks injunctive relief as to five of those copyrights (*see* ECF No. 1511 at 1-2), but

19  provided no specific evidence related to infringement for those particular copyrights. *See infra*

20  Section II.C.2.b. Thus, while Oracle did introduce evidence related to Rimini's copying of JDE,

21  that evidence relates only to whether Rimini is entitled to a declaratory judgment of non-

22  infringement regarding JDE, and is thus discussed here.

23      99.     ***JDE Source Code.*** In disputing Rimini's claim for declaratory relief as to JDE,

24  Oracle makes the threshold claim that Rimini acts outside the scope of certain license agreements

25  any time it copies JDE source code. *See* Tr. 571:17-25 [Frederiksen-Cross]. Oracle proposed in

26  its conclusions of law that: "The Court has already determined that the JD Edwards licenses at

27  issue in *Rimini I* prohibited Rimini from copying JD Edwards source code." ECF No. 1451 ¶ 81

28

RIMINI STREET AND SETH RAVIN'S POST-TRIAL PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW
CASE NO. 2:14-CV-01699-MMD-DJA

Gibson, Dunn &
Crutcher LLP

(Oracle proposed conclusions of law). This misstates the history of the case and the Court's rulings.

100.    Rimini was not held in contempt for any conduct with respect to JDE. *See Rimini I*, ECF No. 1548 at 41-47. The Court discharged the order to show cause entirely as to JDE. *Id.* at 45-47. The Court made two holdings about what was "clear" under the JDE license agreement that was at issue there. First, the Court held that "it is clear that the [JDE] license agreements authorize a third party like Rimini to copy the [JDE] software application and related documentation for the licensee's archival needs *and to support the licensee's use*." ECF No. 1548 at 45 (emphasis added); *see also* Tr. 989:8-991:11 [Allison]. It is undisputed that copying the software application copies JDE source code. *See* ECF No. 1451 ¶¶ 76-77 (Oracle's proposed findings of fact), 221-226 (Oracle's proposed findings of fact). The Court found in the contempt proceedings that "Rimini modifies [JDE] source code" when it provides updates, and that when it uses JDE tools "[t]his necessarily makes a copy of the source code." *Rimini I*, ECF No. 1548 at 43. In other words, the Court found it was clear that Rimini was permitted to copy the software to support its clients, which indisputably involves copying JDE source code.

101.    The second holding the Court made was that it was "also clear" that "Rimini is not authorized to make copies of [JDE] software application and documentation to access the software's source code to carry out development and testing of software updates, to make modifications to the software, or to use the customer's software or support materials, to support *other* customers." *Rimini I*, ECF No. 1548 at 45-46 (emphasis in original). Oracle's proposed finding of fact (ECF No. 1451 ¶ 101) uses ellipses to obscure the import of the final clause "to support *other* customers," which applies to all the preceding activities on the list. In other words, the Court held it was clear that Rimini could not engage in "*cross-use*."

102.    The Court made this even clearer when discharging the order to show cause as to Oracle's argument that Rimini could never copy JDE source code *at all*:

> In this case, *whether Rimini is ever permitted to lawfully copy source code* under a specific provision of the [JDE] license *has never been interpreted or decided* by this Court. Having considered the provisions of the [JDE] Legacy license agreement, *the Court is not convinced at this time that Rimini may never copy*

37

Gibson, Dunn &
Crutcher LLP

*source code when doing so is solely to support the needs of the client.*  And the Court has not before considered what 'screen access' means and whether Rimini's support Process 2.0, in which Rimini remotely accesses the client's environments, is permitted given this provision.  These issues are squarely before the Court in *Rimini II* and therefore, the Court declines to reach them at this time.

*Rimini I*, ECF No. 1548 at 46 (emphases added).

103.    Thus, contrary to Oracle's repeated representation in its trial brief and proposed findings and conclusions that the Court "already" decided in *Rimini I* that the JDE licenses prohibit Rimini from copying "source code," that issue has *never* been decided.  *Rimini I*, ECF No. 1548 at 46 n.66 ("[T]he ultimate determination of whether Rimini may lawfully copy source code under the J.D. Edwards license agreement was not previously before the Court in this case.").

104.    This issue is also an example of how the license agreements vary widely within a particular product line.  Oracle claims that some versions of the legacy JDE licenses at issue in this case contain provisions that prevent a third-party support provider like Rimini from accessing (and thus copying or modifying) JDE source code.  Tr. 937:13-938:10 [Allison].  But only approximately one-third of the JDE license agreements at issue in this case include a source code restriction of any kind.  License Appendix at A1-7.  All of these are legacy license agreements— after Oracle acquired JDE and started writing its own license agreements, it elected *not* to include an equivalent prohibition.  Tr. 995:24-996:3 [Allison].  As explained below, the Court disagrees with Oracle's interpretation of the source code provisions in the legacy license agreements.  But even if it agreed with Oracle's interpretation, the vast majority of JDE license agreements do not include the language on which Oracle bases its arguments, which itself is enough reason to deny Oracle's claims for injunctive relief as to the JDE product line.

105.    The creation of a JDE development environment requires the copying of JDE source code.  Tr. 2332:2-6 [Astrachan]. The Court also finds that it is not possible to make a modification to JDE software without accessing and modifying its source code.  Tr. 569:10-25, 571:21-25 [Frederiksen-Cross]; Tr. 1424:17-1425:20, 1484:23-1485:23 [Mackereth]; Tr. 2137:4-22 [Lanchak]; Tr. 2330:14-18, 2331:14-18 [Astrachan].  And, as Oracle's 30(b)(6) witness explained, Oracle approved as non-infringing third-party support provider Spinnaker providing

Gibson, Dunn &
Crutcher LLP

"custom code" solutions for its JDE clients, including "source code changes" to JDE programs, a position directly contrary to Oracle's claims in this case.  Ransom Dep. 162:20-166:1; *see* Brua Dep. 158:2-13; D-529 ("Spinnaker's current practices and procedures are respectful of and do not infringe upon Oracle's intellectual property rights and … do not violate Oracle's license agreements with its clients."); Tr. 1766:6-10 [Pinto]; Tr. 2142:10-2144:13 [Lanchak]; D-530 ¶ 14 [Stava Decl.]; Tr. 2333:13-2334:7 [Astrachan].

106.    If the provision means what Oracle contends, the Court finds that it would entirely prohibit meaningful third-party support of JDE software products.  *See* Tr. 571:17-573:24 [Frederiksen-Cross]; Tr. 1487:1-1489:18 [Mackereth]; Tr. 2134:10-2136:7, 2137:4-22 [Lanchak].

107.    ***JDE Updates and Technical Specifications.***  As with other product lines, Rimini creates TLR updates for JDE software, and uses technical specifications in that process.  Tr. 636:6-15 [Jacob]; D-2179.

108.    For relatively simple updates, the technical specification is created by the Rimini developer at the outset.  *See* Tr. 632:5-19 [Jacob].  The developer will then go into the development environment of a Rimini client that needs the particular update, and perform the update "to prove out the design" of the technical specification.  *Id.*  If necessary, the Rimini developer will then update the technical specification.  Tr. 632:14-16 [Jacob].  For more complex updates, the Rimini developer will go into the development environment of a client that needs the update to understand where changes will need to be made and, once that is proven out, create the technical specification.  Tr. 632:17-24 [Jacob].  Under either scenario, the work done in the client's development environment is done *for* that client and not on Rimini's servers.  Tr. 632:20-633:1 [Jacob]; Tr. 2324:9-2325:15 [Astrachan].  A Rimini developer will then use the technical specification to manually implement the update, separately, in each client's environment.  Tr. 623:11-19, 642:12-23 [Jacob].  Rimini developers do not develop a JDE update in a client's environment where that client does not need the update.  Tr. 633:15-22 [Jacob].

109.    As already found *supra* ¶¶ 82-83, the technical specifications created during this process, per Rimini's policies, may contain Rimini's knowledge or Rimini-written code useful for

1
2
3
4
5

implementing the update, but the technical specifications cannot include any Oracle code or expression. While some technical specifications that Oracle introduced at trial included code, it was undisputed this was *Rimini* code and did not include any Oracle code or expression. Tr. 655:14-656:6 [Jacob] (discussing P-6349.17432); *see also* Tr. 638:19-20 [Jacob] (discussing D-2179).

6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

110.   Ms. Frederiksen-Cross claimed that Rimini implemented 372 "cross-used" JDE updates, but she discussed only one specific JDE update in her testimony. Tr. 552:13-553:3 [Frederiksen-Cross]. For this update, after the Rimini developer manually wrote new code in a client's environment, the developer printed the Rimini Street code he wrote to a .txt file, emailed it, and saved it to Rimini's system. Tr. 620:15-19 [Jacob] (discussing P-6349.17327); *see also* Tr. 653:10-654:23 [Jacob] (discussing P-6349.17327). It was undisputed that the update contained 100% Rimini code. Tr. 653:10-654:23 [Jacob]; Tr. 2328:6-2329:5 [Astrachan]; Tr. 558:19-566:4 [Frederiksen-Cross] (admitting she had no opinion that the code was Oracle source code). For all the other updates counted as "cross-use," Ms. Frederiksen-Cross included them solely on the basis that an update was implemented for one client and then "received by more than one client." Tr. 553:4-14 [Frederiksen-Cross]. Ms. Frederiksen-Cross offered no opinions on how these updates were actually implemented for clients, and she did not dispute that they were manually implemented by a Rimini developer for each client. Tr. 553:16-556:25 [Frederiksen-Cross]. But she opined they constituted "cross-use" if they involved use of technical specifications that included "detailed, explicit instructions" or code written entirely by Rimini "developed in one customer's environment and then used on behalf of another customer." Tr. 555:7-556:14 [Frederiksen-Cross]. And she went so far as to opine that Oracle's license agreements could operate to "prevent a human being from writing down their own creative expression and re-using it somewhere else." Tr. 556:15-25 [Frederiksen-Cross]. Ms. Frederiksen-Cross offered these opinions despite acknowledging that the same developer—Michael Jacob—frequently implemented JDE updates for all Rimini clients. Tr. 554:17-558:18 [Frederiksen-Cross]. She could offer no explanation of how a single individual is supposed to implement an update for one

28

40

Gibson, Dunn &
Crutcher LLP

client and then implement a solution for the same problem in a different client's environment *without* re-using their work. Tr. 557:1-558:18 [Frederiksen-Cross]; *see also* Tr. 2325:16-2328:5 [Astrachan].

111.     Oracle also elicited some testimony that in one JDE technical specification, Rimini included "locaters"—snippets of Oracle code—that were used to indicate where new code created by Rimini should be included. *See* P-6349.17460; Tr. 624:12-626:4 [Jacob]. It was undisputed that this was the only purpose of the code snippets—they were not themselves executable. Tr. 639:3-640:1 [Jacob]. Oracle did not offer any testimony on the protectability of these snippets, and this Court has already found that such snippets are *de minimis*, and thus not protected by the Copyright Act. *Rimini I*, ECF No. 1548 at 46-47. In any event, Rimini no longer uses such "locaters" in technical specifications. Tr. 640:5-22 [Jacob].

112.     Apart from doing tax, legal, and regulatory updates, Rimini also provides some custom break/fix solutions for clients as the support need arises. Tr. 630:3-21 [Jacob]; Tr. 1459:2-9, 1462:18-1464:4 [Mackereth]. Rimini generates technical specifications for some break/fix solutions. Tr. 636:6-18 [Jacob]; *see also* Tr. 644:11-645:2 [Jacob]. Oracle admitted one such technical specification at trial related to a JDE fix (P-6349.05001), but did not introduce any evidence about its content, and made no claim that it contained any Oracle code. *See* Tr. 1450:6-15 [Mackereth]. Further, Oracle presented no evidence that more than one client received the fix associated with the technical specification, and the face of the specification indicates it was for one specific client. P-6349.05001 at 1 (indicating the fix was for Rimini client CertainTeed Inc.).

113.     ***Spinnaker's JDE Support.*** Rimini is not the only support provider that uses documented know-how for multiple JDE clients. Tr. 641:17-642:11 [Jacob]; Tr. 2151:19-2152:17 [Lanchak]. Spinnaker supports JDE (as well as PeopleSoft, Siebel, EBS, and Database). Tr. 1764:1-1765:8 [Pinto]; Tr. 1897:13-1898:3 [Orszag]; Ransom Dep. 35:23-36:8; *see* Tr. 1586:6-11 [Jackson]; D-536; D-541. While Spinnaker is relevant to Oracle's allegations concerning know-how (as discussed above), it is also relevant to Oracle's allegations that Rimini's JDE support processes infringe. Oracle audited Spinnaker's JDE support practices in 2011, which included an

Gibson, Dunn &
Crutcher LLP

1   on-site visit.  Ransom Dep. 49:23-50:7, 50:10-11, 50:15-17; Brua Dep. 119:5-14; D-529.  After

2   conducting its review of Spinnaker's support practices, senior in-house counsel at Oracle

3   concluded that Spinnaker's JDE processes "do not infringe upon Oracle's intellectual property

4   rights" and "do not violate Oracle's license agreements with its clients."  Ransom Dep. 155:24-

5   157:3, 162:20-164:3; D-529; *see* Tr. 1766:6-10 [Pinto]; D-530.

6       114.   There are numerous similarities between Spinnaker's JDE processes and Rimini's.

7   Tr. 1798:17-20 [Pinto] (Rimini and Spinnaker offer similar support services); Tr. 2332:22-2333:9

8   [Astrachan]; D-510.   Spinnaker creates a "white paper"—the same as Rimini's technical

9   specifications—that explains how to make the needed modifications.  Brua Dep. 46:19-24, 47:7-

10   48:10; D-513 at 2, 4-5; Tr. 2336:2-2337:4 [Astrachan]; Tr. 2151:23-2153:16, 2156:2-19, 2158:18-

11   2160:12 [Lanchak]; D-516 at 1.  Those design documents are shared within Spinnaker to support

12   multiple customers.  Brua Dep. 47:7-48:10, 49:13-22, 50:4-7, 196:3-21; D-513 at 2; D-516 at 1;

13   Tr. 2159:20-23 [Lanchak].  Then, each team goes into each customer's environment that needs the

14   change and creates a custom update for that customer based on its system, its custom code, and all

15   the integrations and differences that the customer may have.  Brua Dep. 43:17-44:17, 46:4-18,

16   47:7-48:10, 217:7-218:11; D-513 at 3-4; D-530 at 4.

17       115.   Spinnaker's developers work on several accounts at once.  Brua Dep. 48:6-10; *see*

18   D-513 at 5.  They gain know-how both from having performed updates on a first account and from

19   the shared design documents.  Brua Dep. 46:19-24, 47:7-48:10, 49:13-22, 50:4-7, 196:3-21; D-

20   513 at 2, 5.  Both the know-how and the documented solutions that result from development

21   (including white papers) benefit multiple customers.  Brua Dep. 46:19-24, 47:7-48:10, 49:13-22,

22   50:4-7, 196:3-21; D-513 at 2, 5; D-516 at 1.  Spinnaker, like Rimini, also treats pseudo-code as its

23   own proprietary information.  Brua Dep. 46:19-24, 47:7-48:10, 49:13-22, 50:4-7; D-513 at 5

24   ("Documenting the knowledge of how to solve a problem can include … pseudocode").  In these

25   respects and others, Rimini's JDE support processes are similar to Spinnaker's.  Oracle has

26   similarly approved CedarCrestone's re-use of written "know-how" and other work product for

27   multiple customers, as explained above.  Tr. 983:14-988:7 [Allison]; D-131 at 55; *see supra* ¶ 88.

42

RIMINI STREET AND SETH RAVIN'S POST-TRIAL PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW
CASE NO. 2:14-CV-01699-MMD-DJA

Gibson, Dunn &
Crutcher LLP

1

**C.     Oracle's Claims for Direct Copyright Infringement**

2

116.    Oracle makes a number of specific direct copyright infringement claims against

3

Rimini, which fall into two broad categories:  (i) migration claims related to Process 1.0; and

4

(ii) specific remaining product-line claims.

5

**1.     Process 1.0 "Migration" Claims**

6

117.    Under Process 1.0, Rimini hosted PeopleSoft environments on Rimini's own

7

computer systems, a practice found to infringe by virtue of violating a "facilities" restriction in

8

certain PeopleSoft licenses (*Rimini I*, ECF No. 474 at 12-14, 17-18).  The Court's ruling did not

9

give any specific instructions on how Rimini should move any locally hosted PeopleSoft

10

environments off of Rimini's systems.  *See* Tr. 2082:17-21 [Lyskawa]; *Rimini I*, ECF Nos. 474,

11

476.

12

118.    As part of the transition to Process 2.0, and particularly after the Court's February

13

2014 summary judgment order in *Rimini I*, Rimini promptly worked to "migrate" these PeopleSoft

14

environments to its clients' respective computer systems so that they were no longer on Rimini's

15

systems.  Tr. 212:9-22 [Ravin]; Tr. 2080:17-2082:16 [Lyskawa].

16

119.    The migration was completed with each client's authorization.  Tr. 662:19-663:4

17

[Benge]; Tr. 2081:16-21 [Lyskawa].  Clients chose where they would host their migrated software

18

environments, whether on their own systems or, at their election, in their cloud accounts.   Tr.

19

216:21-217:16 [Ravin]; Tr. 2085:12-15, 2085:24-2086:4 [Lyskawa]; Miller Dep. 75:16-20.

20

120.    Software is not "movable" in the ordinary sense; to "move" or "migrate" software,

21

one necessarily has to make a copy of it.   Tr. 94:6-12 [Ravin]; Tr. 2082:8-12, 2089:5-11

22

[Lyskawa]; Tr. 2378:16-2379:5 [Astrachan].   Accordingly, the process of migrating Rimini's

23

clients' environments back to those clients' systems necessarily involved making copies of the

24

environments.  Tr. 94:6-12 [Ravin]; Tr. 2082:8-12, 2089:5-11 [Lyskawa]; Tr. 2378:16-2379:5

25

[Astrachan].

26

121.    Rimini completed the migration of its clients' Oracle software environments off of

27

Rimini's systems by not later than July 31, 2014.  Tr. 90:14-91:2 [Ravin]; Tr. 795:24-796:1

28

[Benge]; Tr. 1399:7-23 [Hicks] (Oracle expert Christian Hicks testifying he "saw no evidence that Rimini ever hosted local environments on its systems after July 2014.").

122.   Rimini did not have the option of keeping or deleting the locally hosted PeopleSoft environments because the software belonged to Rimini's clients, not to Rimini.  *See* Tr. 2082:22-2083:3 [Lyskawa].  Moreover, the environments would have been *impossible* (not just costly) to rebuild, given that they contained archived Oracle support materials that had been permissibly downloaded from Oracle's support website when the clients were customers of Oracle support, and which the clients were still permitted to use but could no longer download because they were no longer on Oracle support.  *See* Tr. 2084:16-25 [Lyskawa]; Tr. 215:18-216:13 [Ravin].  Oracle did not dispute this at trial.  And if a client lost access to its development environment for even a short period of time, the client would be unable to receive any tax, legal, or regulatory updates (or other support) during that time, potentially causing the client's enterprise software support systems to perform improperly, *i.e.*, payroll errors, security concerns, etc.  *See*, *e.g.*, Tr. 2083:4-2084:14 [Lyskawa]; Tr. 214:17-216:20 [Ravin]; *see also infra* ¶¶ 187-189.

123.   Notably, following the Court's holding in *Rimini I* that Rimini's local hosting of PeopleSoft environments was outside the scope of certain PeopleSoft license agreements, and *after* the migration was already complete, Oracle requested as a remedy that these very same software environments be impounded or destroyed.  *Rimini I*, ECF No. 900 at 24-25.  The Court denied that relief, and Oracle did not appeal the ruling.  *Rimini I*, ECF No. 1049 at 9-10.

## 2.   Product Line Claims

124.   Oracle also makes a number of specific infringement claims related to each of the Oracle product lines.  The Court makes the following additional factual findings as to those claims.

125.   Each Rimini client at issue in this case has a license agreement with Oracle for the respective enterprise software program it uses.  As discussed above, all of these licenses allow licensees to copy the software and permit the licensee to hire third parties to stand in their shoes and do it for them, subject to certain restrictions.

126.   Many of Oracle's infringement arguments depend on restrictions that are not

Gibson, Dunn &
Crutcher LLP

1    uniform in the license agreements.  *See generally* License Appendix at A1-20; *see also supra*

2    ¶¶ 14-15.  As the Court recognized when denying summary judgment on certain claims in this

3    case, after having "reviewed a number of license agreements," "not all [of them] are the same,"

4    "some of [the] provisions are more restrictive than others," and it was effectively impossible to

5    "make a blanket ruling" on summary judgment.  ECF No. 1253 at 90-91.  For Oracle to show that

6    Rimini has acted outside the scope of a license agreement requires "the Court … to review each

7    license and interpret the provision accordingly."  *Id.*

8                        *a.*    *PeopleSoft*

9         127.    ***Data Changes.***  As part of its TLR update support, Rimini engineers often change

10    certain data fields in a database used by the PeopleSoft software (*e.g.*, a tax withholding rate).  Tr.

11    803:17-21, 804:10-17 [Benge].  When this occurs, a Rimini business analyst typically prepares a

12    spreadsheet that reflects the necessary change.  Tr. 804:18-805:2 [Benge].  Rimini then creates a

13    script to perform the necessary function of updating the data in a client's database.  Tr. 804:18-

14    805:25 [Benge].  Rimini either writes the script manually, or it uses a Rimini-written tool called

15    GenDataChanges that generates a script based on the spreadsheet.  Tr. 818:15-821:2 [Benge]; Tr.

16    2342:23-2343:23 [Astrachan].  Regardless whether the scripts are created manually or by the tool,

17    the scripts do not contain any Oracle protected expression, whether literal or nonliteral.  Tr. 805:15-

18    806:6 [Benge]; D-2373; Tr. 2344:4-21 [Astrachan].  Any modifications of client software (and

19    thus any copies created) when the scripts are run occur on the client's systems, and the copies are

20    for the particular client's internal business operations.  *See* Tr. 2344:19-2345:8 [Astrachan].  These

21    data changes account for 75 to 85% of all PeopleSoft TLR updates provided by Rimini.  Tr. 806:7-

22    9 [Benge].  Oracle did not dispute any of this evidence. *Cf.* Tr. 1396:15-1398:1 [Hicks] (describing

23    GenDataChanges process but not claiming that any script generated by the tool contained Oracle

24    intellectual property, or that any copies of Oracle intellectual property are otherwise shared

25    between clients).

26         128.    ***DAT Files.***  DAT files can be used to load data into a database.  Tr. 1163:16-1164:6

27    [Cauthen].  Through its expert John Cauthen, Oracle attempted to introduce evidence that Rimini

28                                        45

Gibson, Dunn &
Crutcher LLP

"cross-used" certain DAT files by giving them to multiple clients.  But Mr. Cauthen admitted that he had no opinion that there was copyrightable expression in the DAT files.  Tr. 1192:16-1193:6 [Cauthen].  While Mr. Cauthen claimed that DAT files would contain "Oracle IP" in the form of Oracle's PeopleSoft database schema, he admitted that he could not identify what portion of the DAT file contained the protected schema, that he had not compared any DAT file to the schema, and that he did not analyze whether any DAT file was substantially similar to any Oracle copyrighted work.  Tr. 1194:12-1196:13 [Cauthen].  There was thus no evidence that these DAT files were subject to Oracle copyrights.

129.    ***Code Changes.***  As part of its TLR update support, Rimini engineers sometimes make changes to code in PeopleSoft environments on the client's systems.  Tr. 806:10-19 [Benge]. This often occurs manually, that is, (1) a Rimini engineer will remotely access the first client's environment—Client A, or the "prototype" client—and modify code to implement the update and then (2) that developer, or a different developer, will then remotely access Client B's environment and manually implement the update, and so on for Client C.  Tr. 806:20-810:4 [Benge].  The code changes may or may not be the same for each client, depending on each client's unique environment, configuration, and customizations.  Tr. 809:21-810:9 [Benge].

130.    Prior to late 2018, Rimini sometimes used the GenDiff function of the CodeAnalyzer tool, as described above, to automatically make Rimini-written code changes to multiple clients' environments where those clients had the identical software file.  Tr. 822:22-825:4 [Benge]; Tr. 1407:14-1408:17 [Hicks]; Tr. 2347:6-2349:8 [Astrachan].  No Oracle software was transferred between any clients in this process, and any copy of Oracle protected expression occurred only on the client's environment and not on Rimini's systems, and such copies made were for the particular client's internal business operations.  Tr. 825:7-827:7 [Benge]; Tr. 2349:9-18 [Astrachan].  And as Oracle admits, whether a Rimini engineer memorizes and replicates their work between clients, or uses the CodeAnalyzer tool to automate steps in that process, the exact same result is achieved.  Tr. 1215:22-1216:23 [Cauthen]; Tr. 1387:8-12 [Hicks].

131.    Prior to late 2018, Rimini also used a function of the CodeAnalyzer tool called "CopyRSIFileFromClientToClient." Tr. 739:7-16 [Benge]. This tool allowed Rimini to transfer a file *written by Rimini* from a client environment back to Rimini's system, and then onto another client that needed it. Tr. 834:12-835:19 [Benge]; Tr. 2358:9-24 [Astrachan]. The tool included a technical restriction so that it could only be used to send Rimini-written files that begin with an "RS" prefix. Tr. 347:20-348:5 [Frederiksen-Cross]; Tr. 835:17-836:4 [Benge]. Oracle claimed the tool was used to send files to clients 18,930 times, all of which Ms. Frederiksen-Cross labelled as "cross-use" (Tr. 356:11-23 [Frederiksen-Cross]), "[e]ven if there is no literal or nonliteral Oracle expression" in the file (Tr. 583:25-584:24 [Frederiksen-Cross]). Oracle's experts testified there were instances where this function was used to transmit Oracle expression between clients. Tr. 348:6-9 [Frederiksen-Cross]; Tr. 1377:9-12 [Hicks]. But Mr. Hicks admitted during cross-examination that there were only three such files out of 755,000 records. Tr. 1403:13-20 [Hicks]; *see also* Tr. 1199:15-1200:14 [Cauthen] (admitting he did not analyze the content of any file transferred with the CopyRSI function, and that although he claimed DAT files containing Oracle "schema" were transferred with the tool, he "did not identify any specific bytes, bits, or data elements that would constitute the schema" in those files).

132.    Rimini has also used a Rimini-created tool called TransferFiles. This tool allowed Rimini to send files from Rimini's servers to client environments; it does not allow Rimini to send files from a client's environment back to Rimini's systems. Tr. 839:20-840:24 [Benge]; Tr. 2359:24-2360:11 [Astrachan]. This is significant because, per Rimini's policies, Rimini is not permitted to have Oracle materials on its servers. Thus, the unidirectional nature of this tool ensures the tool will only be used to send Rimini work product to clients. Tr. 840:21-841:3 [Benge]; Tr. 2360:8-15 [Astrachan]. The tool could be used to send Rimini's client-facing documentation, as well as other Rimini-written files, to clients. Tr. 840:2-14, 841:4-14 [Benge]. Oracle's expert Mr. Hicks testified that out of 36,000 uses of TransferFiles, he only identified three files with Oracle copyright notices. Tr. 1401:17-22 [Hicks].

Gibson, Dunn &
Crutcher LLP

133.     Even where Rimini makes the same code changes or sends the same Rimini-written file to multiple clients' environments, as discussed *supra* ¶ 86, Rimini performs additional work for each client thereafter, including testing of the code and further development and other changes as necessary to account for each client's specific needs.  Tr. 836:13-837:15, 908:12-23 [Benge]; Tr. 1344:7-1346:1 [Conley]; Tr. 2579:6-10, 2580:1-15 [Frederiksen-Cross]; *see also* Tr. 2318:19-2319:4 [Astrachan].

134.     ***Object Changes.***  PeopleSoft online objects are typically user interface elements that allow users to input information or interact with the program, *e.g.*, drop-down menus, check boxes, etc.  *See* Tr. 1337:20-25 [Conley]; Tr. 811:8-20 [Benge].  It is sometimes necessary for Rimini to modify these interfaces to add or change functionality.  Tr. 811:8-24 [Benge].  When providing these updates to clients, Rimini follows the same process as it does with other updates, logging into each client's environment and making the necessary changes.  *Id.*  Rimini sometimes creates new files in the process of delivering object changes.  This involves Rimini writing files on its own systems, using generally available development tools and text editors like Notepad++ or UltraEdit, none of which use Oracle software.  Tr. 811:25-812:13 [Benge].

135.     Oracle did not dispute any of this evidence at trial.  Instead, it focused only on a Rimini-created tool called DevReview, which was previously used in the process of providing object changes, but has been turned off since November 2018.  Tr. 822:2-5 [Benge]; Tr. 1298:9-12, 1300:5-12, 1315:25-1316:11, 1337:10-16 [Conley]; Tr. 1417:6-17 [Hicks].

136.     To create or modify online objects, a Rimini engineer used the "AppDesigner" utility in a client's development environment.  Tr. 1338:1-17 [Conley].  In so doing, Rimini created data that was stored in a PeopleTools database; this data represented new objects or modifications to objects that *Rimini* created and did not contain any protected Oracle expression whatsoever.  Tr. 1338:1-1339:10 [Conley] ("So, for instance, if you made it a number field, the number 1 would be entered in this property field. If it was character, it would be number 2, and so on, so forth."); *see also* Tr. 2360:16-2361:10 [Astrachan].  After an online object was created for Client A, Rimini would need to "retrofit"—or reimplement—that object for other clients that needed it in those

clients' environments.  Tr. 1340:1-21 [Conley].  This retrofitting process could involve more than 20 different steps.  Tr. 1341:2-4 [Conley]; D-17.  The DevReview tool could assist with some of those steps.  Specifically, it could be used to automatically extract Rimini-created data (and only Rimini-created data) from Client A's database and then load that data into the relevant database in Client B's environment.  Tr. 1338:1-1339:10, 1343:7-1344:1 [Conley]; Tr. 2361:11-24 [Astrachan].  After the data was loaded, the Rimini engineer would need to perform additional steps—as many as ten—to retrofit and test the online object for Client B in Client B's environment (and for any other client that would receive the online object, in that client's environment).  Tr. 1341:1-7, 1342:25-1344:1 [Conley]; D-17.  This would involve additional manual development in each client's environment.  Tr. 1341:8-1342:16 [Conley].

137.    Per Rimini's policies, the DevReview tool was used only for Rimini-created objects and modifications to objects and contained a technical limitation that prevented the transfer of any data associated with an Oracle-created object between clients.  Tr. 1338:18-1339:10, 1341:15-1342:24 [Conley]; D-17 at 5.  Using the tool thus did not involve the transfer of any literal or nonliteral protected Oracle expression between clients or between Rimini and any client.  Tr. 1338:18-1339:16, 1343:7-12, 1344:21-1345:21 [Conley]; Tr. 2361:25-2362:3 [Astrachan].  Oracle's witnesses conceded this point.  Tr. 588:24-589:16 [Frederiksen-Cross] ("**Q.** And, to be clear, you have not offered any opinion that any of the data generated by Rimini's use of the DevReview program, and in those spreadsheets, contains any literal or nonliteral Oracle expression, correct?  **A.** I believe that to be correct, sir."); Tr. 1418:10-14 [Hicks] ("**Q.** And you have no opinion that DevReview was ever run to extract data for a non-Rimini created object, correct?  **A.** I'm not proffering such an opinion.  **Q.** And you haven't seen any evidence of that, correct?  **A.** I don't recall seeing evidence of that.").  Moreover, any copy of any Oracle protected expression made in this process occurred on the client's environment and not on Rimini's systems (Tr. 588:4-6 [Frederiksen-Cross]; Tr. 1417:18-1418:4 [Hicks]; *see also* Tr. 1339:11-25 [Conley]), and the copies made were for the particular client's internal business operations (Tr. 2362:4-7 [Astrachan]).

138.   ***Rimini's Quality Assurance Testing.***   Before a Rimini deliverable is provided to a client for incorporation into the client's production environment, Rimini performs Quality Assurance ("QA") testing to ensure the update functions correctly.  Tr. 2093:19-23 [Davenport]. Rimini performs this testing in each client's environment.  Tr. 2093:24-2094:1, 2096:11-19, 2104:5-11 [Davenport].  Where multiple clients are receiving an update, the QA team typically begins by performing "long tests" on a first group of clients—typically one client "per application release" is chosen (meaning one client with PeopleSoft 8.9, one client with PeopleSoft 9.0, etc.). Tr. 2095:10-2097:10 [Davenport].  The long test involves testing "outside" of what the development team has created, so that the QA team can ensure the new development has not "broken anything else" in the software. Tr. 2096:3-17 [Davenport].  Then the QA team performs "short tests" for each client, which are a less extensive version of the testing.  Tr. 2097:25-2098:4 [Davenport] ("[S]o in a long test, for example, we may enter a hundred employees and run 10 payrolls. For a short test, we may only enter 10 employees and run two payrolls. It's just a shorter version of the long test.").  Rimini does not perform long tests for every client because "[t]here's no need to," since Rimini's QA engineers "learn from the original long test that our code is good" and can then perform short tests for the remaining clients receiving the update.  Tr. 2099:2-9 [Davenport].  The nature of the long and short tests may vary by client, and there are different varieties of short test, including "apply only" and "run to success" tests.  Tr. 2097:16-18, 2098:5-15, 2101:6-2102:16 [Davenport].  But Rimini provides either a long or a short test for every client that receives the update. Tr. 2098:16-24 [Davenport].

139.   The QA team also performs "bundle" testing for each PeopleSoft update, which refers to testing that is performed when multiple individual updates are merged into a single update bundle.  Tr. 2102:17-2104:15 [Davenport].  Bundle testing is intended to ensure that there is no risk a Rimini update will not function once the code has been merged with other Rimini-written code.  Tr. 2102:21-2103:9 [Davenport].  The first few clients to receive a bundle test are referred to as "beta" clients.  Tr. 2103:12-19 [Davenport].  Beta clients "get the same basic task or test plans that everyone else gets"; they are referred to as betas because they are the first clients to be

50

RIMINI STREET AND SETH RAVIN'S POST-TRIAL PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW
CASE NO. 2:14-CV-01699-MMD-DJA

Gibson, Dunn &
Crutcher LLP

tested.  Tr. 2103:12-19 [Davenport].  Bundle testing takes place on the client's system.  Tr. 2104:10-11 [Davenport]

140.   In the QA testing process, Rimini also sometimes uses a Rimini-written software tool called ApplyUpdate.  The ApplyUpdate tool automates the process of putting update files into the right location on the client's environment and applying them so they can be tested, and it runs a report indicating whether the files ran successfully.  Tr. 837:25-839:19 [Benge]; Tr. 2099:10-2100:11 [Davenport].  The tool does not send any files, scripts, or data from one client environment to another, as Oracle admits.  Tr. 592:7-15 [Frederiksen-Cross]; Tr. 839:17-19 [Benge]; Tr. 2100:13-16 [Davenport].  The tool merely automates the work of moving and applying files *within* the client's environment.  Tr. 2100:17-2101:2 [Davenport].  All of these steps happen in the client's environment, as Oracle also admits.  Tr. 590:23-591:5 [Frederiksen-Cross]; Tr. 2099:18-2100:11 [Davenport].

141.   Ms. Frederiksen-Cross testified that her opinion was that if, as a result of testing work performed for one client, Rimini decided it did not "need to test [the update] as thoroughly anywhere else," that would be "cross-use" under *her* definition of that term.  Tr. 534:19-535:14 [Frederiksen-Cross].  But she *acknowledged* that the Court has already ruled that "Rimini is permitted to perform less or even no testing if it so chooses."  Tr. 535:15-536:6 [Frederiksen-Cross].  The Court gives no weight to Ms. Frederiksen-Cross's opinions regarding Oracle's testing theory of "cross-use" because they contradict the Court's orders and common sense.

142.   ***Rimini "Rewrite" Files.***  Beginning in 2010, Rimini undertook a project to streamline and improve (*i.e.*, "rewrite" or "rearchitect") certain files that were included with the PeopleSoft program.  *See* Tr. 1322:16-1323:18 [Conley].  The files related to generating electronic federal and state tax filings, like W2 forms.  *See*, *e.g.*, Tr. 1287:14-16, 1328:7-13 [Conley] (tax960st.sqr, which later became rsi960st.sqr, "create[s] output files which report employee state W-2 data"); D-2474 at 22-23 (explaining role of .sqc files used by tax960st/rsi960st); Tr. 361:16-24 [Frederiksen-Cross] (rsi810st.sqr related to production of "quarterly wage file[s]"); Tr. 405:4-16 [Frederiksen-Cross] (rsi960us.sqr related to printing W2s).  These files were old (some dated

back to the 1990s), routinely modified over the years, and included "lots of dead code" that was no longer operative. *See* Tr. 1322:16-1323:18 [Conley]. In 2010, the goal of Rimini's project was to remove the inoperative code, "modernize[], clean[] up, reorganize[]," and improve the running of the files, and also "add some new functionality" to the files. *Id.* The goal was never to "completely rewrite the code in the original [Oracle] file[s]," but simply to improve their performance, so some Oracle code remained in the files. Tr. 1324:21-1325:1 [Conley].

143. In undertaking this project, Rimini began with the "code that was common to all clients." Tr. 1326:2-21 [Conley]; D-2546 at 4. This meant that Rimini used the oldest version of the file that any client had—this ensured that Rimini was not taking newer code provided by Oracle and giving it to a client that was not authorized to receive it. *Id.* Instead, Rimini's goal was to make sure clients only received code "they already had" and had paid Oracle for. Tr. 1326:22-1327:2 [Conley]. Because this project began in 2010, before any rulings had issued in *Rimini I*, Rimini believed that it was permissible to share Oracle code among clients who already possessed that code and had a license for it. Tr. 1327:5-12 [Conley].

144. Between 2010 and Rimini's transition to Process 2.0, Rimini continued to modify and change the files. By July 31, 2014, Rimini had changed the files so many times that it believed the files were fully Rimini-written, and thus it did not check to see whether they still contained any Oracle code. Tr. 1330:6-1331:3 [Conley]; *see also* Tr. 1277:17-19 [Conley]. Thus, Rimini continued to store the files on its own systems after the transition to Process 2.0. Tr. 1330:10-16 [Conley]. In total, Rimini's project was comprised of 15 distinct files,[6] out of the *tens of thousands* of files that make up a single PeopleSoft environment. Tr. 2356:8-10, 2370:8-21 [Astrachan]; Tr. 2581:11-2582:4 [Frederiksen-Cross].

145. Ms. Frederiksen-Cross testified about two specific rewrite files, which she alleged contained lines of Oracle code. Tr. 360:16-396:11 [Frederiksen-Cross (discussing rsi810dc.sqr,

---

[6] The files are: rsi810st.sqr, rsi860fl.sqr, rsi960st.sqr, rsi960us.sqr, rsibn733.sqc, rsieincd.sqc, rsistcd.sqc, rsitxdta.sqc, rsiw2st.sqc, rsiw2ssa.sqc, rsi960xm.sqc, rsgethrs.sqc, rsicbr01.sqr, rsiosha300a.sqr, and rsimmref.sqc. *See* Tr. 2369:16-2370:21 [Astrachan] (discussing a demonstrative entitled "RSI Files Alleged to Have > 20% Line Matching (P-2533)" (DDX5-66)).

52

Gibson, Dunn & Crutcher LLP

which she claimed led to another file called rsi810st.sqr); Tr. 396:12-406:12 [Frederiksen-Cross] (discussing rsi960us.sqr). She claimed she identified other examples in an exhibit to her expert report, but did not discuss them. *See* Tr. 406:13-408:2 [Frederiksen-Cross]; P-2533.[7] Ms. Frederiksen-Cross testified that she used an "automated" line matching tool to assess whether these files contained code that matched code in Oracle files. Tr. 414:3-7 [Frederiksen-Cross] ("Based on my review of these files in this automated analysis, it is my opinion that these files all contain substantial portions of Oracle's creative expression."); Tr. 407:6-408:2 [Frederiksen-Cross] (describing automated analysis).

146. She acknowledged that only some of Rimini's rewrite files identified in her exhibit were ever actually given to Rimini clients. Tr. 414:19-22 [Frederiksen-Cross] ("Not every file in this list was distributed to a customer."). She presented a list (via a demonstrative) of rewrite files she claimed had been distributed to clients, which included: rsi960us.sqr, rsi810st.sqr, rsiw2st.sqc, rsi960st.sqr, rsiw2ssa.sqc, rsibn733.sqc, rsicbr01.sqr, rsi960usxml.sqc, rsi960xm.sqc, rsiOSHA300a.sqr. *See* Tr. 414:19-415:17 [Frederiksen-Cross] (referring to demonstrative titled "Distributions of RSI files with >20% Line Matching" (slide 40)). The last two files were listed as only having been distributed once (*i.e.*, to a single client).

147. Although the evidence showed that Rimini continued to add and modify code to these files over the years—thus creating new versions with different content over time—Ms. Frederiksen-Cross did not offer any testimony linking the specific versions of rewrite files for which she provided line matching statistics (in P-2533) to the specific versions that she claims were actually distributed to clients. Indeed, even when testifying about supposed "protected expression that is contained with the rsi810st file," she displayed a *different file* during her testimony (rsi810**dc**.sqr**)**, which she acknowledged was an "early version" of the Rimini file that "led to the ultimate rsi810st program." Tr. 373:1-374:11 [Frederiksen-Cross]. She further acknowledged that, "[a]s the development of the file went on," the amount of alleged Oracle

---

[7] The Court admitted this exhibit, but noted that "in determining the weight of the evidence, I'll consider the fact that this is based on – that's what's considered this match is based on Ms. Frederiksen-Cross's opinion." Tr. 408:13-413:18.

protected expression "decreased," "[s]o as time went on and Rimini incorporated changes, there were fewer matching lines." Tr. 387:1-21 [Frederiksen-Cross]. But Ms. Frederiksen-Cross did not present any version of rsi810**st**.SQR, let alone one that had actually been distributed to multiple clients.[8] Nor did she claim that rsi810dc.sqr had been distributed to clients. *See* Tr. 414:19-415:17 [Frederiksen-Cross] (referring to demonstrative slide 40). In short, although Oracle claims that, via these rewrite files, Oracle code was sent to multiple clients (and thus "cross-used"), there is no concrete evidence before the Court regarding the content of the specific rewrite files Oracle alleges were sent to multiple Rimini clients. *See* Tr. 414:19-22 [Frederiksen-Cross] (admitting that "versions" of the files in P-2533 were sent to clients, but not identifying those versions or specifying their alleged matching to Oracle files).

148.    Ms. Frederiksen-Cross also claimed to have performed analytic dissection to filter out unprotectable expression from the Rimini files, as the law requires. But for the specific files listed in her P-2533 exhibit, Ms. Frederiksen-Cross did not offer any testimony on what was or was not protectable in these files, instead presenting only her line match statistics based on her "automated" analysis and a bald assertion that she had "conducted analytic dissection with respect to the … file pairs listed in [P-2533]." *See* Tr. 407:6-408:2, 414:3-18 [Frederiksen-Cross]. Ms. Frederiksen-Cross's failure to engage in this analysis is especially noteworthy given that she *acknowledged* that at least some of the matching content she identified in her automated analysis should be filtered out. *See*, *e.g.*, Tr. 375:8-13, 375:25-376:1, 378:1-11, 379:21-380:3, 382:4-13, 383:4-13, 384:7-16, 386:1-18 [Frederiksen-Cross].

149.    Ms. Frederiksen-Cross also conceded that clients that received an "RSI" file that contained Oracle expression already had copies of that expression, by virtue of having licensed a copy of PeopleSoft. *See* Tr. 597:20-599:5 [Frederiksen-Cross].

150.    In 2018, Rimini stopped storing these files on its system and stopped delivering the files to clients. Tr. 1335:4-20 [Conley]. For clients that had already received these files, Rimini

---

[8] While Ms. Frederiksen-Cross's P-2533 did provide a line matching count for *one* version of rsi810st, she did not claim this version was sent to any clients.

RIMINI STREET AND SETH RAVIN'S POST-TRIAL PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW
CASE NO. 2:14-CV-01699-MMD-DJA

Gibson, Dunn &
Crutcher LLP

treated those files as it would any other Oracle file on a client's system, separately supporting them in each client's siloed environment.    Tr. 1335:21-25 [Conley].    Oracle did not dispute this evidence.

### b.    JDE

151.    **JDE Registrations.**    As mentioned above (*supra* ¶ 98), Oracle has asserted infringement in this case of only five JDE copyright registrations: four covering specific JDE updates and one covering a database of documentation, *i.e.*, registration numbers TX 8-116-321, TX 8-116-317, TX 8-116-314, TX 8-130-597, and TXu1-607-455.    Tr. 574:2-576:4 [Frederiksen-Cross]; ECF No. 584 ¶ 169.    None of those registrations cover the actual JDE releases themselves. Tr. 575:12-21 [Frederiksen-Cross].    Oracle acknowledged that it did not offer any evidence of allegedly infringing conduct related to these five registered copyrights.    Tr. 576:5-10 [Frederiksen-Cross].    Indeed, Oracle sought at the last minute to amend its pleadings in this case to add registrations into its case-in-chief.    ECF No. 1479.    The Court denied Oracle's motion and rejected Oracle's efforts to belatedly assert infringement claims as to any JDE copyright registrations apart from the five identified in Oracle's operative pleading.    *See* ECF No. 1511.

### c.    Siebel

152.    Rimini provides break/fix support services to its Siebel clients, but does not provide TLR updates for Siebel software.    Tr. 1469:19-23 [Mackereth]; Tr. 2373:4-16 [Astrachan].

153.    As part of Process 2.0, Rimini's provision of services to clients using Siebel is done remotely on the client's systems.    Tr. 2373:4-2374:2 [Astrachan]; Tr. 1469:24-1470:1 [Mackereth]; Tr. 90:5-9 [Ravin].    While the evidence shows that all Rimini clients have a license, Oracle presented no evidence of any Siebel license restrictions whatsoever.    And none of the Siebel licenses at issue in this case contain a "facilities" restriction.    Indeed, in the second *Rimini I* appeal, the Ninth Circuit explicitly held that the legacy Siebel license agreements "do not contain" a "facilities" restriction like the PeopleSoft licenses at issue in that case.    *Oracle*, 783 F. App'x at 710-11.

154.    In its Third Amended Corrected Counterclaims, Oracle alleged that Rimini

Gibson, Dunn &
Crutcher LLP

infringed on Siebel copyrights: Siebel 7.8 Initial Release and Documentation (TX 6-941-995); Siebel 8.1.1 Initial Release and Documentation (TX 6-942-001); and Database of Documentary Customer Support Materials for Siebel Software (TXu1-607-453).  ECF No. 584 ¶ 169.  In the pretrial order, Oracle continued to allege that Rimini infringed Siebel by stating that Rimini infringed registered Siebel copyrights by copying "the 225 Siebel environments listed in Exhibit 3."  ECF No. 1309 at 37.  However, Oracle did not propose any findings of fact or conclusions of law regarding Siebel.  ECF Nos. 1451, 1452.  And Oracle presented no evidence whatsoever at trial on Siebel, with its witnesses repeatedly testifying that there were only four product lines at issue in the case, none of which were Siebel.  Tr. 9:9-14 [Screven]; Tr. 321:24-324:15 [Frederiksen-Cross]; *see also* Tr. 1067:2-4 [Catz] (Oracle's CEO Safra Catz asking, "Is Siebel in this case?").

### d.    EBS

155.    ***Updates and Technical Specifications.***  Oracle's main claim as it relates to EBS is that Rimini's process for developing so-called "prototype" updates.  As found above, the prototype client is the first client to receive an update when Rimini provides updates to multiple customers affected by a TLR change.  *See also* Sahni Dep. 52:10-23 (explaining that the "prototype" client is "the first client coding is being started").  A Rimini developer then uses a technical specification to guide the development work for the remaining clients, which Oracle claims is an impermissible form of "cross-use."  Tr. 519:9-17 [Frederiksen-Cross]; Tr. 2305:5-2306:10 [Astrachan].

156.    As with product lines, when providing TLR updates to multiple EBS clients, Rimini uses technical specifications. Tr. 1471:13-1472:22 [Mackereth].  By Rimini's policies, the technical specification may contain Rimini's knowledge or Rimini-written code useful for implementing the update (Tr. 1473:3-1474:8 [Mackereth]; Sahni Dep. 82:7-8), but the technical specification cannot include Oracle code (Tr. 1477:25-1478:7 [Mackereth]).  Using the technical specification, developers manually implement the update, separately, in each client's environment. Tr. 1472:1-22 [Mackereth]; Tr. 2303:6-18, 2318:19-2319:11 [Astrachan].  The implementation of the update for each client may be different because different clients have different software

versions, patch histories, and customizations.  Tr. 1452:19-1453:1, 1474:9-23 [Mackereth]; Tr. 2303:6-2304:9 [Astrachan]; Sahni Dep 72:10-24.

157.    Oracle's expert opined that 158 EBS updates were developed by Rimini through "cross-use." Tr. 506:8-21, 550:13-16 [Frederiksen-Cross].  However, with respect to 157 of these updates, she offered no opinions whatsoever about the contents of either the updates themselves, or of the technical specifications associated with them.  Tr. 550:13-552:5 [Frederiksen-Cross] (conceding that she only discussed five specific examples of "cross-used" EBS updates, and for the other 153 she "provide[d] no opinions whatsoever that they contain any Oracle code" or that the associated tech specs contained Oracle code); Tr. 552:10-12 [Frederiksen-Cross] (admitting that even with respect to the five examples she discussed, she did not contend the updates contained Oracle code).  Rather, Ms. Frederiksen-Cross counted these 157 as "cross-use" because Rimini implemented each of the updates for more than one client, irrespective of *what* they contained or *how* the updates were provided.  Tr. 512:14-20 [Frederiksen-Cross] (admitting she considered these updates "cross-use" "no matter what Rimini writes, no matter what steps are involved"); Tr. 527:13-20 [Frederiksen-Cross] (conceding her "cross-use" opinions do not depend on whether updates implemented for more than one client contain any literal or nonliteral Oracle expression, but only whether an update was developed "through the use of one customer's environment" and then at any later point "applied in another customer's environment"); Tr. 551:24-552:5 [Frederiksen-Cross]; Tr. 511:21-512:6 [Frederiksen-Cross] (updates counted if "developed in a client environment" and there existed "technical documentation that would allow Rimini to apply [it]" for other clients); Tr. 509:17-23 [Frederiksen-Cross] ("I merely identified and counted the fact that the update existed.").

158.    As to the remaining update, Ms. Frederiksen-Cross opined that the contents of the particular technical specification associated with one EBS update (EBS 100025) contained Oracle code.  Tr. 464:25-465:4, 466:6-474:10 [Frederiksen-Cross].  However, she conceded that the update and technical specification was completed in *2013*—before Rimini transitioned to Process 2.0.  Tr. 539:8-540:16 [Frederiksen-Cross]; *see* P-1126.  And she offered no opinion that the

Gibson, Dunn &
Crutcher LLP

1    technical specification and update (which were for a 2013 year-end update) were ever used by

2    Rimini after October 2013.  Tr. 541:20-23 [Frederiksen-Cross].

3    159.    ***Spinnaker's EBS Support.***    As discussed in detail *supra* ¶¶ 113-115, Oracle

4    reviewed Spinnaker's JDE support processes, and Oracle's 30(b)(6) corporate representative

5    regarding that review unequivocally testified that those processes did not infringe Oracle's

6    copyrights.  Oracle also reviewed information relating to Spinnaker's EBS support processes, and

7    Oracle's 30(b)(6) witness testified that they were "identical" to Spinnaker's JDE support

8    processes.  Ransom Dep. 224:9-225:12, 231:9-232:2; *see* D-536.  Oracle did not have "any

9    concerns" about Spinnaker's EBS processes.  Ransom Dep. 224:23-225:12.  Oracle thus approved

10    of Spinnaker providing "[f]ixes, updates and custom code solutions developed by Spinnaker ... [in]

11    the form of source code changes, configuration changes and data changes, or … 'paper fix[es]' or

12    other instructional document[s]" to its EBS clients.  D-530 ¶ 14 [Stava Decl.].  Oracle also

13    authorized Spinnaker to author code fixes for its clients by leveraging "white papers that contain

14    explanations of the knowledge that an issue exists and … a methodology … for fixing the issue,"

15    including documenting "pseudo-code."  Brua Dep. 44:5-7, 46:19-47:13; *see also id.* at 47:22-48:5

16    (defining "pseudo-code" as "instructions" regarding the "methodology [a developer] would take

17    to create the code and where"); D-530 ¶ 20 [Stava Decl.].  And Oracle also endorsed Spinnaker's

18    process of "re-writ[ing]" solutions to problems for one customer "to fix the same problem reported

19    by another customer."  D-530 ¶ 18 [Stava Decl.].

20    160.    ***ePack Tool.***    The Court relies on its previous findings related to Rimini's

21    proprietary software tools in Section II.B.5 *supra*, as it relates to Oracle's specific contentions that

22    the ePack tool constitutes a form of prohibited "cross-use."

23                          ***e.    Database***

24    161.    Rimini provides break/fix support for Database, but does not provide TLR updates.

25    Tr. 1468:20-1469:1 [Mackereth]; Tr. 2374:8-14 [Astrachan].  In providing this support, Rimini

26    receives and responds to support inquiries generated by the client.  Tr. 1462:24-1463:8

27    [Mackereth].  Oracle has no infringement theory in this case related to Rimini's Database break/fix

28

Gibson, Dunn &
Crutcher LLP

support.  Tr. 601:12-21 [Frederiksen-Cross].

162.   Instead, Oracle accuses Rimini of "cross-using" Database on the ground that each time Rimini "cross-uses" another software program that runs in conjunction with Database, Rimini necessarily "cross-uses" Database as well.  Tr. 479:7-480:10 [Frederiksen-Cross]; Tr. 2374:19-25 [Astrachan].  In other words, Oracle's Database infringement theory requires: (1) that Rimini "cross-used" a client's PeopleSoft, JDE, or EBS application; (2) that the application was running on top of an Oracle Database that Rimini was supporting; and (3) that the "cross-use" of the application caused a copy of the Oracle Database environment to be "cross-used."  Oracle failed to present any evidence of specific instances where these three criteria were satisfied.

163.   Ms. Frederiksen-Cross acknowledged that even where a client has both an Oracle application and Oracle Database under Rimini support, this does not mean the application runs on top of Oracle Database; it is common for clients to have multiple databases from different vendors, any one of which could be used for their Oracle applications.  Tr. 599:20-600:15 [Frederiksen-Cross].  And Ms. Frederiksen-Cross did not do any analysis to show that any particular client's application was running on top of an Oracle Database environment supported by Rimini, let alone connect that client to some act of "cross use."  Tr. 600:16-601:2 [Frederiksen-Cross].

164.   Further, the conduct that Oracle accuses of "cross-use" does not always use a database at all.  For example, the GenDiff function does not use Oracle Database.  Tr. 2375:7-20 [Astrachan].  Again, Ms. Frederiksen-Cross identified no specific update that involved "cross-use" of a client's Oracle Database.  Tr. 599:6-19 [Frederiksen-Cross] (admitting that she did not "identify a single specific example of cross-use relating to Oracle Database"); Tr. 2375:21-24 [Astrachan].

165.   The Court also notes it is undisputed Rimini has many clients that receive support from Rimini solely for Oracle Database.  Tr. 601:3-8 [Frederiksen-Cross]; Tr. 1469:6-18 [Mackereth].  Oracle has no infringement theory with respect to those clients—Ms. Frederiksen-Cross admitted that she did not.  Tr. 601:12-21 [Frederiksen-Cross].

166.   All Oracle Database licenses are subject to either an OMA, OLSA, or SLSA.  *See*

Gibson, Dunn &
Crutcher LLP

Tr. 931:2-12 [Allison].

167.    Spinnaker also provides support for Database.  Brua Dep. 26:11-12.

### f.    Miscellaneous Files on Rimini's Systems

168.    The Court incorporates its findings with respect to files on Rimini's systems set out in Section II.B.2, *supra*.

### g.    Derivative Works

169.    Ms. Frederiksen-Cross testified that the updates Rimini creates for PeopleSoft, JDE, and EBS are derivative works of Oracle software because the updates are designed to work with that software. Tr. 316:11-318:25, 461:8-15 [Frederiksen-Cross].  She confirmed that this was her opinion even where Rimini's update consists entirely of Rimini-written code and contains "no literal or nonliteral Oracle expression whatsoever." Tr. 489:2-24 [Frederiksen-Cross]; *see also* Tr. 2299:11-2302:25 [Astrachan] (explaining the parties' different viewpoints on derivative works and the impact Oracle's view would have on software development generally).  On this basis, Oracle accused *all* Rimini updates written for PeopleSoft, JDE, and EBS of being derivative works.  To be clear, there is no dispute between the parties that once Rimini *applies an update to a client's Oracle software environment*, a derivative work is created (*i.e.*, the modified environment *as a whole*).  But Oracle's position is that these updates in *isolation*, even before being applied to a client's environment, constitute derivative works irrespective of their content because they do not have "viability" outside of Oracle software.  *See* Tr. 491:4-494:10, 488:5-17 [Frederiksen-Cross].

170.    As noted, the Court has already rejected Oracle's argument that "every single update and modification of Oracle's software constitutes a derivative work."  *Rimini I*, ECF No. 1459 at 23.  To the contrary, "whether a particular stand-alone update or modification is a derivative work is a fact specific inquiry," and the Court has already declined to make the type of "blanket ruling" Oracle seeks here.  *Id.*

171.    Further, the Court finds that Oracle's license agreements undermine Oracle's approach.  The license agreements acknowledge that the licensee—*not Oracle*—owns modifications to the software (*i.e.*, the modifications standing alone) where those modifications do

Gibson, Dunn &
Crutcher LLP

not contain Oracle code—precisely the opposite of what Oracle is arguing.  *See*, *e.g.*, P-6802 at 2, Article II, ¶ 1(C) ("*Customer shall own all right, title, and interest [in] any Derived Software* except [that] [Oracle] shall retain sole ownership of such portions of the Derived Software that contain part or all of the [JDE] Software." (emphasis added)), Article I, ¶ 8 ("Derived Software" defined as "Software programs or modifications to the Software created through the use of a development tool licensed hereunder and *developed by Customer, its employees or third party agents*…" (emphasis added)); License Appendix at A1-3 (listing 37 licenses with identical language); *see also*, *e.g.*, D-4027 at 1 ¶ 4.1 ("If Licensee creates a Software modification using PeopleTools, Licensee shall only have title in such modification that remains after PeopleTools has been separated from the modification."); D-4003 (same); D-4009 (same); D-4012 (same); D-4036 (same); D-4121 (same) D-4212 (same); D-4326 (same); D-4427 at 2 ¶ 4.1 (licensee if under "no obligation" to disclose modifications to PeopleSoft, but if licensee does disclose a modification, the parties will enter into negotiations "to determined [sic] the terms of an agreement that would grant PeopleSoft full rights title and interest to such Substantive Modification and compensate Licensee for its development efforts related to such Substantive Modification").[9] Oracle cannot claim copyright protection over a modification that is free of any Oracle expression where its license agreements expressly disclaim any ownership over such modifications.

### 3.   Oracle's Claims Regarding Recordkeeping

172.   At trial, Oracle elicited testimony from Ms. Frederiksen-Cross that Rimini's recordkeeping was "poor," and that Rimini did not have an adequate version control system for software.  Tr. 480:11-481:17 [Frederiksen-Cross].  However, Professor Astrachan testified that

---

[9] In a pretrial filing, Oracle contended that under Section 4.1 of certain PeopleSoft legacy licenses, Rimini is prohibited from sharing any "modifications" to the software through any other means besides a long-since-defunct "PeopleSoft forum."  ECF No. 1451 ¶¶ 201-205.  Oracle did not identify such licenses at trial, nor introduce testimony regarding that provision.  In any event, because Rimini's updates when standing alone contain only Rimini expression, Oracle has no rights under 17 U.S.C. § 106 in any such modifications, as they are not derivative works. Therefore, at worst, such distributions would be a problem of contract law, not copyright law under Ninth Circuit precedent (*MDY Indus., LLC v. Blizzard Ent., Inc.*, 629 F.3d 928, 939 (9th Cir. 2010)), and Oracle abandoned, with prejudice, any contract claims in this case.

these criticisms were unfounded—Ms. Frederiksen-Cross's testimony assumed that Rimini was a software company, as opposed to a software *support* company.  Tr. 2385:5-2386:10 [Astrachan].  Under the rules that Oracle has sought to impose on Rimini via litigation, Rimini is prevented from keeping certain Oracle software on its systems, which makes using a standard version control system for updates to client software infeasible.  Tr. 2385:5-2386:10 [Astrachan]; *see also* Tr. 1455:24-1456:19 [Mackereth] (explaining that while Rimini has version controls in place for its own documentation, it is "not version controlling the client's code because the client code exists on the client's environment").

173.    Oracle's experts also claimed that materials were deleted or not provided to them, and that this "made it much more difficult to assess and thoroughly analyze the full extent of Rimini's 'cross-use' behavior or use of Oracle copyrighted code."   Tr. 480:23-481:17 [Frederiksen-Cross]; Tr. 1382:21-1383:16 [Hicks] (testifying that certain records related to TransferFiles were allegedly deleted).  But at the same time, Oracle's experts admit they had access to massive amounts of Rimini data in this case.   Tr. 482:24-486:20 [Frederiksen-Cross] (acknowledging that Rimini's document production was "huge," that Rimini produced more than two petabytes of data, that she had live access to Rimini's development tracking system, and that she had access to (i) the source code and the underlying database for Rimini created tools, (ii) Rimini's technical documentation, and (iii) technical materials produced by Rimini clients in response to more than 700 Oracle subpoenas); Tr. 1399:7-13 [Hicks]; *see also* Tr. 2385:9-22 [Astrachan].  Indeed, Mr. Hicks admitted that this case was "the single biggest data case" he had ever worked on.  Tr. 1399:14-18 [Hicks].  Further, although Oracle never moved for sanctions on any supposed deletion of TransferFiles records in this case, it did make such a motion during the *Rimini I* case, which the Court rejected.  *See Rimini I*, ECF No. 1431 (Magistrate Judge Ferenbach's Report and Recommendation to deny sanctions); *Rimini I*, ECF No. 1459 at 34 (Judge Hicks's order affirming).  One basis for the Court's denial of Oracle's motion was that the TransferFiles process actually creates *more* copies of the file(s) at issue (*Rimini I*, ECF No. 1431 at 7-8)—a fact Mr. Hicks admitted at trial (Tr. 1418:15-1421:14 [Hicks]).

**D.    Oracle's Indirect Claims of Copyright Infringement Against Ravin**

174.    Oracle brings claims of indirect copyright infringement against Ravin on theories of contributory and vicarious infringement liability.   ECF No. 584 ¶ 172; *see also* ECF No. 1451 ¶¶ 308-321 (Oracle's proposed findings of fact).   Oracle's indirect claims of copyright infringement against Ravin were rejected by the jury in *Rimini I*.  *Rimini I*, ECF No. 896 at 2-3.

175.    Ravin is the co-founder, CEO, and Chairman of the Board of Rimini.  Stipulated Facts ¶ 12; Tr. 163:17-18 [Ravin].  His role involves high-level supervision of Rimini's more than 1,800 employees, located in 29 offices in 21 countries, and strategic direction of the company.  Tr. 162:2-8, 166:5-22 [Ravin].  Although Ravin began his career "in coding" and "software design," he "eventually moved more towards the business, the marketing and strategy," and is not familiar with granular specifics of Rimini's support processes for Oracle software or any other support processes offered by Rimini to its over 3,000 active clients.  Tr. 156:10-15, 162:12-16, 166:23-167:8 [Ravin].

176.    On a fully diluted basis, including "stock options and equity," Ravin owns about "13 percent" of Rimini.  Tr. 85:16-23 [Ravin].  He does "not own a controlling interest in the company." Tr. 164:12-16 [Ravin].  Rimini's largest single investor is Adams Street Partners.  Tr. 163:24-164:3 [Ravin].  Ravin reports to and serves at the pleasure of Rimini's board of directors, the majority of which are "certified independent" board members.  Tr. 163:12-164:8 [Ravin].  The board sets Ravin's "goals and … compensation."  Tr. 164:9-11 [Ravin].

177.    Under Ravin's leadership and direction, Rimini adopted its formal AUP, discussed *supra*, in or around 2012.  Tr. 238:7-14, 240:19-22 [Ravin]; D-12758 at 2-3; Tr. 1492:23-1494:2, 1498:9-1499:7 [Mackereth].

178.    Ravin has consistently instructed Rimini employees to comply with all court orders. Tr. 211:14-212:22, 213:2-214:11, 245:3-10 [Ravin]; P-1257; P-1261.

179.    Under Ravin's leadership and direction, Rimini took numerous steps to ensure that clients did not send Oracle intellectual property to Rimini's systems.  *See* Tr. 211:14-212:22, 213:2-214:11, 245:3-10 [Ravin]; P-1257; P-1261.  For instance, clients are repeatedly instructed

Gibson, Dunn &
Crutcher LLP

1  not to upload or send to Rimini any third-party software, intellectual property, or confidential data.

2  *See*, *e.g.*, Tr. 1504:23-1505:7 [Mackereth].  Although clients have on a few occasions sent third-

3  party intellectual property to Rimini despite those warnings, Rimini did not need or want that

4  material to perform its work.  Tr. 1506:9-21 [Mackereth].

5        180.  Although counsel for Oracle conducted an extensive examination of Ravin (*see* Tr.

6  84:2-153:20, 251:9-265:24 [Ravin]) discussing Rimini's migration of software (*e.g.*, Tr. 91:3-22,

7  92:6-94:18 [Ravin]), Rimini's processes generally (*e.g.*, Tr. 105:9-106:19 [Ravin]), AFW tools

8  generally (Tr. 134:23-142:18 [Ravin]), and the like, at no point did Oracle ask Ravin about any

9  specific instances of infringement or whether he was aware of any specific instances of

10  infringement (*cf.* Tr. 139:17-20, 140:1-12 [Ravin]).  Indeed, counsel for Oracle never even asked

11  Ravin about any of the files or updates that Oracle has accused of being infringing.

12  **E.**    **Rimini's Non-License Defenses to Oracle's Claims of Infringement**[10]

13      **1.**    **Rimini's Statute of Limitations Defense to Oracle's EBS Claims**

14        181.  In this case, Oracle asserted counterclaims of copyright infringement going back to

15  2010 arising out of Rimini's support of EBS.  ECF No. 888 at 12-13.  Rimini and Ravin assert a

16  statute of limitations affirmative defense as to all conduct involving EBS prior to February 17,

17  2012.  *See* ECF No. 1253 at 31; *see also* ECF Nos. 967, 974-s at 33-34.

18        182.  In January 2010 when Oracle filed suit against Rimini in *Rimini I*, Oracle alleged

19  that Rimini's entire "business model … relied on extensive infringement of Oracle's copyrights."

20  *Rimini I*, ECF No. 747 at 4.  Rimini introduced its support for EBS products in 2010.  ECF No.

21  969-1 at 1.  In October 2011, Rimini issued public press releases announcing its EBS services,

22

23  ———————————

[10] Rimini maintains that it should have been permitted to present a number of other claims or

24  defenses at trial that were wrongly stricken or dismissed earlier in the case as Rimini set forth in

the pretrial order, including but not limited to Rimini's defenses under 17 U.S.C. § 117, copyright

25  misuse, certain fair use and express license defenses, declaratory judgment claims of non-

infringement and non-hacking, claims under the Lanham Act, intentional interference with

26  contractual relations, claims under the Nevada Deceptive Trade Practices Act, intentional

interference with prospective economic advantage, claims under the California Unfair Competition

27  Law, unclean hands, equitable estoppel, abandonment and waiver, consent and implied license,

and laches.  ECF No. 1309 at 81-115.

28

64

RIMINI STREET AND SETH RAVIN'S POST-TRIAL PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW
CASE NO. 2:14-CV-01699-MMD-DJA

noting that it had signed EBS clients, and that it used the same support processes for EBS as it did for the other Oracle product lines Rimini supported.  *Id*. at 1-3.

183.    Oracle suspected Rimini's Process 1.0 infringed Oracle's copyrights as to PeopleSoft, JDE, Siebel, and Database no later than January 2010 when Oracle filed suit as to those product lines.  It is also clear that Oracle had actual knowledge that Rimini provided services for EBS licensees no later than November 17, 2011.

184.    On summary judgment in this case, "[t]he Court agree[d] with Rimini regarding EBS," that in October/November 2011, "Oracle suspected that Rimini had engaged in widespread copyright infringement … in the course of providing support services for several of Oracle's software products, such as [JDE], Siebel, and PeopleSoft."  ECF No. 1253 at 32-33.  The Court found that there were two material issues of fact for trial:  (i) "[w]hether it would have been reasonable for Oracle, upon hearing that Rimini had begun offering support services for EBS, to investigate whether Rimini was utilizing the same infringing practices with that software as Oracle suspected Rimini was with others"; and (ii) "when Oracle acquired knowledge of or is chargeable with knowledge" of any suspected EBS infringement by Rimini.  *Id.* at 33-34.

185.    Based on the above, the Court further finds that Oracle had a suspicion of EBS infringement by Rimini no later than November 17, 2011, when Oracle deposed Ravin about EBS products (which were not at issue in *Rimini I*).  *See* ECF Nos. 967 at 24, 969-2 at 53:20-25.  The Court also finds that it would have been reasonable for Oracle to conduct an investigation once it was aware that Rimini was servicing EBS products, beginning no later than November 17, 2011.

## 2.    Rimini's Fair Use Defenses

186.    Rimini asserts fair use defenses in this case with respect to Oracle's claims regarding (i) Rimini's migration as part of its transition to Process 2.0, (ii) RAM copies made by CodeAnalyzer (when that tool was in use prior to November 2018), and (iii) Rimini's development of its proprietary AFW and other tools.

187.    ***Migration.***  In addition to the facts already found related to Rimini's migration of client environments, the Court further finds that the wholesale rebuilding of the environments on

the client systems would have been technically impossible or extremely burdensome and disruptive to the clients' operations.   Tr. 210:13-24, 214:17-216:20, 266:20-25 [Ravin] (extensively discussing the "potentially" "catastrophic" impact on clients of "rebuild[ing]" environments rather than migrating them); Tr. 2083:17-2084:25 [Lyskawa] (discussing both the "taxation" risks to clients of rebuilding environments, and that rebuilding client "archives" was impossible); *see also* Tr. 780:4-11 [Benge] (discussing the "critical" nature of TLR updates to client environments and consequences, including "fines," if they were to "fall out of compliance").

188.   The Court ordered that Rimini could no longer locally host PeopleSoft environments in 2014. *Rimini I*, ECF No. 474 at 11-15. In 2016, after Rimini had already migrated these environments back to clients, the Court also denied Oracle's requests to order impoundment or destruction of the environments, holding that an injunction prohibiting local hosting of PeopleSoft environments was a sufficient remedy for Oracle along with the damages Oracle received at trial for that conduct. *Rimini I*, ECF No. 1049 at 9-10; *see also Rimini I*, ECF No. 1458 at 55 (denying repeated request for the same relief).

189.   The purpose of the copies made in the migration was simply to move the client environments to the clients' chosen systems so that the clients could receive support (without unreasonable disruption) in compliance with the Court's order holding that Rimini could not host PeopleSoft environments on its systems.   Tr. 94:6-12, 210:13-24, 214:12-215:17 [Ravin]; Tr. 666:5-18 [Benge]; Tr. 2089:5-11 [Lyskawa]; Tr. 2378:16-2379:5 [Astrachan].  Rimini's clients owned the software, including data, customization, and software archives that could not reasonably be recreated after deletion, and Rimini was not authorized by the clients to retain or otherwise dispose of the client-owned software and data.  Tr. 2082:22-2083:3, 2084:16-25 [Lyskawa].

190.   The migration was not part of Rimini's normal business model, and *Rimini* (not its clients) spent millions of dollars to accomplish it.  Tr. 219:4-8 [Ravin]; Tr. 797:2-6, 797:21-798:10 [Benge]; Tr. 2081:22-2082:7, 2085:1-11 [Lyskawa].

191.   Moreover, Oracle presented no evidence that the migration diminished demand for

Oracle's PeopleSoft software or otherwise affected the market in any way.[11]  By definition, the migrated clients were *already* Rimini (not Oracle) support clients.  And the clients had already paid Oracle for a license at the time Rimini migrated their environments—as noted, it is undisputed that all Rimini clients hold a valid license.  *See* Tr. 200:25-201:4, 202:2-23 [Ravin]; Tr. 964:9-13 [Allison]; Tr. 2072:24-2073:13 [Lyskawa]; *see also* D-237 at 6; D-2370; D-2370A; D-12793.  And Oracle's argument is that Rimini should have deleted and rebuilt the environments—achieving exactly the same result as the migration.  There is no evidence that migrating environments under a client's pre-existing license, rather than rebuilding them under a client's pre-existing license, had any impact on demand for Oracle software whatsoever.  Nor is there any evidence that during the migration Rimini ever sent to a client Oracle software or code that the client did not have a valid license to use.

192.    ***CodeAnalyzer RAM Copies.***  In addition to the facts already found related to the creation of RAM copies made when Rimini previously used the GenDiff function of its CodeAnalyzer tool, the Court further finds:

193.    The purpose of the temporary RAM copies differs from the purpose of the original file.  The purpose of the latter is to carry out specific computer instructions relating to the client's use of its PeopleSoft software, while the purpose of the RAM copies made in the CodeAnalyzer GenDiff process is merely to facilitate the extraction of Rimini's written work product (*i.e.*, its code changes, written entirely by Rimini) from an Oracle file.  Tr. 137:10-140:12, 243:5-244:14 [Ravin]; Tr. 759:3-20, 760:6-11, 822:22-825:1, 915:19-23 [Benge]; Tr. 1407:8-13, 1415:18-1416:12 [Hicks]; Tr. 2345:21-2347:24, 2353:13-2354:6, 2355:7-20 [Astrachan].

194.    The nature of the RAM copies is functional.  Tr. 822:6-825:25 [Benge] (explaining that the comparison process involves creating RAM copies and "computing a hash"); Tr. 2345:21-2346:9, 2351:17-2353:1 [Astrachan] (clients are grouped together into "Toyotas" and "Hondas"

---

[11] "The migration" was testified about at, among other places, transcript pages 91-94, 97-99, 128, 214, 216, 225, 240, 336-340, 418, 576-578, 660-662, 665-668, 1108-1110, 1129, 1631, 1640-1641, 1644-1646, 2080-2090, and 2378-2379, and Oracle never elicited any testimony about its impact on any market.

RIMINI STREET AND SETH RAVIN'S POST-TRIAL PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW
CASE NO. 2:14-CV-01699-MMD-DJA

Gibson, Dunn & Crutcher LLP

by comparing hashes and change sets created by comparing files). Additionally, because the purpose of the RAM copy is simply to allow the CodeAnalyzer tool to read portions of two files and compare them (Tr. 759:16-20, 822:24-823:15 [Benge], Tr. 2346:10-20, 2352:19-2354:6 [Astrachan]; *see* Tr. 346:25-347:9, 430:12-19 [Frederiksen-Cross]; Tr. 1407:8-13, 1415:18-1416:12 [Hicks]), the temporary RAM copy is not being used to take advantage of the expressive portions of the files (Tr. 2353:5-12 [Astrachan]).

195.   The amount of Oracle code temporarily copied into a RAM copy is minimal compared to the overall copyrighted work of PeopleSoft. Tr. 2356:1-10, 2471:16-2472:21 [Astrachan] (RAM copies are made of "one file out of 49,000 plus Oracle files that are part of the PeopleSoft environment").

196.   The RAM copies do not replace or impact in any way the market for Oracle software. Tr. 2356:11-16 [Astrachan]. Indeed, Oracle's expert Christian Hicks, when asked whether he had given any "examples about any impact on any market with respect to these RAM copies" in his analysis of the "GenDiff process" answered, "I don't recall giving examples of what the impact on a particular market would be." Tr. 1417:1-5 [Hicks]. Further, Rimini's prices have not changed since Rimini ceased using CodeAnalyzer in late 2018. *See* Tr. 190:23-191:13 [Ravin] (testifying that Rimini's standard pricing model is a 50% discount on Oracle support, which "has been the model since day one at the company"); Tr. 244:17-19 [Ravin].

197.   ***Creation of Rimini Tools.*** As noted above, Rimini implemented and tested some of its tools in client environments, but the tools were being used *for* the clients that received them, and thus any copies made in the testing process were for that client. *See* Tr. 2323:3-25, 2363:15-2364:19 [Astrachan]. These tools are used by Rimini to automate functionality that Rimini could perform manually without engaging in "cross-use." *See* Tr. 242:6-19 [Ravin]; Tr. 1215:22-1216:23 [Cauthen]; Tr. 2342:16-19 [Astrachan] ("Rimini's PeopleSoft processes with the Rimini tools do not involve cross-use."); *see*, *e.g.*, Tr. 820:19-821:9 [Benge] (GenDataChanges); Tr. 826:15-827:3 [Benge] (GenDiff); Tr. 837:25-383:13 [Benge] (ApplyUpdate); Tr. 1481:7-13 [Mackereth] (ePack); Tr. 2319:18-2322:11 [Astrachan] (ePack); Tr. 2342:24-2345:8 [Astrachan]

Gibson, Dunn &
Crutcher LLP

(GenDataChanges); Tr. 2347:6-2349:18 [Astrachan] (GenDiff); Tr. 2358:25-2359:23 [Astrachan] (ApplyUpdate); Tr. 2359:24-2360:15 [Astrachan] (TransferFiles). That is their overriding purpose. The tools also increase the accuracy and efficiency of developing and testing updates and help reduce bugs and other potential issues, and are in that sense purely functional. Tr. 243:11-244:19 [Ravin]; Tr. 1481:7-13 [Mackereth]; Tr. 2099:18-2100:11 [Davenport]; Tr. 2320:12-15 [Astrachan]. Rimini's tools were entirely written by Rimini and do not contain Oracle code. Tr. 578:14-24 [Frederiksen-Cross]; Tr. 1481:17-18 [Mackereth]; Tr. 2322:20-2323:15, 2344:9-18, 2359:15-23, 2363:15-23 [Astrachan]; *see also* D-1 (Rimini's U.S. patent on AFW). And Oracle presented no evidence that any copies made by testing or using these tools had any effect on the market for Oracle software.

**F.    Rimini's UCL Claims**

198.    Rimini accuses Oracle of harming competition and otherwise violating the "unfair" prong of California's Unfair Competition Law ("UCL") via various Oracle policies and false statements that Oracle made as part of its so-called "Project Rimini" campaign.

199.    As explained in more detail below, the Court finds that Oracle has a stranglehold on the support market for Oracle's enterprise software, which it maintains by adopting policies and engaging in conduct designed to "lock in" customers and prevent them from moving to a third-party competitor.

200.    Oracle witnesses testified that Oracle has an approximately 95% share of the market for Oracle support contracts, and that Oracle's profit margin on its revenue from support contracts is approximately 95%. Tr. 24:24-25:4, 27:1-8 [Screven]; Tr. 1054:14-19, 1057:7-15 [Catz]; Tr. 2526:2-4, 2529:12-14 [Campbell]. All of Oracle's support competitors typically charge *half* (or even less) of what Oracle charges for support, and the evidence shows that these competitors—including Rimini—frequently offer *more* services than Oracle as part of their base support offering. Tr. 2532:20-2535:20 [Campbell]; Tr. 191:8-192:14 [Ravin]; Tr. 1077:20-24 [Catz]; Tr. 1588:12-1589:9 [Jackson]; Tr. 2280:14-19 [Martin]; Stipulated Facts ¶ 15. Yet Oracle also admits that—by policy—*it does not compete on price with its support competitors.* Tr. 1060:17-21

Gibson, Dunn &
Crutcher LLP

[Pinto]; Tr. 1060:13-21, 1080:21-1081:3 [Catz]; D-154 at 3; Tr. 23:18-24:10 [Screven]; Tr. 2281:20-21 [Martin]; D-1930 at 1; D-75 at 2 ("[O]nce the Customer referenced Rimini Street, no concessions were granted," "so [t]he retention strategy therefore had to focus on positioning the value of Oracle Premier Support."); D-154 at 3 [Jones] ("No one is going to start allowing discounts to match Rimini.").

201.   As Oracle acknowledges in internal documents, its goal is to "[a]pply the Eagles 'Hotel California' lyrics to our support contracts: '*You can check out any time you like but you can never leave.*'" D-2458 at 3. To achieve that goal, Oracle has instituted policies and used tactics—including its matching service level ("MSL"), reinstatement fee and back support policies, a campaign of making false statements about third-party support, and other unfair practices—designed to prevent customers from switching to a support competitor.

202.   Oracle's ability to maintain a 95% market share, without competing on price and despite the existence of lawful competitors offering more and charging less, indicates that Oracle's scheme has been effective. Tr. 27:1-10 [Screven] (Oracle's Chief Corporate Architect confirming that "even though Oracle doesn't negotiate with customers over the price of support going forward, it still has about a 95 percent renewal rate for its over 400,000 support customers"). As set forth in further detail below, the Court finds that Oracle's conduct has harmed competition and reduced customer choice by preventing customers from obtaining the competing services they want from third-party support providers like Rimini.

### 1.   Support for Oracle Software

203.   Customers that purchase licenses for the use of Oracle's software products can also purchase support from Oracle in a separate transaction. Tr. 922:15-20 [Allison]; Tr. 1039:17-1040:10 [Catz] (explaining Oracle's support levels); Tr. 23:8-24:5 [Screven]. Oracle's support offerings include—at least initially—break/fix support, software updates, and the ability to access new releases of the licensed software. Tr. 14:5-15:12, 22:15-23:4, 75:8-18 [Screven]; Tr. 922:14-923:4 [Allison]; Tr. 1039:17-1040:10, 1062:20-1063:21 [Catz].

204.   As explained *supra*, Oracle's support offering differs based on the age of the

Gibson, Dunn &
Crutcher LLP

1  product.  When a product is first released, it is eligible for Premier Support, which includes new

2  fixes and updates provided by Oracle.  *See supra* ¶ 18.  After the software reaches a certain age, it

3  falls into Sustaining Support.  *See supra* ¶ 20.  In this tier, Oracle does not provide new fixes or

4  updates for the software.  *Id.*  Once software is in this tier, if a licensee wants new fixes and updates,

5  it must upgrade to a new version of the software.  Tr. 1062:12-1063:21 [Catz].

6  205.  Upgrading to a new version of Oracle software can take a company several years,

7  cause business disruption, and cost millions of dollars.  *See, e.g.*, Tr. 1580:15-1581:17 [Jackson]

8  (former Senior Director of Information Technology and CIO of Oracle licensee Welch Foods

9  testifying that an upgrade would have cost "about four to $5 million," "taken the company close

10  to a year to execute," and required the company "to divert resources from every department in the

11  company to test the upgrade," amounting to "a giant undertaking"); Tr. 2278:2-18 [Martin]

12  (representative for Oracle licensee Atkins testifying that it would have taken "three to four

13  [employees] full-time for six months," "a significant undertaking costwise"); Tr. 179:7-180:5

14  [Ravin] ("[T]he cost of actually executing that upgrade can be measured for some customers,

15  literally, up to billions of dollars for the largest companies, and it can take three to five years to

16  execute a massive project like that."); *see also* Tr. 2166:21-2167:19 [Lanchak].  Thus, for many

17  licensees, upgrading to a new version to get out of Sustaining Support is not feasible.  Tr. 1578:1-

18  3 [Jackson] (Welch Foods was not "planning on upgrading" because they "couldn't afford it" and

19  "didn't want to divert the business resources"); Van Horn Dep. 116:18-117:11 (Oracle licensee

20  NCH's reasons for not upgrading included "business disruption, loss of momentum, cost and

21  availability of resources" and an upgrade would have "take[n] months, if not years").

22  206.  Licensees that do not want support from Oracle can purchase support from third

23  parties, such as Rimini.  Tr. 86:11-14, 146:10-13, 245:12-14 [Ravin]; Tr. 953:15-21 [Allison]; Tr.

24  1055:13-16, 1061:19-1062:4 [Catz].  These third parties operate in "lawful competition" with

25  Oracle.  *Oracle*, 879 F.3d at 952; *see also* Tr. 953:15-21, 959:4-9 [Allison]; Tr. 1008:22-1009:1

26  [Allison] ("Customers have a choice.  They can go to a third-party support provider if they want

27  to."); Tr. 1055:17-18 [Catz] ("I believe [customers] should have a choice, a lawful choice."); Tr.

28

Gibson, Dunn &
Crutcher LLP

1055:19-1056:15, 1061:22-24 [Catz] ("[Customers] may ask someone else to support them as long as it's within their license. Obviously, the Rimini Street people are there."); Tr. 2132:24-2134:9 [Lanchak] (Oracle has acknowledged an increase in demand for third-party providers); Jones Dep. 19:2-4, 19:6-7, 20:17-19.

207.    As also explained *supra*, third-party support providers like Rimini do not have support tiers akin to Oracle's. Instead, these competitors guarantee that they will provide full support for clients for a defined time period, such as 15 years. *See supra* ¶ 21. Thus, clients with software that has reached the Sustaining Support phase—and thus is no longer eligible for new updates or fixes from Oracle—can engage third parties like Rimini to provide those services. *Id.* Notably, between 70% and 90% of Rimini's clients are running software that would fall under Oracle's Sustaining Support offering. D-12781 at 5-6, 9, 14 [Rimini client software version list]; D-2077 at 10, 12, 14 [Oracle Lifetime Support Policy]; Tr. 2077:20-2080:8 [Lyskawa] (90% of PeopleSoft clients, 70% of EBS clients, and 74% of JDE clients in April 2016); Tr. 1513:11-22 [Mackereth] ("around 80%" of Rimini clients' Database versions are in Oracle's "Sustaining Support" tier and are therefore ineligible for "new security patches").

208.    Rimini also provides several services not included in even Oracle's Premier and Extended Support tiers, including support for clients' customized code and extensions, performance tuning, installation and upgrade support, interoperability support, and archiving support. Tr. 168:5-172:4 [Ravin]; Tr. 1458:25-1460:11, 1462:24-1463:9, 1464:5-16 [Mackereth]; Tr. 1574:7-15, 1588:1-11 [Jackson]; Tr. 2282:5-10 [Martin]. Rimini's support for customizations in client software is a significant distinction between Rimini and Oracle support, as it is very common—and in some cases may even be necessary—for Oracle licensees to customize their software to suit their needs. Tr. 1573:20-1574:15 [Jackson]; Tr. 780:12-24 [Benge] Tr. 2004:21-2005:1 [Rubin]; Tr. 2128:8-17 [Lanchak] (Mr. Lanchak's teams at HCL Axon "did a lot of customizations"); Tr. 2201:25-2202:3 [Loftus] ("Now, this ERP software, much of it was designed to be customized, and there were customers who were running these highly-customized versions"); D-402 at 1 ("All customers do some customization and they [Rimini] support the customers [sic]

customizations which in a lot of cases is very beneficial.  We [Oracle] don't offer that as part of our support offering.").  As the former Senior Director of Information Technology and CIO of Oracle licensee Welch Foods testified with respect to Oracle support, "anytime we had an issue, we had to investigate the problem, find out if it was our code or Oracle's base code, and we had to prove to Oracle that it was their base code that needed [to be] fixed before they would take a look at, you know, what the problem was," which was "very costly for us" and "encumbered the process of getting things fixed."  Tr. 1574:16-1575:3 [Jackson].  By contrast, "[i]t was quite different with Rimini because anytime we have a problem, we just call Rimini Street.  They don't care where the code problem is.  They'll look at our extensions, our customizations, or the Oracle base code, and find out where the problem is and take action to fix it."  Tr. 1575:4-10 [Jackson].

209.   The evidence at trial indicated high levels of client satisfaction with Rimini support. Tr. 170:5-11, 170:21-171:5 [Ravin]; Tr. 1462:13-14 [Mackereth]; Tr. 1575:4-10, 1586:18-1587:16, 1588:1-11, 1590:9-22 [Jackson]; Tr. 2281:22-2282:10 [Martin]; Van Horn Dep. 154:4-7, 154:11-12, 154:14.

### 2.   Support Pricing

210.   Oracle prices support based on the cost of the license agreement sold to the customer.  *See supra* ¶ 17.  Typically, Oracle charges 22% of the license cost on an annual basis. Tr. 1036:23-1037:4 [Catz]; ECF No. 1451 ¶ 13 (Oracle's proposed findings of fact).

211.   Rimini prices support at 50% (or more) off of whatever annual price clients were paying to Oracle for support.  Stipulated Facts ¶ 15; *see* Tr. 191:8-192:14 [Ravin]; Tr. 1077:20-24 [Catz]; Tr. 1588:12-1859:9 [Jackson]; Tr. 2280:14-19 [Martin].  Other third-party support competitors offer similar pricing structures.  Tr. 2532:20-2534:5 [Campbell].

212.   Oracle's policy is to not compete with Rimini or other third-party support providers on price.  *See* Tr. 1060:17-21 [Pinto] ("**Q.** Right. So if a customer is thinking of leaving Oracle support and going to a competitor, Oracle doesn't discount support to try to win that business, right?  **A.** As general matter, it does not.  As general matter, it does not.");  Tr. 1080:21-1081:3 [Catz]; Tr. 23:18-24:10 [Screven]; D-154 at 3 [Jones] ("No one is going to start allowing discounts

73

to match Rimini."); *see also* Tr. 2281:20-21 [Martin] (Oracle refused to compete on price); D-1930 at 1 (Oracle employee explaining that in winning a support deal, Oracle "did not compete on price with the competition (Rimini)").

### 3. Oracle Acknowledges the Low Value Proposition of Oracle Support

213.    At trial, extensive evidence showed that top support executives at Oracle believed that Oracle's support offering had little value to customers.  In an internal email sent to other Oracle support executives, Juan Jones, Oracle's head of global sales for support renewals, wrote that Oracle's "Apps"—meaning the software at issue here—was "where the current 'value of Support' proposition is weakest because we are no longer delivering Upgrades with significant business function value."  D-21 at 2; *see also* D-363 at 2 (Oracle licensee Hafele: "Every upgrade since we first went live has been a negative impact on our business with no business value").  Mr. Jones also stated: "As the IT industry and our products continue to mature, the perceived value of break/fix support, patches etc. continues to decline.  With the advent of cloud, the perceived value is zero …." D-21 at 2.  Similarly, in an internal Oracle presentation regarding the value of support, Mr. Jones wrote:  "Problem: Apps Unlimited [the software at issue in this case] products at end of life - $3,350M Contract base at risk; -No new major releases, lack of reperceived valued for Support; -Accelerating cancellations rate and moves to TPMs."  D-166 at 5.  And in an email explaining the presentation, Mr. Jones asserted that "no new significant upgrades/versions make the base ripe for cancellations and third parties like Rimini."  D-166 at 1.  Mr. Jones also testified that these statements in these documents accurately captured his views at the time (Jones Dep. 32:5-32:21, 33:1-33:15, 33:24-34:9, 35:2-35:6, 37:14-38:2), and that there had been a "growing concern within Oracle that the basic value proposition for Oracle support … was diminishing among customers" (*id.* 27:13-19).  Mr. Jones's boss, Charles Rozwat, wrote in an internal email that the "basic value proposition" for Oracle's support has been "1. getting break/fix support, patches, etc. [and] 2. getting all the future releases for the product by staying under contract," but that this was "becoming less interesting as customers have stable environments and are running across fewer problems" and because "there are no future enhancements/upgrades worth

Gibson, Dunn &
Crutcher LLP

mentioning (particularly for Apps)." D-21 at 4-5. He noted that Oracle was seeing "cancellations rise where customers are willing to self-maintain or go to a third-party support provider." *Id.* at 5.

214. Notably, Oracle's founder and Chief Technology Officer Larry Ellison testified that "99 percent" of the value of Oracle's support offering is the right to upgrade the software a customer is running to a newer version. Ellison Dep. 11:15-21. Yet internally, Oracle's executives acknowledged that there are no upgrades for Oracle's applications "worth mentioning." D-21 at 5.

215. Evidence from Oracle's customers echoed Oracle's internal commentary about the declining value of its support services and upgrades, with a senior director of support renewals reporting that "[i]t is a recurring message I hear regarding the decline of support over the past 10 years." D-363 at 1; *id.* at 2 (Oracle licensee Hafele: "I have over 20 years of experience with Oracle Support … and I can honestly say the support has declined over the last decade and is still in decline … I could spend hours explaining the horrors we have experienced with Oracle support"); D-194 at 1 (Oracle licensee 3M cancelled Oracle support because "[t]here have been strained/scarred relationship btwn [sic] CEO and Oracle Sr. Mgmt"); D-2217 at 1 (Oracle licensee St. Francis: "I cannot wait for the day when I can cancel [Oracle support contracts] all at once"); D-12794 at 2 (Oracle licensee SM&A: "Oracle will only support their off the shelf software[,] … requires that you take upgrades … [and] simply locks you in at a very high price"); D-213 at 4 (Oracle licensee AEP: "Cons" of remaining on Oracle support include "limited support for existing products" and being "forced into doing upgrades every 4-6 years whether there are significant business reasons or not, just so we can get tax, legal, and regulatory updates"); D-102 at 1 (Oracle licensee National Grid told Oracle that its communications with National Grid demonstrate an "amazingly inflexible and hostile attitude"); D-101 at 3 (Oracle licensee Enpro: "The fact that you [Oracle] have sent this invoice to EnPro is simply appalling. It has got to be the worst piece of business practice that I have seen in my 30+ years of commerce ... I have no idea what you call that, but it certainly is not good business, and it is absolutely unethical and shameful").

216.     Oracle also acknowledged internally that third-party support providers like Rimini provide a "compelling" alternative to Oracle support.  D-22 at 2.  One Oracle support sales executive wrote in an email to executives:  "They offer half the price, with no updates nor rights to migrate.  If Oracle has ceased to offer a good migration path / roadmap, then what does the customer lose going to the Rimini's of the world.  Of course, we are fighting and we win some and lose some.  But their message is compelling …. On top of that, Rimini offers a support level similar to our Premier Support plus our Priority Service.  So for half the price, you even get a named [engineer]."  D-22 at 2.  This sales executive, who Mr. Jones acknowledged was "credible" and "knowledgeable" about Oracle's support business (Jones Dep. 40:12-15, 41:10-15), recognized that in order to prevent support cancellations, Oracle would need to "[i]mprove on the existing" support offering by changing it to more closely resemble Rimini's (D-22 at 2-3 (suggesting that Oracle, as part of its Premier Support, offer "a dedicated [engineer]," "apply new patches automatically for [customers]," and "issue periodic health checks and configuration reviews")).

217.     The contrast between Oracle support and third-party support offerings like Rimini's is especially stark in the context of Oracle's Sustaining Support tier.  In this tier, Oracle provides no new fixes or updates.  *See supra* ¶ 20.  While licensees have the option to upgrade, it is time consuming and expensive, and—as even Oracle acknowledges—the upgrades do not provide any new or additional functionality that adds real value.  *See supra* ¶¶ 205, 213-216.  By comparison, a licensee can switch to a third-party support provider and receive the fixes and updates it needs, with no requirement of going through an unwanted upgrade, at a savings of 50% or more off what the licensee was paying Oracle.  *See supra* ¶¶ 21-23.

218.     Testimony from Oracle licensees at trial underscored this point, showing that the lack of value in Oracle's support offering—especially during the Sustaining Support phase— caused customers to seek out alternative support providers.  The former CIO of Oracle licensee Welch Foods testified that the company was not "getting good value for the money it was spending on Oracle support" because "the software we were running was fairly stable, so we weren't running into a lot of problems that were with the base code, so we weren't in need of a lot of help from

76

RIMINI STREET AND SETH RAVIN'S POST-TRIAL PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW
CASE NO. 2:14-CV-01699-MMD-DJA

Gibson, Dunn &
Crutcher LLP

Oracle to begin with." Tr. 1577:18-25 [Jackson].  He also testified that Oracle was attempting to force Welch Foods into an upgrade that "provided no value to us" because the software version Welch Foods was using "was very stable, and the company was running very smoothly, and there weren't really any functions -- functionality in the upcoming versions of software that Welch's really cared that much about or really needed to run their business." Tr. 1578:8-21 [Jackson]; *see* D-330 at 4.  Because Welch Foods' software was falling into Sustaining Support, staying with Oracle "would have been a big risk to our business, like I said, because if anything broke that they hadn't already found a patch for or developed a patch for, then we would be left holding the bag in trying to figure out how to fix it ourselves." Tr. 1578:22-1579:5 [Jackson].  Thus, Welch Foods looked for other support options and hired Rimini for support.  Tr. 1584:14-1586:17 [Jackson]; *see* D-330 at 5.

219.    Similarly, a representative for Oracle licensee NCH testified:  "The reason NCH moved to Rimini Street was not about cost.  It was about Oracle's announcement to reduce the level of support for the version of software that we were running.  There were no other alternatives for getting support if Oracle indeed was going to reduce their level of support.  That was what was important, being able to support the corporation with the software when Oracle had clearly said that they were not going to do that." Van Horn Dep. 50:16-24; *see also id.* at 51:6-9 ("**Q.** When you say that there were not other alternatives to getting support, what do you mean?  **A.** Oracle clearly stated that they were ending Premier Support."); *see also* Tr. 2277:21-2278:1 [Martin] (fact that Oracle licensee Atkins's software was going into Sustaining Support was a "major factor" in Atkins's decision to move to Rimini).

**4.    Oracle Seeks to Lock In Customers Rather Than Compete on Price or Service**

220.    The evidence shows that, rather than compete on price or service, Oracle has undertaken an organized campaign to make it difficult or impossible for customers to move to a third-party support provider like Rimini.  *See* Jones Dep. 51:13-16 (Mr. Jones acknowledging that he received "increased pressure in 2016 to come up with some campaigns to try to stop customers from moving to Rimini Street"); D-368 at 1 (Lisa Schreiber, Vice President of Support Sales for

Oracle North America told Mr. Jones, "Daily I am plotting against Rimini with my team.").

### a. *The Matching Service Level Policy*

221.    Oracle has a Matching Service Level ("MSL") policy that requires that "all licenses in any given license set must be supported under the same technical support service level." D-133 at 3; *see* Tr. 26:8-25 [Screven]; Tr. 923:9-15, 924:22-925:2 [Allison] ("this policy applies to all of our products"); Tr. 1006:18-1007:10 [Allison].  A license set is defined as "all of your licenses of a program, including any … program that share[s] the same source code." D-133 at 2; *see* Tr. 26:8-25 [Screven]; Tr. 924:22-925:2, 1007:11-1008:21 [Allison].

222.    Oracle's MSL policy states that "[y]ou may not support a subset of licenses within a license set; the license set must be reduced by terminating any unsupported licenses." D-133 at 3. As Oracle's witness acknowledged, "the matching service level policy requires that if you have Oracle support for one license for a given product, you have to buy support contracts for all the licenses for that same product." Tr. 1006:18-22 [Allison].  In other words, if a customer has two licenses for the PeopleSoft product and buys (or renews) a support contract for one of those licenses, it must buy (or renew) a support contract for the other license—the customer is not permitted to only have Oracle support for one of its two PeopleSoft licenses. Tr. 1007:11-1008:21 [Allison].

223.    If a customer attempts to drop Oracle support on a subset of licenses within a license set, Oracle will not allow the customer to do so unless the customer also cancels the remaining licenses (not simply the support for those licenses), thereby forfeiting the customer's right to use the licensed software.[12]  Tr. 26:8-25 [Screven]; Tr. 925:3-13 [Allison]; Tr. 1007:24-1008:21, 1014:19-23 [Allison]; D-133 at 3 ("You may not support a subset of licenses within a license set; the license set must be reduced by terminating any unsupported licenses.  You will be required to

---

[12] Regardless of which level of support a customer retains, Oracle "bundles" its support services so that customers are paying for support they are no longer using.  Tr. 1582:13-1583:2 [Jackson]. When a customer notifies Oracle that it intends to stop purchasing support for versions of software the customer no longer uses, Oracle will "re-price" the customer's package of software support so that the customer's overall support costs do not change.  Tr. 1582:13-1583:2 [Jackson]; D-133 at 3 (Oracle Technical Support Policies).

78

Gibson, Dunn &
Crutcher LLP

document license terminations via a termination letter.").

224.    The policy frequently comes up when a customer has been receiving support from Oracle for a family of products (*e.g.*, PeopleSoft), but decides it does not want to renew Oracle support on a *subset* of those products and instead wants to hire a third party to provide support. Tr. 1009:2-9 [Allison] ("I'm sure it comes up, to going to a third party for a partial set of licenses, yes."); Tr. 2519:20-2520:2 [Campbell] (Oracle competition expert admitting that the policy applies to "all Oracle customers and all Oracle competitors").  In that situation, Oracle uses the MSL policy to prevent licensees from obtaining the third party's competing services.  Tr. 2520:6-13 [Campbell] (Oracle competition expert admitting that without the MSL policy, "a customer would have the option to put some of their PeopleSoft, for example, with a third party support provider and put some of it with Oracle," but the MSL policy takes away that option).

225.    For example, Oracle licensee Koninklijke KPN ("KPN") was considering hiring Rimini to support some of KPN's instances of Oracle Database, while using Oracle to support other instances.  D-77 at 2-3.  KPN was told by Oracle that under the MSL policy "this would not be possible," and "[i]t would be all or nothing," meaning that KPN would be required to maintain Oracle support on all of its databases if it had Oracle support on any of them.  *Id.* at 3.  KPN's CEO was "furious" and accused Oracle of "blackmailing" KPN.  *Id.*  Yet Oracle executive Richard Allison testified that this example was consistent with Oracle's matching service level policy.  Tr. 1010:14-1011:10 [Allison].  Even Oracle's own competition expert admitted that it was not "good for this customer that Oracle applies its policy this way."  Tr. 2523:5-2524:3 [Campbell].

226.    In another example, Oracle licensee St. Francis hired Rimini to provide support for some of its software, but was subsequently told by Oracle that St. Francis was in violation of the MSL policy.  Tenner Dep. 42:21-42:25, 43:22-44:6, 75:15-76:4.  An Oracle representative also told St. Francis that Oracle would conduct an audit of St. Francis, and that "it would be a very unpleasant experience" if St. Francis did not return to Oracle for support.  *Id.* at 59:15-60:6. Although St. Francis's representative felt "bullied and strong-armed" by Oracle, it ultimately cancelled support with Rimini and returned to Oracle.  *Id.* at 76:22-77:7; D-208 at 5.  Oracle's

Gibson, Dunn &
Crutcher LLP

1  enforcement of its MSL policy in this case was not "consistent with normal competitive behavior."

2  Tr. 2216:15-2217:24 [Loftus].[13]

3  227.   Internal Oracle documents also show that Oracle was specifically focused on

4  enforcing the MSL policy as a means of deterring customers from transitioning to a support

5  competitor.  *See* D-125 (email from Oracle employee Alexandru Cristea stating with respect to a

6  purported MSL violation by a customer:  "I would very much like to enforce this policy by all

7  means because the customer is moving away to Rimini Street….  Our best shot to turn this around

8  is the MSL violation…."); D-366 at 1 (email from Oracle employee regarding a customer

9  considering Rimini: "I say we hit them hard with the legality of it all.  And, let's not exclude major

10  MSL issues on technology they have been renewing all year.  This one – if they cancel several

11  million and have support on 100K or so – will be a good example for us to target from Oracle

12  Legal."); D-154 at 3 ("No one is going to start allowing the waiving of matching services levels

13  for SW.  Nor should they: our renewal rates are awesome with all those policies in place.").

14  228.   The MSL policy's impact on competition is especially acute in the context of

15  Sustaining Support.  A customer may have several licenses for a product under support from

16  Oracle, some of which are on Sustaining Support and some of which are on Premier Support.  As

17  discussed *supra*, Oracle does not create new fixes and updates for products on Sustaining Support,

18  but third parties like Rimini *do* offer those services.  *See supra* ¶¶ 20-21.  These customers

19  naturally may prefer to stop paying Oracle's higher prices and instead engage a third-party support

20  provider for half the cost, so that they can obtain the fixes and updates they need to keep the

21  software running properly.  But Oracle's MSL prevents the customer from doing so—as long as

22  the customer has any of its PeopleSoft products under Oracle support, the customer is forced to

23  keep buying Oracle's Sustaining Support offering for its other PeopleSoft products.[14]  Tr. 1007:11-

24

25  [13] St. Francis had been purchased by another hospital, Trinity, and the acquisition allegedly
   subjected St. Francis to the MSL policy, as Trinity was still under Oracle support.  Tenner Dep.
26  53:23-54:10, 75:15-25.
   [14] While technically a customer could purchase a support contract from Oracle *and* a support
27  contract from Rimini for the same product, this would essentially be double-paying and is not
   typically a feasible solution.

28

Gibson, Dunn &
Crutcher LLP

1008:21 [Allison]; Tr. 2521:23-2522:12 [Campbell]; Tr. 248:5-249:5 [Ravin].

229.     Oracle's application of the MSL policy thus reduces customer choice and competition by preventing customers from being able to buy support from the provider of their choice.  *See* Tr. 2523:22-2524:6 [Campbell] (Oracle competition expert admitting it is "bad" for some customers for Oracle to apply its MSL policy as it does).

230.     Oracle claimed the MSL policy was not anticompetitive and was instead instituted to protect Oracle's intellectual property.   Tr. 1014:7-11, 1028:18-1029:6 [Allison]; 2487:12-2490:11, 2538:7-2539:16 [Campbell].  According to Oracle, if a customer has support for a *subset* of its licenses for a product, then that customer is able to access Oracle's support website to download updates, patches, and fixes for *all* of its licenses for that product, even those without active Oracle support contracts.  Tr. 923:16-924:21 [Allison].  But Oracle failed to present any evidence explaining why the MSL policy was required to prevent customers from doing so.  For example, Oracle presented no evidence that it was not feasible to adopt technical measures on its website to prevent customers from taking materials to which they are not entitled.  Further, the reality is that any Oracle customer with access to Oracle's website—no matter how many products they have, and irrespective of any MSL related issue—has the ability to download materials to which they are not entitled, because Oracle does not restrict access on the website.  Tr. 926:16-21 [Allison].  But Oracle presented no evidence that customers do this, let alone is a large enough issue to justify the draconian impacts of the MSL policy on customer choice.  Moreover, Oracle's purported justification for the policy makes even less sense for customers that run versions of Oracle products on Sustaining Support, because any new updates Oracle publishes to its support website are incompatible with versions of the software on Sustaining Support.  *See supra* ¶ 20.  Thus, there are no updates or fixes for a Sustaining Support to download from the website—yet Oracle still wields the MSL policy against such customers.  The only evidence in the record on Oracle's invocation and use of the policy shows that it was used to pressure customers from leaving Oracle, not to protect Oracle intellectual property, with customers even reporting that they felt that Oracle was "blackmail[ing]" them with the policy into staying with Oracle.  D-77 at 3.

Gibson, Dunn &
Crutcher LLP

231.    Oracle also likened the MSL policy to "insurance," claiming that Oracle must "cover all risks or [it is] not effectively offering an insurance policy to the user." Tr. 2489:2-2490:11 [Campbell]; *see* Tr. 1028:18-1029:6 [Allison].   Oracle's expert admitted on cross-examination that the analogy falls apart.  For instance, if a company has assets in the United States and the U.K., Oracle's expert admitted that no insurance company has a policy requiring a company seeking to insure its U.S. assets to *also* insure its U.K. assets.  Tr. 2520:21-2521:6 [Campbell].  Yet Oracle's MSL policy does just that, because it is a "worldwide" policy.  Tr. 2520:21-2521:6 [Campbell].  Similarly, Oracle's expert admitted on cross-examination that "warranty companies" do not have policies that require buying a warranty for all equipment from the same company or no warranty at all.  Tr. 2521:7-17 [Campbell].

232.    In any event, Oracle failed to explain why an insurance rationale would justify a policy mandating identical service levels for different licenses in a license set.  Rather, Oracle's discussion of an insurance policy focused on stopping and starting coverage (Tr. 1028:18-1029:6 [Allison]; Tr. 2489:2-2490:11, 2538:17-2539:16 [Campbell]), ignoring the fact that the MSL policy on its own does nothing to prevent a customer from wholly switching to a third-party support provider for some period of time, and then wholly resuming Oracle support.  Further, customers forced to purchase support contracts for their licenses on Sustaining Support do not receive the benefit of "insurance" for these licenses, as Oracle does not offer updates or security patches for versions of its software on Sustaining Support.  Tr. 2521:18-2522:12 [Campbell].  The MSL policy therefore heightens, rather than reduces, the risk for those customers.

233.    Oracle has enforced this policy to try to stop California-based companies from using Rimini's services, and Oracle employees based in California have also enforced this policy to stop non-California based companies from using those services.  *See* Stipulated Facts ¶ 1 ("At the time of the events at issue set for trial, Oracle America had its principal place of business in Redwood City, California."); Tr. 1013:12-16 [Allison] (explaining that Oracle's Technical Support Policies are "referred and incorporated into the master agreement [licensees] sign before they first acquire any licenses"); Tr. 2519:20-2520:2 [Campbell] (acknowledging that the

Gibson, Dunn &
Crutcher LLP

matching service levels policy "affects the entire customer base for Oracle's support software," including "all Oracle customers and all Oracle competitors"); D-125 (internal Oracle email about enforcing the MSL policy against a customer based in Sonoma, California, because the customer is moving to Rimini Street); Tr. 2080:9-10 [Lyskawa] (Rimini has "many clients in California").

### b.    Oracle's Reinstatement Fee and Back Support Policy

234.    Oracle's policies regarding "Reinstatement of Oracle Technical Support" require new or returning Oracle support customers to pay retroactive fees and a penalty for prior lapses in Oracle support.  D-133 at 3; Tr. 25:16-26:7 [Screven]; Tr. 1011:24-1012:7 [Allison].

235.    Oracle's policy states:  "If technical support lapses or was not originally purchased with a program license, a reinstatement fee will be assessed.  The reinstatement fee is computed as follows:  a) if technical support lapsed, then the reinstatement fee is 150% of the last annual technical support fee you paid for the relevant program; b) if you never acquired technical support for the relevant programs, then the reinstatement fee is 150% of the net technical support fee that would have been charged if support had been ordered originally…."  D-133 at 3.  That 150% is for every year the customer was off Oracle support.  *See id.*  For example, if a customer that pays Oracle $1 million in support annually leaves Oracle support for two years, that customer will have to pay $3 million in back support and reinstatement fees if it returns to Oracle, in addition to annual support fees moving forward.  Tr. 25:25-26:7 [Screven]; *see also* Tr. 1012:8-17 [Allison].

236.    Under this policy, an Oracle customer that discontinues Oracle support and then returns to Oracle will end up paying Oracle more than if that customer had maintained an active Oracle support contract.  D-100 at 15 ("Cheat Sheet: Oracle Software Support vs. Third Party Support Providers … When a customer does upgrade it will need to pay back support and penalties, so Oracle is cheaper in the long run"); *see also* Tr. 25:16-26:7 [Screven]; Tr. 1012:8-17 [Allison].  The fees paid to Oracle are in addition to the fees paid to a third-party competitor such as Rimini or Spinnaker.  *See* Tr. 25:25-26:7 [Screven].

237.    The evidence shows that Oracle uses the reinstatement fee and back support requirement to thwart Oracle customer decisions to choose support from third parties, such as

Rimini.  Tr. *249:6-14, 251:2-6* [Ravin]; Tr. *1012:25-1013:4* [Allison]; *see*, *e.g.*, P-810 at 2 (email to Oracle customer St. Francis regarding the possibility of dropping support on some licenses: "[I]t would be extremely expensive to do this as back support and reinstatement fees would be applied from the date of the support expiration.  It would be less of an expense to keep the support active- if this was in fact the plan."); D-179 at 2 (email to Oracle licensee IXYS:  "If you do reinstate these services in 2 years ... you would be paying roughly 340k.  That is 4 times your current support fee.  Instead of paying 160k in continuous support for 2 years, you would be paying 340k for 1 year of support!  Has your CFO looked at these numbers?"); D-103 at 1 (email to Oracle licensee Rosetta Stone re "Cancellation of Oracle Support":  "If support- an upgrade or patch is needed at a later date, back support from the time of expiration and reinstatement fees will be applied."); D-102 at 2 (email to Oracle licensee National Grid:  "Comparing Rimini Street to Oracle ... When National Grid does upgrade, you will need to pay back support and penalties, so Oracle is cheaper in the long run."); D-30 at 1 (Oracle employee Juan Jones writing that Oracle customers will "have to pay full Back-Support if you want to return [from Rimini]," and "Don't call Juan Jones and ask him for a break on Back-Support.  He doesn't actually want you to come back.  He wants you to lose your job").

238.    Oracle has enforced this policy to try to stop California-based companies from using Rimini services, and Oracle employees based in California have also enforced this policy to stop non-California based companies from using Rimini services.  *See* Stipulated Facts ¶ 1 ("At the time of the events at issue set for trial, Oracle America had its principal place of business in Redwood City, California."); Tr. 1013:12-16 (explaining that Oracle's Technical Support Policies are "referred and incorporated into the master agreement [licensees] sign before they first acquire any licenses"); Tr. 2080:9-10 [Lyskawa] (Rimini has "many clients in California"); D-179 at 10.

### c.    *False and Misleading Statements*

239.    In public, including during this trial, Oracle executives give the appearance of acknowledging that customers have the option to hire third-party support providers, and that such providers can legally offer support.  Tr. 953:15-955:14 [Allison] ("[C]ustomers don't have to buy

support.  We sell licenses without support all the time, so it happens, and they can choose to support themselves or use a third-party support provider."); Tr. 1008:25-1009:1 [Allison] ("Customers have a choice.  They can go to a third-party support provider if they want to."); Tr. 1055:13-18 [Catz] ("I believe they should have a choice, a lawful choice.").

240.    In private communications, however, Oracle repeatedly tells customers—including customers with operations in California—that third-party support is illegal and that no company but Oracle can provide support for Oracle software without infringing Oracle's copyrights.  D-188 at 3 (email to Oracle licensee Anixter about third-party support: "[T]hose companies are not legally able to offer support for software they do not own and develop."); D-178 at 2 (email to Oracle licensee Cross Country Healthcare: "There is no company out there that can actually provide legitimate support for Oracle licenses."); D-46 at 2 (email to Oracle licensee Sprint: "It is Oracle position that other companies cannot provide support without illegally obtaining source code and tax updates.").

241.    These statements are factually false and are contrary to the rulings of the Court and the Ninth Circuit, which recognize that Rimini and other third-party support providers can lawfully offer support for Oracle software.  *See Oracle*, 879 F.3d at 952.  Moreover, Oracle itself has acknowledged such statements are false.  *E.g.*, Tr. 953:15-21, 955:1-3, 959:4-9; Tr. 1008:22-1009:1 [Allison]; Tr. 1055:8-1056:15 [Catz]; D-392 at 1 [Oracle internal email] (acknowledging that Oracle cannot accurately say Rimini's offerings are illegal); D-182 at 4 (Rimini Street talking points: "What you should not say … Anything that suggests Rimini cannot provide any support, at all, without committing copyright infringement.  They could provide legal support").

242.    Further, although Oracle internally recognized that its support package and software upgrades provided little value (*see supra* Section II.F.3), Oracle never disclosed those facts to its hundreds of thousands of support customers.  To the contrary, Oracle insisted in public marketing materials—and even at trial—that customers that gave up access to Oracle support and went with a third party would expose themselves to material risks (including security risks as discussed below).  Indeed, while privately acknowledging there were no software upgrades "worth

mentioning" (D-21 at 5), Oracle repeatedly told customers that its support was "Trusted, Secure, [and] Comprehensive." D-54 at 2; *see also* D-55 at 7 ("We [Oracle] offer efficient, risk-resistant, rigorously tested, and innovative upgrades to help ensure that your technology investments are more effective … [Oracle] [d]elivers consistent, ongoing, and unparalleled innovation"); D-58 at 7 ("What customers need to know … [Oracle] is the only support provider your enterprise can depend on to protect your investment with 100% genuine parts including rigorously tested updates [and] innovative upgrades"); D-78 at 2 ("With Oracle Support, you benefit from our significant R&D investment, continuous innovation, extensive development … as well as state of the art updates and upgrades."); D-164 at 12 ("Only Oracle offers complete, worry-free support that provides security at the source."); D-339 at 1 (Mr. Jones provided an Oracle sales representative with key points for a discussion with Oracle licensee State of Oklahoma, including, "They are jeopardizing their business running their mission critical applications without Oracle Support.").

243.    Oracle also made statements to customers to the effect that if those customers hired Rimini to provide support, the customers would not be able to comply with regulatory audits related to software security under the Health Insurance Portability and Accountability Act ("HIPAA") (Tr. 2224:10-2225:19 [Loftus]; D-373 at 2; D-359 at 1), the Sarbanes-Oxley Act ("SOX") (Tr. 2227:13-2229:4 [Loftus]; D-358 at 1-2), requirements set by the Food and Drug Administration ("FDA") (Tr. 2229:5-2230:9 [Loftus]; D-1930 at 1), and other standards. Oracle raised these issues with customers without any legitimate factual basis. *See* D-358 at 1-2 (Oracle senior sales director discussing internally the practice of raising SOX compliance with customers and urging them to "google up cyper [sic] attacks" as a way to dissuade them from moving to Rimini); *see also* D-1930 at 1 [Oracle internal email] (discussing practice of raising FDA noncompliance to dissuade customers from moving to Rimini). Moreover, the evidence presented at trial shows these assertions are false: Rimini clients are subject to these audits and pass them. Tr. 1704:15-22 (Oracle's expert Dr. McDaniel agreeing that a Rimini client passed a PCI compliance audit); Tr. 1512:15-1513:14 [Mackereth]; Tr. 2035:17-2037:4 [Rubin]; Tr. 2225:17-19 [Loftus]. And Oracle admitted it was aware of *no* evidence that any client had ever failed such

RIMINI STREET AND SETH RAVIN'S POST-TRIAL PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW
CASE NO. 2:14-CV-01699-MMD-DJA

Gibson, Dunn &
Crutcher LLP

1 an audit. *See* Tr. 1700:20-22 [McDaniel] ("**Q.** And you have no opinion that any of Rimini's

2 clients have ever failed a SOX, HIPAA, or PCI audit, correct**? A.** I'm not aware of any.").

3   244. Oracle's marketing statements in this regard are unusual and exceed ordinary

4 industry standards for competitive sales activity.  Tr. 2200:20-2201:4, 2216:1-14, 2219:22-2220:5,

5 2224:3-7, 2231:2-7, 2268:24-2269:2 [Loftus] (testifying that Oracle's campaign, including

6 admonitions not to put sales tactics in writing and sending clients letters from outside counsel

7 threatening litigation, are extraordinarily unusual in the industry); *see, e.g.*, D-390 at 2, D-391 at

8 1 (Oracle internal emails warning personnel not to put talking points about Rimini in writing).

9   245. Customers heard Oracle's statements, considered them material, and relied on them

10 when deciding which provider to hire for software support.  Tr. 245:15-24, 246:5-7 [Ravin]; Tr.

11 2210:24-2210:2, 2221:5-9 [Loftus] (testifying that customers heard these communications "daily,"

12 that letters from outside counsel were sent to "between 150 to 200" Rimini clients and potential

13 clients, and that the campaign "had an impact"); *see, e.g.*, Tr. 2224:10-14, 2228:12-2229:4, 2230:7-

14 9 [Loftus]; Solomon Dep. 204:11-16 (Mar. 22, 2018).  Indeed, Oracle itself estimates that "Project

15 Rimini" has resulted in a $300 million impact through May 8, 2017, as measured by support sales.

16 Solomon Dep. 296:14-297:4, 298:24-299:11 (Mar. 22, 2018); Tr. 2231:8-2232:5 [Loftus]

17 (analyzing Solomon Dep.).

18   246. Oracle has made these false and misleading statements to stop California-based

19 companies from using Rimini services, and Oracle employees based in California have also made

20 these false and misleading statements to stop non-California based companies from using Rimini

21 services.  *See* Stipulated Facts ¶ 1 ("At the time of the events at issue set for trial, Oracle America

22 had its principal place of business in Redwood City, California."); Tr. 2222:5-24 [Loftus] (noting

23 that various California entities including City of Fresno, California, City of Costa Mesa, California,

24 Ross Stores, Raley's, and Edmund's received a letter from Oracle's outside counsel); Tr. 2224:10-

25 2226:6 [Loftus] (discussing California-based CalPERS having received false statements

26 surrounding HIPAA compliance); D-67 (list of customers that received Oracle outside counsel

27

28

Gibson, Dunn &
Crutcher LLP

1   letter); D-373 (Oracle correspondence with CalPERS); Tr. 2080:9-10 [Lyskawa] (Rimini has
2   "many clients in California").

3        247.   The Court finds that not only were Oracle's various policies and statements noted
4   above harmful to Rimini and its business, they were also harmful to competition.  *Cf.* Tr. 2541:7-
5   9 [Campbell] (acknowledging that "false information" can have anticompetitive effects).

6   **G.    Oracle's Lanham Act Claims and Rimini's Defenses**

7        248.   In its proposed findings of fact and conclusions of law, Oracle accuses Rimini of
8   making "three categories of false statements in its commercial advertising and promotion
9   regarding Rimini's and Oracle's support services."  ECF No. 1451 ¶ 245.  The accused categories
10  are "(1) statements that Rimini had ceased using the support processes that were at issue in *Rimini I*
11  and were honoring Oracle's copyrights and licenses, (2) statements that Oracle's security offering
12  was inadequate and that Rimini's security offering was superior, and (3) statements that Rimini's
13  support offering did not share anything in common with the support offering of TomorrowNow."
14  *Id.*  However, at trial, Oracle failed to meet its burden of proof as to any of these three categories
15  because, among other reasons, Oracle failed to show that the statements were false or misleading,
16  that it suffered any harm as a result of the statements, or that it suffered a likelihood of future harm
17  that cannot be remedied by monetary damages.

18  **1.    Rimini's Statements Regarding Its Support Complying with Oracle's**
19  **Copyrights and Licenses**

20       249.   Oracle argues that certain statements that Rimini made about whether its processes
21  complied with copyright law are false and misleading.

22       250.   On August 14, 2014, Rimini sent a "litigation update" to its clients about the
23  Court's *Rimini I* summary judgment rulings (Tr. 121:12-20 [Ravin]) that stated, among other
24  things:  "Because the Court's rulings relate to processes and software no longer in use at Rimini
25  Street, these rulings will not cause any interruptions to service for any client or any produce line.
26  No actions are required by any client.  This information is being provided to you as part of our
27  commitment to keep clients informed of case developments."  P-6057 at 1 (emphasis omitted).

28

Gibson, Dunn &
Crutcher LLP

251.     In an August 15, 2014 email from Rimini marketing executive Dave Rowe to Chris Preimesberger, an editor of Features and Analysis at eWeek, Rowe directed Preimesberger to the litigation update, and also stated "the rulings … relate to processes and Oracle software no longer in use at Rimini Street, and therefore do not cause interruptions to service for ANY client or ANY product line." P-655 at 2 (emphasis omitted).  Rowe testified that he was "saying that as of August 2014, Rimini no longer engaged in cross-use." Tr. 1546:14-1547:8 [Rowe].  Rowe further testified that this was a "true statement at the time it was made," because it was "after [Rimini's] transition from Process 1.0 to Process 2.0 and Environments 1.0 to 2.0," so "Rimini had changed [its] processes to meet and fulfill what [it] believed were the appropriate activities related to any litigation and judgments." Tr. 1564:15-22 [Rowe].  He further testified that he was unaware "of any Oracle customers that left Oracle and joined Rimini as a result of this statement." Tr. 1564:23-25 [Rowe].  Oracle presented no contrary evidence at trial.

252.     Oracle also introduced a June 28, 2012 email from Rowe to an industry publication called Forrester in response to an inquiry about Rimini's processes. P-648.  In that communication, Rowe stated:  "We have designed our processes to ensure that we deliver responsive, high-quality service to our clients while accurately managing software vendor intellectual property and ensuring that no client received anything that they are not licensed for."  *Id.* at 4; *see also* Tr. 1544:1-1545:20 [Rowe].  Rowe testified that this statement was "accurate as of the time" (Tr. 1545:13 [Rowe]), that the statement was about "the way Rimini Street created archives for clients," and that Oracle did not present any evidence to him of "any customers that reviewed this message," nor was he aware of "any customers that moved from Oracle to Rimini Street as a result of this statement" (Tr. 1563:17-1564:4 [Rowe]).

253.     The Court finds that Rimini's 2014 litigation-related statements are objectively true and not misleading.  The relevant rulings *did* pertain to a particular set of adjudicated conduct, Process 1.0.  Moreover, although Rimini was held liable for infringing at the *Rimini I* jury trial, it was for "innocent infringement," meaning Rimini did not know or have any reason to know that its conduct was illegal.  And even if the Court were to find (and it does not) that Rimini's Process

89

Gibson, Dunn & Crutcher LLP

2.0 were infringing or that certain conduct since the implementation of Process 2.0 were infringing, it would not alter the fact that Rimini's statements concerning the litigation, and its statements regarding revisions to its processes against the backdrop of that litigation, were true.  *See* Tr. 1564:5-22 [Rowe].

254.    The Court also finds that Rowe's 2012 statement was true, particularly because it bore, not on "cross-use" as Oracle implied at trial, but, as Rowe's clarifying testimony showed, the manner in which Rimini supported clients' creation of licensed software archives at the time (something on which Oracle presented no further evidence).

255.    The Court also finds that none of these statements caused any injury to Oracle. There is no evidence that these statements diverted sales from Oracle or caused a loss of Oracle's business reputation.  *See* Tr. 1563:24-1564:4, 1564:23-25 [Rowe]; Tr. 24:20-25:4, 27:1-10 [Screven]; Tr. 1095:23-1096:1 [Catz]; Tr. 1872:5-1873:6 [Orszag].  Oracle's expert who opined on the reasons Oracle support customers left for Rimini Street did not identify a single customer that he believed left Oracle because of these litigation statements.  Tr. 1785:12-1786:8 [Pinto]. And as one of Oracle's experts admitted, the recipients of these statements were sophisticated companies, often with in-house legal teams, and able to reach their own conclusions about legal proceedings, such that it was proper for Rimini to assert its position that its new processes no longer infringed in the manner adjudicated in *Rimini I*.  Tr. 2517:14-2518:11 [Campbell]. Although Rowe testified that certain Rimini statements about its business were part of Rimini's "standard marketing message" (*e.g.*, Tr. 1537:24-1538:17, 1545:7-13 [Rowe]), and Oracle introduced some internal Rimini communications about Rimini winning over Oracle customers, such as 3M (*see* P-674; Tr. 1558:13-1559:6 [Rowe]), Oracle presented no evidence that clients chose Rimini because of the statements Oracle accuses as being false (*e.g.*, Tr. 1563:17-1564:4, 1565:1-12 [Rowe]).  Moreover, the Court finds that Oracle has not demonstrated that these statements are currently harming Oracle in any way.  Some of these statements are over a decade old.

256.    The Court also finds, for purposes of the *Noerr-Pennington* doctrine discussed in

90

Gibson, Dunn &
Crutcher LLP

the Conclusions of Law *infra* ¶¶ 488-489, that the 2014 statements are sufficiently related to Rimini's then-ongoing litigation against Oracle so as to "fal[l] within the protection of the *Noerr-Pennington* doctrine." *Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1007 (9th Cir. 2008). The statements are, on their face, statements concerning complex, ongoing litigation. At minimum, Rimini's litigation-related statements constitute opinions regarding the ultimate outcome of a legal proceeding and the interpretation of court rulings.

### 2.    Rimini's Security-Related Statements

257.    Oracle claims that certain security-related statements made by Rimini are false and misleading. At a high level, the statements at issue concern assertions that Oracle's security fixes are not necessary for clients to achieve the level of software security they need, and that in some instances Rimini's clients can be more secure using security solutions offered or recommended by Rimini. The Court makes the following findings with respect to these statements.

### a.    Software Security for Oracle Customers

258.    Oracle offers security-related fixes to customers in conjunction with their purchase of Oracle's software support. Tr. 14:5-18 [Screven]. Oracle customers can only obtain these security-related fixes from Oracle if they have an active Oracle support contract and are on Premier or Extended Support. Tr. 22:18-23:4 [Screven].

259.    The majority of Oracle's security-related fixes come in the form of critical patch updates ("CPUs"), which are sets of patches containing fixes for security flaws in Oracle products released to Oracle support customers generally four times per year. Tr. 16:21-17:12 [Screven].

260.    CPUs require extensive testing by Oracle to ensure that they can address the vulnerability in question. D-272 at 8-9; Tr. 17:13-18:10 [Screven]. It can take up to six months or more for Oracle to release CPUs after the related vulnerabilities are discovered. *See* D-272 at 8-9; P-1655 at 3; Tr. 2026:13-2027:9 [Rubin]. During this time, the unpatched vulnerability may be exploited. P-1655 at 3; Tr. 2041:21-2042:20 [Rubin]; *see also* P-1230 at 5.

261.    Customers must also test CPUs extensively before applying them to ensure that they do not create other vulnerabilities or otherwise affect software performance. *See* D-272 at

Gibson, Dunn &
Crutcher LLP

26-27 (Oracle white paper explaining that CPUs should be tested to "ensure that the performance of the systems are not negatively impacted by the application of CPUs, and that their application doesn't result in breaking 'applications'"); Tr. 2041:21-2042:20 [Rubin].

262.     Oracle's security expert Dr. Patrick McDaniel claimed that "not one Rimini client has adequate security" (Tr. 1680:18-25 [McDaniel]), that it would be a "preposterously dangerous security practice to leave Oracle support and forego patches entirely" (Tr. 1681:18-21 [McDaniel]), and that Rimini's clients' risk of breach is "very high" (Tr. 1681:22-25 [McDaniel]). Similarly, Edward Screven—Oracle's Chief Corporate Architect and the executive in charge of Oracle's security program—testified that customers "need to apply security fixes to Oracle software" (Tr. 20:6-21:3 [Screven]), and that a customer must buy Oracle support if it wants to "avoid the risk of a security breach" (Tr. 60:16-61:20 [Screven]).

263.     However, Oracle's own white paper on security patches, which Oracle publishes and intends its licensees to rely on (Tr. 41:11-44:10 [Screven]), contradicts these statements.  The white paper asserts that applying patches can be difficult and expensive, and that applying them systematically can be impossible.  D-272 at 12 ("[S]ystematic patching of all systems is typically not possible in large environments because of costs and resources required.  The more diverse the environment, the more difficult it is to patch all systems because of the significant testing effort …."); *id.* at 16 ("[T]he reality of production requirements, the pressure to meet service level requirements, and the cost of repeated wide-scale patching may prevent organizations from applying security patches systematically to all affected systems."); *see also* Tr. 46:11-47:19 [Screven]; Tr. 2004:6-2006:16 [Rubin] (Rimini security expert Dr. Avi Rubin explaining what a client must consider when deciding whether to apply a patch).  Thus, Oracle's white paper acknowledges that "[o]rganizations with control over their environment and a clear understanding of the costs associated with patching can adopt formal security patching policies and procedures that reflect their production requirements and the risk posture that they are willing to assume. **These organizations are also well-equipped to make informed decisions for skipping patches altogether without significant negative impact of their risk posture.**"   D-272 at 16-17

1  (emphasis added); *see also* Tr. 1921:9-16 [Rubin] ("I don't think it's a mainstream opinion that

2  people must apply vendor security patches when they're available because there are a whole lot of

3  other considerations that need to be taken into account when deciding whether to apply patches or

4  not"); Tr. 2007:10-2008:14 [Rubin] (Dr. Rubin testifying that he could not "reconcile" Oracle's

5  position that "companies cannot be secure if they don't apply Oracle's security patches" with

6  Oracle's white paper stating "organizations can skip patches altogether").

7  264.   Testimony from Oracle licensees was consistent with these statements.   A

8  representative from Atkins testified that Atkins "generally" did not apply Oracle CPUs, and instead

9  "focused [its] security around [its] network security, more in firewalls … and did not feel … the

10  requirement or the need to introduce, you know, further patches to that environment."  Tr. 2274:6-

11  13 [Martin].  The Atkins representative also testified that "patches can introduce new issues which

12  was part of our motivation for not always applying them," and that Atkins had previously applied

13  Oracle patches that introduced such issues.  Tr. 2274:17-23 [Martin].

14  265.   Further, for customers with products in Sustaining Support, Oracle does not create

15  new CPUs or other security fixes, even if Oracle has created fixes for later versions of the software.

16  Tr. 34:3-35:1 [Screven]; Tr. 1681:1-6 [McDaniel].  Notably, Mr. Screven admitted that Oracle

17  customers that are on Sustaining Support are "at risk of a security breach."  Tr. 31:20-32:1

18  [Screven].

19  **b.    Software Security for Rimini Clients**

20  266.   As noted, Oracle does not provide security patches for software users that do not

21  purchase Oracle support.  Further, Rimini cannot create certain security fixes because, based on

22  Oracle's policies, Rimini typically does not have access to the necessary layer of source code.  Tr.

23  1666:8-11 [McDaniel].  Thus, Rimini's clients must find alternative methods of securing their

24  software.

25  267.   One alternative security solution to CPUs is "virtual patching," sometimes referred

26  to as an "application firewall" or a "web application firewall."  *See* Tr. 1953:20-23, 2020:7-18

27  [Rubin].  Rimini resells a virtual patching solution created by McAfee called Advanced Database

28

Gibson, Dunn &
Crutcher LLP

Security ("ADS").  Tr. 1945:7-10 [Rubin].  Rimini also recommends virtual patching solutions provided by other software security companies.  Tr. 2017:17-21 [Rubin].

268.   Generally speaking, virtual patching tools mitigate security risks by identifying and blocking attempted exploits of vulnerabilities before they reach their target.  P-1230 at 4; Tr. 1666:12-22 [McDaniel].  Virtual patching can provide several benefits over traditional vendor security patches.  Virtual patches can be developed in a matter of hours or days, as opposed to the many months (or even years) it may take vendors to produce traditional patches.  *See* Tr. 2025:21-2027:9 [Rubin].  Moreover, once a virtual patch is released, it can be applied quickly by the software user with minimal testing.  *Id.*; *see also* Tr. 1694:3-12 [McDaniel].  The evidence also showed that "McAfee was able, on several occasions, to identify particular CVEs [common vulnerabilities and exposures] for Oracle products and provide rules for ADS to protect against them many months before Oracle was able to patch them."  Tr. 2025:21-2026:7 [Rubin].

269.   Rimini's security expert performed demonstrations that showed virtual patching technology "can be as effective as applying the [Oracle] patches."  Tr. 2020:7-2022:2 [Rubin]; *see also* Tr. 2022:6-2023:11 [Rubin] (explaining another demonstration of virtual patching "whitelist" capabilities, which showed that "virtual patching can be used to protect against unknown attacks and can be a legitimate compensating control when patches are not available"); Tr. 2023:12-2025:20 [Rubin] (explaining an analysis he performed of specific security known vulnerabilities in Oracle Database, which led him to conclude "that all of the vulnerabilities that can be found in Oracle Database could be addressed by virtual patching, and, in particular, it could be addressed by [the ADS virtual patching product resold by Rimini]").  Oracle's security expert Dr. Patrick McDaniel performed no analysis of virtual patching in this case (Tr. 1697:22-24 [McDaniel]), but he agreed that virtual patching can prevent exploits of security vulnerabilities, and that it can be "an effective compensating control when vendor patches are not available or when patching is not possible or practical" (Tr. 1683:17-1694:2 [McDaniel]; *see also* Tr. 1694:16-1696:2 [McDaniel] (agreeing that "[v]irtual [p]atching … can greatly improve efforts to reduce organizational risks through quick remediation of vulnerabilities in web software")).

Gibson, Dunn & Crutcher LLP

270.    Beyond virtual patching, Rimini also offers other security-related consulting services to its clients.  Tr. 2016:10-17 [Rubin].

271.    Between 70 and 90 percent of Rimini's clients are on versions of Oracle software that would be on Sustaining Support.  *See* Tr. 2074:15-2075:5, 2080:1-8 [Lyskawa]; Tr. 1513:17-22 [Mackereth].  This means that these clients would not have access to security patches for new vulnerabilities to their software versions even if they were paying Oracle for support instead of Rimini.  These clients would be, according to Oracle, at risk of a security breach if they were on Sustaining Support with Oracle.

272.    Although Oracle's position is that it is "preposterously dangerous" to go without Oracle CPUs, and that customers that do so have a "very high" risk of experiencing a security breach (Tr. 1680:18-25, 1681:18-25 [McDaniel]; Tr. 20:6-21:3 [Screven]), Oracle admitted that it was not aware of any security breach of any of Rimini's 1000+ clients during the entire discovery period covered by this case (2011 to 2018) (Tr. 40:3-5 [Screven] ("**Q.**  Well, are you aware of any customer that has moved to Rimini that suffered a security breach?  **A.**  None that I've heard of."); Tr. 1682:1-14 [McDaniel]; Solomon Dep. 56:14-56:17 (Dec. 1, 2017) ("**Q.**  Well, are you aware of any Rimini Street customers who have suffered security breaches?  **A.**  I'm not aware.")).  Moreover, Rimini clients testified that they had not experienced security breaches of their Oracle software while with Rimini, despite not having access to Oracle patches.  *See* Tr. 1590:9-13 [Jackson] ("**Q.**  Has Welch's had any security breaches since hiring Rimini for EBS support in 2015?  **A.**  Security breaches related to EBS?  **Q.**  Related to EBS.  **A.**  No."); Tr. 2282:2-4 [Martin] ("**Q.**  And when Rimini was supporting Atkins' EBS software, did Atkins experience any security breach with EBS?  **A.**  No, we didn't.").

c.    **Rimini's Security-Related Statements Are Not False or Misleading**

273.    Oracle presented through its expert Dr. McDaniel several statements by Rimini regarding security that Oracle claims are false or misleading.  The Court addresses each of these statements in turn.

95

RIMINI STREET AND SETH RAVIN'S POST-TRIAL PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW
CASE NO. 2:14-CV-01699-MMD-DJA

274. <u>Rimini statement</u>: "Rimini Street Security Support Services helps clients proactively maintain a more secure application compared to the vendor's support program which offers only software package-centric fixes." Tr. 1676:2-9 [McDaniel]. Oracle failed to prove that this statement is false or misleading. It was undisputed at trial that as many as 90% of Rimini's clients would be on Sustaining Support—receiving no new security patches at all—if they purchased support from Oracle. Tr. 2074:16-2075:5, 2080:1-8 [Lyskawa]; Tr. 1513:17-22 [Mackereth]; *supra* ¶ 20. And Oracle's own executive in charge of security admitted these clients would be at risk of a security breach if they stayed on Sustaining Support. Tr. 31:20-32:1 [Screven]. Rimini's security services can thus obviously help these clients maintain a "more secure" application. Further, the evidence was undisputed that virtual patching can be faster than applying Oracle patches, and effective, thus closing off the vulnerability more quickly and eliminating risk. *See* Tr. 2025:21-2027:9 [Rubin]; Tr. 1683:17-1694:2, 1694:16-1696:2 [McDaniel].

275. <u>Rimini statement</u>: Rimini's security services can "[p]inpoint and circumvent vulnerabilities months and even years before they are discovered and addressed by the software vendor." Tr. 1676:19-23 [McDaniel]. Oracle failed to prove that this statement is false or misleading. Dr. McDaniel testified that "the notion that any organization or any technology can pinpoint future vulnerabilities before they even *exist* technically is not -- is not a correct thing to say." Tr. 1677:3-6 [McDaniel] (emphasis added). But this attacks a strawman; the statement in question asserts that security measures offered by Rimini can circumvent vulnerabilities before they are "*discovered and addressed* by the software vendor"—not before they "exist." (emphasis added). And unrebutted evidence showed that Rimini's statement is true: the ADS product, for example, was able to implement virtual patches to address vulnerabilities *before* Oracle released a patch for the vulnerability. Tr. 2025:21-2026:7 [Rubin]. The evidence also showed that a virtual patch can be released and applied much more quickly than an Oracle patch, and that virtual patching can operate in "whitelist" mode, which "can be used to protect against unknown attacks

Gibson, Dunn &
Crutcher LLP

and can be a legitimate compensating control when patches are not available." Tr. 2022:6-2023:11 [Rubin].

276.   <u>Rimini statement</u>:   "Security professionals have found that traditional vendor security patching models are outdated and provide ineffective security protection due to late delivery of patches, complexity to apply patches, and the expense of regression testing, leaving enterprise systems vulnerable for months, sometimes even years." Tr. 1677:13-21 [McDaniel]; Tr. 2041:21-2042:5 [Rubin]. Oracle failed to prove that this statement is false or misleading. As an initial matter, when Oracle software is in Sustaining Support—as is the case for up to 90% of the Rimini clients at issue in this case—Oracle's security patching model provides *no* protection for the software, and thus it is not false or misleading to call it ineffective. Tr. 2074:16-2075:5, 2080:1-8 [Lyskawa]; Tr. 1513:17-22 [Mackereth]; *supra* ¶ 20. Moreover, as Dr. Rubin explained, these statements relate to the relative difficulty of applying patches compared to the ease and speed of virtual patching, "[a]nd so the idea of a patching model is outdated because of all of these problems, and virtual patching can, at times, do a better job of protecting a system." Tr. 2042:6-20 [Rubin].

277.   <u>Rimini statement</u>:   "Once an ERP platform is stable, there is no real need for additional patches from the vendor." Tr. 1678:9-13 [McDaniel]. Oracle failed to prove that this statement is false or misleading. Indeed, at some level, Oracle must accept this assertion as true, given that once its software reaches a certain age (*i.e.*, falls into Sustaining Support), Oracle stops releasing security patches for the software. Further, as Dr. Rubin explained, "once an ERP platform is stable, then an organization is able to use it, and because virtual patching can replace patches, it can apply the same security level and address the same threats to the same vulnerabilities as traditional patches." Tr. 2041:21-2042:20 [Rubin].

278.   The Court also finds that Rimini's statements are ultimately expressions of a reasonable difference of opinion and are not factually false. Indeed, the parties presented testimony from two qualified security experts who had differing opinions on the efficacy and value of Oracle's and Rimini's security approaches. Oracle's expert Dr. McDaniel acknowledged that

he considered Dr. Rubin "an expert in security issues," and he acknowledged that "two computer security experts can reasonably disagree on what constitutes adequate security." Tr. 1679:9-1680:13 [McDaniel]. The mere fact that Oracle disagrees with Rimini's views on security does not make Rimini's statements false or misleading, especially where Oracle has failed to introduce *any* objective indicia that Rimini clients were less secure, such as evidence of actual security breaches.

279. In addition, the Court finds that at most Rimini's statements are puffery, so are not actionable under the Lanham Act.

280. The Court also finds that there is no evidence that Rimini's statements caused any client to leave Oracle for Rimini. Oracle's causation expert Mr. Pinto admitted that he did not identify at trial "any customers that left Oracle and went to Rimini because of a statement about security." Tr. 1785:7-11 [Pinto]. And the evidence was undisputed that licensees of Oracle software are sophisticated, take security seriously, use multiple technologies to secure their software, have dedicated internal security teams, and frequently hire outside security consultants. Tr. 38:10-40:16 [Screven]; Tr. 1686:23-1688:10 [McDaniel]. Indeed, Oracle's own white paper acknowledges that its licensees are "well-equipped" to make their own decisions about security, including to "make informed decisions for skipping patches altogether without significant negative impact of their risk posture." D-272 at 17. There was no evidence that despite clients' sophistication and ability to make informed security decisions, clients were somehow misled by Rimini's statements. *See* Tr. 40:20-24 [Screven]. Further, as Oracle admits, clients that have software in the Sustaining Support tier who make the decision not to update—clients who form the overwhelming majority of Rimini's client base—have already "made a determination that they are going to proceed with using their Oracle software without having access to new critical patch updates and security patches." Tr. 37:8-12 [Screven].

281. The Court also finds that there is no evidence that any of these statements are currently causing any injury to Oracle.

**3.    Statements Regarding TomorrowNow**

Gibson, Dunn &
Crutcher LLP

282.   In Oracle's proposed findings of fact and conclusions of law, Oracle alleged that Rimini falsely told customers that Rimini's "business policies, practices and processes are much different than TomorrowNow's."  ECF No. 1451 ¶ 286.  Oracle contends that this was false because Rimini's processes were, in fact, "identical" to TomorrowNow's.  *See* Tr. 130:25-131:3 (Oracle's counsel arguing to the Court that "for the Lanham Act claim, they're making public representations, distancing themselves from Tomorrow Now, saying we are not what Tomorrow Now is, and we think they are exactly what Tomorrow Now was").  In Oracle's entire section on TomorrowNow related statements, however, Oracle cited to one, and only one, document that it alleged contained false statements about the difference between Rimini and TomorrowNow.  Specifically, Oracle cited a document titled "The Art of War, The Rimini Street Sales Methodology."  ECF No. 1451 ¶ 286.

283.   At trial, Oracle did not seek to admit this document into evidence, and it is not in the record.  The document was not discussed at all; in fact, the term "The Art of War" does not appear in the trial transcript.  Thus, Oracle did not even attempt to establish the claim as set forth in its proposed findings of fact and conclusions of law, and that is the end of the matter.

284.   Nor did Oracle elicit any testimony or introduce any other evidence showing that Rimini made any particular statement telling customers that its "business policies, practices, and processes are much different than TomorrowNow's."  For example, when Oracle questioned Ravin on direct examination, it did not ask him about any statements made by him or anyone at Rimini concerning differences between Rimini and TomorrowNow.  And when Oracle questioned Mr. Rowe, the only testimony elicited on this subject was the following:

Q:  Mr. Rowe, at least as of your deposition in this case, which I'll remind you was December 7th, 2016, Rimini had continued to represent to prospective customers that there were no similarities between Rimini Street and TomorrowNow other than the fact that they both have provided third party software maintenance service.  You would agree with that, right?

A:  Yea, I think the way we characterized it is that Rimini Street was much different in some of the different documents, yes.

Tr. 1556:3-12 [Rowe].  Oracle did not elicit any testimony about what statement was made, what differences were discussed in that statement, when the statement was made, by whom, to whom,

Gibson, Dunn &
Crutcher LLP

and in what medium.  Oracle has therefore failed to meet its initial burden of introducing a statement for the Court to evaluate.

285.    Even if Oracle had introduced any such evidence (which it did not), it did not attempt to show how such a statement would be false.  There is nothing inherently false or misleading about telling customers two businesses are similar in some ways (*e.g.*, both offer third-party support for various software programs at a 50% discount), while also highlighting the differences.  Oracle did not even attempt to show *what* TomorrowNow's technical processes were, let alone that they were so similar to Rimini's as to render Rimini's statements about the differences false or misleading.  Indeed, there were clear differences, including that when Rimini downloaded Oracle software from Oracle's website on behalf of its clients, unlike with TomorrowNow, the Ninth Circuit held that Rimini and Ravin "indisputably had … authorization" to conduct that downloading, and it was lawful.  *Oracle*, 879 F.3d at 962.  In any event, there is no statement in evidence, so the Court cannot evaluate whether it was false or misleading.

286.    And even if Oracle had introduced evidence of a statement (it did not) or evidence that the statement was false (it did not), it did not introduce any evidence that any customer ever received such a statement, let alone that the statement had any impact on any customer or harmed Oracle in any way.  In fact, Oracle's causation expert, Mr. Pinto, testified that he was *not* offering an opinion that a particular customer left Oracle and went to Rimini because they received some statement from Rimini about TomorrowNow.  *See* Tr. 1786:9-1787:11 [Pinto].  There is no other evidence in the record that a customer received any such statement or was impacted by such a statement in any way.  In fact, Oracle's 30(b)(6) witness testified that "Oracle's understanding" is that the "TomorrowNow JD Edwards global support team moved to Spinnaker," *not* Rimini, and that Oracle was "not worried about it" that "the TomorrowNow JD Edwards support team was now providing parallel support services as part of Spinnaker."  *See* Ransom Dep. 70:14-17, 72:6-11.  This binding 30(b)(6) testimony, combined with the absence of any affirmative evidence of harm to Oracle, undermines any allegation that Oracle suffered harm as a result of any statement

Gibson, Dunn &
Crutcher LLP

1    (which, in any event, Oracle has not introduced, shown was false, or shown was presented to any

2    customer).

3           **4.      Ravin's Involvement in Rimini's Statements**

4           287.    For purposes of Oracle's claim of vicarious Lanham Act liability against Ravin for

5    the above statements, the Court incorporates all the above findings.

6           **5.      Rimini's Laches Defense**

7           288.    As early as January 10, 2010, the date it filed its Complaint in the *Rimini I* litigation,

8    Oracle knew that "Rimini Street claims that it can cut customer maintenance and support bills in

9    half and give customers a reprieve from software upgrade cycles by allowing customers to remain

10   on older, often outdated, versions of PeopleSoft, JDE, or Siebel software rather than moving to

11   later versions, and by eliminating fees for fixes and upgrades that customers would otherwise have

12   to pay to remain on the older versions." *Rimini I*, ECF No. 1 ¶ 35.  Oracle first asserted its Lanham

13   Act claims on February 17, 2015.  ECF No. 21.

14   **H.    Oracle's DMCA Claims and Rimini's Defenses**

15          289.    Oracle also accuses Rimini and Ravin of violating the DMCA.  This claim involves

16   some of the "rewrite" files discussed above.  *See supra* ¶¶ 142-150.

17          290.    After Rimini modified these files, they were no longer original Oracle works.

18   Rimini engineers, relying on contemporaneous developer guidelines approved by Rimini's legal

19   department, had been instructed not to include any "copyright notice (Oracle or RSI)" on "new

20   program[s] … created for the client" that leveraged both existing Oracle code and new Rimini

21   code.  *See* Tr. 1102:5-25 [Tahtaras].

22          291.    Oracle's expert Ms. Frederiksen-Cross identified two categories of Rimini-written

23   PeopleSoft files relevant to Oracle's DMCA claim.  *See* Tr. 441:13-442:11 [Frederiksen-Cross].

24   Category 1 consisted of Rimini files where she identified at least one version of the file that

25   included an Oracle copyright notice, and another version of the file with the same file name that

26   did not have an Oracle copyright notice.  *See* Tr. 441:13-442:2, 2572:5-15 [Frederiksen-Cross];

27   *see also* Tr. 323:9-15 [Frederiksen-Cross].  There are six individual files in this category.  *Compare*

28

RIMINI STREET AND SETH RAVIN'S POST-TRIAL PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW
CASE NO. 2:14-CV-01699-MMD-DJA

Gibson, Dunn &
Crutcher LLP

Tr. 2371:4-13 [Astrachan], *with* Tr. 2573:12-18 [Frederiksen-Cross]. Ms. Frederiksen-Cross's contention is that Rimini removed copyright notices from these six files, delivered them to clients, and then continued to provide updates to those files thereafter—she counts a total of 3,588 instances of this occurring. *See* Tr. 2371:3-2372:1 [Astrachan]; Tr. 2573:12-18 [Frederiksen-Cross]. To be clear, Ms. Frederiksen-Cross does not contend that a copyright notice was *removed* from 3,588 files, but instead that the six files in Category 1 were delivered and subsequently updated a total of 3,588 times for Rimini's clients.

292.    Rimini's expert Professor Astrachan testified that any removal of a copyright notice for the files in Category 1 would have occurred in 2010. Tr. 2371:4-13 [Astrachan]. Oracle's expert did not offer any evidence to the contrary. *See* Tr. 442:22- 443:3 [Frederiksen-Cross].[15]

293.    Oracle presented no evidence that the files in Category 1 are exact copies of Oracle files.

294.    Ms. Frederiksen-Cross identified files in Category 2 by examining the contents of Rimini's "rsi" files, comparing those contents to a list of copyrighted Oracle files, and then determining the number of files "that had more than 20 percent line match to the Oracle file, but which contained no Oracle copyright notification." Tr. 442:3-11, 2572:16-2573:1 [Frederiksen-Cross].

295.    Unlike the files in Category 1, Ms. Frederiksen-Cross does not contend that Rimini engineers removed or deleted any Oracle copyright notices from the files in Category 2. *See* Tr. 442:3-11 [Frederiksen-Cross]. In fact, Ms. Frederiksen-Cross did not claim that these "rsi" files *ever* contained a copyright notice. *Compare* Tr. 442:3-11 [Frederiksen-Cross], *with* Tr. 2372:12-24 [Astrachan]. Her apparent contention is that, in creating these files, Rimini copied over *content* from an Oracle file without also copying over the Oracle copyright notice.[16]

---

[15] Ms. Frederiksen-Cross used a demonstrative showing that her Category 1 included the following files: rsicdver.sqc, rsistcd.sqr, rsiw2_st.sqc, and rsiw2ssa.sqc. *See* P-2527 (used for demonstrative purposes only). Mr. Conley testified that these files were all created in 2010 as part of Rimini's project to rewrite a file named tax960st.sqr. Tr. 1329:6-18 [Conley].

[16] Ms. Frederiksen-Cross discussed two Rimini created files—rsi810st.sqr and rsi960us.sqr—and claimed that a particular version of the files did not contain an Oracle copyright. *See* Tr. 369:21-370:22, 400:2-401:20 [Frederiksen-Cross]. This testimony was based on her comparisons between

102

Gibson, Dunn & Crutcher LLP

296.     Rimini's policy on copyright treatment was openly described in its Developer Guidelines.  P-584.  And Rimini's documentation that was delivered to clients in conjunction with the rewrite files told clients that Rimini had "rearchitected" the files such that Oracle code had been modified or reorganized, but not totally eliminated.  *See* Tr. 1328:19-1329:23 [Conley]; D-2474 at 4, 21. There is no evidence that any Rimini clients were confused about the contents of these files.  To the contrary, Rimini clients hire Rimini specifically to make updates to Oracle software, and thus they obviously expect Rimini to update their licensed Oracle files.

297.     Further, as noted, the rewrite files in Category 1 were created by Rimini in 2010. *See* Tr. 1322:16-1325:1 [Conley].  Rimini's initial rewrite projects took place before any findings of infringement in *Rimini I*, *i.e.*, before Rimini was found to have innocently infringed Oracle's copyrights via so-called "cross-use."  Thus, at the time these projects were commenced, Rimini believed that it was not infringing Oracle's copyrights by giving clients rearchitected files that contained Oracle code, so long as every client received only Oracle code that they already had (via valid license agreements with Oracle).  *See* Tr. 1326:22-1327:12 [Conley].  Consistent with that understanding, Rimini engineers took steps to ensure that they did not send rewrite files that contained versions of Oracle code not covered by that client's license.  *See id.*  There is no evidence that any client received any Oracle code for which it did not already have a license via Rimini's rewrite projects; to the contrary, Oracle's technical expert Ms. Frederiksen-Cross agreed that the Oracle code that remained in these files would have been Oracle code that the clients already had. Tr. 596:2-599:5 [Frederiksen-Cross] (discussing demonstrative exhibit P-2522).

298.     In October 2015 in *Rimini I*, the jury found that Rimini's prior infringement was innocent, meaning Rimini did not know and did not have reason to know that its conduct was

---

the Oracle original file and the Rimini created file, which were admitted for demonstrative purposes only.  *See* Tr. 369:16-19 [Frederiksen-Cross] (discussing P-2471); Tr. 400:9-20 [Frederiksen-Cross] (discussing P-2522).  The Court notes that these comparisons do not show that any version of the *Rimini* file ever contained an Oracle copyright notice.  Thus, Ms. Frederiksen-Cross's analysis does not demonstrate that a copyright notice was *removed* from the Rimini files, which is likely why she did not make such a claim.  It is equally plausible that the alleged matching code could have been copied over from the Oracle file into the Rimini file, without Rimini personnel ever deleting or removing an Oracle copyright notice.

Gibson, Dunn &
Crutcher LLP

infringing.  *Rimini I*, ECF No. 896 at 6.  That Rimini had no knowledge or reason to believe that it was infringing Oracle's copyrights at the time of the alleged deletions undermines Oracle's ability to prove that any deletion of copyright notices was done with intent to induce, enable, facilitate, or conceal copyright infringement.  The Court finds that to the extent any Oracle copyright notices were deleted, Rimini had no intention to induce, enable, facilitate, or conceal infringement.

299.    Oracle was aware of these files as a result of discovery in *Rimini I*, and even deposed Rimini employees about the files in 2011.  *See* Tr. 1329:14-1330:5 [Conley].  Rimini produced files in the above-mentioned categories to Oracle in discovery in *Rimini I*, and thus Oracle was aware of Rimini's conduct before February 28, 2013.

300.    Oracle first asserted its DMCA claim on February 28, 2016, in its amended counterclaims.  ECF No. 173 ¶¶ 137-48.

I.    **Oracle's UCL Claims**

301.    Oracle accuses Rimini of violating the UCL through (i) unlawful and (ii) unfair conduct, based on Oracle's accusations of Rimini allegedly violating the Copyright Act (via infringement), the Lanham Act, and the DMCA.  In addition to all other findings the Court has made relevant to the above claims, the Court further finds:

302.    Oracle has failed to establish that it suffered an injury, economic or otherwise, caused by the conduct Oracle accuses of violating the UCL.

303.    In particular, and as discussed more fully in the Court's findings regarding Oracle's requests for injunctive relief (*infra* Section II.J.2), Oracle has failed to show how any of Rimini's conduct that is accused as infringing, violating the Lanham Act, or violating the DMCA—even if the Court were to conclude that Oracle prevailed on the merits of those claims—*caused* any injury, economic or otherwise, to Oracle.  As found below, Rimini's pricing is not a function of any accused conduct (as Oracle asserted), but instead is consistent with the pricing of all other third-party support vendors for Oracle software, including those whose support practices Oracle has reviewed in detail and confirmed do not infringe Oracle's copyrights.  *Infra* ¶¶ 332-335; *see*

RIMINI STREET AND SETH RAVIN'S POST-TRIAL PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW
CASE NO. 2:14-CV-01699-MMD-DJA

Gibson, Dunn &
Crutcher LLP

*also* Tr. 1835:25-1836:6 [Orszag] (other third-party support providers offering 50% discount off Oracle's prices without infringing demonstrates that Rimini's 50% discount off Oracle's prices is not somehow enabled by the accused conduct).  Moreover, as already discussed, Oracle has failed to establish that any of the accused statements under the Lanham Act caused any injury to Oracle at all (*supra* Section II.G.1-3), and has introduced no evidence to show how the alleged removal of copyright notices from certain PeopleSoft files sent only to clients with Oracle licenses (and who already had such files) caused any injury to Oracle (*supra* Section II.H).

304.   The Court further finds (and both parties agree) that, despite all of Rimini's alleged conduct, Oracle continues to maintain a consistent 95% renewal rate on support contracts with its 400,000+ customers, while Oracle maintains a 95% profit margin on that business.  *See* Tr. 24:20-25:4, 27:1-10 [Screven] (Oracle makes about $20 billion a year from sale of support with a 95% profit margin across 400,000+ customers); Tr. 1735:7-1736:4 [Pinto] (95% of Oracle licensees purchase support from Oracle); Tr. 2525:23-2526:1 [Campbell] (around 90% of Oracle licensees purchase support from Oracle, and Oracle's profit margin on support business is about 95%); Tr. 1872:14-1873:6 [Orszag] (both parties' experts agree that renewal rates for Oracle support of products at issue from 2011 through 2018 have remained between 93% and 98%); Tr. 1095:23-1096:1 [Catz] (renewal rates for Oracle support of products at issue "remain high").  Oracle's own expert testified that he saw no evidence that Oracle's pricing of its support offerings was in any way constrained by the prices of competitors like Rimini.  Tr. 2526:10-16 [Campbell].

305.   Oracle has otherwise failed to prove how any of the alleged actions of Rimini—a much smaller competitor when compared to Oracle's size and market share—inflicted any injury to competition, especially given Oracle's sustained market dominance.  Oracle has not proven any classically anticompetitive behavior in the sense relevant under the UCL.

**J.    Facts Related to the Parties' Requested Injunctive Relief**

306.   The Court makes the following additional findings relevant to the parties' respective requests for injunctive relief.

**1.    Rimini's Request for Injunctive Relief**

RIMINI STREET AND SETH RAVIN'S POST-TRIAL PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW
CASE NO. 2:14-CV-01699-MMD-DJA

Gibson, Dunn &
Crutcher LLP

307.     Rimini seeks a permanent injunction under California's UCL to remedy irreparable harm caused by Oracle's at-issue unfair business practices.  Oracle raises various equitable and speech-related defenses and opposes issuance of a permanent injunction on the merits.

308.     In addition to the findings of fact relevant to the merits of Rimini's UCL claim, the Court further finds:

309.     Oracle and Rimini compete with one another in the market for software support of Oracle software products.  Tr. 146:10-13, 245:12-14 [Ravin]; Tr. 953:15-21 [Allison]; Tr. 1055:8-22 [Catz]; Tr. 2232:25-2233:3 [Loftus].

310.     Rimini has proven that it has suffered irreparable injury in at least two ways.

311.     First, Rimini has proven specific injuries to itself in the form of harms to itself and to competition.  The challenged conduct (Oracle's MSL Policy, reinstatement penalty policy, and false statements to customers all as part of "Project Rimini") amount to classic anticompetitive behavior, and included, as set forth above in Section II.F.4.a-c discussing Oracle's challenged policies and practices, Oracle effectively conditioning contracts on not doing business with Rimini; depriving customers of valuable competing services; restricting the supply of Rimini's rival services; baselessly denigrating a rival's services as part of an overall pattern of anticompetitive conduct; raising prices to customers; wrongfully representing to third parties legal risks that do not exist; and bad faith conduct aimed at driving Oracle's largest competitor out of a market space in which Oracle already enjoys a 95% market share and a 95% profit margin.

312.     Rimini produced evidence showing that Oracle itself estimates that "Project Rimini" (which encompasses the unfair business practices challenged by Rimini) kept $300 million in support contracts from leaving Oracle for Rimini through May 8, 2017.  Solomon Dep. 296:14-297:4, 298:24-299:11 (Mar. 22, 2018); Tr. 2231:8-2232:5 [Loftus].  Rimini also produced internal documents from Oracle substantiating specific instances of the challenged conduct playing the decisive role in causing customers to purchase support from Oracle instead of Rimini.  D-77 at 3 [KPN Winback] (describing winback resulting from enforcement of MSL policy); Jones Dep. 228:9-17 (confirming same); D-1930 at 1 [Oracle internal email] (threatened risk of FDA non-

Gibson, Dunn & Crutcher LLP

compliance persuaded customer to stay with Oracle); Tr. 2220:6-2221:4, 2224:10-14, 2228:20-2229:4, 2230:7-9, 2231:8-2232:5 [Loftus] (testifying that these efforts had specific impacts on clients and substantial overall impact).  Rimini also produced evidence from Oracle customers and Rimini clients about the impacts of Oracle's unfair practices, including customers reporting that Oracle used the policies at issue to "blackmail[]" them into staying with Oracle.  D-77 at 3; *see also*, *e.g.*, D-208 at 5 (customer informing Oracle it "felt bullied and strong armed by your organization and am unaccustomed to business tactics by vendor partners represented this way"); D-105 at 1 [customer email to Oracle] ("we are somewhat surprised and disappointed at the apparent threatening tone of [Oracle's legal] letter"); D-191 at 1 [internal Oracle email] (memorializing Oracle's efforts to deter Media General from leaving Oracle support, including presenting "concerns with receiving 3rd party support as well as the policies if Oracle support is needed at a later date"); D-76 at 3 (Oracle documentation that it "prevent[ed] the Customer from transitioning to Rimini Street for the remainder of their PeopleSoft Support contract").

313.   Second, Rimini has also established harms directly to itself in the form of reputational harm and loss of client goodwill.  Oracle's campaign wrongly impugned Rimini and caused a loss of prospective clients and a loss of goodwill.  Tr. 2268:14-16 [Loftus] (Oracle "threatening" customers that they would experience "security breaches if they don't stay with Oracle Sustaining Support" was baseless given that Oracle provides "no security patches for those customers" and "harm[ed] Rimini's reputation and goodwill with its customers"); Tr. 245:19-24 [Ravin] (Rimini has "lost business because of" "fear, uncertainty and doubt that was put into customers through" "harassing e-mails to customers" from Oracle); *id.* (clients have "relay[ed] to [Rimini] that they felt threatened with potential audits" and fear of "penalties" for trying Rimini's support services); *see*, *e.g.*, D-1646 at 27 [Oracle training presentation] (describing winback "success story" based on security concerns); D-75 at 1, 3 (Oracle cancellation avoidance "How I Won the Deal" story documenting that once Oracle presented a customer with "the potential impacts of transitioning to Rimini Street," it "ultimately determined that the levels of risk involved in moving to an Unauthorized Service Provider were unacceptable, even in light of the potential

Gibson, Dunn &
Crutcher LLP

1   savings").

2   314.    Without injunctive relief, the proven harm to Rimini and to competition will

3   continue, and there is no undue harm to Oracle as a result of being enjoined from this illegal

4   conduct.  Oracle has no legitimate interest in acting anticompetitively and equally has no legitimate

5   business reason for making false statements regarding Rimini.

6   315.    The public interest favors robust competition and truthful statements in the

7   marketplace.

8   **2.      Oracle's Requests for Injunctive Relief**

9   316.    Oracle also seeks permanent injunctive relief pursuant to the Copyright Act and

10  DMCA, the Lanham Act, and California's UCL.

11  317.    Oracle has failed to show that any of the conduct it alleges as unlawful irreparably

12  harmed Oracle and/or was likely to cause it irreparable harm in the future.

13  *a.      Oracle Failed to Present Any Facts Showing Irreparable Injury*

14  318.    Oracle has failed to establish any form of irreparable injury that it claims, including

15  reduced market share, reputational damages, or loss of customer goodwill.

16  319.    Unlike Rimini, Oracle failed to call any customers of third-party support for Oracle

17  software to testify (or otherwise submit depositions of customers) to substantiate its claims of

18  irreparable injury.  Specifically, Oracle submitted no customer testimony showing that Rimini's

19  challenged conduct damaged Oracle's goodwill or reputation, or otherwise caused customers to

20  leave Oracle support.

21  320.    Oracle's own CEO confirmed that Oracle's "cancellation rates [for support] stayed

22  pretty steady" over the last ten years and labeled any particular increases during that time period

23  as "not very much" and "not much."  Tr. 1046:8-18, 1072:18-1073:1, 1091:22-1092:1 [Catz].

24  Those cancellation rates are (and have remained) exceedingly low.  Oracle executives confirmed

25  that "every year about 95 percent of Oracle's [400,000+] customers renew support with Oracle."

26  Tr. 27:1-10 [Screven]; *see also, e.g.*, Tr. 1046:8-18 [Catz] (renewals around 95%); Tr. 1091:22-

27  1092:1 [Catz] (5.8% and 6.6% cancellation rates are "pretty typical"); D-21 at 2 [Jones] (citing

28  

Gibson, Dunn &
Crutcher LLP

cancellation rates of 5.8% and 6.6%).  Oracle has continued to dominate the market for support of Oracle software notwithstanding Rimini's challenged conduct, with "95 percent of customers" purchasing support from Oracle and "[t]ypically only five percent" purchasing support from third-party support providers like Rimini.  Tr. 1736:1-4 [Pinto].  And Oracle has maintained that 95% share while also reporting a profit margin of around 95% on its support services.  *See* Tr. 24:20-25:4 [Screven]; Tr. 2526:2-4, 2529:12-14 [Campbell].  Oracle's sustained market dominance is "not consistent" with its generalized claims of irreparable harm.  *See* Tr. 1872:5-1873:6, 1914:13-21 [Orszag]; *see also* Tr. 1559:1-6 [Rowe] (Oracle's support revenues and operating margins have increased every year).

321.    Testimony of other Oracle witnesses also undermines Oracle's specific claims that it was irreparably harmed by aspects of Rimini's conduct.  For example, Oracle's Executive Vice President Richard Allison conceded that "[t]here may be no harm" to Oracle from cloud hosting of Oracle software notwithstanding Oracle's "facilities" restrictions.  Tr. 972:21-24 [Allison].  Oracle's expert Paul Pinto failed in his testimony to identify a single customer that left Oracle for Rimini as a result of any of the allegedly unlawful statements made by Rimini.  Tr. 1784:25-1785:11, 1786:1-8, 1787:1-11 [Pinto].

322.    Further, Oracle's infringement arguments based on provisions that exist in the *legacy licenses*—the facilities restrictions in PeopleSoft legacy licenses and provisions related to source code in JDE legacy licenses—but that Oracle chose *not to include* in SLSA, OLSA, and OMA.  Tr. 956:1-957:1, 966:13-15, 975:19-21, 995:24-996:2 [Allison].  Oracle does not know why these restrictions appeared in the legacy agreements (Tr. 970:7-22 [Allison]), but it *prefers* that its customers be licensed under the Oracle written agreements, and every new license taken *since 2005* has not had these restrictions.  Tr. 950:4-953:1, 947:9-12 [Allison].  If Oracle prefers that its customers not be subject to these restrictions, it cannot possibly claim harm from purported violations of them.  *See* Tr. 975:23-976:5 [Allison].

323.    Nor can the two instances of infringement the Court already found on summary judgment related to Campbell Soup and City of Eugene provide a basis for irreparable harm.  Those

109

RIMINI STREET AND SETH RAVIN'S POST-TRIAL PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW
CASE NO. 2:14-CV-01699-MMD-DJA

occurred in 2014 and 2015 and were, as the Court found, "limited" instances.  ECF No. 1253 at 87; *see also* Tr. 1269:22-1270:1, 1271:19-1272:11 [Conley] (discussing Campbell Soup and City of Eugene).  And Oracle was unable to present any customer statements suggesting that the two infringing updates caused them to leave Oracle in favor of Rimini.  In fact, the direct evidence of customer motivation presented at trial demonstrates that customers left Oracle for a variety of reasons having nothing to do with infringement (Tr. 1846:2-23, 1847:21-1849:5 [Orszag]), including dissatisfaction with Oracle's services (Tr. 1574:16-1575:10, 1583:15-1584:13, 1589:10-1590:8, 1590:14-17 [Jackson]; Tr. 2276:14-2277:5 [Martin]; D-23; D-102), Oracle dropping support for the customer's software (D-154 at 2 [Jones]; Tr. 1080:3-6 [Catz]; Tr. 2277:21-2278:1 [Martin]; Van Horn Dep. 50:15-51:9, 105:10-106:5, 106:16-108:2), and superior quality or service types offered by Rimini or another competitor (Tr. 1574:7-15, 1575:4-10, 1586:18-1588:11, 1590:9-22 [Jackson]).  In any event, there is no threat of future harm from these isolated and limited instances, given that Rimini's AUP prohibits such conduct, and the evidence shows that Rimini continued to improve its communication and enforcement of the AUP with respect to employees, contractors, and clients.  D-11 [AUP]; D-12 [AUP]; Tr. 1494:22-1496:3, 1498:9-1502:9, 1503:11-14, 1504:23-1505:7, 1506:9-1509:9 [Mackereth]; *see*, *e.g.*, D-2066 at 27 (example of client warning); D-2280 at 1 (example of client warning).

324.    And as to other conduct Oracle accuses, such as use of certain of Rimini's proprietary software tools, even if infringing (which they are not), Rimini ceased using them in 2018, as found herein.  Oracle presents no evidence that Rimini's *current* practices threaten Oracle with irreparable injury on a prospective basis that could not be remedied with monetary relief, such as statutory damages, which Oracle abandoned going into this trial.

325.    Even if Oracle had established *some* irreparable injury, the Court finds that Oracle has failed to prove the required causal nexus between Rimini's accused conduct and Oracle's asserted irreparable injury.  As mentioned, Oracle failed to introduce any direct evidence to show irreparable harm or to link any asserted irreparable harm to Rimini's challenged conduct.  Instead, Oracle relied exclusively on the expert opinions of Paul Pinto to show that Rimini's allegedly

Gibson, Dunn &
Crutcher LLP

infringing practices and false statements caused Oracle to lose market share, goodwill with customers, or suffer reputational damages.  The Court rejects those claims and Mr. Pinto's analysis as unduly speculative and unsupported, as well as methodologically unsound.

### b.   *Oracle's Causation Expert Failed to Show Irreparable Injury*

326.   Oracle and Mr. Pinto sought to show causation through a chain of causation linking loss of customers to Rimini's alleged infringement and alleged false statements.  Oracle contends that Rimini's alleged infringement generated significant cost savings, which in turn enabled Rimini to offer a 50% lower price, which in turn was the but-for cause of customers leaving Oracle along with the corresponding false statements.  Tr. 1714:5-14, 1730:11-18, 1737:17-25, 1740:10-1741:22 [Pinto]; Tr. 1865:20-1866:6 [Orszag].  But as explained below, Oracle's theory fails at each step, and the Court rejects it for multiple, independent reasons.

327.   ***Mr. Pinto's Avoided Costs Figure Is Inherently Flawed.***   The foundational assumption in Mr. Pinto's analysis—that Rimini avoided $177 million in labor costs by utilizing the challenged practices (Tr. 1714:5-14 [Pinto])—is fundamentally flawed for multiple reasons.

328.   Mr. Pinto came up with the $177 million figure by taking every individual client update Ms. Frederiksen-Cross labeled as the product of "cross-use"—the vast majority of which Ms. Frederiksen-Cross did not discuss in her trial testimony or otherwise substantiate as the product of "cross-use" in the trial record.  *See* Tr. 1714:18-1715:4, 1728:2-10, 1768:7-1769:2 [Pinto].  Mr. Pinto then estimated the amount of time Rimini engineers would have spent to do separate design, construction, and testing work for each update for each customer.  Tr. 1771:2-5, 1771:20-23, 1772:12-14 [Pinto].  In other words, Mr. Pinto assumed that Rimini engineers—even if they had to develop the same exact update for every single one of Rimini's clients—would never get faster or more efficient at developing and implementing the update.  So if Mr. Pinto estimated that an engineer needed 10 hours to develop an update for a client that 100 other clients needed, Mr. Pinto assumed that the engineer would spend 1,000 hours total "design[ing], coding, and testing" the update for each client.  *See* Tr. 1773:3-1774:10 [Pinto] (confirming that his analysis assumes no efficiency gains of any kind for engineering updates).  Using this methodology, he

Gibson, Dunn &
Crutcher LLP

estimated that Rimini engineers would have spent nearly *two million hours* to create the updates Ms. Frederiksen-Cross labeled as "cross-use." *See* Tr. 1775:11-20 [Pinto]. That would require nearly 1,000 engineers working 40-hour weeks for 50 weeks out of the year.

329. Mr. Pinto's assumption that Rimini engineers could not get faster in designing, constructing, or testing updates is directly contrary to the Court's prior holdings that it is not "cross-use" for a Rimini engineer to "create [an] update for Client B more efficiently because he or she gained experience creating the update for Client A." ECF No. 1253 at 87. As the Court explained: "It is obvious that the first time a software engineer creates an update for a client, he or she is slower and less proficient than any subsequent time they create that update," and "it would be impossible to direct an engineer, who developed an update in Client A's environment, to not use the knowledge he or she gained when developing the same or similar update for Client B." *Id.* Mr. Pinto's cost estimate assumes that to avoid infringement, Rimini engineers would be required to do just what the Court said would be impossible—not re-use any of their own knowledge and spend the *exact same* amount of time developing an update for Client B (as well as Clients C, D, E, and so forth) that they did for Client A. Accordingly, his cost estimate of $177 million is flawed, as it assumes that Rimini, to avoid infringing Oracle's licenses, would have to use inefficient practices that the Court has already ruled it need not use to avoid infringement.

330. But even if Mr. Pinto's estimate that Rimini would have to spend 2 million engineering hours ($177 million) to permissibly develop the updates Ms. Frederiksen-Cross labeled as "cross-use," Mr. Pinto confirmed in his testimony that this cost figure is *not* (as his model requires it to be) a measure of *avoided* costs. Mr. Pinto did not determine how much Rimini *actually spent* to design, construct, and test these updates, and so did not factor into his analysis the costs Rimini actually incurred to develop them. Tr. 1776:22-1777:4, 1781:25-1782:4 [Pinto]. In other words, even though Rimini clearly spent some amount of money developing updates for its clients, Mr. Pinto did not consider that, and so he does not know how much Rimini avoided at all. He effectively conceded that Rimini could have spent $150 million, $170 million, or even *$177 million* developing the updates, which would mean the *actual* costs avoided under even Mr.

Gibson, Dunn &
Crutcher LLP

Pinto's own (already flawed) estimates would be *zero*.  *See* Tr. 1777:4 [Pinto].

331.   In sum, Mr. Pinto never even attempted to calculate the costs Rimini *avoided* through the allegedly infringing practices.

332.   ***Mr. Pinto's Assumption That Rimini Could Not Offer a 50% Discount Without Infringing Is Baseless.***  Relying on his flawed estimate that Rimini would have spent $177 million more on development costs if it changed its support practices to avoid infringement, Mr. Pinto next assumes that Rimini *could not* offer a 50% discount if it were required to bear those costs.  This assumption is without basis.  In fact, Mr. Pinto expressly did not offer an opinion as to *why* Rimini could not continue to provide support at a 50% discount.  *See* Tr. 1731:1-1735:4 [Pinto].  There is thus no evidence in the record to establish this essential link in his causal analysis.

333.   There is nothing unique about Rimini's 50% discount off of Oracle's prices for support.  Oracle's economic expert confirmed that *all* third-party support providers for Oracle software "offer *at least* [] 50% savings" off of Oracle's support prices, if not more.  Tr. 2533:18-2534:5 [Campbell] (emphasis added).  Oracle's attempt to attribute Rimini's 50% discount to Rimini's alleged infringement contradicts Oracle's position, after reviewing in depth the processes of one of those support providers, Spinnaker, that Spinnaker's processes (which are similar to Rimini's and common for the industry) do not infringe on Oracle's copyrights. D-529 at 1 [Oracle letter to Spinnaker]; D-530 ¶¶ 4-26 [Stava Decl.]; Tr. 2143:8-12, 2144:9-13, 2151:19-2153:16, 2159:20-2160:12 [Lanchak]; Tr. 2332:7-2337:4 [Astrachan]; *see* Tr. 199:19-25 [Ravin] (Rimini offers similar, and even slightly higher, prices than Spinnaker); Tr. 1586:6-17, 1592:9-14 [Jackson] (Rimini and Spinnaker prices were comparable); Tr. 1763:4-16, 1766:6-17 [Pinto] (same); Tr. 1835:25-1836:6 [Orszag] (same); *see also* D-510, D-513, D-516, D-541, D-542 [Spinnaker process documentation]; Tr. 1470:11-1471:9 [Mackereth] (prior modifications to clients' custom code shows that Rimini's competitors, including Spinnaker, modify source code); Tr. 2137:4-22, 2160:13-2161:20 [Lanchak] (processes used by Spinnaker are common throughout the industry); Tr. 2332:7-2337:4 [Astrachan] (no technical differences between Spinnaker's and Rimini's processes); Tr. 2532:20-2534:5 [Campbell] (discussing P-1954 at 32).

334.    Rimini has shown that its pricing is commonplace in the industry and was not enabled by any alleged infringement, especially when viewed in the context of Oracle's high profit margins.  Oracle was not able to explain why a 50% discount on that rate could not be achievable absent infringement by third-party providers that do not develop their own enterprise software, as Oracle does.  *See* Tr. 1049:8-12 [Catz] (testifying that Oracle's development costs "eat[] up almost all" revenue from the original license fees).  Moreover, Mr. Pinto conceded that Rimini could avoid infringement by using the same support practices used by Spinnaker (and approved by Oracle), which have enabled Rimini (like every other third-party support provider for Oracle software) to continue offering a 50% discount to Oracle customers.  Tr. 1766:12-17 [Pinto].

335.    Mr. Pinto also made no attempt to determine whether Rimini actually could have continued to offer a 50% discount off of Oracle's support prices if it were forced to bear the $177 million in avoided costs that he estimated.  Tr. 1758:12-19 [Pinto].  Mr. Pinto confirmed that his total measure included *four years* of avoided cost, meaning Rimini would have had to absorb $44 million (not $177 million) per year in additional costs.  Tr. 1760:24-1761:2 [Pinto].  He simply assumed, without conducting *any* analysis, that Rimini could not have continued as a viable entity if it had to absorb such additional costs even though he conceded that Rimini was not actually required to pass along these costs in the form of higher prices.  Tr. 1760:15-23 [Pinto].  Another of Oracle's experts likewise agreed that changes in "costs do not necessarily get reflected to the consumer."  Tr. 2531:24-2532:1 [Campbell].  And as noted, Mr. Pinto expressly offered no opinion concerning whether Rimini (like Spinnaker and others) could continue to offer a 50% discount absent the infringing conduct.  *See* Tr. 1731:1-1735:4 [Pinto].

336.    ***Mr. Pinto's "But-For World" Assumes Rimini Out of Existence and Fails to Analyze Whether Customers Would Have Nevertheless Left Oracle or Joined Rimini.***  After assuming Rimini saved $177 million by infringing, and that paying those costs would have required Rimini to stop offering the industry-standard 50% discount from Oracle's support rates, Mr. Pinto next assumes that in his "but for world"—i.e. the hypothetical world where infringement did not occur—Rimini would not exist.  Tr. 1795:5-7 [Pinto].  He did not even consider whether

Gibson, Dunn & Crutcher LLP

Rimini could have offered a discount of *less* than 50% that would have resulted in the same number of customers leaving Oracle for Rimini, nor whether customers would still have been attracted to Rimini by such a discount.  Tr. 1761:15-1762:17, 1810:19-25 [Pinto]; Tr. 1822:15-1823:23, 1836:12-1837:3, 1840:11-1841:22 [Orszag]; Tr. 2170:20-2171:2 [Lanchak]; Tr. 2380:7-2381:18, 2382:6-15 [Astrachan].  At the same time, Mr. Pinto testified that customers are willing to leave Oracle so long as they are offered at least a 30% savings.  Tr. 1761:19-1762:17 [Pinto].  Instead of analyzing whether clients would have stayed with Rimini at a lower price discount, Mr. Pinto simply assumed for purposes of his analysis that if Rimini did not offer a 50% discount, Rimini did not exist.  This assumption allowed him to conclude that the clients that went to Rimini would have gone *back* to Oracle in the but-for world, thereby showing that Oracle was harmed by Rimini.  But there is no connection between this conclusion (that clients would have gone back to Oracle) and the alleged harm (the infringement-enabled price), because Mr. Pinto failed to analyze whether the clients would have stayed with Rimini if offered some other price.

337.    Indeed, Mr. Pinto's analysis ignores that Rimini's prices have nothing to do with the vast majority of customer decisions to leave Oracle each year.  After all, the evidence shows that Oracle loses 6% to 7% of its support customers every year, a far greater number of clients than Rimini gains over the same time period.  *See* D-21 at 2 [Jones] (citing cancellation rates of 5.8% and 6.6%); Tr. 1046:15-18 [Catz] (cancellation rates anywhere from 1-8%); Tr. 1054:14-19 [Catz] (renewals around 95%); Tr. 1091:24-1092:1 [Catz] (5.8% and 6.6% cancellation rates are "pretty typical"); Tr. 1767:13-16 [Pinto] ("attrition rate is somewhere around five percent").  Oracle has failed to show that the small subset of customers Oracle loses to Rimini each year are motivated only by Rimini's prices, as opposed to the other reasons that cause other customers (that do not go to Rimini) to terminate their support contracts with Oracle.

338.    Importantly, one of the main reasons for Oracle's customer attrition is *Oracle's* conduct—*i.e.*, Oracle's failure to support certain licensed software products still in use by many support customers.  Indeed, as one customer testified:  "The reason NCH moved to Rimini Street **was not about cost**.  It was about Oracle's announcement to reduce the level of support for the

version of software that we were running.  There were no other alternatives for getting support if Oracle was indeed going to reduce their level of support."  Van Horn Dep. 50:16-21 (emphasis added); *see also* D-21 at 2 [Jones] (acknowledging loss in perceived value); D-22 at 2 [Barmat] ("our roadmaps for on premise are minimal to non-existing" and "where we do have a [cloud] migration roadmap, the product changes are so large that … the cost is the same as a full reimplementation"); D-154 at 2 [Jones] ("Usually when [a customer] cancels, our product is either old, difficult to upgrade, [or] doesn't have bells and whistles"); D-166 at 1 [Jones] ("No new significant upgrades/versions make the base ripe for cancellations and third parties like Rimini";"[Customers] are spending more to receive less value[.]"); Jones Dep. 35:2-6, 37:13-18, 38:15-18, 51:13-16 (acknowledging same); Tr. 1080:3-6 [Catz] (acknowledging same); Tr. 1607:18-22 [Jackson] (would "absolutely not" go back to Oracle if Rimini did not exist); Tr. 2200:14-19, 2201:16-2208:10 [Loftus] (customers with stable or customized software see little to no value in retaining Oracle support).

339.    Nonetheless, Mr. Pinto asserts that virtually all of Rimini's clients that left Oracle (95.2% of them) did so because of the alleged infringement-enabled price.  These clients would have returned to Oracle in Mr. Pinto's but-for world because, Mr. Pinto wrongfully assumed, Rimini would not exist.  Tr. 1783:8-10 [Pinto].  This analysis ignores that the vast majority of Rimini's clients at issue in this case use versions of Oracle software that would only be eligible for Sustaining Support.  Tr. 36:9-37:7 [Screven]; Tr. 176:18-177:15 [Ravin]; Tr. 1513:15-1514:2 [Mackereth]; Tr. 2078:14-2079:25, 2080:1-8 [Lyskawa]; *see, e.g.*, Tr. 2275:12-20 [Martin]; Tr. 1579:6-11 [Jackson]; Van Horn Dep. 105:10-106:5, 107:24-108:2.  Therefore, these clients cannot obtain necessary tax, legal, and regulatory updates from Oracle and must seek another third-party to assist them with that support.

340.    Likewise, Rimini has shown that many of its clients chose Rimini because Rimini (unlike Oracle) provides support for clients' custom code and does not require clients to troubleshoot issues on their own (at great expense) before Rimini will provide assistance.  *See, e.g.*, D-313 at 1 (Timex draft email explaining that Rimini provides "the added benefit of receiving

support for Timex custom code and Oracle technology support for Timex custom applications," and Timex can depart from "current approach of performing initial trouble shooting before contacting Rimini Street" which "will free up valuable time of our Analysts to focus on more value added asks and activities"); D-12794 at 2 (client explaining how Oracle "support is 90%+ Margins" and Rimini has proven "a client-centric organization" that supports customization, "assigns an experienced engineer to each of their clients so we'll have a single [point-of-contact]," and "guarantees 30 minutes or less response time on a 24/7 basis which we don't get from Oracle").

341.    Indeed, Mr. Pinto's conclusions are undermined by his *own notes* concerning why customers left Oracle. *See* Tr. 1789:3-1791:2 [Pinto] (Empire District Electric reporting they left Oracle "because Oracle had 'stopped supporting' their PeopleSoft 7.5" and they "needed updates" that "were no longer available from Oracle" "to continue processing payroll, et cetera, on their 7.5 system"); Tr. 1791:3-22 [Pinto] (Weather Shield Manufacturing, Inc., "went to RSI because they could no longer get updates from Oracle for their release of JDE"); Tr: 1792:13-1793:12 [Pinto] (Viking Range, LLC switched to Rimini because of "frustration with the lack of service provided by the vendor," "had grown tired of being ignored by the vendor and were facing a forced upgrade" with "no value or return on investment" and "loved the idea of having someone they could speak with that would actually solve their problems" and "support customizations" which "would help provide relief to already taxed IT staff"); Tr. 1793:13-1794:16 [Pinto] (Douglas County School District "had a very strained relationship with Oracle" and "they did not want to pay another dime to Oracle due to a contentious relationship in recent years").

342.    Nor did Mr. Pinto sufficiently account for customers that would have left Oracle regardless of whether Rimini existed and gone to, for example, another third-party support provider like Spinnaker. Tr. 1855:4-1863:11, 1865:2-14 [Orszag] (explaining flaws in Pinto's "opt-in" methodology); Tr. 1863:12-1864:25 [Orszag] (estimating that Pinto would have concluded up to 77% of Rimini's clients could have gone to Spinnaker but for methodological flaws in Pinto's analysis); Tr. 2131:14-21, 2166:3-2170:19 [Lanchak] (testifying that many customers in the Sustaining Support tier would have left Oracle no matter what).

343.  ***Mr. Pinto Fails to Show that The Accused Statements Caused Any Customers to Leave Oracle.***  Oracle also failed to show that any of the lost customers moved to Rimini because of the alleged false statements or, indeed, that these customers had even *received* the alleged false statements in the first instance.  Tr. 1563:24-1564:4, 1564:23-25 [Rowe]; Jones Dep. 196:11-19.

### III.   CONCLUSIONS OF LAW

**A.   Rimini's Declaratory Judgment Claim Regarding Process 2.0**

344.  Oracle bears the initial burden to demonstrate that Rimini has copied protected expression from one of Oracle's copyrighted works.  *VHT, Inc. v. Zillow Grp., Inc.*, 918 F.3d 723, 731 (9th Cir. 2019).  This requires showing that there is substantial similarity between the two particular works, as well as showing that any such copy is more than *de minimis*.  *Newton v. Diamond*, 388 F.3d 1189, 1193 (9th Cir. 2004).  Moreover, Oracle must show that whatever Rimini has copied is itself protected expression, which requires filtering out non-protected elements of the software in question.  *Narell v. Freeman*, 872 F.2d 907, 910-11 (9th Cir. 1989).  If Oracle meets that burden, Rimini bears the burden of identifying a license that permits Rimini to make copies.  ECF No. 1253 at 42.  Once Rimini does that, the burden shifts back to Oracle to prove that Rimini made copies in violation of the terms of the license agreement at issue.  *Id.*  Oracle also has the burden to prove that the violated term was a "condition" of the license grant, meaning a term limiting the license's scope that, if breached, constitutes copyright infringement, rather than a mere "covenant," the breach of which is actionable only under contract law.  *MDY Indus., LLC v. Blizzard Ent., Inc.*, 629 F.3d 928, 939 (9th Cir. 2010).

345.  Rimini's claim for a declaratory judgment of non-infringement as to Process 2.0 involves application of this same burden-shifting framework.  *See Medtronic, Inc. v. Mirowski Fam. Ventures, LLC*, 571 U.S. 191, 198 (2014) (burden of proof on infringement remains with rightsholder in action seeking declaratory judgment of patent non-infringement); *Marya v. Warner/Chappell Music, Inc.*, 131 F. Supp. 3d 975, 983-84 (C.D. Cal. 2015) (applying *Medtronic* to a declaratory judgment copyright case and concluding burden of proof on infringement remains with rightsholder).  There is no dispute between the parties that, as a general matter, Process 2.0

Gibson, Dunn &
Crutcher LLP

routinely involves the copying of Oracle protected expression when Rimini engineers remotely access a client's software environment on the client's systems and run the program.  The Court holds that Rimini has met its burden of proving that the copies it makes in the course of providing its Process 2.0 support are authorized by the license agreements at issue in this case.  The Court also holds that Oracle has failed to meet its subsequent burden of demonstrating that either Process 2.0 as a whole, or the individual instances Oracle accuses, are infringing.  And in all events, even if some of the instances Oracle points to were infringing (and even accounting for the instances of infringement found on summary judgment), that does not change the Court's declaration that Process 2.0, as designed and generally implemented in the vast majority of cases in Rimini's business operations, is licensed and non-infringing.

### 1.      Third-Party Copy Authorization and "Cross-Use"

346.    Based on the relevant findings of fact, the Court concludes and holds that Rimini is authorized to make copies in support of a client, in that client's environment, as a third-party support provider under the client's license.  Construing a license agreement is principally a matter of contract interpretation.  *S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1088 (9th Cir. 1989).

347.    While there is wide variation among the terms in Oracle's license agreements, the Court has repeatedly held that the license agreements "allow the licensee to copy the software into a development environment and have an in-house IT team service it themselves," and also "allow for a third-party service provider, like Rimini, to copy the software in place of the licensee and customize it for the licensee."  *E.g.*, ECF No. 1253 at 2-3.  In the first *Rimini I* appeal, in which the Ninth Circuit construed certain PeopleSoft, JDE, and Siebel legacy licenses, the Ninth Circuit similarly noted "that the licenses generally permit Oracle's licensees to maintain the software and make development environments for themselves," or, "lacking either the capability or the interest, … to outsource the work of maintenance to others."  *Oracle*, 879 F.3d at 956.

348.    That point is confirmed by the well-established rule of license interpretation that, absent express language to the contrary, a licensee may "fix, update, debug, customize, test, and modify his copy of [licensed software]" and has "unbridled authority to 'authorize' others to

119

Gibson, Dunn &
Crutcher LLP

effectuate those activities for him." 2 *Nimmer on Copyright* § 8.08[D][2]; *see, e.g.*, *Great Minds v. Fedex Off. & Print Servs., Inc.*, 886 F.3d 91, 96 (2d Cir. 2018) (absent "clear statement," license "provide[d] no basis for distinguishing between" licensee's employees and third-party commercial services); *Automation by Design, Inc. v. Raybestos Prods. Co.*, 463 F.3d 749, 757-58 (7th Cir. 2006) (license impliedly authorized licensee to hire third party to build machine on licensee's behalf); *see also* Tr. 963:13-964:8, 978:7-19 [Allison]; ECF No. 1253 at 2-3.

349.    All of the licenses authorize third-party support, and the facts bear out the reality that copying of Oracle software is ubiquitous in the third-party support industry.  The Court rejects Oracle's argument, stemming from the language of the OMA and OLSA, that third parties can only "use" the software for the licensee's internal business operations but cannot "copy" that software for the same purposes.  As noted above, those licenses contain provisions identical or substantially identical to the following:

> You [the licensee] have the non-exclusive, non-assignable, royalty free, perpetual (unless otherwise specified in the order), limited *right* to *use* the Programs and receive any Program-related Service Offerings You ordered *solely for Your internal business operations* and subject to the terms of the Master Agreement….
> You may allow *Your agents and contractors (including, without limitation, outsourcers) to use* the Programs and deliverables *for Your internal business operations* and You are responsible for their compliance with the General Terms and this Schedule … in such use.

D-124 at 7 (emphases added); *see also* P-5567 at 1; Tr. 932:12-25 [Allison].

350.    Oracle's use/copy dichotomy makes no sense either textually or contextually.  Oracle has no explanation for what "non-exclusive, non-assignable, royalty free, perpetual … limited *right* to *use*" the software "solely for [the licensee's] internal business operations" is even being *granted* here if the right to "use" the software does not itself encompass copying.  As found above, software cannot be "used" without also being copied.  Oracle's own expert witness conceded as much.  Moreover, *both* the licensee and third parties are granted the same right to "use" the software, and neither are expressly granted the right to "copy."  Thus, if the right to use does not include a right to copy, not only Rimini but the licensee *itself* would not be able to operate the software at all (because doing so would inevitably create copies)—rendering a license for which the licensee has paid potentially millions of dollars useless.

120

Gibson, Dunn & Crutcher LLP

351.    Oracle's interpretation would also likely render the license agreements illegal. Oracle's "license[s] must be construed in accordance with the purposes underlying federal copyright law" (*S.O.S.*, 886 F.2d at 1088), including avoiding instances of copyright misuse, which are "violative of the public policy embodied in the grant of a copyright" (*Lasercomb Am., Inc. v. Reynolds*, 911 F.2d 970, 978 (4th Cir. 1990)).  "The copyright misuse doctrine prevents holders of copyrights 'from leveraging their limited monopoly to allow them control of areas outside the monopoly'" by "'using … conditions to stifle competition'" and "'prevent[ing] … licensee[s] from using *any other competing product*.'"  *Oracle*, 879 F.3d at 957-58 (quoting *Apple Inc. v. Psystar Corp.*, 658 F.3d 1150, 1157, 1159 (9th Cir. 2011)).  There is no dispute that the very process of providing support by a third party requires making copies.  *See Oracle*, 879 F.3d at 955-56; ECF No. 1253 at 41 ("copies" of Oracle software "are necessarily created when [Oracle] software is used, because a computer-readable version of the software is loaded into the computer's memory so that its instructions can be interpreted and acted upon by the computer" (quotation omitted)).  As found above, software cannot be accessed, used, updated, modified, compiled, run, tested, moved, or even viewed without creating RAM copies of the software.  Thus, Oracle's position would effectively prohibit a competing service—third-party support.  The Court therefore construes the term "use" to include copying in order to avoid rendering the license agreements illegal.  This is consistent with Oracle's own CEO's testimony.  *See* Tr. 1055:23-1056:15, 1061:19-1062:4 [Catz].

352.    Oracle argues, however, that this Court is bound to apply the construction of a single Database OLSA given on summary judgment in a *different case*, *Rimini I*, which limited copying to licensees, while permitting third parties to "use" the software.  *See* ECF No. 1451 ¶¶ 103-14 (Oracle's proposed findings of fact).  That is incorrect.

353.    First, the *Rimini I* summary judgment ruling was that the particular version of Database at issue in that case was downloaded pursuant to the Developer Agreement and not the OLSA (*Oracle*, 6 F. Supp. 3d at 1117-18, 1120), and the Ninth Circuit held that Rimini had waived a challenge to *that* determination (*Oracle*, 879 F.3d at 960).  The Court's alternative construction

Gibson, Dunn &
Crutcher LLP

of the OLSA on summary judgment was dicta and not presented in the appeal and has never been applied to an actual use case. *See Oracle*, 6 F. Supp. 3d at 1120-21.

354. Second, even on Oracle's terms, for the Court to be bound to that construction, "the litigation" in *Rimini I* and the litigation here "must be 'identical in all respects'" as to both "the controlling facts and applicable legal rules." *United States v. Callahan*, 445 F.2d 552, 554 n.4 (9th Cir. 1971) (quoting *Comm'r v. Sunnen*, 333 U.S. 591, 599-600 (1948)). But the issues are manifestly different, as the Court has before it hundreds of licenses in three different formats *for a completely different product line*. Oracle itself conceded in its trial brief that "*Rimini I* did not address E-Business Suite," and "this trial will be the first time the Court addresses this particular software." ECF No. 1452 at 13-14. Even if the issues were "almost exactly the same" (and they are not), they would not be considered "'identical'" so as to bind this Court (*Callahan*, 445 F.2d at 554 n.4 (quoting *Sunnen*, 333 U.S. at 599)), and the Court will thus engage with the licenses and evidence on their own terms in this case. The text of the licenses, as well as the other evidence in this case, clearly demonstrate a right to copy the software so long as it is done for the licensee's internal data processing operations.

355. The next major issue concerns the scope and meaning of the phrase "internal business operations" or its equivalent, which appears in all licenses in this case. The parties agree that this language prohibits the actual acts of "cross-use" adjudicated in *Rimini I*: the use of generic environments not associated with any one particular licensee to support multiple licensees. The real dispute is how much further this prohibition extends, and there are two possible interpretations:

356. Rimini's interpretation of this provision is that so long as each client has a license from Oracle, and so long as Client A authorized the work via its contract with Rimini and has not indicated to Rimini that it does not in fact want the work, Rimini is free to develop updates in Client A's environment, document the gained know-how whether simple or extensive, including any Rimini-written code or other work product (not containing more than a *de minimis* amount of Oracle expression), and re-use that knowledge, know-how, and work product with subsequent

licensed clients that have also authorized the work via their contracts with Rimini.  The fact that subsequent clients *indirectly* benefit from Rimini's prior work for Client A, which entailed making copies in Client A's environment, does not run afoul of the "internal data processing operations" provision.  This extends to Rimini's use of Rimini-written tools, which automates certain functions that Rimini would otherwise perform manually.

357.   Oracle's interpretation is that any copy Rimini makes while supporting one client cannot have any benefit whatsoever—even if indirect, ancillary, and later in time—for another client.  According to Oracle, if Rimini makes a copy of Client A's Oracle software during the course of supporting Client A but knows that other clients may also indirectly benefit (because Rimini has gained experience or developed its own code or other work product), then Rimini is engaged in illegal "cross-use."  Oracle concedes that a Rimini engineer may remember and re-use its know-how, but Oracle claims it becomes illegal "cross-use" if Rimini documents it, even if such documentation contains no protected Oracle expression whatsoever.  That is true, according to Oracle, even if the solutions Rimini develops in Client A's environment are so complex as to require a "magi[c]" or "eidetic" memory to replicate them.  Tr. 562:22-563:10 [Frederiksen-Cross].  Oracle claims that if Rimini creates a copy and there is some arguable indirect benefit from the copy for more than one client—even if the copy stays in Client A's environment and is never accessed or used—then it is "cross-use."  If Rimini tests for one client in a manner that shortens testing time for other clients, that benefit of shortened testing time amounts to illegal "cross-use" in Oracle's view.  In essence, Oracle's position is that Rimini should have to re-write each and every update from scratch without reference to any documented solutions it has created when working for another licensee, regardless of whether those solutions contain Oracle expression or are purely Rimini-written expression.

358.   The Court rejects Oracle's interpretation and accepts Rimini's.   Oracle's interpretation is wrong, unworkable, and anticompetitive.

359.   First, the Court has already drawn the precise lines on which Rimini relies.  The Court held that it is "cross-use" when Rimini "uses one customer's software license for the *direct*

123

Gibson, Dunn & Crutcher LLP

*benefit* of other customers ...." ECF No. 1253 at 6 (emphases added). According to that construction, which is binding as law of the case, "[t]he *core ... definition*" of "cross-use" "entail[s] *the use of one customer's software to <u>directly</u> support another customer.*" *Id.* at 86 (emphases added). That is why the Court rejected Oracle's argument in the contempt proceedings that "because Rimini may use [a] test case for multiple customers," Rimini was violating the *Rimini I* injunction "paragraph 6," which is intended to prohibit "cross-use." *Rimini I*, ECF No. 1459 at 19. It is also why in the contempt proceedings, the Court held that Rimini had not violated the same provision prohibiting "cross-use" when Rimini developed a "one size fits all" update "that could be used across multiple customers" and delivered it to multiple clients that needed it. *Rimini I*, ECF No. 1548 at 52 n.73. And it is why the Court held on summary judgment in this case that when Rimini's client Campbell Soup told Rimini it no longer wanted a particular update but Rimini continued to develop the update in Campbell Soup's environment and then delivered that update to client Toll Brothers, Rimini had engaged in "cross-use." ECF No. 1253 at 48, 53, 87.

360.    Furthermore, it is why the Court held on summary judgment in this case that it is not "cross use for a Rimini engineer to 'memorize and replicate the work,' as Oracle claims." ECF No. 1253 at 87. As the Court has held:

> The fact that a Rimini software engineer can create the update for Client B more efficiently because he or she gained experience creating the update for Client A is not relevant in this analysis. It is obvious that the first time a software engineer creates an update for a client, he or she is slower and less proficient than any subsequent time they create that update. Moreover, it would be impossible to direct an engineer, who developed an update in Client A's environment, to not use the knowledge he or she gained when developing the same or similar update for Client B.

*Id.*

361.    Oracle's interpretation is also unworkable and anticompetitive. Oracle's own experts and witnesses staked out sweeping positions at trial as to what constitutes "cross-use," which would lead to absurd results. Oracle's forensic expert Christian Hicks conceded, for example, that certain copies of Oracle software that are made regardless of whether Rimini implements an update manually or via automated tools "*do serve to facilitate data processing on*

124

*Customer A's system*." Tr. 1386:7-9 [Hicks] (emphasis added); *see also* Tr. 1411:13-1412:1 [Hicks] (discussing the creation of Code_Before and Code_After folders within a client's environment for version control purposes). "[B]ut," he continued, "these copies will also be used to facilitate data processing on the environments of Customers B and C, and *therefore these copies constitute cross-use*" (Tr. 1386:10-12 [Hicks] (emphasis added)), even though it is undisputed that the copies are never actually shared with Clients B and C and remain in Client A's environment (Tr. 1411:15-1412:1 [Hicks] (Code_Before and Code_After files are in client's environment); Tr. 1415:7-14 [Hicks] (discussing his demonstrative slide 14 depicting Code_Before and Code_After files and agreeing that "all the copies on [the demonstrative] are in Customer A's environment"))).

362.    Oracle's expert Barbara Frederiksen-Cross testified, when asked by Oracle's counsel, "What is cross-use?" that it "is the use of one customer's environment that is not *solely* for the benefit of that customer. So, for instance, the development of an update in Customer A's environment and then that update *being provided to Customer B* is "cross-using" Customer A's environment. Tr. 311:9-11 [Frederiksen-Cross] (emphases added). This includes, and in most cases consists merely of, temporary RAM copies unavoidably made in a the client's environment whenever an Oracle file is opened. Thus, for her, developing an update in Client A's environment, assuming Rimini has only one client (Client A), does not result in any "cross-use." But if "six months later" Client B comes to Rimini and "Rimini implements that update for" Client B using a "tech[nical] spec[ification] that Rimini created" six months earlier "during its work for" Client A, her "understanding is that would be considered a cross-use," rendering the RAM copy in Client A's environment the "cross-used" copy. Tr. 531:25-534:11 [Frederiksen-Cross]. In other words, a RAM copy made in Client A's environment when creating an update for Client A is retroactively transformed into illegal "cross-use" if Rimini relies on a technical specification to implement the same update later for Client B, even though the RAM copy in Client A's environment *no longer exists at that point*.

363.    Ms. Frederiksen-Cross also took the position that permissible re-use of "know-how" is limited strictly to what an engineer can literally memorize, and that complex and detailed

Rimini-written solutions cannot be documented, but that it would be fine if the engineer "most enviously had the ability to memorize all of that data." Tr. 563:2 [Frederiksen-Cross]. She also testified that "hypothetically maybe some very simple change could be carried out in an engineer's head and over dinner he writes on the back of his napkin and takes that napkin with him another day," such documentation might be "quite acceptable," but if a technical specification, written entirely by Rimini, "contain[s] lengthy and voluminous amounts of very detailed code and very detailed instructions" for developing and implementing an update, it is impermissible "cross-use." Tr. 526:8-19 [Frederiksen-Cross]; *see also* Tr. 555:15-558:6, 563:11-14 [Frederiksen-Cross].

364.    Oracle's *license* witness, Richard Allison, drew a different line. He testified that the internal data processing operations provision *does* permit the engineer to write down the solution developed in Client A's environment, but only if the engineer is "no longer accessing" the environment at the time it is documented; that is, the engineer could "go back to the office" and "write something down from his knowledge." Tr. 979:17-980:2 [Allison]. But it is not permissible, according to Mr. Allison, to write down such information while looking at the Oracle program. Tr. 980:3-6 [Allison] ("What he can't do, in my opinion, is look at the programs, write down sequences, how to do things while he's using the programs, and then take that information and use that for another customer.").

365.    The Court rejects these positions. So long as Rimini's client has a license for the software (which it is undisputed all clients did) and so long as a copy rendered in the process of providing support was authorized by that client and was for the benefit of that client, the fact that the copy also *indirectly* benefits Rimini's *other* licensed clients does not render the first copy or re-use of that copy infringing "cross-use." As a non-exhaustive example, copies Rimini engineers make "in the Code_Before and Code_After folders," on a client's systems, whether manually or via automated tools, "facilitate data processing" for that first client, even *if* such copies serve to indirectly benefit other clients that will receive the same or similar updates. Tr. 1386:7-12 [Hicks]. Nothing in the licenses prohibits such copying.

366.    The Court also notes that when it comes to *other* third-party support providers like

Gibson, Dunn &
Crutcher LLP

Spinnaker, Oracle reviewed essentially identical support practices and decided that they were permissible and non-infringing.  Oracle similarly entered into a settlement agreement with provider CedarCrestone that permitted CedarCrestone to re-use its know-how and its own code with multiple clients, and Mr. Allison testified at his deposition (changing his position at trial) that nothing in the CedarCrestone settlement agreement was contrary to Oracle's "internal business use" provision, the entire foundation for Oracle's "cross-use" arguments in this case.  Tr. 983:13-986:17 [Allison].

### 2. Remote Access and Copying of Code in Client Environments

367.     With respect to the "facilities" restriction present in some PeopleSoft legacy license agreements (*see* License Appendix at A7-13), as found above, it was undisputed that Rimini has not had any active PeopleSoft environments on its systems after the transition to Process 2.0 (much less environments associated with a client with a license that included a "facilities" restriction).  Moreover, with respect to individual PeopleSoft files, Oracle presented no evidence that any Oracle file allegedly present on Rimini's systems after the transition to Process 2.0 was accessed or used in any manner.  Nor did Oracle present any evidence that any such file was linked to a specific client with a license that contained a "facilities" restriction.  The evidence was undisputed that Rimini has policies preventing the storage of any Oracle materials on its systems, that Rimini repeatedly trains its personnel and educates its clients on these policies, and that when such materials are found on Rimini's systems, Rimini personnel do not use them and are trained to report them so they can be quarantined.  Thus, the Court holds that under Process 2.0, Rimini complies with Oracle's legacy PeopleSoft license agreements with respect to the "facilities" restriction.

368.     Oracle also contends that Rimini made copies of PeopleSoft software outside of clients' "facilities" when it provided support to clients that stored their PeopleSoft software environments in their cloud accounts on Windstream.  The Court rejects this argument.

369.     As the Court held at summary judgment, "agree[ing] with Rimini," "[t]he Ninth Circuit" held that whether a computer system is a licensee's "facilities" in the PeopleSoft license

Gibson, Dunn &
Crutcher LLP

depends on whether the client has "control" over it; indeed, "the concept of control is vital to a determination of what constitutes the licensee'[s] facilities." ECF No. 1253 at 90-91 (citing *Oracle*, 879 F.3d at 959-60). But that dispute has now been resolved, because as found herein, for those few clients that choose to store their environments on the cloud, those clients retain total relevant control over those environments, and thus such cloud systems qualify as "facilities" under the license agreements.

### 3.   Siloed, Client-Specific Environments

370.   Based on the Court's relevant findings herein, the Court holds that Rimini's use of siloed, client-specific environments on a client's systems to support that client is also licensed. Those environments are themselves copies of Oracle's software (often modified with some Rimini-written expression), but are expressly licensed as the "use" and "copying" permitted by the relevant license agreements, across all product lines. No evidence supports a conclusion that software environments on a client's systems are anything other than customized software environments that exist for the purpose of running the client's internal data processing operations.

371.   Even if there were instances in which an engineer used a client's environment in a way that, for example, violated the internal data processing operations provisions of a license agreement, as the Court held on summary judgment had occurred on two "limited" occasions with respect to Campbell Soup and City of Eugene (ECF No. 1253 at 48, 53, 87), or as this Court held during the contempt proceedings had occurred on a few other occasions with respect to the environment for City of Eugene (*Rimini I*, ECF No. 1548 at 25, 29), that does not change the fact that each client's production, testing, and development environments exist on the client's systems to support that client, and are thus authorized. Such copies—and any RAM copies made by Rimini in the process of providing support—are necessary to run and maintain the software for its intended and licensed uses.

### 4.   Re-Use of Rimini's Knowledge and Work Product

372.   The most significant dispute in this case concerns Rimini's various forms of re-using its know-how gained in the process of providing updates and fixes to clients. The Court

Gibson, Dunn &
Crutcher LLP

incorporates and adopts its conclusions in Section III.A.1, and further holds, to make clear, that Rimini is permitted to write down or otherwise memorialize its own know-how, including code, and knowledge in technical specifications or other similar documents.  There is no discernible distinction—in either the copyright laws or the relevant license agreements—between Rimini engineers *remembering* the work that they did and Rimini engineers *writing down* in a document (containing no Oracle protected expression, either literal or nonliteral) the work that they did.

373.    Indeed, memorizing and recreating content is a recognized form of copying under the Copyright Act.  *See, e.g.*, *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 482-83 (9th Cir. 2000), *overruled on other grounds by Skidmore as Trustee for Randy Craig Wolfe Tr. v. Led Zeppelin*, 952 F.3d 1051, 1069 (9th Cir. 2020) (en banc).  If Rimini is permitted to "copy" by creating code for one client, memorizing it, and replicating it elsewhere, then it is also permitted to "copy" by writing that code down in a technical specification or other document.  Nor did Oracle identify any basis for this distinction in its license agreements.  To the contrary, as the Court has noted, Oracle's licenses expressly recognize that the licensee—not Oracle—owns modifications made to the software, which necessarily means that Oracle has no copyright over them.  *See supra* Section II.C.2.g.

374.    For the reasons found above, the inclusion of "#include" lines in certain Rimini files that reference Oracle files merely by name does not convert Rimini's work product into a work covered by Oracle's copyrights.  When a Rimini file contains instructions to include an Oracle file, that Oracle file is only incorporated *on the client's* environment when the Rimini file is run there.  The Oracle file is not incorporated into the Rimini file when the Rimini file is standing alone.

375.    The Court also holds that Rimini's Process 2.0 does not involve the use of one client's environment to create updates that are then given "outright" to other clients without further development or testing.  While the Court found that this occurred in one "limited case" in its summary judgment order (ECF No. 1253 at 87), the undisputed evidence at trial showed that even where Rimini re-uses knowledge or work product to create an update for Client B, Rimini

engineers still log into Client B's separate environment, implement the work, make adjustments as necessary for the particular requirements of Client B's environment, and test the work in multiple phases in Client B's environment, before it is ultimately packaged with other updates and fixes for delivery to Client B to implement in Client B's production environment.

376.    Although specific accusations of infringement are addressed further below, the Court concludes that Rimini's re-use of Rimini-created know-how and Rimini-written code typical to Process 2.0 is licensed.

### 5.    Rimini-Created Software Tools

377.    Based on the Court's relevant findings herein, the Court holds that Rimini's use of its own proprietary tools—including the AFW Tools, the DevReview tool, and the EBS ePack tool—does not constitute "cross-use" of Oracle software.  The evidence showed that these tools were created by Rimini, using its own creativity and know-how, and that they do not incorporate any literal or nonliteral protected Oracle expression.  These tools are designed to send only Rimini-created content to other clients, and any copies of Oracle expression they may create are located in and remain in each client's environment.  And Oracle's witnesses agreed that the effect of these tools was only to automate certain steps in the support process that would otherwise be performed manually.  Just as Rimini is permitted to re-use its own know-how and code when manually creating updates for clients, it is permitted to use tools that automate steps in that process.

378.    The Court also holds that Rimini's creation of these tools was not "cross-use." Again, the evidence showed the tools were created by Rimini and do not contain Oracle intellectual property.  The fact that Rimini implemented and tested these tools in client environments does not mean they were developed via "cross-use" of Oracle software.  The tools were used for the clients that received them, and any copies made in the testing process were thus for that client.

379.    Even if Rimini's tools created copies of Oracle software that were unlicensed, the Court finds those copies are fair use, as discussed *infra* Section III.D.2.

### 6.    JDE Specific Conclusions

380.    Because Oracle's request for injunctive relief as to JDE deals only with copyright

130

Gibson, Dunn &
Crutcher LLP

registrations for which Oracle presented no evidence of infringement, the Court addresses here Oracle's JDE-specific claims of infringement to determine only whether Rimini is entitled to a declaration of non-infringement as to JDE.

381.   ***JDE Source Code.***  As the Court held generally with respect to Process 2.0 above, the license agreements in this case, across all product lines, permit Rimini to make copies on behalf of the licensee for the purposes of software support and maintenance.

382.   With regard to JDE, however, Oracle argues that Rimini acts outside the scope of the license agreements any time it makes a copy of JDE source code.  Oracle raised this issue in the contempt proceedings related to the *Rimini I* injunction, arguing that Rimini could never make any copies of JDE source code for any reason.  The Court rejected this argument in the contempt context, holding that:

> [I]t is clear that the J.D. Edwards license agreements authorize a third party like Rimini to copy the J.D. Edwards software application and related documentation for the licensee's archival needs and to support the licensee's use.  It is also clear that Rimini is not authorized to make copies of J.D. Edwards software application and documentation to access the software's source code to carry out development and testing of software updates, to make modifications to the software, or to use the customer's software or support materials, to support *other* customers.…  [T]he Permanent Injunction only applies to conduct previously held unlawful.  In this case, whether Rimini is ever permitted to *lawfully* copy source code under a specific provision of the J.D. Edwards license has never been interpreted or decided by this Court.  Having considered the provisions of the J.D. Edwards Legacy license agreement, the Court is not convinced at this time that Rimini may never copy source code when doing so is solely to support the needs of the client.  And the Court has not before considered what "screen access" means and whether Rimini's support Process 2.0, in which Rimini remotely accesses the client's environments, is permitted given this provision.  These issues are squarely before the Court in *Rimini II* and therefore, the Court declines to reach them at this time.

*Rimini I*, ECF No. 1548 at 45-46 (citations omitted).

383.   The JDE license agreements vary significantly.  However, based on the relevant findings of fact, the Court concludes that the licenses authorize third-party support, including the copying of source code, so long as it is done consistent with the other terms of the license agreements, such as the common limitation to use copies for the internal data processing operations of the licensee.

384.   In one version of the JDE license typified by the Liz Claiborne license (held by 37

Rimini clients at issue) (*see* License Appendix at A1-3), the license says that the "Customer" (licensee) "may allow its customers, vendors or other entities in a similar relationship to Customer to access [JDE] and use the same for the purpose of conducting inquiries and other limited activities so long as Customer can demonstrate" seven elements, including that "none of the aforementioned entities, at any time, has access to J.D. Edwards' source code." P-6802 at 2, Article II, ¶ 3. Another version, typified by the Giant Cement license (held by 7 Rimini clients at issue) (*see* License Appendix at A2-3), provides that "[f]or any access to the Software other than by an employee of Customer, Customer shall not provide access to source code and all provided access shall be restricted to screen access for the functions required." P-5575 at 1, Article II, ¶ 3.

385.    Oracle's argument fails under both versions of the license. First, Oracle's argument, for either version of the license, is inconsistent with the Ninth Circuit's earlier ruling construing the Giant Cement JDE license. The Ninth Circuit held that the Giant Cement license's language—providing that the licensee can authorize third parties to "copy the Documentation or Software … to the extent necessary for Customer's archival needs *and to support the Users*" (P-5575 at 1, Article II, ¶ 7(iii) (emphasis added))—"would not preclude Rimini *from creating development environments for a licensee for various purposes after* that licensee has become a customer of Rimini." *Oracle*, 879 F.3d at 955, 958 (emphasis added). As found herein, the creation of a "development environment" necessarily requires the copying of source code. Oracle's argument fails in the face of this binding construction by the Ninth Circuit.

386.    Second, the Liz Claiborne license's own terms preclude Oracle's theory. Those licenses recognize that the "Customer shall own all right, title, and interest [in] any Derived Software except [that] [Oracle] shall retain sole ownership of such portions of the Derived Software that contain part or all of [JDE] Software." P-6802 at 2, Article II, ¶ 1(C). "Derived Software," in turn, is defined to mean "[s]oftware programs or modifications to [JDE] created through the use of a development tool licensed hereunder and developed *by Customer, its employees or third party agents (not [Oracle])*." *Id.* at 1, Article I, ¶ 8 (emphasis added). In other words, the license explicitly recognizes that a third party agent *is permitted* to modify JDE using

Gibson, Dunn &
Crutcher LLP

the tools provided with the program. Oracle's own expert testified unequivocally that it is not possible to make a "modification" to JDE software using those tools delivered without accessing and modifying JDE "source code." Thus, these licenses plainly acknowledge that third parties like Rimini are permitted to copy JDE source code.

387. These provisions would be rendered incoherent were the "Third-Party Access" provision read to prohibit "third party agents" from accessing "source code." These particular licenses are governed by Colorado law, which, like most jurisdictions, holds to the basic interpretive principle that the Court must view a contractual agreement "in its entirety with the end in view of seeking to harmonize and to give effect to all provisions so that none will be rendered meaningless." *Fed. Deposit Ins. Corp. v. Fisher*, 292 P.3d 934, 937 (Colo. 2013) (quoting *Copper Mountain, Inc. v. Indus. Sys., Inc.*, 208 P.3d 692, 697 (Colo. 2009)); *see also Peterson v. Minidoka Cnty. Sch. Dist. No. 331*, 118 F.3d 1351, 1359 (9th Cir. 1997) ("The usual rule of interpretation of contracts is to read provisions so that they harmonize with each other, not contradict each other."). Oracle's reading would contradict that bedrock principle of interpretation—as well as Oracle's earlier approval of Spinnaker accessing source code. As noted above, it is standard industry practice for consultants, integrators, and third-party support providers to modify source code, including JDE source code, without being considered in breach of software license agreements. The Court therefore rejects Oracle's contrary no-access argument.

388. Third, the Court's interpretation of the Liz Claiborne license is further supported by the fact that there is simply no *need* to read the license agreement as Oracle proposes—the third-party access limitations Oracle points to, when read in context of the entire agreement, including the rights related to Derived Software as noted above, clearly pertain to third parties *of a particular kind* and do not include Rimini. As the plain language of the agreement states, "screen access" is a limitation that applies to the licensee's "customers, vendors or other entities in a similar relationship to Customer" who are actually running and using JDE for their primary functions, *not* individuals or entities hired to maintain the software for the licensee. P-6802 at 2, Article II, ¶ 3. That is why the license says that third parties may access JDE's *interface* (*i.e.*, screen access) to

Gibson, Dunn &
Crutcher LLP

"conduct[] inquiries" using the software.  *Id.*

389.   Fourth, the Giant Cement license reaches the same outcome with different language.  Article IV of that license contemplates the provision of "consulting services" for software support, which can be provided *either* "by [Oracle]" *or* "from *third parties*," with Oracle disclaiming any responsibility "for problems caused by *alterations or modifications made by Customer or a third party to the Software*."  P-5575 at 2 (emphases added).  The license also explicitly contemplates either Oracle or third parties providing "Developed Software" to the licensee under Article IV.  None of this would make any sense if the third party were not able to access "source code," both because accessing and copying "source code" is undisputedly necessary to make "alterations" or "modifications" "to the Software," and because making such alterations and modifications is clearly the nature of the "consulting services" discussed in the license to be provided by either Oracle or a "third party."

390.   Fifth, Oracle's reading, including Oracle's reliance on the Liz Claiborne license provisions that limit access to source code to third parties that do not "compet[e] with [Oracle]," would be an unequivocal instance of copyright misuse.  Oracle's "license[s] must be construed in accordance with the purposes underlying federal copyright law" (*S.O.S.*, 886 F.2d at 1088), including avoiding instances of copyright misuse, which are "violative of the public policy embodied in the grant of a copyright" (*Lasercomb*, 911 F.2d at 978).  "The copyright misuse doctrine prevents holders of copyrights 'from leveraging their limited monopoly to allow them control of areas outside the monopoly'" by "'using … conditions to stifle competition'" and "'prevent[ing] … licensee[s] from using *any other competing product*.'"  *Oracle*, 879 F.3d at 957-58 (quoting *Psystar*, 658 F.3d at 1157, 1159).  The Court thus construes the licenses in this fashion to avoid copyright misuse in all events because Oracle cannot use license provisions to monopolize the aftermarket for software support services.

391.   ***JDE Updates and Technical Specifications.***  Based on the relevant findings of fact, the Court holds that Oracle has failed to meet its burden to demonstrate that Rimini's re-use of know-how in the form of JDE technical specifications violates the relevant licenses and is therefore

Gibson, Dunn & Crutcher LLP

infringing.  Oracle's theory is that Rimini's use of JDE technical specifications to record know-how constitutes "cross-use" of JDE software in violation of the license provisions limiting copies to the internal business operations of the licensee.  The Court rejects this theory.

392.    Under Rimini's policies, technical specifications can include Rimini know-how and Rimini-written code, but cannot include any Oracle protected expression.  Any copies of Oracle expression created while working on an update for a client or creating a technical specification remain in that client's siloed environment.

393.    The Court has already rejected Oracle's overly broad "cross-use" theories in other contexts, and does the same here with respect to technical specifications.  Each time a copy, for instance a RAM copy, is made when a Rimini engineer creates an update that is documented in a technical specification, the initial copy is made to service that client's licensed business operations.  The licenses do not prohibit Rimini from having multiple clients.

394.    Indeed, that the licenses permit this conduct is readily apparent from Oracle's treatment of Spinnaker's JDE support processes, which are materially identical to Rimini's in numerous respects.  As found above, Oracle's 30(b)(6) witness testified that Oracle audited Spinnaker's JDE support services and identified no issues or concerns that the processes were infringing.  The same witness also explained that Oracle inspected Spinnaker's EBS support processes in 2015—processes that involve a "general design framework" and re-use of know-how in the same manner as Rimini's technical specifications—and concluded that the processes did not infringe Oracle's intellectual property rights or violate Oracle's license agreements with Spinnaker's clients.  Other evidence demonstrated that Spinnaker's practice of modifying source code in the course of providing support to clients is common in the industry.  Rimini's conduct, like Spinnaker's and others' in the industry, does not violate the license agreements.

### 7.    Declaration of Non-Infringement

395.    District courts have discretion to entertain actions for declaratory judgment with respect to copyright infringement pursuant to the Copyright Act (17 U.S.C. §§ 101 *et seq.*) and the Declaratory Judgment Act (28 U.S.C. § 2201(a)).  Based on the relevant findings of fact, the Court

Gibson, Dunn &
Crutcher LLP

holds that a justiciable controversy exists between the parties and exercises its discretion to enter a declaratory judgment. *See Shloss v. Sweeney*, 515 F. Supp. 2d 1068, 1075 (N.D. Cal. 2007).

396.    Based on the foregoing findings of fact, the Court holds that Rimini may do all of the following without violating Oracle's license agreements or the Copyright Act:

(i) Rimini engineers can, in the process of providing support to a licensed client, memorialize and document the know-how gained in that process, including in Rimini-authored documents such as technical design specifications and other similar documents, and re-use that knowledge and documentation for multiple licensed clients, when it does not contain more than a *de minimis* amount of Oracle protected expression, literal or nonliteral.

(ii) Rimini engineers can, in the process of providing support to a licensed client, memorialize and document Rimini's own written software code that does not contain more than a *de minimis* amount of Oracle protected expression, literal or nonliteral, and re-use that code for multiple licensed clients.

(iii) Rimini engineers can use Rimini-written software tools that contain no Oracle protected expression, literal or nonliteral, to automatically perform functions associated with Rimini's re-use of its code and know-how, as held above.

(iv) Rimini engineers can access and create copies in client environments when those clients host their environments on cloud systems such as Windstream, so long as the clients maintain relevant control over those systems.

397.    The Court orders Rimini to file a proposed declaratory judgment consistent with these findings of fact and conclusions of law.

398.    The Court's judgment renders Rimini a "prevailing" party for purposes of the Copyright Act's attorney's fees and costs provision.  17 U.S.C. § 505; *Shloss v. Sweeny*, 515 F. Supp. 2d 1083, 1085 (N.D. Cal. 2007).

**B.      Oracle's Claims for Direct Copyright Infringement**

**1.      Process 1.0 "Migration" Claims**

399.      Oracle asserts in this case that Rimini's process of "migrating" PeopleSoft environments from Rimini's systems to Rimini's clients' systems, done in part to comply with the Court's 2014 summary judgment order, infringed Oracle's copyrights by creating unauthorized copies on Rimini's systems as a part of that process.

400.      Based on the relevant factual findings entered by the Court, the Court holds that Oracle failed to shoulder its burden of showing that the creation of these copies violated the relevant license agreements.  It is Oracle's burden to demonstrate that such copying was done outside the scope of the relevant PeopleSoft license agreements.  *S.O.S.*, 886 F.2d at 1087-88.  But there can be no doubt that the copying of environments in order to relocate them to a place of the client's choosing was done as a part of supporting the client's "internal business operations."

401.      Furthermore, in *Rimini I*, Rimini was held liable because the license agreement at issue contained a provision limiting the use of the software to the licensee's "facilities."  *Oracle*, 879 F.3d at 959-60.  But there *is no "facilities" restriction* in a number of the PeopleSoft licenses for migrated environments.  *See* License Appendix at A3-7; *supra* Section II.B.2.  The Ninth Circuit has been clear that a license agreement lacking such a restriction does not dictate *where* the licensee may use or copy the software; thus, copies on Rimini's systems are non-infringing (*Oracle*, 783 F. App'x at 710-11), and the copies were made within the scope of the relevant license agreements.

402.      Even assuming that the copies Rimini made during the migration for clients with license agreements that *did* have a "facilities" restriction were *prima facie* infringing, Rimini has met its burden of showing that such copies were permitted as a matter of fair use to comply with a court order, as set forth below.  The Court's ruling did not provide any specific guidance as to how Rimini should move locally hosted environments off its systems.  *See Rimini I*, ECF No. 474; Tr. 2082:17-21 [Lyskawa].  And after the migration was complete, the Court *denied* Oracle's request that the environments be destroyed or impounded.  *Rimini I*, ECF No. 1049 at 9-10.  Rimini was

Gibson, Dunn &
Crutcher LLP

1    not required to delete the environments, and the migration properly complied with the Court's

2    order.

3        403.    Oracle's argument that Rimini should have deleted the software on its systems and

4    built new environments for each PeopleSoft client from scratch is unavailing.  At worst, rebuilding

5    environments from scratch would be impossible, such as in the case of attempting to recreate client

6    archives; returning the client's software to the clients was Rimini's only option.  *See* Tr. 215:18-

7    216:20 [Ravin]; Tr. 2084:16-25 [Lyskawa].  At best, the end result would be exactly the same:

8    Rimini's clients would still have the same software environments with the same licensed Oracle

9    code, but the environments would be on the clients' systems instead of Rimini's.  Oracle would

10   not have earned any more money, as it is undisputed that every client involved in the migration

11   already paid Oracle for a license, and there is no evidence that a client received Oracle code not

12   covered by its license as part of the migration.  The only impact would be to make Rimini's clients

13   endure unnecessary delays and disruption (thereby damaging their relationship with Rimini and

14   potentially rendering them non-compliant with state and federal laws and regulations), and to force

15   Rimini to spend unnecessary time and resources recreating and reapplying updates it had already

16   provided to these clients.  *Cf. Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1527-28 (9th Cir.

17   1992) ("[W]here disassembly is the only way to gain access to the ideas and functional elements

18   embodied in a copyrighted computer program and where there is a legitimate reason for seeking

19   such access, disassembly is a fair use of the copyrighted work, as a matter of law."); *Sony Comp.*

20   *Ent., Inc. v. Connectix Corp.*, 203 F.3d 596, 605 (9th Cir. 2000) (holding that competitor's copying

21   was fair use when it reverse engineered Sony's operating system for the purpose of reviewing the

22   source code to create a competitor product, and rejecting Sony's argument that the use was not fair

23   because the competitor made "more copies" than necessary in the process, and concluding that

24   "[e]ven if we were inclined to supervise the engineering solutions of software companies in minute

25   detail, and we are not, our application of the copyright law would not turn on such a distinction.

26   Such a rule could be easily manipulated." (footnote omitted)).

27

28

Gibson, Dunn &
Crutcher LLP

2.  **Oracle's Product-Line Claims**

   a.  ***PeopleSoft***

404.  ***Data, Code, and Object Changes.***  Oracle accuses a number of procedures Rimini uses with respect to data, code, and object changes in PeopleSoft of infringing by violating the "internal business operations" provision common to PeopleSoft licenses.  Based on the relevant findings of fact, the Court holds that Oracle has failed to meet its burden of showing that Rimini acted outside the license agreements.

405.  Oracle's theory with respect to all of these matters is that Rimini engages in "cross-use" because, in essence, it makes copies in one client's environment that, by Rimini gaining experience and know-how and developing Rimini-created work product, inure to the benefit of subsequent clients that require the same TLR update.  The Court rejects Oracle's theory for substantially the same reasons as stated in discussing Rimini's declaratory judgment claim.

406.  ***Rimini's Quality Assurance Testing.***  Based on the relevant findings of fact, the Court rejects Oracle's theory that shortened testing time in Rimini's QA testing amounts to illegal "cross-use."

407.  As the Court already held on summary judgment, it is "not cross use" for a Rimini engineer to become "more efficient[]" in providing updates.  ECF No. 1253 at 87.  And the Court also held that "Rimini is not required to test updates" at all.  *Rimini I*, ECF No. 1459 at 26.  It necessarily follows that Rimini can batch its testing in such a way that earlier tests require more time, and subsequent tests require less.  Nothing in the license agreements prohibits that.

408.  ***Rimini "Rewrite" Files.***  Based on the relevant findings of fact, the Court holds that Oracle has failed to meet its burden of demonstrating that the Rimini rewrite files constitute copying, that is, that they are "substantially similar" to the Oracle files that Oracle accuses Rimini of copying.

409.  As found above, there is no evidence before the Court that the particular files allegedly sent to multiple clients contained protectable Oracle expression.  Ms. Frederiksen-Cross did not link the versions of the Rimini files sent to clients with the versions she analyzed for line

Gibson, Dunn &
Crutcher LLP

matching. Indeed, with respect to rsi810st.sqr—her primary example during her direct testimony—she presented evidence about line matching in a *different* file that she admitted was an "early" version of what eventually became the rsi810st.sqr file, while acknowledging that alleged matching in later versions of the file decreased. For this Court to assess whether the files allegedly sent to multiple clients were substantially similar to an Oracle copyrighted work, Oracle was required to present evidence of the content of *those specific* files. Oracle did not.

410. Further, merely presenting line matching statistics (even if they were linked to files actually distributed to clients) is not sufficient. As this Court has previously held in rejecting similar accusations from Oracle with respect to files accused of copying Oracle expression, "[i]t is well settled that not all copying violates the Copyright Act, but rather, a plaintiff must prove 'copying of protectable expression beyond the scope of the license.'" *Rimini I*, ECF No. 1548 at 33 (quoting *MAI Sys. Corp. v. Peak Comput., Inc.*, 991 F.2d 511, 517 (9th Cir. 1993)). "Copying may be shown by circumstantial evidence of access and substantial similarity of both the general ideas and expression between the copyrighted work and the allegedly infringing work." *Apple Comput., Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1442 (9th Cir. 1994). "[W]orks cannot be substantially similar where analytic dissection demonstrates that similarities in expression are either authorized, or arise from the use of common ideas or their logical extensions." *Id.* at 1439. Analytic dissection refers to the process of determining whether the allegedly similar features are "elements of a work that are protectable and used without the author's permission." *Id.* at 1443.

411. Ms. Frederiksen-Cross did not offer any concrete testimony on analytic dissection of these files, as is Oracle's burden.[17] She did not identify what should be filtered out from the matches reflected in her exhibit P-2533, despite acknowledging that at least some of the matching lines contained content that *should* be filtered out. Without such evidence, the Court cannot

---

[17] The Ninth Circuit's decision in *Bell v. Wilmott Storage Services, LLC*, 12 F.4th 1065, 1074 (9th Cir. 2021), which Oracle relies on for the proposition that it need not conduct analytic dissection if there is "verbatim" copying, is not on-point—that case concerns the *de minimis* exception, not analytic dissection of computer code. As the Court recognized in the contempt proceedings, analytic dissection is required when assessing whether substantial similarity exists as to software code because not all components of software are "protectable" under the Copyright Act and thus must be filtered out. *Rimini I*, ECF No. 1548 at 34.

conclude that the Rimini files are substantially similar to an Oracle copyrighted work.  *See*, *e.g.*, *Cavalier v. Random House, Inc.*, 297 F.3d 815, 822 (9th Cir. 2002) (court "must filter out and disregard the non-protectible elements in making its substantial similarity determination"); *see also DropzoneMS, LLC v. Cockayne*, 2019 WL 7630788, at *7, *14 (D. Or. Sept. 12, 2019) (excluding Ms. Frederiksen-Cross's opinions for, among other things, failing to properly conduct analytic dissection).  Indeed, it is little surprise that Rimini's files, which are designed to accomplish tasks related to, *e.g.*, the preparation of standard federal and state tax forms, would match with Oracle files designed to accomplish precisely the same task.  The key issue is whether what matches between the files is *protectable*.  Oracle has not met its burden to show that it is.

412.    In sum, Oracle did not present concrete evidence that *actual versions of files* sent to Rimini clients had *protectable* Oracle expression in them, and thus the Court has no basis to conclude those files were substantially similar to an Oracle copyrighted work.

413.    In addition, the evidence showed that Oracle's copyrighted work—PeopleSoft—contains nearly 50,000 individual files.  The evidence presented on the Rimini files was that some versions of them contained *lines* of code from *15* PeopleSoft files.  The Court holds, as it did during the contempt proceedings, that such "copying"—even if properly demonstrated by Oracle—would be *de minimis* and that "*de minimis* copying is not prohibited by the Copyright Act." *Rimini I*, ECF No. 1548 at 47 (citing *Newton*, 388 F.3d at 1193).

414.    Finally, as found above, Rimini began its project to rewrite these files in 2010, and it was undisputed that Rimini has not provided them to new clients since 2018.  Moreover, Oracle conceded that even when these files were being sent to clients, any Oracle code in the files was code that the client *already had* by virtue of having licensed a copy of PeopleSoft.  Thus, there is no indication of any harm to Oracle, and certainly none that is ongoing today.

### b.    JDE

415.    ***JDE Registrations.***  Because Oracle has asserted infringement in this case of only five registered copyrights (four JDE updates and one documentation database), none of which cover the actual JDE releases themselves, and because Oracle also did not offer any evidence of

allegedly infringing conduct related to these five registered copyrights, Oracle's claims of infringement and corresponding requests for injunctive relief as to JDE fail as matter of law.[18]

### c.      Siebel

416.    Based on the relevant findings of fact, the Court holds that Oracle has failed to meet its burden to demonstrate copyright infringement as to its Siebel claims.

417.    During the course of Oracle's case-in-chief, Oracle failed to present any evidence about instances of alleged infringement of Siebel, and its witnesses repeatedly testified that there were only four product lines at issue in this case—PeopleSoft, JDE, EBS, and Database.  Oracle has thus "failed to carry" its "essential burden of proof" on the Siebel claims it asserted in its pleadings and in the pre-trial order (*see Price v. U.S. Navy*, 818 F. Supp. 1323, 1324 (S.D. Cal. 1992) (granting judgment on partial findings of fact and conclusions of law under Rule 52(c))), and as to Rimini's declaratory judgment claim of non-infringement as to Siebel (*see Marya*, 131 F. Supp. 3d at 983-84 (burden of proof on infringement remains with rightsholder)).

### d.      EBS

418.    Based on the relevant findings of fact, the Court holds that Oracle has failed to demonstrate that Rimini's "prototyping" of EBS updates using technical specifications is an illegal form of "cross-use" that violates the internal data processing limitation in the EBS license agreements.

419.    Rimini has established that during the "prototype" process, Rimini creates an update for a first client in that client's environment, and then manually re-implements the update in each subsequent client's environments.  As already discussed, Rimini is permitted to use a technical specification in this process that documents Rimini's own know-how and code.  Oracle failed to present any evidence that Rimini's current processes involve sharing Oracle code between clients or including it in technical specifications under Process 2.0.  That means that every copy

---

[18] Even if Oracle had asserted a claim of copyright infringement for registered copyrights that cover the actual JDE releases, that claim would fail for the reasons explained *supra* Section III.A.6. Rimini is permitted to make copies of JDE source code to support licensees and does not "cross-use" when creating technical specifications that include Rimini know-how and Rimini-written code.

142

of Oracle expression made during this process, whether disk or RAM, is made in the siloed client environment and *for* that client.  Rimini's processes are similar to Spinnaker's EBS support processes, which Oracle reviewed and approved, as Oracle's 30(b)(6) witness testified.

### e.    *Database*

420.    Based on the relevant findings of fact, the Court holds that Oracle has failed to prove that Rimini has infringed Oracle's copyrights in Database.

421.    First, Oracle's entire theory of infringement as to Database proceeds on the assumption that Rimini has engaged in "cross-use" of programs that rely on Database when they run.  But Rimini has not committed such "cross-use," so even on Oracle's theory, no "cross-use" of Database occurred.

422.    Second, even if Oracle had prevailed on some claims of infringement as to other programs that rely on Database, Oracle has still failed to prove that Rimini engaged in "cross-use" of Database.  Oracle did not offer any evidence of a specific instance where Rimini "cross-used" an Oracle application that resulted in "cross-use" of a copy of Oracle Database.  Indeed, as noted in the Court's relevant findings of fact, Oracle failed to present any evidence that Rimini "cross-used" a client's PeopleSoft, JDE, or EBS application, that the application was running on top of an Oracle Database that Rimini was supporting, or that such "cross-use" of the application caused a copy of Oracle Database to be "cross-used" itself.  Further, as discussed in the Court's other relevant findings and conclusions related to the OMA, OLSA, and SLSA licenses, the language and context of those licenses authorize Rimini to make copies of the program subject to those licenses to support the client's licensed use.  *See supra* Section III.A.1.  And Oracle has approved of Spinnaker's Oracle Database support, further bolstering the conclusion that the licenses indeed permit third parties to make such copies.

423.    Third, it is undisputed that Rimini supports many clients for Oracle Database only, such that Rimini does not access—let alone "cross-use"—any application running on top of Oracle Database for these clients.  Oracle admitted it had no infringement theory with respect to these clients.

RIMINI STREET AND SETH RAVIN'S POST-TRIAL PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW
CASE NO. 2:14-CV-01699-MMD-DJA

Gibson, Dunn &
Crutcher LLP

### f.    Miscellaneous Files on Rimini's Systems

424.    The Court rejects Oracle's contentions with respect to Oracle files on Rimini's systems for the same reasons set out in the Court's discussion of Rimini's declaratory judgment claim.  Oracle failed to prove that any file purportedly on Rimini's system was linked to a particular client that had a "facilities" restriction in its PeopleSoft license.  Indeed, some of the testimony Oracle elicited showed that some of these files were EBS files, and EBS licenses do not contain a "facilities" restriction.  Nor was there any evidence that Rimini used any of the alleged Oracle files on its systems for any purpose.

### g.    Derivative Works

425.    The Court further holds that the Rimini-written updates at issue that the Court has found contain no protected Oracle expression, whether literal or nonliteral, are not derivative works under the Ninth Circuit's test.  *Micro Star v. Formgen Inc.*, 154 F.3d 1107, 1110 (9th Cir 1998); *Lewis Galoob Toys, Inc. v. Nintendo of Am., Inc.*, 964 F.2d 965, 967 (9th Cir. 1992).

426.    The Court rejects again, as it did previously, Oracle's "blanket" approach arguing that any Rimini update to Oracle software is a derivative work.  *Rimini I*, ECF No. 1459 at 23 (disagreeing with Oracle's argument that "every single update and modification of Oracle's software constitutes a derivative work").  To the contrary, "whether a particular stand-alone update or modification is a derivative work is a fact specific inquiry." *Id.*  Even under the test the Court articulated on summary judgment, which treats purely Rimini-written work product or code containing no protected Oracle expression as a derivative work if it (1) was written using an Oracle tool and (2) can only run with Oracle software (*see* ECF No. 1253 at 52-53), Oracle failed to prove that all of Rimini's updates meet these requirements.  Even if Oracle had, these updates were licensed, as the relevant licenses permit the licensee, and third parties on their behalf, to create derivative works (*see id.* at 52 (noting PeopleSoft license agreement "clearly permits … a third party servicer, like Rimini, to create … derivative works on [the licensee's] behalf")).[19]

---

[19] Rimini disagrees with the definition of derivative works the Court adopted on summary judgment, contending that under *Lewis Galoob Toys*, if a stand-alone program or update contains no Oracle expression, literal or nonliteral, then it cannot be a derivative work, and has presented

Gibson, Dunn &
Crutcher LLP

427.    Further, as the Court has found, Oracle's own license agreements expressly disclaim ownership over modifications to Oracle software where those modifications do not contain Oracle code.  Oracle thus cannot claim that its copyrights cover such modifications.

428.    The Court also holds that Oracle failed to prove that Rimini-written tools were derivative works.  As held above, these tools do not contain any literal or nonliteral Oracle expression.  The evidence also showed that Rimini did not use Oracle software or software tools to develop them, and that the tools could be used outside the context of Oracle software.

**C.    Oracle's Indirect Claims of Copyright Infringement Against Ravin**

429.    In order to prevail on a claim of secondary copyright infringement liability, Oracle must prove predicate instances of *direct* copyright infringement on which the secondary liability claims rely.  *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1169 (9th Cir. 2007).  Because Oracle has not shown the predicate instances of direct copyright infringement, Oracle's claims of secondary copyright infringement liability necessarily fail.

430.    For contributory infringement liability, Oracle must prove that Ravin: (i) had "actual knowledge of specific acts of infringement" by Rimini; and (ii) intentionally induced or materially contributed to Rimini's infringing acts.  *Luvdarts, LLC v. AT&T Mobility, LLC*, 710 F.3d 1068, 1072 (9th Cir. 2013) (citation and quotation marks omitted).  "Stated differently, liability exists if the defendant engages in personal conduct that encourages or assists the infringement." *Cobbler Nev., LLC v. Gonzales*, 901 F.3d 1142, 1147 (9th Cir. 2018) (citation and quotation marks omitted).  For vicarious infringement liability, Oracle must prove that Ravin: (i) directly benefited financially from Rimini's direct infringement; and (ii) had the right and the ability to supervise or control the infringing activity.  *Ellison v. Robertson*, 357 F.3d 1072, 1076 (9th Cir. 2004).  Oracle fails on each set of claims.

**1.    Contributory Infringement**

431.    Based on the relevant findings of fact, the Court holds that Oracle has failed to carry

---

that test as a means of preservation, contending that the *Lewis Galoob Toys* definition should apply to all claims of derivative works in this case.

Gibson, Dunn &
Crutcher LLP

its burden of proving the elements of contributory infringement liability as to Ravin.

432.   Ravin: (1) did not have actual knowledge that Rimini engineers accessed or used Oracle copyrighted materials in specific ways that are alleged to be copyright infringement, and (2) did not actively encourage or induce those engineers to infringe in the ways alleged.  Rather, Ravin established a framework to investigate potentially infringing activity under the AUP and imposed consequences, up to and including termination, for employees or contractors who violated the AUP.

### 2.   Vicarious Infringement

433.   Based on the relevant findings of fact, the Court holds that Oracle has failed to carry its burden of proving the elements of vicarious infringement liability as to Ravin.

434.   Ravin:  (1) did not receive a direct financial benefit from the particular alleged instances of infringement, as Oracle has not shown that he received payments directly related to the infringement or any other facts amounting to a direct benefit, and (2) did not have the practical ability to stop the allegedly directly infringing conduct as CEO overseeing thousands of employees and clients.

### D.   Rimini's Non-License Defenses to Oracle's Claims of Infringement

435.   Although the Court finds that Oracle has failed to meet its burden of proof on its direct infringement claims, the Court nonetheless addresses Rimini's non-license affirmative defenses in an abundance of caution, as follows:  (i) Rimini's statute of limitations defense as to Oracle's pre–February 17, 2012 EBS claims; and (ii) Rimini's fair use defenses.

### 1.   Rimini's Statute of Limitations Defense to Oracle's EBS Claims

436.   In this case, Oracle asserted counterclaims of copyright infringement "going back to 2010" arising out of Rimini's support of EBS.  ECF No. 888 at 12.  Rimini and Ravin assert a statute of limitations affirmative defense as to all conduct involving EBS prior to February 17, 2012.  *See* ECF No. 1253 at 31; ECF No. 967 at 22.  Oracle's claims are subject to a three-year statute of limitations (17 U.S.C. § 507(b)), that runs at the time Oracle "discover[ed], or reasonably should have discovered, the alleged infringement."  *Media Rts. Techs., Inc. v. Microsoft Corp.*,

146

922 F.3d 1014, 1022 (9th Cir. 2019).  Based on the relevant findings of fact, the Court finds that Oracle "had constructive knowledge" sufficient "to warrant an investigation" (*id.* at 1024 (citation and quotation marks omitted)) no later than November 17, 2011, during the deposition of Ravin. At that point, Oracle had a clear "suspicion" of infringement as to EBS, it was under a "duty to investigate" its claims, and it is "imput[ed]" with all knowledge it would have gained in that investigation—an investigation it did not do.  *Oracle Am., Inc. v. Hewlett Packard Enter. Co.*, 971 F.3d 1042, 1048 & n.5 (9th Cir. 2020) (citation and quotation marks omitted).  Oracle's EBS infringement claims against Rimini are therefore time-barred as to any conduct that occurred before February 17, 2012.

### 2.    Rimini's Fair Use Defenses

437.    Rimini raises a fair use defense to several of the accusations of infringement that Oracle has raised.  The Court need not reach these defenses, as Oracle has failed to prove infringement in the first instance, but in an abundance of caution, the Court now holds that were it to apply the fair use doctrine, it would find that Rimini has carried its burden.

#### a.    Standard for Fair Use

438.    "[A] copyright holder cannot prevent another person from making a 'fair use' of copyrighted material."  *Google LLC v. Oracle Am., Inc.*, 141 S. Ct. 1183, 1196 (2021) (citing 17 U.S.C. § 107).  The "fair use" doctrine is an "equitable rule of reason" that "permits courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster."  *Stewart v. Abend*, 495 U.S. 207, 236 (1990) (citation and quotation marks omitted).

439.    The statute sets out four factors that "indicate[], rather than dictate[], how courts should apply" the doctrine (*Google*, 141 S. Ct. at 1196):  (i) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (ii) the nature of the copyrighted work; (iii) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (iv) the effect of the use upon the potential market for or value of the copyrighted work.  17 U.S.C. § 107.

Gibson, Dunn & Crutcher LLP

440.    Rimini bears the burden of proving fair use (*Dr. Seuss Enters., L.P. v. ComicMix LLC*, 983 F.3d 443, 459 (9th Cir. 2020)), but need not prove that each of these factors weighs in its favor (*Google*, 141 S. Ct. at 1197).  Fair use requires a "case-by-case analysis" that is "not to be simplified with bright-line rules."  *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577 (1994).  All four factors must be explored, weighed together, and considered alongside the goals of copyright law (*id.*):  "To promote the Progress of Science and useful Arts" (U.S. Const. art. I, § 8, cl. 8) and to serve "the welfare of the public" (*Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 429 n.10 (1984) (citation and quotation marks omitted)).

441.    The first factor requires courts to consider the "purpose and character" of the accused use in order to determine whether and to what extent the new work is "transformative." *Perfect 10*, 508 F.3d at 1164 (quoting *Campbell*, 510 U.S. at 579).  A commercial character generally weighs against fair use, while a nonprofit educational purpose weighs in favor of fair use.  *See id.* at 1164, 1166.  But "the commercial or nonprofit educational purpose of a work is only one element of the first factor" and does not carry "presumptive force."  *Campbell*, 510 U.S. at 584.  If the accused use "adds something new and important" and furthers the purpose of copyright law (*Google*, 141 S. Ct. at 1203), it is transformative and may be fair use even if used for commercial purposes (*Campbell*, 510 U.S. at 584-85).

442.    The second factor concerns the nature of the copyrighted work and the degree of protection afforded as a result.  Creative works "are closer to the core of intended copyright protection" than "more fact-based works," so it is generally more difficult to establish fair use for copying traditional literary works than for copying informational works.  *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 820 (9th Cir. 2003) (citation and quotation marks omitted).  "[C]omputer programs are subjects of copyright" and may involve creative expression, but may also include uncopyrightable computing tasks and/or code.  *Google*, 141 S. Ct. at 1201.

443.    The third factor asks whether the "amount and substantiality of the portion used" is "reasonable in relation to the purpose of the copying."  *Campbell*, 510 U.S. at 586 (citation and quotation marks omitted).  In assessing this factor, courts consider both quantity and quality: a

Gibson, Dunn & Crutcher LLP

small amount of copying may go to the heart of a work's creative expression, while a large amount of material copied may be largely divorced from the original work's creative expression or be central to the copier's valid purpose. *Google*, 141 S. Ct. at 1205. Wholesale copying therefore does not weigh against a finding of fair use if the secondary user copies only as much as is necessary for the transformative use. *Kelly*, 336 F.3d at 821.

444. The fourth and final factor focuses on the effect of the copying on the potential market for or value of the copyrighted work. Potential lost revenue and whether the copied work has created a market substitute for the original may have a detrimental effect on the market of the copyrighted work and weigh against a finding of fair use. *Google*, 141 S. Ct. at 1206. However, courts must consider "not just the amount but also the source of the loss." *Id.* For example, criticism of a copyrighted work may reduce demand for the original, but that is not cognizable harm because there is a benefit to the public. *Id.*; *see also MCA, Inc. v. Wilson*, 677 F.2d 180, 183 (2d Cir. 1981) ("[W]here a claim of fair use is made, a balance must sometimes be struck between the benefit the public will derive if the use is permitted and the personal gain the copyright owner will receive if the use is denied."). "This last factor is undoubtedly the single most important element of fair use." *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 566 (1985).

### b.    Application of Fair Use to Particular Claims of Infringement

445. Rimini asserts its fair use defense as to two distinct areas of accused conduct: the migration of copies off of its systems and the creation of certain incidental RAM copies Oracle accuses. Each is addressed in turn.

446. ***Migration.*** Based on the relevant findings of fact, the Court holds that, having holistically considered the fair use factors, Rimini has met its burden of demonstrating that even if the migration of client environments off of Rimini's systems to Rimini's clients' systems resulted in unauthorized copies being made, such copies were a fair use.

447. First, and most importantly, the Court will consider the effect on the marketplace of the copies made during the migration. The copies Rimini made of client environments and archives during the migration, so that their software could simply be *moved* in order to comply

Gibson, Dunn & Crutcher LLP

with a court order, had no impact on the market for Oracle's products and services. Indeed, these clients had already paid Oracle for a license to that software, and were already clients of Rimini—there was no evidence that demand from those clients for Oracle products or services somehow decreased because of the migration. Furthermore, each client was entitled to its environments under the license agreements and depends on those environments for its internal business operations. The deletion of the environments followed by full-scale reconstruction, rather than copying them and moving them, would have been unduly injurious to Rimini's clients.

448. Second, the amount and substantiality copied here was significant, including entire environments, but it was nonetheless reasonable in relation to the purpose of the copying. The clients needed their entire environments, so Rimini's copying of the environments to return them to the clients was justified. It was impossible for Rimini to "move" the environments without creating the copies at issue here, and thus the copying was no more than necessary to comply with the court order. And the same amount of expression would have necessarily been copied even if Rimini had rebuilt environments rather than moved them.

449. Third, the purpose of the accused use here was to move client environments in order to comply with a court order. While the copies here were minimally transformative (in that these were disk copies of the entire environments, as modified by Rimini, or entire files and archives), the overall purpose and character of this use weighs in favor of a finding of fair use.

450. Finally, the nature of the copyrighted work here is a neutral factor. The programs copied contain mixed elements of both functional unprotected expression, as well as copyrighted protected expression. However, there is no dispute that each client held a valid license entitling them to their environments—the only question was how to remove them from Rimini's systems and place them onto the clients' systems.

451. Considered together, the Court holds that Rimini has met its burden of demonstrating that the copies made in the process of migration were a fair use. The Court will thus enter judgment for Rimini on this issue.

452. **RAM Copies Created by CodeAnalyzer.** Based on the relevant findings of fact, the

150

Gibson, Dunn &
Crutcher LLP

1  Court holds that, having holistically considered the fair use factors, Rimini has met its burden of

2  demonstrating that even if the incidental creation of RAM copies of text of an Oracle software file

3  made during the previous use of its CodeAnalyzer tool were outside the scope of the license

4  agreements, it would nonetheless constitute fair use.

5  453.    First, as to the purpose and character of the RAM copies here, while commercial,

6  they are sufficiently transformative, as the purpose of the original files versus the RAM files is

7  completely different.  The purpose of the original files is to carry out specific computer instructions

8  relating to the client's use of its PeopleSoft software, such as printing information on a tax form

9  or creating a report.    But the purpose of the ephemeral RAM copies Oracle accuses is

10  fundamentally different.  The temporary RAM copy does not carry out the instructions of the

11  program.  It is made with the purpose of simply finding and identifying the differences that *Rimini*

12  has introduced into a file when it first manually implemented an update.  This is no different than

13  a human reading two paragraphs of text that are slightly different and noting the differences.  These

14  RAM copies are made in order to locate and extract *Rimini*'s own expression and work product—

15  Rimini's modifications of files.  This factor weighs in Rimini's favor.

16  454.    Second, as to the nature of the files, they undisputedly contain numerous purely

17  functional aspects.  Additionally, because the purpose of the RAM copy is simply to read portions

18  of two files and compare them, the temporary RAM copy is not being used to take advantage of

19  the expressive portions of the files.  The code in those files is never executed.  This factor also

20  weighs in Rimini's favor.

21  455.    Third, considering the amount of copied code in relation to the work as a whole,

22  the Court also holds that this factor favors Rimini.  No Oracle code or expression is copied in any

23  non-transitory way—the RAM copies exist for a matter of seconds.  Moreover, the amount copied

24  temporarily is minimal in the context of the entire copyrighted work, PeopleSoft.  PeopleSoft itself

25  comprises tens of thousands of files, but the copying here is dealing with two versions of a single

26  file being copied into temporary memory for a brief instant.  In addition, the creation of the RAM

27  copy is inherent in the functioning of computers and is unavoidable.

28

RIMINI STREET AND SETH RAVIN'S POST-TRIAL PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW
CASE NO. 2:14-CV-01699-MMD-DJA

Gibson, Dunn &
Crutcher LLP

456.    Fourth, the Court considers the effect of the copy on the potential market, and concludes that these temporary RAM copies do not have any meaningful effect on the market for PeopleSoft software.  Apart from the fact that these temporary copies exist for only seconds, the Court has also found that Rimini clients do not leave Oracle *because* of any supposed infringement. Indeed, Rimini shut CodeAnalyzer off in 2018, and it did not have any effect on Rimini's pricing. This demonstrates that the accused infringement was not a significant factor in Rimini's pricing strategy, contrary to Oracle's entire causation theory.

457.    Considered together, the Court holds that Rimini has met its burden of demonstrating that the creation of any RAM copies of text of an Oracle software file made during the previous use of its CodeAnalyzer tool was a fair use.  The Court will thus enter judgment for Rimini on this issue.

458.    ***Creation of Rimini's Tools.***  Based on the relevant findings of fact, the Court holds, having holistically considered the fair use factors, that Rimini has met its burden of demonstrating that even if initial creating and testing of certain of Rimini's tools resulted in unauthorized copies being made, such copies were a fair use.

459.    First, as to the purpose and character of the copies created during the testing or use of Rimini tools, the copies empower tools that are transformative.  Although Rimini uses the tools for a commercial purpose, Rimini created the tools for a purpose that is entirely different from what the PeopleSoft software does or was designed to do.  PeopleSoft files perform various business functions for an enterprise.  When Rimini was creating and testing the AFW tools, for instance, Rimini was using tools that it independently developed to make sure they are interoperable with PeopleSoft.  The AFW tools do not perform any of the same functionality as PeopleSoft itself.  Rather, the tools manage development processes, such as extracting data representing a developer's modifications to a file (CodeAnalyzer GenDiff), automatically generating scripts that will edit tax tables (GenDataChanges), moving files into folders and applying them for testing (ApplyUpdate), and others.  The overall purpose is to allow a developer to remotely invoke tasks in a client's environment.  Rimini's ePack tool serves the function of

Gibson, Dunn &
Crutcher LLP

moving updates and fixes from one location on a client's systems to another location and does not even execute Oracle software. This factor weighs in favor of Rimini.

460. Second, regarding the nature of the files, any copies made during the creation or use of the AFW tools or ePack were RAM copies. As part of the testing process of the AFW tools to confirm they work within a PeopleSoft environment, temporary RAM copies are necessarily created. There would be no way for Rimini to test the functionality without running PeopleSoft and therefore causing temporary copies of the software to be loaded in RAM. As explained above, temporary RAM copies have numerous purely functional aspects and do not implicate the expressive portions of the copyrighted material. As no copies other than RAM copies were made as a result of the creation of the AFW tools, this factor favors Rimini. As to ePack, any RAM copies of Oracle's EBS that are created when the tool operates are within the client's environment, and again, are purely functional.

461. Third, the amount of copied code in the RAM copies is minimal and transitory, for the reasons explained above. This factor favors Rimini.

462. Fourth, neither the temporary RAM copies nor the tools themselves have a meaningful effect on the market for PeopleSoft or the support market for the same. The AFW tools are used in the environments of clients that have already purchased licenses for PeopleSoft software, so it cannot be the case that the AFW tools harm the market for the PeopleSoft software itself. And PeopleSoft software does not include any tools that perform the same functionality as the Rimini-developed AFW tools. Nor is there any impact on the market by Rimini's ePack tool. This factor weighs in favor of Rimini.

463. Considered together, the Court holds that Rimini has met its burden of demonstrating that any RAM copies created during initial creation and testing of the AFW tools were a fair use. And any copies created in the testing or use of ePack are similarly fair use to the extent they would otherwise be infringing. The Court will thus enter judgment for Rimini on this issue.

Gibson, Dunn &
Crutcher LLP

1

### E.    Rimini's UCL Claims

2      464.    To establish that Oracle's challenged business practices violate the "unfair" prong

3    of California's UCL, Rimini must prove by a preponderance of the evidence that the practice

4    (1) threatens an incipient violation of an antitrust law, (2) violates the policy or spirit of one of

5    those laws because its effects are comparable to or the same as a violation of the law, or

6    (3) otherwise significantly threatens or harms competition.  *Cel-Tech Commc'ns, Inc. v. L.A.*

7    *Cellular Tel. Co.*, 973 P.2d 527, 544 (Cal. 1999).  For the reasons that follow, the Court holds that

8    Rimini has established the necessary elements of its UCL claims against Oracle as to:  (i) Oracle's

9    MSL policy; (ii) Oracle's reinstatement fee and back support policy; and (iii) Oracle's false and

10    misleading statements about Rimini's third-party support.  Oracle's actions exhibit "classic anti-

11    competitive behavior" and inflict classic anticompetitive harms comparable to those that antitrust

12    law and policy seek to prevent.  *Mattel, Inc. v. MGA Ent., Inc.*, 782 F. Supp. 2d 911, 1013 (C.D.

13    Cal. 2011).

14      465.    Indeed, the impact of Oracle's conduct on competition is evident, as the Court

15    found *supra* ¶¶ 200-202.  Despite the presence of competitors like Rimini that offer 50% off of

16    Oracle's pricing (or more) with high levels of client satisfaction, Oracle consistently has a 95%

17    renewal rate on support contracts, and enjoys an approximately 95% profit margin.  And Oracle is

18    able to achieve this *without competing on price*.  Instead, Oracle has engaged in a scheme to make

19    it difficult or impossible for licensees to hire third-party support providers even when that is their

20    preference.  As found *supra* ¶ 201, Oracle acknowledges that this is its goal, and that policies such

21    as the MSL have helped to achieve it.  In sum, Oracle's conduct harms competition.

22      466.    These harms were felt by California-based companies and were inflicted by Oracle

23    employees in California.  The Court further holds that Oracle has failed to establish any applicable

24    justification or speech-related defense.

25      ### 1.    Competitor Standing

26      467.    Based on the relevant findings of fact, the Court holds that Rimini has carried its

27    threshold burden of proving competitor standing under the UCL by establishing that it suffered an

28

Gibson, Dunn &
Crutcher LLP

economic injury caused by Oracle's conduct.

468.    Rimini is Oracle's direct and primary competitor in the support services market for Oracle's software products.  Oracle's anticompetitive business practices require Rimini to expend additional resources and employee time to retain its clients and have resulted in (i) Oracle licensees that are in the process of shifting to Rimini to abandon that plan and renew support with Oracle, and (ii) Rimini clients returning to Oracle for support.

469.    In addition to restricting Rimini's access to clients, Oracle's campaign of false and misleading statements has harmed Rimini's goodwill among clients and diminished market opportunities Rimini otherwise would have had to compete for support clients.

470.    The direct and vigorous nature of the competition between the parties is enough to show standing in a competitor case.  *E.g.*, *Kwikset Corp. v. Super. Ct.*, 246 P.3d 887, 889 (Cal. 2011).

## 2.    Oracle's Market Definition Argument

471.    Oracle argues that Rimini's claim fails because Rimini has not defined a relevant antitrust market, citing antitrust case law that requires a plaintiff to define a relevant market in various contexts.  These arguments are misdirected.  The UCL "unfair" prong requires proving conduct that threatens a violation of the antitrust laws, violates the "policy or spirit" of the antitrust laws, or otherwise harms competition—which Oracle's conduct unquestionably does.  *Cel-Tech*, 973 P.2d at 544.

## 3.    Oracle's Anticompetitive Business Practices

### a.    *Oracle's Matching Service Level Policy*

472.    Based on the relevant findings of fact, Rimini has established that Oracle's MSL policy is an "unfair" practice both on its own and in conjunction with the other accused Oracle conduct, which is part of an overall pattern of conduct.

473.    Rimini has presented sufficient evidence to prove that Oracle's MSL policy substantially harms competition.  Under this policy, Oracle requires that "all licenses in any given license set must be supported under the same technical support service level," and further, that the

Gibson, Dunn &
Crutcher LLP

customer cannot "support a subset of licenses within a license set; the license set must be reduced by terminating any unsupported licenses." D-133 at 3. One effect of the MSL policy is that it forces certain Oracle customers to continue to purchase Oracle's so-called "Sustaining Support" for older versions of Oracle software for which Oracle does not even provide new updates or fixes, when the customer would rather support those older products with a third-party support provider like Rimini, which does provide those updates and fixes. This has the practical effect of "condition[ing] [Oracle's] contracts" on not doing business with competitors (*Mattel*, 782 F. Supp. 2d at 1013; *cf. Lorain J. Co. v. United States*, 342 U.S. 143, 152-53 (1951); *Covad Commc'ns Co. v. Bell Atl. Corp.*, 398 F.3d 666, 675 (D.C. Cir. 2005)); "depriv[ing] consumers of valuable products" and "potentially restricting the supply of [a rival's] products to consumers" (*Mattel*, 782 F. Supp. 2d at 1013; *see Cisco Sys., Inc. v. Beccela's Etc., LLC*, 403 F. Supp. 3d 813, 831 (N.D. Cal. 2019)); and "rais[ing] the price to consumers" (*Weco Supply Co. v. Sherwin-Williams Co.*, 2012 WL 1910078, at *5 (E.D. Cal. May 25, 2012)). Moreover, internal Oracle documents link the MSL policy to Oracle's high renewal rates and its ability to avoid competing on price in the support market.

474.    The Court is not persuaded that the MSL policy is necessary to protect Oracle's intellectual property or that it has a procompetitive rationale. While Oracle claimed the MSL policy was implemented in order to safeguard its intellectual property from customers that would otherwise improperly access updates to which they are not entitled, Oracle did not present any evidence suggesting that the MSL policy was tailored to that purpose or that Oracle faced a real risk of such customer behavior. Nor does this rationale make any sense as applied to Sustaining Support customers—Oracle does not release new updates for software in Sustaining Support. In reality, the evidence showed that Oracle has asserted its MSL policy not to protects it intellectual property, but rather its market share and profit margins. Indeed the evidence presented at trial showed Oracle wielding the policy against customers that sought support from a competitor to disincentivize their departure.

Gibson, Dunn &
Crutcher LLP

1

### b. Oracle's Reinstatement Fee and Back Support Policy

2      475.    Based on the relevant findings of fact, the Court also holds that Rimini has

3   established that Oracle's reinstatement fee and back support policy is an "unfair" practice within

4   the meaning of California's UCL, both on its own and in conjunction with Oracle's other

5   anticompetitive conduct.

6      476.    Rimini's arguments with respect to Oracle's reinstatement fee and back support

7   policy are similar to those offered with respect to Oracle's MSL policy, and they succeed for

8   substantially the same reasons:  The policy substantially harms competition by creating lock-in

9   effects above and beyond those stemming from long-term customer investment in Oracle products.

10  Oracle uses the fee policy as a deterrent to keep Oracle support customers from hiring

11  competitors—in other words, to keep customers locked in.  Oracle licensees seeking to use an

12  alternative provider are subject to the substantial and unnecessary risk of being forced to pay

13  hundreds of thousands of dollars, if not more, to bring critical enterprise systems back online.  And

14  Oracle emphasizes this penalty to customers it suspects may switch to Rimini's support services.

15  As with the MSL Policy, this has the practical effect of "condition[ing] [Oracle's] contracts" on

16  not doing business with competitors (*Mattel*, 782 F. Supp. 2d at 1013; *cf. Lorain J.*, 342 U.S. at

17  152-53; *Covad*, 398 F.3d at 675); "depriv[ing] consumers of valuable products" and "potentially

18  restricting the supply of [a rival's] products to consumers" (*Mattel*, 782 F. Supp. 2d at 1013; *Cisco*,

19  403 F. Supp. 3d at 831); and "rais[ing] the price to consumers" (*Weco*, 2012 WL 1910078, at *5).

20     477.    The Court is not persuaded by the argument that Oracle's fee structure for

21  reengaging Oracle support is necessary to protect investments in customer-specific software

22  implementations and support.  As with the intellectual property rationale, Oracle's justification is

23  pretextual and far out of proportion with the selected means.  For starters, there is no evidence that

24  Oracle is burdened when a support customer leaves for a competitor but later returns, and any

25  argument for incipient financial risk is belied by Oracle's consistent 95% profit margin on support

26  services.  Even assuming that Oracle has a legitimate business interest in the fee structure in a

27  subset of cases, requiring a returning customer to pay the technical support fee it would have paid

28

Gibson, Dunn &
Crutcher LLP

1   Oracle had it remained on support, *in addition* to a 50% penalty, smacks of double-counting and

2   has no relation to that justification.  Along with the MSL policy and Oracle's practice of making

3   false and misleading statements to Rimini clients, the reinstatement fee and back support policy is

4   part of Oracle's pattern of anticompetitive behavior.

5                              **c.**       ***False and Misleading Statements***

6          478.   Based on the relevant findings of fact, the Court holds that Rimini has established

7   that Oracle engaged in "unfair" conduct in violation of the UCL by making false statements

8   regarding the legality of third-party support.

9          479.   Unfair competition in violation of the UCL may take the form of false and

10  misleading statements intended to lure customers away from potential competitors and toward the

11  dominant market player.  Testimony from customers subject to these Oracle communications

12  illustrates a coordinated scheme to keep clients away from Rimini and other third-party providers.

13         480.   Both by themselves and collectively with Oracle's MSL policy and punitive

14  reinstatement and back support fees, Oracle's concerted false statements form part of an overall

15  pattern of anticompetitive conduct that violates the UCL.  *See Mattel*, 782 F. Supp. 2d at 1013

16  ("warn[ing]" other companies "not to [use]" a competitor's products can form the basis of a UCL

17  claim); *GSI Tech., Inc. v. United Memories Inc.*, 2015 WL 5655092, at *10 (N.D. Cal. Sept. 25,

18  2015) ("disparaging remarks" when they are "part of a pattern of conduct" are sufficient to show

19  a UCL unfair practice).

20                            **e.**       ***Oracle's Speech Defenses***

21         481.   Finally, based on the relevant findings of fact, the Court holds that Oracle's UCL

22  liability for false and misleading statements is not precluded by any constitutional or statutory

23  protection for speech.  Although the provisions Oracle invokes are varied, the reason none of them

24  apply here is not: false and misleading speech made incidental to a broader scheme of conduct that

25  violates the UCL does not enjoy free speech protection.  "Untruthful speech, commercial or

26  otherwise, has never been protected for its own sake." *Va. State Bd. of Pharmacy v. Va. Citizens*

27  *Consumer Council, Inc.*, 425 U.S. 748, 771 (1976).  As the California Supreme Court has

28

Gibson, Dunn &
Crutcher LLP

1 explained, "commercial speech that is false or misleading receives no protection under the First

2 Amendment." *Kasky v. Nike, Inc.*, 45 P.3d 243, 261 (Cal. 2002).[20]

### F.   Lanham Act Claims and Defenses

4      482.   To prove that any of Rimini's statements violated the Lanham Act, Oracle must

5 prove the following by a preponderance of the evidence:  (1) Rimini made a false statement of fact

6 in a commercial advertisement about Rimini's or Oracle's product; (2) the statement actually

7 deceived or had the tendency to deceive a substantial segment of customers; (3) the deception was

8 material to the purchasing decisions of customers; (4) Rimini caused the false statement to enter

9 interstate commerce; and (5) Oracle has been or is likely to be injured as a result of the false

10 statement, either by direct diversion of sales from itself to Rimini or by a lessening of the goodwill

11 associated with Oracle's products.  *Wells Fargo & Co. v. ABD Ins. & Fin. Servs., Inc.*, 758 F.3d

12 1069, 1071 (9th Cir. 2014).

13      483.   For the reasons set forth below, the Court now holds that Oracle has failed to

14 establish the necessary elements of its Lanham Act claims as to each of the three alleged categories

15 of false statements that Oracle accuses.

### 1.   Rimini's Statements Regarding Its Support Complying with Oracle's Copyrights and Licenses

18      484.   Based on the relevant findings of fact, the Court holds that Oracle's Lanham Act

19 claim related to Rimini's statements about its processes' compliance with copyright law fails.

20      485.   First, Oracle has not proven that Rimini's litigation-related statements were false

21 or misleading.  *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997).  As

22 explained in the Court's findings of fact, Rimini statements were *true*.  Oracle has not shown that

23 these statements conveyed an "implied message" that "deceived a significant portion of the

---

[20] Oracle requests a declaratory judgment that it has not violated the UCL as alleged by Rimini. Because the Court holds above that Rimini has established that multiple of Oracle's business practices violate the California UCL, and that Oracle failed to establish an applicable affirmative defense, Oracle's request for declaratory relief is denied.

Gibson, Dunn &
Crutcher LLP

recipients." *William H. Morris Co. v. Grp. W, Inc.*, 66 F.3d 255, 258 (9th Cir. 1995); *see also Prager Univ. v. Google LLC*, 951 F.3d 991, 1000 (9th Cir. 2020).

486.    Second, and in any event, Oracle has not satisfied its burden to prove that the statements were "material" to customers' decisions to contract with Rimini for support.  *See Verisign, Inc. v. XYZ.COM LLC*, 848 F.3d 292, 298 (4th Cir. 2017).  As noted in the Court's findings, at no point did Oracle present testimony from any Oracle customer or elicit testimony otherwise at trial that Rimini's statements were material to Oracle customer decision-making or otherwise caused Oracle customers to leave for Rimini.

487.    Third, and relatedly, Oracle failed to prove that Rimini's statements caused Oracle any injury in the form of diverted sales or loss of business reputation.  Under the Lanham Act, Oracle must prove "an injury to a commercial interest in sales or business reputation proximately caused by the defendant's misrepresentations." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 140 (2014).  But Oracle provided no evidence that Rimini's statements diverted any sales from Oracle or harmed Oracle's goodwill or reputation.  In fact, the customers at issue were *already Rimini clients* at the time they received the allegedly false statements, so any link between Rimini's statements and Oracle's (unproven) commercial injury would be tenuous at best. *See Suntree Techs., Inc. v. Ecosense Int'l, Inc.*, 693 F.3d 1338, 1349 (11th Cir. 2012).  There is simply no evidence linking these statements to any injury.  Accordingly, Oracle's Lanham Act claim fails for lack of causation. *See Dependable Sales & Serv., Inc. v. TrueCar, Inc.*, 394 F. Supp. 3d 368, 375 (S.D.N.Y. 2019).

488.    Finally, "[u]nder the *Noerr-Pennington* doctrine, those who petition any department of the government for redress are generally immune from statutory liability for their petitioning conduct." *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 929 (9th Cir. 2006).  "Conduct incidental to a lawsuit … falls within the protection of the *Noerr-Pennington* doctrine." *Theme Promotions*, 546 F.3d at 1007.  This includes a company's communications to its customers, so long as those communications "are sufficiently related to petitioning activity." *AirHawk Int'l, LLC*

Gibson, Dunn &
Crutcher LLP

*v. TheRealCraigJ, LLC*, 2017 WL 3891214, at *2 (C.D. Cal. Jan. 19, 2017) (quoting *Sosa*, 437 F.3d at 935).

489.    Rimini's statements providing litigation updates to clients and discussing the implications of the *Rimini I* litigation with clients and in the press are statements regarding ongoing litigation or, at minimum, "sufficiently related" to statements and issues regarding Rimini's litigation activity.    The *Noerr-Pennington* doctrine thus bars Oracle's Lanham Act claim as to these statements.    The Court rejects Oracle's argument that Rimini's statements that it was no longer using processes that the Court found infringing go beyond details of the litigation, so are not covered by the *Noerr-Pennington* doctrine.    The doctrine protects even communications that "can be construed to contain advertising or promotion," so long as the communications sufficiently relate to the litigation.    *AirHawk*, 2017 WL 3891214, at *3 (citation and quotation marks omitted). Here, while the communications may have incidentally served an advertising or promotional function, they primarily concerned Rimini's litigation with Oracle.    Accordingly, the *Noerr-Pennington* doctrine bars Oracle's Lanham Act claims as to these communications.

490.    Even if the *Noerr-Pennington* doctrine did not apply, Rimini's litigation-related statements constitute opinions regarding the ultimate outcome of a legal proceeding and the interpretation of court rulings, which are not actionable under the Lanham Act.    *See Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 731 (9th Cir. 1999).

### 2.    Rimini's Security-Related Statements

491.    Based on the relevant findings of fact, the Court holds that Oracle has failed to prove that Rimini's security-related statements violated the Lanham Act.

492.    Oracle has not shown that Rimini's security-related statements were false or misleading.    And, given the context of these statements, no reasonable customer would have been misled by them.    *See William H. Morris*, 66 F.3d at 258; *Intermountain Stroke Ctr., Inc. v. Intermountain Health Care, Inc.*, 638 F. App'x 778, 795-96 (10th Cir. 2016).

493.    The key context for these statements is that for the vast majority of Rimini's clients, the software in question would have been on Oracle's Sustaining Support, for which Oracle

Gibson, Dunn &
Crutcher LLP

provides no new updates, security patches, or fixes.  Given that Oracle was not offering *any* security-related support for these clients, Rimini's statements that it offered better or superior security could not have been false or misleading.

494.    Oracle's evidence of falsity is insufficient.  Oracle's expert Dr. Patrick McDaniel opined that Rimini's statements regarding the benefits of Rimini's security offering are false and misleading because virtual patching only resolves security issues at the application level rather than the software code level, and because virtual patching can only complement, rather than substitute for, traditional patching.  But as Rimini's expert Dr. Avi Rubin explained, given the delays and other challenges associated with reliance on CPUs, holistic security and virtual patching is, in fact, often a more secure, more effective option for many clients, particularly those on Sustaining Support that would be forced to upgrade to receive security updates from Oracle.

495.    Dr. McDaniel also opined that Rimini's claim that it can provide what Oracle calls "vendor-level" support, and Rimini's statements downplaying the necessity of Oracle maintenance and support are false and misleading because Rimini cannot provide Oracle licensees with Oracle CPUs.  But Rimini never said that it provides clients the exact same configuration of support that Oracle provides—it simply said that it can give clients a way to sufficiently replace vendor support.  As Dr. Rubin persuasively explained, Rimini offers Oracle licensees an alternative to Oracle security support that nonetheless allows them to maintain an adequate level of software security taking into account all relevant factors, including the system at issue, relevant threat models, the software user's budget, and the user's risk tolerance.  Furthermore, Dr. McDaniel's bald assertion that the only way to maintain application security is to patch the application itself is contradicted by the record, including Oracle's own security white paper.

496.    Oracle's Lanham Act claims as to Rimini's security-related statements also fail because the statements are puffery and opinion, so are not actionable under the Lanham Act. *Coastal Abstract*, 173 F.3d at 731; *Southland Sod*, 108 F.3d at 1145.

497.    Finally, as the Court concluded with respect to the other categories of Rimini's statements, Oracle again fails to prove that Rimini's security-related statements caused any injury

Gibson, Dunn & Crutcher LLP

to Oracle.  Although Rimini made at least some of the statements to prospective clients, there is simply no evidence that the security-related statements caused Oracle to lose any client or sales, or that the statements harmed Oracle's business reputation.  Oracle's Lanham Act claims thus fail for this reason as well.  *Williams & Cochrane, LLP v. Rosette*, --- F. Supp. 3d ----, 2022 WL 4544711, at *17, *20 (S.D. Cal. Sept. 27, 2022).

### 3.      Statements Regarding TomorrowNow

498.      Based on the Court's relevant findings of fact, the Court holds that Oracle has failed to meet its burden as to TomorrowNow-related statements.  Oracle cited one document in its pretrial proposed findings of fact and conclusions of law, but did not seek to admit that document into evidence at trial.  Oracle's claim therefore fails.  Nor did Oracle otherwise introduce any statement in which Rimini stated that its "business policies, practices and processes are much different than TomorrowNow's."  Oracle has therefore failed to meet the most basic element of a Lanham Act claim—identifying a "statement of fact."  *Southland Sod*, 108 F.3d at 1139; *cf. EcoDisc Tech. AG v. DVD Format/Logo Licensing Corp.*, 711 F. Supp. 2d 1074, 1085 (C.D. Cal. 2010) (at the pleading stage, plaintiff must state the "time, place, and specific content of the false representations" (citation and quotation marks omitted)).  Nor has Oracle demonstrated that any statements were false or misleading.  Oracle did not even attempt to show what TomorrowNow's policies, practices, and processes *were*, let alone how they were similar to or different from Rimini's.  And Oracle also failed to show that any customer received any such statement, let alone that Oracle was harmed by it.  Oracle's causation expert conceded that he was offering no opinion on this issue, and Oracle's 30(b)(6) witness testified that Oracle was "not worried about it" that TomorrowNow employees were providing "parallel" services at Spinnaker, undermining any harm argument that could flow from this category of statements.

### 4.      Vicarious Liability as to Ravin

499.      The Court rejects the legal premise of Oracle's argument, *i.e.*, that the Lanham Act provides for vicarious liability as to a corporate executive of a company that issues false or misleading statements in violation of the Lanham Act.  Oracle cites no Ninth Circuit authority

Gibson, Dunn &
Crutcher LLP

1   recognizing such a theory—and the Court is aware of none.  The handful of district courts in the

2   country that have imposed vicarious Lanham Act liability have only done so as to co-defendant

3   advertising agencies, not as to an executive of a company.  Indeed, Oracle's cases do not even

4   recognize a theory of vicarious liability, but rather hold that certain co-defendants were jointly and

5   severally liable for violating the Lanham Act directly.  *Cf. In re Century 21-RE/MAX Real Est.*

6   *Advert. Claims Litig.*, 882 F. Supp. 915, 925 (C.D. Cal. 1994); *Gillette Co. v. Wilkinson Sword,*

7   *Inc.*, 795 F. Supp. 662, 664 (S.D.N.Y. 1992), *vacated*, 1992 WL 12000396, at *1 (Oct. 28, 1992).

8   Oracle's theory fails on this basis.

9           500.    Even assuming that the Lanham Act provides for vicarious liability as to false

10  advertising claims against a corporate executive rather than an advertising agency, Oracle failed

11  to meet its burden under its own proposed test.  Oracle asserts that Ravin is liable if he "knowingly

12  participated in the creation, development and propagation of [a] … false advertising campaign."

13  ECF No. 1451 ¶ 111 (Oracle's proposed conclusions of law) (quoting *In re Century 21-RE/MAX*,

14  882 F. Supp. at 925, in turn quoting *Gillette*, 795 F. Supp. at 664).  Given that vicarious liability

15  is a form of tort liability, it requires—as it does with secondary theories of copyright infringement

16  liability—a showing of *scienter*.  Thus, Oracle has to prove that Ravin *knew* the statements were

17  false.

18          501.    Oracle has not shown any such thing.  Based on the relevant findings of fact, the

19  Court holds that the statements Rimini made were true, opinion, puffery, or protected by the *Noerr-*

20  *Pennington* doctrine and thus Oracle's claims fail.  Moreover, even if Oracle had prevailed on any

21  of its claims, Oracle still failed to prove that Ravin had knowledge of the false or misleading nature

22  of any of the statements at issue.

23          502.    Oracle's claims against Ravin fail under Oracle's proposed test for an additional

24  reason:  "[Oracle] has not shown that the claims made by [Rimini] … have caused any injury or

25  are likely to cause any injury to [Oracle]."  *In re Century 21-RE/MAX*, 882 F. Supp. at 925.  None

26  of these statements harmed Oracle.  And even if any of these statements had harmed Oracle in the

27

28

Gibson, Dunn &
Crutcher LLP

1  past (something Oracle has not proven), they are certainly not causing Oracle any injury now, a

2  decade later.

3       **5.**     **Rimini's Laches Defense**

4       503.     Rimini asserts a laches defense to Oracle's Lanham Act claims.  Although the Court

5  need not reach this defense given Oracle's failure to prove any Lanham Act violation, the Court

6  nevertheless holds that Oracle's Lanham Act claims are barred by the doctrine of laches.

7       504.     "Laches is an equitable time limitation on a party's right to bring suit, resting on

8  the maxim that one who seeks the help of a court of equity must not sleep on his rights." *Jarrow*

9  *Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 835 (9th Cir. 2002) (citations and quotation

10  marks omitted).  "A party asserting laches must show that it suffered prejudice as a result of the

11  plaintiff's unreasonable delay in filing suit." *Id.*

12       505.     Although the Lanham Act contains no explicit statute of limitations, the limitations

13  period from the most closely analogous state law cause of action determines the presumptive

14  applicability of laches.  *Id.* at 836-37.  If a Lanham Act claim "is filed within the analogous state

15  limitations period, the strong presumption is that laches is inapplicable; if the claim is filed after

16  the analogous limitations period has expired, the presumption is that laches is a bar to suit." *Id.* at

17  837.  "[T]he presumption of laches is triggered if *any part* of the claimed wrongful conduct

18  occurred beyond the limitations period." *Id.* (emphasis added).  In determining the presumption

19  for laches, "the limitations period runs from the time the plaintiff knew or should have known

20  about his [Lanham Act] cause of action." *Id.* at 838.

21       506.     Here, the analogous limitations period is Nevada's limitations period for fraud,

22  which is three years.  Nev. Rev. Stat. § 11.190(3)(d); *see Jarrow Formulas*, 304 F.3d at 838

23  (borrowing California's three-year limitations period for fraud for Lanham Act false advertising

24  claim); *Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 191-92 (2d Cir. 1996) (borrowing New

25  York's fraud period for Lanham Act false advertising claim).

26       507.     Oracle first asserted its Lanham Act claims on February 17, 2015.  ECF No. 21.

27  But Oracle "knew or should have known" about its Lanham Act claims more than three years

28

165

RIMINI STREET AND SETH RAVIN'S POST-TRIAL PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW
CASE NO. 2:14-CV-01699-MMD-DJA

Gibson, Dunn &
Crutcher LLP

before that date.  *Jarrow Formulas*, 304 F.3d at 838.  As early as January 10, 2010, the date it filed its Complaint in the *Rimini I* litigation, Oracle knew that "Rimini Street claims that it can cut customer maintenance and support bills in half and give customers a reprieve from software upgrade cycles by allowing customers to remain on older, often outdated, versions of PeopleSoft, JDE, or Siebel software rather than moving to later versions, and by eliminating fees for fixes and upgrades that customers would otherwise have to pay to remain on the older versions." *Rimini I*, ECF No. 1 ¶ 35.  Rimini's statements that it could save clients 50% in support costs and allow clients to avoid unnecessary upgrades are clearly "part of the claimed wrongful conduct" in this case.  *Jarrow Formulas*, 304 F.3d at 837.  Therefore, laches is presumed to bar Oracle's Lanham Act claims.

508.    Rimini has also demonstrated that Oracle's delay in asserting its claims was unreasonable.  As Rimini pointed out, Oracle waited nearly five years after it knew of its potential cause of action to assert its claims.  What's more, Oracle knew about that potential cause of action *while already engaged in litigation with Rimini*.  Under these circumstances, the Court finds that Oracle's delay was unreasonable.

509.    Rimini also suffered prejudice as a result of Oracle's delay.  Rimini's statements regarding its support processes, its security-related offerings, and how it provides a cheaper, more effective alternative to Oracle have been a significant part of Rimini's marketing to the public. *Jarrow Formulas*, 304 F.3d at 839.  "If [Oracle] had [asserted its claims] sooner, [Rimini] could have invested its resources in shaping an alternative identity for [Rimini security offerings] in the minds of the public." *Id.*  Given Rimini's reliance on the challenged statements in carrying out its business operations, and Oracle's failure to object to them earlier, the Court concludes that Rimini would be prejudiced if Oracle's claims were to proceed. *Id.* at 839-40; *Conopco*, 95 F.3d at 192-93.

510.    Moreover, given that Oracle seeks injunctive relief as to these statements—some of which are well over a decade old—the equitable doctrine of laches weighs against any such injunctive relief requiring Rimini to cease making statements not made for so long or to issue

Gibson, Dunn & Crutcher LLP

1   corrective statements for conduct long in the past.

2   **G.    DMCA Claims and Defenses**

3   511.    To prevail on its DMCA claims, Oracle must prove by a preponderance of the

4   evidence that Rimini and/or Ravin intentionally removed or altered copyright management

5   information ("CMI") from Oracle's works, or that Rimini intentionally distributed copies of Oracle

6   works knowing that CMI had been removed or altered.  *See* 17 U.S.C. § 1202(b)(1), (b)(3).  Oracle

7   must also prove that Rimini and/or Ravin took these actions knowing or having reasonable grounds

8   to know that they would induce, enable, facilitate, or conceal copyright infringement.  *Id.*; *see also*

9   *Kirk Kara Corp. v. W. Stone & Metal Corp.*, 2020 WL 5991503, at *6 (C.D. Cal. Aug. 14, 2020).

10   512.    Based on the relevant findings of fact, the Court holds that Oracle failed to prove a

11   removal of CMI from an Oracle "work" as required by the DMCA.  The DMCA prohibits the

12   removal of CMI from "copies … of a work" and the distribution of "copies of works" from which

13   CMI has been removed.  17 U.S.C. § 1202(b)(3), (c).  Here, Oracle has not shown that either of

14   the categories of files identified by Ms. Frederiksen-Cross from which copyright notices were

15   allegedly removed are "copies" of Oracle "works," as opposed to files that contained a mix of

16   Rimini-written and Oracle-written code.  *See Robert L. Stark Enters., Inc. v. Neptune Design Grp.,*

17   *LLC*, 2017 WL 1345195, at *11 (N.D. Ohio Apr. 12, 2017) (no DMCA violation where there was

18   "no evidence that plaintiff … removed CMI *from defendant's original work*" as opposed to a work

19   "strikingly similar" to the original work); *Kirk Kara*, 2020 WL 5991503, at *6 ("[E]ven where the

20   underlying works are similar, courts have found that no DMCA violation exists where the works

21   are not identical.").  Because the files at issue are not copyrighted works, Oracle's DMCA claim

22   fails.

23   513.    Moreover, with respect to the second category of files identified by Ms.

24   Frederiksen-Cross, Oracle has failed to prove by a preponderance of the evidence that Rimini

25   removed any CMI at all.  Indeed, there is no evidence that this category of files ever contained

26   CMI that was then removed.  Rather, Ms. Frederiksen-Cross opined only that the Rimini files did

27   not have Oracle CMI but contained some amount of code that matched code in an Oracle file.  This

28

Gibson, Dunn &
Crutcher LLP

is not a "removal" under the DMCA.  *See Frost-Tsuji Architects v. Highway Inn, Inc.*, 2014 WL 5798282, at *5 (D. Haw. Nov. 7, 2014) (DMCA requires "evidence of removal," and "[t]he physical act of removal is not the same as basing a [work] on someone else's work"), *aff'd*, 700 F. App'x 674 (9th Cir. 2017); *Falkner v. Gen. Motors LLC*, 393 F. Supp. 3d 927, 938-39 (C.D. Cal. 2018) (copying whole parts of a work without copying the work's CMI does not constitute removing CMI); *Huffman v. Activision Publ'g Inc.*, 2020 WL 8678493, at *11 (E.D. Tex. Dec. 14, 2020), *adopted* 2021 WL 2141352 (May 26, 2021) (DMCA "does not cover the mere failure to add truthful CMI to a copy," but "requires actual alteration or removal of CMI already found on [a work]").

514.    Finally, Oracle failed to prove that any Rimini employee took any action knowing or having reasonable grounds to know that it would induce, enable, facilitate, or conceal copyright infringement.  The evidence shows that Rimini did not attempt to hide its conduct and that its clients would not have suffered any confusion about the nature of the files given that Rimini's work is to deliver updates to Oracle software.  It is not sufficient for Oracle to generically argue that alleged CMI removal *might* somehow lead to infringement.  *Stevens v. Corelogic*, 899 F.3d 666, 673-75 (9th Cir. 2018).  Oracle also ignores that many of the removals and distributions of these files counted by Ms. Frederiksen-Cross indisputably occurred in 2010, years prior to the *Rimini I* jury finding that any infringement by Rimini was innocent—meaning that Rimini did not know or have reason to know its conduct was infringing.

515.    Rimini asserts a statute of limitations defense against Oracle's DMCA claims.  Although the Court need not reach this defense given Oracle's failure to prove any DMCA violation, based on the relevant findings of fact, the Court nevertheless holds that Oracle's DMCA claims are barred by the statute of limitations.

516.    The statute of limitations for a DMCA claim is three years.  17 U.S.C. § 507(b).  Oracle filed its DMCA claims on February 28, 2016.  ECF No. 174 ¶¶ 137-48.  Accordingly, claims that accrued before February 28, 2013, are time-barred.  A claim accrues when Oracle "has knowledge of a violation or is chargeable with such knowledge."  *Polar Bear Prods., Inc. v. Timex*

Gibson, Dunn & Crutcher LLP

1  *Corp.*, 384 F.3d 700, 706 (9th Cir. 2004) (citation and quotation marks omitted).  The evidence

2  shows that Oracle was aware of the underlying conduct at issue before February 28, 2013, as the

3  result of discovery in the *Rimini I* case, and thus Oracle's claims are barred by the statute of

4  limitations.

5  **H.    Oracle's UCL Claims**

6  517.    To establish its claims for "unlawful" conduct under the UCL, Oracle must show

7  by a preponderance of the evidence that Rimini engaged in conduct that (1) "can properly be called

8  a business practice" and (2) "is forbidden by law."  *Korea Supply Co. v. Lockheed Martin Corp.*,

9  63 P.3d 937, 943 (Cal. 2003) (quoting *Cel-Tech*, 973 P.2d at 539).  To establish its claims for

10  "unfair" conduct, Oracle must show by a preponderance of the evidence that Rimini's conduct

11  amounts to an incipient violation of the text or spirit of the antitrust laws or threatened substantial

12  harm to competition, as set out above.  *Cel-Tech*, 973 P.2d at 544.  Based on the relevant findings

13  of fact and for the reasons that follow, the Court holds that Oracle has failed to establish any of its

14  claims under the UCL.

15  518.    ***Competitor Standing.***    By contrast to Rimini, Oracle failed to establish an

16  economic injury caused by the accused illegal or unfair conduct as required to establish competitor

17  standing.

18  519.    Setting aside its sweeping allegations of infringement and disparaging statements,

19  Oracle ultimately failed to show the ascertainable harm required by many of its claims and did not

20  overcome Rimini's contrary evidence that Oracle maintained, and continues to retain,

21  overwhelming market power and profit margins of around 95% on the support services Rimini

22  was alleged somehow to have damaged, with renewal rates for Oracle support of the products at

23  issue remaining steady at 95%.  Oracle also failed to present a single customer that testified to

24  leaving Oracle and joining Rimini because of any Rimini conduct alleged in Oracle's UCL claim.

25  520.    The Court notes that intangible harms to reputation and the like do not confer

26  standing under the UCL.  "California courts have distinguished the UCL standing requirement as

27  more stringent than the federal Article III standing requirement" because the statute limits

28

169

Gibson, Dunn &
Crutcher LLP

claimants to those who "lost money or property." *Pirozzi v. Apple, Inc.*, 966 F. Supp. 2d 909, 919 (N.D. Cal. 2013) (citation and quotation marks omitted).

521. ***Unlawful Conduct Claims.*** In any event, Oracle's "unlawful" conduct claims fail for the additional reason that Rimini's accused conduct did not "violate another 'borrowed' law." *Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1168 (9th Cir. 2012) (quoting *Cel-Tech*, 973 P.2d at 539-40) (affirming dismissal of UCL "unlawful" claim).

522. ***Unfair Conduct Claims.*** Similarly, Oracle's "unfair" conduct claims fail on the merits because the predicate conduct has been adjudicated lawful and because Oracle fell well short of proving the incipient antitrust violation or substantial harm to competition required under *Cel-Tech*.

523. The underlying allegations comprising Oracle's unfair competition claims—that Rimini "engaged in a systematic breach of Oracle's software licenses" and "false advertising in violation of the Lanham Act" (ECF No. 589 at 21)—have either dropped out of the case (ECF No. 1420 at 1 (stipulation of dismissal of Oracle's breach of contract and inducing breach of contract claims with prejudice)), or, as set forth herein, been adjudicated as true and otherwise not unlawful (*see, e.g.*, *City of San Jose v. Off. of Comm'r of Baseball*, 776 F.3d 686, 692 (9th Cir. 2015) (clearly lawful conduct not considered unfair)).

524. Finally, Oracle failed to present a plausible theory to explain, let alone present evidence to prove, how a much smaller competitor in a market dominated by Oracle inflicted "injury *to competition*." *Cel-Tech*, 973 P.2d at 544 (emphasis added). Even had harm to Oracle been proven, both federal and California courts have been crystal clear that, like other antitrust laws, the UCL was "enacted for 'the protection of *competition*, not *competitors*.'" *Id.* (quoting *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 115 (1986)).

## I. The Parties' Requested Injunctive Relief

### 1. Rimini's Request for Injunctive Relief

525. Rimini seeks a permanent injunction under California's UCL to remedy the irreparable and ongoing harms caused by Oracle's at-issue unfair business practices. Oracle raises

Gibson, Dunn &
Crutcher LLP

defense of unclean hands and a variety of speech-related defenses arising under certain statutes and constitutional protections, and also opposes issuance of a permanent injunction on the merits.

### i. *Injunctive Relief*

526.    Based on the relevant findings of fact and for the reasons that follow, the Court grants Rimini's request for injunctive relief.

527.    Under the UCL, successful claimants may seek broad-based injunctive relief in the public interest to remedy and prevent unfair business practices.  *See* Cal. Bus. & Prof. Code § 17203; *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 2020 WL 1812257, at *5 (N.D. Cal. Apr. 9, 2022).  To obtain injunctive relief under the Supreme Court's *eBay* test for equitable jurisdiction, Rimini must prove: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *see Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 837 (9th Cir. 2020).

528.    ***Irreparable Harm and Causal Nexus.***  In addition to $300 million in lost sales, *supra* ¶ 312, Rimini has proven that it has suffered irreparable injury, including incalculable damage to its reputation.  As a competitor in the same market as Oracle, Rimini is irreparably injured by the reduction in competition caused by Oracle's harmful anticompetitive business practices.  *See Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1023 (9th Cir. 2016).  Rimini established the factual basis for competitive injury by presenting evidence of Oracle's high market share and profit margins, as well as written exhibits and live testimony reflecting the experiences of Oracle licensees participating in the same market and demonstrating the tangible, and negative, effect of Oracle's anticompetitive practices on the market.

529.    Although loss in competition is sufficient to show irreparable injury here, the Court notes that Rimini has established a second irreparable injury in the form of reputational harm and loss of client goodwill.  *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841

Gibson, Dunn &
Crutcher LLP

(9th Cir. 2001) ("threatened loss of prospective customers or goodwill certainly supports" irreparable harm). Without injunctive relief, harm to Rimini's reputation stemming from Oracle's misstatements and implied threats will only continue to ripple throughout the market and unfairly enhance Oracle's position. The Court finds the proposed injunction will forestall further harm and allow Rimini gradually to recover the lost reputation and client goodwill.

530. ***Inadequate Remedy at Law.*** From the foregoing analysis, the Court easily concludes that Rimini has no adequate remedy at law that could forestall and redress its competitive and reputational injuries. *See Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d 1197, 1219 (C.D. Cal. 2007) (noting the first and second *eBay* factors generally collapse into the same inquiry when considering whether to issue a permanent injunction). As California courts have emphasized, the broad substantive coverage of the UCL is contrasted by the fact that "the primary form of relief available … is an injunction." *In re Tobacco II Cases*, 207 P.3d 20, 34 (Cal. 2009).

531. Damages cannot be tabulated for market-wide harms to competition because the analysis of what the world would look like but for Oracle's unfair conduct quickly becomes an exercise in speculation. For the same reason, damages cannot be reliably assessed for reputational harm that spreads unpredictably and exponentially. And even if damages could be tabulated, that legal remedy would be inadequate to make up for the competitive harm here because a one-time payment from Oracle to Rimini would not necessarily deter Oracle and would do nothing to compensate the other competitors and clients harmed by Oracle's anticompetitive activities.

532. ***Balance of Hardships.*** The Court also concludes that the balance of hardships favors issuing Rimini's requested injunction. The Court has identified a number of ways in which Rimini is tangibly harmed on an ongoing basis by Oracle's anticompetitive business practices, including by enduring increased costs and unfairly losing support clients. By contrast, Oracle will not be seriously burdened by the requested injunction. And there is no valid business reason to make false statements.

533. ***Public Interest.*** The Court finds that granting a permanent injunction designed to

Gibson, Dunn &
Crutcher LLP

increase competition is necessarily in the public interest.  *See Boardman*, 822 F.3d at 1024.  The market for support of Oracle products will benefit from *more*, rather than *less*, competition.

### ii.      *Oracle's Defenses*

534.    In response to Rimini's request for an injunction, Oracle asserts a defense of unclean hands and a variety of speech defenses arising under applicable statutes and constitutional protections.  For the following reasons, the Court holds that Oracle failed to make the showings required to establish these defenses and defeat otherwise available equitable relief.

535.    The doctrine of unclean hands is an equitable defense that precludes awarding relief to a plaintiff who acted in bad faith or with fraud or deceit as to the controversy at issue.  *Northbay Wellness Grp., Inc. v. Beyries*, 789 F.3d 956, 959 (9th Cir. 2015).  The doctrine should not be enforced to aid an undeserving defendant or when contrary to the public interest.  *Id.* at 960.

536.    The Court concludes that Oracle failed to prove its unclean hands defense.  Oracle has failed to identify bad faith conduct by Rimini that would be severe enough to warrant denial of otherwise available equitable relief.  As set forth herein, the Court concluded that the very conduct at the center of Oracle's assertion of unclean hands is, in fact, lawful.  The Court further concludes that Oracle's speech-related defenses are inapplicable where, as here, the requested injunction bars unlawful anticompetitive conduct rather than protected speech.  *Va. State Bd. of Pharmacy*, 425 U.S. at 771; *Kasky*, 45 P.3d at 261.

537.    Accordingly, the Court holds that Rimini has demonstrated that each of the four *eBay* factors weighs in favor of granting the requested permanent injunction, and that none of Oracle's defenses have merit, for the reasons set forth above.  The Court orders Rimini to submit a proposed order and injunction for the Court's consideration and based on these findings of fact and conclusions of law.

### 2.      Oracle's Requests for Injunctive Relief

538.    Oracle also seeks permanent injunctive relief in connection with its claims under the Copyright Act, Lanham Act, DMCA, and California's UCL.  With respect to Oracle's claim under the Copyright Act regarding JDE, Oracle's claim fails at the outset because Oracle failed to

Gibson, Dunn &
Crutcher LLP

offer any evidence of allegedly infringing conduct related to the five registered JDE copyrights identified in Oracle's counterclaims. As to Oracle's other claims, the Court holds that Oracle has failed to show an entitlement to injunctive relief, that Rimini has established defenses precluding most such relief, and that Oracle's requested relief is overbroad and impermissibly vague in any event. Oracle's request for injunctive relief is denied.

539. ***Irreparable Harm and Causal Nexus.*** To succeed under the first *eBay* factor, Oracle must "demonstrate that irreparable injury is *likely* in the absence of an injunction" and cannot succeed by pointing to "a mere 'possibility of some remote future injury.'" *Park Vill. Apt. Tenants Ass'n v. Mortimer Howard Tr.*, 636 F.3d 1150, 1160 (9th Cir. 2011) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)).

540. With respect to its infringement claims, Oracle asserts irreparable harm in the form of reduced market share, reputational damage, and loss of customer goodwill. Injunctive relief is required to forestall these harms, Oracle argues, because the Court found on summary judgment that Rimini infringed four of Oracle's PeopleSoft copyright registrations in connection with two specific updates developed for clients Campbell Soup and City of Eugene (because the Court found no additional infringement at trial, these are the only instances of prior infringement at issue here). ECF No. 1253 at 38-66. Based on the relevant findings of fact, the Court finds that Oracle has failed to show irreparable harm on this basis.

541. Even if Oracle had shown some infringement, which it has not, Oracle's claim would still fail because it has not established the required causal nexus between its purported irreparable harm and any infringement. Under Ninth Circuit precedent, Oracle must show "a sufficient causal connection" between the infringement found and the likelihood of actually facing irreparable loss of market share, reputational damage, or loss of goodwill. *Perfect 10, Inc. v. Google, Inc.*, 653 F.3d 976, 982 (9th Cir. 2011); *see also Apple Inc. v. Samsung Elecs. Co.*, 735 F.3d 1352, 1360 (Fed. Cir. 2013) ("To show irreparable harm, it is necessary to show that the infringement caused harm in the first place." (citation and quotation marks omitted)); *Oracle*, 783 F. App'x at 710. This showing is necessary for injunctive relief because courts can no longer

1  "presum[e] irreparable harm in a copyright infringement case" in light of the Supreme Court's

2  decision in *eBay*.  *Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.*, 654 F.3d 989, 998 (9th Cir.

3  2011).

4  542.  Oracle failed to show the required causal connection.  As an initial matter, the Court

5  notes that Oracle presented no direct evidence that Rimini's alleged infringement reduced its

6  market share by "even a single former [customer]."  *Perfect 10,* 653 F.3d at 982.  Oracle conceded

7  that its high support renewal rates have stayed consistent over the relevant time period.  *See* Tr.

8  1046:11-13 [Catz] (going back ten years, "our cancellation rates stayed pretty steady"); Tr. 1872:5-

9  1873:6, 1914:13-21 [Orszag] (Oracle's high renewal rates "not consistent" with Oracle's

10  allegations).  Moreover, Rimini demonstrated that the vast majority of its clients run versions of

11  Oracle software for which Oracle does not offer any meaningful support—including updates

12  necessary to run the software in compliance with legal and regulatory changes—undermining

13  Oracle's theory that clients only hire Rimini for cost savings that are enabled by Rimini's alleged

14  infringement.  Nor did Oracle prove that Rimini's pricing is enabled by infringement; Rimini's

15  pricing is consistent with (if not higher than) the pricing of every other third-party support provider,

16  and Oracle conceded that providers can (and do) offer Rimini's prices with non-infringing support

17  services.  With respect to Campbell Soup and City of Eugene, Oracle was unable to present any

18  customer statements suggesting that the two infringing updates caused them to leave Oracle in

19  favor of Rimini.  In fact, the direct evidence of customer motivation presented at trial suggests

20  customers left Oracle for a variety of reasons.  *See Perfect 10*, 653 F.3d at 981-82 (denying

21  injunction where threat of bankruptcy was not caused by alleged infringement); *supra* ¶ 323.

22  543.  The Court also finds that Oracle's asserted irreparable harm requiring DMCA

23  relief—the prospective removal of CMI—is substantially similar to, and ultimately derivative of,

24  Oracle's argument for an injunction under the Copyright Act.  *See*, *e.g.*, *TELUS Corp. v. Watson*,

25  2010 WL 11614138, at *2 (N.D. Cal. Dec. 17, 2010) (analyzing requests for injunctive relief under

26  both statutes simultaneously).  Oracle has not shown past harm of any sort stemming from the

27

28

RIMINI STREET AND SETH RAVIN'S POST-TRIAL PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW
CASE NO. 2:14-CV-01699-MMD-DJA

Gibson, Dunn &
Crutcher LLP

1    failure to include Oracle copyright notices on files that were not Oracle copyrighted works, let

2    alone establish a likelihood of future harm that could not be remedied by money damages.

3        544.    The same holds true for the Lanham Act.  Oracle has failed to demonstrate how

4    statements from Rimini, *even if false and misleading*, from *nearly a decade ago* could conceivably

5    cause Oracle *irreparable harm* justifying prospective injunctive relief.  There is no risk of any

6    future injury here.

7        545.    Oracle contends that it is entitled to a rebuttable presumption of irreparable injury

8    flowing from any Lanham Act violations.  That is incorrect.  Oracle relies on a *2020* amendment

9    to the Lanham Act for that presumption.  *See Quidel Corp. v. Siemens Med. Sols USA, Inc.*, 2021

10   WL 4622504, at *5 (9th Cir. Oct. 7, 2021).  All the conduct Oracle accuses of violating the Lanham

11   Act occurred many years ago, and importantly, all before the 2020 amendment.  As other courts

12   have held in rejecting the same argument Oracle makes here, longstanding legal principles impose

13   a "traditional presumption … against retroactive application" of statutes, including the 2020

14   Lanham Act amendments.  *Park Ridge Sports, Inc. v. Park Ridge Travel Falcons*, 2022 WL

15   1643840, at *11 (N.D. Ill. Jan. 5, 2022) (holding that 2020 amendment is not retractive).

16   Retroactivity requires "'clear congressional intent favoring such a result'" (*id.* (quoting *Hamdan*

17   *v. Rumsfeld*, 548 U.S. 557, 576 (2006)), and there is no such intent here.  The Ninth Circuit's post-

18   *eBay* case law before the 2020 Lanham Act amendments squarely holds that there is no such

19   presumption.  *Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1249-50 (9th Cir.

20   2013); *Flexible Lifeline Sys.*, 654 F.3d at 998; *Reno Air Racing Ass'n, Inc., v. McCord*, 452 F.3d

21   1126, 1137-38 (9th Cir. 2006).  Thus the Court applies the Ninth Circuit's traditional standard, and

22   holds that Oracle has failed to establish irreparable injury.

23       546.    Furthermore, even if the Court applied the rebuttable presumption under the 2020

24   amendments, Rimini has rebutted that presumption.  There is simply no evidence that Oracle was

25   ever injured by these statements when they were made, let alone that Oracle continues to suffer an

26   irreparable injury more than a decade later.

27

28

RIMINI STREET AND SETH RAVIN'S POST-TRIAL PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW
CASE NO. 2:14-CV-01699-MMD-DJA

Gibson, Dunn &
Crutcher LLP

547.   With respect to Oracle's UCL claims, Oracle asserts generalized harms of unfair competition that have reduced Oracle's competitive advantages.  As explained above, Oracle's UCL claims under the "unlawful" prong are coterminous with its claims under the Copyright Act and Lanham Act, and Oracle's UCL claims under the "unfair" prong are limited to injuries to competition for which Oracle cannot demonstrate competitor standing by showing harm caused by Rimini's alleged unfair conduct.  Based on the Court's previous analysis of Oracle's competitor standing and of causation in the infringement context, the Court finds that Oracle has failed to establish an irreparable injury capable of being remedied by an injunction under the UCL's "unfair" prong separately from Oracle's remaining claims.

548.   Finally, Oracle's request for further injunctive relief makes little sense in light of an existing injunction that is already in place.  If, for instance, Oracle were to prevail on its migration claims, it would not be entitled to any further relief on them.  These claims concern copies of PeopleSoft on Rimini's systems from years ago, and the *Rimini I* injunction already prohibits the copying or use of PeopleSoft files on Rimini's systems.  Thus, Oracle's remedy already exists as to those claims, and it is not entitled to a further injunction.  *Jellybean Ent., Inc. v. Usnile LLC*, 2013 WL 3283845, at *3 (S.D. Cal. June 26, 2013) ("[A]n order enjoining Defendants' alleged copyright infringement and unfair business practices already issued, which undermines the risk of future harm.").

549.   ***Inadequacy of Monetary Relief.***  To succeed under the second *eBay* factor, Oracle must show that money damages would be inadequate to compensate the asserted harm in the absence of an injunction.  The Court notes that the first and second *eBay* factors often overlap in the permanent injunction context.  *See City & Cnty. of S. F. v. Trump*, 897 F.3d 1225, 1243 (9th Cir. 2018).  But, importantly, Oracle litigated this case until the eleventh hour pursuing claims of *over $1 billion* in actual and statutory damages under the Copyright Act, DMCA, Lanham Act, and other state law statutes and causes of action.  All of these claims involve allegations of infringement that are generally remediable through damages.  *See generally* ECF Nos. 397, 1309. It is black-letter law that "future copyright infringement can always be redressed via damages,

177

Gibson, Dunn & Crutcher LLP

1  *whether actual or statutory.*"  *Metro-Goldwyn-Mayer*, 518 F. Supp. 2d at 1215 (emphasis added);

2  *see also eBay*, 547 U.S. at 391.  Yet Oracle voluntarily forfeited its claims for actual damages as

3  well as *statutory* damages that could have entitled it to legal relief for the alleged wrongdoing.  In

4  all events, the Court holds that Oracle has failed to demonstrate irreparable harm or an inadequate

5  remedy at law.

6       550.  **Balance of Hardships.**  To succeed under the third *eBay* factor, Oracle must show

7  that the balance of hardships favors granting relief.  In evaluating this factor, the Court recognizes

8  that enjoining a party to stop conduct that has been adjudicated unlawful is not a hardship.  *See*,

9  *e.g.*, *BNI Enters., Inc. v. Referral Leaders Int'l, LLC*, 2015 WL 12644984, at *7 (C.D. Cal. Jan. 9,

10  2015).  On the whole, however, the Court finds this factor weighs in Rimini's favor as well because

11  the nature and scope of the requested relief threatens greater hardship on Rimini than that faced by

12  Oracle in the absence of an injunction.  And, as noted above, Oracle is basing its claims for

13  injunctive relief on conduct that is, in many cases, a decade old.  Injunction compliance is

14  burdensome, and imposing an injunction based on acts from so long ago would hurt Rimini far

15  more than it would prevent likely future irreparable injuries to Oracle.

16       551.  **Public Interest.**  To succeed under the fourth *eBay* factor, Oracle must show the

17  public interest does not run contrary to the injunctive relief sought.  The Court finds that this factor,

18  too, counsels against issuing injunctive relief.  "[G]eneral public interest" in supporting intellectual

19  property rights is not sufficient to warrant a permanent injunction, because infringement alone

20  does not justify injunctive relief.  *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d

21  1312, 1341 (Fed. Cir. 2012).  Furthermore, granting the injunction requested in this case will not,

22  given the Court's findings above, likely aid competition, and may in fact harm it.  *See eBay*, 547

23  U.S. at 396-97 (Kennedy, J., concurring) (an injunction does "not serve the public interest" where

24  it "is employed simply" to gain "undue leverage").

25       552.  The Ninth Circuit has repeatedly emphasized that "[i]njunctive relief … must be

26  tailored to remedy the *specific harm alleged*.  An overb[roa]d injunction is an abuse of discretion."

27  *Park Vill.*, 636 F.3d at 1160 (alterations in original) (quoting *Lamb-Weston, Inc. v. McCain Foods*,

28

178

*Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991)).  Based on the relevant findings of fact, the Court finds that Oracle's requested relief is overbroad and vague in several respects.

553.    With respect to its Copyright Act claims, Oracle requests a sweeping injunction across virtually all of the product lines relevant here.  But as noted above, Oracle only proved—at summary judgment—infringement as to four specific PeopleSoft registrations with respect to two specific updates developed for Campbell Soup and City of Eugene.  Evidence presented at trial indicates that both cases do not reflect Rimini's overall policy framework for software support and involved conduct that Oracle was not able to generalize across Rimini's support activities.

554.    Moreover, and importantly, Oracle cannot propose any coherent way to meet the requirement that injunctions be "narrowly tailored" when it comes to the *license* restrictions in the 1,000+ licenses in this case.  *Price v. City of Stockton*, 390 F.3d 1105, 1117 (9th Cir. 2004).  The Court cannot enjoin Rimini from conduct permitted by the license agreements; that much is clear from the Ninth Circuit's decisions in *Rimini I*.  *Oracle*, 783 F. App'x at 710-11.  If a particular license agreement does not have a "facilities" restriction, the Court cannot enjoin Rimini from having that program on its systems.  It follows that the Court cannot practically issue a properly tailored injunction that blanketly prohibits conduct across even a *single* product line, because the license agreements are so varied.

555.    Oracle failed to demonstrate that the *eBay* factors are established here and that it is entitled to an injunction *even if* it had prevailed on its claims (which it has not).

556.    **Scope of Relief.**[21]  Oracle makes twelve specific requests for injunctive relief in its trial brief, which, based on the findings of fact in this order, the Court rejects as follows:

- "Prohibiting Rimini from using or further reproducing Oracle software environments that have been found to infringe."  ECF No. 1452 at 22.  Oracle provides no legal support for its theory that it is entitled to an injunction that would prohibit Rimini from using Oracle software when it is conducted according to the

---

[21] Rimini objects to being required to brief the scope of relief prior to any liability finding and provides this paragraph only in an abundance of caution.  *See supra* n.1.

Gibson, Dunn &
Crutcher LLP

terms of the relevant license agreement.  Indeed, the Ninth Circuit has held the opposite.  *Oracle*, 783 F. App'x at 710-11.  And as the Court has held with respect to Rimini's declaratory relief claim, as designed and implemented in the vast number of instances, Rimini's Process 2.0 is non-infringing.  Enjoining Rimini from lawfully servicing the environments of licensed clients would simply be anticompetitive and vastly overbroad, when this Court's authority to enjoin is limited to "narrowly tailor[ing]" injunctive relief to actual instances of infringement.  *Price*, 390 F.3d at 1117.

- "Prohibiting Rimini from using or further reproducing Rimini updates and associated files that have been found to infringe."  ECF No. 1452 at 22.  The Court rejects this request for the same reason it rejects Oracle's first request as to environments.

- "Prohibiting the creation of RAM copies associated with cross-use and the creation of derivative works."  ECF No. 1452 at 22.  The Court rejects this request for two reasons. First, the request is illogical and technically impossible, as the mere "looking at" a software program "necessarily" creates a RAM copy.  Tr. 499:18-500:10 [Frederiksen-Cross].  Second, if *some* RAM copies were infringing and were created in the process of "cross-use" as Oracle describes it, they would already be prohibited by the existing injunction's terms governing "cross-use."

- "Prohibiting Rimini's cloud hosting of customer environments."  ECF No. 1452 at 23.  The evidence at trial unequivocally established that Rimini does not "cloud host" anything for its clients—some of Rimini's *clients* choose to host *their* licensed software in the cloud. *See supra* ¶ 64. Moreover, Oracle's request is vastly overbroad, as there is no dispute that only a subset of legacy PeopleSoft license agreements even contain the "facilities" restriction that could conceivably prevent cloud hosting. *See supra* ¶ 58.

Gibson, Dunn &
Crutcher LLP

- "Prohibiting infringement of Oracle's EBS software." ECF No. 1452 at 23. Aside from the infringement as to four specific PeopleSoft registrations with respect to two specific updates developed for Campbell Soup and City of Eugene, Oracle has failed to prove that Rimini infringed Oracle software, and even if Oracle had shown some instances of infringement of EBS, for instance via a technical specification allegedly containing Oracle code (*see* Tr. 464:16-470:1 [Frederiksen-Cross]), such conduct took place years ago, and Oracle presented no evidence showing it is likely to recur.

- "Prohibiting Rimini's use of certain automated tools, including AFW, Dev Review, and ePack." ECF No. 1452 at 23. Oracle has failed to prove that these tools infringe. *See supra* Section III.A.5.

- "Prohibiting Rimini's copying of JDE source code." ECF No. 1452 at 23. The relevant subset of license agreements that even arguably have a limitation on the copying of JDE source code do not, as a matter of fact or law, prohibit such copying when done for a particular licensee and when there is no "cross-use." Oracle's request thus fails on its own terms but would also be vastly overbroad and not tailored to the terms of actual license agreements. *Oracle*, 783 F. App'x at 710-11.

- "Prohibiting Rimini from removing CMI from files containing Oracle code." ECF No. 1452 at 23. The evidence in this case established that any removal of Oracle CMI from Oracle files occurred *over a decade ago*, and such conduct is no basis for issuing prospective relief.

- "Prohibiting Rimini from making certain false and misleading statements in its commercial advertising and promotions." ECF No. 1452 at 23. Besides the fact that the accused statements are neither false nor misleading, the accused statements are at times nearly a *decade old*, and could not possibly warrant prospective relief.

- "Requiring Rimini to take remedial measures to correct false and misleading statements it has previously made in its commercial advertising and promotions."

181

Gibson, Dunn &
Crutcher LLP

ECF No. 1452 at 23. The Court denies this request for the same reasons it denies Oracle's request to prohibit Rimini from making false and misleading statements.

- "Other relief tailored to the evidence that develops, including appointment of a monitor for Rimini's support processes to ensure compliance with existing and additional injunctive relief." ECF No. 1452 at 23. The Court rejects Oracle's extreme request for a compliance monitorship, which lacks any basis and would violate Rimini's due process rights and exceed this Court's authority. Rule 53 requires statutory authorization for the appointment of a monitor, absent consent of both parties. *See* Fed. R. Civ. P. 53. The Copyright Act nowhere authorizes monitorships. *See* 17 U.S.C. §§ 101 *et seq.* Nor is there a "documented … historical practice" or an "irrefutable showing" that the Court possess the inherent power to order a monitorship under the Copyright Act. *See Cobell v. Norton*, 334 F.3d 1128, 1141 (D.C. Cir. 2003).

- "Impoundment of Rimini's computer systems." ECF No. 1452 at 23. Impoundment is an extreme remedy and one for which Oracle has presented no evidence. The Court previously *twice* denied Oracle's request for impoundment and again denies its requests for the same reasons. *Rimini I*, ECF No. 1049 at 9-10; *Rimini I*, ECF No. 1458 at 55. Even if the Court were to grant Oracle relief, narrowly tailored injunctive relief would provide Oracle with all the relief it needs or would be entitled to. *Id.*

## IV.    CONCLUSION

557.    For the foregoing reasons, the Court hereby enters judgment for Rimini and Ravin and against Oracle as follows:

- Rimini has established its declaratory judgment claim regarding Process 2.0; and

- Oracle has failed to establish its copyright infringement claims against Rimini or its contributory and vicarious copyright infringement claims against Ravin; and

Gibson, Dunn & Crutcher LLP

- Rimini and Ravin have established statute of limitations defenses to all EBS infringement claims arising before February 17, 2012, and
- Rimini and Ravin have established fair use defenses to all copyright infringement claims regarding the Process 1.0 "migration" and RAM copies created by automated tools; and
- Rimini has established its UCL claims regarding Oracle's anticompetitive policies and false and misleading statements, and
  - Oracle has failed to establish constitutional or statutory speech-related defenses to Rimini's UCL claims; and
- Oracle has failed to establish its Lanham Act claims, and
  - Rimini has established a laches defense to all Lanham Act claims; and
- Oracle has failed to establish its DMCA claims, and
  - Rimini has established a statute of limitations defense to all DMCA claims arising before February 28, 2013; and
- Oracle has failed to establish its UCL claims; and
- Rimini has demonstrated an entitlement to injunctive relief; and
- Oracle has failed to demonstrate an entitlement to injunctive relief for reasons independent of its failure to establish the aforementioned claims.

The Court directs Rimini to prepare a proposed declaratory judgment and permanent injunction, as well as to propose modifications to the existing *Rimini I* injunction, based on these findings of fact and conclusions of law.

RIMINI STREET AND SETH RAVIN'S POST-TRIAL PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW
CASE NO. 2:14-CV-01699-MMD-DJA

Gibson, Dunn &
Crutcher LLP

1    Dated:  February 23, 2023                  Respectfully submitted,

2                                               GIBSON, DUNN & CRUTCHER LLP

3
                                               By:    /s/ Eric D. Vandevelde
4                                                         Eric D. Vandevelde

5                                               *Attorneys for Defendants/ Counterclaimants*
                                               *Rimini Street, Inc., and Seth Ravin*
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

RIMINI STREET AND SETH RAVIN'S POST-TRIAL PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW
CASE NO. 2:14-CV-01699-MMD-DJA

Gibson, Dunn &
Crutcher LLP

**LICENSE APPENDIX**

**I.  JDE License Agreements**

There are 146 JDE license agreements held by clients at issue in this case.  Forty-four of those licenses have provisions that specifically relate to access to JDE source code by third parties.  The remaining 102 JDE licenses do not contain such provisions.

**i.  JDE License Agreements With Language Related to Third Party Source Code Access**

Thirty-seven Rimini clients at issue in this case hold a JDE license agreement with the following provisions:

> Derived Software [means] Software programs or modifications to the Software created through the use of a development tool licensed hereunder and developed by Customer, its employees or third party agents (not J.D. Edwards). …

> J.D. Edwards grants to Customer a non-exclusive, non-transferable, perpetual limited license to use the Licensed Products ….

> J.D. Edwards grants to Customer the right to create Derived Software without the consent of J.D. Edwards.  Customer shall own all right, title and interest in any Derived Software except J.D. Edwards shall retain sole ownership of such portions of the Derived Software that contain part or all of the Software. …

> J.D. Edwards agrees that customer may allow its customers, vendors or other entities in a similar relationship to Customer to access the Licensed Products and use the same for the purpose of conducting inquiries and other limited activities so long as Customer can demonstrate the following:
>> (i) none of the aforementioned entities, at any time, has access to J.D. Edwards' source code;
>> (ii) their access is restricted to screen access and to those specific functions they are required to perform;
>> (iii) under no circumstances will they use the Software to operate their own businesses;
>> (iv) the provision of the J.D. Edwards software or services is not the primary purpose, value, performance, or cost of the relationship between Customer and the entity;
>> (v) the entity does not compete with J.D. Edwards;
>> (vi) such access is not a violation of the Article V, Section 11, Export Controls, and
>> (vii) each such user shall be licensed as a Licensed User under this Agreement.

A1

Gibson, Dunn &
Crutcher LLP

The client licenses with this language are:

| | |
|---|---|
| 1.   3M Company | D-04740 |
| 2.   Access Intelligence, LLC | D-04182 |
| 3.   Alps Electric North America | D-04156 |
| 4.   American Golf Corporation | D-04183 |
| 5.   Auckland International Airport Limited | D-04483 |
| 6.   Aurivo Co-operative Society Limited | D-04810 |
| 7.   Cardinal Health, Inc. | D-04267 |
| 8.   CertainTeed Gypsum N. American Services, Inc. | D-04258 |
| 9.   Chiquita Brands L.L.C. | D-04782 |
| 10. City of Rochester Hills | D-04113 |
| 11. East Coast Millworks Distributors, Inc. | D-04468 |
| 12. Elementis Global LLC | D-04469 |
| 13. Equity Office Management L.L.C. | D-04491 |
| 14. Ermenegildo Zegna Co. | D-04195 |
| 15. First Service Networks | D-04243 |
| 16. Gables Residential Trust | D-04194 |
| 17. Hillsborough County Sheriff's Office | D-04153 |
| 18. HL Operating Corporation | D-04151 |
| 19. HNI Corporation | D-04357 |
| 20. HoMedics, Inc. | D-04289 |
| 21. International Paper Company | D-04306 |
| 22. Jackson Energy Authority | D-04231 |
| 23. John Brooks Company Limited | D-04209 |
| 24. Laticrete International, Inc. | D-04215 |
| 25. Liz Claiborne, Inc. | D-04214 |
| 26. Lloyd's Register | D-04472 |
| 27. Logan's Roadhouse, Inc. | D-04896 |
| 28. Master Halco, Inc. | D-04233 |
| 29. Medtronic, Inc. | D-04162 |
| 30. Pfizer, Inc. | D-04395 |
| 31. Reynolds Services Inc. | D-04664 |
| 32. Sealed Air Corporation | D-04809 |
| 33. Springs Global US, Inc. | D-04316 |
| 34. Sugoi Performance Apparel Limited Partnership | D-04355 |
| 35. ThyssenKrupp Elevator Company | D-04112 |
| 36. UCI International, Inc. | D-04807 |
| 37. Weather Shield Manufacturing, Inc. | D-04100 |

Seven Rimini clients at issue in this case hold a JDE license agreement with the following

A2

Gibson, Dunn &
Crutcher LLP

provisions:

> J.D. Edwards grants to Customer a non-exclusive, non-transferable, limited license to use the Software and Documentation on the Customer System(s) for Customer's internal business operations. …

> J.D. Edwards grants to Customer the right to modify the Licensed Products or use any development tools contained In the Licensed Products to create software ('Derived Software'). Such Derived Software is for internal use only and is subject to the terms and conditions of this Agreement. J.D. Edwards shall retain sole ownership of portions of any Software contained in the Derived Software.

> Access to the Software is limited to those categories below who have been licensed as a User (collectively 'Customer Representatives'):
> (i) employees of Customer;
> (ii) Independent contractors engaged by Customer who require access to the Software to perform their tasks; and
> (iii) distributors, vendors, and customers of customer, …

> For any access to the Software other than by an employee of Customer, Customer shall not provide access to source code and all provided access shall be restricted to screen access for the functions required.

> Customer shall not, or cause anyone else to: …
> (iii) copy the Documentation or Software except to the extent necessary for Customer's archival needs and to support the Users. All such copies shall be subject to this Agreement and contain all proprietary legends that appeared on or in the original ….

The client licenses with this language are as follows:

| | | |
|---|---|---|
| 1. | Conestoga Wood Specialties Corporation | D-04185 |
| 2. | Express Scripts Holding Company | D-04393 |
| 3. | Giant Cement Holding, Inc. | D-04080 |
| 4. | Scholastic Inc. | D-04230 |
| 5. | Stockland Development Pty Limited | D-04799 |
| 6. | TBC Corporation | D-04023 |
| 7. | Waterford Wedgwood Japan Ltd. | D-04320 |

### ii.  JDE License Agreements **Without** Language Related to Third Party Source Code Access

Twenty-four Rimini clients at issue in this case hold a JDE license agreement with the following provisions:

> J.D. Edwards grants to Customer … a non-exclusive and non-transferable perpetual limited license to use the Licensed Products. …

A3

Gibson, Dunn &
Crutcher LLP

Customer has the right to modify the Licensed Products without the consent of J.D. Edwards. Modifications to the Licensed Products made by Customer, its employees, or third-party agents (and not made by J.D. Edwards) shall be the property of Customer.

The client licenses with this language are as follows:

| 1. | ACM Technologies, Inc. | D-04175 |
|---|---|---|
| 2. | BJ Services Company | D-04187 |
| 3. | Canson, Inc. | D-04114 |
| 4. | City of Medicine Hat | D-04011 |
| 5. | City of Santa Monica | D-04342 |
| 6. | ConAgra Foods, Inc. | D-04389 |
| 7. | Douglas County, Wisconsin | D-04116 |
| 8. | DRI Companies | D-04467 |
| 9. | Fintube Technologies, Inc. | D-04079 |
| 10. | Hadady Corporation | D-04736 |
| 11. | Ian Martin Group, Inc. | D-04659 |
| 12. | Iroquois Gas Transmission System, L.P. | D-04891 |
| 13. | Kansas City Missouri School District | D-04661 |
| 14. | Milwaukee Electric Tool Corp. | D-04310 |
| 15. | Monadelphous Group Limited | D-04475 |
| 16. | NMTC, Inc. dba Matco Tools | D-04186 |
| 17. | Noritex S.A. | D-04904 |
| 18. | Pitney Bowes | D-04107 |
| 19. | RaceTrac Petroleum, Inc. | D-04476 |
| 20. | Seahawk Drilling, Inc. | D-04255 |
| 21. | ServiceMaster Consumer Services, Inc. | D-04377 |
| 22. | Skyjack, Inc. | D-04225 |
| 23. | TBC Corporation | D-04820 |
| 24. | Team Industrial Services, Inc. | D-04478 |

Seventeen Rimini clients at issue in this case hold a JDE license agreement with the following provisions:

J.D. Edwards … grants to Customer … a non-exclusive and non-transferable perpetual limited license to use … the Licensed Products ….

The client licenses with this language are as follows:

| 1. | Aspen Ski Company | D-04115 |
|---|---|---|
| 2. | BEI Hawaii, LLC | D-04465 |
| 3. | Casella Waste Systems, Inc. | D-04321 |
| 4. | Cerro Flow Products, Inc. | D-04154 |
| 5. | CHS Inc. | D-04466 |
| 6. | City of Overland Park, Kansas | D-04247 |

A4

RIMINI STREET AND SETH RAVIN'S POST-TRIAL PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW
CASE NO. 2:14-CV-01699-MMD-DJA

Gibson, Dunn &
Crutcher LLP

| 7. City of Waukesha | D-04184 |
|---|---|
| 8. CxS Corporation | D-04670 |
| 9. Dean Services, LLC | D-04671 |
| 10. F.A.P.S., Inc. | D-04192 |
| 11. GlaxoSmithKline Services Unlimited | D-04668 |
| 12. JALPAK International America, Inc. | D-04017 |
| 13. K&W Cafeterias, Inc. | D-04109 |
| 14. Libbey Glass, Inc. | D-04367 |
| 15. Lutron Electronics Co., Inc. | D-04370 |
| 16. Milton Hershey School | D-04474 |
| 17. The Ryland Group, Inc. | D-04150 |

Six Rimini clients at issue in this case hold a JDE license agreement containing Oracle's OLSA provisions:

| 1. Baxter Healthcare Corporation | D-04866 |
|---|---|
| 2. Praxair, Inc. | D-04950 |
| 3. Reflexite Corporation | D-04166 |
| 4. Vulcan Information Packaging | D-04932 |
| 5. WM. Bolthouse Farms, Inc. | D-04780 |
| 6. World Vision Canada | D-04386 |

Two Rimini clients at issue in this case hold a JDE license agreement containing Oracle's OMA provisions:

| 1. Hutton Communications Inc. | D-04887 |
|---|---|
| 2. Southern States Cooperative, Inc. | D-04922 |

Five Rimini clients at issue in this case hold a license agreement written by PeopleSoft with provisions applicable to JDE software:

| 1. Federal Signal Corporation | D-04470 |
|---|---|
| 2. Fike Corporation | D-04883 |
| 3. Gullivers Travel Associates | D-04354 |
| 4. Gun Lake Tribal Gaming Authority d/b/a Gun Lake Casino | D-04675 |
| 5. Mannatech, Incorporated | D-04824 |

Seven Rimini clients at issue in this case hold a JDE license agreement with unique provisions, so they cannot be grouped into any of the above categories. But these licenses similarly do not contain language related to third-party access to source code:

A5

RIMINI STREET AND SETH RAVIN'S POST-TRIAL PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW
CASE NO. 2:14-CV-01699-MMD-DJA

Gibson, Dunn &
Crutcher LLP

| 1. | Blockbuster, Inc. | D-04259 |
|----|-------------------|---------|
| 2. | Cemex Central S.A. de C.V. | D-04098 |
| 3. | Marine Power International Pty Ltd | D-04473 |
| 4. | MeadWestvaco Corporation | D-04224 |
| 5. | National Envelope Corporation | D-04213 |
| 6. | Station Casinos, Inc. | D-04279 |
| 7. | USI Corporation | D-04929 |

For many of the Rimini clients at issue that licensed JDE, Oracle did not identify a license. Instead, because Oracle could not locate the specific licenses for these clients, Oracle identified a purported "representative" license belonging to a *different* client. *See* D-2370 at 1; D-12793; D-2370A. Oracle therefore has not identified any license provision in these clients' actual licenses that relates to third party source code access:

| 1. | AGCO Corporation |
|----|-------------------|
| 2. | Argent Management LLC (Suncal) |
| 3. | Artel Video Systems |
| 4. | Australian Agricultural Company Limited |
| 5. | Bluescope Steel Limited |
| 6. | Bulova Corporation |
| 7. | C.R. Bard, Inc. |
| 8. | Cardinal Health Canada |
| 9. | Carico International |
| 10. | Choctaw Nation of Oklahoma |
| 11. | Corporation Uniland, S.A. |
| 12. | Fond Du Lac Reservation Business Committee |
| 13. | Gamakatsu PTE Ltd. |
| 14. | Greer Laboratories, Inc. |
| 15. | Hoover Materials Handling Group, Inc. |
| 16. | JAS Worldwide Management, Inc. |
| 17. | Jones Lang LaSalle Americas, Inc. |
| 18. | Kellogg Brown & Root LLC |
| 19. | King Architectural Metals, Inc. |
| 20. | Koninklijke |
| 21. | Lee Hecht Harrison (SOW No. 3) |
| 22. | Leukemia & Lymphoma Society |
| 23. | Lloyd's Register Group Services Limited |
| 24. | Maquet Cardiovascular LLC |
| 25. | Masco Corporation |
| 26. | MicroPort Orthopedics, Inc. |

A6

Gibson, Dunn &
Crutcher LLP

| | |
|---|---|
| 27. | Miki Pulley Co., LTD |
| 28. | MZ Berger & Company, Inc. |
| 29. | Praxis SARL |
| 30. | RS&I, Inc. |
| 31. | Skellerup Industries Limited |
| 32. | Tanashin Denki Co., Ltd |
| 33. | Toyo Tanso Co., Ltd. |
| 34. | TruGreen Limited Partnership |
| 35. | Tsuchiya Co., Ltd. |
| 36. | TTM Technologies, Inc. |
| 37. | UP Support Services, Inc. |
| 38. | Vivo Energy Investments BV |
| 39. | Washtenaw County, MI |
| 40. | Wellman, Inc. |
| 41. | WWRD US, LLC |

## II. PeopleSoft License Agreements

There are 378 PeopleSoft license agreements held by clients at issue in this case. 183 of those licenses have "facilities" restrictions. The remaining 195 PeopleSoft licenses do not contain such provisions.

### i. PeopleSoft License Agreements <u>With</u> "Facilities" Restrictions

Seventy-eight Rimini clients at issue in this case hold a PeopleSoft license agreement with the following provision:

PeopleSoft grants Licensee and its Affiliates a perpetual, non-exclusive, non-transferable license to use the licensed Software in Licensee's facilities located in the Territory, solely for the internal data processing operations of Licensee and its Affiliates, for the size entity, all as specified in the Schedule(s). Licensee shall use any third party Software products or modules provided by PeopleSoft solely with PeopleSoft Software. Licensee may modify or merge the Software with other software, provided, however, that no modification, however extensive, shall diminish PeopleSoft's title or interest in the Software.

The client licenses with this language are as follows:

| | | |
|---|---|---|
| 1. | American Council on Education | D-04132 |
| 2. | AmeriGas Propane L.P. | D-04157 |
| 3. | Baker Botts L.L.P. | D-04387 |
| 4. | Bausch & Lomb Incorporated | D-04096 |
| 5. | Blue Diamond Growers | D-04009 |
| 6. | BlueCross BlueShield of Tennessee, Inc. | D-04726 |
| 7. | Bright Horizons Childrens Centers LLC | D-04685 |
| 8. | Bright House Networks, LLC | D-04485 |

A7

Gibson, Dunn & Crutcher LLP

| | |
|---|---|
| 9.   Carroll Enterprises, Inc. | D-04136 |
| 10. CC Industries | D-04059 |
| 11. City of Kingston | D-04444 |
| 12. City of Los Angeles, a municipal corporation | D-04711 |
| 13. Commerce Bankshares, Inc | D-04055 |
| 14. Convergys Corporation | D-04158 |
| 15. Cooper Tire & Rubber Company | D-04159 |
| 16. Crowley Maritime Corporation | D-04391 |
| 17. CUB Pty Ltd | D-04487 |
| 18. Dana Limited | D-04012 |
| 19. Dave & Buster's | D-04005 |
| 20. Dobbs Temporary Service d/b/a/ Pro Staff | D-04119 |
| 21. Donatos Pizzeria Corporation | D-04392 |
| 22. Drugstore.com | D-04273 |
| 23. E D & F Man Limited | D-04451 |
| 24. EmblemHealth Services Company, LLC | D-04422 |
| 25. Empire District Electric | D-04058 |
| 26. Fireman's Fund Insurance Co. (Allianz) | D-04038 |
| 27. Fujitsu America, Inc. | D-04759 |
| 28. Future Farmers of America Incorporated (FFA) | D-04142 |
| 29. Guest Services, Inc. | D-04304 |
| 30. Hastings Entertainment | D-04081 |
| 31. HGST, Inc. | D-04459 |
| 32. Hinda Inc. | D-04785 |
| 33. Hitchiner Manufacturing Company, Inc. | D-04323 |
| 34. HNI Corporation | D-04356 |
| 35. Informatica Corporation | D-04015 |
| 36. ING North America Insurance Corporation | D-04133 |
| 37. Internal Revenue Service | D-04360 |
| 38. Intrepid USA Inc | D-04946 |
| 39. J Jill Group, Inc. | P-06832 |
| 40. Jacobs Technology, Inc. | D-04493 |
| 41. Jostens, Inc. | D-04363 |
| 42. Kaweah Delta Heath Care District | D-04285 |
| 43. Kichler Lighting | D-04219 |
| 44. King County Public Hospital District No. 2 d/b/a EvergreenHealth | D-04457 |
| 45. Matheson Trucking, Inc. | D-04144 |
| 46. Medtronic, Inc. | D-04162 |
| 47. Mosaic | D-04097 |

Gibson, Dunn &
Crutcher LLP

| | |
|---|---|
| 48. National Grid USA Service Company, Inc. | D-04122 |
| 49. NEC Corporation of America | D-04257 |
| 50. NetApp, Inc. | D-04796 |
| 51. Oklahoma Publishing Company | D-04022 |
| 52. Organic, Inc. | D-04371 |
| 53. Overwaitea Food Group LP | D-04052 |
| 54. Pfizer, Inc. | D-04394 |
| 55. Piggly Wiggly Carolina Company, Inc. | D-04130 |
| 56. QuadraMed Affinity Corporation | D-04141 |
| 57. Ricoh Electronics, Inc. | D-04312 |
| 58. Rio Tinto Canada Management, Inc. | D-04494 |
| 59. Sager Electrical Supply District | D-04283 |
| 60. Saginaw Chippewa Indian Tribe of Michigan | D-04376 |
| 61. Scholastic Inc. | D-04227 |
| 62. SGS Tool Company | D-04378 |
| 63. Spartan Staffing, LLC | D-04837 |
| 64. Spokane County Washington | D-04021 |
| 65. SPX Corporation | D-04463 |
| 66. SRI International | D-04544 |
| 67. St. Luke's Cornwall Hospital | D-04190 |
| 68. St. Luke's Hospital | D-04140 |
| 69. Steak n Shake Company | D-04235 |
| 70. Talisman Energy, Inc. | D-04317 |
| 71. The Regional Municipality of York | D-04435 |
| 72. The Standard Register Company | D-04325 |
| 73. The Talbots Inc. | D-04250 |
| 74. Visiting Nurse Service of New York | D-04778 |
| 75. Whole Foods Market Services, Inc. | D-04385 |
| 76. Winn-Dixie Stories, Inc. | D-04031 |
| 77. Wisconsin Physicians Service Insurance Corporation | D-04779 |
| 78. Young America Corporation | D-04124 |

Fifty-three Rimini clients at issue in this case hold a PeopleSoft license agreement with the following provision:

> PeopleSoft grants Licensee a nonexclusive, nontransferable license to make and run copies of the Software for access by Licensee and Designates for Licensee's internal data processing operations …. at facilities owned or leased by Licensee …. PeopleSoft grants Licensee a nonexclusive, nontransferable license to: (i) modify or merge the Software with other software, and use such modified or merged software; and (ii) to make copies of and modify the Documentation and use such modified documentation; in accordance with the terms of this Agreement.  No modification or merger of the Software with other software

A9

RIMINI STREET AND SETH RAVIN'S POST-TRIAL PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW
CASE NO. 2:14-CV-01699-MMD-DJA

or modification of the Documentation, however extensive, shall diminish PeopleSoft's or its licensors' right, title or interest in the Software and Documentation.  This license does not permit the use of the Software for creation of new modules or products.

The client licenses with this language are as follows:

| | | |
|---|---|---|
| 1. | Abilene ISD | D-04064 |
| 2. | Advance Stores Company, Incorporated | D-04860 |
| 3. | AGL Energy Limited | D-04481 |
| 4. | Agri Beef Co. | D-04437 |
| 5. | Amarillo Independent School District | D-04690 |
| 6. | AMN Healthcare, Inc. | D-04438 |
| 7. | Barnes & Noble Booksellers, Inc. | D-04722 |
| 8. | Belvedere International Inc. | D-04181 |
| 9. | Birdville Independent School District | D-04065 |
| 10. | Blue Cross and Blue Shield of Kansas City | D-04040 |
| 11. | Burswood Nominees Limited | D-04730 |
| 12. | California Physicians Service d/b/a Blue Shield of California | D-04486 |
| 13. | Circle K Stores, Inc. | D-04696 |
| 14. | Clear Channel Management Services LP | D-04061 |
| 15. | CRC Services, LLC | D-4877 |
| 16. | DecoPac | D-04073 |
| 17. | Deutsche Post IT Services GmbH | D-04094 |
| 18. | Dot Foods, Inc. | D-04299 |
| 19. | Dynamics Research Corporation | D-04179 |
| 20. | Easter Seals New Hampshire, Inc. | D-04197 |
| 21. | Educate, Inc. (Sylvan Learning Center) | D-04286 |
| 22. | Future Electronics Inc. | D-04424 |
| 23. | Genesis HealthCare Corp | D-04053 |
| 24. | Heald College | D-04082 |
| 25. | Health Shared Services BC | D-04176 |
| 26. | Hickory Tech Corporation | D-04083 |
| 27. | Hudson Global Resources Management, Inc. | D-04358 |
| 28. | Infogix, Inc. | D-04359 |
| 29. | ISG Information Services Group Americas, Inc. | D-04852 |
| 30. | Journal Communications, Inc. | D-04428 |
| 31. | La Madeleine de Corps, Inc. | D-04123 |
| 32. | Legg Mason & Co., LLC | D-04366 |
| 33. | Lucas County, OH | D-04236 |
| 34. | Maricopa County, Arizona | D-04252 |
| 35. | Markel Corporation | D-04024 |

A10

Gibson, Dunn & Crutcher LLP

| | |
|---|---|
| 36. MasterBrand Cabinets, Inc. | D-04429 |
| 37. Medtron Software Intelligence | D-04088 |
| 38. Meskwaki Bingo Casino Hotel | D-04146 |
| 39. Oakland County Michigan | D-04218 |
| 40. Okuma America Corporation | D-04277 |
| 41. Petroleum Geo Services ASA | D-04062 |
| 42. Pinnacle Health Systems | D-04278 |
| 43. PLATO Learning, Inc. | D-04167 |
| 44. QVC, Inc. | D-04462 |
| 45. Santa Clara Valley Water District | D-04855 |
| 46. Sears Canada Inc. | D-04313 |
| 47. St. Joseph Health System | D-04379 |
| 48. The Longaberger Company | D-04327 |
| 49. Toll Bros., Inc. | D-04383 |
| 50. Veolia Energy | D-04464 |
| 51. Veolia Environmental Services North America LLC | D-04464 |
| 52. Visteon Corporation | D-04030 |
| 53. Yum Restaurant Services Group, Inc. | D-04108 |

Thirty-three Rimini clients at issue in this case hold a PeopleSoft license agreement with the following provisions:

PeopleSoft grants Licensee a perpetual, non-exclusive, non-transferable license to use the licensed Software, solely for Licensee's internal data processing operations at its facilities ….

Licensee may: …
b.  make a reasonable number of copies of the Software, solely for: (i) use in accordance with the terms set forth herein in the Territory for the size of the entity specified in the applicable Schedule; (ii) archive or emergency back-up purposes; and/or (iii) disaster recovery testing purposes; and
c.   modify or merge the Software with other software, with the understanding that any modifications, however extensive, shall not diminish PeopleSoft's title or interest in the Software.

The client licenses with this language are as follows:

| | |
|---|---|
| 1.   Allied Systems Holdings, Inc. | D-04271 |
| 2.   Apollo Group, Inc. | D-04439 |
| 3.   Bd of Water Works Trustees of the City of Des Moines, IA | D-04249 |
| 4.   California Public Employees' Retirement System | D-04939 |
| 5.   Capital District Health Authority | D-04265 |
| 6.   City of Boise, ID | D-04067 |
| 7.   City of Des Moines IA | D-04068 |

A11

Gibson, Dunn & Crutcher LLP

| | |
|---|---|
| 8.   City of Eugene, OR | D-04069 |
| 9.   City of Flint MI | D-04010 |
| 10.  City of Fresno | D-04297 |
| 11.  City of Ontario, CA | D-04071 |
| 12.  City of Overland Park, Kansas | D-04246 |
| 13.  Conseillers En Gestion Et Informatique CGI, Inc. | D-04450 |
| 14.  County of Kent, Michigan | D-04049 |
| 15.  Detroit Public Schools, Div of Info Tech | D-04178 |
| 16.  Dynegy Administrative Services Company | D-04345 |
| 17.  Fairchild Semiconductor Corp. | D-04013 |
| 18.  Frederick County IIT | D-04198 |
| 19.  Harte-Hanks, Response Management/Austin, Inc. | D-04228 |
| 20.  London Drug Limited | D-04307 |
| 21.  Louisville/Jefferson County Metro Government | D-04274 |
| 22.  Lower Colorado River Authority (LCRA) | D-04275 |
| 23.  Mashantucket Pequot Gaming Enterprise d/b/a Foxwood Resort Casino | D-04324 |
| 24.  McLennan County Texas | D-04054 |
| 25.  Municipal Employees Retirement System | D-04126 |
| 26.  Municipality of Anchorage, Alaska | D-04025 |
| 27.  Ontario Gaming and Lottery (CAD) | D-04090 |
| 28.  Principal Life Insurance Company | D-04952 |
| 29.  Rochester City School District | D-04276 |
| 30.  Shawnee Mission School District | D-04127 |
| 31.  The Aldo Group | D-04326 |
| 32.  UNICOM Government, Inc. | D-04495 |
| 33.  Williams Information Technology, Inc. | D-04936 |

Twelve Rimini clients at issue in this case hold a PeopleSoft license agreement with the following provisions:

PeopleSoft grants Licensee a perpetual and irrevocable …, nonexclusive, nontransferable license to make and run copies of the Software … for access by Employees and Designates on one or more servers and/or workstations located at facilities owned or leased by Licensee or Licensee's outsourcer, in the Territory, for the size entity, and number of Users and Employees, all as specified in the Schedule(s)….

PeopleSoft also grants Licensee a perpetual …, nonexclusive, nontransferable license to modify the Software only to extend the specific functionality of the Software module being modified …. Licensee may also merge the Software with other software. No modification or merger of the Software with other software, however extensive, shall diminish PeopleSoft's or its licensors' right, title or interest in the Software. This license does not permit the creation of new modules or products.

A12

RIMINI STREET AND SETH RAVIN'S POST-TRIAL PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW
CASE NO. 2:14-CV-01699-MMD-DJA

Gibson, Dunn & Crutcher LLP

The client licenses with this language are as follows:

| | | |
|---|---|---|
| 1. | Brandeis University | D-04338 |
| 2. | Canadian Tolling Company International Inc. | D-04443 |
| 3. | Capital One Services, LLC | D-04869 |
| 4. | EP Energy E&P Company, L.P. | D-04404 |
| 5. | Equity Office Management L.L.C. | D-04447 |
| 6. | Grays Harbor PUD | D-04303 |
| 7. | IMS Health Incorporated | D-04739 |
| 8. | Knoxville Utility Board | D-04084 |
| 9. | Liz Claiborne, Inc. | D-04212 |
| 10. | Owens Corning Sales LLC | D-04372 |
| 11. | PDI, Inc. | D-04125 |
| 12. | School District of Pittsburg, PA | D-04091 |

Seven Rimini clients at issue in this case hold a PeopleSoft license agreement with the following provision:

> PeopleSoft grants Licensee a nonexclusive, nontransferable license to make and run copies of the Software for access by Licensee and Designates on one or more servers and/or workstations located at facilities owned or leased by Licensee …. PeopleSoft grants Licensee a nonexclusive, nontransferable license to: (i) modify or merge the Software with other software, and use such modified or merged software; and (ii) to modify the Documentation and use such modified documentation; in accordance with the terms of this Agreement.  No modification or merger of the Software with other software or modification of the Documentation, however extensive, shall diminish PeopleSoft's or its licensors' right, title or interest in the Software and Documentation.  This license does not permit the use of the Software for creation of new modules or products.

The client licenses with this language are as follows:

| | | |
|---|---|---|
| 1. | City of Huntsville, AL | D-04043 |
| 2. | Express Scripts Holding Company | D-04348 |
| 3. | Harkins Builders, Inc. | D-04245 |
| 4. | Learning Tree International, Inc. | D-04894 |
| 5. | Pillsbury Winthrop Shaw Pittman, LLP | D-04020 |
| 6. | Ross Stores | D-04037 |
| 7. | Summit Technology, Inc (Shands Healthcare) | D-04026 |

### ii.  PeopleSoft License Agreements **Without** "Facilities" Restrictions

Seventy-nine Rimini clients at issue in this case hold a PeopleSoft license agreement with the following provisions:

A13

Gibson, Dunn & Crutcher LLP

1

PeopleSoft grants Licensee a perpetual, non-exclusive, non-transferable license to use the licensed Software, solely for Licensee's internal data processing operations ….

2

Licensee may: …

3
    b. make a reasonable number of copies of the Software, solely for: (i) use in accordance with the terms set forth herein in the Country (Countries) specified in the applicable Schedule; (ii) archive or emergency back-up purposes; and/or (iii) disaster recovery testing purposes; and

4

5
    c. modify or merge the Software with other software, with the understanding that any modifications, however extensive, shall not diminish PeopleSoft's title or interest in the Software.

6

7

The client licenses with this language are as follows:

8

| | | |
|---|---|---|
| 1. | A. O. Smith Corporation | D-04006 |
| 2. | A.H. Belo Management Services, Inc. | D-04448 |
| 3. | Ace Parking Management, Inc. | D-04007 |
| 4. | Acushnet Company | D-04008 |
| 5. | Acushnet Company | D-04008 |
| 6. | Adventist HealthCare | D-04808 |
| 7. | Alex Lee, Inc. | D-04294 |
| 8. | Allianz of America Corporation | D-04042 |
| 9. | American Electric Power Service Corporation | D-04335 |
| 10. | AS America, Inc. | D-04207 |
| 11. | Asciano Limited | D-04441 |
| 12. | Avery Dennison Corporation | D-04415 |
| 13. | Battelle Memorial Institute | D-04417 |
| 14. | BBU, Inc. | D-04484 |
| 15. | Bell Aliant Regional Communications, Ltd Partership | D-04295 |
| 16. | Bemis Company, Inc. | D-04442 |
| 17. | Big Lots Stores, Inc. | D-04032 |
| 18. | BJ's Wholesale Club, Inc. | D-04296 |
| 19. | Bose Corporation | D-04388 |
| 20. | Brazoria County, Texas | D-04066 |
| 21. | Brazoria County, TX | D-04066 |
| 22. | Campbell Soup Company | D-04339 |
| 23. | CCH Incorporated | D-04121 |
| 24. | Choice Hotels International Services Corp | D-04340 |
| 25. | City of Costa Mesa, CA | D-04341 |
| 26. | City of Santa Monica | D-04343 |
| 27. | City of Tallahassee | D-04298 |
| 28. | City Utilities of Springfield, Missouri | D-04072 |
| 29. | CKE Restaurants, Inc | D-04033 |

A14

Gibson, Dunn & Crutcher LLP

| | |
|---|---|
| 30. Clean Harbors Environmental Services, Inc. | D-04419 |
| 31. Cleco Corporation | D-04344 |
| 32. Community Development Commission of the County of Los Angeles | D-04406 |
| 33. ConAgra Foods, Inc. | D-04044 |
| 34. Cornell University | D-04189 |
| 35. Cowlitz County Washington | D-04045 |
| 36. Crain Communications, Inc. | D-04421 |
| 37. Cross Country Healthcare, Inc. | D-04390 |
| 38. Crown Equipment Corporation | D-04698 |
| 39. Dick's Sporting Goods, Inc. | D-04074 |
| 40. East Bay Municipal Utility District | D-04046 |
| 41. Entergy Services, Inc. | D-04347 |
| 42. Factory Mutual Insurance Company | D-04117 |
| 43. Federated Services Company | D-04047 |
| 44. General Dynamics Ordnance and Tactical Systems, Inc. | D-04761 |
| 45. Genesis HealthCare Systems | D-04034 |
| 46. Giant Eagle, Inc. | D-04350 |
| 47. Green Mountain Coffee Roasters, Inc. | D-04351 |
| 48. Harry & David Operations, Inc. | D-04260 |
| 49. Health Care Service Corporation | D-04754 |
| 50. Herff Jones, LLC | D-04427 |
| 51. HRB Tax Group, Inc. | D-04253 |
| 52. J. B. Hunt Transport, Inc. | D-04028 |
| 53. Johnson Controls, Inc. | D-04361 |
| 54. Jones Lang LaSalle Americas, Inc. | D-04002 |
| 55. Lydall, Inc. | D-04308 |
| 56. McKesson Corporation | D-04835 |
| 57. Media General, Inc. | D-04309 |
| 58. Metro Vancouver | D-04041 |
| 59. Novell, Inc. | D-04203 |
| 60. Olin Corporation | D-04051 |
| 61. Osmose, Inc. | D-04431 |
| 62. Rain Bird Corporation | D-04129 |
| 63. Raley's | D-04311 |
| 64. Saint Francis Hospital and Medical Center | D-04787 |
| 65. Schoenecker, Inc. | D-04131 |
| 66. Security Benefit Corporation | D-04216 |
| 67. Simon Property Group LP | D-04027 |
| 68. Snelling Holdings, LLC | D-04315 |
| 69. Sphereon Corporation | D-04217 |

A15

Gibson, Dunn &
Crutcher LLP

| | |
|---|---|
| 70. The American Dental Association | D-04405 |
| 71. The Board of Regents of the University of Oklahoma | P-07270 |
| 72. The Corporation of the City of Windsor | D-04322 |
| 73. The Marketing Store Worldwide, L.P. | D-04381 |
| 74. The New York Times Company | D-04318 |
| 75. The Northern Trust Company | D-04802 |
| 76. The Smead Manufacturing Company | D-04397 |
| 77. Union Pacific Railroad Company | D-04222 |
| 78. Weyerhauser Company NR | D-04099 |
| 79. YRC Worldwide Technologies | D-04248 |

Twelve Rimini clients at issue in this case hold a PeopleSoft license agreement with the following provisions:

PeopleSoft … agrees to grant … a non-exclusive, non-transferable, and perpetual license for internal use only ….

Licensee may use and may make modifications to those portions of the HRMS Product which are supplied in source form.

The client licenses with this language are as follows:

| | |
|---|---|
| 1. Alcon Laboratories, Inc. | D-04057 |
| 2. City of Glendale, a municipal corporation | D-04418 |
| 3. Crown Melbourne Limited | D-04816 |
| 4. Dofasco (CAD) | D-04075 |
| 5. Enbridge Inc. | D-04743 |
| 6. Inter-American Development Bank | D-04139 |
| 7. Kansas City Board of Public Utilities | D-04291 |
| 8. Lifeway Christian Resources | D-04282 |
| 9. Nexen Energy ULC | D-04460 |
| 10. Virginia Farm Bureau | D-04092 |
| 11. VITAS Hospice Services, L.L.C. | D-04093 |
| 12. WorkSafeBC | D-04436 |

Eleven Rimini clients at issue in this case hold a PeopleSoft license agreement containing Oracle's OLSA provisions:

| | |
|---|---|
| 1. Bandai America Incorporated | D-04416 |
| 2. MaineGeneral Health | D-04161 |
| 3. New Jersey Manufacturers Insurance Company | D-04903 |
| 4. OSF Healthcare System | D-04906 |
| 5. Payless ShoeSource Worldwide, Inc. | D-04909 |

A16

Gibson, Dunn & Crutcher LLP

| | | |
|---|---|---|
| 6. | PETCO Animal Supplies Stores, Inc. | D-04263 |
| 7. | PNMR Services Company | D-04373 |
| 8. | Shaner Hotel Group Limited Partnership | D-04920 |
| 9. | Surgical Eye Care Affiliates, LLC | D-04102 |
| 10. | The Susan G. Komen Breast Cancer Foundation, Inc. | D-04953 |
| 11. | Virginia Farm Bureau | D-04848 |

Five Rimini clients at issue in this case hold a PeopleSoft license agreement containing Oracle's OMA provisions:

| | | |
|---|---|---|
| 1. | Assistance Services | D-4972 |
| 2. | Rogers Corporation | D-04917 |
| 3. | Saint Elizabeth Health Care | D-04918 |
| 4. | Stefanini, Inc. | D-04923 |
| 5. | The University of British Columbia | D-04957 |

Two Rimini clients at issue in this case hold a PeopleSoft license agreement containing Oracle's SLSA provisions:

| | | |
|---|---|---|
| 1. | AT&T (The Limited Stores, Inc) | D-04234 |
| 2. | Meritor, Inc. | D-04947 |

Eleven Rimini clients at issue in this case hold a PeopleSoft license agreement with unique provisions, so they cannot be grouped into any of the above categories. But these licenses similarly do not contain a "facilities" restriction:

| | | |
|---|---|---|
| 1. | 3M Company | D-04334 |
| 2. | Alberta Health Services | D-04689 |
| 3. | Aon Services Pty Ltd | D-04449 |
| 4. | El Camino Hospital | D-04244 |
| 5. | Express LLC | D-04145 |
| 6. | NCR Corporation | D-04430 |
| 7. | Recall Corporation | D-04854 |
| 8. | Sears, Roebuck and Co. and Kmart Holding Corporation | D-04919 |
| 9. | Societe Internationale de Telecommunications Aeronautiques S.C. (SITA) | D-04963 |
| 10. | Sonoco Products Company | D-04772 |
| 11. | Suncor Energy Services Inc. | D-04237 |

Gibson, Dunn & Crutcher LLP

For many of the Rimini clients at issue that licensed PeopleSoft, Oracle did not identify a license.  Instead, because Oracle could not locate the specific licenses for these clients, Oracle identified a purported "representative" license belonging to a *different* client.  *See* D-2370 at 1; D-12793; D-2370A.  Oracle therefore has not identified any "facilities" provision in the actual licenses for any of these clients:

| | |
|---|---|
| 1. | Advance Central Services, Inc. |
| 2. | Alcatel-Lucent, Compagnie Financiere |
| 3. | Amedisys Holding, L.L.C. |
| 4. | American Century Services, LLC |
| 5. | American Commerical Lines LLC |
| 6. | American Solutions for Business |
| 7. | AMICA Mutual Insurance Companies |
| 8. | Aucnet Inc. |
| 9. | Berlin Packaging L.L.C. |
| 10. | Bridgestone Bandag, LLC |
| 11. | C.R. Bard, Inc. |
| 12. | CareTech Solutions, Inc. |
| 13. | Charles River Laboratories International, Inc. |
| 14. | Comporium, Inc. |
| 15. | Conde Nast Publications Inc. |
| 16. | Construtora Norberto Odebrecht S.A. |
| 17. | Cytec Industries Inc. |
| 18. | DCP Midstream Partners, LP |
| 19. | DMD Data Systems, Inc. (Lexington Fayette Urban Co. Gov't) |
| 20. | ECMC Group, Inc. |
| 21. | EE Limited |
| 22. | Elkay Manufacturing Company |
| 23. | Ensco International Incorporated |
| 24. | Ensco International Incorporated |
| 25. | EZPAWN, L.P. |
| 26. | First Solar, Inc. |
| 27. | First West Credit Union |
| 28. | Frederick County, Maryland |
| 29. | Fuji Xerox Co., Ltd. |
| 30. | Fundamental Administrative Services |
| 31. | Gregg Appliances, Inc. |
| 32. | Her Majesty in Right of Newfoundland and Labrador |

RIMINI STREET AND SETH RAVIN'S POST-TRIAL PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW
CASE NO. 2:14-CV-01699-MMD-DJA

Gibson, Dunn &
Crutcher LLP

| |
|---|
| 33. HM Operating, Inc. |
| 34. Interpark Holdings |
| 35. Louisiana Community & Technical College System |
| 36. Lutron Electronics Co., Inc. |
| 37. McKesson Corporation |
| 38. Mesa, Arizona City of |
| 39. MESSA |
| 40. New York State Urban Development Corp |
| 41. Open Universities Australia Pty Ltd |
| 42. Orange S.A. |
| 43. Oriental Bank |
| 44. Petco Animal Supplies Inc. |
| 45. Powerwave Technologies, Inc. |
| 46. Regus Group |
| 47. Richardson Electronics, Ltd. |
| 48. River Rock Casino |
| 49. Rock-Tenn Shared Service, LLC |
| 50. Siemens Medical Solutions USA, Inc. |
| 51. Suburban Propane, L.P. |
| 52. Summit Technology, Inc (Children's Health System) |
| 53. Summit Technology, Inc (Linc Facility Services) |
| 54. Symcor Inc. |
| 55. TAKKT America Holding, Inc. |
| 56. Tarion Warranty Corporation |
| 57. Teradata Operations, Inc. |
| 58. Tervita Corporation |
| 59. The Navigators |
| 60. The Regents of the University of Oklahoma |
| 61. The Regional Municipality of Peel |
| 62. The Select Family of Staffing Companies |
| 63. The Star Tribune Company |
| 64. Toyota Canada Inc. |
| 65. Toyota Motor Manufacturing & Engineering North America, Inc. |
| 66. Toys "R" Us - Delaware, Inc. |
| 67. Tribune Company |
| 68. Tropical Shipping USA, LLC |
| 69. U.S. Steel Canada Inc. |
| 70. United Space Alliance, LLC |
| 71. Unum Group |

A19

Gibson, Dunn & Crutcher LLP

| |
|---|
| 72.  USEC Inc. |
| 73.  Vanderbilt University |
| 74.  WEC Business Services LLC |
| 75.  WEX Inc. |

A20

Gibson, Dunn &
Crutcher LLP