UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

ORACLE INTERNATIONAL
CORPORATION, *et al.*,

                    Plaintiffs,

      v.

RIMINI STREET, INC., *et al.*,

                    Defendants.

Case No. 2:14-cv-01699-MMD-DJA

BENCH ORDER

## I.   SUMMARY

This is a software copyright and unfair competition dispute between Plaintiffs and Counter Defendants Oracle America, Inc., and Oracle International Corporation (collectively, "Oracle") and Defendants and Counter Claimants Rimini Street, Inc., and Seth Ravin (collectively "Rimini") generally regarding Rimini's unauthorized copying of Oracle's enterprise software into and from development environments created by Rimini for its clients. (ECF Nos. 1253 at 2, 1305 at 12-13.) The Court presided over a bench trial. (ECF Nos. 1469, 1471, 1472, 1473, 1474, 1475, 1478, 1483, 1488, 1489, 1491, 1494.) These findings of fact and conclusions of law follow.

To preview, while there is some nuance further explained below, the Court finds Rimini infringed Oracle's copyrights as to PeopleSoft and Database, but not E-Business Suite or J.D. Edwards. But Rimini is only entitled to a declaration of non-infringement as to E-Business Suite. Rimini's remaining claim under the California Unfair Competition Law fails. Oracle also prevails on its claims under the Digital Millenium Copyright Act and the Lanham Act. The Court concurrently enters a permanent injunction tailored to the Court's findings herein. The permanent injunction imposes mandatory requirements on Rimini.

///

**II.     PROCEDURAL HISTORY**

United States District Judge Larry R. Hicks presided over this case for approximately its first eight years. As the Court has noted in several orders since taking over this case, the Court treats—as it must—Judge Hicks' prior rulings as law of the case. Moreover, both Judge Hicks' pretrial rulings and various rulings the Court made before, during, and after trial constrain—or at least contextualize—the Court's findings of fact and conclusions of law provided below. The Court accordingly first describes the pertinent procedural history of this case, focusing on key rulings. In gist, and despite some of the parties' arguments at trial, much was already decided before the trial even began.

Moreover, this is the second, similar case between Oracle and Rimini. *See Oracle USA, Inc., et al. v. Rimini Street, Inc.*, Case No. 2:10-cv-00106-LRH-VCF (D. Nev. Filed Jan. 25, 2010) ("*Oracle I*"). Judge Hicks also presided over—and continues to preside over—*Oracle I*. As of the date of entry of this order, the posture of *Oracle I* is that the United States Court of Appeals for the Ninth Circuit is presiding over—but has not yet issued an opinion in—an appeal of a contempt order Judge Hicks issued, finding Rimini violated the operative permanent injunction he had issued in that case ("Permanent Injunction") in a few specific ways. To distinguish from *Oracle I*, the Court refers to this case using the shorthand *Oracle II*.

**A.     The Summary Judgment Order**

Perhaps most notably, Judge Hicks has already adjudicated significant components of this case at summary judgment. (ECF No. 1253 ("September 2020 Order").) He granted partial summary judgment to Oracle on many of Rimini's claims and some of Oracle's claims, leaving only specific claims predicated on specific theories for trial. He did not grant summary judgment to Rimini on any of its claims. The Court now briefly describes some of Judge Hicks' summary judgment rulings, roughly in the order he made them.

///

Judge Hicks first granted summary judgment to Oracle on several of Rimini's claims. Specifically, he granted summary judgment to Oracle on Rimini's claims under the Computer Fraud and Abuse Act, along with its California and Nevada state analogues. (*Id.* at 9-13.) Judge Hicks found that Oracle may terminate the access of anyone using Oracle's support website at any time, further finding that Rimini is not allowed to access Oracle's support website when Oracle has expressly forbidden it from doing so. (*Id.*) Judge Hicks next granted Oracle summary judgment on Rimini's claim for intentional interference with contractual relations to the extent that claim is premised on Oracle sending a cease and desist letter to Rimini telling Rimini to stop downloading any content from Oracle's website—finding that Oracle's sending of the letter is protected under the absolute right doctrine. (*Id.* at 13-17.) He similarly granted Oracle summary judgment on Rimini's claim under Ca. Bus. & Prof. Code § 17200 ("UCL") based on the same conduct (sending the cease and desist letter). (*Id.* at 17-20.) Judge Hicks again reasoned that Oracle had an absolute right to send the cease and desist letter, so sending it was not unfair, nor was sending the letter unlawful because he had either previously dismissed (ECF No. 633) all of Rimini's claims for violations of particular laws, or granted summary judgment to Oracle on them in the summary judgment order.

In the next portion of his order, Judge Hicks granted summary judgment to Oracle on Oracle's copyright infringement claim based on Rimini violating the 'facilities restriction' of 47 specified PeopleSoft licenses. (*Id.* at 21-31.) Judge Hicks correspondingly granted summary judgment to Oracle on Rimini's express and implied license defenses to this claim based on this theory. (*Id.*) Judge Hicks also specifically rejected Rimini's argument that Oracle had to individually establish infringement for each of the 47 licenses because Rimini did not demonstrate how any of them differed. (*Id.*) However, later in the order, Judge Hicks granted summary judgment to Oracle on what is essentially Rimini's counterclaim to Oracle's copyright infringement allegations—a claim for declaratory relief that its Process 2.0 does not infringe Oracle's copyrights—but only as to four copyrights

1  specifically discussed in the order. (*Id.* at 65-66.) The four specific copyrights cover
2  elements or versions of the PeopleSoft product. (*Id.*) But Judge Hicks noted, "[a]s Rimini's
3  Third Amended Complaint specifies that it seeks declaratory rulings on each of Oracle's
4  software copyrights as identified, dated, and numbered, the Court's summary judgment
5  ruling for Oracle is limited to the four at issue copyrights." (*Id.* at 66.) In sum, Judge Hicks
6  found that Rimini violated Oracle's copyrights when it violated the facilities restriction in
7  47 PeopleSoft licenses, and found Rimini's Process 2.0 infringing as to four specific
8  copyrights covering aspects of the PeopleSoft product.

9  Judge Hicks then addressed more of Rimini's affirmative defenses. (*Id.* at 31-38.)
10  He denied Oracle's motion as to Rimini's statute of limitations defense, finding genuine
11  disputes of material fact as to when Oracle should have investigated whether Rimini was
12  infringing once Oracle learned Rimini had begun offering support for Oracle's E-Business
13  Suite software, and what Oracle knew or should have known about any infringement
14  before February 17, 2012. (*Id.* at 31-34.) However, Judge Hicks granted Oracle summary
15  judgment on Rimini's affirmative defenses of laches, equitable estoppel,
16  abandonment/waiver, and unclean hands as to Oracle's copyright infringement claim. (*Id.*
17  at 34-38.)

18  In the next portion of the order, Judge Hicks turned back to Oracle's copyright
19  infringement claim, granting Oracle summary judgment that Rimini infringed Oracle's
20  copyright when it made RAM copies of PeopleSoft in the course of creating updates for
21  Rimini's client Campbell Soup. (*Id.* at 39-48.) Judge Hicks made this finding first because
22  Rimini developed the update in Campbell Soup's environment even though Campbell
23  Soup did not want or need it, accordingly violating the 'internal use' restriction in the
24  license. (*Id.*) Judge Hicks further found Rimini also infringed Oracle's copyright by taking
25  the update it developed in Campbell Soup's environment and giving it to another client,
26  Toll Brothers. (*Id.*) Judge Hicks similarly, and additionally, found Rimini violated Oracle's
27  copyright when it developed an update in Rimini client the City of Eugene's PeopleSoft

28

4

environment and then gave that update outright to three other clients: Easter Seals New Hampshire, Inc., Shawnee Mission Schools, and the City of Glendale. (*Id.* at 49-63.) As to these instances of copyright infringement, Judge Hicks also specifically rejected Rimini's express license and fair use defenses. (*Id.*)

In contrast, Judge Hicks denied Oracle's summary judgment as to its claim that Rimini infringed Oracle's copyrights by using its Rimini-developed Automated Framework Tools because those tools constitute impermissible cross-use. (*Id.* at 63-65.) Judge Hicks found issues of material fact as to whether AFW Tools *per se* constitute copyright infringement and whether Rimini copies Oracle's protected expression through use of a 'diff' file. (*Id.*)

Judge Hicks then returned to some of Rimini's claims.[1] Judge Hicks granted summary judgment to Oracle on Rimini's claim for intentional interference with contractual relations to the extent based on Rimini's theories Judge Hicks had not already addressed—specifically that Oracle made misrepresentations to Rimini's clients regarding the legality of Rimini's services and that Oracle engaged in selective audits of Rimini's clients to harass them and drive them away from Rimini's services. (*Id.* at 66-71.) Judge Hicks also granted summary judgment to Oracle—based on extraterritoriality—on Rimini's claim for violation of the Nevada Deceptive Trade Practices Act. (*Id.* at 71-73.) But Judge Hicks permitted Rimini to proceed to trial—for injunctive relief only—on Rimini's UCL claim because Oracle did not discuss it the pertinent section of its briefing.[2] (*Id.* at 73-74.)

///

---

[1]The Court already summarized Judge Hicks' ruling as to Rimini's declaratory relief claim that its Process 2.0 does not infringe Oracle's copyrights *supra*.

[2]But to reiterate, Judge Hicks granted Oracle summary judgment on Rimini's claim under the UCL based on Oracle sending a cease and desist letter telling Rimini it could not download materials from Oracle's website anymore. (*Id.* at 17-20.) Thus, Oracle has already prevailed on this claim to the extent based on this particular theory.

1    Judge Hicks next addressed Oracle's motion as it relates to Rimini's decision to

2    migrate client development environments previously hosted on Rimini's systems to its

3    clients' systems, where some of the development environments were then hosted on a

4    third-party cloud-hosting service called Windstream, infringed Oracle's copyrights. (*Id.* at

5    74-75.) Judge Hicks denied summary judgment because Oracle did not address Rimini's

6    fair use defense until its reply. (*Id.*)

7    Judge Hicks then moved back to Rimini's motions for summary judgment, denying

8    five of them.[3] Judge Hicks denied Rimini's motion seeking a declaration that files it

9    creates, which do not contain any Oracle code or expression, cannot infringe Oracle's

10   copyrights. (*Id.* at 82-84.) He noted that "even if the software does not contain any

11   copyrighted code, it may still substantially incorporate protected material from the

12   preexisting work." (*Id.* at 83.) As to Rimini's ePack script, which installs Rimini-created

13   updates on client systems for them (*id.* at 83), Judge Hicks found a genuine dispute of

14   material fact precluded summary judgment because the parties' experts disagreed as to

15   whether the ePack scripts substantially incorporated protected material from Oracle's

16   preexisting works (*id.*). Judge Hicks also denied Rimini's motion as to "Rimini-created

17   scripts" and "functional and technical specifications" because they were categories too

18   broad to rule on, at least the way Rimini presented them. (*Id.* at 83-84.)

19   Judge Hicks then rejected Rimini's argument that a Rimini engineer's use of "know-

20   how" constitutes "cross-use" but is also not infringing. (*Id.* at 84-89.) Judge Hicks

21   reasoned that, contrary to Rimini's argument, Rimini was not insulated from Oracle's

22   claims for copyright infringement because Rimini's clients (who are or were also Oracle's

23   clients) have a license from Oracle. (*Id.*) "Furthermore, Rimini has failed its burden of

24   identifying any provision within the applicable software license that allows for it to engage

25

26   _____

27

28   [3]Judge Hicks first denied a motion that is no longer pertinent to this case because it appears to have only related to damages. (*Id.* at 75-81.)

in the conduct which Oracle has alleged is unlawful." (*Id.* at 85.) Judge Hicks also found the parties' experts disagreed in pertinent ways as to this motion, and reiterated that any violation of the internal data processing provisions of the relevant licensing agreements is a copyright violation, not merely a contract violation. (*Id.* at 85-89.)

Judge Hicks additionally denied Rimini's motion seeking a declaration that Rimini's clients hosting their PeopleSoft software on cloud servers does not violate the 'facilities' restriction contained in many PeopleSoft licensing agreements because disputes of material fact remained as to whether the pertinent licensing agreements expressly allow for cloud hosting, and if they do, whether the particular Rimini client exercised control such that the cloud constituted its "facility." (*Id.* at 89-91.) Finally, Judge Hicks denied Rimini's motion that its migration of its clients' software from its own computer systems over to its clients' systems and/or by helping its clients host their environments on Windstream did not infringe Oracle's copyrights. (*Id.* at 92.) And while Judge Hicks noted that he had also denied Oracle's corresponding motion—arguing that the same conduct constituted copyright infringement—he granted summary judgment to Oracle on Rimini's affirmative defense of express license to this theory of this claim. (*Id.*) He wrote, "Rimini can point to no express provision in the license that permitted it to make more copies of the software after it was held to have infringed when it migrated the client's software from its servers back to the client." (*Id.*)

**B.     Order Realigning the Parties**

About a year after issuing the September 2020 Order (ECF Nos. 1253 (filed September 14, 2020), 1305 (filed September 2, 2021)), Judge Hicks issued an order that, in pertinent part, realigned the parties, making Oracle the Plaintiff and Rimini the Defendant (ECF No. 1305 at 3-5). In that same order, Judge Hicks also decided to bifurcate the trial, with legal claims going first to a jury followed by equitable claims before the Court, and denied Rimini's request for an interlocutory appeal. (*Id.* at 6-12.) The case

1 | proceeded toward the contemplated bifurcated trial following this order, including after it

2 | was reassigned to the Court. (ECF Nos. 1309, 1327.)

3 |       **C.**    **Transition to Bench Trial**

4 |      That said, and as summarized in a recent order the Court issued, Oracle dropped

5 | its damages claims shortly before trial. (ECF No. 1529.) The Court incorporates by

6 | reference the procedural history recited in that recent order here. (*Id.*) But in brief, through

7 | several stipulations and status conferences, the potential trial in this case transitioned

8 | from a bifurcated jury and then bench trial to a single bench trial on equitable claims

9 | only—and any corresponding injunctive relief. (*Id.*)

10 |       **D.**    **Pretrial Orders**

11 |      The parties had filed motions in limine and *Daubert* motions before they agreed to

12 | proceed to a single bench trial, filed notices at the Court's direction as to which arguments

13 | remained live following the transition, and the Court issued an order addressing those

14 | motions that the parties continued to argue remained live. (ECF No. 1427.) The Court did

15 | not limit the scope of the trial in that order, as it denied all of the motions that remained

16 | pending in it. (*Id.*) Shortly before trial, the Court granted Oracle's motion to compel certain

17 | of Rimini's witnesses' testimony at trial. (ECF No. 1443.) For this reason, this order did

18 | not limit the scope of the issues for trial either.

19 |       **E.**    **Written Rulings During and Shortly After Trial**

20 |      On the first day of trial, Oracle objected that Rimini's counsel was attempting to

21 | elicit testimony from Rimini's founder, chief executive, and co-Defendant Mr. Ravin

22 | regarding evidence that postdated the March 2018 discovery cutoff. (ECF No. 1470

23 | (written order issuing ruling on objection).) Rimini argued that such evidence—generally

24 | about Rimini's efforts to comply with Judge Hicks' Permanent Injunction in *Oracle I* and

25 | respect Oracle's intellectual property—was relevant to Oracle's claims for injunctive relief,

26 | and the Court could consider current conditions in crafting injunctive relief. (*Id.*) Oracle

27 | countered that it would be unfair to let Rimini proffer such evidence post-dating the

28 |

1    discovery cutoff the parties had agreed to, particularly considering that Rimini had never
2    produced such evidence in discovery, never moved to reopen discovery, and had itself
3    argued that the Court must enforce the discovery cutoff in various prior motions and
4    arguments. (*Id.*) The Court agreed with Oracle and sustained Oracle's objection. (*Id.*) This
5    ruling limited the scope of the trial, precluding argument and evidence that postdates the
6    March 2018 discovery cutoff.

7          Towards the end of the trial, Oracle filed a motion for leave to amend its operative
8    pleading to explicitly allege infringement of 24 J.D. Edwards copyrights, including but
9    beyond the five J.D. Edwards copyrights it had listed in that pleading. (ECF No. 1476.)
10   The Court denied that motion (ECF No. 1511), effectively further limiting the scope of the
11   trial because that ruling meant that the Court will only consider Oracle's copyright
12   infringement allegations as to the five J.D. Edwards copyright registrations asserted in
13   Oracle's operative pleading in this order. (*Id.*)

14         After the trial, both sides filed their revised, proposed findings of fact and
15   conclusions of law for the Court's consideration. (ECF Nos. 1524, 1525.) But Rimini also
16   filed a motion for leave to file objections to Oracle's proposed injunction. (ECF No. 1526.)
17   The Court denied this motion, reiterating that the Court would hold a hearing on the scope
18   of any potential injunctive relief if, and only if, it found one necessary. (ECF No. 1529.)
19   And as pertinent here, this ruling limits the scope of what the Court will consider this order
20   in the sense that the Court denied Rimini's request to submit additional arguments
21   regarding the precise scope of any injunctive relief the Court finds appropriate. (*Id.*)

22         Post-trial, the Court ordered supplemental briefing on the impact of *Andy Warhol*
23   *Found. for the Visual Arts, Inc. v. Goldsmith*, 143 S. Ct. 1258 (2023), if any, on the parties'
24   fair use arguments. (ECF No. 1531.) The parties timely filed those briefs. (ECF Nos. 1532,
25   1533.)

26   ///

27

28

### III.    FINDINGS OF FACT

1.    To start, the parties stipulated to certain facts, so the Court incorporates by reference those stipulated facts. (ECF No. 1460.) In addition, at the outset of the trial (ECF No. 1469), the Court granted the parties' stipulations regarding copyright registrations and customers, so the Court also incorporates by reference the content of those stipulations. (ECF Nos. 1463, 1464, 1466 (sealed version of customer stipulation).) The Court begins its findings of fact with findings pertinent to Oracle's copyright infringement claims.

#### A.    Copyright Infringement

2.    Oracle divides its discussion of its copyright infringement allegations in its proposed findings by product, and then further divides its discussion by infringement theory. (ECF No. 1524 at 65-142.) The Court follows a similar structure in its discussion below.

#### 1.    PeopleSoft

3.    In January 2005, Oracle acquired PeopleSoft. PeopleSoft had previously acquired JD Edwards. Through its acquisition of PeopleSoft, Oracle became the owner of the then-existing PeopleSoft and JD Edwards copyrighted materials in suit. (ECF No. 1460 at 1; ECF No. 1508 at 264-267.)

4.    The parties have also stipulated to the date on which Oracle became the owner or exclusive licensee of each registered work as set forth in ECF No. 1463-1. (ECF No. 1469.)

5.    Patches, fixes, and updates to a particular version of Oracle's software are also incorporated into and become part of the next complete version of Oracle's software and are covered by the copyright registration for that version of the software. (ECF No. 1508 at 265.)

6.    Oracle generally registers the copyrights in its software by version. (*Id.* at 264.) Each of the copyright registrations at issue states the publication date of the covered

1   registered work. Preexisting PeopleSoft registrations later acquired by Oracle were
2   similarly registered by version. (*Id.* at 265.) Before Oracle's acquisition of PeopleSoft,
3   PeopleSoft patches, fixes, and updates distributed after the release of a particular version
4   of the PeopleSoft software were incorporated into the next version of the software and
5   covered by the copyright registration for that version of the software. (*Id.* at 266.) New
6   versions of Oracle's software include pre-existing code covered by one or more existing
7   registered copyrights. (*Id.*)

8       7.    Oracle first accuses Rimini of infringing its PeopleSoft copyrights by
9   creating what it calls gap customer environments, or customer environments it created
10  on Rimini's systems for new customers after Oracle filed *Oracle I*.

### a.    Gap Customer Environments

12      8.    Mr. Ravin admitted that Rimini used PeopleSoft environments on Rimini's
13  systems to support 'gap' customers between 2011 and 2014. (ECF No. 1503 at 87.) After
14  the close of fact discovery in the *Oracle I* litigation, and between January 23, 2012, and
15  March 30, 2014, Rimini created 65 new local PeopleSoft environments on its computer
16  systems. (ECF No. 1504 at 23, 56.) Rimini further admitted that it used substantially the
17  same support practices for these environments as it did during the *Oracle I* time period.
18  ECF No. 1253 at 21-22.) And indeed, Judge Hicks already found that Rimini infringed as
19  to 47 of these environments at the summary judgment stage of this case. (*Id.* at 27.)

20      9.    The Oracle license agreements applicable to the remaining 18 local
21  PeopleSoft environments (associated with 12 customers) that Rimini created on its
22  systems also (like the 47 already found infringing) contain license restrictions limiting

1    copying and use of the PeopleSoft software to a licensee's facilities. (ECF Nos. 1504 at

2    56-57; 1506 at 158-59.)

3        10.    Overall, Rimini used approximately 416 locally hosted PeopleSoft

4    environments during the gap period between 2011 and 2014. (ECF No. 1504 at 56-57.)

5                          **b.    Migration**

6        11.    Rimini also created hundreds of additional copies of environments

7    embodying Oracle's copyrighted works as part of its "migration" of environments

8    previously hosted on Rimini computer systems. (*Id.* at 67-72; ECF No. 1503 at 90-93.)

9    Rimini called the migration "Environments 2.0," though also referred to it as "Rimini 2.0,"

10   "Development 2.0," and "Process 2.0." (*Id.* at 89-90.) Rimini has admitted that the

11   environments that Rimini copied as part of the migration had "been adjudged to be

12   infringing by the Court." (ECF No. 1505 at 115-18.)

13       12.    Before trial, Mr. Ravin testified during his deposition that Rimini decided to

14   migrate the infringing environments off Rimini's systems after Judge Hicks' February 2014

15   summary judgment order issued in *Oracle I* ("February 2014 Order") and did so, "[t]o

16   comply with the Court's orders as quickly as possible." (ECF No. 1503 at 92-93.) Rimini

17   made similar assertions at the summary judgment phase (ECF No. 927 at 40; ECF No.

18   1253 at 92), and likewise asserted in its pretrial proposed findings of fact that the "purpose

19   of the copies made in the migration was simply to move the client environments to the

20   clients' chosen systems in order to comply with the Court's order . . .." (ECF No. 1445 at

21   33.)

22       13.    Rimini's and Mr. Ravin's assertions about the timing and purpose of the

23   migration were false. At trial, Mr. Ravin admitted that his deposition testimony about the

24   migration was "incorrect" (ECF No. 1503 at 93), and further admitted that he decided to

25

26

27

28
                                        12

do the migration in 2012 to "save a tremendous amount of our own server costs" and "offset some of the other costs" with "remote development." (*Id.* at 209.)

14.    To elaborate, other evidence also shows Rimini did not engage in the migration because of Judge Hicks' February 2014 Order. Over a year earlier, and by September 2012, Rimini had identified a target client for Environments 2.0 (*i.e.*, the migration) and had articulated a number of reasons to shift to a remote services model— "[t]ake Rimini Street and our support model to the next level"—none of which had anything to do with Oracle. (P-1549 at 1, 5;[4] *see also* ECF No. 1512 at 64-68.) Rimini also identified multiple benefits from the migration promising "[l]iberation from our own physical infrastructure & operational constraints"—none of which had anything to do with Rimini's litigation with Oracle. (P-1549 at 6; *see also* ECF No. 1512 at 67.) Rimini took no steps to comply with Judge Hicks' February 2014 Order other than to accelerate the migration that was already underway. (ECF No. 1503 at 93, 99, 128.) Mr. Ravin even decided to continue making copies of the environments that Judge Hicks had ruled were infringing. (*Id.* at 98.)

15.    And under its "business as usual" approach to infringing Oracle's copyrights, Rimini also continued to use the infringing local environments on its systems to support customers until the migration was complete. (*Id.* at 94, 97; ECF No. 1505 at 119-121.)

16.    When Rimini onboards new clients, Rimini either builds development and test environments from the client's installation media or the customer assigns Oracle software environments that it already has for Rimini's use. (ECF No. 1503 at 87.) Mr. Ravin decided that Rimini would take neither approach for those customers subject to the migration. (*Id.* at 98.) Instead, Mr. Ravin decided that Rimini would "copy the infringing

---

[4]This refers to one of Oracle's exhibits admitted at trial. Oracle's exhibits begin with a P and Rimini's exhibits begin with a D. Citations to exhibits throughout this order will follow this same format.

environments and send those copies to the clients." *Id.* Even Mr. Ravin referred to the migration as a "copy"—"That's the way the migration works, yes." (*Id.* at 94.) Indeed, Rimini made at least three copies of each environment that was part of the migration. (ECF No. 1504 at 71-72.)

17.   First, Rimini created what it referred to as "backup" copies of the infringing local PeopleSoft environments that were on Rimini's computer systems. (ECF No. 1505 at 120.) The backup copies of the infringing environments were created on Rimini's systems and contained "the entirety of what Rimini was hosting for a particular customer in a particular environment," as well as the "cumulative history of changes" that Rimini had applied to those environments. (ECF No. 1504 at 67; ECF No. 1505 at 120; *see also* ECF No. 1492-12 at 4 (stating that the migration copies contained "the tax updates that had been provided previously to our customer").)

18.   Second, after Rimini completed its backup copy of an infringing environment on its systems, Rimini copied the backup from Rimini's systems onto USB and hard drives for delivery to the customer. (ECF No. 1504 at 71-72; ECF No. 1503 at 94; ECF No. 1505 at 118 ("Certainly, if they had to be placed on a USB drive, that would be a copy, yes."); ECF No. 1514 at 152.) Even with its accelerated efforts after the February 2014 Order, Rimini needed six months—between February 2014 and July 2014—to complete all the copying associated with the migration. (ECF No. 1505 at 115.)

19.   Third, Rimini copied the infringing environments "into the new location when they were installed" on either a customer's computer systems or on Windstream. (ECF No. 1504 at 71-72.) After receiving a USB drive, the "customer copied the data down to the location where they were intending to host these PeopleSoft environments," and Rimini built environments that "should be a copy of the environment that had previously

1   been on the Rimini systems." (ECF No. 1492-12 at 3-4 ("[Rimini] would create the

2   environment.").)

3       20.   By July 2014, Rimini migrated 195 PeopleSoft environments associated

4   with 85 customers from Rimini's own computer systems to its clients' computer systems

5   or to Windstream's computer systems. (ECF No. 1504 at 68.) Exhibit P-9008 identifies

6   the PeopleSoft environments that Rimini migrated. (P-9008.) Mr. Allison reviewed the

7   PeopleSoft licenses associated with 73 of the customers whose associated PeopleSoft

8   environments were migrated off Rimini's computer systems. The licenses for these 73

9   PeopleSoft customers each contain a facilities restriction. (ECF No. 1506 at 159 (noting

10  that the Court would take judicial notice of the list of customers on the demonstrative slide

11  in addition to containing the pertinent testimony); *see also* R. Allison Demonstrative Slide

12  6.22 (listing the 73 customers whose licenses contained a facilities restriction).)

13      21.   The environments associated with the remaining 12 customers that were

14  copied as part of the migration were also adjudged infringing in *Oracle I* because Rimini

15  admitted that it created these environments on its computer systems and Rimini stipulated

16  in *Oracle I* that the license agreements associated with each of these customers

17  contained a facilities restriction. In the *Oracle I* Pretrial Order, the parties agreed that

18  "Rimini reproduced copyright PeopleSoft works listed in Exhibit C by copying or installing

19  the listed environments on its local systems." *Oracle I*, ECF No. 528 at 18 (¶ 21) & Exh.

20  C. The parties further stipulated in *Oracle I* that the PeopleSoft license agreements for all

21  of Rimini's PeopleSoft customers have identical or similar language to the PeopleSoft

22  license agreements addressed in the February 2014 Order and thus contain a facilities

23  restriction. *See id.*, ECF No. 599. Exhibit C to the *Oracle I* Pretrial Order includes the

24  customer names and environments of 11 of the remaining 12 customers that Rimini

1    copied as part of the migration, with the only difference being the "RSI-" prefix at the

2    beginning of the environment name.

3         22.   As to the twelfth remaining customer, PNMR Services Company, Judge

4    Hicks ruled in this case that its PeopleSoft license prohibits local hosting, and thus its

5    associated environments on Rimini's systems were also infringing. (ECF No. 1253 at 21-

6    29 & n.15; *see also* ECF No. ECF No. 896-23 at 3 (listing PNMR Services Company, RSI-

7    H910PNMO).) Rimini copied one of these infringing environments, H910PNMO, as part

8    of the migration. (P-9008 at 11-12.)

9         23.   Appendix PeopleSoft-2 identifies the copyright registrations corresponding

10   to the PeopleSoft software environments that Rimini migrated. (ECF No. 1524-2 at 3-18.)

11        24.   Rimini's migration prioritized efficiency and the retention of copies of

12   environments and updates deemed infringing in *Oracle I.* (ECF No. 1504 at 68-69.) Rimini

13   could have avoided its migration of infringing local environments by using each clients'

14   installation media or by creating a copy of their production environments. (*Id.* at 69-71.)

15   Mr. Benge admitted in 2012 that "clients should have the original installation media" for

16   their Oracle software. (ECF No. 1505 at 121.) He also admitted that every customer he

17   had ever worked with already had multiple installed copies of the software for

18   development and testing purposes. (*Id.* at 118.) Despite all of this, Rimini never asked its

19   clients whether it would be possible to use the environments that they already had on

20   their systems for development and testing, or to use its clients' installation media. (*Id.* at

21   121-22.) There is no evidence that Rimini "even contemplated let alone attempted" any

22   of these non-infringing alternatives. (ECF No. 1504 at 71.)

23        25.   When asked to explain why Rimini did not "delete" the infringing

24   environments, Mr. Ravin testified that Rimini had to migrate the environments rather than

25   "rebuild" them, emphasizing dramatically that if customers did not have their Oracle

26   software "you're talking about potentially millions of wrong paychecks, potentially wrong

27   taxes on billions of dollars on transactions. Yeah, it would have been catastrophic

28

potentially." (ECF No. 1503 at 214-216, 251.) This was not accurate. The environments at issue were testing and development environments. (*Id.* at 251-52.) The migration did not directly implicate the live production environments which contain the Oracle software that the customers use daily. (*Id.*) The same situation arises with every new Rimini customer: when Rimini onboards new customers, it builds new testing and development environments for the customer from Oracle installation media, or the client assigns environments it already has for this purpose. (*Id.* at 87.) Customers also back up production environments each night, and those backups are available for potential use, including as testing and development environments. (*Id.* 252.) After these admissions, Mr. Ravin retreated on redirect from his claims of catastrophe to saying only that if a customer needed a Tax, Legal, and Regulatory ("TLR") update before a testing and development environment was built, Rimini would not have been able to provide it. (*Id.* at 266.) But Rimini did not ever demonstrate how being required to build non-infringing development and test environments would affect its ability to provide updates. (ECF No. 1504 at 70-71.)

26.     Rimini also controlled the migration and gave its clients only "two choices": (1) "Contract with our cloud provider (Windstream) for an environment for us to use" or (2) "Provide a remote environment governed by our specifications." (P-1549 at 8.) Rimini also required its clients to sign an amendment to their Rimini support contracts to reflect which of these two options the clients had selected.[5]

27.     After Judge Hicks issued the February 2014 Order in *Oracle I*, Rimini grew "very concerned" that its clients "don't seem to have a sense of urgency in getting this

---

[5](*See, e.g.*, D-8730 (Campbell Soup); D-8711 (American Council on Education); D-8711 (same); D-8738 at ¶ 4 (City of Eugene); D-8751 (Cowlitz County Washington); D-8764 (Easter Seals New Hampshire); D-8779 (Genesis Healthcare Systems); D-8790 (Hitchiner Manufacturing Company, Inc.); D-8806 (Kichler Lighting); D-8829 (Mosaic); D-8853 (Rio Tinto Canada Management, Inc.); D-8860 (Santa Clara Valley Water District); D-8896 (VITAS Hospice Services, Inc.).)

done" and emphasized the "need[] to be very aggressive in pushing the [c]lients" to complete the migration. (P-1259 at 1.) "[T]o instill more of a sense of urgency" and "change the tone of these conversations," Rimini threatened its clients that "[a]ny delays in the migration . . . may expose both our organizations to the threat of an injunction preventing the use of the current RSI-hosted environments." (*Id.* (emphasis added); ECF No. 1512 at 71-75.) Rimini also threatened its clients that the Court's "finding of infringement puts both Rimini Street and [the client] at risk of damages for every day you remain on the Rimini Street infrastructure." (ECF No. 1512 at 76-78.)

28.    Even after the migration was complete, Rimini used the migrated environments in the same way that it used the infringing local environments on its computer systems during Process 1.0. Rimini often used the migrated environments during Process 2.0 to develop fixes and updates that were distributed to other customers. (ECF No. 1503 at 98, 218 ("PeopleSoft environments that were migrated to customers in 2014, were later used during process 2.0 to develop fixes and updates that were distributed to other customers"); ECF No. 1504 at 69 (Rimini was "able to use those environments once migrated in the same way as they had been able to use them when they were located on Rimini's systems"); ECF No. 1505 at 120-21 ("The most straightforward approach would be to continue using the environments we had been using for development and testing"); ECF No. 1492-12 at 3-4 (including the statement that migrated environments "allow[ed] us to further develop updates going forward").)

### c.    Windstream Hosting of Some Migrated Environments

29.    Windstream Hosted Solutions ("Windstream") is a company that Rimini and its customers contracted with for cloud hosting services. (ECF No. 1492-6 at 3-4; *see also, e.g.*, P-1774.)

30.    For customers who did not want to host their own Oracle software environments, Rimini provided an option for customers to use Windstream for cloud hosting services. Rimini selected Windstream as the cloud provider and set up a standard

agreement. (ECF No. 1503 at 110-112; *see also* P-1549 at 7; P-1586 at 2.) Rimini would make an introduction between Windstream and the customer. (ECF No. 1492-6 at 3-4.)

31.    The contracts between Rimini's customers and Windstream were multitenant agreements, organized as "child" accounts under a Rimini "parent" account. (ECF Nos. 1492-6 at 3-4; ECF No. 1492-22 at 3.) One reason to do this was "so the parent would have access to the child's environment from an administration and management perspective." (ECF No. 1492-6 at 4.) The agreements with Windstream also characterized Rimini customers as subtenants. (P-1774.)

32.    Rimini also wanted customers to host their environments on Windstream because Windstream environments are "very easy" for Rimini to access. (ECF No. 1507 at 192-93; ECF No. 1505 at 179-180; ECF No. 1504 at 148; *see also* P-578 (4/10/15 Ease of Access information – "Very Easy (Windstream)"); P-580 at 76 (same).) Because of this ease of access, Rimini developers prefer to use a limited group of environments, primarily Windstream environments for development and testing of PeopleSoft updates. (ECF No. 1505 at 181-82 (agreeing that Oracle's expert's Barbara Fredrickson-Cross' Demonstrative Slide 41 is accurate); ECF No. 1504 at 147-152 (presenting that slide); *see also* P-577 at 4 ("If we're going to go ahead and move away from using CAMX as our prototype environment, we would choose a client that is a Windstream client who operates in multiple [states] on 8.4 tools, such as MOS").)

33.    Rimini (not its customers) controlled the Windstream environments, and Rimini told customers that was one reason why they should use Windstream for hosting. (P-516 at 7 ("Windstream will manage and support your infrastructure, and Rimini Street will manage and support the Non-Production applications without having to engage your IT resources").) Rimini's presentation to their salespeople concerning roll out of the

Windstream environments confirmed that "[w]hile it is a client's environment, they will stay out of it and leave it for our exclusive use." (P-1549 at 7; *see also* ECF No. 1512 at 68.)

34.   Rimini treated Windstream environments as functionally the same as the infringing local environments it had controlled on its own computer systems. (P-1586 at 3 ("If the Client is Cloud-Hosting, we will have the SAME access and administrative capabilities as . . . OUR Data Center today . . . our engineers will have better and wider access and administrative rights than ever!"); *see also* ECF No. 1503 at 219 ("Q And -- for the customers who chose the cloud, versus the customers who chose their own systems, was there any difference in the way Rimini went about doing the work for the customers? A No, because a computer is a computer, and it was exactly the same process.").)

35.   After the February 2014 Order in *Oracle I*, Rimini internally concluded that outsourcing environments to Windstream violated the facilities restriction in customers' licenses with Oracle. Mr. Ravin wrote about cloud data centers following the ruling, stating that the "judge agreed with Oracle's argument that the contracts are not open to interpretation – must be interpreted literally when they say 'software can only reside on customer's premises.'" (P-1577 at 3.) Industry analyst Gartner provided Rimini a draft report on the summary judgment ruling for a "legal fact check," (P-1578 at 1), which Rimini edited, but without changing Gartner's conclusion that "Customers using any third-party service providers who are providing Cloud, hosting, outsourcing services . . . could be impacted if software vendors enforce software license agreements that contain terms about locating and/or using copies of software at specific locations." (*Id.* at 5; *see also* ECF No. 1503 at 117-120). Rimini claims that it later became uncertain as to whether the February 2014 Order applied to Windstream environments. (*Id.* at 116-117 ("Q Now, at the time that Mr. Benge was asking that question, you were uncertain whether the February 2014 summary judgment ruling applied to Windstream locations; is that correct? A That's correct. We were still trying to interpret the order from the Court").) Whether

certain or uncertain about what Oracle's licenses required, Rimini encouraged its customers to host their Oracle software environments on Windstream. (*Id.* at 110, 112-115; *see also* P-516 at 3 ("This [Windstream] solution is the fastest to set up and requires the least amount of your labor.").)

36.     Twenty-one of Rimini's PeopleSoft customers chose to use Windstream's hosting services: Adventist Healthcare ("AHC"); American Council on Education; AT&T (The Limited Stores, Inc.); Board of Water Works Trustees of the City of Des Moines, IA; Campbell Soup Company; City of Eugene, Oregon; Cowlitz County Washington; Easter Seals New Hampshire; Frederick County IIT; Genesis Healthcare Systems; Hitchiner Manufacturing Company, Inc.; Johnson Controls, Inc.; Kichler Lighting; Mashantucket Pequot Gaming Enterprise d/b/a Foxwood Resort Casino; Mosaic; Raley's; Rio Tinto Canada Management, Inc.; Santa Clara Valley Water District; Toll Bros, Inc.; U.S. Steel Canada, Inc.; and VITAS Hospice Services, Inc. (ECF No. 105 (sealed) at 3 n.1.) Each of these twenty-one Rimini customers has an Oracle PeopleSoft license that limits the use of PeopleSoft to a licensee's facilities. (ECF No. 1506 at 159 (stating that this is the case, and referring to a list of customers on a demonstrative slide; the Court taking judicial notice of the list of customers on the slide).)

37.     The Windstream-hosted PeopleSoft environments associated with twenty of these Rimini customers are copies of infringing environments that Rimini had previously locally hosted on its computer systems. (P-9008.) Rimini copied these environments to Windstream as part of its migration. (ECF No. 1503 at 98; ECF No. 1504 at 66-67.)

### d.     Rimini's Provision of Tax, Legal, and Regulatory ("TLR") Updates to Clients

38.     One of the types of support Rimini provides for its customers is TLR update support whereby Rimini develops updates to account for new tax, legal, and regulatory changes. (ECF No. 1503 at 15.) TLR updates often involve making modifications to

existing code in customers' environments, and Rimini may also write new code, for example, to account for new laws. (ECF Nos. 1505 at 187-88, 1504 at 34.)

39.    A single PeopleSoft TLR update may require the creation of, or modifications to, multiple types of files. (ECF Nos. 1505 at 187-88, 1506 at 33-34.) For example, an update may involve changes to application logic code, which is source code for the PeopleSoft application that performs functions like HR management. (ECF No. 1504 at 27-30.) Application logic code in PeopleSoft is typically written in SQR, SQC, or COBOL computer languages. (*Id.* at 31.) Even if SQR code is written on Rimini's system, at some point before it is delivered to a client, Rimini agrees that the code must be unit tested in a PeopleSoft environment. (ECF No. 1505 at 144-45, 191-92.)

40.    An update may also involve changes to the PeopleSoft user interface—referred to as "online objects"—using a PeopleSoft tool called PeopleTools Application Designer. (ECF No. 1504 at 28-31.) User interface elements like run control pages (the user interface pages seen by the user) are maintained in PeopleCode and are created or modified in the PeopleTools Application Designer. (*Id.* at 30-21; *see also* ECF No. 1508 at 15.)

41.    An update may also require retrieving data from, or making changes to, the underlying database, which may involve the use of source code scripts such as Data Mover scripts ("DMS scripts" or "DMS files") and data files called DAT files. (ECF No. 1504 at 28-33; ECF No. 1507 at 202-203.) DMS and DAT files are created and applied in PeopleSoft environments using another tool, PeopleTools Data Mover. (ECF No. 1504 at 32-33; ECF No. 1507 at 202-203.)

42.    If Rimini either develops or tests modifications to existing code or develops or tests code for new functionality in a customer's environment, a RAM copy of the

1   customer's Oracle software is made. (ECF No. 1503 at 139; ECF No. 1504 at 36-42

2   (describing generation of RAM copies during development); ECF No. 1515 at 128-129.)

3        43.    Rimini's standard development practice for its TLR updates involves

4   copying and using one customer's PeopleSoft environment to develop and test updates,

5   or individual files within an update, for distribution to multiple customers. (ECF No. 1504

6   at 36-46.) Rimini refers to these practices as "prototyping." (ECF No. 1503 at 107; ECF

7   No. 1504 at 42-43; ECF No. 1505 at 173-74; ECF No. 1506 at 15-18; ECF No. 1507 at

8   182-83 ("Prototype development is the common practice to use at the beginning of a

9   development phase"); *see also* P-577 at 2-3, 4 (Conley noting on May 17, 2015 that "CAM

10  is leaving at the end of the year and we will all miss using them for our prototype

11  development!"); P-1759 at 18 (instructing in the CodeAnalyzer User Guide that,

12  "[n]ormally, you would choose a single client to be used as a prototype for which you will

13  work out the details of the code modifications"); P-710 at 2 (J. Allen: "We really can't afford

14  to let environments remain off line like this, *especially* Windstream, which we depend

15  on heavily for prototyping and initial testing").)

16       44.    When a developer chooses the prototype environment, the developer

17  knows the prototype update is going to be applied to all of the other clients in the group.

18  (ECF No. 1505 at 177.) Similarly, when a Rimini PeopleSoft update requires online work,

19  a Rimini developer typically prototypes the online work in Application Designer in one of

20  its customer's PeopleSoft environments, the "prototype environment." (ECF No. 1508 at

21  37-38, 47-48.) As one example, Rimini used environments associated with Campbell's

22  Soup as a prototype environment for online work, as documented by a training video

23  involving Mr. Conley that was shown at trial. (*Id.* at 47-49; *see also* P-2014-001; P-2014-

24  002.)

25       45.    Oracle next and more specifically accuses two approaches that Rimini uses

26  to develop TLR updates for PeopleSoft of infringement: the creation and use of technical

27  specifications and the creation and use of RSI files. The Court makes factual findings

28

1    regarding the technical specifications, and then RSI files. While some of the specific

2    technical specifications discussed in this next section are for other Oracle products, not

3    PeopleSoft, the Court finds that Rimini's use of technical specifications is substantially

4    the same across all of the Oracle products it supports.

5                             *i.       Technical Specifications*

6          46.    During the prototyping development process, Rimini developers create

7    functional and technical specifications that describe what the updates will do and how the

8    update will be technically implemented. (ECF No. 1506 at 15-16.) Functional

9    specifications define the scope of an update. (*Id.* at 15.) Technical specifications provide

10   specific technical details on how the prototyped update will be implemented. (*Id.* at 16,

11   30.) Technical specifications are long and detailed documents. (*Id.* at 97; ECF No. 1504

12   at 255-256; *see also* P-1673; P-1202; P-1206; P-6349.14068.) They may specify in

13   advance which environment will be used to conduct the prototype testing. (ECF No. 1504

14   at 161-162.)

15         47.    Rimini keeps its technical specifications on its system, and they are used to

16   create updates for multiple customers. (ECF No. 1506 at 31, 96-97, 104; ECF No. 1508

17   at 54-55; ECF No. 1515 at 249.) Mr. Benge also testified that during and after prototype

18   development and testing of an update, Rimini developers often "leverage" development

19   work performed for one client by updating existing technical specifications for use with

20   other clients. (ECF No. Tr. 1506 at 38-39.)

21         48.    However, technical specifications are commonly used in software support

22   and taught in college computer science courses. (ECF No. 1505 at 94-95; ECF No. 1514

23   at 219-221 (technical specifications are a "standard and accepted practice").) Typically,

24   where Rimini needs to implement a similar update for multiple clients (for example, a tax

25   rate change for all of its clients) or needs to memorialize the history of an update for only

26   one client, Rimini will create a technical specification that documents the steps required

27   to effectuate the update within each client's environment. (ECF No. 1505 at 95-96; ECF

28

                                            24

No. 1506 at 15-17.) Rimini engineers can then use the technical specification to guide their work on the update for multiple clients. (ECF No. 1505 at 95; ECF No. 1506 at 16-17, 74-75 (discussing D-2349).) Rimini also may create technical specifications where a solution is going to only one client. (ECF No. 1505 at 95.) These documents may contain code written by Rimini as part of the update. (ECF No. 1505 at 106-107; ECF No. 1506 at 30-31; ECF No. 1515 at 136-137.)

49.    Oracle did not identify at trial any Rimini technical specification containing Oracle Code in a more than *de minimus* amount. As explained in more detail in the Court's conclusions of law *infra*, the Court rejects Oracle's argument that Oracle's license agreements, or Judge Hicks' prior orders, prevent Rimini from documenting its own know-how and code in technical specifications used with multiple clients.

50.    Apart from doing TLR updates, Rimini also provides some custom break/fix solutions for clients as the support need arises. (ECF No. 1505 at 83; ECF No. 1508 at 197-202.) Rimini generates technical specifications for some break/fix solutions. (ECF No. 1505 at 89, 97-98.) Oracle admitted one such technical specification at trial related to a J.D. Edwards ("JDE") fix (P-6349.05001), but did not introduce any evidence about its content, and made no claim that it contained any Oracle code. (ECF No. 1508 at 188-189.) Further, Oracle presented no evidence that more than one client received the fix associated with the technical specification, and the face of the specification indicates it was for one specific client. (P-6349.05001 at 1 (indicating the fix was for Rimini client CertainTeed Inc.).)

51.    And more broadly, the one technical specification document that Oracle specifically discusses in its proposed findings of fact (P-6349.14068) contains only a small amount of code. (ECF No. 1524 at 84.)

52.    Similarly, the technical specification documents Rimini references in its proposed findings contain no Oracle code. (ECF No. 1505 at 106-107 (testifying there is no Oracle code in P-6349.17327); *see also id.* at 11-14 (admitting that Oracle's expert

25

Fredrickson-Cross had no opinion that the code in P-6349.17327 was Oracle code); ECF No. 1508 at 212-15 (testifying there is no Oracle code in P-6349.26774 and P-6349.15781).) The Court now moves on to its findings of fact regarding Oracle's claim that Rimini's creation of 'RSI' or 'one-size-fits-all' files violates its PeopleSoft copyrights.

*ii.     RSI Files*

53.     Different PeopleSoft licensees often have different versions of PeopleSoft source code files (SQR and SQC files), which may vary across different versions of PeopleSoft. (P-1710; P-1203; P-582 (including instant messages between Tahtaras and Conley discussing how there are 92 versions of a file out of 112 clients).)

54.     Under Process 2.0, Rimini's goal was to replace disparate customers' PeopleSoft source code files with "one code for all" or rewrite files, which were sometimes referred to as "RSI files" because the file name for these rewritten source code files typically began with the letters "RSI." (ECF No. 1503 at 105; ECF No. 1504 at 78, 89-90; ECF No. 1505 at 150; ECF No. 1507 at 157-159.) Rimini's goal in standardizing code across all customers was to minimize development and testing efforts and thereby save money. (P-1710 at 2 (Benge 11/21/14: "There will ultimately be savings (for both Dev and QA) in having one version instead of several dozen"); *see also* ECF No. 1507 at 191-192 (RSI files "make it more efficient. You wouldn't have to maintain 90 something plus versions"); ECF No. 1505 at 170-72, 175-78; ECF No. 1507 at 156, 163-64, 273 ("one version for all or one code for all" files are files that "would run on any operating system database platform App release . . . in any PeopleSoft instance").)

55.     Rimini's goal of standardizing code across all customers was "absolutely crucial to [Rimini's] success given our new Env 2.0 business model." (P-1203 at 2 (Conley: "the 'one version for all clients' isn't really just a good idea, it is absolutely crucial to our success"); *see also* P-1201 at 1, 2; P-1202 at 1; P-1202 at 4; P-7982 at 2 (Benge and Conley: "everyone likes" the one code line model, "our team could support 1000

26

1   clients if all of the regularly modified programs were one code line"); *see also* ECF No.

2   1507 at 165, 274-276.)

3       56.   Rimini's standardized "one code for all" files reduced the resources and

4   effort Rimini needed to expend because Rimini could prototype an update once in a single

5   customer environment and then distribute it to all other customers without doing separate

6   development and testing in each customer's environment. (ECF No. 1505 at 150-151;

7   ECF No. 1507 at 276-282; *see also* P-1203; P-7982.) And while Rimini talked at trial about

8   how it would work with clients that had customized code, Rimini told customers that

9   customizations were the client responsibility for one code for all files. (P-1204 at 3-4.)

10      57.   Rimini infringed Oracle's copyrights in PeopleSoft software by developing

11  and testing its RSI rewrite files in a prototype customer environment, in many cases

12  directly copying Oracle source code into its RSI files, and then distributing the RSI files

13  using CopyRSIFileFromClientToClient to other clients. (ECF No. 1504 at 90-91.) This

14  process, for both original creation and the subsequent modification of the RSI files, is

15  what Judge Hicks and the Ninth Circuit have referred to as infringing cross-use because

16  it creates RAM copies of PeopleSoft software, as well as RAM and hard disk copies of

17  Oracle source code, in the prototype environment that are not solely for the prototype

18  customer's internal data processing operations. Indeed, Rimini delivered one-code-for-all

19  files to all customers, regardless of whether each individual customer needed them, to

20  keep code in synch across all customers. (P-1674 at 43 (Tahtaras 3/31/15: "RRC is a

21  casino in DC, so will not really need this, but since it's a one version file, we must keep

22  all clients in synch"); *see also* P-8035 at 1.)

23      58.   In many instances, Rimini directly copied substantial portions of protected

24  expression from Oracle's PeopleSoft source code files to create its "one code for all" or

25  RSI files. (ECF No. 1504 at 95-99, 100-119, 127-128, 130-138.) One example is rewrite

26  file RSI810ST.SQR, which Rimini developed during Process 2.0 in an attempt to create

27  one code line for state tax requirements. (*Id.* at 91-107; *see also* ECF No. 1492-11

28

(Mandla Depo.) at 141 ("Q: Is RSI810ST a project to create one set of code for all customers? ... A: It is one version that can be used across all the clients"); *see also* P-1673 at 1 ("Original Design" dated "11/11/2014").)

59.     Rimini's RSI810ST.SQR file replaced Oracle's TAX810DC.SQR file and was "created as [a] generic program [that] can be modified to fit in the other state specific requirements." (ECF No. 1504 at 94-95; ECF No. 1492-11 (Mandla Depo.) at 5 ("Q: And RSI810ST was developed to accommodate additional states? A: Yes"), 6 ("Q: But the SQR itself is the same for every customer? A: SQR is one version"); *see also* P-1673 at 2.) The RSI810ST.SQR file was developed as part of the HCM104455 update, the technical specification for which indicated that, in addition to the creation of the RSI810ST.SQR file, an update would also be made to the run control page for the program to replace it with a "new run page for the RSI810ST program." (ECF No. 1504 at 92-94.)

60.     Rimini developer Harika Mandla—the same author of the HCM104455 technical specification—developed RSI810ST.SQR "directly as initially a copy of the TAX810DC.SQR file" in an environment associated with customer AHC. (*Id.* at 95-96.) Ms. Frederiksen-Cross (who made the quoted statement) reached this determination after analyzing the files within the recycle bin of the AHC environment as part of standard forensic practices and comparing the deleted files against Oracle's TAX810DC.SQR file. (*Id.*) Rimini admitted that the environments associated with AHC contained PeopleSoft HRMS 8.9 and PeopleTools 8.48.16, which embody a substantial portion of the Oracle protected expression covered by the copyright registrations TX 7-065-381 and TX 7-092-819. (P-2055 at 5-13; P-8982; P-9598.)

61.     Ms. Frederiksen-Cross analyzed the earliest version of RSI810ST.SQR against Oracle's TAX810DC.SQR file. (*Compare* P-9390 *with* P-9364 (Oracle's TAX810DC.SQR); *see also* P-2471 (Ex. N.01 side-by-side comparison); ECF No. 1504 at 97-108.) The parties stipulated that the Oracle TAX810DC.SQR file that she used for

28

her comparison is from PeopleSoft HRMS Version 9. (ECF No. 1467 ¶ 2; ECF No. 1467-2; *see also* P-9364 (identifying "Release: HR9" underneath the Oracle copyright notice).) Oracle's copyright registration corresponding to this version of PeopleSoft is TX 7-065-386. (P-5713.) RSI810ST.SQR is also one of the Rimini files that Rimini said that it had quarantined in November 2018 to comply with Judge Hicks' rulings and the file pre-dated Rimini 2.0. (P-9300 at 3.)

62.     Ms. Frederiksen-Cross performed analytic dissection as part of her comparison of RSI810ST.SQR against TAX810DC.SQR. (ECF No. 1504 at 102-108.) She determined that the RSI810ST.SQR file contains substantial portions of Oracle's protected expression and was substantially similar to Oracle's TAX810DC.SQR file. (*Id.* at 103.) Examples of Oracle's protected expression within the RSI810ST.SQR file include, "blocks of identical lines that are performing exactly the same function using identical code in the same order." (*Id.* at 104-108.)

63.     Neither Professor Astrachan nor any other Rimini witness rebutted Ms. Frederiksen-Cross's analytic dissection analysis. Ms. Frederiksen-Cross considered and rejected the list of seven so-called "non-protected elements of the relevant files" that Rimini included in its proposed findings of fact and conclusions of law about analytic dissection. (*Id.* at 108-116; ECF No. 1445 at 19-20.) Ms. Frederiksen-Cross even applied this formulation of non-protected elements from Rimini's lawyers "in their various forms" and still concluded that the RSI810ST.SQR file incorporated substantial portions of Oracle protected expression. (ECF No. 1504 at 117.) Rimini offered no contrary testimony.

64.     During Process 2.0, Rimini distributed the RSI810ST.SQR program to customers 4,710 times using CopyRSIFileFromClientToClient and 2,337 times using TransferFiles. (ECF No. 1504 at 120-126; *see also* P-2661; P-2596.) Whatever subsequent changes Rimini may have made to the RSI810ST.SQR program are irrelevant, because the "evolution" of RSI810ST.SQR shows that it "was derived from

29

1 Oracle's file that started with copying Oracle's file and changing things." (ECF No. 1504

2 at 118-119 ("from a cross-use perspective, this is still an update that was developed in a

3 customer environment and then shipped to other customers"); *see also id.* at 126-127.)

4       65.     Another example rewrite file is RSI960US.SQR, developed by Rimini as

5 part of the HCM103493 update, which was a "[p]roject to get all client code to one version

6 of the US Fed YE process." (P-1202 at 1.) Working in an environment associated with the

7 City of Eugene, Rimini directly copied the Oracle file TAX960US.SQR and rearchitected

8 and renamed it to make the RSI960US.SQR file. (ECF No. 1504 at 127-128; *see also*

9 ECF No. 1507 at 156-158; ECF No. 1508 at 12.) TAX960US.SQR is another of the Rimini

10 files that Rimini said that it had quarantined in November 2018 to purportedly comply with

11 the Court's rulings and the file pre-dated Rimini 2.0. (P-9300 at 3.)

12       66.     Ms. Frederiksen-Cross analyzed the RSI960US.SQR program against

13 Oracle's TAX960US.SQR file. (*Compare* P-9387 (RSI960US.SQR) *with* P-9359

14 (TAX960US.SQR); *see also* ECF No. 1504 at 130-135.) The parties stipulated that the

15 Oracle TAX960US.SQR file that she used for her comparison is from PeopleSoft HRMS

16 Version 9.2. (ECF No. 1467 ¶ 2; ECF No. 1467-2; *see also* P-9359 (identifying "Release:

17 HR92" underneath the Oracle copyright notice).) Oracle's copyright registration

18 corresponding to this version of PeopleSoft is TX 8-151-289. (P-6190.)

19       67.     Ms. Frederiksen-Cross also performed analytic dissection as part of her

20 comparison and determined that Rimini's RSI960US.SQR file contains a substantial

21 portion of Oracle's protected expression from Oracle's TAX960US.SQR file. (ECF No.

22 1504 at 131-136.) Her analytic dissection identified significant protected expression in the

23 form of directly copied comment blocks (P-2522 at 5-6) and further discovered that Rimini

24 reordered many of the functions within the original Oracle file, which, when reordered and

25

26

27

28

compared function-by-function, more than doubled the number of matching lines. (ECF No. 1504 at 131-136.)

68.    During Process 2.0, Rimini distributed the RSI960US.SQR program to customers 2,178 times using CopyRSIFileFromClientToClient and 5,673 times using TransferFiles. (ECF No. 1504 at 136-137.)

69.    Ms. Frederiksen-Cross also identified other RSI files that "show inclusions of large pieces of Oracle copyrighted code" and further establish that "the copying of Oracle code into the so-called independently authored RSI files was endemic throughout many, many, many programs." (*Id.* at 137-138.) P-2533 summarizes the RSI files in which more than 20% of their source code lines were directly copied from an Oracle copyrighted file, as well as the percentage of matching lines of Oracle source code in each Rimini file. (ECF No. 1504 at 138-139, 144-145; *see also* P-2533.)

70.    Ms. Frederiksen-Cross performed analytic dissection with respect to the files identified in P-2533. (ECF No. 1504 at 137-138.) In addition to RSI810ST.SQR and RSI960US.SQR, she determined that the following 29 RSI files contain substantial portions of Oracle's protected expression: RSI860FL.SQR, RSI860FL_XXX.SQR, RSI860FL[1].SQR, RSITXDTA.SQC, RSITXDTA_PRE_QA.SQC, RSIW2SSA.SQC, RSIW2SSA[1].SQC, RSI810ST-VER0.SQR, RSI810ST-ORIG.SQR, RSI960XM.SQC, RSICBR01.SQR, RSIMMREF.SQC, RSIW2ST.SQC, RSIW2_ST.SQC, RSIW2ST[1].SQC, RSI960US_V1.SQR, RSI960US V.1.SQR, RSI960US_1.SQR, RSI960US_V2.SQR, RSI960XM_V1.SQC, RSI960US BEFORE.SQR, RSI960USXML.SQC, RSIEINCD.SQC, RSI960ST.SQR, RSIBN733_BEFORE.SQC, RSI810STOLD.SQR, RSIBN733.SQC, RSIOSHA300A.SQR, RSI810DC.SQR. (*Id.* at 144-145.) She further determined that each of the RSI files in P-2533 is a derivative work. (*See id.*)

71.    Although not all specific versions of the files listed in P-2533 were distributed to customers, Ms. Frederiksen-Cross determined many of the RSI files

1    identified in P-2533 were distributed to customers using CopyRSIFileFromClientToClient

2    and versions of the files identified in P-2533 were distributed 10,175 times to customers

3    using TransferFiles. (*Id.* at 145-146.)

4         72.    Neither Professor Astrachan nor any other Rimini witness rebutted Ms.

5    Frederiksen-Cross's analysis of Rimini's rewrite files, including her analytic dissection

6    methodologies.

7         73.    Rimini's TAX960ST.SQR and RSI960ST.SQR files are additional examples

8    of Rimini rewrite files. Oracle has a program named TAX960ST.SQR that generates W-2

9    electronic files for annual reporting with state governments. (ECF No. 1508 at 10.) In

10   2010, and according to Rimini's Tim Conley, Rimini "rearchitected Oracle's TAX960ST to

11   create a one version for all customers file." (*Id.* at 10-12.) Rimini's "rearchitecture [was] a

12   mixing of old and new, meaning old Oracle code and new Rimini Street code." (*Id.* at 12.)

13   The majority of the source code in Rimini's TAX960ST.SQR file "was Oracle code at the

14   beginning"; 75 percent of the code was Oracle source code that had been modified, with

15   very little source code having been written from scratch by Rimini. (*Id.* at 13-14.) After

16   Rimini developed TAX960ST.SQR in a customer environment and tested it in an

17   environment associated with a different customer, TAX960ST.SQR was "pushed out" to

18   all US clients. (*Id.* at 12-13.) Rimini's TAX960ST.SQR and RSI960ST.SQR files are also

19   Rimini files that Rimini said that it had quarantined in November 2018 to purportedly

20   comply with Judge Hicks' rulings and the files pre-dated Process 2.0. (P-9300 at 3.)

21        74.    During Process 2.0, Rimini sent new clients the same Rimini rearchitected

22   TAX960ST.SQR file that had 75 percent Oracle code, as well a new "TAX960ST Run

23   Control page" that Rimini created using PeopleSoft Application Designer, to "replace what

24   [the new clients] already have." (ECF No. 1508 at 12-15; *see also* P-7908 at 1 (email

25   dated February 2014).) Mr. Conley admitted that when transitioning to Process 2.0, Rimini

26   "didn't change the process" with respect to TAX960ST.SQR and related RSI files. (ECF

27

28
                                            32

No. 1508 at 68-69.) Rimini even stored TAX960ST.SQR and related RSI files on its computer systems, which Mr. Conley conceded was a "mistake." (*Id.*)

75.     Rimini updated TAX960ST.SQR multiple times during Process 2.0. (*Id.* at 15-19.) For example, Rimini's HCM104700 update in 2015 involved modifications to address issues associated with TAX960ST.SQR as well as modifications to two other RSI files. (*Id.* at 15-16; *see also* P-1197 at 1 (listing RSISTCD.SQC and RSIW2SA.SQC).) Mr. Conley admitted that RSISTCD.SQC, one of the RSI files that was part of HCM104700, "had original information from the original Oracle coding from TAX960ST." (*Id.*; *see also* ECF No. 1508 at 17.)

76.     In February 2015, Rimini developed and unit tested update HCM104700 in an environment associated with Campbell Soup Company. (*Id.* at 17-19; *see also* P-1197 at 4 ("Unit Testing was performed in : WSM-H890CAMX"); P-1198 at 9 (note 11).) After performing QA testing only in a Campbell Soup Company environment, Rimini applied the HCM104700 update to over a hundred clients. (ECF No. 1508 at 18-20; *see also* P-1709 at 2 ("Luckily it is a 'one size fits all' kind of sqr/sqc so if we do a long test in one env it should be good to go for all clients").)

77.     In October 2015, Mr. Conley and Ms. Mandla performed further development work on Rimini's TAX960ST.SQR file. Mr. Conley directed Ms. Mandla to "push out the code_after tax960st.sqr to all the clients except ALD using the File Transfer tool" and he "put the code after version in the t:\HRMS New Development folder" on Rimini's computer systems. (ECF No. 1508 at 21-23; *see also* P-1679 at 5.) The source code that Mr. Conley placed on Rimini's computer systems was code from an environment associated with AHC, and Ms. Mandla never advised Mr. Conley that moving files from a customer environment to Rimini's computer systems was prohibited. (*Id.*) Mr. Conley then instructed Ms. Mandla to use Rimini's TransferFiles tool to send the modified

1  version of TAX960ST.SQR from Rimini's systems to "all of the clients." (ECF No. 1508 at

2  23-25; *see also* P-1679 at 6.)

3        78.    By December 2016, Rimini renamed its TAX960ST.SQR file to

4  RSI960ST.SQR. (ECF No. 1508 at 25; *see also* P-1206 at 2 ("The TAX960ST.SQR

5  program will be renamed to RSI960ST.SQR.").) Rimini continued to make modifications

6  to TAX960ST.SQR and RSI960ST.SQR throughout Process 2.0, distributing

7  TAX960ST.SQR hundreds of times to clients using its TransferFiles tool and distributing

8  RSI960ST.SQR to over a hundred clients using CopyRSIFileFromClientToClient. (ECF

9  No. 1516 at 53-54.)

10        79.    One such example is the HCM106183 update, which Rimini developed in

11  January 2017 after client Fundamental (FUN) "report[ed] an issue of the W2 file to NC

12  being rejected by the new NC tax portal." (ECF No. 1508 at 27; *see also* P-7999 at 10.)

13  Mr. Conley developed an update to TAX960ST.SQR to fix the issue experienced by

14  Fundamental, but he developed that update in City of Eugene's environment. (ECF No.

15  1508 at 27-29; *see also* P-7999 at 1, 3; P-8035.) Mr. Conley believed that it was

16  permissible under Rimini's processes to develop this update in City of Eugene's

17  environment even though City of Eugene was not experiencing or reporting any problems

18  with the program because "the program is the same for all clients," and "if it's a problem

19  for one, it's a problem for all." (ECF No. 1508 at 30.) Mr. Conley confirmed that Rimini still

20  believes those processes to be acceptable, even after Judge Hicks found that Rimini's

21  troubleshooting processes violated the *Oracle I* Permanent Injunction. (*Id.* at 31-32.)

22        80.    Rimini waited until November 6, 2018, over four years after transitioning to

23  Process 2.0, and the day after the Ninth Circuit denied Rimini's motion to stay the

24  Permanent Injunction, to state that it was quarantining and prohibiting further use of

25  specific RSI rewrite files. (*Compare* P-9300 *with Oracle USA, Inc. v. Rimini St., Inc.*, 9th

26  Cir. Case No. 18-16554, ECF No. 11 (November 5, 2018).) Though Mr. Benge asserted

27  that Rimini developed its RSI rewrite files before transitioning to Environments 2.0 (ECF

28

1  No. 1505 at 125-127), his testimony was contradicted by the evidence, set forth above,

2  that Rimini continued to develop RSI rewrite files containing Oracle code throughout

3  Process 2.0 (ECF No. 1516 at 51).

4       81.    Before November 6, 2018, no one at Rimini was disciplined under the AUP

5  for having or using the newly prohibited RSI rewrite files. (ECF No. 1505 at 130-131.)

6  Before that date, these RSI rewrite files were stored on Rimini's computer systems,

7  copied from Rimini systems to a client's system, distributed to multiple clients, and

8  otherwise generally used as part of Rimini's support processes. (*Id.* at 128-132.)

9                **e.**    **Other Update Methods Rimini Uses**

10       82.    Rimini's updates also include prototyping changes to the PeopleSoft

11  interfaces ("object changes" or "online work," such as "run control pages") in the

12  PeopleSoft environments of its customers. Rimini developed these modified Peoplesoft

13  interfaces using PeopleTools Application Designer (or "App Designer"), and then

14  replicated these changes to other customers. (ECF No. 1504 at 28-30, 36-37; ECF No.

15  1506 at 135-136; ECF No. 1508 at 15, 35-36, 75-76; *see also* P-2282.)

16       83.    For example, Rimini used App Designer in the PeopleSoft environments of

17  two customers, DMW and FRD, to create "portions of the update associated with

18  RSI810ST," including a run control page discussed in the associated HCM104455

19  technical specification. (ECF No. 1504 at 93-94, 119-120, 28-29; ECF No. 1492-11

20  (Mandla Depo.) at 5-6 ("Q: And the idea is that those prototypes that you developed in

21  DMW and FRD would then be copied out to the other 8.81, 8.31 customers; is that right?

22  A: That is the prototype environment we use once the design is completed, we can

23  propagate those changes to other clients."); *see also* P-1673 at 2; P-9008 at 1-2, 5-6.)

24       84.    Much like its creation of RSI files and use of online objects, Rimini also

25  prototypes DMS scripts used to modify or retrieve data from the underlying database in

26  one customer's environment and then provides the scripts to other clients. (ECF No. 1504

27  at 28-34.) Rimini tests and verifies that the scripts are working properly using PeopleTools

28

1  (creating RAM copies during the process), and then copies the scripts outright to one or

2  more other customers. (*Id.* at 34-35, 230-31; ECF No. 1506 at 108; ECF No. 1507 at 186.)

3  DMS scripts are intended to be executed by the Oracle PeopleTools utility Data Mover.

4  (ECF No. 1504 at 28, 31-32.) Rimini necessarily developed DMS scripts through cross-

5  use because the scripts only run and can only be tested in DataMover in a PeopleSoft

6  environment. (*Id.* at 130.)

7       85.    For example, as part of the HCM103493 update, Rimini developed a data

8  mover script (HCM103493.DMS) through cross-use in five different customer

9  environments (AEP, FUT, COE, AED, and COW). (P-1202 at 2 ("Script Groupings by App

10  Release").) Each of these customer environments "was used as the prototype for this

11  particular DMS script, and then, as it says, and will be copied to the rest of the clients in

12  that group." (ECF No. 1504 at 128-130; *see also* P-1202 at 2 (development of DMS files

13  in one client in a group "copied to the rest of the clients in the group").) Rimini used

14  Oracle's DataMover tool to develop and test these Data Mover scripts in these prototype

15  customer environments. (*Id.*) As shown in P-9578, Rimini routinely copied DMS files from

16  one client to anywhere from one to dozens of other clients. (*See* P-9578 (FILENAME

17  column identifying distribution of ".DMS" files).)

18       86.    However, as to DAT files, Oracle attempted to introduce evidence that

19  Rimini "cross-used" certain DAT files by giving them to multiple clients through its expert

20  John Cauthen. But Mr. Cauthen admitted that he had no opinion that there was

21  copyrightable expression in the DAT files. (ECF No. 1507 at 231-232.) While Mr. Cauthen

22  claimed that DAT files would contain "Oracle IP" in the form of Oracle's PeopleSoft

23  database schema, he admitted that he could not identify what portion of the DAT file

24  contained the protected schema, that he had not compared any DAT file to the schema,

25  and that he did not analyze whether any DAT file was substantially similar to any Oracle

26

27

28

1    copyrighted work. (*Id.* at 233-235.) There was thus no evidence that these DAT files were

2    subject to Oracle copyrights.

3                  **f.**      **Rimini's Distinction Between an Update and a File**

4          87.    Rimini's witnesses sought to distinguish between "files" and "updates," with

5    "updates" consisting of multiple files. Rimini did so to suggest that, even after cross-using

6    one client's PeopleSoft software to create files and modifications that were distributed to

7    other clients, Rimini might still perform later development work on the files that it

8    distributed or otherwise assembled into a "formal" update to other customers through

9    cross-use. (ECF No. 1505 at 196, 203; ECF No. 1515 at 218.)

10        88.    To the extent Rimini was attempting to suggest that cross-use does not

11    occur so long as an "update" rather than "file" is delivered to customers, Rimini is mistaken

12    for multiple reasons. To start, Rimini and others use the terms "file," "update file," and

13    "update" interchangeably without drawing any distinction between them. (ECF No. 1516

14    at 49.)

15        89.    Second, the revisionist gloss that Mr. Benge offered for this distinction

16    between updates and files at trial—asserting that Rimini is "still in the development phase"

17    when Rimini sends update files to "our development environment in [customers] B and

18    C," (ECF No. 1505 at 201)—is contrary to Judge Hicks' prior rulings on prototyping and

19    cross-use. (ECF No. 1253 at 53 (finding that prototyping is not solely for customer's

20    internal data processing operations).) In the September 2020 Order in this case, Judge

21    Hicks stated that it is "generally not cross use for a Rimini engineer to create an update

22    file for Client A using Client A's software and then create the same update file for Client

23    B exclusively using Client B's software." (*Id.* at 87 (emphasis added).) But if Rimini creates

24    an update file for Client A, and then distributes that update file to Client B so that it can

25    be integrated into a larger update, that is still cross-use notwithstanding any additional

26

27

28                                         37

work done in service of the update, because that update file would not be created for Client B exclusively using Client B's software.

90.    Third, as Oracle's technical expert Christian Hicks explained, impermissible "cross-use occurs when the software on the first environment is used for a purpose not solely for the data processing operations of that environment, which includes transmitting the file to another environment." (ECF No. 1508 at 114-115.) "[A]t that point, there's clearly been cross-use whether or not that file will be subsequently worked on or packaged or whatever." (*Id.*) Further, Rimini's own expert, Professor Astrachan, admitted that the word "update" is not so specific as Rimini suggests. (ECF No. 1515 at 242-243 ("an update might not be just one file. It might be several files, it might be tax or regulatory updates," and it is "correct" that "one kind of update is certainly software code").)

91.    Fourth, an "update" can be transmitted by distributing all of its constituent files via AFW. (ECF No. 1516 at 50.) Rimini's AFW records show the transmission of updates from one customer's environment to multiple other customers' environments. (*Id.*) Rimini associates each AFW transaction with a particular Rimini update. (P-9578 ("DEVTRACK_ID" column).)

92.    Fifth, Rimini offered no evidence that it performed any further development work in customer environments that had received "files" or "updates" that Rimini developed through cross-use in a prototype customer's environment. (ECF No. 1516 at 42-43.) Mr. Benge asserted (without any documentary evidence or examples) that "there could be further work on" a file when it is sent from Client A's environment to Rimini's systems using the AFW function CopyRSIFileFromClientToClient before being sent to other customers. (ECF No. 1505 at 195-196.) But when pressed for details, he then backed away from that assertion and stated that "[i]t would be more likely that the work would happen within the next client environment, honestly." (*Id.* at 197.) Eventually, Mr. Benge conceded—with prompting from the Court—that when a file is developed in Client A's environment, transferred back to Rimini's computer systems, and then transferred out

to Client B's and C's development environments, it is the same file. (*Id.* at 204-205.) Mr. Benge even admitted that Rimini does not go back and rewrite code individually for Clients B and C after it is delivered from Client A. (ECF No. 1506 at 124-125.)

93.     Rimini also identified no records documenting its claim of further development work or articulating the further development work that it claimed to have performed. To the contrary, Rimini's AFW records repeatedly showed that if further modifications needed to be made to an update or file that Rimini had already developed through cross-use in a prototype environment and sent to multiple customers, Rimini would not independently develop that update in the environments of each customer that had received it. Instead, Rimini would go back to the prototype environment, further cross-use the PeopleSoft software in that environment, and then re-send the update or file to the customer environments that had initially received it. (ECF No. 1516 at 43-47.) Ms. Frederiksen-Cross "saw this pattern many times in the transactions that [she] analyzed." (*Id.*)

94.     Sixth, Rimini's claim of further development work is contradicted by its own AFW patent. Mr. Benge agreed that Rimini's AFW patent explains that after the "software update" is made for Client A, "it is automatically rolled out to client environment B"—not that Client B gets a separate update or that the code has changed before it gets to customer B. (ECF No. 1506 at 136-139; *see also* D-1 at col. 4:47-62.) The term "roll-out" also appears in Rimini's technical specifications. (ECF No. 1508 at 15-16; *see also* P-1197 at 1 (HCM104700: "202/08/2015 Roll-out of prototype for all clients").)

95.     Seventh, Rimini's claim of further development work is also contradicted by its own testimony and business model. Rimini does not need to do any further development work on updates and fixes (or underlying files) as part of its GenDiff/ApplyDiff process because "the whole premise" of that development model is "the software is identical so the identical update can be applied." (ECF No. 1516 at 41-42.) Further development work on its RSI files is likewise "contrary to the whole purpose of

1    one code for all" because the point of that development model is to "keep as many

2    customers as possible on a single version of the code." (*Id.* at 42.)

3                                **g.    Rimini's Provision of Break-Fix Support to its Customers**

4           96.    Break-fix support involves Rimini helping its customers solve issues with

5    their Oracle software, including bugs that may exist in the software or something else that

6    breaks or does not work. (ECF No. 1503 at 86; ECF No. 1504 at 163.)

7           97.    Break-fix support involves Rimini employees making modifications to

8    existing code in customers' environments. (ECF No. 1503 at 86.) Rimini requires

9    persistent access to one or more customer nonproduction environments to provide

10   troubleshooting services. (*Id.* at 113; *see also* P-516.) If Rimini accesses or modifies the

11   software in a customer's environment, a RAM copy of the customer's software is made

12   during that process. (ECF No. 1503 at 139; ECF No. 1504 at 36-37, 205, 230-231.)

13   Professor Astrachan concedes that RAM copies of Oracle software are typically created

14   when Rimini is working on a modification in Client A's environment, and there is no way

15   to use software without creating RAM copies. (ECF No. 1515 at 128-129; ECF No. 1504

16   at 37, 230-31.)

17          98.    Judge Hicks addressed break-fix support in *Oracle I*, finding that Rimini

18   copied and used the PeopleSoft environment associated with the City of Eugene to

19   troubleshoot a problem for Johnson Controls, including developing and testing a solution,

20   after the Permanent Injunction went into effect. *See Oracle I*, ECF No. 1548 at 26-28.

21   Judge Hicks determined this conduct constituted prohibited cross-use that was enjoined

22   by the Permanent Injunction and warranted a finding of contempt. (*Id.* at 28-30.)

23          99.    Rimini engaged in the same prohibited cross-use throughout the *Oracle II*

24   period. For one, Rimini used the PeopleSoft environment associated with the City of

25   Eugene to troubleshoot problems for other Rimini customers. For example, Rimini used

26   and created copies of City of Eugene's PeopleSoft environment to replicate and solve an

27   issue reported by Rimini customer Crown Equipment Corporation. (ECF No. 1504 at 163-

28

1   165; *see also* P-2308.) This conduct is prohibited cross-use because Rimini made copies

2   of PeopleSoft software that were not used solely for City of Eugene's own internal data

3   processing operations. (ECF No. 1504 at 42-43, 165.)

4       100.   Ms. Frederiksen-Cross also identified additional instances of Rimini using

5   and copying the PeopleSoft environments associated with one customer to troubleshoot

6   and solve problems experienced by other Rimini customers during the *Oracle II* period.

7   As another example, on October 20, 2016, Rimini employee Jai Ramachandran reported

8   that customer Fundamental ("FUN") reported issues with RSI810ST—a Rimini rewrite

9   file—and that he was trying to replicate the issue. (P-2307 at 3; *see also* ECF No. 1504

10  at 166-169.) In the next email, Timothy Pringle states that he ran TAX960ST—an Oracle

11  file name—in a different environment associated with AHC. (P-2307 at 2; *see also* ECF

12  No. 1504 at 167-168.) Mr. Pringle later reports that he "ran RSI860ST in [VITAS Hospice

13  Services LLC] and could not replicate the client's results"—*i.e.*, an environment

14  associated with VITAS, yet another Rimini customer. (P-2307 at 1; *see also* ECF No.

15  1504 at 168.) In short, Rimini cross-used PeopleSoft software from two different customer

16  environments to troubleshoot a problem reported by a third customer, FUN—double

17  troubleshooting cross-use. (*Id.* at 168-169.)

18      101.   The PeopleSoft software in the environments associated with City of

19  Eugene, AHC, and VITAS Hospice Services, L.L.C. substantially embody the PeopleSoft

20  software protected by the following copyright registrations: TX 5-469-032, TX 7-092-819,

21  TX 7-065-381, and TX 7-065-376. (P-2055 (Rimini Responses and Objections to

22  Amended First Set of RFAs [Nos 1-2]); P-9598 (Exhibit D-3.4 to Rimini's Eighth

23  Supplemental Responses to Interrogatory No. 3).)

24              **h.    Rimini's Quality Assurance Testing**

25      102.   Oracle also argues that Rimini's approach to testing—a few 'long tests'

26  followed by some 'short tests'—further evidences Rimini's infringement. (ECF No. 1524

27  at 102-105.) The Court disagrees. Before a Rimini deliverable is provided to a client for

28

41

incorporation into the client's production environment, Rimini performs Quality Assurance ("QA") testing to ensure the update functions correctly. (ECF No. 1514 at 163.) Rimini performs this testing in each client's environment. (*Id.* at 163-166, 174.) Where multiple clients are receiving an update, the QA team typically begins by performing "long tests" on a first group of clients—typically one client "per application release" is chosen (meaning one client with PeopleSoft 8.9, one client with PeopleSoft 9.0, etc.). (*Id.* at 165-167.) The long test involves testing "outside" of what the development team has created, so that the QA team can ensure the new development has not "broken anything else" in the software. (*Id.* at 166.) Then the QA team performs "short tests" for each client, which are a less extensive version of the testing. (*Id.* at 167-168 ("[S]o in a long test, for example, we may enter a hundred employees and run 10 payrolls. For a short test, we may only enter 10 employees and run two payrolls. It's just a shorter version of the long test.").) Rimini does not perform long tests for every client because "[t]here's no need to," since Rimini's QA engineers "learn from the original long test that our code is good" and can then perform short tests for the remaining clients receiving the update. (*Id.* at 169.) The nature of the long and short tests may vary by client, and there are different varieties of short test, including "apply only" and "run to success" tests. (*Id.* at 167-168, 171-172.) But Rimini provides either a long or a short test for every client that receives the update. (*Id.* at 168.)

103.   Rimini's QA team also performs "bundle" testing for each PeopleSoft update, which refers to testing that is performed when multiple individual updates are merged into a single update bundle. (ECF No. 1514 at 172-174.) Bundle testing is intended to ensure that there is no risk a Rimini update will not function once the code has been merged with other Rimini-written code. (*Id.* at 172-173.) The first few clients to receive a bundle test are referred to as "beta" clients. (*Id.* at 173.) Beta clients "get the same basic task or test plans that everyone else gets"; they are referred to as betas

1    because they are the first clients to be tested. (*Id.* at 173.) Bundle testing takes place on

2    the client's system. (*Id.* at 174.)

3        104.    Oracle's expert Ms. Frederiksen-Cross testified that her opinion was that if,

4    as a result of testing work performed for one client, Rimini decided it did not "need to test

5    [the update] as thoroughly anywhere else," that would be "cross-use" under her definition

6    of that term. (ECF No. 1504 at 265-266.) But she acknowledged that Judge Hicks has

7    already ruled that "Rimini is permitted to perform less or even no testing if it so chooses."

8    (*Id.* at 266-267.) While the Court generally found Ms. Frederiksen-Cross persuasive, it

9    did not find her persuasive on this point.

10                            **i.    Rimini's Automated Tools**

11        105.    As part of its transition to "Process 2.0," Rimini created several Automated

12    Tools, including its Automation Framework ("AFW"), which Rimini uses throughout the

13    software development lifecycle to assist with preparing TLR updates. Rimini also created

14    the Dev Review program, which Rimini uses to replicate user interface changes

15    prototyped in one customer's PeopleSoft software environment to other customers. (ECF

16    No. 1504 at 72-73, 84; ECF No. 1503 at 134-136, 210; *see also* P-1257 at 1; P-1265 at

17    1.) Because these Automated Tools facilitate and automate Rimini's prototype and

18    distribute model, they are engines for impermissible cross-use of Oracle's PeopleSoft

19    software. (ECF No. 1508 at 103; ECF No. 1504 at 72-74, 84.)

20        106.    As set forth below in this section, for each of these tools, Rimini's oft-

21    repeated defense at trial was that the files being cross-used were Rimini work product

22    and did not include Oracle code or protected expression. That turned out not to be true in

23    many cases. As also discussed below concerning specific Rimini Automated Tools, even

24    when it was true, Rimini created and tested its claimed work product in the PeopleSoft

25    environments of Oracle's other licensees, creating RAM copies of those environments

26    and software files. The files created and tested by Rimini's copying of PeopleSoft software

27    in the environment of one customer were then distributed and used to support other

28

customers, constituting cross-use. Further, the files and documentation Rimini claims it created, even those without Oracle code, and then distributed to multiple customers, were derivative works because they leveraged portions of existing Oracle programs and were created in PeopleSoft environments with PeopleSoft tools for use in PeopleSoft environments.

107.   Rimini and Mr. Ravin considered AFW to be "one of the most important projects in the company." (ECF No. 1503 at 135; *see also* P-1265 at 1.) The plan for AFW and Rimini's other Automated Tools was to automate impermissible cross-use of remote customer environments. (ECF No. 1503 at 141; *see also* P-1266 at 1 (Benge to Ravin 4/12/13 "This is a fundamental requirement of our tools to work in a distributed environment. With this we will be able to simultaneously initiate processes across a multitude of client environments.").) Jim Benge explained that it would be "next to impossible" for Rimini to "efficiently" or "profitably" implement its PeopleSoft updates for customers manually rather than through AFW. (P-1732 at 1, 3 (Benge: "we cannot make exceptions" for customers not willing to use AFW).)

108.   Rimini developed and tested its Automated Tools in PeopleSoft environments on Rimini systems, which also created RAM copies of the PeopleSoft software in those environments. (ECF No. 1504 at 36, 74-75.) Mr. Benge admitted Rimini tested CodeAnalyzer in the PeopleSoft software environment associated with customer Aldo, and that CodeAnalyzer was developed to benefit many clients, not just Aldo. (ECF No. 1503 at 136 ("Q And AFW was tested in PeopleSoft customer environments on Rimini systems as part of its development, correct? A I believe so, yes."), 139; ECF No. 1505 at 165; ECF No. 1504 at 74, 83; *see also* P-9289 at 1 ("I am using [customer] Aldo as a pattern since we already have development folders on their remote"); P-1573 at 1 (Slepko to Ravin (10/6/13): "They were tested on our environments"); P-1266 at 1 (achieving the first end to end test of AFW on a remote environment).) AFW was created as a tool to

1   benefit all Rimini clients. (ECF No. 1505 at 168.) The development of portions of AFW

2   further required the copying of PeopleTools. (ECF No. 1504 at 75.)

3       109.   The components of the AFW system communicate through a hub-and-

4   spoke model, with a Rimini FTP Server in the middle. (ECF No. 1508 at 104-105.) The

5   AFW FTP server on Rimini systems essentially functions as a "drop box" where computer

6   communications and data are deposited to be retrieved. (*Id.*) AFW also has a database

7   ("AFW database") that stores a variety of information about AFW and transactions. (*Id.*;

8   *see also id.* at 117.)

9       110.   AFW is part of Rimini's prototype and distribute model: Rimini prototypes

10  an update file in Client A, which is then propagated back to the AFW FTP server and then

11  distributed out to Clients B and C. (*Id.* at 105.) The AFW database identifies the source

12  and recipient customer environments. (ECF No. 1504 at 149, 154-155; *see also* P-2577;

13  P-2582.)

14      111.   *CodeAnalyzer*. Rimini's Automated Tools include CodeAnalyzer, which is a

15  tool that identifies and groups together identical versions of source code across multiple

16  customers to facilitate the development and testing efforts associated with a particular

17  update. (ECF No. 1508 at 105-07, 145; ECF No. 1504 at 76-77; ECF No. 1505 at 170-

18  72; ECF No. 1506 at 53; *see also* P-1759 at 1.) Rimini only stopped using CodeAnalyzer

19  when the Permanent Injunction first went into effect in November 2016, resumed using it

20  when that Injunction was stayed in December 2016, and stopped using it again when the

21  Permanent Injunction went back into effect in November 2018. (ECF No. 1503 at 142,

22  244; ECF No. 1507 at 185, 189-190.) Mr. Ravin also admitted that Rimini would like to

23  resume using CodeAnalyzer. (ECF No. 1503 at 142.)

24      112.   Rimini's CodeAnalyzer Guide tells its developers:

25  "There are two premises that are exploited by CodeAnalyzer. First, if the source

26  code of a particular program is identical for two clients . . . we can manually make

27

28

the modifications for the first client and then use an automated tool to apply those same modifications for the second client" (P-1759 at 5);

• "Normally, you would choose a single client to be used as a prototype for which you will work out the details of the code modifications for all of the affected program modules," (*id.* at 18);

• "For this example, we see that there are two program modules with 11 QA Groups and 10 Development Groups . . . . you will need to pick one client from each QA Group and manually apply your code modifications to each program file for those clients," (*id.* at 19);

• "Once you have made your manual modifications, you can use CodeAnalyzer to apply your modifications to the other clients within each of the Development Groups," (*id.* at 20, 40-42 (including other examples)); and

• "Copying RSI Custom Program Modules Between Clients. Sometimes during the development process, you have a need to copy a program module from one client to another. . . . This feature is used to distribute RSI developed code that is identical for all clients. It allows the developer to write the code once, and then distribute it to all impacted clients." (*Id.* at 52.)

113.    If Code Analyzer identifies customers with identical code, they are placed into the same "development group," and Rimini can prototype an update in one customer's environment and then use CodeAnalyzer tools to apply the update to all customers' environments who have the same code. (ECF No. 1504 at 76-77; ECF No. 1505 at 170-72, 175-77; ECF No. 1506 at 53; *see also* P-1759 at 20, P-1201 at 1.) Mr. Benge admitted that Rimini grouped clients based on who had identical code both before and during Process 2.0. (ECF No. 1506 at 94-95.) Mr. Benge testified that the prototyping applied to other client environments is "solely" for the first client, even though the CodeAnalyzer Guide instructs that the prototype will be distributed to all remaining clients

1    (ECF No. 1505 at 174), and even though the developers know the prototype will be
2    applied to all of the other clients in a group (*id.* at 177). (*See also* P-1759 at 5.)

3         114.   CodeAnalyzer is an engine of impermissible cross-use because, as detailed
4    above, it permits Rimini to group customers with identical code, then develop an update
5    once and apply the modifications automatically to the remaining customers in the group.
6    (ECF No. 1504 at 72-73, 76-78.) Professor Astrachan "concluded as a factual matter that
7    there was no copying of Client's A software done by Rimini to develop updates to support
8    Client B or C." (ECF No. 1515 at 248.) He reached this conclusion despite the fact that
9    development and testing in Client A's environment creates RAM copies, and without
10   addressing whether the updates were derivative works based on the Court's rulings in
11   this case. (*Id.* at 110-111; *see also* ECF No. 1253 at 50-53, 83.)

12        115.   Mr. Benge defended the CodeAnalyzer Guide by saying it was an "old
13   document" and "As part of Process 2.0, we develop and test for each client," while
14   admitting "I'm not contradicting what the guide says." (ECF No. 1505 at 171, 175 ("I'm not
15   contradicting anything that's in this guide.").) The CodeAnalyzer Guide is a Process 2.0
16   document, dated September 2015, that governs the use of CodeAnalyzer, which Rimini
17   used, other than a brief halt in 2016, until the *Oracle I* Permanent Injunction in November
18   2018, and which, as Mr. Benge knew, Rimini desires to use again depending on the
19   outcome of this case. (*Id.* at 192-193.)

20        116.   *CopyRSIFileFromClientToClient*. AFW and the CodeAnalyzer tool contain
21   additional functions that automate other development tasks. (ECF No. 1508 at 107-108.)
22   Rimini uses the function "CopyRSIFileFromClientToClient" to copy files from one
23   customer's PeopleSoft environment and distribute them to multiple other customers as
24   part of Rimini's prototype-and-distribute model. (*Id.* at 108-109; ECF No. 1504 at 78-79;
25   ECF No. 1515 at 258; *see also* P-1759 at 52-54.) At least six copies of a given update file
26   are made in connection with prototyping and distributing a file with this function, plus the
27   RAM copies of PeopleSoft software that Rimini created as part of its development of the

28
                                              47

1 update file. (ECF No. 1508 at 109-13.) Even Professor Astrachan admitted that the

2 copying of Client A's software is done to test Rimini-written code distributed by this tool

3 and then the code "is used in Client B and C's environment." (ECF No. 1515 at 257; *see*

4 *also* DDX5-52.)

5       117.   The only technical restriction on the types of files that Rimini employees can

6 send through CopyRSIFileFromClientToClient is that it will only copy and distribute files

7 that start with the letters "RS" or "RXC" or DMS files stored in a particular folder. (ECF

8 No. 1504 at 78-79; ECF No. 1508 at 120-21; ECF No. 1507 at 200-01.) These restrictions

9 are ineffective because "if you have an Oracle file that you want to transmit, all you would

10 have to do is change the name and it would go." (ECF No. 1507 at 201-02.) And indeed,

11 both Mr. Hicks and Ms. Frederiksen-Cross identified instances where Rimini distributed

12 Oracle protected expression and files containing Oracle copyright notices using

13 CopyRSIFileFromClientToClient. (ECF No. 1508 at 115, 139-141; ECF No. 1504 at 79,

14 117, 131, 137; *see also* P-2533.) And as found *supra*, Rimini used AFW to send RSI files

15 to customers.

16       118.   Rimini's assertion that files sent with CopyRSIFileFromClientToClient are

17 not sent "directly" from one customer's PeopleSoft software environment to other

18 customers' PeopleSoft software environments is misleading and irrelevant. (ECF No.

19 1508 at 118-119, 142 ("from a user interface standpoint, it does.").) While files sent using

20 this AFW function are deposited temporarily on the Rimini AFW FTP server before going

21 to the recipient computer environments, the purpose and the name of the function is

22 CopyRSIFileFromClientToClient. (*Id.* at 118-119.) To run the function, a Rimini developer

23 selects the file to send, the source customer, and the destination customer, before the file

24 is ever sent. (*Id.*) Because CopyRSIFileFromClientToClient makes a copy of the file in

25 Client A's environments regardless of the provisions in Client A's license agreement and

26

27

28

1 distributes that copy to other customers, this function also constitutes impermissible

2 cross-use. (ECF No. 1504 at 86-87; ECF No. 1508 at 103, 109.)

3      119.   Indeed, Judge Hicks found at summary judgment that Rimini infringed

4 certain of Oracle's copyrights because it cross-used City of Eugene's environment to

5 develop and distribute the HCM104288 update—held to be a derivative work—to other

6 customers. (ECF No. 1253 at 49-53; *see also* ECF No. 1508 at 115.) In particular, 92

7 clients received update HCM104288 from COE using CopyRSIFileFromClientToClient,

8 with a total of 2,957 files transferred as part of the update. (*Id.* at 117-18; *see also* P-

9 9437.) Exhibit P-9578 is a list of the update files that Rimini sent in the same manner as

10 HCM104288, along with the names of the source customer whose software was copied

11 and cross-used in sending each file. (ECF No. 1504 at 153-54, 159; *see also* P-9578.)

12      120.   Exhibit P-2582 contains a count of the number of instances a particular

13 customer's PeopleSoft software environment was used as a source environment for a

14 CopyRSIFileFromClientToClient request, which shows Rimini impermissibly cross-used

15 at least 217 environments associated with 177 customers in connection with its use of the

16 CopyRSIFileFromClientToClient function. (ECF No. 1504 at 149.) Based on the AFW

17 records, more than half of the CopyRSIFileFromClientToClient transactions were

18 concentrated in about a dozen customer environments, including City of Eugene. (*Id.* at

19 147-48.) Rimini engaged in cross-use of PeopleSoft environments using the AFW tool

20 CopyRSIFileFromClientToClient 18,930 times. (*Id.* at 87.) Appendix PeopleSoft-3

21 identifies the copyright registrations corresponding to the PeopleSoft software in the

22 source PeopleSoft software environments listed in P-2582. (ECF No. 1524-2 at 19-39.)

23      121.   *TransferFiles*. Rimini also uses another file transfer function called

24 "TransferFiles" to copy and distribute one or more files stored on Rimini's system to

25 PeopleSoft software environments associated with its customers. (ECF No. 1508 at 119-

26

27

28

21; ECF No. 1504 at 81.) There is no technical restriction regarding the types of files that can be sent using TransferFiles. (ECF No. 1508 at 119-20; ECF No. 1504 at 81-82.)

122.   Ms. Frederiksen-Cross identified instances of files with Oracle copyrights and/or filenames being transferred through TransferFiles, as well as thousands of transfers of the derivative work files RSI810ST.SQR and RSI960US.SQR. (ECF No. 1504 at 81-82, 124-27, 136-37.) Her and Mr. Hicks's analyses were hampered by Rimini's decision to program AFW to delete the files sent using TransferFiles and keep only the record of the transfer (and the given file name transferred), and not the contents of the file, in the AFW Database. (*Id.*; *see also* ECF No. 1508 at 120-21.)

123.   Rimini also uses TransferFiles as another way to distribute updates prototyped in one customer's environment to other customers. As an example, Mr. Conley admitted that he copied a modified version of TAX960ST.SQR from a customer environment associated with customer AHC to Rimini's systems (on the T drive) so that another Rimini developer could use TransferFiles to send it to all of Rimini's other clients. (ECF No. 1508 at 21-25, 49; *see also* P-1679 at 5-6.) He also instructed another developer, Harika Mandla, to copy and paste code from AHC to her text editor on Rimini's systems, send it to other clients, and save it to Rimini's T drive. (ECF No. 1508 at 57-59; *see also* P-1682 at 3.) As another example, the Online Development Retrofitting Guide for the Dev Review program instructs Rimini developers to use TransferFiles to send the files prototyped as part of the Dev Review process (discussed below) to the target customer environment. (D-17 at 4, 11; *see also* P-1684 at 1 (Mandla to Benge: "successfully transferred files. I will delete the file from rimini ftp").) Mr. Conley called TransferFiles "just a different way of doing it to transfer the file out to clients." (ECF No. 1508 at 24.)

124.   Rimini's use of TransferFiles results in impermissible cross-use and is part of its prototype-and distribute model: distribution of a file tested in one customer's environment to other customers. (ECF No. 1504 at 81.) Though Mr. Benge asserted that

1    Rimini only used TransferFiles for "Rimini written files," even he agreed those files would

2    have been tested in a customer environment. (ECF No. 1506 at 133; ECF No. 1504 at

3    34-37, 41.) And if that test revealed a problem, a Rimini developer would revise the file,

4    transfer it to the customer environment again, and test it again. (ECF No. 1506 at 134.)

5    Rimini would then use TransferFiles to send that file to every customer in scope—in short,

6    prototype-and-distribute. (*Id.*)

7         125.   *GenDiff/ApplyDiff*.   Rimini   uses   another   CodeAnalyzer   function,

8    "GenDiff/ApplyDiff," when it wants to copy code modifications (*i.e.*, portions of code that

9    are written into existing files) prototyped in one customer's environment and then

10   distribute those modifications to other customers. (ECF No. 1508 at 121-22; ECF No.

11   1504 at 79-80; ECF No. 1505 at 207-14; *see also* P-1759 at 40 ("When your update

12   involves program code that is identical across two or more clients, then you are able to

13   take advantage of a time saving feature of CodeAnalyzer that allows you to

14   programmatically apply RSI modifications made for one client to the program code for

15   another client, as long as that client has an identical version of the program code").) The

16   file containing the code modifications is called a "Diff file" or "Change set." (ECF No. 1508

17   at 121-122, 150.) The changes in the Diff file are encoded such that it would be difficult

18   or impossible to figure out what they actually are without the original file. (*Id.* at 150-52.)

19        126.   Rimini's use of GenDiff/ApplyDiff involves a Rimini developer prototyping

20   an update to an Oracle source code file in Client A's environment, invoking

21   GenDiff/ApplyDiff to generate a Diff file containing just the changes, transmitting the

22   changes to Clients B and C via AFW, and then applying those changes to the same

23   source code files in environments for Clients B, C, and others. (ECF No. 1508 at 121-22,

24   150; ECF No. 1505 at 213.) Regardless of what the Diff file contains, the use of this

25   function is still impermissible cross-use because, among other things, the end result is

26   that the modified source code file prototyped in Client A's environment is also for the

27   benefit of Clients B and C and is replicated in those environments of Clients B and C.

28

1    (ECF No. 1508 at 125-27; ECF No. 1504 at 80-81; ECF No. 1505 at 213.) Professor
2    Astrachan admitted that the Diff file created in Client A's environment is used for Clients
3    B and C "to implement the updates in those clients, that's correct." (ECF No. 1515 at 255-
4    56.)

5            127.   The GenDiff/ApplyDiff process also creates multiple copies of PeopleSoft—
6    both of the enterprise software in the prototype environment and of the specific source
7    code file that Rimini is modifying. (ECF No. 1505 at 209, 211-12; ECF No. 1508 at 123-
8    25.) As to source code, Rimini creates two copies of the Oracle file that it is modifying in
9    two separate folders: "Code Before" and "Code After." The file in "Code After" is modified
10   as needed. (*Id.* at 149-50; ECF No. 1506 at 108-12; *see also* P-1759 at 41.)

11           128.   When a Rimini developer invokes GenDiff/ApplyDiff to distribute the
12   changes that Rimini made to the Oracle source code file, the tool compares the Code
13   After file to the Code Before file to generate the Diff file, which is then sent outright to
14   other customers so that the same modifications made for Client A can be automatically
15   applied to the other customers' environments. (ECF No. 1506 at 112-15; *see also* P-1759
16   at 42-43.) In doing so, the function creates four RAM copies for purposes of creating the
17   Diff file. None of these RAM copies of Oracle source code facilitates any internal business
18   operations of Client A because, importantly, Client A already has the modified Oracle
19   source code file. (ECF No. 1508 at 123-25; ECF No. 1505 at 212-14.)

20           129.   Rimini asserts that its use of the GenDiff/ApplyDiff function is fair use, but
21   the assertion ignores many essential facts. First, the RAM copies created from running
22   GenDiff/ApplyDiff are like any other executable software that is loaded into and remains
23   fixed in RAM for as long as needed. (ECF No. 1508 at 127-28.) Second, these RAM
24   copies have the same purpose as the original files, as opposed to being for a
25   fundamentally different purpose such as being turned into a song or a statue. (*Id.* at 128.)
26   As Mr. Hicks explained, "[t]his is PeopleSoft code before used for PeopleSoft purposes,
27   and it's PeopleSoft code after used for PeopleSoft purposes." (*Id.* at 128.) Third, these

28

RAM copies, like any kind of software copies (including temporary copies) can affect the market. (*Id.* at 131-32.) Rimini's expert, Professor Astrachan, failed to consider these factors and many others in forming his fair use opinion. (ECF No. 1515 at 243-47.)

130.   The Diff file does not facilitate any internal data processing in Client A's environment. The Diff file is not stored in Client A's environment and Client A does not receive any benefit from the Diff file. (ECF No. 1508 at 122-23.) The Diff files are created for the benefit of Clients B and C. (ECF No. 1505 at 213-14 (conceding change set created for benefit of Clients B and C).)

131.   Exhibit P-2577 contains a count of the number of instances a particular customer's PeopleSoft software environment was used as a source environment for a GenDiff/ApplyDiff request. (ECF No. 1504 at 154-55.) Rimini engaged in cross-use of PeopleSoft environments using the AFW tool GenDiff/ApplyDiff 4,302 times. (*Id.* at 87-88.) Appendix PeopleSoft-3 identifies the copyright registrations corresponding to the PeopleSoft software in the source PeopleSoft software environments listed in P-2577. (ECF No. 1524-2 at 19-39.) The total number of times Rimini engaged in cross-use of PeopleSoft environments with both the GenDiff/ApplyDiff and CopyRSIFileFromClientToClient tools is 22,357, excluding duplicates. (ECF No. 1504 at 88.)

132.   *GenDataChanges.* Rimini uses AFW to automate additional development tasks. Rimini uses a function called "GenDataChanges" to create DMS script files for use with PeopleTools. (ECF No. 1508 at 134.) These files are used for making database changes, and Rimini developers create them by prototyping and testing a DMS script (or spreadsheet that will be turned into a DMS script with GenDataChanges) in Client A's environment. (*Id.* at 135-36.) When the prototype is ready, the script (or spreadsheet) is transferred through AFW to Clients B and C. (*Id.*)

133.   *ApplyUpdate.* Rimini also uses a function called 'ApplyUpdate' which replicates the database changes that were prototyped on Client A's environment using

the PeopleTools DataMover utility. (*Id.* at 134-36; ECF No. 1504 at 82-83; ECF No. 1505 at 43.) ApplyUpdate is also used to apply or install updates for testing or delivery, again applying DMS scripts with DataMover. (*Id.*; *see also* ECF No. 1514 at 169.) Because this again involves the use of Client A's environment for updates to Client B's and C's environments, the use of these tools is impermissible cross-use. (ECF No. 1508 at 136.)

134.   Rimini's Automated Tools, and the development and QA processes underlying these tools, involves the creation of copies of PeopleSoft software associated with one customer, including RAM copies in the prototype customer's PeopleSoft environment, to copy and distribute update files to other Rimini customers. (*Id.*) Even if the files being distributed via AFW did not contain PeopleSoft source code, Rimini's use of AFW constituted cross-use because Rimini prototyped the updates and their corresponding files in one customer's PeopleSoft environment, created RAM copies of that environment during prototyping or distribution, and then used AFW to distribute the updates and files to other customers. (ECF No. 1515 at 164-65; ECF No. 1507 at 165 (admitting DMS file for HCM103493 in P-1202 was copied from a customer environment for American Electric Power to the rest of the clients in the group).)

135.   The design and operation of AFW confirms that Process 2.0 is not designed to prevent the copying of materials that infringes Oracle's copyrights. (ECF No. 1507 at 199; ECF No. 1504 at 81 (regarding GenDiff/ApplyDiff).) Instead, Rimini's Process 2.0 tools were designed to facilitate Rimini's copying and impermissible cross-use. (ECF No. 1507 at 198, 222.) AFW, in particular, was designed to help Rimini impermissibly cross-use PeopleSoft software by: (1) grouping customers; (2) developing updates for one customer in the group and then copying to the other customers in the group; and (3) automating the transfer of updates containing Oracle software from one customer to many. (*Id.* at 199.) These tools also allowed Rimini to hide what its developers were doing. (*Id.* at 198.) Rimini's disclosure of the operation of AFW in its patent application and in discovery does not change the fact that Rimini's design ensured the contents of the files

1   in its everyday operation are hidden from view. (*Id.* at 229, 257, 261.) AFW was not

2   designed to prevent the transmission of materials that infringe Oracle's copyrights. Mr.

3   Cauthen proved this through an experiment in which he used GenDiff/ApplyDiff to send

4   a test file that included an Oracle copyright notice, demonstrating that AFW CodeAnalyzer

5   was not designed to avoid this. (*Id.* at 217-18, 257-58; ECF No. 1508 at 150.) Mr. Cauthen

6   further testified that, in his work at the FBI, he regularly encountered commercial entities

7   who implemented measures that monitored for unauthorized copyrighted material; but in

8   this case, Rimini put in place no such measures as part of Process 2.0. (ECF No. 1507

9   at 224-25.)

10         136.   *Dev Review.* Rimini also created the "Dev Review" program, another tool

11   that results in impermissible cross-use. (ECF No. 1504 at 84; ECF No. 1508 at 132-33.)

12   The Dev Review program is used with what Rimini calls "online work" or "online

13   development," which as discussed *supra*, refers to the modifications made to the

14   PeopleSoft user interface pages using PeopleTools App Designer. (ECF No. 1508 at 38,

15   75-76; ECF No. 1504 at 28.) User interface code is stored in the PeopleSoft database as

16   PeopleCode and is used to display screens that the end user (such as an HR employee)

17   would see when they are using PeopleSoft programs (such as windows, buttons, and text

18   fields). (ECF No. 1508 at 42, 76, 132.)

19         137.   The Dev Review program then facilitates the copying and use of these

20   modifications (also referred to as "online objects") made in a prototype customer's

21   PeopleSoft environment to other customers' PeopleSoft environments. (ECF No. 1504 at

22   84; ECF No. 1508 at 36-38, 132-33; *see also* P-2014-001; P-2014-002.) Rimini also refers

23   to this Dev Review process as "retrofitting." (ECF No. 1508 at 38.) As explained in a 2014

24   training video presented by Mr. Conley (that he had previously denied existed (ECF No.

25   1508 at 36-37)) and Bruce Kelling about the Dev Review program that was shown at trial,

26   the Dev Review program was intended to help with "how to produce [online] projects for

27

28
                                            55

a hundred or a thousand clients, we thought we had to have some reproducibility." (*Id.* at 37-40; *see also* P-2014-001 at 3; P-2014-002.)

138.    Rimini specifically uses Dev Review to create data files and a spreadsheet that Rimini developers then use to: (1) make modifications to the target environment; and (2) confirm that the modifications match a prototype modification once initial user interface work in a prototype environment is completed. (ECF No. 1508 at 43-51, 76; *see also* P-2014-002; D-17 at 6; P-2014-001 at 26.) Data files are extracted from the Peoplesoft database in the prototype environment. (ECF No. 1508 at 45.) These files are then put on the T drive, which is on Rimini's system, so they can be sent to and used with other customer environments using the AFW TransferFiles function. (P-2014-001 at 6 ("You can send an entire folder of files through the file transfer"); P-2014-002; *see also* ECF No. 1508 at 48-51.)

139.    To replicate, or "retrofit," the modification to another customer's environment (the "target environment"), Rimini instructed its developers to log into Application Designer to copy and paste the code changes from the spreadsheet into App Designer in the target environment. (P-2014-001; P-2014-002; *see also* ECF No. 1508 at 38-39, 51-52.) Mr. Conley told developers "not to be creating anything new" or use their creativity, but to engage in "mind numbing[] copying and pasting." (P-2014-001 at 94; P-2014-002; *see also* ECF No. 1508 at 53, 93-94.)

140.    Rimini also instructs its developers to refer to screenshots of the prototype environment, or to directly enter the prototype environment, so they can compare the prototype environment to the target environment and ensure the modified target environment looks exactly like the prototype. (P-2014-001; P-2014-002; D-17 at 5-6 ("Note: It is CRITICAL to verify the page's cosmetic appearance against the prototype screenshot"); *see also* ECF No. 1508 at 54-55, 93-94.)

141.    The Rimini developer then runs the Dev Review program in audit mode to confirm that the target environment matches the prototype environment exactly. (D-17 at

1   6 ("Select Audit from the Program Run Mode dropdown list and enter the DevTrack Id,

2   then click Run to run the Dev Review Program").) If it does not, the Rimini Developer

3   adjusts his or her work and runs the audit again. (*Id.* ("repeat Steps 17 and 18 until you

4   get an error-free audit report.").)

5       142.   In response to Mr. Conley explaining some of the rules for the spreadsheet,

6   Rimini developer Don Sheffield commented in the training video 'Legal doesn't have a

7   clue what we're doing.' (P-2014-001 at 90; P-2014-002; *see also* ECF No. 1508 at 56.)

8       143.   Even if Rimini only uses the Dev Review program on code that Rimini claims

9   to have written (*id.* at 51, 76-77), this practice is still impermissible cross-use because the

10   updates to the PeopleSoft user interface have been developed and tested in prototype

11   environments for other customers.

12       144.   The Dev Review program relies on the PeopleSoft environment and does

13   not run on other products. (ECF No. 1504 at 84; ECF No. 1508 at 38, 53-54.) The Dev

14   Review program runs in a client's PeopleSoft environment and may also run PeopleTools

15   Data Mover. (ECF No. 1504 at 85; ECF No. 1505 at 41.)

16       145.   The source code for the Dev Review program, RSIDVRVW.SQR, was

17   developed using PeopleSoft environments. (ECF No. 1504 at 84; ECF No. 1516 at 47.)

18   Rimini used at least an environment associated with Campbell's Soup as a prototype, as

19   shown in the training video about the Dev Review program. (ECF No. 1508 at 47-51; *see*

20   *also* P-2014-001 at 16; P-2014-002.) Rimini then distributed the Dev Review program

21   (RSIDVRVW.SQR) to other customers' PeopleSoft environments, and did so multiple

22   times. (ECF No. 1516 at 45; *see also* D-17 at 5 ("Update RSIDVRVW.SQR in

23   PSHOME/SQR Folder"); *see also, e.g.*, P-2596 at 67, 69, 90 (showing transfers of

24   RSIDVRVW.SQR).) Rimini also impermissibly cross-used customer environments such

25   as Campbell Soup, City of Eugene, YRC Worldwide Technologies, and American Council

26

27

28

on Education to distribute the Dev Review program to other customers, frequently to more than 100 customer environments at a time. (P-9578 at 31-32.)

**j.      Rimini's Automated Tools As Part of Its Business Model**

146.   AFW and Dev Review eliminate manual work and save time and money for the Rimini development and QA teams. (P-1920 (regarding Dev Review Program: "week long dev review process was turned into a seconds review" and "this is about replicating re-doing the same thing for 100 clients and ensure that clients all have the same thing"); *see also* ECF No. 1515 at 262; ECF No. 1512 at 60-61 (agreeing that "the reason Rimini was using these automated tools was to reduce its own costs").) Tim Conley said in a training session for the Dev Review tools: "my main concern was keeping this program, and they [legal] were ready to put the kibosh on it. And I said, without this program, we cannot do the work. Might as well hire 100 more developers. I mean it's just ludicrous." (P-2014-001 at 90-91.)

147.   Although Mr. Benge suggested that AFW was only "nice to have," and that a developer manually updating files would not take that long (ECF No. 1505 at 152-53), this testimony was contradicted by Rimini's own emails (P-1732 at 1, 3). In addition, Mr. Slepko admitted that automated tools made developers more efficient. (ECF No. 1512 at 56-57.)

148.   Because Rimini's Automated tools, including AFW, CodeAnalyzer and Dev Review, and the development and QA processes around those tools, consistently copy and use the PeopleSoft software associated with one customer to copy and distribute update files to other Rimini customers, this means that Rimini's Automated Tools facilitate copying and cross-use. (ECF No. 1508 at 136.)

**k.      Rimini's Unlicensed Distribution of Updates from Customer Associated Environments Licensed with a Distribution Restriction**

149.   Section 4.1 to the City of Eugene's PeopleSoft software license provides: "Licensee may share modifications with other customers only through PeopleSoft Forum,

58

1  subject to PeopleSoft's right to modify and monitor modifications distributed through

2  PeopleSoft Forum. Except as stated above, Licensee shall have no rights to market or

3  distribute modifications." (ECF No. 1253 at 54.) Judge Hicks ruled in the summary

4  judgment order that this provision in the City of Eugene license agreement "expressly

5  prohibits distribution and/or marketing of those modifications, created and tested for City

6  of Eugene, to anyone else." (*Id.*)

7       150.   Rimini used the City of Eugene environments 10,745 times "as a source

8  environment to send content to other customers" using its AFW tools. (ECF No. 1504 at

9  147-48; *see also* P-2582; P-2577.) During the *Oracle I* contempt proceedings, Judge

10  Hicks found that Rimini used the City of Eugene's development environment as the

11  functional equivalent of a generic environment to engage in prohibited cross-use. *See*

12  *Oracle I*, ECF No. 1548 at 23-26, 28-30 ("Rimini's conduct here, using City of Eugene's

13  development environment to develop a fix for clients Spherion, Smead, and Matheson

14  Trucking," and "to develop, test, and trouble shoot a fix for Johnson Controls," "is

15  essentially the same as the prohibited conduct previously held unlawful" and "shows a

16  return to the use of generic environments in this instance, which is clearly prohibited").

17       151.   Rimini also used other customer environments as a source environment to

18  send files to other customers using its AFW tools whose license agreements contain

19  similar restrictions on distributing and transferring modifications and accessing

20  PeopleSoft source code. The following customers that Rimini used as a source

21  environment to send files to other customers using its AFW tools each have a PeopleSoft

22  license that contains substantively the same Section 4.1 prohibitions against marketing

23  and distributing modifications as the City of Eugene: Apollo Group, Inc. (P-6971); County

24  of Kent (P-6685); Louisville / Jefferson County Metro (P-6853); Lower Colorado River

25  Authority (P-6854); Municipality of Anchorage (P-6665); Rochester City School District

26

27

28

(P-6855); Shawnee Mission School District (P-1381); City of Des Moines (P-6702); City of Fresno (P-6872); Cowlitz County Washington (P-6682); Frederick County IIT (P-6795).

152. The following customers that Rimini used as a source environment to send files to other customers using its AFW tools each have a PeopleSoft license that contains prohibitions (primarily in Section 4.1) against commercializing and transferring PeopleSoft software and documentation and modifications thereto: Easter Seals New Hampshire (P-626); Abilene ISD (P-6698); Amarillo Independent School District (P-7185); AMN Healthcare, Inc. (P-6970); Barnes & Noble (P-7211); Blue Cross Blue Shield of Kansas City (P-854); Circle K Stores (P-7190); Clear Channel Management Services (P-6694); ConAgra (P-2089); Genesis HealthCare Corp (P-6688); Hickory Tech Corporation (P-6712); Hudson Highland Group (P-6913); Markel Corporation (P-6664); MasterBrand Cabinets (P-6962); Meskwaki Bingo Casino (P-6755); Santa Clara Valley Water District (P-2222); Toll Brothers (P-767); Dofasco (P-6708 (Section A(5))); VITAS Hospice Services (P-6717 (Section A(5))).

153. The following customers that Rimini used as a source environment to send files to other customers using its AFW tools each have a PeopleSoft license with "Designates" restrictions that prohibit Rimini from accessing PeopleSoft source code: Adventist Healthcare (P-7286 at Sections 1.1 and 17); Abilene ISD (P-6698 at Sections 1.1(b) and 14); Amarillo Independent School District (P-7185 at Sections 1.1(b) and 14); AMN Healthcare, Inc. (P-6970 at Sections 1.1 and 14); Blue Cross Blue Shield of Kansas City (P-854 at Sections 1.1(b) and 17); Circle K Stores (P-7190 at Sections 1.1(b) and 14); ConAgra (P-2089 at Sections 1.1(b) and 16); Easter Seals New Hampshire (P-626 at Sections 1.1 and 14); Hickory Tech Corporation (P-6712 at Sections 1(b) and 14); Hudson Highland Group (P-6913 at Section 1.1(b) and 14); Markel Corporation (P-6664

1   at Sections 1.1(b) and 14); Meskwaki Bingo Casino (P-6755 at Sections 1.1(b) and 14);

2   Toll Brothers (P-767 at Sections 1.1(b) and 14).

3        154.   P-2582 summarizes the number of instances in which a client environment

4   was used as a source environment to send files to other customer environments using

5   CopyRSIFileFromClientToClient. (ECF No. 1504 at 149-52.) The files that Rimini sent

6   from one customer environment to other customers through

7   CopyRSIFileFromClientToClient are modifications to PeopleSoft software: "they are

8   changes to the PeopleSoft software developed in the PeopleSoft environment" of one

9   customer that are "then provided to other customers." (*Id.* at 152-53.) Appendix P-2582

10  is a copy of P-2582 highlighting the source environments that were licensed with one or

11  more of the distribution prohibitions previously discussed in this section.

12       155.   P-9578 identifies the specific files that Rimini transmitted through

13  CopyRSIFileFromClientToClient from a source customer environment to other customers

14  during Process 2.0 and the *Oracle II* period. (ECF No. 1504 at 153-54.) Appendix P-9578

15  is a copy of P-9578 highlighting specific files that were sent from source environments

16  that were licensed with one or more of the distribution prohibitions previously discussed

17  in this section. Rimini used CopyRSIFileFromClientToClient to transfer the files identified

18  in P-9578 the same way that it transferred its HCM104288 update previously found

19  infringing in the September 2020 Order. (ECF No. 1504 at 158-59.)

20       156.   P-2577 summarizes the number of instances in which a client environment

21  was used as a source environment to send modifications to Oracle source code files using

22  GenDiff/Apply Diff. (ECF No. 1504 at 154-55.) The Diff files that Rimini sent to other

23  customer environments using GenDiff/ApplyDiff are modifications to PeopleSoft source

24  code; Diff files are "a recording of what the differences are between two files so that those

25  differences can be programmatically replicated on another computer system." (*Id.* at 123.)

26  Appendix P-2577 is a copy of P-2577 highlighting the source environments that were

27

28

1    licensed with one or more of the distribution prohibitions previously discussed in this

2    section.

3         157.   Appendix PeopleSoft-4 identifies the copyright registrations corresponding

4    to the PeopleSoft software in the source PeopleSoft software environments that contain

5    one or more of the distribution prohibitions previously discussed in this section. (ECF No.

6    1524-2 at 40-44.)

7         **2.     E-Business Suite ("EBS")**

8         157.   Oracle's main claim as it relates to Oracle's E-Business Suite ("EBS")

9    product is that Rimini's process for developing so-called "prototype" updates infringes

10   Oracle's pertinent copyrights. The prototype client is the first client to receive an update

11   when Rimini provides updates to multiple customers affected by a TLR change. (Sahni

12   Depo. at 52 (explaining that the "prototype" client is "the first client coding is being

13   started").) A Rimini developer then uses a technical specification to guide the

14   development work for the remaining clients, which Oracle claims is an impermissible form

15   of "cross-use." (ECF No. 1504 at 250; ECF No. 1515 at 116-18.)

16        158.   When providing TLR updates to multiple EBS clients, Rimini uses technical

17   specifications. (ECF No. 1508 at 209-11.) Using the technical specification, developers

18   manually implement the update, separately, in each client's environment. (*Id.* at 210-11;

19   ECF No. 1515 at 114, 129-30.) The implementation of the update for each client may be

20   different because different clients have different software versions, patch histories, and

21   customizations. (ECF No. 1508 at 190-91, 212; ECF No. 1515 at 117.)

22        159.   Oracle's expert Ms. Fredricksen-Cross opined that 158 EBS updates were

23   developed by Rimini through "cross-use." (ECF No. 1504 at 237; ECF No. 1505 at 3.)

24   However, with respect to 157 of these updates, she offered no opinions about the

25   contents of either the updates themselves, or of the technical specifications associated

26   with them. (*Id.* at 3-5 (conceding that she only discussed five specific examples of "cross-

27   used" EBS updates, and for the other 153 she "provide[d] no opinions whatsoever that

28

they contain any Oracle code" or that the associated tech specs contained Oracle code); *id.* at 5 (admitting that even with respect to the five examples she discussed, she did not contend the updates contained Oracle code).) Rather, Ms. Frederiksen-Cross counted these 157 updates as "cross-use" because Rimini implemented each of the updates for more than one client, irrespective of what they contained or how the updates were provided. (*Id.* at 243, 258 (conceding her "cross-use" opinions do not depend on whether updates implemented for more than one client contain any literal or nonliteral Oracle expression, but only whether an update was developed "through the use of one customer's environment" and then at any later point "applied in another customer's environment"), 240 ("I merely identified and counted the fact that the update existed."), 242 (updates counted if "developed in a client environment" and there existed "technical documentation that would allow Rimini to apply [it]" for other clients; ECF No. 1505 at 4.)

160.    As to the remaining update, Ms. Frederiksen-Cross opined that the contents of the particular technical specification associated with one EBS update (EBS 100025) contained Oracle code. (ECF No. 1504 at 194-197.) However, she offered no opinion that the technical specification and update (which were for a 2013 year-end update) were ever used by Rimini after October 2013. (*Id.* at 272.)

### 3.    J.D. Edwards ("JDE")

161.    As mentioned above, Oracle asserted infringement in this case of only five JDE copyright registrations: four covering specific JDE updates and one covering a database of documentation, *i.e.*, registration numbers TX 8-116-321, TX 8-116-317, TX 8-116-314, TX 8-130-597, and TXu1-607-455. (ECF No. 1505 at 27-29; ECF No. 584 at 40-41.) None of those registrations cover the actual JDE releases themselves. (ECF No. 1505 at 28.) Oracle acknowledged that it did not offer any evidence of allegedly infringing conduct related to these five registered copyrights. (*Id.* at 29.) Indeed, Oracle sought at the last minute to amend its pleadings in this case to add registrations into its case-in-chief. (ECF No. 1479 (sealed).) The Court denied Oracle's motion and rejected Oracle's

efforts to belatedly assert infringement claims as to any JDE copyright registrations apart from the five identified in Oracle's operative pleadings. (ECF No. 1511.)

### 4.   Oracle Database

162.   The parties have stipulated that "Oracle owns and develops Oracle Database, database software that is often used in conjunction with enterprise software applications." (ECF No. 1309 at 14; ECF No. 1460 at 1 (¶ 4).)

163.   Rimini created at least 65 new Oracle software environments on its own computer systems between January 23, 2012, and March 30, 2014. Of these 65 local environments, 18 of them included a copy of Oracle Database as the database component. (ECF No. 1504 at 55-57.)

164.   Oracle's Appendix Database-1 (ECF No. 1524-3 at 1) identifies the software environments that Rimini created on its own computer systems during the *Oracle II* period containing an installed copy of Oracle Database, as well as the Oracle Database registrations corresponding to each such installation.

165.   Oracle's Appendix Database-2 (*id.* at 2-5) identifies the PeopleSoft environments that were subject to the migration and contained an installed copy of Oracle Database, as well as the Oracle Database registrations corresponding to each such installation. In performing the migration, Rimini made complete copies of these instances of Oracle Database.

166.   Oracle's Appendix Database-3 (*id.* at 6-8) identifies the PeopleSoft environments that Rimini used as source environments to send updates, files, and modifications to PeopleSoft software using the AFW tools CopyRSIFileFromClientToClient and GenDiff/ApplyDiff that contained an installed copy of Oracle Database, as well as the Oracle Database registrations corresponding to each such installation.

///

///

### B. Oracle's Claims Under the Digital Millenium Copyright Act ("DMCA")

167. Rimini removed Oracle's copyright notices and other copyright management information in Oracle files or derivative works thereof and distributed those files without Oracle's copyright management information. (ECF No. 1504 at 54, 170.)

168. Rimini directed its employees to remove copyright management information from Oracle's source code files and derivative works thereof. (*Id.* at 170-72.) Rimini wrote "Developer Guidelines" instructing its developers not to include Oracle's copyright notice when creating a file "that leverages portions of existing Oracle program(s)." (*Id.*; *see also* P-584 at 14; ECF No. 1507 at 142-43.) "Leveraging" means "reusing a component"—*i.e.*, "reusing source code." (ECF No. 1504 at 172.)

169. Since Process 1.0, and in earlier versions of its Developer Guidelines dating back to 2012, Rimini has consistently instructed its developers not to include Oracle copyright notices in files that "leverage portions of existing Oracle program(s)." (P-9489 at 10 ("Effective: June 15, 2012"); P-9466 at 14 ("Effective: 6/23/2014"); *see also* ECF No. 1507 at 141.) The Process 2.0 versions of Rimini's Developer Guidelines continued this instruction but removed the language admitting that Rimini programs that "leverage portions of existing Oracle program(s)" "are derivative works." (*Compare* P-9489 at 10 *with* P-9475 at 15 ("Effective: 6/23/2014") *and* P-584 at 14 ("Effective: 6/30/2014"); *see also* ECF No. ECF No. 1507 at 140-44, 150-51.)

170. Ms. Frederiksen-Cross identified thousands of instances in which Rimini distributed files containing substantial portions of Oracle's protected expression but where Oracle's copyright management information had been removed. (ECF No. 1504 at 54, 170-74.)

171. In her first analysis, Ms. Frederiksen-Cross identified 3,588 instances in which copyright management information was removed from RSI-prefixed files that were located in PeopleSoft environments associated with Rimini's customers. (*Id.* at 172-74.)

1   In other words, her first analysis identified 3,588 instances of RSI-prefixed files in which

2   an early version of an RSI-prefixed file contained an Oracle copyright notice but then later

3   did not contain any Oracle copyright management information, but nonetheless contained

4   substantial portions of Oracle's protected expression. (*Id.*)

5       172.   Professor Astrachan incorrectly contended that these 3,588 DMCA

6   violations concern only six files. (ECF No. 1515 at 181-83.) To the contrary, while Ms.

7   Frederiksen-Cross identified "six file names" associated with these violations, "there are

8   many, many different versions of these files" that were distributed "to many customers

9   that we were able to confirm from the third party production." (ECF No. 1516 at 72.)

10  Demonstrative exhibit P-2527 lists the unique versions of those six files and the customer

11  environments in which they were found. (*Id.* at 72-75; *see also* P-2527.) Ms. Frederiksen-

12  Cross identified over 150 unique versions of these files from which Oracle copyright

13  management information had been removed, many versions of which were found in

14  multiple customer environments. (*Id.*)

15      173.   There is also no evidence to support Professor Astrachan's contention that

16  Rimini's removal of copyright management information from these 3,588 files only took

17  place in 2010. (ECF No. 1515 at 181-82.) While Mr. Conley briefly discussed some of the

18  file names underlying Rimini's DMCA violations, the most that Mr. Conley explained was

19  that some version of these files had been delivered to clients in 2010. (ECF No. 1508 at

20  67.) Mr. Conley never testified as to when Rimini removed copyright management

21  information from each of the files that Ms. Frederiksen-Cross identified. (*Id.*) In addition,

22  the 2010 client delivery documentation that Mr. Conley referenced during his testimony

23  falsely states "This is a new SQC" for each of the file names that he discussed—

24  RSICDVER.SQR, RSISTCD.SQC, RSIW2SSA.SQC, and RSIW2_ST.SQC—without any

25

26

27

28

1    indication that the origin of these files is Oracle's PeopleSoft source code. (D-2474 at 22-

2    23.)

3        174.    The precise timing of Rimini's removal of Oracle copyright management

4    information from these files is also irrelevant. Ms. Frederiksen-Cross confirmed that

5    Rimini repeatedly used AFW to send files from which Oracle's copyright management

6    information had been removed up through 2018. (ECF No. 1504 at 173-74.) For example,

7    RSICDVER.SQC, RSIW2SSA.SQC, and RSISTCD.SQC, which are included within Ms.

8    Frederiksen-Cross's first analysis of DMCA removal files, were frequently distributed by

9    Rimini using CopyRSIFileFromClientToClient during Process 2.0. (*Compare* P-2527

10   ("File Name") *with* P-9578 ("FILENAME").) Professor Astrachan did not dispute the

11   distributions, and conceded that that these files and derivatives of these files, "might be

12   used as part of many updates in many clients." (ECF No. 1515 at 182.)

13       175.    The RSI810ST.SQR and RSI960US.SQR programs previously analyzed

14   present additional evidence of Rimini's removal of Oracle copyright management

15   information from rewrite files during Process 2.0 and the distribution of those files to

16   customers. Regarding RSI810ST.SQR, Ms. Frederiksen-Cross determined that Rimini

17   developer Harika Mandla "deleted the lines from [the] copyright notice" in Oracle's

18   TAX810DC.SQR file during the creation of Rimini's RSI810ST.SQR file in late 2014. (ECF

19   No. 1504 at 101; P-1673 at 1 ("Original Design" dated "11/11/2014").) During Process

20   2.0, Rimini distributed the RSI810ST.SQR program to clients 7,047 times using its AFW

21   tools. (ECF No. 1504 at 126.)

22       176.    Regarding RSI960US.SQR, Rimini developer Susan Tahtaras confirmed

23   that Rimini created this rewrite file by rearchitecting Oracle's TAX960US.SQR file. (ECF

24   No. 1507 at 156-58.) Ms. Tahtaras confirmed that before engaging in that rewrite process,

25   Oracle's TAX960US.SQR file (titled "Create W-2 Print File") "was modified numerous

26   times by Rimini." (*Id.* at 158-59; *see also* P-2422.) Ms. Tahtaras confirmed that Rimini's

27   modifications to TAX960US.SQR continued through June 2013, and that Rimini created

28

1   RSI960US.SQR (also titled "Create W-2 Print File," but without an Oracle copyright

2   notice) in connection with Rimini's development of the HCM103493 update in June 2014.

3   (ECF No. 1507 at 159, 163; *see also* P-9505; P-1203.) And Ms. Tahtaras further

4   confirmed that the HCM103493 update had "been in development since 6/20/2013,"

5   leading to the only reasonable conclusion that Rimini removed the Oracle copyright notice

6   from TAX960US.SQR when rearchitecting the file to create RSI960US.SQR, just as

7   Rimini was transitioning to Process 2.0 in the middle of 2014. (ECF No. 1507 at 163; *see*

8   *also* P1203 at 1; P-1201 at 1 ("Original Design" dated 8/29/2014); P-1202 at 1 ("Original

9   Design" dated 6/26/2014).)

10   177.   Rimini's removal of Oracle copyright management information from

11   TAX960US.SQR to create RSI960US.SQR is also consistent with the functional and

12   technical specifications for the HCM103493 update, which explain that as part of this

13   update, the "W-2 print program, TAX960US.sqr, has been modified and the process

14   definition has been replaced with RSI960US.sqr to unify the various code lines . . . ." (P-

15   1201 at 1, 10 ("TAX960US – project to get all clients on one code line version"); P-1202

16   at 1 ("Project to get all client code to one ver[s]ion for the US Fed YE process"); *see also*

17   ECF No. 1507 at 163-65.)

18   178.   Further evidence was also presented at trial establishing that Rimini

19   removed an Oracle copyright notice as part of its creation of its RSIW2SSA.SQR file.

20   (*Compare* P-9500 ("RSISSAW2: EFW2 record layout for SSA W2" source code file, listing

21   "6/21/2010 RSIHCM101507" as the only entry on the Rimini Street Modification Log, with

22   Oracle copyright notice), *with* P-9492 ("RSIW2SSA: EFW2 record layout for SSA W2"

23   source code file listing "6/21/2010 RSIHCM101507" as first entry and "2/6/2015 RSI-

24   HCM104700" as last entry on Rimini Street Modification Log, with Oracle copyright notice

25   removed; *see also* ECF No. 1507 at 151-55.) As shown in P-9578, Rimini distributed

26

27

28

RSIW2SSA.SQC from one customer to one or more other customers 39 times using CopyRSIFileFromClientToClient.

## C. Ravin's Involvement With Infringing Activity

341.    Mr. Ravin is the CEO and Chairman of Rimini Street. He has operational control over Rimini by virtue of his role as CEO and Chairman. Mr. Ravin also leads Rimini's operating committee, the highest level of management of Rimini Street. (ECF No. 1503 at 84.)

342.    Mr. Ravin oversaw Rimini's creation of infringing Oracle PeopleSoft environments on Rimini's systems and the migration (copying) of those infringing environments. (*Id.* at 93-94.)

343.    Mr. Ravin personally made the decision to carry out the migration and, between February 2014 and July 2014, oversaw the copying of specific customer environments and files from Rimini's systems to "cloud" services and customer-hosted environments. (*Id.* at 91, 94, 98, 117.) Mr. Ravin also made the determination that copying the infringing environments on Rimini's systems and then sending those copies to Windstream's cloud services did not infringe Oracle copyrights. (*Id.* at 116-17; *see also* P-1577.)

344.    Mr. Ravin also personally made the decision not to comply immediately with Judge Hicks' February 2014 Order in *Oracle I* holding the PeopleSoft environments on Rimini Street's systems were infringing, and instead to continue using those infringing environments while the migration was underway between February 2014 and July 2014. (ECF No. 1503 at 94, 97.) Mr. Ravin further decided that Judge Hicks' order did not affect any product line other than PeopleSoft. (*Id.* at 96.) The day after the Court issued its order, Mr. Ravin sent a company-wide email telling employees, "PeopleSoft Support and Development are to be provided EXACTLY as we do today, with no interruption or any

69

1  changes in service" and "[it]s business as usual for all PeopleSoft support and

2  development." (P-1257 at 2; *see also* ECF No. 1503 at 97 (Ravin discussing P1257).)

3       345.   Mr. Ravin also made the decision that Rimini Street would not build new

4  development and testing environments, but instead would make multiple copies of the

5  infringing environments and send those copies to customers. (ECF No. 1503 at 98.) After

6  the "migration," Rimini continued to use the migrated infringing environments in the same

7  way that it had used the infringing local environments to develop fixes and updates that

8  were distributed to other customers. (*Id.*) After the February 2014 Order in *Oracle I*, Mr.

9  Ravin told Rimini's employees that they didn't have to do anything in response to the

10  Court's order that Rimini wasn't doing already. (*Id.* at 99.)

11       346.   Mr. Ravin took personal charge over, and regularly monitored, development

12  efforts related to the Rimini tools at issue in this case that infringe Oracle's copyrights.

13  (*Id.* at 242; *see also* P-1573; P-1265; P-1266.)

14       347.   Mr. Ravin gave the direction to move to the PeopleSoft TLR development

15  processes using AFW as part of what was interchangeably called Environments 2.0,

16  Rimini 2.0, Process 2.0, and Development 2.0. (ECF No. 1503 at 89, 134-35.) Rimini did

17  not develop and implement AFW for the purpose of complying with the Court's orders in

18  *Oracle I*. Under Mr. Ravin's direction, Rimini designed AFW and the Environments 2.0

19  strategy in 2012—before any Court rulings or orders. (*Id.* at 135-36, 210.)

20       348.   Mr. Ravin considered Environments 2.0 to be "one of the most important

21  projects that Rimini had ever done." (*Id.* at 94.) Mr. Ravin reviewed detailed project plans

22  for Environments 2.0 and was actively involved in making sure that Environments 2.0 was

23  designed and completed on time. (*Id.* at 93-94.) Mr. Ravin considered AFW to be "the

24  most important project in the company." (*Id.* at 94, 135; *see also* P-1265 at 1.) He also

25

26

27

28

took charge of that project after determining that Jim Benge and others working on it had "to be pulled up hill by the nose." (P-1572 at 1; P-1265; *see also* ECF No. 1505 at 162.)

349. Mr. Ravin also demonstrated an in-depth understanding of Rimini's infringing support practices under Process 2.0. According to Mr. Ravin, one of Rimini's goals was to replace different customers' PeopleSoft source code files with "one code for all" or "rewrite" files so that all customers receiving the same update would have a common code or one code for all. (ECF No. 1503 at 105.) Mr. Ravin understood that Rimini's standard practice under this prototyping model for PeopleSoft TLR updates is to develop and test a "one code for all" file in a prototype customer environment, creating RAM copies of the customer environment, for the benefit of other customers. (*Id.* at 108 ("Q I'm asking you, using your definition of prototype as you stated in court, do they give – do they develop that prototype in one environment and give that prototype to other customers? A They would give the design to other customer environments."), 139 (agreeing that Rimini creates RAM copies of Oracle software when developing updates), 105-06 ("Q Well, is it a violation of the acceptable use policy since July 2014 to use one client's PeopleSoft software to develop software updates or modifications for the benefits of other clients? A Oh, I think other clients can benefit.").)

350. Mr. Ravin also understood the critical importance of AFW and other development tools to Rimini's plan to automate the cross-use of remote customer PeopleSoft environments. (P-1266 at 1 (Benge to Ravin: "This is a fundamental requirement of our tools to work in a distributed environment. With this, we'll be able to simultaneously initiate processes across a multitude of client environments."); *see also* ECF No. 1503 at 141.) He also knew that Rimini developed and tested AFW in customer environments, which created RAM copies of the PeopleSoft software in those environments. (*Id.* at 136.)

351. Mr. Ravin also had direct supervision over Code Analyzer's timeline and planning. (*Id.* at 135.) Code Analyzer creates "the recipe of how to create that particular

71

update, and that recipe is then stored on [Rimini Street's] system." (*Id.* at 244.) That "recipe" is then "used to help build other environments and other changes at other customers . . . ." (*Id.* at 140.)

352.    Mr. Ravin similarly oversaw Rimini's provision of support for JDE. When the Permanent Injunction was first issued in *Oracle I* in 2016—prohibiting Rimini from accessing and copying JDE source code—Rimini temporarily stopped its infringing JDE support processes and adopted an approach of "looking over the shoulder" via remote access of customers' employees accessing the source code to comply with the Permanent Injunction. (*Id.* at 142-43.)

353.    Mr. Ravin and Rimini told investors and potential investors that the Injunction would "limit the process of Rimini's currently offered JD Edwards Support Services, to the extent Rimini would not be able to access source code." (P-9582 at 18.) Moreover, Mr. Ravin and Rimini represented to investors that Rimini's "over the shoulder" approach was a viable alternative that would enable Rimini to "fulfill its Service obligations involving source code modification[s]" to JD Edwards customers while complying with the Injunction. (*Id.*)

354.    Mr. Ravin personally made the decision to abandon "over the shoulder" and revert back to JD Edwards support services that included technical specifications containing snippets of Oracle code, after determining that the Permanent Injunction entered in *Oracle I* purportedly permitted Rimini engineers to copy JD Edwards source code to develop fixes and updates. (ECF No. 1503 at 144.)

355.    Given Mr. Ravin's knowledge of the court orders, the *Oracle I* Permanent Injunction, and his intimate knowledge of, authority over, and personal involvement in developing the technical business practices of Rimini, this Court finds that he either knew about or was willfully ignorant to the widespread copying and impermissible cross-use

1  continuing at Rimini and materially contributed to and induced Rimini's infringement of

2  Oracle's copyrights.

3      356.    Mr. Ravin also had and exercised the right and ability to control Rimini's

4  infringing and otherwise unlawful conduct. Mr. Ravin was and still is the chief executive

5  of Rimini and through that position had the ultimate authority and responsibility over what

6  happened at the company, including the authority to bring an end to any infringing Rimini

7  support process. (*Id.* at 84.)

8      357.    Mr. Ravin has profited, continues to profit from, and has a substantial

9  financial interest in Rimini's ongoing unlawful conduct.

10     358.    Accordingly, this Court finds that Mr. Ravin profited directly from Rimini's

11 copyright infringement and had the authority and ability to supervise Rimini.

12              **D.  Rimini's Claim for Declarations of Non-Infringement**

13     359.    For the reasons provided below in its pertinent conclusions of law, the Court

14 will only include facts pertinent to Rimini's support of Oracle's JDE product here.

15     360.    Like with some other Oracle products for which it offers support, one way

16 that Rimini provides support for JDE customers is by performing a fix or update for one

17 customer, and then writing a technical specification document about how the pertinent

18 developer created that fix or update so that other developers then use to perform the

19 same fix or update for other customers. (ECF No. 1505 at 89; *see also* D-2179.)

20     361.    For relatively simple updates, the technical specification is created by the

21 Rimini developer at the outset. (ECF No. 1505 at 85.) The developer will then go into the

22 development environment of a Rimini client that needs the particular update, and perform

23 the update "to prove out the design" of the technical specification. (*Id.*) If necessary, the

24 Rimini developer will then update the technical specification. (*Id.*) For more complex

25 updates, the Rimini developer will go into the development environment of a client that

26 needs the update to understand where changes will need to be made and, once that is

27 proven out, create the technical specification. (*Id.*) Under either scenario, the work done

28

1  in the client's development environment is done for that client and not on Rimini's servers.

2  (*Id.* at 85-86; ECF No. 1515 at 135-36.) A Rimini developer will then use the technical

3  specification to manually implement the update, separately, in each client's environment.

4  (ECF No. 1505 at 76, 95.) Rimini developers do not develop a JDE update in a client's

5  environment where that client does not need the update. (*Id.* at 86.)

6       362.    Oracle's expert Ms. Frederiksen-Cross claimed that Rimini implemented

7  372 "cross-used" JDE updates, but she discussed only one specific JDE update in her

8  testimony. (*Id.* at 5-6.) For all the other updates counted as "cross-use," Ms. Frederiksen-

9  Cross included them solely on the basis that an update was implemented for one client

10 and then "received by more than one client." (*Id.* at 6-7.) Ms. Frederiksen-Cross offered

11 no opinions on how these updates were actually implemented for clients, and she did not

12 dispute that they were manually implemented by a Rimini developer for each client. (*Id.*

13 at 6-9.) But she opined they constituted "cross-use" if they involved use of technical

14 specifications that included "detailed, explicit instructions" or code written entirely by

15 Rimini "developed in one customer's environment and then used on behalf of another

16 customer." (*Id.* at 8-9.)

17      363.    Oracle also elicited some testimony that in one JDE technical specification,

18 Rimini included "locaters"—snippets of Oracle code—that were used to indicate where

19 new code created by Rimini should be included. (P-6349.17460; *see also* ECF No. 1505

20 at 77-79.) Judge Hicks already ruled that any technical specifications that contain such

21 locators violate the Permanent Injunction entered in *Oracle I*. *See Oracle I*, ECF No. 1548

22 at 46-47. Accordingly, Rimini may not use or write any technical specifications that contain

23 "locators." *See id.* But Rimini's business analyst for the Tax and Regulation Department

24 for JDE, Michael Jacob, admitted that the technical specification for Rimini's JDE105115

25

26

27

28
                                            74

1   update contains multiple excerpts of JDE source code. (P-6349.17460 at 38, 40; ECF No.

2   1505 at 77-79.)

3        364.   Indeed, Rimini claimed to have stopped putting screenshots of JDE

4   software into its JD Edwards technical specifications, but never specified when it

5   supposedly implemented this process change. (ECF No. 1505 at 91.) In any event, the

6   practice remained widespread through at least 2016, as evidenced by the technical

7   specification for Rimini's JDE105106 update. This 2016 update addressed "US-FED IRS

8   Form 1094-C & 1095-C for Tax Year 2016" and was delivered to four of Rimini's clients.

9   (P-6349.17432 at 2.) Mr. Jacob admitted that the JDE105106 technical specification

10  contained multiple screenshots of the "exact coding change[s] needed to be made for this

11  particular update." (ECF No. 1505 at 79-82; *see also* P-6349.17432 at 44, 51, 53, 80.) In

12  total, the JDE105106 technical specification contains 88 screenshots of JDE software,

13  over 60 of which illustrate the exact coding changes that need to be made as part of this

14  update. (P-6349.17432 at 43-118.) Rimini developed this update for customers Carico

15  International (EnterpriseOne 8.12), Fond du Lac Reservation (Enterprise One 9.1),

16  Washtenaw County (OneWorld XE), and Libby Glass (World A9.3). (*Id.* at 2.)

17       365.   Two other JD Edwards technical specifications containing screenshots of

18  code are also in evidence. (P-6349.5001 at 9-11 ("This section shows the actual code

19  changes made to all objects affected by this design"; showing changes to files

20  XT4312Z1.h and XT4312Z2.c); P6349.17313 at 10-12 ("Existing Code"; "Corrected

21  Code"), 15-18 ("Incorrect Code"; "Corrected Code").) The updates in P-6349.5001 were

22  made in the JD Edwards environment associated with customer CertainTeed Inc

23  (OneWorld/Enterprise One 8.9), and the updates in P-6349.17313 were made in the JD

24  Edwards environment associated with customers Carico International, Fond du Lac

25

26

27

28

Reservation, Washtenaw County, Kansas City Missouri School District (World A8.1), and Libby Glass.

366.   Apart from doing tax, legal, and regulatory updates, Rimini also provides some custom break/fix solutions for JDE clients as the support need arises. (ECF No. 1505 at 83.) Rimini generates technical specifications for some break/fix solutions. (*Id.* at 89.)

### E.   Lanham Act

367.   As further explained below in its pertinent conclusions of law, the Court agrees with Oracle that Rimini made three categories of false statements in its commercial advertising and promotion regarding Rimini's and Oracle's support services, including: (1) statements that Rimini had ceased using the support processes that were at issue in *Oracle I* and was honoring Oracle's copyrights and licenses; (2) statements that Oracle's security offering was inadequate and that Rimini's security offering was superior; and (3) statements that Rimini's support offering did not share anything in common with the support offering of TomorrowNow.

### 1.   Statements Regarding Support Process Changes

368.   In *Oracle I*, Judge Hicks ruled in February and August 2014 that Rimini had violated Oracle's software license agreements and infringed Oracle's copyrights by: (1) creating copies of Oracle copyrighted materials on locations outside of the customers' facilities; and (2) using one customer's Oracle software environment to support other customers. *See Oracle I*, ECF Nos. 474, 476.

369.   Following these rulings, Rimini made the widespread representation to customers and prospective customers in marketing communications that Judge Hicks' summary judgment rulings in *Oracle I* were related to processes and software no longer in use at Rimini Street.

370.   In August 2014, after Judge Hicks issued his second *Oracle I* summary judgment order, Rimini sent a communication to all of its customers stating—in underlined

text—that "the Court's rulings relate to processes and software no longer in use at Rimini Street." (P-6057; *see also* ECF No. 1503 at 121.)

371.   Rimini used the same message as a talking point for customers, prospective customers, media, and analysts. (P-1580 at 2 ("The rulings relate to Oracle software no longer in use at Rimini Street"); *see also* ECF No. 1503 at 124-25.)

372.   David Rowe, who was Rimini's Chief Marketing Officer in 2015, disseminated the same message through the media, including an August 15, 2014, email from Rimini to an editor of eWEEK and Associated Press correspondent, stating that "the rulings in February and today relate to processes and Oracle software no longer in use at Rimini Street." (P-655 at 2.)

373.   Mr. Rowe testified that this statement was a representation that Rimini was no longer engaging in any cross-use. (ECF No. 1508 at 284-85.)

374.   From July of 2014, it was also Rimini's "standard and general messaging to customers that Rimini was not copying or sharing Oracle software between clients." (P-1157; *see also* ECF No. 1503 at 104.)

375.   It was also Rimini's standard message to customers after July 2014 that, in providing support to customers, Rimini no longer used "any Oracle software or support materials stored on any Rimini Street serves or at any Rimini Street facility." (P-1157; *see also* ECF No. 1503 at 105.)

376.   As Rimini knew when it made them, those representations were false and misleading.

377.   Rimini knew as of February 2014, when Judge Hicks issued the first summary judgment ruling in *Oracle I*, that the local PeopleSoft software environments stored on its systems infringed Oracle's PeopleSoft copyrights. Nevertheless, Rimini

1    continued using those same software environments in support of its customers. (P-1257;

2    *see also* ECF No. 1503 at 95-97.)

3        378.    Further, while Rimini eventually migrated those software environments off

4    of its systems to Windstream or client facilities, Rimini continued using those same

5    PeopleSoft software environments to support its customers. (*Id.* at 97-98.)

6        379.    Rimini continues to use some of those infringing, migrated software

7    environments. (*Id.* at 218.)

8        380.    This evidence establishes that, contrary to its messaging to customers,

9    Rimini continued to use the same PeopleSoft software environments at issue in *Oracle I*

10   long after it told its customers the software at issue in *Oracle I* was "no longer in use."

11       381.    And as discussed above the evidence also shows that, contrary to its

12   statements to customers that the processes at issue in *Oracle I* were no longer used at

13   Rimini, Rimini continued to impermissibly cross-use Oracle software as a core part of its

14   support model well beyond the summary judgment rulings and throughout this litigation.

15       382.    Further, Judge Hicks has already determined that Rimini's cross-use and

16   violations of the facilities restrictions continued after the *Oracle I* summary judgment

17   rulings, contrary to Rimini's representations.

18       383.    Judge Hicks ruled in the September 2020 Order that Rimini made copies of

19   the Campbell Soup PeopleSoft environment that "could not be for Campbell Soup's sole

20   'internal data processing operations'" and that "Rimini used Campbell Soup's

21

22

23

24

25

26

27

28

1    development environment, under color of Campbell Soup's license, to develop [an]

2    update for Toll Brothers." (ECF No. 1253 at 44, 46.)

3    384.    Judge Hicks also found that Rimini engaged in impermissible cross-use

4    when it distributed an update developed and tested in the City of Eugene's development

5    environment to other Rimini customers. (*Id.* at 53.)

6    385.    In his *Oracle I* contempt ruling, Judge Hicks also determined that Rimini's

7    impermissible cross-use and violations of the facilities restrictions continued after the

8    *Oracle I* summary judgment rulings.

9    386.    Indeed, Judge Hicks ruled that Rimini violated the *Oracle I* Permanent

10    Injunction and the PeopleSoft license facilities restriction by storing multiple PeopleSoft

11    files on Rimini's systems. *See Oracle I*, ECF No. 1548 at 17-18.

12    387.    Judge Hicks also found "by clear and convincing evidence that Rimini cross

13    used City of Eugene's development environment to support other clients." *Id.* at 25-29.

14    388.    Judge Hicks further found that Rimini improperly copied Oracle Database

15    files on its systems in violation of Oracle's Database license and the *Oracle I* Permanent

16    Injunction. (*Id.* at 48-49.)

17    389.    The evidence regarding Rimini's conduct and Judge Hicks' prior findings

18    regarding Rimini's conduct establishes that Rimini's representations that the *Oracle I*

19    summary judgment findings "relate to processes and software no longer in use at Rimini

20    Street" were false.

21    **2.      Rimini's Statements Regarding Security**

22    396.    Enterprises use enterprise software like the products at issue to store highly

23    valuable and sensitive data, such as financial information, social security numbers, and

24    patient information. (ECF No. 1503 at 15-16; ECF No. 1512 at 100.) Enterprises

25

26

27

28
                                            79

accordingly have a real and serious need to protect their enterprise software from cyberattacks, which only continue to grow in frequency and sophistication. (*Id.*)

397.   As part of Oracle's support services for the enterprise software products at issue, Oracle develops and releases security patches that fix vulnerabilities in the products' source code that hackers may otherwise exploit. (ECF No. 1503 at 14-15.) The vast majority of Oracle's security patches are released in quarterly bundles called "critical patch updates" ("CPUs"), but, in the uncommon occurrence where a vulnerability becomes publicly known, Oracle releases "security alerts" to patch the publicly known vulnerability as soon as the patch becomes available. (*Id.* at 16-17.)

398.   It is undisputed that Rimini does not and cannot provide its customers with CPUs or security alerts because Rimini does not have access to the source code necessary to develop these patches. (ECF No. 1512 at 99; ECF No. 1513 at 165-66.) Rimini's security offerings to customers consist of: (1) security advisory services that Rimini calls Global Security Services ("GSS"); and (2) a "virtual patching" software created by a third party company, McAfee, that Rimini rebranded as "Advanced Database Security" ("ADS") and began reselling for an additional charge in June 2017. (ECF No. 1514 at 15, 18-19, 40-41, 86-87; ECF No. 1512 at 95, 99; *see also* P-1655.) Rimini may also recommend to its customers two other third-party virtual patching products—

Integrigy's AppDefend and Imperva's SecureSphere—but it does not resell those products and they are not part of Rimini's security offering. (ECF No. 1514 at 18, 87.)

399.    Oracle alleges that various statements made by Rimini to customers regarding Rimini and Oracle's respective security offerings violate the Lanham Act, including the following statements from Rimini's standard messaging:

a. "Security professionals have found that traditional vendor security patching models are outdated and provide ineffective security protection." (P-1655 at 3; *see also* ECF No. 1508 at 293.)

b. Oracle's CPUs provide little to no value to customers and are no longer "relevant." (ECF No. 1508 at 289; *see also* ECF No. 1492-5 (Grady

Depo.) at 8-9; P-1443 ("[A] key message is 'security patches are no longer relevant'".).)

c. Oracle's CPUs are unnecessary to be secure. (ECF No. 1503 at 153; ECF No. 1508 at 288-90; *see also* P-643.)

d. It is not risky to switch to Rimini and forego receiving CPUs from Oracle. (ECF No. 1508 at 287-88.)

e. "Once an ERP [enterprise] platform is stable, there is no real need for additional patches from the vendor." (P-643 at 1; ECF No. 1508 at 290.)

f. "If you are operating a stable version of the application platform, especially with customizations, you probably can't apply or don't even need the latest patches." (P-643 at 1.)

g. Virtual patching can serve as a replacement for vendor patching. (ECF No. 1508 at 287-88; *see also* P-1443 at 1-2.)

h. "Virtual patching can be more comprehensive, more effective, faster, safer, and easier to apply than traditional vendor patching." (P-1655 at 3.)

i. Rimini helps clients "gain a holistic approach to security across the enterprise," *i.e.*, security at all layers of a system. (P-1656 at 2; P-643 at 2; *see also* ECF No. 1508 at 285-86.)

j. Rimini offers "holistic security" solutions for enterprises. (*See, e.g.*, P-1656 at 2; P-643 at 2; ECF No. 1508 at 286.)

k. "Rimini Street Security Support Services helps clients proactively maintain a more secure application compared to the vendor's support

program which offers only software package-centric fixes." (P-634 at 3-4; *see also* ECF No. 1508 at 292.)

l.   Rimini provides more security as compared to Oracle. (*Id.* at 289-91.)

m.  Rimini's GSS can "pinpoint and circumvent vulnerabilities months and even years before they are discovered and addressed by the software vendor." (P-1656 at 3; *see also* P-634 at 4.)

400.   The challenged representations by Rimini, which can generally be characterized into three key representations: (1) customers do not need Oracle's security patches because "virtual patching" is an effective replacement for "outdated" and unnecessary traditional patching; (2) Rimini offers "holistic" security; and (3) customers can be more secure if they use Rimini for third party support than if they remain on Oracle support, are false and misleading.

### a.   Software Patching

401.   The security community recognizes that software-level patching is one of the most important aspects of any modern IT security strategy. (ECF No. 1512 at 105-09; ECF No. 1503 at 18-21; *see also* ECF No. 1514 at 8-14 (discussing publications that extol the importance of software patching); P-1213 at 3 (McAfee whitepaper stating, "Patching is an important part of fighting malware and cybercriminal activities").)

402.   Security patches are important because they remove vulnerabilities from systems so that software cannot be exploited even from behind a firewall. (ECF No. 1503 at 19-20; ECF No. 1512 at 96.) Rimini's industry expert Mr. Loftus agreed that it was normal in the industry to say that "security patching is essential." (ECF No. 1515 at 57-58.)

403.   A customer's copy of Oracle software will grow increasingly vulnerable to security breaches over time if the customer does not routinely install the security patches that Oracle releases every three months, in part because hackers can reverse engineer patches to learn what vulnerabilities the patches fixed. (ECF No. 1503 at 20-21; ECF No.

1512 at 99-100.) Failure to install released security patches may compromise a customer's critically sensitive data and expose the customer to regulatory compliance issues. (*Id.* at 99-102; ECF No. 1492-3 (Fanning Depo.) at 6 ("You certainly need to patch your software to avoid getting out of compliance."), 7.)

404.    The importance of software patching does not diminish based on a system's maturity—even mature, stable systems will become more and more vulnerable if they remain unpatched. (ECF No. 1512 at 109-10.)

405.    Unlike security patches, which fix security problems at the software code level, "virtual patching" does not and cannot actually fix the underlying software vulnerabilities. (ECF No. 1503 at 19; ECF No. 1512 at 96-98.)

406.    There are many ways that bad actors can gain access to enterprise software despite the use of virtual patching or firewall technology. For example, the firewall could be misconfigured, the firewall may not be able to catch a particular exploit attempt, a bad actor could gain access to the software behind the firewall through either legitimate or stolen credentials, or a hacker could gain access behind the firewall through installed malware. (ECF No. 1503 at 19-20.) Although firewalls are an important method to help increase the security of enterprise software, it is still necessary to routinely apply available security patches to close the vulnerabilities in the software to prevent them from being exploited. Virtual patching can supplement, but not replace, the security offered by traditional patching and is no way more comprehensive, more effective, or safer than vendor patching. (*Id.* at 19-21; ECF No. 1512 at 97-98; *see also* ECF No. 1492-3 (Fanning Depo.) at 4 ("Q. Do you know whether McAfee has ever publicly stated that Virtual Patching is a substitute for vendor provided software patches? A. We have not – in the documentation that we have produced, we've always said that Virtual Patching is a

1   compensating control or a bridge and that we will recommend obviously that all software

2   be patched by the appropriate vendor.").)

3      407.   Tellingly, McAfee, the creator of Rimini's ADS virtual patching software,

4   continues to recommend security patching as an important part of maintaining adequate

5   software security. (P-1214 at 3 ("Leaving databases unpatched just isn't worth the risk");

6   ECF No. 1492-3 (Fanning Depo.) at 4.) McAfee markets virtual patching as a suitable

7   "bridge" until a software patch becomes available, but not as an effective alternative to

8   patching. (P-1213 at 4 ("Virtual patching uses proven security technologies to protect you

9   from emerging threats targeting vulnerabilities until you can actually patch them through

10  normal change-management processes during off hours"); P-1214 at 6 ("The hybrid

11  approach of implementing vendor patches as soon as they can be reasonably deployed,

12  in combination with virtual patching in the interim, provides an effective balance between

13  the challenges of patch deployment and the need to implement adequate security for

14  compliance purposes").)

15     408.   Internal Rimini documents reveal that even Rimini does not believe its own

16  security messaging that customers do not need, and can be more secure without,

17  Oracle's software patches:

18          a.   Rimini internally acknowledges that patching remains an important

19               component of enterprise software security that is necessary to

20               achieve adequate security and regulatory compliance. (P-1435 at 1

21               ("In every organization I have always applied available patches when

22               the opportunity presented itself. . ."), 3 ("Industry experts are saying:

23               you need to patch[,] [c]ompliance standards say: you need to patch.

24               . ."); P-1440 at 2 ("In a perfect world, a CISO [Chief Information

25

26

27

28

85

Security Officer] would have all the money he/she needed to BOTH invest in their overall security posture AND apply the patches").)

b.   Rimini knows that many enterprises continue to value security patches and to apply them. (P-1435 at 2 (patches "come up in just about every Q&A as a massive fear of losing the patches,"); *id.* at 5 ("It seems MOST clients actually use the patches,"); *id.* at 1 ("no one is thinking of not applying patches at all,"); ECF No. 1514 at 55-66; *see also* P-1438 at 4 ("If we do NOT get [Quest Diagnostics] comfortable on [Rimini's] Security Patches [rather than Oracle's CPUs] we get nothing"); ECF No. 1492-5 (Grady Depo.) at 6 (acknowledging for Quest Diagnostics, security patches was its "biggest remaining concern" when considering if it would hire Rimini); P-1439 at 6 ("It is our goal to have an 'alternative solution' for each type of vulnerability, but my point is – since they don't involve any ability to physically update Oracle code, the 'alternative solutions' will not be an acceptable alternative solution to all buyers"), 9 ("We need to go all in on fixing the CPU replacement objection on [Oracle technology] . . . . CPUs might need to be treated like Tax and Regs where Oracle comes out with 7 or 8 a year and so do we and we build, buy or partner to get them"); P-1443 at 3 ("my prospect Quest Diagnostics stood down this year primarily because of their concern about losing CPUs for Oracle [D]atabase").)

c.   Rimini also understands that it cannot provide a replacement for Oracle CPUs. For example, Mr. Ravin wrote that Rimini "will never have a 1:1 replacement for CPU's as they include closed code components" and "CPU Replacements CANNOT be 100%

alternatives . . . [Rimini] can't delivery fully equivalent functionality like [it] can with TLR Updates." (P-1439 at 10.)

409.   Understanding that security is a weakness in Rimini's sales pitch, Rimini and Mr. Ravin have instructed Rimini employees not to affirmatively raise the topic of security in conversations with clients. For example:

    a.    Mr. Ravin instructed members of Rimini's sales team to only address security concerns "if the client raises objection questions" and then "breeze through" answers and "move on." (P-1601 at 1.)

    b.    The head of Rimini's GSS, Mr. Sosnin, told Rimini's Global Vice President, Global Support, Mr. Mackereth, not to bring up Rimini's "Security Advisory Services" with clients "unless there is a reason." (P-1654 at 1.) Mr. Sosnin explained that some "existing clients [] had no issues until" Rimini brought security up. The clients then "figured out they had no patches and it got messy." (*Id.*) Mr. Sosnin reiterated that Rimini should not "spook" clients who were onboarding or those that are about to renew by talking about security. (*Id.*) Mr. Rubin did not consider this email when forming his opinion. (ECF No. 1514 at 42-45.)

    c.    Rimini's President Mr. Grady instructed employees to "get through the questions [of patching] as fast as possible with minimum collateral damage" because "[p]atching is a definite weakness under [third party maintenance]." (P-1435 at 1; P-1438 at 4 ("We do not have a great story that we can easily send in writing to clients on [s]ecurity. It is a hodgepodge of varied information that is all over the board.").)

410.   Rimini and Mr. Ravin also sought to suppress messages acknowledging the singular importance of software patching while Rimini's sales team affirmatively told

customers that Oracle's software patches were ineffective and unnecessary. For example:

    a.    In 2017, Rimini employees had a meeting with McAfee employees to discuss a McAfee whitepaper on virtual patching, entitled "Protect Critical Assets with Virtual Patching," because Rimini did not agree with the language within the paper. In an email to McAfee, Rimini called out a sentence stating that "Virtual patching uses proven security technologies to protect you from emerging threats until you can actually patch the targeted vulnerabilities through normal processes." (P-1238 at 1-2 (emphasis added) ("Here is the 'offending' whitepaper"); *see also* P-1213.) At Rimini's request, McAfee temporarily pulled the paper from its website. McAfee later put the paper back on its website and re-affirmed its accuracy. (ECF No. 1492-3 (Fanning Depo.) at 8-10.)

    b.    Rimini's President Sebastian Grady refused to financially support a report authored by Aberdeen Strategy & Research on virtual patching unless it "unequivocally," said that "CPUs can be replaced with [virtual patching] and are no longer needed at all." (P-1443 at 1-2, 5; ECF No. 1492-5 (Grady Depo.) at 8-9.)

    c.    Grady also refused to send a whitepaper to a prospective Rimini client that stated: "While vendor security patches should be a part of [a database security] program, exclusive reliance on them does not ensure system-wide security." (P-1440 at 1 ("I can't send this whitepaper out. The first paragraph is DEAD ON ARRIVAL. How can we possible tell a prospect 'while vendor security patches should be

part of such a program?'"); *see also* ECF No. 1492-5 (Grady Depo.) at 7-8.)

        d.    Mr. Ravin fired a Rimini employee who had acknowledged the importance of vendor patching in Rimini's sales materials. (ECF No. 1503 at 151-53; P-1603.) In a document concerning "GSS Top Security Objections," the employee had written: "Applying security updates/patches is a basic component of all Information Security programs; it is considered critical to corporate risk reduction and the prevention of a potential security breach. Prospective clients are concerned they will no longer receive security updates (CPUs for Oracle) and email alerts about vulnerabilities and potential patches upon moving to Rimini Street support." (P-1603 at 1.) Reacting to this language, Mr. Ravin responded: "I don't like and I had killed it before . . . but it is back. . . . This first sentence is a death-trap . . . . You can't say this. You should ELIMINATE THE text in red, and NOT set us up by declaring both the patch strategy and receiving patches as 'critical risk reduction.'" (*Id.*)

411.    Although Rimini presented testimony of a cybersecurity expert, Dr. Rubin, his suggestion that Rimini's virtual patching offering provides greater security protection for Oracle licensees as compared to vendor patching is not credible or supported by the evidence in the record. (ECF No. 1514 at 49-50.) His testimony was contrary to numerous authoritative sources within the cybersecurity industry, including the National Institute of Standards and Technology, the Department of Homeland Security's Office of the Inspector General, and the PCI DSS [Payment Card Industry Data Security Standard]. (*Id.* at 9-14.) Dr. Rubin's testimony also conflicted with several of Dr. Rubin's own public statements emphasizing the importance of software patches. (ECF No. 1513 at 170-74.) His testimony was also inconsistent with Rimini's own internal documents, which reveal

Rimini's own awareness that vendor patching remains singularly important, and security is a "weakness" in Rimini's offering as compared to vendor patching.

412.   The Court also finds uncompelling Rimini's apparent argument that virtual patching must be an effective replacement to security patching because Oracle did not present evidence of any security breach suffered by a Rimini customer. (ECF No. 1503 at 40; ECF No. 1512 at 113.) Simply because no evidence of a breach was presented does not mean none occurred, nor does it mean that Rimini's customers are not at increased risk of becoming a victim of such a breach.

**b.   Rimini's Claims About Holistic Security**

413.   The security industry generally understands the terms "holistic security" and "defense in depth" to refer to a comprehensive approach to security at all layers of a system, and includes security patching at the software level among other security measures. (ECF No. 1503 at 18-21; ECF No. 1512 at 101; ECF No. 1492-3 (Fanning Depo.) at 8.)

414.   Rimini's security offering is not "holistic" or "multilayered" as those terms are commonly understood. Rimini's security offering is limited to "security advisory services" and a virtual patching tool, which cannot provide security at all layers of a system, including to the software source code. (ECF No. 1503 at 21.) Most notably, Rimini's offering cannot meet the industry's definition of holistic security because it does not include vendor patching. (*Id.*; *see also* ECF No. 1512 at 101.) One of Rimini's own experts agreed with this proposition at trial. (ECF No. 1515 at 57 ("I'll agree that the security patching is one of multiple essential things that you need to protect yourself against data breaches.").)

**c.   Relative Security of Oracle and Rimini**

415.   Because Rimini cannot provide Oracle licensees with security patches, once a customer leaves Oracle support for Rimini, no customer using Rimini's offerings can have any future vulnerability fixed unless they return to Oracle support. (ECF No.

1   1503 at 15, 25; ECF No. 1512 at 95-96, 99-100.) Accordingly, Rimini's security offerings

2   to Oracle licensees do not help licensees maintain a more secure application than

3   Oracle's CPUs because they do not actually remove any security vulnerabilities. (*Id.* at

4   95-96, 107.)

5         416.  Rimini did not even offer the ADS virtual patching product—the primary

6   security offering it relied on at trial to support its claims that customers can be "more"

7   secure with Rimini than with Oracle—until June 2017, well after Rimini made several of

8   the statements at issue in Oracle's Lanham Act claim. (P-1655 (6/7/17: announcing

9   Rimini's "launch" of the ADS product).) For example, Rimini's statement that GSS "helps

10  clients proactively maintain a more secure application compared to the vendor's support

11  program which offers only software package-centric fixes" was made in 2015. (P-634 at

12  1, 3-4; *see also* P-643; P-1443 at 1, 3, 5 (2016: "[a] key message is 'security patches are

13  no longer relevant'").)

14        417.  Even after Rimini made the ADS virtual patching technology available, it

15  was not part of Rimini's standard software offering, was only available to purchase at an

16  additional price, and was only purchased by a handful of customers. (ECF No. 1512 at

17  95, 98-99 (explaining Rimini's ADS offering and that Rimini only "had five customers who

18  had purchased the ADS product"); ECF No. 1514 at 89 (failing to provide an alternative

19  figure), 120-22 (discussing the deposition testimony of Rimini's Steven Salaets).)

20  Meanwhile, Oracle support customers were, like Rimini support customers, also able to

21  purchase and use virtual patching software, including the McAfee technology that Rimini

22  re-sells as "ADS," the other virtual patching products Rimini sometimes recommends from

23  Integrigy and Imperva, and even virtual patching software from Oracle. (*Id.* at 15-18, 58-

24  59; ECF No. 1492-3 (Fanning Depo.) at 3; P-1435 at 9 (Virtual patching "technology is

25

26

27

28

1  available from third party security solution providers such as McAfee, Imperva, AppSec,

2  Integrigy, and even Oracle").)

3      418.   Rimini's GSS offering also does not make Rimini's support customers "more

4  secure" than Oracle support customers. Internal documents reveal that Rimini's GSS was

5  created to "assist with overcoming sales objections" and was only to be referenced "in

6  response to client queries, rather than presented proactively to prospects or clients." (P-

7  1652 at 6; *see also* ECF No. 1514 at 46-47.) Rimini provides scant detail about what its

8  consulting service entails other than that Rimini uses cybersecurity standards in providing

9  the service and offers "onsite support." (*Id.* at 86-88.) Rimini presented no evidence at

10  trial as to how many of Rimini's clients used or relied on Rimini's consulting services,

11  including its "onsite support," or what such support consisted of. (*Id.* at 41, 87-88.) Dr.

12  Rubin also claimed that Rimini conducts "security assessments" as part of its advisory

13  services, but there is no factual evidence in the record to support this assertion. (*Id.* at

14  41-42 ("Q. And you also believed, based on Mr. Salaets, that Rimini offered security

15  assessments to clients, but you've never seen a Rimini security assessment, correct? A.

16  Correct.").)

17      419.   Contrary to Rimini's assertions, Rimini's GSS cannot "pinpoint" future

18  security vulnerabilities before they even exist because that is not technically feasible.

19  (ECF No. 1512 at 107-08.)

20      420.   At trial, Rimini advanced the argument that customers with products on

21  Sustaining Support are more secure at Rimini than with Oracle because Oracle does not

22  provide security patches for products on Sustaining Support unless the customers

23  upgrade their software, and customers can make informed and reasonable decisions not

24  to upgrade. Although Oracle only releases security patches for products on Premier and

25  Extended Support, Oracle's support includes the right to upgrade for free to the newer,

26  fully-patched versions of the enterprise software product. (ECF No. 1503 at 30-31, 34-

27  36.) The fact that some customers may choose not to upgrade products on Sustaining

28

Support even though such upgrades are available to them for free is irrelevant to the Lanham Act inquiry; some customers' choice not to upgrade does not change the fact that their software would be more secure if it was upgraded to a patched version, nor does it change the fact that such upgrades are available only on Oracle support and not on Rimini support.

### d. Statements Regarding TomorrowNow

421.   Rimini represented to prospective customers that there were no similarities between TomorrowNow and Rimini Street other than the fact that they both have provided third-party maintenance. (ECF No. 1508 at 294-95.)

422.   Rimini made that representation to customers despite Mr. Ravin's public statements about the similarities between TomorrowNow and Rimini, and despite the fact that Rimini and Mr. Ravin knew that TomorrowNow had PeopleSoft environments on its systems, just as Rimini did prior to the migration.

423.   Rimini's own public statements about its similarities to TomorrowNow and the fact that both Rimini and TomorrowNow had infringing PeopleSoft environments on their systems establish that Rimini's standard marketing message to customers and prospective customers about the lack of similarities between Rimini's and TomorrowNow's support practices was false.

### 3. Ravin's Involvement in Rimini's Statements

424.   Mr. Ravin has also been integrally involved in developing Rimini's standard marketing messaging: the more important the Rimini marketing message at issue, the more involved Mr. Ravin was in developing that message. (ECF No. 1508 at 275-76.) He authored, directed, and/or approved Rimini's false statements to customers and prospective customers, including: (1) statements that Rimini had ceased using the support process that were found to infringe Oracle's copyrights in *Oracle I*; (2) statements that Oracle's patches and updates are unnecessary to secure software; and (3)

1   statements that Rimini's support practices did not share anything in common with the

2   support practices of TomorrowNow.

3       425.   First, Rimini made the widespread representation to its customers and

4   prospective customers that Judge Hicks' rulings in *Oracle I* "relate to processes and

5   software no longer in use at Rimini Street." In August 2014, Rimini communicated this

6   message in relation to Judge Hicks' second summary judgment order in *Oracle I* to each

7   of its clients in a letter signed by Mr. Ravin. (P-6057 at 3; ECF No. 1503 at 121.) Mr. Ravin

8   approved this message to be repeated in media statements and disseminated talking

9   points containing this message to Rimini employees for use with prospects, clients,

10  media, and analysts. (P-1580 at 2-3.) He also authored or directed standard messaging

11  to clients and the media in September 2014 that Rimini's support services no longer

12  infringed Oracle's copyrights. (P-1582 at 3; P-1157.)

13      426.   Second, Mr. Ravin was extensively involved in Rimini's standard messaging

14  to customers regarding Rimini's and Oracle's security offerings, and instructed members

15  of Rimini's sales team not to affirmatively bring up the topic of security with clients. For

16  example, Mr. Ravin believed that customer-facing sales materials that discussed security

17  concerns were a "disaster," and ordered the Global Vice President of Global Product

18  Marketing and Strategy to remove those materials because "[t]he LAST thing we want is

19  a CIO hearing that he/she SHOULD be worried about security because 75% of their

20  colleagues are WORRIED" and think, "hey, maybe I need to look into this much more

21  deeply." (P-1601; *see also* ECF No. 1503 at 150 (discussing P-1601).) At trial, Mr. Ravin

22  admitted that he fired a Rimini employee who prepared a marketing document stating that

23  "[a]pplying security updates/patches is a basic component of all Information Security

24  programs" because this message was a "death trap" that deviated from Rimini's standard

25

26

27

28

94

messaging to customers that Oracle's software patches are ineffective and unnecessary. (P-1603 at 1.)

427.    Third, Mr. Ravin knew that Rimini's public statements that its support practices did not share anything in common with the support practices of TomorrowNow were false. Mr. Ravin's former company TomorrowNow, which provided third party support to Oracle software, was ultimately found to be criminally and civilly liable in 2011 for copyright infringement based on support practices that Mr. Ravin designed. Before TomorrowNow pled guilty, Mr. Ravin publicly stated in marketing materials to customers that he designed TomorrowNow's support processes and that Rimini's support model relating to core services and design elements did not change much from the model he built at TomorrowNow. (ECF No. 1503 at 133-34; *see also id.* at 134 ("Q Tomorrow Now was the Bellagio and Rimini was The Wynn, correct? A Yes.").)

428.    The Court therefore finds that Mr. Ravin knowingly participated in the creation and propagation of Rimini's false advertising related to its infringing support practices.

**F.    Rimini's Remaining Unfair Competition Law ("UCL") Claim**

429.    The sole remaining basis for Rimini's Unfair Competition Claim under Cal. Bus. & Prof. Code § 17200, *et. seq.* ("UCL") is Oracle's alleged violation of the UCL's "unfairness" prong. (ECF No. 1309 at 63, ¶ 46; ECF No. 1444 at 24-25 (Rimini's trial brief); ECF No. 1253 at 20.)

430.    In its trial brief and pre-trial proposed findings of fact and conclusions of law, Rimini asserts only three bases for its UCL claim: Oracle's Matching Service Level ("MSL") policy, Oracle's Reinstatement Fee and Back Support Policy, and allegedly false statements by Oracle to customers. (ECF No. 1444 at 24-25 (Rimini's trial brief); ECF No. 1445 at 36-39, 74-77 (Rimini's pre-trial proposed findings).)

431.    While Rimini points to testimony and trial exhibits related to other potential theories of UCL liability, those theories were not identified in Rimini's pre-trial brief and

1   proposed findings, and the Court therefore excludes them from consideration on that

2   basis. (ECF No. 1503 at 232, 234 (holding that testimony would be stricken if there are

3   not proposed findings relating to the issue in the offering party's proposed findings of act);

4   ECF No. 1470 (minute order stating the Court would not consider the objectionable

5   testimony).)

6        **1.    The Relevant Product Market**

7        432.    Rimini does not claim to develop or sell enterprise software, and does not

8   compete with Oracle in the market for enterprise software. (ECF No. 1503 at 174.)

9        433.    Rimini makes no contention that Oracle monopolizes the "primary" market

10   for enterprise software.

11        434.    There is also no dispute that any "primary" market for enterprise software is

12   intensely competitive. Oracle witnesses testified without contradiction that Oracle

13   competes with many firms in the primary market for enterprise software, including SAP,

14   Workday, Salesforce.com, IBM, Microsoft, Amazon, Google, and many others. (*Id.* at 10-

15   11; ECF No. 1507 at 71-72.) The evidence before the Court indicates that Oracle's

16   support prices are dictated by licensing prices and that pricing is competitive in the market

17   for enterprise software. (ECF No. 1515 at 301-02; ECF No. 1507 at 72-78.)

18        435.    Rimini does compete with Oracle as well as other third-party support

19   providers such as Spinnaker and IBM for the support of Oracle's enterprise software, and

20   Rimini also competes against customers self-supporting their Oracle software. (ECF No.

21   1503 at 199-200, 245.)

22        436.    Rimini has failed to demonstrate the existence of a separate relevant

23   "aftermarket" or secondary market for software support. The evidence instead shows that

24   it is common in the enterprise software market for customers to inquire about, and make

25   purchasing decisions based upon, the total cost of using the software over time, including

26

27

28

96

both the cost of a software license and the annual cost of software support. (ECF No. 1515 at 301-02.)

437.   A typical enterprise software customer evaluates Oracle and Oracle's competitors' enterprise offerings together and negotiates simultaneously with Oracle and Oracle's competitors over the license fee and subsequent support fees (since support fees are typically a percentage of the license fees). (ECF No. 1507 at 72-78.)

438.   Rimini provides no evidence or expert analysis whatsoever regarding Oracle's market share if enterprise software and support are viewed as a single product in a single integrated market.

### 2.   Market Power and Harm to Competition

439.   It is common in the enterprise software market for the owners of the software to be the primary providers of support for their software given their development and knowledge of the software's source code. (ECF No. 1506 at 152-53.)

440.   None of Rimini's expert witnesses persuasively demonstrated at trial any harm to any market, to competition, or to consumers.

441.   Even assuming a separate market for support could be demonstrated by Rimini, Rimini has provided no evidence that Oracle obtained its market share in such a market through unlawful means.

442.   Third-party support providers can provide support for Oracle software to licensees so long as that support is within the scope of the customer's license or if the provider has a license to provide support from Oracle. (*Id.* at 185; ECF No. 1507 at 95.)

443.   Rimini identifies no provisions in Oracle's agreements with customers that prevent customers from purchasing software support from third-party support providers.

### 3.   Oracle's Support Policies

444.   When customers enter into a license agreement with Oracle and also agree to use Oracle support, they are made aware of, and consent to, Oracle's Technical

97

1   Support Policies, including Oracle's MSL policy, reinstatement fee policy, and back

2   support policy. (*Id.* at 52.)

3       445.   Oracle's Software Technical Support Policies are also typically referenced

4   and incorporated into the license and support agreements between Oracle and its

5   customers. (*Id.*)

6                   **a.    Matching Service Level ("MSL") Policy**

7       446.   Oracle's MSL policy requires that a customer purchase support for all

8   licenses of the same product owned by the customer, or, alternatively, the customer may

9   not purchase support for any of the licenses of the product. (ECF No. 1506 at 153; *see*

10  *also* D-133 at 3 (2014 Oracle Software Technical Support Policies).)

11      447.   For example, if a customer purchases 100 PeopleSoft licenses from Oracle,

12  it must purchase Oracle support for all 100 of those licenses or none of them. (ECF No.

13  1506 at 45-46.)

14      448.   The MSL policy does not apply across product lines. For example, the policy

15  does not require a customer with both PeopleSoft and JDE to purchase support for both

16  products or neither. (ECF No. 1507 at 129-30.)

17      449.   When a customer purchases Oracle support for a product, it has access to

18  the My Oracle Support portal, including the support documentation, updates, and all the

19  other Oracle support materials. (ECF No. 1506 at 153-55.)

20      450.   Oracle has no way of limiting or restricting a customer's use of My Oracle

21  Support to support a single license for which the customer is paying for support and

22  preventing the customer from using My Oracle Support to support any other licenses for

23  which the customer is not paying for support. (*Id.*)

24      451.   The purpose of the MSL policy is to prevent a customer from purchasing

25  Oracle support for one license or a limited number of licenses and then using that support

26

27

28
                                      98

1  for other, unsupported licenses. (*Id.*; *see also* ECF No. 1507 at 121; ECF No. 1492-7

2  (Henslee Depo.) at 3-4.)

3      452.  The MSL policy does not explicitly prevent a customer from purchasing

4  support from a third party such as Rimini in addition to or as a replacement for Oracle

5  support. (ECF No. 1507 at 46-48, 53; ECF No. 1492-7 (Henslee Depo.) at 5-6.)

6      453.  MSL policies are common in the software industry. (ECF No. 1507 at 53.)

7      454.  While the MSL policy may restrict certain customers from splitting up

8  support of multiple licenses for a product between Oracle support and other support

9  options (third-party support, self-support, or no support), the overall policy is not bad for

10  customers as a whole. (ECF No. 1516 at 19-24.)

11      455.  As explained by Dr. Campbell, an expert witness in the field of

12  microeconomics related to competition issues, the MSL policy is procompetitive because

13  it allows Oracle to protect and adequately monitor the rate of return on its investment in

14  its intellectual property by preventing a customer from paying for a portion of support on

15  one license but then using the support for a broader set of licenses. (ECF No. 1515 at

16  298-99.)

17      456.  The MSL policy is also procompetitive because it allows Oracle to sell its

18  support as a comprehensive set of protection of the customer's Oracle software

19  investment, as opposed to some subset of the customer's Oracle software investment.

20  Comprehensive protection prevents a situation where the customer experiences a crisis

21  and then there is a dispute about whether the partial coverage the customer purchased

22

23

24

25

26

27

28

covers the harm from the crisis. Without Oracle's MSL policy, Oracle would not be able to market its product in a way that avoids that potential negative outcome. (*Id.* at 37-38.)

457.   Two of Rimini's experts opined that Oracle's MSL policy actually causes some customers to leave Oracle support, rather than forcing customers to stay on Oracle support. (ECF No. 1514 at 242-43; ECF No. 1515 at 75-76.)

**b.   Back Support and Reinstatement Fee Policies**

458.   Under Oracle's back support and reinstatement fee policies, when a customer that terminates Oracle support for a product later purchases support again for that product, that customer must pay the support fees the customer would have paid during the lapsed period, along with an additional 50% fee. (ECF No. 1507 at 50-51; *see also* D-133 at 3 (2014 Oracle Software Technical Support Policies).)

459.   Oracle charges back support and reinstatement fees for at least two reasons.

a.   First, if a customer terminates support for a product, Oracle continues creating patches, fixes, updates, and upgrades for that product. When the customer rejoins Oracle support, it receives the benefit of all the support materials developed during the lapsed period. Therefore, Oracle charges the customer for support during the lapsed period to prevent customers from free-riding on the support fees paid by other customers. (ECF No. 1507 at 54.)

b.   Second, Oracle views its back support and reinstatement fees as analogous to insurance. If a customer lets an insurance policy lapse but decides they need the insurance policy later, it makes sense to charge for the lapsed period as well as an additional fee. (*Id.* at 67-68.)

460.   As Dr. Campbell persuasively explained, Oracle's support offering is analogous to an insurance policy from an economic perspective. Customers pay for

support on their enterprise system to ensure that it does not crash, analogous to insurance customers purchasing an insurance policy against a disaster. (ECF No. 1515 at 299-300.)

461.    Oracle's structuring of its pricing policies, including its back support and reinstatement fee policies, in line with an insurance model, is procompetitive.

> "The model of insurance requires that premiums be paid based on a certain risk pool, and the participants in that risk pool would be those that the insurer is providing underwriting for the risk. If an insured party chooses to drop insurance, then the event happens such as a fire in the home, that insured party cannot simply join the insurance policy again and simply resume as though there were no break at all. That would destroy the entire model of compensation of insurance. And, similarly, you would have a distorted risk pool, that is to say the risk pool incorporates a group of persons who have some greater risk and some less, and the underwriter is making a comparison and a calculation of all those risks. If, by contrast, you add in someone who has already suffered the casualty, again using the insurance analogy, then that risk pool is distorted. You no longer party anything like a random sample of users who might be subject to these casualties, but you have someone who, with 100 percent certainty, has suffered the casualty. Accordingly, if you charged that person the same premium as everyone who had stayed in the risk pool, the risk pool premium would have been distorted."

(*Id.* at 300-01.)

462.    Oracle support customers that cancel support and then seek to return only when they need it are similar to insurance customers that cancelled their policy and then seek to return once a disaster occurs. If Oracle allowed customers to leave support and then return without paying a higher fee, "it is distortive of [the insurance pricing] model resulting in undercompensation for the underwriter [, *i.e.*, Oracle, in this case,] if you are obliged to pay only the premium that a user who had never left had to pay." (*Id.* at 301.)

463.    While Mr. Ravin made the unsupported assertion that he believes Rimini has lost customers because of Oracle's back support and reinstatement fee policies (ECF No. 1503 at 249, 251), the Court did not see any corroborating evidence at trial that any customer declined to contract with Rimini and remained with Oracle due to the back support or reinstatement fee policies. And indeed, the hundreds of customers that left

1   Oracle for Rimini and did not return to Oracle (*see* ECF No. 1466) despite the back

2   support/reinstatement fee policies.

3   464.   If anything, the back support and reinstatement fees would benefit Rimini

4   by incentivizing those customers not to return to Oracle. The policies provide that

5   customers must make higher, not lower, payments for Oracle to take customers back

6   from Rimini.

7   465.   The only customer evidence at trial related to back support/reinstatement

8   fees came from the testimony of Randall Martin, Director of Corporate Systems at Atkins

9   North America. Atkins was an Oracle EBS customer that left Oracle for Rimini in 2014.

10   (ECF No. 1515 at 82, 88.)

11   466.   Mr. Martin testified that Oracle specifically reminded Atkins of the back

12   support and reinstatement fee policies before Atkins terminated Oracle support, and

13   Atkins moved forward with the decision to terminate Oracle support regardless. (*Id.* at

14   92.)

15   467.   Rimini's expert Mr. Loftus opined that Oracle's reinstatement policy actually

16   had a mixed effect on the competition between Rimini and Oracle and could not define

17   any adverse effect. (*Id.* at 75.)

18   **c.    Unchanging Nature of Oracle's Support Policies**

19   468.   Oracle's MSL, back support, and reinstatement fee policies have not

20   changed in response to Rimini or any other competition. Oracle's customer agreements

21

22

23

24

25

26

27

28

102

1  prohibit Oracle from making material changes to the Technical Support Policies, and
2  Oracle has not made any such material changes. (ECF No. 1507 at 52.)

3      469.   The Technical Support Policies at issue were in place before Rimini existed.
4  (*Id.* at 51-54, 66, 120-21.)

5          **d.      Oracle's Allegedly False and Misleading Statements**

6      470.   Rimini's trial brief and pre-trial proposed findings identify two categories of
7  statements that Rimini alleges are false and misleading and violate the UCL:

8          a.     Statements about the legality of third-party support (ECF No. 1444
9                 at 25 (Rimini's trial brief); ECF No. 1445 at 38 (Rimini's pre-trial
10                proposed findings)); and

11         b.     Statements about risk to customers resulting from Rimini's support
12                related to security (ECF No. 1444 at 25; ECF No. 1445 at 38).

13     471.   While Rimini may now point to testimony and trial exhibits related to other
14 categories of allegedly false and misleading statements that Rimini claims violate the
15 UCL, those categories were not identified in Rimini's pre-trial brief and proposed findings,
16 and the Court therefore excludes them from consideration on that basis. (ECF No. 1503
17 at 232, 234 (holding that testimony would be stricken if there are not proposed findings
18 relating to the issue in the offering party's proposed findings of fact); ECF No. 1470
19 (minute order stating the Court would not consider the objectionable testimony).)

20              *i.     Statements Related to the Legality of Third Party Support*

21     472.   Rimini identifies two statements that it claims are statements by Oracle
22 about the legality of third-party support. Both statements are by Silvia Predescu, who is
23 not an employee of Oracle America, Inc., or Oracle International Corporation. She is an
24 employee of Oracle Romania. (ECF No. 1492-13 (Predescu Depo.) at 3.)

25     473.   On February 11, 2015, Ms. Predescu emailed Jason Bourque of Cross
26 Country Healthcare in reference to Cross Country's upcoming renewal deadline for
27 support of Oracle Database, stating: "Or are you saying that Cross Country is actually

28                                      103

considering to have an unauthorized third party reseller maintain your Oracle licenses. I would be surprised for this to be the case, as such decision would expose your company to severe risks. There is no company out there that can actually provide legitimate support for Oracle licenses, as only Oracle owns the software source code to do any sort of bug fixing or solution development. Any 'support package' advertised by a third party provider can only be composed of what Oracle publicly releases in terms of support solutions. But you will not have access to any upgrade path – therefore to any new version of your product-, bug fixed, patches, preventive support tools or any of the other benefits that are included in the support package." (D-178 at 3.)

474.   On February 12, 2015, Ms. Predescu emailed Cross Country again, stating: "As I mentioned, no company out there, including Rimini Street, can offer you the support of the vendor without committing copyright infringement. Such companies do not have legal access to our Intellectual Property, updates, patches and fixes." (*Id.* at 2.)

475.   As Ms. Predescu explained at her deposition, her use of the phrase "legitimate support" referred to "the same support that Oracle provides," and it did not mean "legal support." (ECF No. 1492-13 (Predescu Depo.) at 3.)

476.   Cross Country became a Rimini support customer for Oracle Database on February 10, 2015, and had not returned to Oracle support as of the close of fact discovery in this case. (ECF No. 1466 at 1, 8.)

477.   There is no evidence in the record that Cross Country was deterred from contracting with Rimini for support of its Oracle products as a result of Ms. Predescu's statements.

478.   The Court finds that Ms. Predescu's statements at issue in D-178 are not false or misleading. She accurately stated that a third-party support provider such as Rimini cannot provide certain aspects of support that Oracle provides, in part due to Oracle's exclusive access to the underlying source code. Ms. Predescu's characterization of Oracle support as the only "legitimate" support is, at worst, a statement of Ms.

1   Predescu's opinion related to her truthful statements about the capabilities of third-party
2   support.

3      479.   On August 12, 2014, Ms. Predescu wrote to IXYS regarding a renewal
4   deadline for Oracle support for Database and EBS, stating: "Internally, you might have
5   the talented people to support the software – but how you will be able to download
6   patches without Oracle support? -, but going to an unauthorized support provider will put
7   your organization at risk in terms of copyright infringement and breaking IP laws." (D-179
8   at 2.)

9      480.   There is no evidence in the record as to whether or not IXYS ultimately
10  renewed its support contract with Oracle. Nor is there any evidence that IXYS was
11  considering contracting with Rimini or any other third-party support provider, or that IXYS
12  was deterred from contracting with Rimini or any other third-party support provider.

13     481.   The Court finds that Ms. Predescu's statements at issue in D-179 are not
14  false or misleading. Rimini is the most well-known third-party support provider for Oracle
15  software, and, as of 2014, was possibly the only third-party support provider for certain
16  Oracle software products. At that point in time, Rimini had been found to have infringed
17  Oracle's copyrights. Therefore, it was accurate that engaging with third-party support
18  could entail IP-related risk.

19               *ii.*      *Statements Regarding Security and Regulatory Compliance*

20     482.   Rimini appears to challenge statements made by Oracle that Rimini's
21  support offerings are inferior to Oracle's, do not protect against critical vulnerabilities, and
22  expose customers to security risks, including from ransomware attacks. (ECF No. 1503
23  at 247-48; ECF No. 1514 at 98-105.) Because Rimini did not include such alleged
24  misrepresentations in its proposed findings of fact on its UCL claim, Rimini waived these
25  arguments. (ECF No. 1503 at 232, 234 (holding that testimony would be stricken if there
26  are not proposed findings relating to the issue in the offering party's proposed findings of

27
28

1  act); ECF No. 1470 (minute order stating the Court would not consider the objectionable

2  testimony).)

3      483.   Alternatively, the Court finds that such statements are not false or

4  misleading.

5      484.   Oracle has stated that "Virtual patching can't protect your software from

6  critical vulnerabilities." (D-341 at 1.) This statement is not false or misleading. As

7  discussed above, there are many ways that bad actors can gain access to enterprise

8  software despite the use of virtual patching or firewall technology. For example, the

9  firewall could be misconfigured, the firewall may not be able to catch a particular exploit

10  attempt, a bad actor could gain access to the software behind the firewall through either

11  legitimate or stolen credentials, or a hacker could gain access behind the firewall through

12  installed malware. (ECF No. 1503 at 19-20; ECF No. 1512 at 98.) Although firewalls are

13  a method to help increase the security of enterprise software, it is still necessary to apply

14  available security patches to close the vulnerabilities in the software to prevent them from

15  being exploited. (ECF No. 1503 at 19-21; ECF No. 1512 at 96-97; *see also* ECF No. 1492-

16  3 (Fanning Depo.) at 4.)

17      485.   Oracle has stated that: "No third-party vendor can provide upgrades to

18  software installed on your servers because they don't own the intellectual property. This

19  means you won't have access to the most recent innovations your software vendor has

20  developed to help you compete more effectively in your markets, or to ensure that your

21  software is secure from attacks like Petya and WannaCry." (D-49 at 3.) Oracle has also

22  stated that "If WannaCry has taught us anything, it's that the potential ramifications of

23  cybercrime make it very hard to defend using a cut-rate third party services vendor who

24  doesn't even believe in patching software against known vulnerabilities, simply to lower

25  the price of maintenance." (D-736 at 3.) These statements are not false or misleading. As

26  discussed above, Rimini's customers are at risk for critical security attacks (including

27  ransomware attacks) because they are not receiving software patches closing critical

28

106

1   vulnerabilities. (ECF No. 1503 at 19-20; ECF No. 1512 at 98.) Again, firewalls, while

2   helpful, are not a substitute for software patches. The challenged representations relating

3   to the risks of ransomware attacks, D-49 at 3 and D-736 at 3, do not indicate that Oracle

4   software was involved in the example ransomware attacks named in those documents.

5   Those ransomware attacks support Oracle's overarching points in those articles—that

6   failure to patch your software can put you more at risk of ransomware attacks.

7        486.   In an email from an Oracle employee to employees of CalPERS, an Oracle

8   employee said she did not find that "organizations move their [HIPAA] regulated systems

9   to Rimini Street because they cannot stay in [HIPAA] compliance" and that the "decision

10   of your technology team to work with Rimini Street will take CalPERS out of compliance

11   and not support the security and protection tone you have set for your organization and

12   its stakeholders." (D-373 at 2.) This statement is not false or misleading. The evidence at

13   trial showed that customers need security patches to adhere to key security regulations,

14   including HIPAA. These regulations either require software patching or have standards

15   which are viewed by the security community as only being addressable by patching. (ECF

16   No. 1512 at 101-02; ECF No. 1503 at 37-38; *see also* ECF No. 1492-3 (Fanning Depo.)

17   at 6-8.)

18        487.   Rimini's internal documents concede that both industry experts and

19   compliance standards state that "you need to patch" (P-1435 at 3), and it is undisputed

20   that Rimini's customers no longer on Oracle support do not receive security patches.

21   (ECF No. 1503 at 25; ECF No. 1512 at 97.)

22        488.   Without software patches, "virtual patching" cannot generally serve as an

23   effective "compensating control" to achieve HIPAA compliance. (*Id.* at 103.)

24   Compensating controls are temporary "workarounds" used when a regulatory

25   requirement is technically infeasible. Compensating controls are not meant to be used by

26

27

28

1   enterprises to save money. Further, compensating controls must be documented,

2   audited, and approved in order to achieve compliance. (*Id.* at 102-03.)

3          489.   Rimini provides little to no support for its contention that this statement is

4   false or misleading. At trial, Rimini's security expert stated it's "not true" "that

5   organizations that leave Oracle and go to Rimini cannot be HIPAA complaint." (ECF No.

6   1514 at 106-07.) Further, Mr. Mackereth reported that one of Rimini's clients, BAE

7   Systems, passed some sort of HIPAA compliance audit. (ECF No. 1508 at 250; ECF No.

8   1514 at 107.) The Court finds this information insufficient to establish that Oracle's

9   statement is clearly false. As Oracle noted, the government agency administering HIPAA

10  does not conduct regular audits. Moreover, Rimini's own security expert Dr. Rubin had

11  no independent knowledge concerning Rimini clients' passing HIPAA compliance audits,

12  and concedes that the ultimate determination about whether an enterprise follows HIPAA

13  is if it survives a HIPAA compliance investigation. (*Id.* at 132-35.)

14         490.   At trial, Mr. Ravin testified that Rimini's ISO certification meant that its

15  security procedures had been validated and certified by an accepted industry auditor, a

16  certification it also cites commonly to customers. (ECF No. 1503 at 188; *see also* P-634

17  at 10 ("We are the only provider with ISO 27001 which ensures security for our clients

18  through rigid regulatory controls").) This was misleading. On cross examination, Mr. Ravin

19  admitted that ISO certification relates to security at Rimini and not at the location of any

20  Rimini customer and that he could not say how the ISO certification related to anything

21  "beyond our walls." (ECF No. 1503 at 259.)

22         491.   Rimini has claimed that other customers have achieved compliance under

23  PCI DSS [Payment Card Industry Data Security Standard] and SOX [Sarbanes-Oxley

24  Act] as well, but a closer examination of the evidence reveals that it was not due to any

25  of Rimini's security offerings. For example:

26              a.     Rimini asserts that at least one of its customers achieved compliance

27                     with PCI-DSS. (ECF No. 1512 at 135.) This can be achieved by

28                                                   108

removing sensitive data from the regulated unpatched data system so that the data is no longer within the scope of PCI DSS requirements. (*Id.* at 103-04.) In this scenario, virtual patching has no impact on PCI DSS compliance. (*Id.* at 105.) Removing data from an unpatched system to take it outside the scope of a PCI DSS audit is not a security measure. (*Id.*)

b. Documents produced by one of Rimini's prospective clients confirms that virtual patching does not achieve PCI DSS compliance. In a series of emails between Rimini and LifeWay Christian Resources, LifeWay expressed concern about maintaining PCI DSS compliance in the absence of Oracle patches. (P-969 at 5.) Rimini responded in part by recommending third-party virtual patching software. (P-971 at 1.) Lifeway rejected that approach, recognizing that virtual patching alone "would not work" because under PCI DSS, Lifeway was "supposed to have multiple security devices like the web applic[ation] firewall in front of critical systems, along with up-to-date patching," and "Doing one, does not let [Lifeway] omit the other." (*Id.*; *see also id.* ("I can't imagine any company getting [that] past an auditor"); P-970 at 1 ("Rimini has an alternative approach to keeping databases secure using another third party . . . But it was not acceptable for PCI compliance.").) LifeWay understood that the only way to achieve PCI DSS compliance without Oracle patches was to remove sensitive credit card information (of the kind PCI DSS is meant to protect) from the unpatched Oracle software altogether. (*Id.* ("we are moving forward with getting EBS out of PCI scope"); *see also* P-971 ("we need to remove Oracle from PCI scope by being tokenized and not allowing credit cards to be entered into Oracle").)

Another Rimini client, World Vision, adopted this approach by "tokeniz[ing] EBS and the corresponding tech stack, removing it from the scope of the PCI audit." (P-969 at 4.)

    c.    Rimini claims that its client Goodyear passed a SOX audit. (ECF No. 1508 at 251.) SOX compliance with unpatched enterprise resource software can be achieved in the same way that PCI DSS compliance can—by removing sensitive financial data from the regulated systems, not through virtual patching as a substitute for security patching. (ECF No. 1512 at 105.)

### 4. Oracle's Purported Campaign Against Rimini

492. Rimini alleges a "campaign" by Oracle against Rimini designed to "thwart Oracle customer efforts to switch to Rimini." (ECF No. 1445 at 36 (Rimini's pre-trial proposed findings); ECF No. 1444 at 10 (Rimini's trial brief).) Rimini alleges that the campaign includes sales talking points about the litigation, letters to customers, tracking customer "winbacks" from Rimini, and incentivizing employees for winning back customers. (ECF No. 1445 at 36.)

493. Other than the two categories of allegedly false and misleading statements addressed above, Rimini does not allege that the statements at issue in Oracle's alleged campaign against Rimini are false or misleading. (ECF No. 1445 at 36; ECF No. 1444 at 10.)

494. Rimini appears to allege that the existence of such a campaign by Oracle, even if the statements made by Oracle as part of the campaign are true, would constitute a UCL violation. (*Id.*; *see also* ECF No. 1503 at 245-46.)

495. But marketing that spreads fear, uncertainty, and doubt ("FUD") in customers about a competitor is not necessarily anticompetitive. It is instead part of the competitive economic system for alternative providers of a product or service to inform

customers about the qualities of their product or service and the detriments of their competitor's product or service. (ECF No. 1515 at 304-05.)

496.   FUD-based marketing is common, especially in industries like software support, where the product at issue is a competitive service that reduces risk. (*Id.* at 305-306.)

497.   Indeed, one of Rimini's experts admits that he expects to see FUD in the normal competitive process. (*Id.* at 54-55.)

498.   While FUD-based marketing may hurt a competitor's chances of winning a customer, that does not make it anticompetitive. The opportunity to beat a competitor through FUD-based marketing draws in competitors to a market to compete for customers, which is procompetitive. (*Id.* at 306-07.)

499.   Harm to a competitor, such as FUD-based marketing that results in a competitor losing customers, can harm the competitor in the sense of causing it to lose a customer and make less profit, but it can still be good for competition overall. (*Id.* at 307.)

500.   For example, in this case, Rimini claims that it lost customers as a result of Oracle's FUD-based marketing, but Rimini did not increase its prices. Therefore, while the FUD-based marketing allegedly resulted in lost customers, it did not cause a price increase, which indicates that competition as a whole was unharmed. (*Id.*) Here, as Rimini's own expert, Mr. Orszag, admits, Rimini did not change its prices during the relevant period. (ECF No. 1513 at 80.)

501.   Further, even Mr. Ravin acknowledged that any FUD-based marketing from Oracle "doesn't hold much water" and is not a "showstopper" with Rimini's customers. (ECF No. 1503 at 258-59.)

502.   The Court further discusses the various aspects of Oracle's purported campaign against Rimini below.

**a.      Legal Letters to Customers**

503.   After the summary judgment rulings in *Oracle I*, Oracle's outside counsel began sending letters to certain customers updating them on the status of the litigation. The letters contained quotations from court rulings, summaries of court documents, and summaries of various key events in the litigation. (D-52; D-88; D-1987.)

504.   Oracle's letters were aimed at providing the customers with information about what had happened in the litigation. (ECF No. 1492-9 (Jones Depo.) at 14; ECF No. 1492-17 (Schreiber Depo.) at 8-9.)

505.   The Court finds that the content of those legal letters is not false or misleading.

506.   An internal Oracle document identifies 138 Oracle customers that received a letter regarding Rimini from Oracle's outside counsel. (D-67 at 7-9.)

507.   Rimini has provided no expert testimony or customer testimony indicating that those letters caused customers to continue with Oracle support as opposed to moving to or continuing with Rimini support.

508.   Of those customers listed on D-67, at least 70 contracted with Rimini and did not return to Oracle by the close of fact discovery, including: Alex Lee, City of Fresno, DOT Foods, Giant Eagle, Guest Services, PNMR Services, Raley's, Ross Stores, Brandeis University, Lydall, Apollo Group, BDP International, City of Costa Mesa, Dendreon Corporation, Edgen Murray Corporation, Edmunds.com, Express Scripts, Federal Signal, Fram Group Operations, Genex Services, The Great Atlantic & Pacific Tea Company, Jostens, Kollmorgen Corporation, Legg Mason, Precision Dynamics, PTI Technologies, Recall Corporation, SafeNet, Sears, The New York Times, Toys "R" Us, Transaction Network Services, Unum Group, Valspar, The American Dental Association, Battelle Memorial Institute, BJ's Wholesale Club, Hudson Global, SGS Tool Company, Snelling Holdings, Emdeon Business Services, Internal Revenue Service, Herff Jones, ESCO Corporation, Conde Nast Publications, Family Dollar, Scientific Games Corporation, Genband US, Circle K Stores, Haemonetics Corporation, Health Care

1    Service Corporation, TeleTech Holdings, Aptean, Charles River Laboratories, Fujitsu

2    America, Sanmina Corporation, DCP Midstream, Capital One Services, Toyota Motor

3    North America, Barnes & Noble, Panduit Corporation, NetApp, LifeWay Christian

4    Resources, Amedisys Holding, State of Louisiana, Clark County WA, Geokinetics, St.

5    Johns River Water Management District, The AMES Companies, and PHH Corporation.

6    (*Compare* D-67 at 7-9 *with* ECF No. 1466.)

7        509.   That list is likely underinclusive, because ECF No. 1466 does not include

8    Rimini customers for Oracle products not at issue in this case, customers that signed with

9    Rimini and returned to Oracle years after receiving the letter, or customers that are

10   international entities and thus are not customers of Oracle America.

11       510.   The fact that so many recipients of the letter still signed with Rimini indicates

12   that the letter had little, if any, effect on customers.

13       511.   Rimini points to internal Oracle emails regarding the outside counsel letter

14   to St. Francis as evidence that the letters caused customers to decide not to contract with

15   Rimini. (D-45 at 1; D-92 at 1.)

16       512.   The St. Francis customer testified that the outside counsel letter was one

17   reason it decided to stay with Oracle, but the decision was also related to an MSL issue

18   St. Francis had due to being acquired by another company. (ECF No. 1492-20 (Tenner

19   Depo.) at 6.) Rimini's expert Mr. Loftus pointed to a representative from St. Francis calling

20   the letter to St. Francis threatening, but did not know that the representative from St.

21   Francis had recanted that testimony. (ECF No. 1515 at 28-29, 60-61.)

22       513.   While Rimini's expert, Mr. Loftus, initially testified that the outside counsel

23   letters were not normal competitive conduct (*id.* at 35), he later acknowledged that he did

24

25

26

27

28

1  not know that the outside counsel letters informed customers about the litigation (*id.* at
2  49-50).

3      514.   Mr. Loftus otherwise acknowledged that he does not take issue with
4  Oracle's describing the litigation to clients (*id.* at 47), and that the language in the outside
5  counsel letters reserving Oracle's rights was not abnormal, (*id.* at 59-60).

6                    **b.    Sales Talking Points**

7      515.   During the course of the litigation with Rimini, Oracle developed a set of
8  internal talking points to guide Oracle sales representatives in their discussions with
9  customers about Rimini. (D-40, D-86, D-182; *see also* ECF No. 1492-13 (Predescu
10  Depo.) at 4.) Rimini's experts pointed to no false statements in the talking points. The
11  talking points included extensive quotes from this Court, the accuracy of which were not
12  disputed. (ECF No. 1515 at 56.) The talking points included statements that "Rimini
13  denied cross-using Oracle software for years only to testify at trial that they cross-used
14  all the time," and that Rimini had admitted destroying a library of Oracle software that it
15  had denied existed, statements which were admittedly true. (*Id.* at 56-57.) The talking
16  points (D-40), also included statements that Rimini's funder, Colbeck Capital, was also a
17  funder of pornography, including financing for one of the world's largest online
18  pornography companies, the truth of which Rimini's expert did not dispute and which he
19  admitted he would expect to influence customers. (ECF No. 1515 at 73.)

20      516.   Rimini also had a list of internal talking points. (P-1580; *see also* ECF No.
21  1503 at 125.)

22      517.   As Rimini's expert admits, having talking points that discuss the litigation
23  with Rimini is not abnormal competitive behavior in the industry. (ECF No. 1515 at 55-
24  56.)

25      518.   Oracle sales representatives were instructed not to send out written copies
26  of the talking points because the document was an internal Oracle document that included

27

28
                                   114

1    items that sales representatives were not allowed to say about Rimini. (ECF No. 1492-9

2    (Jones Depo.) at 13.)

3         **G.**    **Injunctive Relief**

4         519.    The Court first discusses Rimini's unresponsiveness to Judge Hicks' prior

5    orders and then makes further factual findings pertinent to Oracle's requested remedy of

6    injunctive relief.

7         **1.**    **Rimini's Responses to Judge Hicks' Prior Orders**

8         521.    Rimini understood Judge Hicks' February 2014 Order in *Oracle I* as

9    prohibiting Rimini's Process 1.0 practice of hosting customer environments on Rimini's

10   systems. (ECF No. 1506 at 27; ECF No. 1514 at 152 ("[W]e were not allowed to have the

11   Oracle software on the Rimini Street datacenters"); *see also* P-1257 at 1.) Unlike his

12   response to the TomorrowNow guilty plea with respect to hosting PeopleSoft customer

13   environments on TomorrowNow systems, Mr. Ravin also has stated that after the

14   February 2014 Order he understood that Rimini was prohibited from hosting Peoplesoft

15   environments on Rimini systems. (ECF No. 1503 at 88.)

16        522.    Rimini also understood after Judge Hicks' February 2014 Order that

17   Rimini's practice of prototyping fixes and updates in one customer environment and then

18   distributing them to other customers—*i.e.*, impermissible cross-use—infringed Oracle's

19   copyrights. (*Id.* (Q. Now, you also understood after that February 14th summary judgment

20   ruling that the Court had held that Rimini infringed Oracle's copyrights by developing fixes

21   and updates in one customer environment that were distributed to other customers. A.

22   Yes. Q. And you've heard that practice called cross-use. A. Yes"); *see also* P-1416 at 3-

23   4 (Sahni 2/28/17: "We have not used Prototype and Build team approach in EBS . . . due

24   to the Court order that prohibited us using a client environment (prototype here) to develop

25

26

27

28

or test software updates or modifications for the benefit of any other clients."); ECF No. 1492-15 (Sahni Depo.) at 10.)

523.   Rimini and Mr. Ravin similarly understood that, as a result of the February 2014 Order, Rimini could no longer copy Oracle code between customers. (ECF No. 1503 at 88-89 ("Q. And you also understood that the cross-use that the Court described in its February 2014 order included taking of Oracle's code and copying Oracle code between customers, that was no longer allowed. A. Yes.").) In response to a question from his counsel, Mr. Ravin described his understanding of prohibited cross-use as including "using one client's software to create software that's delivered to other customers." (*Id.* at 224-25.)

524.   Notwithstanding this understanding after Judge Hicks' February 2014 Order was issued, Mr. Ravin told all Rimini personnel: "PeopleSoft Support and Development are to be provided EXACTLY as we do today, with no interruption or any changes in service. Its business as usual for all PeopleSoft support and development." (P-1257 at 2 (Ravin 2/15/14); *see also* ECF No. 1503 at 97-99, 128 ("Q. And actually the only thing you did in response to the Court's order was accelerate the migration. That's it. Everything else was business as usual, right? A. Yes.").)

525.   Mr. Ravin further stated: "This decision does NOT in any way effect any product line other than PeopleSoft." (P-1257 at 2 (Ravin 2/15/14).) At trial, Mr. Mackereth could not recall any changes that Rimini made in its EBS processes as a result of the February 2014 Order, but at deposition he testified no such changes were required. (ECF No. 1508 at 180.)

526.   Rimini claimed at trial that its Process 2.0 practices are different from its Process 1.0 practices because it has moved to a model where everything is "completely siloed." (ECF No. 1506 at 23-24.) This claim is belied by the fact that Rimini made the same assertion in *Oracle I*, where it stated in its Answer that under Process 1.0, "each of

Rimini Street's clients has a unique data silo for storing client's Oracle software and support materials." (*Id.* at 91-93.)

527.   The same message was repeated after Judge Hicks' August 2014 summary judgment ruling. (P-1580 at 2 (Ravin 8/15/14 email to all Rimini personnel: "The rulings relate to Oracle software no longer in use at Rimini Street and therefore the Court rulings do not cause interruptions to service for any client or product line"); P-6057 at 1, 3 (Ravin 8/1/14: "Because the Court's rulings relate to processes and software no longer in use at Rimini Street, these rulings will not cause any interruptions to service for any client or any product line. No actions are required by any client."); ECF No. 1503 at 121 (P-6057 "was actually sent to all clients"); P-657 at 2 (Grady 8/15/14 email: "none of these rulings are affecting anything required to run" Rimini's business); ECF No. 1503 at 126 (Rimini's "standard messaging" was that "the rulings of the Court were insignificant to the operations of the company"); P-655 at 2 (Rowe 8/14/14: the *Oracle I* summary judgment rulings "relate to processes and Oracle software no longer in use at Rimini Street, and therefore do not cause interruptions to service for ANY client or ANY product line").)

528.   Rimini also made no changes to its operations as a result of the *Oracle I* October 2015 jury verdict. (ECF No. 1503 at 126 ("Rimini made no changes in its operations as a result of the jury verdict"); ECF No. 1507 at 224 ("I don't think that business model has changed despite the rulings").)

529.   The Permanent Injunction went into effect for a limited period in 2016, was then stayed, and then went into permanent effect in 2018. Rimini publicly stated that the Permanent Injunction "would simply prohibit the previous conduct by Rimini Street" that was found to be infringing, but "since Rimini Street had ceased said conduct by July 2014, there is no expected impact on any current or future service offering or Rimini Street's current or future ability to service any of its clients." (P-1582 at 3 (Ravin 9/22/16).)

530.   Judge Hicks' January 2022 contempt order in *Oracle I* also found Rimini in contempt for multiple and willful violations of the Permanent Injunction for its hosting of

1  PeopleSoft source code and documentation on its computer systems, continued cross-
2  use of PeopleSoft software, and unlicensed copying of Oracle Database files. With
3  respect to cross-use, Judge Hicks found that it was a violation of the Permanent Injunction
4  to "develop, test, and troubleshoot a fix" for one client in another client's environment.
5  *Oracle I*, ECF No. 1548 at 26-30. Judge Hicks found that it was not enough that a reported
6  bug affecting one client may also cause the same issue for other clients, in part because
7  the record did not support a finding that Rimini believed "other clients were impacted"
8  when it created the fix—the most the evidence showed is that other clients "could be
9  impacted." *Id.* at 28 ¶ 7, 29 ¶ 4.

10       531.   As established more fully in the Court's findings of fact above, Rimini
11  engaged in the same troubleshooting found impermissible in *Oracle I* for one customer in
12  another customer's environment during the *Oracle II* period. (*See, e.g.*, P-8035 at 1
13  (1/18/17 Conley: "I did it in COE because there was no data in AHC for NC").) Even after
14  being presented with this evidence of cross-use, and Judge Hicks' contempt finding in
15  *Oracle I*, Rimini developer Timothy Conley testified that he thinks it is "still acceptable" to
16  use one customer's environment to develop a fix to an issue reported by another client if
17  Rimini believes other clients "might" also later receive the fix. (ECF No. 1508 at 28-31
18  (stating in pertinent part that when a client comes to Rimini with a problem, Rimini can
19  "develop the fix in any other environment where" Rimini believes "that client might be in
20  scope for the update" and this is "still acceptable").)

21       532.   Internally, Rimini has characterized Judge Hicks' prior orders, including
22  those it has failed to comply with, as "insignificant," "immaterial," and the result of the
23  Court being "sold a bill of goods" by Oracle. (ECF No. 1503 at 123-24; P-1581 at 1 (Ravin
24  7/27/15: "We have a Judge who almost always rules against us on motions . . . the public
25  does not understand how insignificant or immaterial such ruling are").) Rimini's General

26
27
28

1   Counsel told Rimini's President, Sebastian Grady, as well as Rimini customers that Judge

2   Hicks "was just sold a bill of goods and was misled by Oracle." (P-1430 at 1 (12/8/16).)

3                    **2.     Rimini's Acceptable Use Policy**

4        533.    Rimini has had an Acceptable Use Policy ("AUP") that applies to all Rimini

5   employees since before Process 2.0—during the period that Rimini was found to be

6   infringing Oracle software in *Oracle I*. (ECF No. 1503 at 101 ("All employees sign it,

7   including me"); ECF No. 1505 at 136-37 ("it's been in place for a long time, long before

8   Process 2.0"); ECF No. 1508 at 232 (the AUP applies to "all Rimini employees"); D-11

9   (11/12/17 AUP); D-12 (2/16/18 AUP); P-4380 (9/4/18 AUP).)

10       534.    Rimini says that its employees receive training on the AUP both when they

11  begin working at the company and annually thereafter, and employees are expected to

12  read and sign the AUP on an annual basis. (ECF No. 1503 at 240 (Rimini personnel

13  "receive annual trainings" on the AUP "and they have to sign every year").)

14       535.    But Rimini employees testified that they do not recall ever receiving training

15  on the AUP or attending any meetings at which the AUP was discussed, and do not know

16  who enforces the AUP or the consequences for violating it. (ECF No. 1492-4 (Frank

17  Depo.) at 4-5 (explaining he did not recall receiving training or attending meetings where

18  the AUP was discussed, and did not know who enforced it); ECF No. 1492-8 (Hu Depo.)

19  at 4-6 (stating they did not know who received emails sent to the security group email and

20  did not know how long the AUP had been around); ECF No. 1492-11 (Mandla Depo.) at

21  7-8 (stating they did not know who enforces the AUP, did not "remember what is inside

22  the document," and did not "know if there are any consequences for violating" the AUP).)

23       536.    Violations of the AUP are to be reported to Mr. Ravin, who is "involved in

24  the decision of what disciplinary action should be taken." (ECF No. 1503 at 101.) As of

25  early 2018, despite Judge Hicks' summary judgment rulings, the verdict in *Oracle I*, and

26  the evidence in this case, Mr. Ravin was aware of only two violations of the AUP. (*Id.* at

27  103.) Mr. Mackereth said he was aware of employees who were disciplined between 2014

28

                                          119

1    and 2018 for violations of the AUP, but would not say how many. (ECF No. 1508 at 236,

2    252.)

3        537.   Testimony from other Rimini witnesses demonstrates that Rimini has not

4    adequately enforced its AUP. (ECF No. 1492-8 (Hu Depo.) at 6-7, 10-11 (agreeing he

5    was not "disciplined for accessing [Oracle] code on a Rimini system" and "sending

6    [Oracle] code through Rimini's email system"); ECF No. 1492-11 (Mandla Depo.) at 7-9

7    (stating she did not think she had ever been found to violate the AUP, did not know if

8    anyone had ever been investigated for violating the AUP, and was unaware of anyone

9    reporting AUP violations).)

10       538.   Jim Benge testified that copying, using, or forwarding a PeopleSoft file is a

11   violation of Rimini's AUP, and that both he and Barbara MacEachern were disciplined in

12   2020 for violating the AUP in November 2018 by forwarding an email attaching

13   PeopleSoft files. (ECF No. 1505 at 145, 148 (recognizing P-4397 "as a document

14   containing Oracle copyright notices and PeopleSoft documents" and "the email [he]

15   received that resulted in [him] being disciplined in 2020")); P-4397 (11/27/18 MacEachern

16   email forwarding PeopleSoft documentation internally at Rimini).) Neither Mr. Benge nor

17   Ms. MacEachern was disciplined until more than a year after the violation, and then only

18   after Oracle began efforts to discover Rimini's compliance with the Permanent Injunction.

19   (ECF No. 1505 at 146-47.) Jim Benge was aware of only one other disciplinary action of

20   someone on his team for violating the AUP, which also occurred after Oracle challenged

21   Rimini's compliance with the Permanent Injunction. (*Id.* at 147-48.) Less than a year after

22   being disciplined, Mr. Benge was promoted from his role of Vice President of PeopleSoft

23   Development to Group Vice President, Global Product Development. (*Id.* at 112; ECF No.

24   1506 at 8.)

25       539.   Judge Hicks held in the *Oracle I* contempt proceedings that "Rimini's annual

26   training on its Acceptable Use Policy has not created a corporate environment where

27

28

1   employees are clear on the prohibitions put in place by the permanent injunction." *Oracle*
2   *I*, ECF No. 1548 at 9, 11, 14, 18-19.

3          540.    Moreover, it became clear at trial that Rimini—despite the history of
4   TomorrowNow, Judge Hicks' summary judgment orders, and the jury verdict, the
5   Permanent Injunction and contempt order in *Oracle I*—does not enforce its AUP. A
6   training video shown to the Court regarding Rimini's Dev Review tool—discussing
7   significant volumes of cutting and pasting of code from prototype environments—includes
8   the statement: "Legal doesn't have a clue what we're doing." (P-2014-001; P-2014-002;
9   *see also* ECF No. 1508 at 56.)

10         541.    Rimini puts the responsibility for complying with copyright law and Oracle
11  license agreements on its customers. (ECF No. 1503 at 99 (stating that Rimini's
12  "automatic assumption" is "that the customer has reviewed its license agreement and
13  determined that it has the right to receive Rimini support services under that license"); *id.*
14  at 99-100 (Rimini believes it is "the responsibility of the customer to tell" Rimini if the
15  support Rimini provides "is not in compliance with their license"); *id.* at 202 (agreeing that
16  Rimini requires customers to warrant that they have legal authority to contract with
17  Rimini); P-1578 at 4 (recommending that Gartner "should recommend clients inquire in
18  the diligence phase as to whether this is a practice that would be used for delivery to the
19  client, so that client can evaluate against their own license terms"); ECF No. 1503 at 119-
20  20 (stating that clients should "evaluate their own license terms" and should ask Rimini
21  whether software updates created for the client's environments are used for other
22  clients).) Rimini even relies on its customers to determine that it has complied with
23  multiple "compliance principles" in its AUP. (*Id.* at 102.)

24         542.    As of at least 2018, Rimini was not aware of any customers having looked
25  at Rimini's processes and determining that they were legal. (*Id.* at 100.)

26         543.    Jim Benge testified that having Oracle PeopleSoft files on Rimini's systems
27  after Process 1.0 violates the AUP, and if Rimini employees found any such files, they

28

1  needed "to report it. We were not to copy it, use it, forward it[.]" (ECF No. 1506 at 29; *see*

2  *also* D-11 at 7 (11/12/17 AUP).)

3      544.   Despite its own AUP policy, and as explained more fully above, as part of

4  its migration Rimini continued to make wholesale copies, on its own computer systems,

5  of the PeopleSoft environments that were already on Rimini's computer systems and

6  Judge Hicks had already found infringing in *Oracle I*.

7      545.   Even after Rimini claimed that it had fully implemented its "Process 2.0" by

8  July of 2014 and no longer had any Oracle software on its own computer systems, Rimini

9  still had thousands of Oracle software files on its computer systems throughout the *Oracle*

10  *II* period.

11      546.   In March 2019, Rimini sent a notice about the AUP advising that "[a]ll client

12  data must stay on the clients env." (P-4382 at 2.) A Rimini QA employee responded that

13  "I guess this also refers to screenshots we take for QA?" and Brenda Davenport

14  responded that Rimini would continue to put screenshots onto Rimini systems: "We

15  should be putting them on the client environment or in spira" (*i.e.*, an internal Rimini

16  system). (*Id.* at 2, 1.)

17      547.   Rimini also does not consistently instruct clients that they cannot send

18  Rimini Oracle copyrighted materials once the clients have done so. (ECF No. 1508 at 255

19  (stating Rimini "employees do not instruct the clients on every occasion" that when clients

20  send PeopleSoft confidential information to Rimini "please don't do that, you're not

21  supposed to put that on our system").)

22      548.   The AUP requires Rimini to comply with licensing terms and conditions

23  regulating the use of Other Companies' Software and Materials or other intellectual

24  property it acquires, including that of Oracle. (D-11 at 4 (11/12/17 AUP: "We will comply

25  with all licensing terms and conditions regulating the use of software or other intellectual

26  property that we acquire"); D-12 at 4 (2/16/18 AUP: same); P-4380 at 6 (9/4/18 AUP:

27  same); ECF No. 1503 at 102.) But Rimini does not "regularly review any customer license

28

1  agreements." (*Id.* at 102-03.) Rimini believes the customer is responsible for telling Rimini

2  if its support is not compliant with a customer's license. (*Id.* at 99-100.)

3      549.   The AUP prohibits Rimini from making or using unauthorized copies of

4  Other Companies' Software and Materials. (D-11 at 4 (11/12/17 AUP: "We will neither

5  endorse nor permit the making or using of unauthorized copies of software or other

6  intellectual property"); D-12 at 5 (2/16/18 AUP: same); P-4380 at 6 (9/4/18 AUP: same).)

7  Despite the impermissible cross-use documented in *Oracle I* and this case, Jim Benge of

8  Rimini testified that the AUP should be understood to prohibit using one client's software

9  to develop software updates or modifications for the benefit of other clients such that any

10 work done in one client's environment is solely for that specific client. (ECF No. 1505 at

11 137-38 (acknowledging that it is "a violation of the AUP to use one client's PeopleSoft

12 software to develop software updates or modifications for the benefit of any other

13 clients").) But Jim Benge testified that he is not aware of anything in the AUP that prohibits

14 Rimini from "making RAM copies in one client's environment for the benefit of other

15 clients." (*Id.* at 138-39.)

16     550.   It is a violation of Rimini's policies to develop an update in one environment

17 and test it in another. (ECF No. 1503 at 106.) But at least in some instances, Rimini

18 developed prototypes in one customer's environment and tested those prototypes in

19 another customer's environment.

20     551.   It is a violation of the AUP for Rimini engineers to remove Oracle copyright

21 notices from copies of Oracle code. (*Id.* at 109.) But Rimini has removed Oracle copyright

22 notices from thousands of files that it distributed to customers.

23     552.   The February 2018 version of the AUP—which went into effect just 11 days

24 before the close of fact discovery in this case—includes an appendix titled "'CAN'T COPY

25 CONTENT' RULES," which prohibits Rimini from copying Oracle software and materials

26 onto Rimini computers, and prohibits Rimini from copying Oracle software from one client

27 to another. (P-4380 at 26; ECF No. 1507 at 271-72 ("what our policy is, is that we don't

28

give Oracle IP from one client to another client").) This appendix did not exist in any prior version of the AUP. (*Compare* D-12 at 12 (2/16/18 AUP with "'CAN'T COPY CONTENT' RULES" appendix) *with* D-11 (11/12/17 AUP without such an appendix); *see also* ECF No. 1512 at 51-52.)

553.    Notwithstanding the "'CAN'T COPY CONTENT' RULES" belatedly added to the AUP, Mr. Mackereth testified that they do not prohibit copying JDE software so long as Rimini does not move it from one client to another. (ECF No. 1508 at 177-79.)

554.    Rimini's Senior Director of EBS, Praveen Sahni, admitted to forwarding a document containing an Oracle copyright notice internally within Rimini; when asked if doing so was a violation of Rimini's AUP, he claimed it was "speculation" that the file with the Oracle copyright notice was "a file from Oracle." (ECF No. 1492-15 (Sahni Depo.) at 7-8.)

555.    The September 2020 Order found that Rimini infringes Oracle's copyrights if it develops an update using a customer's environment when it is clear that the customer "did not want or need the update." (ECF No. 1253 at 44.) Rimini does not consider this conduct to violate the AUP. (ECF No. 1503 at 109 ("it doesn't violate" the AUP "to develop updates in the environment of a customer when the customer does not need the update").)

556.    Mr. Benge was unaware of any provision of the AUP that addresses derivative works, and did not even understand what a derivative work was sufficiently to comply with an AUP prohibition on creation or distribution of derivative works if one existed without asking the legal department. (ECF No. 1505 at 140-41, 210.) And in 25 years at Rimini, he had never asked the legal department how to define a derivative work. (*Id.* at 210.) Susan Tahtaras testified that Rimini created "rewrites" that "fell under the definition of derivative work" in Rimini's "developer guidelines" and sent them to "multiple clients." (ECF No. 1507 at 185.) Senior Rimini employees know that Oracle still owns the changes that Rimini makes to Oracle's software products because they are derivative

works. (P-9484 at 4 ("Any changes we make to the Oracle/Siebel system, for instance, are considered 'derivative works' of the base Oracle product and therefore Oracle still owns that IP.").)

### 3.    Harm to Oracle From Rimini's Practices

557.    Oracle software is very difficult and expensive to build, but extremely easy to copy, and so Oracle copyrights its software so that it can defend its rights to the software it builds. (ECF No. 1507 at 70-71, 90 ("it's absolutely critical that we defend our rights, and we have consistently, and they continue to infringe on our copyrights against us").) The money customers pay Oracle to license and support its copyrighted software funds "the entire business, especially the development of the new products." (*Id.* at 70.) Because the sales process "usually eats up almost all" the license fee, "the money that supports innovation" is from the support business. (*Id.* at 88.) Oracle invests billions of dollars in research and development a year, including employing tens of thousands of engineers who work on research and development. (*Id.* at 87-88.) Oracle must enforce its copyrights otherwise "more and more customers will go to people who don't spend the money to actually build the technology, just spend a little bit of money copying it" and then "innovation just completely disappears." (*Id.* at 90.)

558.    Although Oracle does not require customers who license its software to also purchase support, approximately 95% of Oracle's support customers renew support with Oracle every year.

559.    Historically, Oracle has a high customer retention rate and customers usually purchase support for many years or buy new products from Oracle. (*Id.* at 85-90.) Rimini's economist Mr. Orszag was asked to calculate damages for a claim of Rimini that was dismissed on summary judgment and for that analysis he estimated that customers, even with competition from Oracle and others, stayed with Rimini for an average life of six years (ECF No. 1513 at 154-56), based on Rimini data that was generally consistent

1   with Oracle data about its customers (*id.* at 157). This was a conservative number he

2   used because Rimini's life of customer estimates ranged from six to eight years. (*Id.*)

3     560. From the outset, Rimini told potential investors that "Rimini Street separates

4   Oracle from is acquired licensees – denying Oracle recurring revenue." (P-5363 at 1

5   (2006 "Funding Opportunity Summary"); *see also* ECF No. 1503 at 146.) Rimini tells

6   customers that it has no real competition for Oracle support other than Oracle. (*Id.*) Rimini

7   has even tracked how its growth in contracts has coincided with reduced Oracle support

8   revenues. (*Id.*)

9     561. Mr. Ravin admitted that, if Rimini support violates Oracle copyrights, then

10   Rimini would not have a business: "it wouldn't matter if we had the best JDE resources in

11   the world if we don't resolve the foundation issues. A client first and foremost must believe

12   they have the right to be with us and use their software . . . or the rest is just noise!" (P-

13   5543 at 1 (10/28/05 Ravin); ECF No. 1503 at 148-49.) Rimini's economist offered no

14   opinions on the significance of customer beliefs about whether Rimini was violating

15   Oracle copyrights. (ECF No. 1513 at 129.)

16     562. Through the infringing conduct described above, Rimini continued to build

17   its business by saving time and labor costs, which enabled Rimini to offer support to

18   Oracle customers at a standard list price of 50% off of Oracle's support pricing throughout

19   the *Oracle II* period, and offer even higher discounts in practice.

20     563. When Oracle discussed third-party support with customers, they "always"

21   brought up "Rimini as compared to other third-party . . . support providers." (ECF No.

22   1492-16 (Schebe Depo.) at 8.)

23     564. Rimini has taken market share and multiple large customers away from

24   Oracle for Oracle software support because they have contracted with Rimini instead.

25   (ECF No. 1508 at 295; P-670 at 2 (Rowe 1/11/12: "with our nearly $400 million in backlog

26   (lifetime contract value), that $800 million in vendor maintenance fees has to come from

27   somewhere! Interesting that our growth has coincided with comparative weakness in

28

Oracle maintenance revenues"); P671 at 1 (Rowe 1/17/12: "nearly $800 million in maintenance fees leaving the software vendor over the life of our contracts"); P-674 at 1 (Rowe 1/11/12: "we know we are contributing to Oracle's reduced maintenance number"); ECF No. 1508 at 296 (indicating that Rimini understands that its marketing and sales actions have contributed to Oracle's reduced maintenance numbers).)

565. The consequences of lost market share and customers is undoubtedly significant. Judge Hicks dismissed Rimini's claims that Oracle wrongfully took its customers at summary judgment. (ECF No. 1253 at 66, 93.) Before that, its economist estimated Rimini's losses in the amount of $243 million from 143 lost customers. (ECF No. 1513 at 153-54.)

566. A customer that terminates Oracle support not only stops paying Oracle support fees, but also terminates the Oracle customer relationship, the harm for which is difficult to quantify, because long-term customer relationships often result in opportunities to expand the Oracle footprint with the customer into new products and services into the future. (ECF No. 1507 at 90-91 (stating that Rimini's conduct has "had an incredibly detrimental impact on" Oracle because not only does Rimini take Oracle's customers while infringing on Oracle's rights, "but they also tell our customers that we're pretty much overcharging them for their support agreement, and they break that relationship" between Oracle and its customers, who "would have both bought support from" Oracle "in subsequent years, or potentially bought new products, totally different products from us over the future.").)

567. Offering vendor replacement-level support at the cost savings offered by Rimini was a substantial factor in Rimini's customers' decision to cancel their support

1   contracts with Oracle and turn to Rimini for support of their PeopleSoft, EBS, or JDE

2   software. (ECF No. 1512 at 3, 22, 166-68; ECF No. 1515 at 82, 91-92.)

3       568.   Self-support (support without the assistance of a vendor) was ordinarily not

4   an option considered or used by customers leaving Oracle support. (ECF No. 1512 at

5   172-81.)

6       569.   One of the main reasons that customers leave Oracle support for Rimini

7   support is cost reduction. (ECF No. 1512 at 7, 22 (stating the "main reason" Welch's

8   decided to leave Oracle for Rimini was "cost"), 166-70 ("for 95.2% of customers, "Rimini's

9   50 percent discount was the main driving factor in their decision to leave Oracle and

10  engage Rimini," based on an "analysis of 955 companies and 1,353 contracts"); ECF No.

11  1513 at 120 (agreeing that "Price is always an important reason" and "Their pricing is one

12  factor that helps them compete and succeed in the marketplace"); ECF No. 1492-16

13  (Schebe Depo.) at 8 ("Q. Now, in your experience, when customers left Oracle support

14  for Rimini support, did the reasons vary on a customer-by-customer basis as to why they

15  left? A. In my experience, in my segment, the reason why customers left was based on

16  cost, cost reduction.").)

17      570.   Rimini's expert Jonathan Orszag critiqued Mr. Pinto's estimates of Oracle's

18  lost customers from the point of view of economics and, in doing so, provided an outline

19  of why lost sales and goodwill are difficult to measure because of Rimini's infringement if

20  an economist was required to find irreparable harm. He testified that to determine lost

21  customers from Rimini's infringement required an analysis of a price effect on Rimini's

22  pricing and a loss of customers, including a pricing model showing how costs affect prices,

23  whether an infringing firm would absorb the costs of not infringing, and how specific prices

24  affect customers. (ECF No. 1513 at 70-71, 81, 88-89.) This analysis would also include

25  an economic pass-through analysis. (*Id.* at 84-85.) He testified that the existence of

26  another competitor (Spinnaker) would mitigate any impact of infringement. (*Id.* at 83.) He

27  also testified that an analysis would have to account for qualitative factors other than price

28

1  that affect customer decisions. (*Id.* at 93-94.) At the same time, Mr. Orszag did not give

2  his own estimate of lost customers for Oracle assuming infringement. (*Id.* at 114-15.) And

3  he was silent about any opinion as to whether Oracle has suffered irreparable harm.

4          571.   "Rimini's 50% discount is directly enabled by the labor costs that Rimini

5  avoided through its infringing activities." (ECF No. 1512 at 161.) Mr. Orszag critiqued Mr.

6  Pinto but did not analyze whether Rimini's prices depend on the engineering processes

7  used by Rimini. (ECF No. 1513 at 126.) Rimini also argued that it would continue to offer

8  a list price 50% discount without its copyright infringement, but made no mention of

9  continuing to offer its actual discounts of 50% and higher. Rimini could not explain how it

10 could do so given that, even with 50% incremental margins, it reported tens of millions of

11 dollars in annual net losses to the SEC for every year during the *Oracle II* period. (*Id.* at

12 117-18.) Mr. Orszag agreed that with continuing losses, Rimini's investors at some point

13 would demand a return on investment. (*Id.* at 118-19.)

14         572.   Rimini's pricing is enabled in part by its migration of environments found to

15 be infringing in *Oracle I*, so that Rimini could continue to use the infringing environments

16 for development and testing of fixes and updates.

17         573.   Rimini's pricing is also enabled by its impermissible cross-use, which allows

18 Rimini to develop and test prototype fixes and updates for PeopleSoft on a per update

19 basis rather than on a per customer basis, saving Rimini time and resources, thereby

20 allowing Rimini to develop fixes and updates faster and less expensively than would

21 otherwise be the case. (ECF No. 1504 at 45-46, 75-77, 179-80, 195, 255-59 (opining that

22 cross use "allows them to do development on a per update rather than a per customer

23 basis" and Rimini's automated tools are "engines of cross use"); P-1202 at 2 ("Developed

24 HCM103493.DMS in [AEP, FUT, COE, AED, COW] and copied to the rest of the clients

25

26

27

28

in the group"); ECF No. 1504 at 224 (opining that GenDiff/ApplyDiff was "designed to facilitate the cross-use[.]").)

574.   Rather than developing update files "from scratch in each client's environment," which "would take additional resources," Rimini creates one size fits all files (also referred to as "RSI," "one version," or "one code for all" files) so that it can develop the file once and send it to multiple customers, including by using its time and money saving automated tools. (ECF No. 1512 at 60-61 (agreeing that one primary reason Rimini was using these automated tools was to reduce its own costs).)

575.   Rimini rewrote existing Oracle files as one version for all files to eliminate the differences between customers' versions to permit Rimini to conduct less testing so it could be more efficient. (P-582 at 2-3 ("only about 8 apply only clients" "out of 112 clients" "because of tax920us" is "very bad" and that file "should be on our list for rewrite"); ECF No. 1507 at 190-92 (agreeing that the reason to rewrite files is so Rimini "wouldn't have to maintain 90 something plus versions").)

576.   Rimini considered "one version for all clients" to be "absolutely crucial to our success given our new Env 2.0 business model," and that the "downstream affects from the Business Analysis, to Development, to QA testing, and all the way to Product Support cannot be understated." (P-1203 at 2 (Conley 8/26/14); ECF No. 1507 at 273-75.) "[H]aving one version of code for all clients allows Rimini" to be "more efficient" because it allowed Rimini to develop and deliver fixes more quickly. (*Id.* at 276; ECF No. 1508 at 10-11 (explaining that Rimini rearchitected Oracle file TAX960ST to enable Rimini to "deliver the same code line to clients in a more efficient way").) This development model was "necessary" to "improve" Rimini's "scalability." (P-1203 at 1 (Tahtaras 8/26/14); ECF No. 1512 at 53-57 (agreeing development of fixes and updates is easier to scale than other support because there are some common functions and developments that can be used across multiple customers).) Rimini could "support 1000 clients" "if all of the regularly modified programs were one code line" because they are just "one program that needs

130

1    [updating]." (P-7982 at 2 (Conley 5/14/12); *see also* ECF No. 1507 at 278-83 ("if we had

2    one code line, one program, then it didn't matter how many clients").)

3         577.   Rimini documents and witnesses have explained the time and labor savings

4    that Rimini obtains through impermissible cross-use, use of automated tools, one version

5    for all files, and the migration of customer environments full of infringing copies and

6    derivative works of Oracle software and support materials. (P-1732 at 3 (Benge 11/9/14:

7    "If we cannot utilize the utilities, we're looking at major manual efforts. . . . I don't see how

8    we could do it profitably"); P-2014-001 at 90-91 (Conley: without Dev Review, "we cannot

9    do the work. Might as well hire 100 more developers. I mean it's just ludicrous."); ECF

10   No. 1505 at 115-16, 117-18, 120-21 ("The most straightforward approach would be to

11   continue using the environments we had been using for development and testing"); ECF

12   No. 1514 at 159 ("Q. And the business reason was that it was more economical for Rimini

13   Street to not host the environments, true? A. It's true. It would have been at less cost to

14   Rimini Street, yes."); P-1276 at 2 (Slepko: modifications made to comply with the *Oracle

15   I* summary judgment rulings "cost approximately $4 million," "The permanent injunction

16   entered by the Court on October 11, 2016 would require Rimini to further modify its

17   support processes for Oracle products," and "processes that are now automated can be

18   done manually, requiring Rimini to pay additional labor costs to accomplish the manual

19   processes" estimated to cost "at least $1 million and up to $4 million per year").)

20        578.   Absent Rimini's discounted support offering, 78.1% of the customers that

21   left Oracle for Rimini would have remained with Oracle. (ECF No. 1512 at 172-76, 180-

22   81 ("it's my opinion that in the but-for world, if Rimini did not exist, that the vast majority

23   of customers would have remained with Oracle").) Rimini's experts critiqued Mr. Pinto's

24   analysis but did not have an opinion on whether customers or market share lost by Oracle

25   was due to Rimini's conduct. (ECF No. 1513 at 114-15; ECF No. 1515 at 44-45.)

26

27

28

1    Regardless of the exact number of customers who left Oracle due to Rimini's conduct,

2    the number was significant.

3        579.   For example, when Rimini customer NCH investigated alternatives for third-

4    party support, it learned from its consultants that Rimini was the only alternative other

5    than another company that was "too small a player for NCH to be able to deal with." (ECF

6    No. 1492-21 (Van Horn Depo.) at 4.)

7        580.   Other than cost reduction, one of Oracle licensees' top concerns when

8    considering terminating Oracle support and engaging third-party support is the ability to

9    maintain the security of the Oracle software. (*See supra*; *see also* ECF No. 1492-3 at 7

10   (McAfee's Director of Product Management for McAfee's datacenter server and cloud

11   agreeing that "Oracle addresses a significant number of serious vulnerabilities in the core

12   database in every CPU").)

13       581.   Rimini's false statements about security described above as to Rimini's

14   Lanham Act violations caused customers to contract with Rimini and terminate Oracle

15   support. (ECF No. 1512 at 172 ("Rimini also needed to make statements to these risk-

16   averse CIOs about the ability to secure and protect their systems and their data" to attract

17   customers), ECF No. 1513 at 57.)

18       582.   Another top concern of Oracle licensees considering terminating Oracle

19   support and engaging third-party support is receiving assurances from the potential third-

20   party support vendor that its support practices are non-infringing. (ECF No. 1492-20

21   (Tenner Depo.) at 4 (noting Rimini's statement that its "work product shall not include any

22   intellectual property owned by a client or third party unless Rimini Street or client has

23   precured proper permission" was important to Saint Francis before it signed the contract

24   with Rimini because Saint Francis "did not want to infringe upon Oracle's proprietary

25   information."); ECF No. 1492-21 (Van Horn Depo.) at 5 (agreeing it was "important to

26   NCH when contracting with Rimini that Rimini Street processes do not violate the rights

27   of any software vendor"); ECF No. 1515 at 98 (agreeing that "Atkins wants to work with

28

132

1  business partners that are in compliance with the law"); ECF No. 1513 at 57.) Rimini's

2  economist recalled customers being asked questions on this topic, but could not recall

3  their responses. (ECF No. 1513 at 130.)

4        583.   Rimini's substantial DMCA violations—in which Rimini removed Oracle

5  copyright notices from files that it distributed to customers—also caused Oracle harm by

6  allowing Rimini to "leverage" Oracle-written and copyrighted code for its own support

7  purposes and pass off Oracle-written code as its own.

8        584.   Rimini's representations to customers that its practices were not infringing

9  also caused customers to contract with Rimini and terminate Oracle support. (ECF No.

10  1492-20 (Tenner Depo.) at 3-4 ("Q. Would Saint Francis have gone to Rimini Street if

11  Saint Francis had known that, in fact, Rimini Street had been found to be infringing the

12  product that Saint Francis was using? A. No."); ECF No. 1492-21 (Van Horn Depo.) at 5

13  (stating that NCH would not have contracted with Rimini "If NCH knew that Rimini's

14  business model violated a provision in NCH's license with Oracle"); *see also* ECF No.

15  1512 at 35 (agreeing it would "generally not" have "been Welch's general practice to

16  knowingly contract with a vendor that was not providing services in a lawful way" and "it

17  was important for Welch's to know that the vendors they contract with comply with the

18  law"), 37; ECF No. 1515 at 99; ECF No. 1512 at 171-72 (after reviewing "thousands of

19  documents and a number of deposition testimonies" concluded that "statements and

20  assurances of noninfringing actions were necessary to be made" for Rimini to attract

21  customers); ECF No. 1513 at 57.)

22        585.   Rimini's false statements about the nature of its support practices and the

23  difference between its ongoing support practices and those at issue in *Oracle I* and in the

24  TomorrowNow litigation also caused customers to contract with Rimini and terminate

25

26

27

28

1   Oracle support or to remain with Rimini and decline to return to Oracle support. (ECF No.

2   1513 at 57.)

3   **IV.   CONCLUSIONS OF LAW**

4         The Court structures its conclusions of law similarly to its findings of fact,

5   addressing the claims in the following order: copyright infringement; Rimini's claim for a

6   declaration of noninfringement; Ravin's involvement in allegedly infringing conduct;

7   Oracle's Lanham Act claims; Rimini's remaining UCL claim; and finally the scope of the

8   injunctive relief to which Oracle is entitled.

9         **A.   Copyright Infringement**

10        1.   A copyright owner holds the exclusive right both "to do and to authorize"

11  each of the exclusive rights enumerated in the Copyright Act. 17 U.S.C. § 106. Included

12  among such exclusive rights are the right "to reproduce the copyrighted work in copies,"

13  the right "to prepare derivative works based upon the copyrighted work," and the right "to

14  distribute copies . . . of the copyrighted work to the public . . . ." 17 U.S.C. § 106(1)-(3).

15        2.   "The statute defines derivative works, which the copyright owner has 'the

16  exclusive righ[t]' to prepare, § 106(2), to include 'any other form in which a work may be

17  recast, transformed, or adapted,' § 101." *Andy Warhol Found.*, 143 S. Ct. at 1275. "To be

18  sure, this right is '[s]ubject to' fair use." *Id.* (first citing § 106, then citing § 107). "The two

19  are not mutually exclusive." And a derivative work "must exist in a concrete or permanent

20  form," and "must substantially incorporate protected material from the preexisting work."

21  *Micro Star v. Formgen Inc.*, 154 F.3d 1107, 1110 (9th Cir. 1998). But as Judge Hicks has

22  previously ruled in this case, a work can "substantially incorporate protected material"

23  (and thus be a derivative work) of copyrighted software even if the work does not contain

24  any of the copyrighted code. (ECF No. 1253 at 50-53 (discussing *Micro Star*, 154 F.3d at

25  1111-12), 83.) For example, Judge Hicks has already held that a Rimini update

26  substantially incorporates protected Oracle material, even if it contains only Rimini written

27

28

1    expression, if "it only interacts and is useable with PeopleSoft and it was designed using
2    Oracle's utility tools software." (*Id.* at 52-53.)

3        3.    To prove a prima facie case of copyright infringement, Oracle must show:
4    (1) ownership of the relevant copyrights; and (2) copying of protected expression. *See*
5    *Range Rd. Music, Inc. v. E. Coast Foods, Inc.*, 668 F.3d 1148, 1153 (9th Cir. 2012).
6    "Copying is a shorthand reference to the act of infringing any of the copyright owner's five
7    exclusive rights set forth at 17 U.S.C. § 106." *Dun & Bradstreet Software Servs., Inc. v.*
8    *Grace Consulting, Inc.*, 307 F.3d 197, 206 (3d Cir. 2002) (citations omitted).

9        4.    The parties have stipulated that the "copyright registrations for each of the
10   136 registered works" at issue "are valid" and Oracle is the owner or exclusive licensee
11   of each work. (ECF No. 1463; *see also* ECF No. 1240 at 3-4; ECF No. 1309 at 14.)

12       5.    On June 4, 2019, Judge Hicks granted Oracle's motion under 17 U.S.C. §
13   410(c) and exercised his discretion to find that the following 22 copyright registrations at
14   issue filed more than five years after first publication are entitled to a presumption of
15   validity of the copyright and of the facts stated in the certificate: (1) TX 7-095-798; (2) TX
16   8-151-290; (3) TX 6-541-029; (4) TX 6- 541-047; (5) TX 8-060-246; (6) TX 8-060-225; (7)
17   TX 8-060-232; (8) TX 8-060-249; (9) TX 8- 060-264; (10) TX 8-060-259; (11) TX 8-060-
18   258; (12) TX 8-060-255; (13) TX 8-108-902; (14) TX 8-108-914; (15) TX 8-108-944; (16)
19   TX 8-108-891; (17) TX 8-108-968; (18) TX 8-108-961; (19) TX 8-108-850; (20) TX 8-108-
20   924; (21) TX 7-781-659; (22) TX 7-781-641. (ECF No. 1240 at 3.)

21       6.    Judge Hicks also held in his June 4, 2019 Order that Rimini is precluded
22   from relitigating whether Oracle is the valid copyright holder of the following 17 copyrights
23   registrations at issue filed more than five years after first publication and cannot contest
24   their validity: (1) TX 7-065-376; (2) TX 7-065-381; (3) TX 7-063-688; (4) TX 7-065-319;
25   (5) TX 7-063-683; (6) TX 7-063-668; (7) TX 7-077-447; (8) TX 7-077-451; (9) TX 7-092-

26

27

28

406; (10) TX 7-092-603; (11) TX 7-092-583; (12) TX 7-092-617; (14) TX 6-541-033; (15) TX 6-941-989; (16) TX 6-941-988; (17) TX 6-941-990. (*Id.* at 4.)

7.      And as further discussed in Judge Hicks' June 4, 2019 order, the remaining 97 copyright registrations at issue are entitled to an automatic presumption of validity and their certificates constitute prima facie evidence of the facts stated in the certificate because they were registered within five years of first publication. *See* 17 U.S.C. § 410(c). (*See also* ECF No. 1240 at 3.)

8.      The Court concludes that Oracle has established the element of ownership as to each of the 136 registered works listed in Paragraph 113 of Rimini's Corrected Third Amended Complaint. (ECF No. 585 (sealed) at 34-41.)

9.      As to the copyright registrations for which Rimini is not otherwise precluded from relitigating validity, Rimini has waived any argument that the registration dates of Oracle's work disprove the publication dates stated on the certificates of registration by stipulating to the validity of Oracle's registrations. Even if Rimini had not waived its right to challenge Oracle's copyright registrations on that basis, Oracle's registration of multiple versions of its software at one time is permitted by the Copyright Act so long as the facts stated on the application for registration, including each version's publication date, are accurate. *See* 17 U.S.C. § 408(a). The Court further finds that Oracle's registrations of the major versions of its software, including those registrations listed in Paragraph 113 of Rimini's Corrected Third Amended Complaint (ECF No. 585 (sealed) at 34-41), encompass all of the patches and updates that Oracle incorporated into those versions, even if Oracle made those patches and updates available to its customers under a support contract before such registrations.

10.      The Oracle software that Rimini uses and copies in the development and test environments associated with its Process 2.0 customers contains substantial portions of Oracle's protected expression. The Court concludes that the 847 PeopleSoft environments listed in Exhibit P-8982 and the 963 environments containing Oracle

1    Database listed in Exhibit P-8990 embody a substantial portion of the protected

2    expression of those corresponding copyright registrations listed in the respective exhibits

3    for that environment.

4         11.    Each time that Rimini used an Oracle software environment associated with

5    its customers, this use created copies of Oracle's software, including at the very least

6    copies of Oracle's software in the computer's RAM.

7         12.    Rimini's creation of RAM and other copies of Oracle software while working

8    in the development and test environments associated with its customers constitute

9    "copies" within the meaning of the Copyright Act. "[I]t cannot be disputed that the RAM

10   copies are 'sufficiently permanent or stable to permit [them] to be perceived, reproduced,

11   or otherwise communicated for a period of more than transitory duration.'" (ECF No. 1253

12   at 41.) *See also MAI Sys. Corp. v. Peak Computer Corp., Inc.*, 991 F.2d 511, 518-19 (9th

13   Cir. 1993).

14        13.    Judge Hicks repeatedly held that the terms of Oracle's PeopleSoft license

15   agreements do not permit Rimini to copy or use PeopleSoft software on Rimini's computer

16   systems. Judge Hicks' January 2022 contempt order in *Oracle I* also reaffirmed that the

17   terms of Oracle's license agreements, such as the OLSA which governs Oracle Database

18   and E-Business Suite, do not authorize Rimini to make copies of the licensed software

19   on Rimini's computer systems. *See Oracle I*, ECF No. 1548 at 48-49.

20        14.    Rimini's copying of PeopleSoft copyrighted files on its computer systems is

21   unlicensed conduct and an infringement of Oracle's respective copyrights. The Court

22   concludes that Rimini infringed the Oracle copyrights listed in Appendix-Local Copies

23   (ECF No. 1524-1) by maintaining identical copies of Oracle's copyrighted PeopleSoft

24   software files on its computer systems throughout the *Oracle II* period.

25        15.    The presence of these Oracle files on Rimini's systems also disproves

26   Rimini's allegations that its Process 2.0 support model reformed its prior infringing

27   conduct. The evidence also does not support Rimini's claim that these thousands of

28

1   infringing files are merely a remnant of Process 1.0. Metadata and other evidence

2   associated with these files shows that many of them were created on Rimini's systems

3   as late as 2017.

### 1.   PeopleSoft

5   16.   Again as it did in its findings of fact above, the Court organizes its

6   conclusions of law as to Oracle's copyright infringement claims regarding PeopleSoft by

7   Oracle's infringement theory. The Court begins with gap customers.

#### a.   Gap Customer Environments

9   17.   As noted, Judge Hicks previously ruled that Rimini infringed Oracle's

10  PeopleSoft copyrights when it created 47 of the 65 local PeopleSoft environments Oracle

11  accused of infringement under its gap customer theory on Rimini's own computer systems

12  during the *Oracle II* discovery period. (ECF No. 1253 at 21-29.)

13  18.   The PeopleSoft license agreements applicable to the additional 18

14  PeopleSoft environments Rimini copied on its own computer systems (associated with 12

15  customers), and not already adjudicated at summary judgment, also limit copying and

16  use of the software to the licensee's facilities. Rimini accordingly also infringed Oracle's

17  PeopleSoft copyrights when it created the other 18 PeopleSoft environments on its own

18  computer systems during the *Oracle II* period.

19  19.   The Court concludes that Rimini infringed the copyright registrations

20  identified in Appendix PeopleSoft-1 as to gap customers. (ECF No. 1524-2 at 1-2.) That

21  brings the Court to Oracle's copyright infringement theory based on Rimini's migration of

22  infringing PeopleSoft environments to its customers' systems.

#### b.   Migration

24  20.   As also noted, Judge Hicks previously rejected Rimini's express license

25  defense as to the migration at summary judgment. (ECF No. 1253 at 23-29.) The Court

26  now concludes that Rimini infringed Oracle's PeopleSoft copyrights, including those

27  identified in Appendix PeopleSoft-2 (ECF No. 1424-2 at 3-18), when Rimini: (1) made

28

backup copies onto its own computer systems of the PeopleSoft environments that were previously found to be infringing; (2) copied those backups onto USB storage devices and hard drives that it sent to its customers; and (3) directed that additional copies be made of those backups onto its customers' and Windstream's computer systems and further used those additional copies to build and configure additional PeopleSoft environments.

21.     Rimini's sending of USB and hard drives to its customers also constituted an infringing distribution of copies of Oracle's PeopleSoft software under 17 U.S.C. § 106(3). As the owner and exclusive licensor of the copyrights in-suit, Oracle maintains the exclusive right to distribute copies of the materials covered by these copyrights. *See id.* Oracle also holds the separate and distinct right to reproduce the materials. *See Cohen v. Paramount Pictures Corp.*, 845 F.2d 851, 853 (9th Cir. 1988) (finding license containing language permitting the copying of a work did not include language permitting its distribution). Rimini possesses no express license from Oracle to distribute any of Oracle's copyrighted software. Rimini also cannot justify its distribution based on its customers' Oracle licenses because those licenses do not grant customers the right to distribute Oracle's copyrighted software to others.

22.     Rimini further infringed Oracle's PeopleSoft copyrights through its use and reproduction of, preparation of derivative works from, and distribution of software from the environments listed in Appendix PeopleSoft-2. (ECF No. 1524-2 at 3-18.) When Rimini made multiple copies of each of these environments as part of its migration, it infringed each of the corresponding Oracle copyright registrations listed in Appendix PeopleSoft-2, and engaged in the same conduct that the Court had held to be infringing in *Oracle I* and in the summary judgment order in this case. *See MAI Sys.*, 991 F.2d at 518-19 (affirming summary judgment of infringement where defendant copied the plaintiff's

software into computer memory from a storage medium and maintained multiple copies on computers at its headquarters).

23.    While Rimini argues that the copies it made of PeopleSoft environments during the migration were fair uses, the Court disagrees for the reasons explained below in the portion of these conclusions of law addressing Oracle Database. The analysis is the same for both products because the infringing copies of Oracle Database at issue were the database components of infringing copies of PeopleSoft environments discussed above. Said otherwise, they are complementary pieces of the same software environments, copied in the same way for the same reasons—so the same analysis applies.

**c.    PeopleSoft Environments Hosted on Windstream**

24.    Rimini further infringed Oracle's PeopleSoft copyrights when it used and reproduced the Oracle PeopleSoft software hosted on Windstream's computer systems following the migration. (ECF No. 1524-2 at 3-18 (listing customer environments to which this infringement finding applies).) 48 of the Rimini Windstream hosted PeopleSoft environments, associated with 20 Rimini customers, are copies of locally-hosted environments that were adjudicated unlicensed and infringing in Judge Hicks' September 2020 Order, or above regarding the additional 18 PeopleSoft environments Rimini copied on its own computer systems, and are therefore unlicensed and infringing for the reasons previously discussed in the Court's analysis of Rimini's migration.

25.    Judge Hicks has also previously held that the "facilities restriction" provision in the pertinent PeopleSoft license agreements also prohibited Rimini from copying PeopleSoft software to and on locations on the cloud hosted by third parties if the licensee did not exercise control over the software. (ECF No. 1253 at 90-91.) Judge Hicks did not resolve the parties' arguments as to this infringement theory at summary judgment, but

1    identified the question of who controlled the Windstream environments as the key

2    question for resolution at trial. (*Id.*)

3         26.    The evidence admitted at trial and described above in the Court's findings

4    of fact demonstrates that Rimini controlled these environments. To start, Rimini admitted

5    in internal documents and at trial that it had the same access to Windstream environments

6    as it did for infringing local environments on its own computer systems and the

7    environments would require no involvement from the client's IT personnel. Rimini also

8    stated that "[w]hile it is a client's environment, they will stay out of it and leave it for our

9    exclusive use," demonstrating the reality that Rimini controlled the environments. (P-1549

10   at 7.) Consistent with these admissions, Rimini deployed significant contractual and

11   technical measures to ensure that it maintained the same level of control over the

12   Windstream hosted PeopleSoft environments as it did for the locally hosted versions of

13   these environments that Rimini used on its computer systems during the *Oracle I*

14   litigation. Rimini orchestrated the entire relationship between Windstream and its

15   customers: it made introductions, created a standard agreement, and organized the

16   customer accounts as "child" accounts under a Rimini "parent" account to maintain

17   administrative control over the environments.

18        27.    While there is testimony, as Judge Hicks noted in the September 2020

19   Order, that some of Rimini's customers believed they had control over their associated

20   Windstream PeopleSoft environments (ECF No. 1253 at 91), the Court finds that such

21   testimony is insufficient to demonstrate that Rimini's customers affirmatively exercised

22   control over these environments in the face of Rimini's documents showing that in

23   practice the environments were for Rimini's exclusive use. An assertion of control is

24   different from the affirmative exercise of control. Absent from the evidentiary record is any

25   affirmative act by a customer demonstrating that it exercised control over any of its

26   Windstream associated PeopleSoft environments. The evidence instead shows that

27

28

1   Rimini exclusively used, reproduced, and cross-used the PeopleSoft software within

2   these environments to develop and test updates for many other Rimini customers.

3         28.    Mr. Ravin's testimony at trial further reinforces this finding. First, he

4   described how Rimini created a special contract with Windstream that Rimini's customers

5   could use to set up their accounts. (ECF No. 1503 at 110.) When considered with the

6   arrangement also described in the pertinent findings of fact—that Rimini was configured

7   as the 'parent' Windstream account and all of its clients were configured as 'children,'

8   meaning that Rimini had full access to all of their accounts—this further illustrates how

9   Rimini ultimately controlled the environments. Moreover, Mr. Ravin discussed at trial a

10  2012 email in which he emphasized how Windstream was a good option because it would

11  give Rimini full access and administrative capabilities to all of its customers' Windstream

12  environments, equivalent to environments hosted on Rimini's own systems. (*Id.* at 110-

13  111; *see also id.* at 110-115 (further discussing the level of control Rimini had over

14  customers' Windstream environments).) In sum, Rimini exercised control over the

15  pertinent Windstream environments such that Rimini infringed Oracle's PeopleSoft

16  copyrights when it used and reproduced the Oracle PeopleSoft software hosted on

17  Windstream's computer systems following the migration.

18                  **d.**    **TLR Support**

19        29.    The sort of cross-use that Judge Hicks repeatedly found prohibited by

20  various, applicable PeopleSoft licenses in *Oracle I* and in the September 2020 Order in

21  this case generally refers to the copying or use of one customer's software to support

22  another customer. (ECF No. 1253 at 3, 86.) And as the Ninth Circuit and Judge Hicks

23  have ruled previously, there are numerous forms of cross-use. *See Oracle I*, 879 F.3d at

24  956; *see also* ECF No. 1253 at 86-87.

25        30.    As in *Oracle I*, the evidence admitted at trial tends to show that Rimini's

26  PeopleSoft business model continues to be built on its infringement of Oracle's

27  copyrighted software, even after Rimini's transition to 'process 2.0.' *See Oracle I*, ECF

28

No. 1164 at 6 ("The evidence further establishes that Rimini Street's business model from 2006, and up until at least the court's summary judgment orders in February 2014, was built entirely on its infringement of Oracle's copyrighted software"). Indeed, Judge Hicks already ruled in the September 2020 Order that Rimini committed unlicensed and infringing cross-use in the period covered by this case when it prototyped its PPACA Phase 1 update in the PeopleSoft environment associated with customer Campbell Soup and gave it to customer Toll Brothers, because that work was not solely for Campbell Soup's "internal data processing operations." (ECF No. 1253 at 43-46.)

31.     The Court now finds that, despite all of Rimini's protestations to the contrary, most of Rimini's PeopleSoft support processes used during the *Oracle II* period, including after its transition to "Process 2.0," were built on impermissible cross-use: copying and using one customer's PeopleSoft software environment as a prototype environment for developing and testing updates, or individual files within an update, for distribution to its other customers. To start, the Court rejects Rimini's distinction between updates and files: to the extent that a portion of an update is a product of cross-use, the update is infringing.

32.     Rimini specifically infringed Oracle's PeopleSoft copyrights by developing its RSI files through impermissible cross-use. Because Rimini prototyped RSI files in one customer's environment for other customers, and copied and distributed outright these RSI files containing PeopleSoft software from one customer to other customers, Rimini made copies of PeopleSoft software not created solely for the prototype customer. Such conduct is unlicensed and an infringement of Oracle's copyrights.

33.     The Court finds that Rimini's RSI rewrite or "one code for all" files are infringing reproductions of materials covered by Oracle's PeopleSoft copyrights because they contain direct copies of PeopleSoft source code and are substantially similar to the PeopleSoft source code from which they were created: RSI810ST.SQR, RSI960US.SQR, TAX960ST.SQR,        RSI960ST.SQR,        RSISTCD.SQC,        RSI860FL.SQR, RSI860FL_XXX.SQR, RSI860FL[1].SQR, RSITXDTA.SQC, RSITXDTA_PRE_QA.SQC,

1   RSIW2SSA.SQC, RSIW2SSA[1].SQC, RSI810ST-VER0.SQR, RSI810ST-ORIG.SQR,

2   RSI960XM.SQC, RSICBR01.SQR, RSIMMREF.SQC, RSIW2ST.SQC, RSIW2_ST.SQC,

3   RSIW2ST[1].SQC, RSI960US_V1.SQR, RSI960US V.1.SQR, RSI960US_1.SQR,

4   RSI960US_V2.SQR, RSI960XM_V1.SQC, RSI960US BEFORE.SQR,

5   RSI960USXML.SQC, RSIEINCD.SQC, RSIBN733_BEFORE.SQC, RSI810ST-

6   OLD.SQR, RSIBN733.SQC, RSIOSHA300A.SQR, RSI810DC.SQR.

7       34.    Oracle's expert, Ms. Frederiksen-Cross, demonstrated that Rimini engaged

8   in direct copying of significant amounts of protected Oracle source code to create each

9   of these files. Ms. Frederiksen-Cross thoroughly discussed Rimini's direct copying of

10   Oracle source code to create RSI810ST.SQR and RSI960US.SQR during her testimony.

11   With respect to TAX960ST.SQR and RSI960ST.SQR, Mr. Conley admitted that Rimini's

12   version of TAX960ST.SQR contained approximately 75 percent Oracle source code when

13   initially created; Ms. Frederiksen-Cross confirmed that Rimini engaged in a similar

14   process to "rearchitect" these files; and Rimini continued to modify and distribute these

15   files to customers during Process 2.0. The evidence of direct copying of Oracle source

16   code that Ms. Frederiksen-Cross demonstrated for the remaining RSI rewrite or "one code

17   for all" files, as set forth in P-2533, is the product of similarly reliable methodologies and

18   analyses.

19       35.    As Judge Hicks previously ruled, "substantial similarity analysis is only

20   relevant absent evidence of direct copying. 'As Professor Nimmer explains, "[i]f such

21   duplication is literal or verbatim, then clearly substantial similarity exists."'" (ECF No. 1427

22   at 11-12 (quoting *Bell v. Wilmott Storage Servs., LLC*, 12 F.4th 1065, 1074 (9th Cir. 2021)

23   (citation omitted)).) Given the direct evidence of copying presented at trial, the Court finds

24   that it is unnecessary to perform analytic dissection to determine whether there were

25

26

27

28

1  substantial similarities between Rimini's RSI files and Oracle's protected source code

2  files.

3      36.     To the extent that substantial similarity analysis is required to demonstrate

4  Rimini's infringement of Oracle's software, the Court also finds that Ms. Frederiksen-

5  Cross performed unrebutted analytic dissection and her opinions are the result of reliable

6  principles grounded in computer forensics and computer programming. Ms. Frederiksen-

7  Cross thoroughly explained her analytic dissection methodology during trial and

8  demonstrated several times how her analysis filtered out unprotected elements from

9  Rimini's direct copying of Oracle source code. Though Rimini offered its own analytic

10 dissection methodology in its proposed findings of fact and conclusions of law, Rimini

11 offered no credible testimony or evidence to rebut Ms. Frederiksen-Cross's analytic

12 dissection analysis. The Court further finds that Rimini's proposed analytic dissection

13 methodology is unreliable for the reasons articulated by Ms. Frederiksen-Cross during

14 her testimony.

15     37.     Rimini further infringed Oracle's PeopleSoft copyrights by copying these

16 RSI files to its own computer systems, thus violating the facilities restriction in Oracle's

17 PeopleSoft licenses. *See Oracle I*, ECF No. 1548 at 17-19.

18     38.     Rimini's claim that it stopped providing certain of the RSI rewrite files to

19 customers in November 2018 is not a basis to deny injunctive relief as to Rimini's

20 continued reproduction and use of the infringing RSI files. Indeed, Judge Hicks has

21 previously ruled, "Rimini Street's claim that it no longer engages in the conduct adjudged

22 by the court and jury to infringe Oracle's software copyrights is not a basis to deny

23 issuance of an injunction." *Oracle I*, ECF No. 1164 at 7. The evidence also showed that

24 after November 2018, Rimini continued to provide updates to the infringing RSI rewrite

25 files to those customers that had received the infringing files before that date.

26     39.     Rimini further infringed Oracle's PeopleSoft copyrights when it prototyped

27 other components of an update in one customer's environment for other customers, such

28

as the user interface changes made using App Designer and replicated to other customers, and the data changes incorporated into DMS files created and/or tested using Data Mover and given outright to other customers. In doing so, Rimini cross-used one customer's PeopleSoft software when it created RAM copies of that software to prototype its DMS files or other user interface changes and then distributed them to other customers. Because this conduct creates unlicensed copies of PeopleSoft software, Rimini infringed Oracle's PeopleSoft copyrights.

40.     Judge Hicks also previously found that Rimini's PPACA Phase 3 update HCM104288 is a derivative work of Oracle's copyrighted PeopleSoft software because it exists in a "concrete and permanent form," and because it "substantially incorporated protected material from the preexisting work," in that Rimini created the update using Oracle utility tools and the update "was designed to interact with PeopleSoft, and Rimini's customers would access the new update by signing into their existing PeopleSoft software." (ECF No. 1253 at 52; *see also Oracle I*, ECF No. 1548 at 24 n.33 ("a stand-alone update is a derivative work if the update substantially incorporated protected material from the preexisting work, *i.e.*, it was created using Oracle tools and the update could not be used with any software programs other than PeopleSoft").)

41.     Because Rimini's RSI rewrite or "one code for all" files substantially incorporate Oracle protected expression, they are also infringing derivative works. And even if, in the case of a particular RSI file, it is not substantially similar to its corresponding PeopleSoft files, such files—and the Rimini updates that incorporate them—are nonetheless infringing derivative works because they interact only with PeopleSoft and were designed using Oracle PeopleSoft and PeopleSoft utility tools. For similar reasons, the Court further concludes that any Rimini PeopleSoft update containing these RSI files is likewise an infringing derivative work.

42.     The Court further concludes that the updates to PeopleSoft that Rimini developed during the *Oracle II* period are infringing derivative works. The evidence at trial

1   established that Rimini's PeopleSoft updates are extensions to and modifications of

2   Oracle's copyrighted software, were developed and tested using Oracle's PeopleSoft

3   software, and cannot be used with any software programs other than PeopleSoft. Rimini

4   further created its PeopleSoft updates using Oracle tools such as PeopleTools

5   Application Designer and Data Mover.

6          43.   Rimini has asserted that many of its PeopleSoft updates contain only

7   Rimini-written expression. The Court concludes that these assertions are not supported

8   by the evidence. Even if they were, the facts established by Oracle at trial show that

9   Rimini's PeopleSoft updates substantially incorporate protected Oracle expression and

10  are derivative works under Judge Hicks' prior rulings and the Ninth Circuit's *Micro Star*

11  precedent.

12         44.   In his January 12, 2022, contempt order in *Oracle I*, Judge Hicks stated that

13  "Under the law of [*Oracle II*], the Court would likely find" that Rimini's "DMS files are

14  derivative works." *Oracle I*, ECF No. 1548 at 40.

15         45.   The Court now holds that the DMS files meet the definition of derivative

16  works, because they do not work with any other programs than PeopleSoft and were

17  prototyped using the PeopleSoft Data Mover tool, among other Oracle software utility

18  tools.

19         46.   However, the Court finds that Oracle has not met its burden as to Rimini's

20  use of technical specifications and DAT files.

21         47.   As to technical specifications, Oracle's expert Ms. Frederiksen-Cross took

22  the position that permissible re-use of "know how" is limited strictly to what an engineer

23  can literally memorize, and that complex and detailed Rimini-written solutions cannot be

24  documented, but that it would be fine if the engineer "most enviously had the ability to

25  memorize all of that data." (ECF No. 1505 at 16.) She also testified that "hypothetically

26  maybe some very simple change could be carried out in an engineer's head and over

27  dinner he writes on the back of his napkin and takes that napkin with him another day,"

28

1   such documentation might be "quite acceptable," but if a technical specification, written

2   entirely by Rimini, "contain[s] lengthy and voluminous amounts of very detailed code and

3   very detailed instructions" for developing and implementing an update, it is impermissible

4   "cross-use." (ECF No. 1504 at 257; ECF No. 1505 at 8, 16.) This is one of the few points

5   on which the Court found Ms. Frederiksen-Cross' otherwise persuasive testimony less

6   persuasive. The Court does not find that Rimini's technical specifications infringe Oracle's

7   copyrights except those containing portions of Oracle code ("locators") that Judge Hicks

8   already found infringing in *Oracle I*.

9       48.    And Oracle's license witness, Richard Allison, drew a different line. He

10  testified that the internal data processing operations provision present in many of the

11  applicable PeopleSoft licenses does permit the engineer to write down the solution

12  developed in Client A's environment, but only if the engineer is "no longer accessing" the

13  environment at the time it is documented; that is, the engineer could "go back to the office"

14  and "write something down from his knowledge." (ECF No. 1507 at 18.) But it is not

15  permissible, according to Mr. Allison, to write down such information while looking at the

16  Oracle program. (*Id.* at 19 ("What he can't do, in my opinion, is look at the programs, write

17  down sequences, how to do things while he's using the programs, and then take that

18  information and use that for another customer.").)

19      49.    The Court rejects these positions. Rimini is permitted to write down or

20  otherwise memorialize its own know-how, including short, de minimus snippets of code,

21  and knowledge in technical specifications or other similar documents—again, except to

22  the extent Judge Hicks has already found particular technical specifications infringing.

23  There is no discernible distinction—in either the copyright laws or the relevant license

24  agreements—between Rimini engineers remembering the work that they did and Rimini

25  engineers writing down in a document (sometimes containing no Oracle protected

26  expression, either literal or nonliteral) the work that they did. Each time a copy, for

27  instance a RAM copy, is made when a Rimini engineer creates an update that is

28

1   documented in a technical specification, the initial copy is made to service that client's

2   licensed business operations. The pertinent licenses do not prohibit Oracle's customers

3   from hiring a third party like Rimini to perform updates or fixes to the same extent the

4   Oracle customer could under the pertinent license.

5          50.    As to DAT files, and as noted *supra*, Oracle's expert Mr. Cauthen admitted

6   that he had no opinion that there was copyrightable expression in the DAT files. (ECF No.

7   1507 at 231-32.) While Mr. Cauthen claimed that DAT files would contain "Oracle IP" in

8   the form of Oracle's PeopleSoft database schema, he admitted that he could not identify

9   what portion of the DAT file contained the protected schema, that he had not compared

10  any DAT file to the schema, and that he did not analyze whether any DAT file was

11  substantially similar to any Oracle copyrighted work. (*Id.* at 233-35.) There was thus no

12  evidence that these DAT files were subject to Oracle copyrights.

13                         **e.     Break-Fix Support for PeopleSoft**

14         51.    *In Oracle I*, Judge Hicks ruled that Rimini infringed Oracle's copyrights when

15  it copied and used Oracle software in environments associated with one customer to

16  develop and test updates for other Rimini customers. *See Oracle I*, ECF No. 474 at 13.

17         52.    In his January 12, 2022, contempt order in *Oracle I*, Judge Hicks found

18  Rimini in contempt of Court for violating the Permanent Injunction because it used City of

19  Eugene's PeopleSoft environment to troubleshoot a problem for Johnson Controls—

20  conduct that constituted "a return to the use of generic environments" to "develop, test,

21  and trouble shoot a fix" for other customers. *Oracle I*, ECF No. 1548 at 29-30. Rimini is

22  currently appealing that order.

23         53.    Regardless, the Court now concludes that Rimini infringed Oracle's

24  PeopleSoft copyrights, including those registrations identified in the Court's findings of

25  fact, *supra*, by using and copying the PeopleSoft software associated with one Rimini

26  customer (such as the City of Eugene, Adventist Healthcare, and VITAS Hospice

27  Services, Inc., among others) to replicate and troubleshoot issues experienced by other

28

1   Rimini customers during the *Oracle II* time period as part of its break-fix support services.

2   Rimini's conduct of copying and using one customer's PeopleSoft software environment

3   to replicate and solve an issue reported by other Rimini customers is the same

4   impermissible cross-use of Oracle software that Judge Hicks ruled was infringing in

5   *Oracle I* and warranted contempt of court when Rimini engaged in the same prohibited

6   conduct after the *Oracle I* Permanent Injunction went into effect.

7               **f.    Rimini's Automated Tools**

8               54.    In his September 2020 Order, Judge Hicks found there was a material issue

9   of fact as to whether Rimini's AFW Tools "per se constitute[] copyright infringement" and

10  whether Rimini's use of AFW Tools copies Oracle's protected expression when creating

11  Diff files. (ECF No. 1253 at 65.) Judge Hicks noted that it was unclear from the evidentiary

12  record at that time whether "when Rimini's AFW Tools software operates, RAM copies of

13  Oracle's copyrighted software are made." (*Id.*) The Court now concludes based on the

14  evidence presented at trial that Rimini's Automated Tools

15  (CopyRSIFileFromClientToClient, GenDiff/ApplyDiff, TransferFiles, GenDataChanges,

16  ApplyUpdate, and Dev Review) constitute copyright infringement because copies of

17  Oracle's protected expression are made during their operation, including RAM copies.

18              55.    Rimini's copying of Oracle protected expression during the operation of its

19  Automated Tools (which includes the copying of individual PeopleSoft files, derivative

20  works thereof, and RAM copies of the prototype files or PeopleTools) is not for or solely

21  for the internal business operations of the prototype customer whose PeopleSoft software

22  Rimini is using to develop and test updates for other Rimini customers. These copies are

23  all the product of unlicensed cross-use that infringes Oracle's PeopleSoft copyrights.

24  Appendix PeopleSoft-3 (ECF No. 1524-2 at 19-39) identifies the copyright registrations

25  corresponding to the unlicensed copies listed in P-2582 and P-2577.

26              56.    And even if Rimini's Automated Tools do not cause *per se* infringement of

27  Oracle's copyrights, the evidence shows that they are an important component of Rimini's

28

model of prototyping an update in one customer's environment and distributing the update to other customers that facilitates Rimini's impermissible cross-use of one customer's PeopleSoft software for the benefit of other customers.

57.    The Court also concludes that Rimini's Automated Tools were created through impermissible cross-use because Rimini used and copied its customers' PeopleSoft software environments during the development and testing of the Automated Tools for the benefit of other customers, as well as for Rimini's benefit. The copies of PeopleSoft created during the development and testing of the Automated Tools were unlicensed and infringing because they were not for or at least solely for the internal business operations of the customers whose software environments were being used and copied. Rimini Diff files, even if they do not contain Oracle code, are derivative works because they were developed in its customers' PeopleSoft software environments and rely on the software for their operation. The Court further concludes that Rimini's Automated Tools are also derivative works because they were developed in its customers' PeopleSoft software environments and rely on the software for its operation, including PeopleTools Application Designer and Data Mover.

58.    The Court further concludes that none of the statutory fair use factors under 17 U.S.C. § 107 support Rimini's arguments that its creation of its Automated Tools and its use of the GenDiff/ApplyDiff function were fair use. Rimini's expert Professor Astrachan gave the limited opinion that the GenDiff/ApplyDiff function (not AFW or other tools) was fair use and in doing so used his own factors to analyze fair use and not those set forth in Judge Hicks' prior decisions concerning Rimini and its fair use defense.

59.    Fair use is an affirmative defense to a claim of copyright infringement on which Rimini bears the burden of proof. (ECF No. 1253 at 55-56.) *See also* 17 U.S.C. § 107. Fair use is an "equitable rule of reason" that balances four factors "in light of the purposes of copyright" to "permit[] courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster."

*Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1399 (9th Cir. 1997) (citation omitted). To determine whether an accused act is "fair use" within the purpose of copyright, courts evaluate: (1) the purpose and character of the accused use; (2) the nature of the copyrighted work; (3) the importance of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the accused use on the potential market for or value of the copyrighted work. *See id*; *see also Andy Warhol Found.*, 143 S. Ct. at 1273-74.

60.   The Court now addresses Rimini's fair use arguments regarding the creation and testing of its Automated Tools. In essence, Rimini argues that it was fair use to infringe Oracle's PeopleSoft copyrights to create and test software that Rimini wrote to infringe Oracle's PeopleSoft copyrights more efficiently. The Court disagrees.

61.   As to the first fair use factor, "purpose and character of the use," Rimini's copying of PeopleSoft software to create and test its Automated Tools was for a commercial purpose for the reasons set forth elsewhere in this order in discussing the migration. Rimini created its Automated Tools to save significant time, money, and effort as compared to developing updates individually for each customer in each customer's associated PeopleSoft environments. These commercial purposes weigh against a finding of fair use. *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 562 (1985); *see also Andy Warhol Found.*, 143 S. Ct. at 1287 (finding that the "purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes" weighed in the plaintiff's favor where the allegedly infringing work shared "substantially the same purpose, and the use is of a commercial nature").

62.   And there is also nothing transformative about Rimini's copying of PeopleSoft software to create and test its Automated Tools. Rimini's arguments that its Automated Tools may have been transformative misses the point that the copies of PeopleSoft that Rimini made to create these tools were not. Rimini's Automated Tools

1   were written to perform the same software-updating tasks that a PeopleSoft developer
2   updating PeopleSoft software would undertake. Thus, when Rimini made copies of
3   PeopleSoft to develop and test its Automated Tools, Rimini "put those [PeopleSoft] copies
4   to the identical purpose as the original software. Such a use cannot be considered
5   transformative." *Wall Data Inc. v. Los Angeles Cnty. Sheriff's Dep't*, 447 F.3d 769, 778
6   (9th Cir. 2006).

7         63.   The second fair use factor, "nature of the copyrighted work," does not
8   support a finding of fair use either. Indeed, Judge Hicks already ruled that this factor
9   weighs in favor of Oracle: "the nature of the copyrighted work is unique business
10  enterprise software, which is clearly protected by copyright law." (ECF No. 1253 at 59.)
11  *See also Apple Comput. Inc. v. Franklin Comput. Corp.*, 714 F.2d 1240, 1249 (3d Cir.
12  1983). There is also evidence that Oracle developed its PeopleSoft and Oracle Database
13  software products "over several years, and required a multi-[billion] dollar investment on"
14  Oracle's part to acquire and develop them. (ECF No. 1503 at 9-11.) *See also Wall Data*,
15  447 F.3d at 780.

16        64.   As to the third fair use factor, "amount and substantiality of the portion
17  used," Judge Hicks ruled at summary judgment that Rimini's use of RAM copies was
18  quantitively and qualitatively significant because such RAM copies contained a
19  substantial portion of the protected expression of the at issue copyrighted software. (*Id.*
20  at 60.) RAM copies are protected by the Copyright Act. *See MAI Sys.*, 991 F.2d at 518.
21  As noted *supra*, the development and testing of Rimini's Automated Tools involved
22  creating both copies of individual PeopleSoft files and RAM copies of the PeopleSoft
23  software as a whole, and doing so multiple times while Rimini's developers made changes
24  to and fixed bugs in the software of its Automated Tools between test runs. This factor
25  thus also does not support a finding of fair use.

26        65.   As to the fourth fair use factor, "effect upon the market," Professor
27  Astrachan's fair use analysis also did not consider that Oracle and Rimini are direct

28

1    competitors in the market for Oracle software support, or whether Rimini's updates

2    themselves have an effect on the market. (ECF No. 1515 at 247.) Judge Hicks previously

3    weighed both of these factors—in Oracle's favor—in rejecting Rimini's fair use defense in

4    the September 2020 Order. (ECF No. 1253 at 62 ("without the RAM copies, Rimini would

5    be unable to create and test its updates, and those updates clearly have an effect on the

6    market. . . the fact that Rimini competes directly with Oracle in the market for software

7    support, is sufficient to undercut Rimini's arguments that its conduct does not affect the

8    market").)

9        66.    Because none of the statutory fair use factors weigh in Rimini's favor, the

10   Court concludes that Rimini's copying of PeopleSoft software to create and test its

11   Automated Tools was not a fair use of the software covered by Oracle's PeopleSoft

12   copyrights.

13       67.    The Court now turns to Rimini's fair use arguments regarding the RAM

14   copies of PeopleSoft software that are made when Rimini uses the GenDiff/ApplyDiff

15   function. The first factor weighs in Oracle's favor for similar reasons because these copies

16   of PeopleSoft software are for a commercial and non-transformative purpose.

17   GenDiff/ApplyDiff makes copies of PeopleSoft files so that it can compare before and

18   after versions of the Oracle source code files that Rimini modified, generate a Diff file that

19   contains those changes, and then propagate those same changes in other customer

20   environments. These copies of PeopleSoft save Rimini significant time, money, and effort

21   over individual development in each customer's own development environment. And

22   these copies of PeopleSoft serve the "identical purpose as the original software" because

23   Oracle provides its PeopleSoft source code files to be modified by its licensees. *See Wall*

24   *Data*, 447 F.3d at 778.

25       68.    The third fair use factor similarly weighs in Oracle's favor. The

26   GenDiff/ApplyDiff function copies the original and modified version of an Oracle source

27   code file to create the Diff file for other customers. Rimini's use of the GenDiff/ApplyDiff

28

1    function during the *Oracle II* period resulted in a massive amount of copying of Oracle
2    source code files, which, as noted above, are required for the GenDiff/ApplyDiff function
3    to both create the Diff file in the source environment and propagate the modifications in
4    each of the target environments.

5         69.    Finally, for the same reasons as previously discussed, the second and
6    fourth factors also do not support a finding of fair use.

7         70.    Because none of the statutory fair use factors weigh in Rimini's favor as to
8    the GenDiff/ApplyDiff function, the Court concludes that Rimini's use of the
9    GenDiff/ApplyDiff function was not a fair use of Oracle's copyrights in PeopleSoft
10   software.

11                        **g.    Rimini's Unlicensed Distribution of Updates from**
                                  **Customer Associated Environments Licensed with a**
12                                **Distribution Restriction**

13        71.    Judge Hicks previously ruled that Section 4.1 in the City of Eugene license
14   agreement "expressly prohibits distribution and/or marketing of those modifications,
15   created and tested for City of Eugene, to anyone else." (ECF No. 1253 at 54.)

16        72.    Judge Hicks further ruled that Rimini violated Section 4.1 of City of Eugene's
17   PeopleSoft software license when it created and tested files related to HCM104288 in the
18   City of Eugene's environment and distributed the HCM104288 update to Rimini
19   customers other than City of Eugene, and that such an act was copyright infringement
20   under *MDY Indus., LLC v. Blizzard Ent., Inc.*, 629 F.3d 928, 939 (9th Cir. 2010). (ECF No.
21   1253 at 54-55.)

22        73.    Rimini infringed Oracle's PeopleSoft copyrights when it used its AFW tools
23   to distribute 10,745 files relating to its PeopleSoft updates from an environment
24   associated with City of Eugene to other Rimini customers.

25        74.    Rimini also infringed Oracle's PeopleSoft copyrights when it used its AFW
26   tools to distribute thousands of additional files relating to its PeopleSoft updates from
27   environments associated with the following customers whose licenses contain

28

substantively the same Section 4.1 prohibitions against marketing and distributing modifications as COE: Apollo Group, Inc. (P-6971); County of Kent (P-6685); Louisville / Jefferson County Metro (P-6853); Lower Colorado River Authority (P-6854); Municipality of Anchorage (P-6665); Rochester City School District (P-6855); Shawnee Mission School District (P-1381); City of Des Moines (P-6702); City of Fresno (P-6872); Cowlitz County Washington (P-6682); Frederick County IIT (P-6795).

75.     Rimini infringed Oracle's PeopleSoft copyrights when it used its AFW tools to distribute thousands of additional files relating to its PeopleSoft updates from environments associated with the following customers whose licenses contain prohibitions against commercializing and transferring PeopleSoft software and documentation and modifications thereto: Easter Seals New Hampshire (P-626); Abilene ISD (P-6698); Amarillo Independent School District (P-7185); AMN Healthcare, Inc. (P-6970); Barnes & Noble (P-7211); Blue Cross Blue Shield of Kansas City (P-854); Circle K Stores (P-7190); Clear Channel Management Services (P-6694); ConAgra (P-2089); Genesis HealthCare Corp (P-6688); Hickory Tech Corporation (P-6712); Hudson Highland Group (P-6913); Markel Corporation (P-6664); MasterBrand Cabinets (P-6962); Meskwaki Bingo Casino (P-6755); Santa Clara Valley Water District (P-2222); Toll Brothers (P-767); Dofasco (P-6708 (Section A(5))); VITAS Hospice Services (P-6717 (Section A(5))).

76.     Rimini also infringed Oracle's PeopleSoft copyrights when it used its AFW tools to distribute thousands of additional files relating to its PeopleSoft updates from environments associated with the following customers whose licenses contain "Designates" restrictions that prohibit Rimini from accessing PeopleSoft source code: Adventist Healthcare (P-7286 at Sections 1.1 and 17); Abilene ISD (P-6698 at Sections 1.1(b) and 14); Amarillo Independent School District (P-7185 at Sections 1.1(b) and 14); AMN Healthcare, Inc. (P-6970 at Sections 1.1 and 14); Blue Cross Blue Shield of Kansas City (P-854 at Sections 1.1(b) and 17); Circle K Stores (P-7190 at Sections 1.1(b) and

1    14); ConAgra (P-2089 at Sections 1.1(b) and 16); Easter Seals New Hampshire (P-626

2    at Sections 1.1 and 15); Hickory Tech Corporation (P-6712 at Sections 1(b) and 14);

3    Hudson Highland Group (P-6913 at Section 1.1(b) and 14); Markel Corporation (P-6664

4    at Sections 1.1(b) and 14); Meskwaki Bingo Casino (P-6755 at Sections 1.1(b) and 14);

5    and Toll Brothers (P-767 at Sections 1.1(b) and 14).

6       77. When Rimini distributed an individual update, file, or modification made to

7    a licensee's PeopleSoft software that was licensed to the customer with one of more of

8    the distribution prohibitions discussed in this section, then Rimini acted outside the scope

9    of the customer's license and committed an act of copyright infringement. Even if Rimini

10   did not engage in prohibited cross-use while making such modifications, and even if such

11   modifications did not qualify as a derivative work, Rimini nonetheless committed an act

12   of copyright infringement because the prohibitions on distributing modifications in Oracle's

13   PeopleSoft licenses are "a copyright-enforceable condition rather than a contractual

14   covenant." (ECF No. 1253 at 54-55.)

15      78. The Court concludes that each of the files and AFW transactions highlighted

16   in Appendices P-2582, P-9578, and P-2577 constitute an infringement of Oracle's

17   copyrights. The specific registrations that Rimini infringed through these acts of

18   distribution are identified in Appendix PeopleSoft-4. (ECF No. 1524-2 at 40-44.)

19      **2.** **E-Business Suite (EBS)**

20      61. Based on the relevant findings of fact, the Court holds that Oracle has failed

21   to meet its burden to demonstrate that Rimini's "prototyping" of EBS updates using

22   technical specifications is an impermissible form of "cross-use" that violates the internal

23   data processing limitation in the EBS license agreements.

24      62. Indeed, to the contrary, the evidence introduced at trial as to EBS

25   specifically showed that during the "prototype" process, Rimini creates an update for a

26   client in that client's environment, and then manually re-implements the update in each

27   subsequent client's environments. As already discussed as to PeopleSoft, Rimini may

28

1    permissibly use a technical specification in this process that documents Rimini's own

2    know-how and code, provided those technical specifications do not contain more than de

3    minimus snippets of Oracle's code. Oracle failed to present any evidence that Rimini's

4    EBS support processes involve sharing Oracle code between clients or including it in

5    technical specifications under Process 2.0. That means that every copy of Oracle

6    expression made during this process, whether disk or RAM, is made in the siloed client

7    environment and for that client.

8        63.    In sum, Oracle has not met its burden to show that Rimini's EBS support

9    processes infringe Oracle's pertinent copyrights.[6]

10       **3.    J.D. Edwards (JDE)**

11       64.    Because Oracle has asserted infringement in this case of only five

12   registered copyrights (four JDE updates and one documentation database), none of

13   which cover the actual JDE releases discussed at trial themselves, and because Oracle

14   also did not offer any evidence of allegedly infringing conduct related to these five

15   registered copyrights, Oracle's claims of infringement and corresponding requests for

16   injunctive relief as to JDE fail as matter of law.

17       **4.    Oracle Database**

18       65.    Oracle presents three theories of copyright infringement as to Oracle

19   Database: (1) Rimini created 18 environments on its systems during the *Oracle II* period

20   that included copies of Oracle Database; (2) some of the PeopleSoft environments that

21   Rimini migrated included copies of Oracle Database; and (3) Rimini infringed when it

22   cross used other Oracle software to the extent that software included Oracle Database

23   as its database component because the cross-use necessarily created copies of Oracle

24   Database. (ECF No. 1524 at 230-31.) Rimini primarily responds to the cross-use theory,

25

26   _____

27       [6]As the Court does not find infringement, the Court need not—and does not—
     reach Rimini's statute of limitations affirmative defense as to EBS. (ECF No. 1525 at 75-
28   76.)

1   and contends the migration was a fair use, but does not address the creation of 18
2   environments theory. (ECF No. 1525 at 69-71, 76-78, 154, 158-61.) Rimini separately
3   contends that Oracle has no infringement theory as to clients that Rimini supports for
4   Oracle Database only. (*Id.* at 154.)

5   66.   There is no dispute that Rimini created 18 'gap customer' environments on
6   its systems during the pertinent period that included copies of Oracle Database. In *Oracle*
7   *I*, Judge Hicks ruled that no Oracle Database license permitted Rimini to make copies of
8   Database on its own computer systems. *See Oracle I*, ECF No. 476 at 6-16. Judge Hicks
9   reiterated this prohibition when he found Rimini in contempt of court for copying Oracle
10   Database files onto its computer systems in violation of the Permanent Injunction. *See*
11   *Oracle I*, ECF No. 1548 at 48-49. Particularly because of these prior rulings, and also
12   because it is undisputed, the Court finds that Rimini infringed Oracle's Database
13   copyrights when it created 18 software environments containing copies of Oracle
14   Database on its systems during the time period between January 23, 2012, to March 30,
15   2014. The Court therefore concludes that Rimini infringed the Oracle Database
16   registrations set forth in Oracle's Appendix Database-1. (ECF No. 1524-3 at 1.)

17   67.   As to Oracle's Database copyright infringement theory based on the
18   migration, Rimini does not dispute that it copied the instances of Oracle Database
19   specified in Oracle's Appendix Database-2 (ECF No. 1524-3 at 2-5), but instead contends
20   that all copies it made as part of the migration—including, but not limited to, copies of
21   Oracle Database—were a fair use. As further explained below, the Court is unpersuaded.

22   68.   None of the statutory fair use factors under 17 U.S.C. § 107 support Rimini's
23   arguments. To start, Rimini's expert Professor Astrachan gave the opinion that the
24   GenDiff/ApplyDiff function of AFW was fair use, but he did not contend that the migration
25   copies were fair use. (ECF No. 1515 at 247.) Regardless, as to the first fair use factor,
26   "purpose and character of the use," the Supreme Court has held that "every commercial
27   use of copyrighted material is presumptively an unfair exploitation of the monopoly

28

privilege that belongs to the owner of the copyright." *Harper*, 471 U.S. at 562. And Judge Hicks has already found that "Rimini's purpose in using PeopleSoft is clearly commercial and for Rimini's own financial gain," (ECF No. 1253 at 57), and that remains true here. Rimini's copying of PeopleSoft and Oracle Database software during the migration was for a commercial purpose and was undertaken by Rimini to provide support to customers in the manner preferred by Rimini and so that it could save time, money, and effort. Rimini chose to copy environments ruled to be infringing instead of rebuilding development and test environments from scratch using its customers' installation media or backups from their production environments, or otherwise asking its clients to assign to Rimini the development and test environments that already existed on the client's computer systems. Rimini also agreed at trial that it benefits from its work creating and testing updates for clients, with margins above 50%. These commercial purposes weigh against a finding of fair use, particularly when Rimini did not introduce any evidence that it contemplated—let alone attempted—any of these non-infringing alternatives.

69.    There was also nothing transformative about Rimini's copying of PeopleSoft and Oracle Database software during the migration. Indeed, Judge Hicks has previously found that Rimini's development and testing of PeopleSoft updates is not transformative because the updates are "ultimately implemented in the same PeopleSoft software as the original" and "it uses the software for the same purpose as the original software." (ECF No. 1253 at 57-58.) Judge Hicks also rejected Rimini's contention supporting a fair use defense as to PeopleSoft that its development and testing resulted in the creation of entirely new software containing no Oracle copyrighted expression. (*Id.* at 58-59.) For the migration, Rimini copied entire infringing PeopleSoft environments, some of which included full copies of Oracle Database, together with backups to new locations and continued using them as before. Rimini also used the infringing environments on its computer system to support customers until the migration was complete by July 2014. Rimini thus "put those [PeopleSoft and Oracle Database] copies to the identical purpose

1      as the original software. Such a use cannot be considered transformative." *Wall Data*,

2      447 F.3d at 778.

3              70.     As to the second fair use factor, "nature of the copyrighted work," this factor

4      does not support a finding of fair use either. Again, this case concerns "unique business

5      enterprise software, which is clearly protected by copyright law." (ECF No. 1253 at 59.)

6              71.     As to the third fair use factor, "amount and substantiality of the portion

7      used," Judge Hicks held in analyzing this fair use factor as to PeopleSoft that Rimini's use

8      of a client environment to develop and test an update created RAM copies that "contained

9      a substantial portion of the protected expression of the at issue copyrighted software."

10     (ECF No. 1253 at 60.) For the migration, Rimini copied entire PeopleSoft environments

11     previously found to be infringing, and Rimini did so multiple times for each PeopleSoft

12     environment that Rimini "migrated" to Windstream or to customer-hosted computer

13     systems. This was a massive amount of copying. The migration copies were also

14     complete copies of environments and archives—again, some of which included full copies

15     of Oracle Database—and "copying an entire work militates against a finding of fair use."

16     (ECF No. 1253 at 60 (quotations omitted).) Even with its accelerated efforts after Judge

17     Hicks' *Oracle I* February 2014 Order, Rimini needed six months between February 2014

18     and July 2014 to complete all of the copying associated with the migration. And as Judge

19     Hicks has previously held, the copying here is qualitatively significant because Rimini

20     copied the software "so that it could continue to be used for its original purpose and in the

21     same manner for which it was designed to be used." (ECF No. 1253 at 60-61.) This factor

22     also does not support a finding of fair use.

23             72.     As to the fourth fair use factor, "effect upon the market," Judge Hicks has

24     already found with respect to this factor as to PeopleSoft that Rimini updates "clearly have

25     an effect on the market." (ECF No. 1253 at 62.) Rimini has admitted and this Court has

26     found that "Rimini and Oracle are competitors" (ECF No. 585 at 26 (¶ 80); ECF No. 1253

27     at 62), and that Rimini's services "pose a direct competitive threat to Oracle" (ECF No.

28

585 at 4 (¶ 8); ECF No. 1253 at 62). Rimini's repeated and massive copying of PeopleSoft software to accomplish its migration affected a software market because this copying allowed Rimini to continue competing with Oracle for PeopleSoft support services and to continue to offer cut-rate services, particularly for the Rimini customers affected by the migration. (ECF No. 1253 at 62.) Because Rimini prioritized efficiency and retention of copies of environments and updates deemed infringing in the *Oracle I* matter over efforts to avoid unlicensed copying, this factor also does not support a finding of fair use. The Court additionally concludes that Rimini failed in its fair use burden to "bring forward favorable evidence about relevant markets." *Dr. Seuss*, 983 F.3d at 459 (quotations omitted). Rimini's arguments also fail to address "a crucial right for a copyright holder— the derivative works market, an area in which [Oracle] engaged extensively for decades" through its development of updates to and new versions of its copyrighted software. *See id.* at 460.

73.     Because none of the statutory fair use factors weigh in Rimini's favor, the Court concludes that Rimini's migration of infringing environments was not a fair use of Oracle's pertinent PeopleSoft copyrights or the Oracle Database copyright registrations specified in Oracle's Appendix Database-2. The Court also rejects the additional justifications that Rimini has marshaled in favor of its fair use arguments, including claims that Rimini undertook the migration to comply with the February 2014 Order and did so at its clients' direction. As to the first claim, Mr. Ravin admitted at trial that Rimini did not undertake the migration in response to the Judge Hicks' February 2014 Order and instead started its migration as early as 2012 for its own commercial purposes. (ECF No. 1503 at 92-100.) Rimini also took no steps to comply with Judge Hicks' February 2014 Order other than to accelerate the migration. (*Id.* at 99.)

74.     As to the second claim, the evidence showed that Rimini controlled the migration from its inception and gave clients only two options: host the migrated environments on either the client's computer systems or Windstream's. (P-1549 at 8.)

1    Rimini imposed additional contractual and technical requirements on its clients as part of

2    the migration, as reflected in its contracts, and controlled the timing and pace of the

3    migration well after the Court's February 2014 Order, repeatedly threatening its clients

4    with legal risk if they were not cooperating quickly enough with the migration of their

5    associated environments. (P-1259 at 1; P-4916.)

6          75.    The Court further rejects Rimini's claim that a finding of infringement as to

7    the migrated environments would significantly harm the clients associated with these

8    environments.  It is undisputed that the environments that Rimini migrated are

9    development and test environments—not production environments. (ECF No. 1503 at

10   251-52.) Rimini did not explore alternative ways to support its clients affected by the

11   migration in a non-infringing manner and also did not analyze how being required to build

12   non-infringing development and test environments would impact its ability to provide

13   updates to its clients. And the purported technical infeasibility of noninfringing approaches

14   is not relevant to the fair use analysis in any event, which instead asks the Court to

15   consider the four factors described *supra*.

16         76.    The Court accordingly concludes that Rimini also infringed the Oracle

17   Database registrations set forth in Oracle's Appendix Database-2 when it completed the

18   migration. (ECF No. 1524-3 at 2-5.)

19         77.    Turning back to Oracle's cross-use infringement theory as to Oracle

20   Database, the Court finds that Rimini infringed Oracle's copyrights identified in Oracle's

21   Appendix Database-3 (*id.* at 6-8) because, as the Court found above, Rimini's use of the

22   AFW GetSendClientFiles and/or GenDiff/ApplyDiff automated tools infringes Oracle's

23   pertinent PeopleSoft copyrights. Accordingly, as these Oracle Database installations

24   were used as source software environments for instances where Rimini used these

25

26

27

28

163

1    infringing tools, Rimini infringed Oracle's copyrights identified in Oracle's Appendix

2    Database-3 (*id.* at 6-8).

3         78.    However, the Court does not find that Rimini infringed the copyright

4    registrations identified in Oracle's Appendix Database-4 (*id.* at 9-10) because, as also

5    explained above, the Court finds that Oracle does not prevail on its EBS copyright

6    infringement claim based on Rimini's use of technical specifications to perform updates

7    for its customers.

8         **B.    Oracle's DMCA Claims**

9         79.    Rimini committed thousands of violations of the DMCA under 17 U.S.C. §

10   1202(b)(3) by removing copyright management information from Oracle files and then

11   distributing such files to customers.

12        80.    First, Oracle "placed copyright management information on its copyrighted

13   work[s] and copies of its works[.]" *Reno-Tahoe Specialty, Inc. v. Mungchi, Inc.*, Case No.

14   No. 2:12-cv-01051-GMN-VCF, 2014 WL 7336082, at *11 (D. Nev. Dec. 19, 2014) (citing

15   § 1202(b)). The Oracle software and support materials in this case include copyright

16   notices and other identifying information that Oracle's software and support materials are

17   protected by copyright. *See* 17 U.S.C. §§ 1202(c), (c)(3).

18        81.    Second, Ms. Frederiksen-Cross identified thousands of instances in which

19   Rimini distributed to its customers files from which it had removed (or failed to include)

20   Oracle's copyright management information. Her two analytical methodologies meet the

21   statutory requirement of identifying instances in which Rimini had "distribute[d], import[ed]

22   for distribution, or publicly perform[ed] works, copies of works, or phonorecords" from

23   which copyright management information had been "removed or altered without authority

24   of the copyright owner or the law." 17 U.S.C. § 1202(b)(3). Her identified instances of

25   copyright management information removal were taken from technical productions in the

26   case reflecting customers' PeopleSoft environments, thus establishing that the files she

27   identified were distributed by Rimini to customers. Many of Ms. Frederiksen-Cross's

28

164

1   identified instances of DMCA violations also appear within Rimini's AFW transmission
2   records.

3       82.    The Court also rejects Rimini's argument—improperly raised for the first
4   time in its *Daubert* motion (ECF No. 1427 at 12)—that a work that removes copyright
5   management information must be an exact copy of the original work. This construction of
6   the DMCA would weaken the statute's intended protections for copyright holders. Courts
7   have held that when a defendant "modifie[s] source code 'substantially similar' to
8   Plaintiff's copyrighted source code," including by replacing the author's name with its own,
9   the defendant is liable under the DMCA. *Enter. Tech. Holdings, Inc. v. Noveon Sys., Inc.*,
10  Case No. 05-CV-2236 W (CAB), 2008 WL 11338356, at *14-*16 (S.D. Cal. July 29, 2008)
11  (emphasis added). In addition, in the Ninth Circuit, a "'striking similarity' between the
12  works may give rise to a permissible inference of copying," supporting a DMCA claim.
13  *Friedman v. Live Nation Merch., Inc.*, 833 F.3d 1180, 1188 (9th Cir. 2016).

14      83.    The Court also concludes that Rimini's processes of "rearchitecting" Oracle
15  source code files to create its RSI rewrite files constitutes a removal, or, at the very least,
16  an alteration of the copyright management information in Oracle's PeopleSoft source
17  code files sufficient to establish liability under 17 U.S.C. § 1202(b)(3) (creating liability for
18  distribution of works from which copyright management information "has been [knowingly]
19  removed or altered").

20      84.    Third, Rimini knew that copyright management information had been
21  removed from the files underlying Ms. Frederiksen-Cross's DMCA analyses because
22  Rimini's own developers (including Harika Mandla, Susan Tahtaras, and Timothy Conley)
23  created the RS-prefixed and other files that were ultimately distributed to customers.

24      85.    Fourth, Rimini distributed files from which Oracle copyright management
25  information had been removed or altered "knowing, or . . . having reasonable grounds to
26  know, that it will induce, enable, facilitate, or conceal an infringement of" Oracle's
27  copyright. 17 U.S.C. § 1202(b)(3). Rimini developed the files underlying its DMCA

28

1   violations through the unlawful cross-use of Oracle software and the unlicensed

2   incorporation of protected expression from Oracle's copyrighted source code files. Rimini

3   also distributed the files underlying its DMCA violations to customers as part of its tax,

4   legal, and regulatory updates. By removing Oracle's copyright management information

5   from these files, Rimini concealed the nature of these files and misled its customers into

6   believing that Rimini's updates did not infringe Oracle's copyrights and did not contain

7   Oracle's protected expression. If Oracle's copyright management information had been

8   included in the files that were distributed, customers would have questioned why Rimini

9   was sending Oracle files as part of its updates to customers, which may have altogether

10  avoided the infringement compounded by Rimini's actions.

11         86.    Rimini's prior infringement of Oracle's copyrights during the *Oracle I*

12  litigation "demonstrate[es] a past 'pattern of conduct' or 'modus operandi,' that [Rimini]

13  was aware or had reasonable grounds to be aware of the probable future impact of its

14  actions." *Stevens v. Corelogic, Inc.*, 899 F.3d 666, 674 (9th Cir. 2018); *see also Reno-*

15  *Tahoe Specialty*, 2014 WL 7336082, at *4 (finding the alleged infringer's previous

16  infringement "upon [the movant's] copyrighted works" is an "important[]" component of

17  this inquiry). In particular, by instructing its developers to remove Oracle copyright notices

18  for files "that leverage[] portions of existing Oracle program(s)," (*e.g.*, P-584), Rimini

19  affirmatively concealed, contrary to its false public statements of reform, that its support

20  processes continue to infringe Oracle's copyrights.

21         87.    The Court also rejects Rimini's argument that its DMCA violations are not

22  actionable because any removal of copyright management information must have

23  occurred in 2010. The statutory language of 17 U.S.C. § 1202(b)(3) "does not only

24  prohibit, as [Rimini] would have it, the first such distribution; it forbids all of them." *GC2,*

25  *Inc. v. Int'l Game Tech.*, 391 F. Supp. 3d 828, 850-51 (N.D. Ill. 2019) (emphasis in

26  original). Here, the evidence shows that Rimini continued to distribute files from which

27  Oracle copyright management information had been removed during the *Oracle II*

28

1    discovery period, including through 2018. "It is widely recognized that the separate-

2    accrual rule attends the copyright statute of limitations. Under that rule, when a defendant

3    commits successive violations, the statute of limitations runs separately from each

4    violation." *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 671 (2014) (footnote

5    omitted). Consistent with this holding, district courts have applied the separate accrual

6    rule to DMCA claims arising under 17 U.S.C. § 1202. *See, e.g.*, *Fischer v. Forrest*, Case

7    Nos. 14 Civ. 1304 (PAE) (AJP), 14 Civ. 1307 (PAE) (AJP), 2017 WL 128705, at *7 & n.7

8    (S.D.N.Y. Jan. 13, 2017), *report and recommendation adopted*, 2017 WL 1063464

9    (S.D.N.Y. Mar. 21, 2017).

10   **C.    Ravin's Liability for Copyright Infringement**

11   88.    "[A] corporate officer or director is, in general, personally liable for all torts

12   which he authorizes or directs or in which he participates, notwithstanding that he acted

13   as an agent of the corporation and not on his own behalf." *Comm. for Idaho's High Desert,*

14   *Inc. v. Yost*, 92 F.3d 814, 823 (9th Cir. 1996) (quoting *Transgo, Inc. v. Ajac Transmission*

15   *Parts Corp.*, 768 F.2d 1001, 1021 (9th Cir. 1985)).

16   89.    "A party engages in contributory copyright infringement when it '(1) has

17   knowledge of another's infringement and (2) either (a) materially contributes to or (b)

18   induces that infringement.'" *Erickson Prods., Inc. v. Kast*, 921 F.3d 822, 831 (9th Cir.

19   2019) (quoting *VHT, Inc. v. Zillow Grp.*, 918 F.3d 723, 745 (9th Cir. 2019)).

20   90.    Through his direct management, supervision, and involvement in Rimini's

21   infringement, Mr. Ravin had knowledge of Rimini's infringement and materially

22   contributed to and induced that infringement. Mr. Ravin is therefore liable for contributory

23   infringement.

24   91.    Mr. Ravin has admitted that he knew that the presence of PeopleSoft

25   environments on TomorrowNow was one reason for its guilty plea, but he then

26   established Rimini which engaged in the same practices from 2011 to the middle of 2014,

27   after which Rimini was found to be violating Oracle copyrights. Likewise in this case,

28

1    Rimini has engaged in copyright infringement again after the verdict and Permanent

2    Injunction in *Oracle I*. Mr. Ravin even stated at trial that it was acceptable to create a

3    presentation to the Court that the SEC could find misleading because "[t]his is not an SEC

4    document," it was a document for a court. (ECF No. 1503 at 257-58.)

5        92.    Copyright law also "allows imposition of liability when the defendant profits

6    directly from the infringement and has a right and ability to supervise the direct infringer,

7    even if the defendant initially lacks knowledge of the infringement." *Metro-Goldwyn-Mayer*

8    *Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 n.9 (2005); *see also Ellison v. Robertson*,

9    357 F.3d 1072, 1076 (9th Cir. 2004) ("A defendant is vicariously liable for copyright

10   infringement if he enjoys a direct financial benefit from another's infringing activity and

11   'has the right and ability to supervise' the infringing activity.") (citation omitted); *Symantec*

12   *Corp. v. CD Micro, Inc.*, 286 F. Supp. 2d 1265, 1275 (D. Or. 2003) (holding CEO

13   vicariously liable on summary judgment for company's copyright infringement where "[i]n

14   addition to his salary, [the CEO] is also the majority shareholder and would thus have a

15   direct financial benefit if the infringing sales raise the value of the company's stock").

16       93.    Because Mr. Ravin profited directly from the copyright infringement

17   discussed above and had the right and ability to supervise Rimini, the direct infringer, Mr.

18   Ravin is liable for vicarious copyright infringement.

19       **D.    Rimini's Claim for Declarations of Non-Infringement**

20       94.    Rimini brought a claim for declaratory relief under the Declaratory Judgment

21   Act that its processes do not infringe Oracle's copyrights. The Court finds that Oracle

22   prevails on Rimini's declaratory relief claim as to PeopleSoft and Oracle Database

23

24

25

26

27

28

1  because, as explained above, Rimini infringed Oracle's pertinent PeopleSoft and Oracle

2  Database copyrights.

3       95.     However, the Court declares that, based on the evidence introduced at trial,

4  Rimini's support process for EBS does not infringe Oracle's pertinent copyrights.

5       96.     The analysis for JDE is different because Oracle asserted infringement of

6  only five JDE copyrights, while Rimini sought a declaration of noninfringement as to 24

7  JDE copyrights. However, the Court finds that Rimini is not entitled to a declaration of

8  noninfringement as to its JDE support processes. As explained above in the Court's

9  findings of fact, evidence introduced at trial showed that at least some of the technical

10  specifications Rimini employees created for JDE support contained screenshots,

11  locators, and snippets of Oracle code not permitted by the *Oracle I* Permanent Injunction.

12       97.     The Court further exercises its discretion to dismiss the remaining aspect of

13  Rimini's declaratory relief claim as to Siebel given the limited evidence presented as to

14  this product line during the trial. *See Wilton v. Seven Falls Co.*, 515 U.S. 277, 288 (1995)

15  ("Consistent with the nonobligatory nature of the remedy, a district court is authorized, in

16  the sound exercise of its discretion, to stay or to dismiss an action seeking a declaratory

17  judgment before trial or after all arguments have drawn to a close").

18       **E.**     **Lanham Act Claims**

19       98.     Rimini acknowledges that its false and misleading statements to customers

20  have enabled the company "to grow by large amounts year over year." (P-1286 (Slepko

21  11/14/13: "We have to bullshit our way through a lot of what we do and we've been doing

22  it successfully for years! . . . But let's not believe all our own marketing."); *see also* ECF

23  No. 1512 at 83-85) (agreeing that Rimini's "strategy of talking to customers in a way that

24  is bigger than Rimini actually is has worked quite well for Rimini Street" because "the

25  company continues to grow by large amounts year over year").

26       99.     Section 43 of the Lanham Act imposes civil liability against any person or

27  entity who makes a "false or misleading description of fact, or false or misleading

28

representation of fact" "in commercial advertising or promotion which misrepresents the nature, characteristics, or qualities of its or another person or entity's goods, services, or commercial activities." 15 U.S.C. § 1125(a)(1)(B); *see also Agence Fr. Presse v. Morel*, 769 F. Supp. 2d 295, 306-07 (S.D.N.Y. 2011) (stating that Section 43 prohibits misrepresentations of goods through commercial advertising or promotion). (*See also* ECF No. 633 at 21 (ruling on Oracle's motion to dismiss).)

100.    The elements of a claim under Section 43 of the Lanham Act are: "(1) a false statement of fact by the defendant in a commercial advertisement or promotion about its own or another's product; (2) that the statement actually deceived or has the tendency to deceive the consuming public; (3) that the false statement is material, in that it is likely to influence the purchasing decision[s] of the consuming public; (4) that defendant caused its false statement to enter interstate commerce; and (5) that the aggrieved party has been or is likely to be injured as a result of the false statement, either by direct diversion of sales or by a lessening of the goodwill associated with its products." *Skydive Arizona, Inc. v. Quattrocchi*, 673 F.3d 1105, 1110 (9th Cir. 2012). (*See also* ECF No. 633 at 21 (ruling on Oracle's motion to dismiss).)

101.    "To demonstrate falsity within the meaning of the Lanham Act, a plaintiff may show that the statement was literally false, either on its face or by necessary implication," when viewed and analyzed in the statement's full context." *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997) (citation omitted). (*See also* ECF No. 633 at 21.)

102.    Rimini's statements challenged by Oracle were literally false, as established above in the Court's pertinent findings of fact.

103.    In determining whether speech is commercial, a district court considers the three factors set forth by the Supreme Court in *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66-67 (1983): (1) whether the speech was an advertisement; (2) whether the speech refers to a particular product; and (3) whether the speaker has an economic

1  motivation. *See Charles v. City of Los Angeles*, 697 F.3d 1146, 1151 (9th Cir. 2012). A

2  party's representation constitutes commercial advertising when the statement is made

3  "by a defendant who is in commercial competition with plaintiff" and was made "for the

4  purpose of influencing consumers to buy defendant's goods or services." *Rice v. Fox*

5  *Broad. Co.*, 330 F.3d 1170, 1181 (9th Cir. 2003), *overruled on other grounds in Skidmore*

6  *as Tr. for Randy Craig Wolfe Tr. v. Led Zeppelin*, 952 F.3d 1051 (9th Cir. 2020). Further,

7  to be actionable under the Lanham Act, the alleged commercial statements "must be

8  sufficiently disseminated to the relevant purchasing public." *Fashion Boutique of Short*

9  *Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 55 (2d Cir. 2002) (citation omitted). (*See also*

10  ECF No. 633 at 22.)

11      104.   The statements at issue were made by Rimini about its and Oracle's support

12  services to customers and prospective customers by mass-emailing campaigns, standard

13  marketing messaging and talking points, and postings on Rimini's website to persuade

14  prospective customers to switch to Rimini for support services or to persuade current

15  customers to continue receiving support services from Rimini. Therefore, the statements

16  at issue were commercial advertising.

17      105.   Oracle need not prove the deceit and materiality elements under the

18  Lanham Act because Rimini's statements at issue were false. Where an advertisement is

19  demonstrated to be literally false, a plaintiff is entitled to a presumption that the consuming

20  public was deceived or misled by the false statement and that the false statements were

21  material to the consuming public's purchasing decisions. (ECF No. 633 at 21-22.)

22  Regardless, as discussed in the Court's pertinent findings of fact, Rimini's customers and

23  prospective customers were deceived by the statements at issue and those statements

24  were material to the customers' purchasing decisions regarding support services.

25      106.   Rimini caused its false statements to enter into interstate commerce by

26  emailing marketing communications to customers, communicating over phone and email

27

28

1  using Rimini's standard messaging, and posting marketing communications on Rimini's

2  public website.

3      107.   The evidence establishes that Oracle was injured as a result of Rimini's

4  false statements due to the loss of customer support revenue and customer relationships

5  described above in the Court's findings of fact.

6      108.   Rimini's false statements are not privileged under the *Noerr-Pennington*

7  doctrine. *Noerr-Pennington* does not immunize false and misleading statements absent

8  a proven nexus between the communications and the right to petition. *See Spin Master,*

9  *Ltd. v. Brix 'N Clix Co.*, Case No. CV 14–2808 PSG (PLAx), 2014 WL 12597147, at *6

10  (C.D. Cal. Oct. 17, 2014); *W. Sugar Coop. v. Archer-Daniels-Midland Co.*, Case No. CV

11  11-3473 CBM (AJWx), 2015 WL 12683192, at *6 (C.D. Cal. Aug. 21, 2015) (finding *Noerr-*

12  *Pennington* did not apply because "no evidence before the [c]ourt . . . show[ed] that the

13  alleged false or misleading statements were incidental to valid efforts to influence [the

14  party's] position . . . [or] the prosecution of [the present] lawsuit"); *Sosa v. DIRECTV, Inc.*,

15  437 F.3d 923, 938 (9th Cir. 2006). Rimini's statements regarding security do not directly

16  discuss Rimini's litigation with Oracle, so *Noerr-Pennington* does not apply to those

17  statements. And while Rimini's statements that certain support processes and software

18  were no longer in use and that Rimini had nothing in common with TomorrowNow were

19  made in response to litigation-related events, those statements were not part of Rimini's

20  petitioning efforts and they were not incidental to Rimini's efforts to influence Judge Hicks.

21  Rather, they were marketing statements asserting facts about Rimini's support processes

22  aimed at assuaging customer's concerns about litigation events.

23      109.   Rimini's false statements are also not mere non-actionable puffery because

24  each of the statements makes a "specific factual assertion which could be established or

25  disproved" about Rimini or Oracle that is false. *Anunziato v. eMachines, Inc.*, 402 F. Supp.

26  2d 1133, 1141 (C.D. Cal. 2005). Each of the statements at issue makes a specific factual

27

28

1  assertion about Rimini's support processes or Oracle's or Rimini's security offerings that

2  has been disproven by the evidence in this case.

3      110.    Rimini's laches defense is also unavailing. Rimini bases its laches defense

4  on a quotation from Oracle's 2010 complaint stating that "Rimini Street advertises that it

5  can cut customer maintenance and support bills in half and give customers a reprieve

6  from software upgrade cycles by allowing customers to remain on older, often outdated,

7  versions of PeopleSoft, JD Edwards, or Siebel software rather than moving to later

8  versions, and by eliminating fees for fixes and upgrades that customers would otherwise

9  have to pay to remain on the older versions." (ECF No. 1445 at 43, 84-85.) This blanket

10  statement about Rimini's discount business model and support for old versions of

11  software is insufficiently related to Rimini's false and misleading statements discussed

12  above. Rimini's false and misleading statements at issue were not made until years after

13  the quoted statement.

14      **F.    Rimini's Remaining Unfair Competition Law ("UCL") Claim**

15      111.    "In competitor cases, a business practice is 'unfair' only if it 'threatens an

16  incipient violation of an antitrust law, or violates the policy or spirit of one of those laws

17  because its effects are comparable to or the same as a violation of the law, or otherwise

18  significantly threatens or harms competition.'" *Drum v. San Fernando Valley Bar Ass'n.*,

19  182 Cal. App. 4th 247, 254 (Cal. Ct. App. 2010) (quoting *Cel-Tech Commc'ns, Inc. v. L.A.*

20  *Cellular Tel. Co.*, 20 Cal. 4th 163, 187 (Cal. 1999)).

21      112.    Rimini does not claim that any of Oracle's alleged conduct violates the

22  "policy and spirit" of the antitrust laws without also violating the antitrust laws themselves.

23  As such, Rimini must demonstrate an actual or threatened violation of the antitrust laws

24  to demonstrate violation of the UCL. *See Facebook, Inc. v. BrandTotal Ltd.*, Case No. 20-

25  CV-07182-JCS, 2021 WL 3885981, at *6 (N.D. Cal. Aug. 31, 2021) ("Courts have

26  dismissed competitors' claims under this prong of the statute where plaintiffs fail to identify

27  "any 'unusual' aspect of the alleged conduct that would make that conduct something that

28

173

violates the 'policy and spirit' of the antitrust laws without violating the actual laws themselves," comparable to the *Cel-Tech* defendant's "'privileged status as one of two holders of a lucrative government-licensed duopoly.'") (citations omitted).

113.   "[I]f the conduct is deemed reasonable and condoned under the antitrust laws," it is not "unfair" under the UCL. *Chavez v. Whirlpool Corp.*, 93 Cal. App. 4th 363, 375 (Cal Ct. App. 2001).

114.   To establish a violation of the "unfair" prong of the UCL through claims of monopolization, Rimini must demonstrate: (1) possession of monopoly power in the relevant market; (2) willful acquisition or maintenance of that power; and (3) causal antitrust injury. *See Pacific Express, Inc. v. United Airlines, Inc.*, 959 F.2d 814, 817 (9th Cir.), *cert. denied*, 506 U.S. 1034 (1992) (citation omitted). Similarly, under the UCL's "unfair" prong, Rimini must show that Oracle's business practices "caused or were likely to cause substantial injury." *In re Firearm Cases*, 126 Cal. App. 4th 959, 981 (Cal. Ct. App. 2005).

115.   Rimini failed to establish a relevant market, market power exercised by Oracle within that market, or any other anticompetitive conduct by Oracle. Rimini also failed to demonstrate any injury to competition as a whole or likelihood of substantial injury.

### 1.   Relevant Market

116.   Market definition is an essential predicate for any monopolization claim because "[w]ithout a definition of [the] market there is no way to measure [the defendant's] ability to lessen or destroy competition." *Coronavirus Rep. v. Apple Inc.*, Case No. 21-CV-05567-EMC, 2021 WL 5936910, at *6 (N.D. Cal. Nov. 30, 2021), *reconsideration denied*, No. 21-CV-05567-EMC, 2022 WL 307941 (N.D. Cal. Feb. 2, 2022) (quoting *Ohio v. American Express Co.*, 138 S.Ct. 2274, 2285 (2018)) (currently on appeal).

117.   "Failure to identify a relevant market is a proper ground for dismissing a Sherman Act claim." *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063 (9th Cir. 2001)

1    (citation omitted). Failure to identify a relevant market is also grounds for dismissing a

2    UCL "unfair" claim. *See Facebook*, 2021 WL 3885981, at *8-*9.

3        118.    Relevant markets for antitrust purposes have two dimensions: the

4    geographic market and the product market. *See Brown Shoe Co. v. United States*, 370

5    U.S. 294, 324 (1962).

6        119.    The purpose of defining a relevant market is to assist in determining

7    whether a company has market power within that market, *i.e.*, the power to raise prices

8    without inducing customers to turn elsewhere. *See United States v. E. I. Du Pont de*

9    *Nemours & Co.*, 351 U.S. 377, 380, 404 (1956).

10       120.    Rimini was required, but failed, to demonstrate injury to competition in the

11   relevant market as a whole, and not merely injury to itself. *See Cel-Tech*, 20 Cal. 4th at

12   186; *see also Snapkeys, Ltd. v. Google LLC*, 442 F. Supp. 3d 1196, 1210 (N.D. Cal. 2020)

13   (finding the plaintiff "fail[ed] to allege any harm to competition but merely focuses on harm

14   to itself, which is insufficient to state a claim under the 'unfair' prong of the UCL.").

15       121.    Because of Oracle's large market share for the support of Oracle enterprise

16   software, Rimini urges the aftermarket for support of enterprise software as the relevant

17   market. But Rimini failed to demonstrate the existence of a separate and distinct market

18   for support of Oracle software. Instead, all evidence indicates that customers view and

19   consider enterprise software and support as a single product market, with purchasing

20   decisions based upon the total cost of ownership of the software, inclusive of support

21   costs, over time.

22       122.    Further, even assuming licensing and support constitute separate product

23   markets, the market for support of Oracle software is not a relevant antitrust market.

24   Companies that service and support their own products "can be expected to have a very

25   high percentage of the services aftermarket for those products" because these companies

26   know their products best. *SMS Sys. Maint. Servs. v. Dig. Equip. Corp.*, 188 F.3d 11, 16

27   (1st Cir. 1999). As a result, large market share is insufficient and, "[u]nless the evidence

28

1   shows that the manufacturer can exert raw power in the aftermarket without regard for

2   commercial consequences in the foremarket, the aftermarket is not the relevant market."

3   *Id.* at 17.

4       123.   Rimini did not make a showing that Oracle has or can exert monopoly power

5   in the aftermarket for support of Oracle software without consequences in the primary

6   market for licensing that software. As a result, the aftermarket for the support of Oracle

7   software cannot be considered the relevant market in which to assess Oracle's claimed

8   monopoly power. *See SMS Sys. Maint. Servs.*, 188 F.3d at 17-18 (finding relevant market

9   is integrated market of primary equipment and replacement goods and services); *PSI*

10   *Repair Servs., Inc. v. Honeywell, Inc.*, 104 F.3d 811, 819-20 (6th Cir. 1997) (finding the

11   primary market and aftermarket comprise single relevant product market); *Xerox Corp. v.*

12   *Media Scis., Inc.*, 660 F. Supp. 2d 535, 545 (S.D.N.Y. 2009) (finding that, to establish

13   existence of a relevant aftermarket, a plaintiff must proffer "hard evidence dissociating the

14   competitive situation in the aftermarket from activities occurring in the primary market").

15                  *2.*    **Oracle's Pertinent Market Power**

16       124.   Monopoly power is "the power to control prices or exclude competition."

17   *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966) (citations omitted). Monopoly

18   power can be demonstrated either by direct evidence of restricted output and supra-

19   competitive prices or through circumstantial evidence. *See Rebel Oil Co. v. Atl. Richfield*

20   *Co.*, 51 F.3d 1421, 1434 (9th Cir.), *cert. denied*, 516 U.S. 987 (1995). To establish

21   monopoly power through circumstantial evidence, Rimini must: (1) define a relevant

22   market; (2) show that Oracle owns a dominant share of that market; and (3) show that

23   there are significant barriers to entry and that existing competitors lack the capacity to

24   increase their output in the short term. *See id.*

25       125.   Even assuming Rimini's claimed aftermarket for the support of Oracle

26   software could be considered a relevant product market for antitrust purposes, any market

27   power held by Oracle or restraint on competition in that market results from customers'

28

1    agreement to purchase Oracle support for their Oracle software products at the time the

2    software products are licensed.

3            126.   An antitrust claimant cannot rest on market power that arises solely from

4    contractual rights that consumers knowingly and voluntarily agree upon. *See Newcal*

5    *Indus. v. Ikon Office Sol.*, 513 F.3d 1038, 1048-49 (9th Cir. 2008). Stated differently, to

6    be actionable, the complained-of restraints on trade in a claimed aftermarket must not

7    have been disclosed to consumers in advance and they must not have agreed to those

8    restraints voluntarily.

9            127.   In *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1476 (9th Cir.1997), *aff'd sub*

10    *nom. Humana Inc. v. Forsyth*, 525 U.S. 299 (1999), and *overruled on other grounds by*

11    *Lacey v. Maricopa Cnty.*, 693 F.3d 896 (9th Cir. 2012), the Ninth Circuit rejected a

12    plaintiff's claim of monopolization in an "aftermarket" for hospitals used by the defendant

13    insurance company's insureds because "contractual provisions in their insurance

14    policies" dictated such use and the insureds agreed upon these restrictions. *See also*

15    *Apple, Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1200-03 (N.D. Cal. 2008) (finding the

16    defendant failed to plead plausible aftermarket for hardware that could be used with

17    Apple's Macintosh operating system because, by contract, "Apple specifically restricts the

18    use of Mac OS to Apple-labeled computer hardware systems," and "customers, therefore,

19    knowingly agree to the challenged restraint").

20            128.   Here, the evidence shows that Oracle customers are advised of and agree

21    to each of the support policies Rimini claims to be anticompetitive and a reflection of

22    Oracle's claimed market power, including Oracle's MSL policy and policies concerning

23    back support and reinstatement fees. Further, those policies pre-date the existence of

24    competition in Oracle software support. As such, Rimini has failed to establish the

25    existence of any actionable market power in any relevant market. *See PSI Repair Servs.*,

26    104 F.3d at 820 (finding that a plaintiff claiming monopolization in aftermarket for service

27    or replacement parts cannot succeed when defendant did not change its policies after

28

1  retaining customers and the defendant has otherwise been forthcoming about its pricing

2  structure and service policies).

3      129.    Rimini also failed to show the requisite market power exercised by Oracle

4  because Rimini has not shown that Oracle has the power to control prices or exclude

5  competition. *See E.I. Du Pont De Nemours*, 351 U.S. at 391. Rimini claims that it can

6  provide the same level of support as Oracle, if not better, at 50% of the price, and claims

7  to have gained a significant and growing market share from Oracle in the claimed

8  aftermarket. And there are at least two additional, recent entrants to the support market

9  for the Oracle products at issue. There is therefore no evidence that Oracle has been able

10  to exclude competition for support given competition from Rimini, Spinnaker, and others.

11      130.    Rimini's claim that Oracle possesses monopoly power because it refuses

12  to compete on price is also misplaced because it again assumes that the relevant product

13  market is solely the market for support. The evidence shows that Oracle's prices for

14  support are based on license prices and that there is extensive price competition in the

15  market for enterprise software as a whole.

### 3.    Judge Hicks' Pertinent Prior Rulings

17      131.    Under the UCL's "unfair" prong, Rimini must show that Oracle's business

18  practices "caused or were likely to cause substantial injury." *In re Firearm Cases*, 126

19  Cal. App. 4th at 981.

20      132.    Earlier in this litigation, Rimini alleged that Oracle intentionally interfered

21  with Rimini's contractual relations by making false and misleading representations to

22  customers and selectively auditing Rimini customers to harass them and drive them away

23  from Rimini's services. (ECF No. 1253 at 66.)

24      133.    But Judge Hicks held that Rimini failed to prove causation as to its audit-

25  based and misrepresentation-based interference claims. (*Id.* at 67-71.)

26      134.    Judge    Hicks'    prior    finding    alternatively    precludes    Rimini's

27  misrepresentation-based UCL claim, where Rimini must also prove causation as to its

28

1    misrepresentation-based claims. *See Mycogen Corp. v. Monsanto Co.*, 28 Cal. 4th 888,

2    896 (Cal. 2002); *Boeken v. Philip Morris USA, Inc.*, 48 Cal. 4th 788, 797-98 (Cal. 2010).

3                  **4.**      **Unfair or Unreasonable Conduct**

4          135.    Oracle brought its counterclaims in this action, and claims in *Oracle I*, based

5    on a history of copyright violations and misconduct by Mr. Ravin's software support

6    companies. To declare Oracle's conduct as unfair or anticompetitive under California law

7    would mean that Oracle cannot protect its copyrighted software against Mr. Ravin, whose

8    firm TomorrowNow pled guilty to criminal infringement of Oracle's copyrights, whose next

9    firm, Rimini Street, was found liable on summary judgment and by a jury for infringement

10   of Oracle's copyrights and then found in contempt of the *Oracle I* Permanent Injunction

11   protecting Oracle's copyrights, and found on summary judgment in this very case to have

12   engaged in more copyright infringement. No California law condemns Oracle's efforts to

13   protect its copyrighted software.

14         136.    Rimini's expert witness, Mr. Loftus, testified that Oracle's conduct was not

15   normal competitive behavior, but Oracle was reacting to a history of copyright

16   infringement, which Mr. Loftus admitted was not normal competitive behavior. (ECF No.

17   1515 at 76.) Oracle's marketplace conduct and legal actions cannot be considered

18   without the context of Rimini's and Mr. Ravin's past history of copyright infringement.

19                 **5.**      **Lack of Actionably False or Misleading Statements**

20         137.    Alleged misrepresentations to prospective or existing customers are

21   typically not actionable under the UCL's "unfair" prong. *See AlterG, Inc. v. Boost*

22   *Treadmills LLC*, 388 F. Supp. 3d 1133, 1140, 1155-56 (N.D. Cal. 2019) (finding alleged

23   false statements about competitive product designed to "denigrate" competitor insufficient

24   to state a claim under "unfair" prong of UCL; unfair acts "must rise to significantly more

25

26

27

28

1    serious levels than what has been alleged here to sustain a finding of unfairness under

2    the UCL.").

3        138.    To establish any antitrust violation based upon alleged false or misleading

4    statements, Rimini must show that the statements have a "significant and enduring

5    adverse impact on competition itself in the relevant markets," and also overcome a

6    presumption that any effect on competition was de minimis. *Am. Pro. Testing Serv., Inc.*

7    *v. Harcourt Brace Jovanovich Legal & Pro. Publ'ns*, 108 F.3d 1147, 1152 (9th Cir. 1997).

8    To overcome the presumption of de minimis impact, Rimini was required to prove that the

9    statements challenged as false and misleading were "(1) clearly false, (2) clearly material,

10   (3) clearly likely to induce reasonable reliance, (4) made to buyers without knowledge of

11   the subject matter, (5) continued for prolonged periods, and (6) not readily susceptible of

12   neutralization." *Id.* (citation omitted).

13       139.    Rimini failed to establish that any of the challenged statements are clearly

14   false. Many of the challenged statements amount to mere puffery at most, including

15   statements about the legitimacy of the support Rimini provides and that use of Rimini for

16   support exposes customers to legal and security risk. *See Cook, Perkiss & Liehe, Inc. v.*

17   *N. Cal. Collection Serv. Inc.*, 911 F.2d 242, 246 (9th Cir. 1990) (finding that statements

18   implying superior services than those of a competitor are puffery); *Punian v. Gillette Co.*,

19   Case No. 14-CV-05028-LHK, 2016 WL 1029607, at *9 (N.D. Cal. Mar. 15, 2016) (finding

20   claim that product could be trusted, and implication that competitive products could not

21   be trusted, mere puffery).

22       140.    The claimed "false" statements identified by Rimini were also statements of

23   opinion by Oracle representatives regarding Rimini. Such statements are not actionable

24   as false or misleading and are protected by the First Amendment. *See ZL Techs., Inc. v.*

25   *Gartner, Inc.*, 709 F. Supp. 2d 789, 795 (N.D. Cal. 2010) ("An expression of pure opinion

26   is protected by the First Amendment and may not form the basis for a civil lawsuit."); *see*

27   *also Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 731 (9th Cir.

28

1999) (finding non-factual statements not actionable as a matter of law). "A representation is one of opinion if it expresses only [] the belief of the maker, without certainty, as to the existence of a fact . . . ." Restatement (Second) of Torts § 538A (1977).

141.    Still other claimed "false" statements, including those predicting future negative consequences for customers electing to use Rimini support, do not concern any existing or past fact and are therefore not actionable as false and misleading statements. *See Cansino v. Bank of Am.*, 224 Cal. App. 4th 1462, 1469 (Cal. Ct. App. 2014) ("The law is well established that actionable misrepresentations must pertain to past or existing material facts. Statements or predictions regarding future events are deemed to be mere opinions which are not actionable.") (citations omitted).

142.    Oracle's statements challenged by Rimini concerning the prior holdings of this Court in connection with the *Oracle I* litigation are not false, and for the most part either quote or paraphrase this Court's prior orders. Further, the California litigation privilege, Cal. Civ. Code § 47(b), immunizes such statements from liability under the UCL. *See Silberg v. Anderson*, 50 Cal.3d 205, 213 (Cal. 1990) ("The principal purpose of section [47(b)] is to afford litigants and witnesses the utmost freedom of access to the courts without fear of being harassed subsequently by derivative tort actions.") (citations omitted); *Rubin v. Green*, 4 Cal.4th 1187, 1203 (Cal. 1993) (finding that, because conduct alleged by plaintiffs came within the scope of California's litigation privilege, plaintiffs could not use UCL to overcome absolute immunity provided by litigation privilege).

143.    Oracle's statements concerning the litigation with Rimini are also immunized from UCL liability under the *Noerr-Pennington* doctrine. *See UMG Recordings, Inc. v. Glob. Eagle Ent.*, Inc., Case No. CV 14–3466 MMM (JPRx), 2015 WL 12746208, at *19-*20 (C.D. Cal. Oct. 30, 2015) (finding the litigation privilege and *Noerr-Pennington* doctrine bar claims premised upon cease-and-desist letters regarding alleged copyright infringement); *Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991,

1   1007 (9th Cir. 2008) (finding *Noerr-Pennington* precludes claim based on letters sent to

2   customers asserting non-frivolous legal positions).

3       144.   Rimini also failed to demonstrate that the claimed statements were clearly

4   material or likely to induce reasonable reliance by any customer.

5       145.   Rimini also presented no evidence that Oracle's alleged false and

6   misleading statements "continued for prolonged periods" and were "not readily

7   susceptible to neutralization." *Am. Pro. Testing Serv.*, 108 F.3d at 1152.

8       146.   In sum, the Court concludes that Rimini has not established a UCL violation

9   and is therefore not entitled to relief on its UCL claim. In addition, because Rimini's claim

10  for restitution was dismissed on summary judgment, the sole remedy potentially available

11  to Rimini for its claimed violation of the UCL was for injunctive relief. (ECF No. 1253 at

12  74.) Rimini has also failed to demonstrate that it is entitled to injunctive relief for the

13  reasons set forth above. The Court will not enter any injunction in Rimini's favor.

14      **G.    Oracle's Requested Injunctive Relief**

15      147.   The Copyright Act provides that a district court may enter a permanent

16  injunction "on such terms as it may deem reasonable to prevent or restrain infringement

17  of a copyright." 17 U.S.C. § 502(a).

18      148.   The DMCA provides that the court "may grant . . . permanent injunctions on

19  such terms as it deems reasonable to prevent or restrain a [DMCA] violation." 17 U.S.C.

20  § 1203(b)(1); *see also Apple v. Psystar*, 658 F.3d at 1161 ("The DMCA [] provides

21  authority to grant injunctive relief.").

22      149.   Injunctive relief may also be granted under the Lanham Act. *See* 15 U.S.C.

23  § 1116; *see also, e.g., TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820, 829 (9th Cir.

24  2011) ("Courts routinely grant permanent injunctions prohibiting deceptive advertising"

25  under the Lanham Act).

26      150.   Mandatory injunctive relief in the form of corrective advertising is an

27  appropriate remedy for Rimini's false and misleading statements. *See Santos Elecs. Inc.*

28

1  *v. Outlaw Audio, LLC*, Case No. 8:22-cv-00827-JVS-KESx, 2022 WL 18396275, at *10

2  (C.D. Cal. Dec. 12, 2022) (granting preliminary injunction and ordering the defendant to

3  correct false advertisements on its website, advertising material, and third party

4  websites); *Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 264-65 (2d Cir. 2014)

5  (affirming injunction requiring corrective advertising and specifying content of

6  advertisements to be purchased by defendant).

7  151.  "[T]he decision whether to grant or deny injunctive relief rests within the

8  equitable discretion" of the district court. *eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S.

9  388, 394 (2006). Such discretion should be "exercised consistent with traditional

10  principles of equity." *Id.* In determining whether to issue a permanent injunction, courts

11  evaluate four factors: (1) irreparable harm; (2) inadequacy of monetary damages; (3) the

12  balance of hardships; and (4) whether the public interest would be served by a permanent

13  injunction. *See id.* at 391; *see also Oracle I*, ECF No. 1164 at 5. A "permanent injunction

14  should issue when the intervention of the court in equity is essential to protect a party's

15  rights against injuries that could not otherwise be remedied." *Oracle I*, ECF No. 1164 at

16  5 (citing *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)).

17  **1.  Irreparable Harm**

18  152.  When analyzing irreparable harm, courts "regularly examine three main

19  considerations: (1) direct competition between the parties; (2) loss of market share due

20  to the infringement; and (3) loss of customer and business goodwill." *Oracle I*, ECF No.

21  1164 at 5 (citations omitted).

22  153.  Direct competition strongly supports the potential for irreparable harm

23  absent an injunction. *See Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 702

24  F.3d 1351, 1362 (Fed. Cir. 2012); *Open Text, S.A. v. Box, Inc.*, 36 F. Supp. 3d 885, 906

25  (N.D. Cal. 2014) ("In a market where only two parties are directly competing, the potential

26

27

28

1  harm in allowing the defendant to continue its infringing conduct is probably at its

2  greatest").

3      154.   Loss of market share also demonstrates irreparable harm, even where the

4  plaintiff is a large international conglomerate and the defendant is a smaller corporation.

5  *See Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1155-56 (Fed. Cir. 2011)

6  (permanently enjoining "small, domestic corporation" Pylon from infringing "international

7  conglomerate" Bosch's patent because without permanent injunction Bosch would

8  "continue to suffer irreparable harm due to lost market share, lost business opportunities,

9  and price erosion").

10     155.   "Harm resulting from lost profits and lost customer good will is irreparable

11 because it is neither easily calculable, nor easily compensable, and is therefore an

12 appropriate basis for injunctive relief." *eBay, Inc. v. Bidder's Edge, Inc.*, 100 F. Supp. 2d

13 1058, 1066 (N.D. Cal. 2000); *see also Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,

14 240 F.3d 832, 841 (9th Cir. 2001) ("Evidence of threatened loss of prospective customers

15 or goodwill certainly supports a finding of the possibility of irreparable harm.") (citation

16 omitted).

17     156.   In the context of copyright infringement, irreparable harm exists where a

18 defendant "operate[s] their infringing service without the normal licensing restrictions

19 imposed by" the plaintiff because they interfere with the plaintiff's "ability to control the

20 use and transmission of their Copyrighted Works, thereby causing irreparable injury."

21 *Warner Bros. Ent. Inc. v. WTV Sys., Inc.*, 824 F. Supp. 2d 1003, 1012-13 (C.D. Cal. 2011).

22     157.   In entering the Permanent Injunction, Judge Hicks found that Rimini's

23 infringement of Oracle's copyrights "irreparably injured Oracle's business reputation and

24 goodwill." *Oracle I*, ECF No. 1164 at 6. Rimini's continued infringement of Oracle's

25 copyrights during the *Oracle II* litigation has caused similarly irreparable injuries to Oracle.

26     158.   In affirming the Permanent Injunction in pertinent part, the Ninth Circuit

27 affirmed Judge Hicks' finding that Rimini's conduct had a "causal connection" to the

28

1    irreparable harm suffered by Oracle because Oracle and Rimini were direct competitors,

2    Rimini was able to increase its market share by offering lower prices than Oracle, and

3    Rimini's lower prices were possible because Rimini's infringing conduct saved the

4    company time and money. *See Oracle USA, Inc. v. Rimini St., Inc.*, 783 F. App'x 707, 710

5    (9th Cir. 2019). Neither Judge Hicks' finding nor the Ninth Circuit's affirmance required

6    testimony from an expert tying Oracle's irreparable harm to specific customers or

7    quantifying the harm with the particularity required to award monetary damages. Because

8    each of the facts underlying the causation finding from *Oracle I* remain true in *Oracle II*,

9    Oracle has sufficiently established a causal connection warranting an injunction in this

10   case notwithstanding Rimini's criticisms of Mr. Pinto's analysis.

11        159.   First, as set forth above and previously held by Judge Hicks, Oracle and

12   Rimini are direct competitors. *See Oracle I*, ECF No. 1164 at 6 ("it is undisputed (and has

13   been repeatedly acknowledged by the parties) that Oracle and Rimini Street directly

14   compete with each other to provide after-license software support services to customers

15   that license Oracle's copyrighted software."); *Douglas Dynamics, LLC v. Buyers Products

16   Co.*, 717 F.3d 1336, 1344-45 (Fed. Cir. 2013) (reversing district court's finding of no

17   irreparable harm: "Where two companies are in competition against one another, the

18   patentee suffers the harm—often irreparable—of being forced to compete against

19   products that incorporate and infringe its own patented inventions").

20        160.   Second, Rimini's continued infringement has adversely impacted Oracle's

21   market share. The situation here is the same as was the case with Rimini's earlier

22   copyright infringement. "By offering cut-rate prices on its own services, generally at a

23   discount of 50% of Oracle's prices for similar service contracts, Rimini Street gained

24   increasing market share and growth." *Oracle I*, ECF No. 1164 at 6.

25        161.   Rimini's discounted support offering of at least 50% and up to 99% off of

26   Oracle's support pricing—enabled at least in part by Rimini's infringement—was a key

27   factor driving customers to terminate Oracle support and contract with Rimini, and absent

28

1   that discounted support offering, a significant number of customers that left Oracle for

2   Rimini would have remained with Oracle.

3       162.   In *WTV Systems*, the defendants were "able to offer their services at

4   significantly lower prices" because they "pay no licensing fees to Plaintiffs and do not

5   incur the costs necessary to comply with Plaintiffs' quality controls or security measures."

6   824 F. Supp. 2d at 1013. And indeed that court's finding of irreparable injury to plaintiffs

7   was predicated upon the defendants' admission "that the technology they use to provide

8   their service is 'scalable . . . to support millions of customers,'" which demonstrated that

9   the defendant's conduct caused a loss of revenue to the plaintiff that was "already

10  significant" and "will continue to increase." *Id.*

11      163.   The same is true here. Rather than developing update files "from scratch in

12  each client's environment," which "would take additional resources," Rimini creates RSI

13  "one code for all files" so that it can develop at scale.

14      164.   Because Rimini's "significantly lower prices"—enabled by scalability

15  achieved through infringing conduct—have caused customers to leave Oracle, thereby

16  decreasing Oracle's market share, the Court finds Rimini's conduct has irreparably

17  harmed Oracle. *See Oracle I*, ECF No. 1164 at 6-7; *WTV Systems*, 824 F. Supp. 2d at

18  1012-14.

19      165.   Third, Rimini's conduct has caused Oracle to lose prospective customers

20  and goodwill. *See Am. Rena Int'l Corp. v. Sis-Joyce Int'l Co.*, 534 F. App'x 633, 636 (9th

21  Cir. 2013) ("The district court also did not abuse its discretion in finding that irreparable

22  harm will likely result in the absence of preliminary injunction relief. [Plaintiff] has provided

23  evidence of threatened loss of customers or goodwill, and pointed to a wide range of

24  intangible injuries, such as damage to ongoing recruitment efforts and goodwill, likely to

25  result—and already resulting—from [Defendant's] infringing practices"); *Celsis in Vitro,*

26  *Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012) ("As the district court

27  explained: 'There is no effective way to measure the loss of sales or potential growth—to

28

1  ascertain the people who do not knock on the door or to identify the specific persons who

2  do not reorder because of the existence of the infringer'"). Rimini has continued to build

3  and operate its business based on copyright infringement. It is indeed stipulated that 489

4  customers, many who were Oracle customers as to multiple software products, left Oracle

5  for Rimini's infringing business through February 28, 2018. (ECF No. 1466.)

6    166.   Further, by continuing to "purport[] to offer vendor-level support at half the

7  price of Oracle support, Rimini Street created the impression that Oracle was

8  overcharging for support and eroded the bonds and trust that Oracle has with its

9  customers." *Oracle I*, ECF No. 1164 at 7; *see also* ECF No. 1507 at 90-91 (testifying that

10  Rimini's conduct has "had an incredibly detrimental impact on" Oracle because not only

11  does Rimini take Oracle's customers while infringing on Oracle's rights, "but they also tell

12  our customers that we're pretty much overcharging them for their support agreement, and

13  they break that relationship" between Oracle and its customers, who "would have both

14  bought support from" Oracle "in subsequent years, or potentially bought new products,

15  totally different products from us over the future."). *See also Am. Broadcasting Cos., Inc.

16  v. Aereo, Inc.*, 874 F. Supp. 2d 373, 398 (S.D.N.Y. 2012), *aff'd sub nom. WNET v. Aereo,

17  Inc.*, 712 F.3d 676, 696 (2d. Cir. 2013), *rev'd on diff. grounds sub nom. Am. Broadcasting

18  Cos., Inc. v. Aereo, Inc.*, 134 S. Ct. 2498 (2014) (stating that harm to ability to negotiate

19  "has been accepted as irreparable based, at least in part, on the difficulty of proving or

20  quantifying such damages"). "Such injuries to a business' reputation and goodwill have

21  consistently been held to constitute irreparable harm." *Oracle I*, ECF No. 1164 at 7 (citing

22  *Apple Inc. v. Psystar Corp.*, 658 F.3d at 1154).

23    167.   Rimini argued that there can be other causes of Oracle losing customers,

24  but that is insufficient to disprove that Oracle has suffered irreparable harm here. *See

25  Am. Rena Int'l Corp.*, 534 F. App'x at 636 ("Even if [Plaintiff's] bad business practices

26  contributed in some part to its decline in business, the district court did not clearly err in

27  finding that [Defendant's] actions, too, have significantly contributed to [Plaintiff's] loss of

28

187

business"). Even Rimini's expert Mr. Orszag did his own adjustments with what Rimini called a "more accurate percentage" of Oracle's lost customers and concluded that after his adjustments, "that would leave 8 percent [of Rimini customers] that would stay at Oracle or return to Oracle." (ECF No. 1513 at 111-12.) This alone would have been a significant loss of market share for Oracle. Mr. Pinto's base of Rimini customers for his calculations was 955 customers with 1,353 contracts (ECF No. 1512 at 173), eight percent of which would be 76 customers and 108 contracts. Lost customers and market share of this magnitude unquestionably have value. Mr. Orzsag testified at trial that when he estimated damages for Rimini's dismissed damages claims that he estimated the value of 143 lost customers to Rimini at $243 million. (ECF No. 1513 at 153-54.)

168.    Based solely on Rimini's continued infringement of Oracle's copyrights, the Court finds that this factor again weighs in favor of a permanent injunction. *See Oracle I*, ECF No. 1164 at 7.

169.    The Court also finds that Rimini's thousands of DMCA violations—in which Rimini removed Oracle copyright notices from files that it has continued to distribute to customers—further contributed to the irreparable injury of Oracle's business reputation and goodwill. These DMCA violations harmed Oracle by allowing Rimini to "leverage" Oracle-written and copyrighted code for its own support purposes and pass off Oracle-written code as its own.

170.    Rimini's false statements to existing Rimini customers and Oracle customers, and resulting Lanham Act violations, also caused Oracle irreparable injury to its business reputation and goodwill. By making false statements about security, the infringing nature of its support practices, and the difference between its ongoing support practices and those at issue in *Oracle I* and at TomorrowNow, Rimini caused customers to contract with Rimini rather than Oracle for support.

### 2.    Inadequacy of Monetary Damages

171.   "One of the most fundamental rights a copyright holder has is the right to exclude others from taking and distributing the copyrighted work and this right has routinely been held difficult to compensate solely through monetary compensation." *Oracle I*, ECF No. 1164 at 8 (citation omitted).

172.   Where a copyright infringement plaintiff suffers "intangible injuries difficult to quantify and compensate," such as "lost market share and company goodwill," monetary damages are inadequate compensation. *Oracle I*, ECF No. 1049 at 6-7 (citing *Apple v. Psystar*, 658 F.3d at 1154).

173.   "Even if Plaintiffs chose to forgo a damages award," the Court may find that monetary damages would be inadequate where "the amount of infringement that [defendant] could induce in the future is so staggering that the recoverable statutory damages would very probably be well beyond [defendant's] anticipated resources." *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d 1197, 1217 (C.D. Cal. 2007) (granting permanent injunction notwithstanding that plaintiffs did not provide specific evidence that defendant would "be unable to pay damages for the infringements it has induced in the past, and could continue to induce in the future").

174.   Oracle has shown that monetary damages are an inadequate remedy for Rimini's copyright infringement or for Rimini's violations of the DMCA and Lanham Act. As with *Oracle I*, the harms that Oracle suffered because of Rimini's conduct such as "lost market share and erosion of company goodwill are intangible injuries difficult to quantify and compensate which supports the issuance of a permanent injunction." *Oracle I*, ECF No. 1164 at 7; *see also Apple v. Psystar*, 673 F. Supp. 2d at 949 (stating that injuries to a business' reputation and company goodwill are intangible injuries difficult to quantify and compensate), *aff'd* 658 F.3d at 1154.

175.   Moreover, any monetary damages would not prevent Rimini from continuing to infringe Oracle's copyrights and violate the DMCA and Lanham Act in the future. *See Oracle I*, ECF No. 1049 at 6 ("Rimini's claim that it no longer engages in the conduct

1   adjudged by the court and jury to infringe Oracle's copyrights is not a basis to deny

2   issuance of an injunction."); *Oracle I*, ECF No. 1164 at 7 (same); *Grokster*, 518 F. Supp.

3   2d at 1222 ("A private party's discontinuation of unlawful conduct does not make the

4   dispute moot, however. An injunction remains appropriate to ensure that the misconduct

5   does not recur as soon as the case ends.").

6       176.   To the contrary, Rimini's connection to TomorrowNow, Judge Hicks'

7   summary judgment rulings and the jury's infringement verdict in *Oracle I*, the infringement

8   findings articulated above, and Judge Hicks' January 2022 order in *Oracle I* finding Rimini

9   in contempt for multiple and willful violations of the Permanent Injunction together

10  underscore that Rimini is a recidivist infringer.

11      177.   Rather than discontinuing its use of customer software environments found

12  to be infringing in *Oracle I*, Rimini took those exact same environments and migrated

13  them to its customers so that Rimini could continue to use them for further development

14  and testing of updates.

15      178.   Rather than discontinuing the cross-use that Rimini understood constituted

16  infringement after *Oracle I*—*i.e.*, prototyping fixes and updates in one customer

17  environment and distributing them to other customers—Rimini continued this conduct, as

18  recognized by Judge Hicks in his finding of contempt for violating the Permanent

19  Injunction. *See Oracle I*, ECF No. 1548 at 26, 30.

20      179.   Despite over 13 years of litigation between the parties and entry of the

21  Permanent Injunction, it is clear that Rimini's claim that it has ceased its infringing conduct

22  is not true. This litigation history further demonstrates that legal remedies are inadequate

23  to compensate for the injuries that Oracle has suffered, and will likely continue to suffer,

24  as a result of Rimini's illegal acts, and "an injunction remains appropriate to ensure that

25  the misconduct does not recur." *Grokster*, 518 F. Supp. 2d at 1222. Indeed, Rimini

26  expressed a desire to continue engaging in infringing activities, including Mr. Ravin's

27

28

1   desire to use CodeAnalyzer in the future with PeopleSoft, along with Mr. Mackereth's

2   claim that Rimini must copy JD Edwards source code to provide JD Edwards support.

3       180.   Finally, and as with *Oracle I*, the Court finds that copyright infringement

4   damages in this action would have been "uniquely complex and difficult to determine,"

5   rendering it difficult for a jury to arrive at an award that would have been sufficient to

6   compensate Oracle for Rimini's infringement of its copyrights and violations of the DMCA

7   and Lanham Act. *Oracle I*, ECF No. 1164 at 7-8.

8       181.   In sum, this factor also weighs in favor of issuing a permanent injunction.

9           **3.**   **Balance of Hardships**

10       182.   "Generally, the balance of hardships tips in favor of a holder of a copyright

11   seeking to protect its copyrighted works, especially when the party to be enjoined does

12   not have a separate legitimate business purpose for continuing the conduct or acts

13   deemed to be infringement." *Oracle I*, ECF No. 1164 at 8-9; *see also Oracle I*, ECF No.

14   1049 at 7-8 (citing *Grokster*, 518 F. Supp. 2d at 1220); *SATA GmbH & Co. KG v. USA*

15   *Italco Int'l Ltd.*, 2019 WL 4601513, at *6 (D. Nev. Sept. 20, 2019) ("The Court finds no

16   hardships that Defendants would endure besides being compelled to cease their unlawful

17   conduct. But without an injunction, SATA will continue to be harmed because Defendants

18   are likely to continue to infringe on SATA's marks and designs.").

19       183.   Here, the balance of hardships tips in Oracle's favor because Oracle is the

20   copyright holder seeking to protect its copyrighted works. (ECF No. 1507 at 70, 90 ("it's

21   absolutely critical that we defend our rights, and we have consistently, and they continue

22   to infringe on our copyrights against us").) Moreover, permanent injunctive relief as to

23   those Rimini acts that have been adjudicated unlawful as part of the trial is necessary to

24   adequately protect and enforce Oracle's copyrights, which are significantly important to

25   Oracle's business. Injunctive relief is particularly warranted because although Rimini

26   claims to have changed its "whole business" to be "fully compliant with the Court's orders

27   and findings" in *Oracle I* (ECF No. 1503 at 244-45), the evidence demonstrates that

28

Rimini's Process 2.0 practices reflect an alternative method of engaging in the same infringing conduct years after Judge Hicks held that it was unlawful.

184.   Further, Rimini does not have a separate legitimate business purpose for continuation of its infringing acts, and it can lawfully provide support services by redesigning its infringing processes such that it completes PeopleSoft development either from scratch in each client's environment without using materials created while doing development in another client's environment, or using technical specifications that contain no more than de minimus amounts of Oracle's copyrighted materials, and by doing development work manually rather than by using Rimini's automated tools. (ECF No. 1506 at 3-7, 85-86, 90-91; *see also* P-1276 at 2.) Rimini may complain of the additional cost required to do development work in a noninfringing manner, but "neither commercial success, nor sunk development costs, shield an infringer from injunctive relief." *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 863 (Fed. Cir. 2010), *aff'd*, 564 U.S. 91; *see also id.* ("Similarly irrelevant are the consequences to [Rimini] of its infringement, such as the cost of redesigning [its] infringing [processes].").

185.   Rimini has also known, since at least the post-Permanent Injunction contempt proceedings in *Oracle I*, that further equitable relief would be warranted at the conclusion of this case. During the briefing on Oracle's motion for an order to show cause as to why Rimini should not be held in contempt for violating the Permanent Injunction, Rimini repeatedly argued that an order to show cause should not issue as to certain of its conduct that the parties were litigating in *Oracle II*. While Judge Hicks agreed with Rimini, in part, Judge Hicks nonetheless made clear that further injunctive and equitable relief would be appropriate should Oracle prevail on those *Oracle II* copyright infringement disputes. *See Oracle I*, ECF No. 1458 at 46; *see also Oracle I*, ECF No. 1476 at 2 ("If Oracle wishes to rely on the Court's reasoning for additional contempt motions in the future, it may do so at that time."). In addition, in his January 12, 2022, contempt order, Judge Hicks declined to hold Rimini in contempt for certain conduct because issues

1   pertinent to that conduct was actively being litigated in *Oracle II*. *See Oracle I*, ECF No.

2   1548 at 41-52. Those rulings apprised Rimini of the need for further injunctive and

3   equitable relief if Oracle were to prevail upon those issues at the conclusion of the *Oracle*

4   *II* trial. And for the most part, Oracle did.

5   186.   In addition, Rimini's unresponsiveness to Judge Hicks' prior orders as

6   extensively described above further tips the balance of hardships in Oracle's favor. This

7   factor also favors granting Oracle a permanent injunction.

8   **4.   Public Interest**

9   187.   "[I]t is virtually axiomatic that the public interest can only be served by

10  upholding copyright protections and, correspondingly, preventing the misappropriation of

11  the skills, creative energies, and resources which are invested in the protected work." *See*

12  *Apple Computer, Inc. v. Franklin Computer Corp.*, 714 F.2d 1240, 1255; *Reflex Media,*

13  *Inc. v. SuccessfulMatch.com*, Case No. 2:18-cv-00259-GMN-EJY, 2020 WL 8459143, at

14  *11 (D. Nev. Dec. 29, 2020) ("the public interest is served with a permanent injunction

15  when holders of a mark are protected against 'increased infringement'"), *recommendation*

16  *adopted in Reflex Media, Inc. v. Successfulmatch.com*, Case No. 2:18-cv-00259-GMN-

17  EJY, 2021 WL 240816 (D. Nev. Jan. 22, 2021). Accordingly, the public interest also

18  weighs in favor of a permanent injunction.

19  188.   The Court concludes that further permanent injunctive relief prohibiting the

20  Rimini acts that have been adjudicated infringing as part of this trial "strikes a workable

21  balance between protecting [Oracle's] rights and protecting the public from the

22  injunction's adverse effects." *i4i*, 598 F.3d at 863.

23  189.   In addition, a permanent injunction preventing continued infringing acts

24  under the Copyright Act and DMCA serves the public interest by ensuring that "the public

25  will continue to benefit from the creative fruits of [Oracle's] labor." *Apple v. Psystar*, 673

26  F. Supp. 2d at 950, *aff'd*, 658 F.3d 1150. The public interest also "favors restraining the

27  publication of false and misleading statements, especially as widespread as is possible

28

1    on the internet." *Al Muderis v. Hernandez*, Case No. 2:19-cv-01002-APG-DJA, 2022 WL

2    43869, at *5 (D. Nev. Jan. 5, 2022). "It is self evident that preventing false or misleading

3    advertising is in the public interest in general." *PBM Prods., LLC v. Mead Johnson & Co.*,

4    639 F.3d 111, 127 (4th Cir. 2011) (affirming grant of permanent injunction).

### 5.    Scope of Injunctive Relief

6        190.    Oracle included a proposed injunction and final disposition order along with

7    its post-trial proposed findings of fact and conclusions of law. (ECF No. 1524-9.) The

8    Court used that proposed injunction as a starting point for the permanent injunction that

9    will issue concurrently but separately from this order, but does not adopt it in its entirety.

10   The Court explains below the most significant ways in which the permanent injunction

11   that the Court issues in this case differs from Oracle's proposed injunction.

12       191.    And as noted, the Court denied Rimini's motion to submit more objections

13   than it already did to Oracle's proposed injunction. (ECF No. 1529.) The Court finds it

14   does not need any further briefing to craft an injunction equitably tailored to its findings

15   above.

16       192.    To start, the Court will omit from the injunction Oracle's proposed sections

17   regarding EBS and JDE because the Court found Oracle did not meet its burden to

18   establish copyright infringement as to those products.

19       193.    The Court next notes that Oracle's proposed injunction did not include a

20   section addressing Database. While the Court found copyright infringement above as to

21   Database, the Court will not include any restrictions specifically regarding Database in its

22   permanent injunction because Oracle did not ask for any.

23       194.    In addition, because the Court found above that Rimini may support Oracle

24   products through the use of technical specifications (provided there is no direct

25   distribution, copying-and-pasting of more than de minimus content, use of automated

26   tools, removal of copyright management information, or violation of Judge Hicks' prior

27   orders occurring) without infringing Oracle's copyrights the Court strikes all provisions

28

from Oracle's proposed injunction apparently drafted to prohibit Rimini from drafting and using technical specifications to support its customers.

195.    The Court also declines to order Rimini to deliver all of its computers and storage media that Rimini has used to provide support for Oracle products to its customers to a third party escrow service—as Oracle requests—and will instead order Rimini to permanently delete all environments, files, updates, and automated tools the Court has found infringing in this order. Impoundment of the presumably thousands of computers, hard drives, etc. that Rimini uses to supports its Oracle software customers is an extreme and unnecessary remedy given the mandatory prohibitions the Court will include in the permanent injunction, along with the provisions the Court includes requiring deletion of infringing materials. Rimini must also certify in writing within 60 days of the date of entry of this order that it has permanently deleted all environments, updates, files, and automated tools that the Court has found infringing in this order. Moreover, the Court also grants Oracle leave to file a motion renewing its request for an impoundment remedy if it credibly suspects Rimini is not complying with the terms of the permanent injunction. These enforcement provisions accomplish similar goals to Oracle's proposed impoundment remedy but in a less extreme manner.

196.    Similarly, and relatedly, the Court declines to appoint a special master to oversee Rimini's compliance with the injunction at this time. The Court expects Rimini to comply with the terms of the injunction and therefore no monitoring or ongoing discovery should be necessary. But the Court's denial of Oracle's request for a special master and ongoing discovery is without prejudice to renewal if later motion practice indicates it is necessary.

197.    But the Court will grant Oracle's request for corrective advertising regarding Oracle's Lanham Act claims. As the Court found above, Rimini and Mr. Ravin made numerous false statements to customers and prospective customers about Rimini's practices, whether they infringe Oracle's rights, and the relative security of staying with

1   Oracle support versus switching to Rimini. As also stated in the injunction, Rimini must

2   file with the Court "a report in writing under oath setting forth in detail the manner and

3   form in which the defendant has complied with the injunction" within 60 days of the date

4   of entry of this order. 15 U.S.C. § 1116(a).

5          198.   That brings the Court to an important point. The Court included extensive

6   findings above regarding Mr. Ravin's direct involvement in Rimini's infringing practices

7   and false statements even though Oracle dropped its damages claims pre-trial to support

8   its finding that the injunction also applies to Mr. Ravin. As written, the permanent

9   injunction applies with full force to Mr. Ravin. Because of the Court's pertinent findings

10  regarding his extensive involvement with infringing practices and the false statements at

11  issue in this case, the Court expects Mr. Ravin to personally ensure compliance with the

12  Court's permanent injunction throughout Rimini. The Court will hold Mr. Ravin

13  accountable along with Rimini if it finds any future violations of the injunction it is entering

14  concurrently with this order. To be clear, this means both Mr. Ravin and Rimini could be

15  subject to appropriate sanctions, monetary or otherwise, in the event the Court finds

16  noncompliance with its permanent injunction going forward.

17  **V.    CONCLUSION**

18         The Court notes that the parties made arguments and cited cases not discussed

19  above. The Court has reviewed these arguments and cases, and has determined they do

20  not materially affect the outcome of this case.

21         It is therefore ordered that Oracle mostly prevails—as specified herein—on its

22  claims arising under the Copyright Act.

23         It is further ordered that Oracle prevails—as specified herein—on its claims arising

24  under the DMCA.

25         It is further ordered that Oracle prevails—as specified herein—on its claims arising

26  under the Lanham Act.

27  ///

28
                                            196

1   It is further ordered that Rimini is immediately and perpetually subject to the
2   permanent injunction entered concurrently with, but separately from, this order.

3   It is further ordered that Rimini must file the written certifications required by this
4   order and the permanent injunction within 60 days of their date of entry.

5   It is further ordered that, consistent with this and Judge Hicks' prior orders in this
6   case, Rimini is entitled to a declaration of non-infringement as to its EBS support
7   processes to the extent Rimini exclusively uses technical specifications to support EBS
8   customers, does not use any automated tools, and its EBS support processes do not
9   otherwise violate Judge Hicks' prior orders. The Court so declares. But Rimini does not
10  otherwise prevail on any of the claims it raised in this case.

11  The Clerk of Court is directed to enter judgment accordingly and close this case.

12  DATED THIS 24th Day of July 2023.

15  MIRANDA M. DU
    CHIEF UNITED STATES DISTRICT JUDGE